**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-1575

ERIC COOMER, Ph.D.,
      Plaintiff

v.

PATRICK BYRNE, STEVEN LUCESCU, and
THE AMERICA PROJECT, INC., a Florida non-profit corporation,
      Defendants

---

**PLAINTIFF'S OMNIBUS RESPONSE TO ALL DEFENDANTS'
MOTIONS TO DISMISS PURSUANT TO F.R.C.P. 12(b)(2), 12(b)(3), AND 12(b)(6)**

---

Respectfully submitted,

Charles J. Cain, No. 51020
ccain@cstrial.com
Bradley A. Kloewer, No. 50565
bkloewer@cstrial.com
**Cain & Skarnulis PLLC**
P. O. Box 1064
Salida, Colorado 81201
719-530-3011/512-477-5011 (Fax)

Thomas J. Rogers III, No. 28809
trey@rklawpc.com
Mark Grueskin, No. 14621
mark@rklawpc.com
**RechtKornfeld PC**
1600 Stout Street, Suite 1400
Denver, Colorado 80202
303-573-1900
**ATTORNEYS FOR PLAINTIFF**

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ........................................................................................... i

INDEX OF AUTHORITIES .................................................................................. iii

I.    INTRODUCTION ...........................................................................................1

II.    STATEMENT OF FACTS ..............................................................................1

RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS FOR LACK OF
JURISDICTION PURSUANT TO F.R.C.P. 12(b)(2) AND MOTIONS FOR CHANGE OF
VENUE PURSUANT TO F.R.C.P. 12(b)(3) ...................................................................9

I.    STANDARD OF REVIEW ............................................................................9

II.    AGUMENT ....................................................................................................11

      A.    Defendants have minimum contacts with Colorado ...............................13

            i.    Defendants published and distributed the Film in Colorado ....................14

            ii.    Defendants purposefully availed themselves to the state of Colorado under the harmful effects framework ..........................................................20

            iii.    Defendants purposefully availed themselves of the state of Colorado under the market exploitation framework ...................................................31

            iv.    Defendants' contacts with Colorado gave rise to this litigation ...............36

      B.    Exercising personal jurisdiction over Defendants' does not offend traditional notions of fair play or substantial justice .............................................37

RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS PURSUANT TO F.R.C.P. 12(b)(6) ..................................................................................38

I.      LEGAL STANDARD..............................................................................38

II.     AGUMENT..............................................................................................39

        A.      Dr. Coomer has stated a claim for defamation ....................................39

                i.      Defendants published the Film ..................................................40

                ii.     Dr. Coomer's private conduct was not a matter of public concern and, therefore, he must only show negligence ...........................................43

                iii.    Even were Dr. Coomer's conduct a matter of public concern, he has alleged actual malice..................................................................45

                iv.     Defendants' statements are not protected statements of opinion...............49

                v.      The Communications Decency Act does not immunize TAP from liability ............................................................................51

        B.      Dr. Coomer has stated a claim for intentional infliction of emotional distress ......................................................................................52

        C.      Dr. Coomer has stated a claim for unjust enrichment...........................56

        D.      Dr. Coomer has stated a claim for civil conspiracy .............................58

CONCLUSION.......................................................................................60

PRAYER..............................................................................................60

CERTIFICATE OF SERVICE ....................................................................61

# INDEX OF AUTHORITIES

**CASES**                                                                 **Page**

*ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*,
    293 F.3d 707 (4th Cir. 2002) .............................................................23, 27, 28

*Anderson v. Colo. Mountain News Media, Co.*,
    2019 WL 6888275 (D. Colo. Dec. 18, 2019)...................................................55

*Annie Oakley Enters., Inc. v. Sunset Tan Corp. & Consulting, LLC*,
    703 F.Supp. 2d 881 (N.D. Ind. 2010) ...........................................................34

*Anzures v. Flagship Rest. Grp.*,
    819 F.3d 1277 (10th Cir. 2016) .....................................................................29

*Archangel Diamond Corp. v. Lukoil*,
    123 P.3d 1187 (Colo. 2005).................................................................. *passim*

*Archer v. Farmer Bros. Co.*,
    70 P.3d 495 (Colo. App. 2002), *aff'd*, 90 P.3d 228 (Colo. 2004)....................53

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)........................................................................................38

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)........................................................................................38

*Benton v. Cameo Corp.*,
    375 F.3d 1070 (10th Cir. 2004) .....................................................................13

*Bochan v. La Fontaine*,
    68 F.Supp. 2d 692 (E.D. Va. 1999) ...............................................................30

*Bridgeport Music v. Still N the Water Publishing*,
    327 F.3d 472 (6th Cir. 2003) .........................................................................19

*Bristol-Myers v. Superior Ct. of Cal., San Francisco Cnty.*,
    137 S.Ct. 1773 (2017)...............................................................................14, 32

*Brown v. Petrolite Corp.*,
    965 F.2d 38 (5th Cir. 1992) ...........................................................................47

*Burger King Corp. v. Rudzewicz,*
    471 U.S. 462 (1985)............................................................................13, 37

*Burns v. McGraw-Hill Broad. Co.,*
    659 P.2d 1351 (Colo. 1983).............................................29, 47, 49, 50

*Busch v. Viacom Int'l, Inc.,*
    477 F.Supp. 2d 764 (N.D. Tex. 2007) ..................................................34

*C5 Med. Werks, LLC v. CeramTec GMBH,*
    937 F.3d 1319 (10th Cir. 2019) ............................................................29

*Cablevision of Breckenridge, Inc. v. Tannhauser Condominium Ass'n,*
    649 P.2d 1093 (Colo. 1982)..................................................................57

*Calder v. Jones,*
    465 U.S. 783 (1984)..........................................................16, 22, 23, 24

*Card v. Blakeslee,*
    937 P.2d 846 (Colo. App. 1996) ...........................................................15

*Celle v. Filipino Rep. Enters., Inc.,*
    209 F.3d 163 (2d Cir. 2000)...................................................................46

*Colo'n v. Akil,*
    449 Fed. Appx. 511 (7th Cir. 2011) .......................................................18

*DCB Const. Co., Inc. v. Central City Dev. Co.,*
    965 P.2d 115 (Colo. 1998)....................................................................57

*Dental Dynamics, LLC v. Jolly Dental Grp., LLC,*
    946 F.3d 1223 (10th Cir. 2020) ............................................................26

*DiLeo v. Koltnow,*
    613 P.2d 318 (Colo. 1980).....................................................................44

*Diversified Mgmt., Inc. v. Denver Post, Inc.,*
    653 P.2d 1103, 1107 (Co. 1982)..............................................44, 45, 46

*Does v. Rodriquez,*
    2007 WL 684117 (D. Colo. Mar. 2, 2007) ...........................................57

*Donaldson v. Am. Banco Corp. Inc.,*
    945 F.Supp. 1456 (D. Colo. 1996).........................................................54

*Dorsey & Whitney LLP v. RegScan, Inc.*,
    488 P.3d 324 (Colo. App. 2018) ...................................................................28

*EarthInfo, Inc. v. Hydrosphere Res. Consultants, Inc.*,
    900 P.2d 113, 119 (Colo. 1995) ..................................................................58

*Ellis v. Buckley*,
    790 P.2d 875 (Colo. App. 1990) ..................................................................54

*Employers Mut. Cas. Co. v. Bartile Roofs, Inc.*,
    618 F.3d 1153 (10th Cir. 2010) ...................................................................10

*Enigma Software Grp. USA, LLC v. Beeping Computer LLC*,
    194 F.Supp. 3d 263 (S.D.N.Y. 2016)............................................................45

*Eramo v. Rolling Stone, LLC*,
    209 F.Supp. 3d 862 (W.D. Va. 2016) ......................................................46, 47

*F.T.C. v. Accusearch Inc.*,
    570 F.3d 1187 (10th Cir. 2009) ...................................................................52

*Far W. Cap., Inc. v. Towne*,
    46 F.3d 1071 (10th Cir. 1995) ................................................................25, 30

*First of Michigan Corp. v. Bramlet*,
    141 F.3d 260 (6th Cir. 1998) .......................................................................11

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
    141 S.Ct. 1017 (2021).......................................................................28, 32, 36

*Fresenius Kabi USA, LLC v. Custopharm, Inc.*,
    2021 WL 651022 (D. Colo. Feb. 19, 2021) .................................................10

*Giduck v. Niblett*,
    408 P.3d 856 (Colo. App. 2014).......................................................28, 35, 59

*Gilmore v. Jones*,
    370 F.Supp. 3d 630 (W.D. Va. 2019) ...............................................30, 31, 47

*Gognat v. Ellsworth*,
    224 P.3d 1039 (Colo. App. 2009) ................................................................59

*Gordon v. Boyles*,
    99 P.3d 75 (Colo. App. 2004) ........................................................................39

*Graymore, LLC v. Gray*,
    2007 WL 1059004 (D. Colo. Apr. 6, 2007)...........................................11, 38

*Gubarev v. Buzzfeed, Inc.*,
    253 F.Supp. 3d 1149 (S.D. Fla. 2017) ........................................................34

*Gulf Ins. Co. v. Glasbrenner*,
    417 F.3d 353 (2nd Cir. 2005)......................................................................11

*Gwynn v. TransCor America, Inc.*,
    26 F.Supp. 2d 1256 (D. Colo. 1998).........................................................11

*Han Ye Lee v. Colorado Times, Inc.*,
    222 P.3d 957 (Colo. App. 2009).................................................53, 54, 55

*Harris Group, Inc. v. Robinson*,
    209 P.3d 1188 (Colo. App. 2009)...............................................................58

*Harris v. City of Seattle*,
    152 Fed. App'x 565 (9th Cir. 2005) ..........................................................47

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
    491 U.S. 657 (1989).............................................................29, 45, 46

*Hawbecker v. Hall*,
    88 F.Supp. 3d 723 (W.D. Tex. 2015)........................................................30

*Humphrey v. O'Connor*,
    940 P.2d 1015 (Colo. App. 1996) ..............................................................57

*Hustler Mag., Inc. v. Falwell*,
    485 U.S. 46 (1988).......................................................................................55

*Int'l Shoe Co. v. Wash.*,
    326 U.S. 310 (1945).............................................................................11, 36

*Jankovic v. Int'l Crisis Grp.*,
    822 F.3d 576 (D.C. Cir. 2016) ............................................................29, 46

*John E. Reid and Assocs., Inc. v. Netflix, Inc.*,
    2020 WL 1330657 (N.D. Ill. Mar. 23, 2020).................................16, 17, 18

*Jones v. Dirty World Ent. Recordings, LLC*,
    766 F.Supp. 2d 828 (E.D. Ky. 2011) ...........................................................30

*Keefe v. Kirschenbaum & Kirschenbaum, P.C.*,
    40 P.3d 1267 (Colo. 2002) ...........................................................................11

*Keeton v. Hustler Mag., Inc.*,
    465 U.S. 770 (1984) .......................................................................... *passim*

*Kemp v. State Bd. of Agric.*,
    803 P.2d 498 (Colo.1990) ............................................................................45

*Keohane v. Stewart*,
    882 P.2d 1293 (Colo. 1994) ...........................................................20, 24, 26,

*Klayman v. Zuckerberg*,
    753 F.3d 1354, 1356 (D.C. Cir. 2014) .......................................................51

*Kuhn v. Trib.-Republican Pub. Co.*,
    637 P.2d 315 (Colo. 1981) ...........................................................29, 47, 50

*Lewis v. Lewis*,
    189 P.3d 1134 (Colo. 2008) .......................................................................57

*Lewis v. McGraw-Hill Broad. Co. Inc.*,
    832 P.2d 1118 (Colo. App. 1992) .....................................................44, 46, 55

*Lohrenz v. Donnelly*,
    223 F.Supp. 2d 25 (D.D.C. 2002), *aff'd.*, 350 F.3d 1272 (D.C. Cir. 2003) ...............29, 46

*Mackall v. JPMorgan Chase Bank, N.A.*,
    356 P.3d 946 (Colo. App. 2014) ................................................................53

*Magill v. Ford Motor Co.*,
    379 P.3d 1033 (Colo. 2016) .......................................................................11

*Marshall's Locksmith Serv. Inc. v. Google, LLC*,
    925 F.3d 1263 (D.C. Cir. 2019) .................................................................51

*Mass v. Martin Marietta Corp.*,
    805 F.Supp. 1530 (D. Colo. 1992) .............................................................54

*McIntyre v. Jones*,
    194 P.3d 519 (Colo. App. 2008) ................................................................43, 44

*Meiter v. Cavanaugh*,
    580 P.2d 399 (Colo. App. 1978) ..........................................................................54

*Milkovich v. Lorain Journal Co.*,
    497 U.S. 1 (1990) ..................................................................................................49

*Mobile Anesthesiologists Chi., LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*,
    623 F.3d 440 (7th Cir. 2010) ...............................................................................18

*Montoya v. Bebensee*,
    761 P.2d 285 (Colo App. 1988) ...........................................................................54

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ..............................................................................................55

*Old Republic Ins. Co. v. Cont'l Motors, Inc.*,
    877 F.3d 895 (10th Cir. 2017) .......................................................13, 20, 31, 32

*OMI Holdings, Inc. v. Royal Ins. Co. of Canada*,
    149 F.3d 1086 (10th Cir. 1998) ...........................................................12, 13, 36

*Outdoor Channel, Inc. v. Performance One Media, LLC*,
    826 F.Supp. 2d 1271 (N.D. Okla. 2011) .............................................................34

*Palnik v. Westlake Ent., Inc.*,
    344 Fed.Appx. 249 (6th Cir. 2009) .....................................................................19

*Parocha v. Parocha*,
    418 P.3d 523 (Colo. 2018) ...............................................................11, 12, 37, 38

*Publ'ns Intern., Ltd. v. Simon & Schuster, Inc.*,
    763 F.Supp. 309 (N.D. Ill. 1991) ........................................................................34

*Quigley v. Rosenthal*,
    327 F.3d 1044 (10th Cir. 2003) .....................................................................44, 45

*Raphael v. Advantage Pawn, Inc.*
    No. 14-cv-03488-LTB-NYW, 2015 WL 70143474 (D. Colo. Nov. 12, 2015) ...................9

*Revell v. Lidov*,
    317 F.3d 467 (5th Cir. 2002) ...............................................................................34

*Robinson v. Colo. State Lottery Div.*,
179 P.3d 998 (Colo. 2008) ................................................................58

*Robinson v. Jeopardy Prods., Inc.*,
315 So.3d 273 (La. App. Cir. Oct. 21, 2020) ....................................34

*Rockwood Select Asset Fund XI (6)-1, LLC v. Devine*,
750 F.3d 1178 (10th Cir. 2014) .........................................................29

*Rome v. Reyes*,
401 P.3d 75 (Colo. App. 2017) ....................................................25, 34

*Rugg v. McCarty*,
476 P.2d 753 (Colo. 1970) .................................................................54

*Salzman v. Bachrach*,
996 P.2d 1263 (Colo. 2000) ...............................................................57

*Shrader v. Biddinger*,
633 F.3d 1235 (10th Cir. 2011) ...................................................26, 27

*Spacecon Specialty Contractors, LLC v. Bensinger*,
713 F.3d 1028 (10th Cir. 2013) ...................................................29, 46

*Spacecon Specialty Contractors, LLC. v. Bensinger*,
782 F.Supp. 2d 1194 (D. Colo. 2011) ..........................................29, 46

*St. Amant v. Thompson*,
390 U.S. 727 (1968) .....................................................................29, 46

*Tamburo v. Dworkin*,
601 F.3d 693 (7th Cir. 2010) .............................................................30

*Tan v. Det-CO, Inc.*,
2018 WL 922133 (D. Colo. Feb. 15, 2018) .....................................56

*TMJ Implants, Inc. v. Aetna, Inc.*,
498 F.3d 1175 (10th Cir. 2007) .........................................................16

*Trierweiler v. Croxton & Trench Holding Corp.*,
90 F.3d 1523 (10th Cir. 1996) ...........................................................29

*Tripwireless Inc. v. Borrego*,
    2019 WL 12248967 (D. Colo. Nov. 4, 2019) ...............................................10

*TV Azteca v. Ruiz*,
    490 S.W.3d 29 (Tex. 2016)..............................................................................34

*U.S. Dominion, Inc. v. Powell*,
    554 F.Supp.3d 42 (D.D.C. 2021) ....................................................................49

*uBID, Inc. v. GoDaddy Group, Inc.*,
    623 F.3d 421 (7th Cir. 2010) ...................................................................18, 35

*Universal Commc'n Sys. Inc. v. Lycos Inc*.,
    478 F.3d 413 (1st Cir. 2007)............................................................................52

*Walden v. Fiore*,
    571 U.S. 277 (2014)................................................................................. *passim*

*Walker v. Van Laningham*,
    148 P.3d 391 (Colo. App. 2006) .....................................................................59

*Weller v. Flynn*,
    312 F.Supp.3d 706 (N.D. Ill. 2018) ................................................................20

*Wells v. Liddy*,
    186 F.3d 505 (4th Cir. 1999) ....................................................................29, 46

*Williams v. Cont. Airlines, Inc.*,
    943 P.2d 10 (Colo. App. 1996)........................................................................44

*Williams v. Dist. Court, Second Judicial Dist., City & Cnty. of Denver*,
    866 P.2d 908 (Colo. 1993)...............................................................................39

*World-Wide Volkswagen Corp. v. Woodson*,
    444 U.S. 286 (1980)................................................................................. *passim*

*Wyles v. Brady*,
    822 F. App'x 690 (10th Cir. 2020) ..................................................................29

*Zimmerman v. Al Jazeera Am., LLC*,
    246 F.Supp. 3d 257 (D.D.C. 2017) ...........................................................29, 46

**STATUTES**

28 U.S.C. § 1391(a) ..........................................................................................10

28 U.S.C. § 1391(b) ..........................................................................................10

47 U.S.C. § 230(c)(1) ........................................................................................51

47 U.S.C. § 230(f)(3) .........................................................................................51

C.R.S. § 13-1-124(1)(b) ....................................................................................21

**OTHER AUTHORITIES**

Colorado Jury Instructions – Civil Ch. 22.7 ....................................................15

RESTATEMENT (SECOND) OF TORTS § 577 (1977) ...........................................15

RESTATEMENT (SECOND) OF TORTS § 578 (1977) ...........................................15

RESTATEMENT (SECOND) OF TORTS § 581 (1977) ...........................................16

TO THE HONORABLE JUDGE OF THE UNITED STATES DISTRICT COURT:

Plaintiff Eric Coomer, Ph.D. (Dr. Coomer) submits this Omnibus Rresponse to Defendants Patrick Byrne, (Byrne), The America Project (TAP), and Steven Lucescu (Lucescu) (collectively, Defendants) Motions to Dismiss pursuant to F.R.C.P. 12(b)(2), 12(b)(3), and 12(b)(6).[1]

## I.     INTRODUCTION

Defendants' "documentary film" *The Deep Rig* (the Film) targeted a Colorado resident and and his work for Dominion Voting Systems, a Colorado-based business. Defendants' statements about Dr. Coomer were made in exclusive reliance on and in coordination with a Colorado podcaster, Joe Oltmann (Oltmann), who worked with Defendants to create a distribution platform for the Film. Oltmann was prominently featured in both the Film and its promotional materials. Defendants' conduct resulted in devastating consequences for Dr. Coomer in Colorado, including invading his privacy, threatening his security, and defaming his reputation in his home and to his community in Colorado. As such, Dr. Coomer reasonably brought claims against Defendants here for their tortious conduct.

Defendants' motions to dismiss for lack of personal jurisdiction closely resemble motions filed by a variety of other individuals and entities that defamed Dr. Coomer in Colorado and also sought to escape accountability here. Like those similar arguments, Defendants' motions primarily argue that Defendants' statements were not forum-focused despite Dr. Coomer's plain allegation that Defendants committed the intentional tort of defamation against him through Colorado-centric statements *in the state of Colorado*. With this, Defendants fall into the same trap that Donald J.

---

[1] Dkts. 31, 29, and 28, respectively.

1

Trump for President, Inc.,[2] Rudy Giuliani,[3] Sidney Powell,[4] Defending the Republic,[5] James Hoft,[6] TGP Communications LLC dba The Gateway Pundit,[7] Eric Metaxas,[8] and Chanel Rion[9] did elsewhere by misstating the facts and misapplying the law. Here, the facts show that Defendants intentionally targeted and defamed a Colorado resident through a distribution network that they created, in part with Oltmann, that was directed into Colorado. Defendants' contacts with Colorado were not random, fortuitous, or attenuated. They were purposeful and consistent. This conduct is what gives rise to personal jurisdiction as Defendants purposefully published false statements in Colorado; the source and subject of those statements involved Coloradans; and Colorado was the focal point of those statements and of the harm caused to Dr. Coomer. These contacts with Colorado are more than sufficient under well-settled state and federal doctrine to establish specific personal jurisdiction.

Defendants further claim that their choice of a national platform to defame insulates them from being compelled to appear in a Colorado court. In essence, Defendants advance the untenable position that by committing tortious conduct everywhere they cannot be held accountable except in their home state. No court has held this. That Defendants sought a national audience does not

---

[2] *See Coomer v. Donald J. Trump for President, Inc., et. al*., Case No. 2020CV34319, Denver Dist. Ct., Order Denying Defendants' Motions to Dismiss Pursuant to C.R.C.P. 12(b)(2) for Lack of Personal Jurisdiction, June 21, 2021, at pp. 10-12. A copy of the Denver District Court's Order is attached as **Exhibit 1**.

[3] *Id*. at pp. 14-17.

[4] *Id*. at pp. 12-14.

[5] *Id*.

[6] *Id*. at pp. 17-19.

[7] *Id*.

[8] *Id*. at pp. 19-21.

[9] *Id*. at pp. 21-23.

negate the harm they caused in Colorado or the minimum contacts they established within this state.  Indeed, Defendants continue to raise money in Colorado based on their defamation of a Colorado resident, and TAP has spent substantial sums of money attempting to influence Colorado elections.  As such, Dr. Coomer respectfully requests this Court reject Defendants' arguments and deny their motions to dismiss for lack of personal jurisdiction and to change venue.

In addition to their arguments challenging this Court's jurisdiction, Defendants also challenge the sufficiency of Plaintiff's Complaint under F.R.C.P. 12(b)(6).  These arguments are similarly unavailing.  Plaintiff's 68-page Complaint[10] presents ample factual statements for the Court to determine that Plaintiff has more than sufficiently pleaded claims for defamation, intentional infliction of emotional distress, unjust enrichment, civil conspiracy, and for injunctive relief.  The Court should also deny Defendants' motions to dismiss pursuant to F.R.C.P. 12(b)(6).

## II.    STATEMENT OF FACTS

1.    Byrne's relationship with Oltmann, the Colorado resident who fabricated the false claims at issue in this dispute, extends back at least as far as January 2021 and likely for several months preceding the attack on the U.S. Capitol on January 6, 2021.  At a minimum, in the months prior to the insurrection, Oltmann and Byrne were indisputably working with many of the same individuals who were also trying to overturn the election results, including, but not limited to,

---

[10] Dkt. 1.

Rudy Giuliani,[11] Sidney Powell,[12] Phil Waldron,[13] Matthew DePerno,[14] Russ Ramsland,[15] among others. By the time of the insurrection, Oltmann and Byrne's efforts to overturn the election results were so closely connected that both men were present in the same room at the Willard Hotel on the day of the attack.[16]

2.     In the months thereafter, the relationship between Oltmann and Byrne continued to deepen, as did Byrne's growing reliance on Oltmann's false claims about events that purportedly occurred in Colorado. Oltmann's claims centered on an election fraud conspiracy with allegations of treasonous conduct by Dr. Coomer in Colorado through his Colorado-based employment. In fact, Oltmann and Byrne had grown so close that Byrne even tasked Oltmann with formulating and implementing a distribution plan for *The Deep Rig*,[17] which prominently featured Oltmann's claims as the Film's centerpiece.[18]

3.     Byrne soon realized that Oltmann had no meaningful technical expertise, that he was untrustworthy, that his promises did not pan out, and that Oltmann had a disconcerting penchant for attempting to encourage violence in "every conversation" in which he partook.[19] Byrne subsequently removed Oltmann from the team creating the Film's website and distribution

---

[11] *See generally Coomer v. Donald J. Trump for President, Inc. et. al.*, Case No. 2020CV34319, Denver Dist. Ct.

[12] *Id.*

[13] *See* Plaintiff's Complaint at ¶¶ 48, 53, 57, 84, 87.

[14] *Id.* at ¶¶ 72, 74-77, 79.

[15] *Id.* at ¶¶ 45-46, 50.

[16] *Id.* at ¶ 54; *see also* Declaration of Eric Coomer, at ¶ 25.

[17] *See* Dec. of Eric Coomer at ¶ 22.

[18] *See* Plaintiff's Complaint at ¶¶ 72-86; *see also* Dec. of Eric Coomer at ¶¶ 3, 5-7.

[19] *See* Dec. of Eric Coomer at ¶ 23.

platform, but nonetheless he and his co-producer Lucescu kept Oltmann and his false claims as the centerpiece of the Film.[20]

4.      For his part, Lucescu was a co-director who took responsibility for the content of the Film, including through his efforts to vet potential stars and their associated claims.[21] The Film's other co-director, Roger Richards, has publicly commended Lucescu on his thorough vetting practices.[22] In addition to being intimately involved with the entire process of creating the Film, as confirmed by Lucescu's sworn Declaration submitted in conjunction with his motion to dismiss, Lucescu was also the chief architect of the Film's distribution model and platform, which he worked on closely with Byrne.[23] Despite Lucescu's sworn declaration that he "had no role in the distribution or publication of *The Deep Rig*, in Colorado or anywhere else," Lucescu was in fact recorded on numerous instances, often alongside Byrne,[24] where both men discussed the distribution model and platform they had created,[25] promoted the Film's distribution,[26] provided viewers with the means and instructions to download and show the Film,[27] and touted the means by which viewers could profit from assisting Byrne, Lucescu, and TAP in their efforts to distribute the Film as widely as possible.[28]

---

[20] *Id.*

[21] *See* Dec. of Eric Coomer at ¶ 11.

[22] *Id.*

[23] *See* Plaintiff's Complaint at ¶ 66; *see also* Dec. of Eric Coomer at ¶¶ 3-4.

[24] *See* Plaintiff's Complaint at ¶¶ 64-66; *see also* Dec. of Eric Coomer at ¶¶ 3-4, 7-13, 17-18.

[25] *See* Plaintiff's Complaint at ¶¶ 64-66; *see also* Dec. of Eric Coomer at ¶¶ 3-4, 7-13, 17-18.

[26] *See* Plaintiff's Complaint at ¶¶ 65-66; *see also* Dec. of Eric Coomer at ¶¶ 3-4, 7-10, 12-13.

[27] *See* Plaintiff's Complaint at ¶¶ 65-66; *see also* Dec. of Eric Coomer at ¶¶ 3-4, 7, 12.

[28] *See* Plaintiff's Complaint at ¶¶ 65-66; *see also* Dec. of Eric Coomer at ¶¶ 3-4, 7, 17-18.

5.    In addition to purportedly vetting Oltmann's claims and deciding on his inclusion in the Film, Lucescu also made publicity appearances with Oltmann to promote the Film's premiere and subsequent distribution.[29]  As the Film's producer, and upon information and belief, Lucescu was also instrumental in deciding to promote the Film with a series of trailers that exclusively focused on Oltmann,[30] as well as other trailers that included Oltmann's commentary as a draw for potential Film consumers.[31]  Byrne and Lucescu both also gave promotional interviews praising Oltmann's integrity and touting his unique contributions to the Film.[32]

6.    Byrne and Lucescu also made numerous publicity appearances with other Film stars, where they consistently discussed the Film's distribution model and platform, encouraged viewers to sign up with TAP, and assured their viewers of the absolute truth and factual accuracy of the claims presented by the Film.[33]

7.    When the Film premiered in Phoenix on June 26, 2021, Byrne, Lucescu, and TAP president Joe Flynn all appeared onstage with Oltmann before a live audience, where they streamed a Q&A promoting TAP and distribution of the Film.[34]  Here again, Byrne and Lucescu took credit for creating the Film's distribution platform, and they explained how both they and TAP stood to profit if their viewers followed their instructions and utilized the websites they had created to distribute the Film.[35]  One of those websites was theamericaproject.com, which is the website for

---

[29] *See* Dec. of Eric Coomer at ¶ 8.

[30] *See* Dec. of Eric Coomer at ¶¶ 3, 5-7.

[31] *See id*. at ¶¶ 3, 5-7.

[32] *See* Dec. of Eric Coomer at ¶¶ 7-8.

[33] *See* Dec. of Eric Coomer at ¶¶ 8, 10.

[34] *See* Plaintiff's Complaint at ¶ 57; *see also* Dec. of Eric Coomer at ¶ 13.

[35] *See* Plaintiff's Complaint at ¶¶ 64-66; *see also* Dec. of Eric Coomer at ¶¶ 13-15.

TAP.  TAP owns the copyright to the Film, and published the Film on theamericaproject.com, which they control.[36]  Other stars of the Film again publicly credited Byrne and Lucescu for the distribution model and platform they had created.[37]

8.      The Film itself is a series of outright falsehoods that all ultimately rely on the lynchpin of the Film's narrative--Oltmann's lies that Dr. Coomer partook in an Antifa conference call, that he claimed on that call to have rigged the presidential election, and that he did in fact rig the election by exploiting his role at Dominion.  The claims are easily disproven, and Oltmann has never provided any evidence to support them.  Nonetheless, Defendants' publication of the Film presented those lies to a nationwide audience eager for "evidence" to support the preconceived narrative that the election had been rigged.  The Film features appearances and commentary by all three board members of TAP:  Byrne, Michael Flynn, and Joe Flynn, and the Film concludes with a request for donations at TAP's website.[38]  Throughout the filming, production, and distribution of the Film, Defendants all relied exclusively on Oltmann and his anonymous sources, disregarded countless reliable authorities, made no effort whatsoever to contact Plaintiff or anyone else who could potentially corroborate the Film's claims, and knowingly presented inherently implausible claims they knew to be false, all in order to profit and to further their overarching objective of undermining faith in American democracy.

9.      Following the Film's premiere, the Film was repeatedly published in Colorado,[39] as intended, by utilizing the Film's website and distribution model discussed above.  In the months

---

[36] *See* Plaintiff's Complaint at ¶¶ 1, 65.

[37] *See* Dec. of Eric Coomer at ¶¶ 16.

[38] *See* Dec. of Eric Coomer at ¶ 19.

[39] *See* Plaintiff's Complaint at ¶¶ 89-91; *see also* Dec. of Eric Coomer at ¶ 27.

following the Film's distribution and publication in Colorado, Byrne repeatedly appeared on Oltmann's Colorado-based podcast, Conservative Daily, as did TAP president Joe Flynn.[40]  In these various interviews, both men spoke as agents of TAP and promoted the work of TAP,[41] and Byrne joined in with Oltmann's ongoing and still constant defamation of Dr. Coomer.[42]  Even after being served with this lawsuit, Byrne and Flynn still appeared on Oltmann's show, both individually and as agents of TAP, where they again promoted TAP and sought donations from Oltmann's Colorado audience.[43]

10.     For its part, TAP profited from every one of these appearances, including and especially through the numerous publicity appearances made by its board members and agents, Byrne and Joe Flynn.[44]  TAP solicited and accepted donations from Colorado residents throughout the timeframe at issue in this dispute and continues to do so to this day.[45]  Months after the release of the Film, TAP went on to spend at least $100,000 in Colorado in an effort to boost the candidacy of their fellow election conspiracy theorist, Tina Peters, as Colorado's Republican nominee for Secretary of State.[46]

11.     Throughout this entire timeframe, Defendants have been on notice that Oltmann's claims were false, that Oltmann was unstable and dangerous, that Oltmann was constantly calling for violence, and that Oltmann's ire was directed at the focal point of their Film, Colorado resident

---

[40] *See* Plaintiff's Complaint at ¶¶ 92-93; *see also* Dec. of Eric Coomer at ¶¶ 20-21, 26.

[41] *See* Dec. of Eric Coomer at ¶¶ 20-21, 26.

[42] *See* Plaintiff's Complaint at ¶¶ 92-93; *see also* Dec. of Eric Coomer at ¶ 20.

[43] *See* Dec. of Eric Coomer at ¶ 26.

[44] *See* Plaintiff's Complaint at ¶¶ 56, 64, 66; *see also* Dec. of Eric Coomer at ¶¶ 19-20, 26.

[45] *See* Dec. of Eric Coomer at ¶¶ 14-15, 19-20, 26.

[46] *See* Dec. of Eric Coomer at ¶ 19.

Dr. Coomer and his Colorado-based former employer, Dominion Voting Systems.[47]  They knew

that Oltmann's entire story turned on events that allegedly occurred in Colorado, and that their

Film would inevitably drum up animosity, anger, and potential violence against Dr. Coomer

personally here in Colorado.[48]  For all of the reasons that follow, Defendants have at least minimum

contacts with Colorado, Defendants have purposefully availed themselves of the state of Colorado,

their Colorado-based conduct gave rise to this litigation, and Dr. Coomer has adequately stated

multiple claims for relief.

### RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS FOR LACK OF JURISDICTION PURSUANT TO F.R.C.P. 12(b)(2) AND MOTIONS FOR CHANGE OF VENUE PURSUANT TO F.R.C.P. 12(b)(3)

### I.        STANDARD OF REVIEW

12.        Defendants assert Rule 12(b)(2) motions challenging this Court's jurisdiction.  The

Court has discretion whether to decide a Rule 12(b)(2) motion based solely on documentary

evidence or by holding an evidentiary hearing.  *Archangel Diamond Corp. v. Lukoil*, 123 P.3d

1187, 1192 (Colo. 2005).[49]  These options are not mutually exclusive, but the plaintiff's burden of

proof depends on which one the Court chooses.  *Id.*  If the Court decides the motion based only on

documentary evidence, the plaintiff meets its burden by raising a reasonable inference that the

Court has personal jurisdiction over the defendant.  *Id.*  Documentary evidence includes the

pleadings, as well as affidavits and any other evidence submitted by the parties.  *Id.*  The allegations

in the plaintiff's complaint must be accepted as true, and if the defendant provides competent

---

[47] *See* Plaintiff's Complaint at ¶¶ 89-93, 95-103; *see also* Dec. of Eric Coomer at ¶¶ 22-24.

[48] *See* Plaintiff's Complaint at ¶¶ 89-93, 95-103; *see also* Dec. of Eric Coomer at ¶¶ 23-24, 27.

[49] *See also Raphael v. Advantage Pawn, Inc.*, No. 14-cv-03488-LTB-NYW, 2015 WL 7014374, at *4 (D. Colo. Nov. 12, 2015).

evidence that presents conflicting facts, the discrepancies must be resolved in the plaintiff's favor. *Id.* The purpose of this "light" burden at the early stage of litigation "is simply to screen out cases in which personal jurisdiction is obviously lacking, and those in which the jurisdictional challenge is patently bogus." *Id.* (internal quotations omitted).

13.     If the Court decides to hold an evidentiary hearing, the plaintiff must establish personal jurisdiction by a preponderance of the evidence. *Archangel*, 123 P.3d at 1192. A hearing may be appropriate where the facts indicate "it is unfair to force an out-of-state defendant to incur the expense and burden of a trial on the merits in a local forum without first requiring more of the plaintiff than a prima facie showing of facts essential to in personam jurisdiction." *Id*. at 1193 (internal quotations omitted).

14.     Defendants further assert Rule 12(b)(3) motions contending that venue is improper. "The standard under Rule 12(b)(3) is generally the same as a motion to dismiss for lack of personal jurisdiction." *Tripwireless Inc. v. Borrego*, 2019 WL 12248967, at *3 (D. Colo. Nov. 4, 2019. When a defendant challenges venue under Rule 12(b)(3), "the plaintiff bears the burden of presenting a prima facie showing of venue." *Fresenius Kabi USA, LLC v. Custopharm, Inc.*, 2021 WL 651022, at *1 (D. Colo. Feb. 19, 2021). 28 U.S.C. § 1391(b) provides, in relevant part, that venue is proper in:

> (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

Courts conduct a two-part analysis when reviewing challenges to venue under § 1391(a)(2). *Employers Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1166 (10th Cir. 2010). First, courts

"examine the nature of the plaintiff's claims and the acts or omissions underlying those claims." *Id.* Second, courts "determine whether substantial 'events material to those claims occurred' in the forum district." *Id.* (quoting *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 357 (2nd Cir. 2005)). "Even if a more substantial portion of the activities giving rise to the claim occurred in other districts, venue is proper if the district the plaintiff chose had a substantial connection to the claim." *Graymore, LLC v. Gray*, 2007 WL 1059004, at *14 (D. Colo. Apr. 6, 2007) (quoting *Gwynn v. TransCor America, Inc.*, 26 F.Supp. 2d 1256, 1261 (D. Colo. 1998)); *see also First of Michigan Corp. v. Bramlet*, 141 F.3d 260, 263-64 (6th Cir. 1998) (in diversity of citizenship cases, venue is proper in any forum with a substantial connection to the plaintiff's claim).

## II.     ARGUMENT

15.     This Court has personal jurisdiction over Defendants.  To invoke the personal jurisdiction of the Court over a non-resident defendant, a plaintiff must establish that Colorado's long-arm statute and constitutional due process requirements are met.  *Parocha v. Parocha*, 418 P.3d 523, 527 (Colo. 2018).  Because Colorado's long-arm statute confers the maximum jurisdiction permitted by the United States and Colorado constitutions, the Court must only perform a due process analysis that "involves an ad hoc evaluation of the facts of each case and is generally considered more of an art than a science." *Archangel*, 123 P.3d at 1194 (citing *Keefe v. Kirschenbaum & Kirschenbaum, P.C.*, 40 P.3d 1267, 1272 (Colo. 2002)).

16.     That ad hoc evaluation determines whether the defendant has minimum contacts with Colorado such that "the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Magill v. Ford Motor Co.*, 379 P.3d 1033, 1037 (Colo. 2016) (citing *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945)).  In assessing whether a defendant has minimum

contacts with Colorado, the Court considers "whether the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Parocha*, 418 P.3d at 529 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)) (internal quotations omitted). In assessing whether the maintenance of the suit comports with traditional notions of fair play and substantial justice, the Court considers "whether a district court's exercise of personal jurisdiction over a defendant with minimum contacts is ***reasonable*** in light of the circumstances surrounding the case." *Archangel*, 123 P.3d at 1195 (quoting *OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1091 (10th Cir. 1998)) (internal quotations omitted and emphasis added). Both the Colorado Supreme Court and the Tenth Circuit have recognized that these two elements operate on a sliding scale: where a defendant's minimum contacts with Colorado are weak, "the less a defendant need show in terms of unreasonableness to defeat jurisdiction," and where a plaintiff's showing of reasonableness is especially strong, it "may serve to fortify a borderline showing of minimum contacts." *Id.* (quoting *OMI Holdings, Inc. v. Royal Ins. Co. of Canada,* 149 F.3d 1086, 1092 (10th Cir. 1998)) (internal quotations omitted).

17. Here, Defendants targeted their defamatory statements and fundraising efforts at Colorado and Colorado audiences, relied on Colorado sources and subject matter for those statements, conspired with a Colorado resident to defame another Colorado resident, published their defamation in Colorado, and caused harm in Colorado. They further used their defamatory campaign to lay the groundwork for a targeted fundraising effort in Colorado, spending money in Colorado to fund political advertising for candidates for public office in Colorado. It is inherently reasonable that a Colorado court require Defendants to answer for the harm they caused here.

**A.    Defendants have minimum contacts with Colorado.**

18.    "The quantity and nature of the minimum contacts required depends on whether the plaintiff alleges specific or general jurisdiction." *Archangel*, 123 P.3d at 1194.  Where, as here, a plaintiff alleges specific jurisdiction, the Court considers (1) whether "the defendant has purposefully directed its activities at residents of the forum" and (2) whether "the litigation results from alleged injuries that arise out of or relate to those activities." *OMI Holdings, Inc.*, 149 F.3d at 1091 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)) (internal quotations omitted); *see also Benton v. Cameo Corp.*, 375 F.3d 1070, 1078 (10th Cir. 2004).

19.    While the Court's assertion of jurisdiction over a non-resident defendant depends upon "the relationship among the defendant, the forum, and the litigation," *Walden v. Fiore*, 571 U.S. 277, 283-84 (2014) (quoting *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 775 (1984)) (internal quotations omitted), there is no specific test for establishing minimum contacts for purposes of specific jurisdiction, *see Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 905 (10th Cir. 2017) (recognizing that at least three frameworks exist for determining whether a court may exercise specific jurisdiction).  The United States Supreme Court has developed the harmful effects and market exploitation frameworks for cases involving non-resident media defendants' publications, both of which provide independent bases for establishing specific jurisdiction here.

20.    These frameworks are built on underlying principles of the minimum contacts analysis.  First, while a defendant's contact with the state cannot be random, fortuitous, attenuated, or based on the unilateral acts of another, a single act by a defendant can satisfy due process. *Burger King*, 471 U.S. at 475-76 and n.18 ("even a single act can support jurisdiction.").  Second,

that contact does not require a defendant's physical presence in the state. *Id.* at 476 (noting "we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction"). Third, the claim at issue determines how the Court analyzes a defendant's contact with the state. *Walden*, 571 U.S. at 287-88 (noting a defendant's contact with the forum state is particularly strong as a "function" of the libel tort). These principles have consistently been reaffirmed by the United States Supreme Court in cases involving defamation so as to uphold personal jurisdiction. *See id.* at 288-89 (finding specific jurisdiction in the defamation case *Calder v. Jones* where the "reputation-based 'effects' of the alleged libel connected the defendants" to the forum); *see also Bristol-Myers v. Superior Ct. of Cal., San Francisco Cnty.*, 137 S.Ct. 1773, 1782 (2017) (finding specific jurisdiction in the defamation case *Keeton*, where the publication of false statements occurred in the forum and the harm was to both the subject and the readers of the defamation). These principles similarly compel jurisdiction over Defendants in this case.

      *i.*       **Defendants published and distributed the Film in Colorado.**

21.     Lucescu and Byrne focus their jurisdictional arguments on claims that they merely "produced" the Film, which they assert does not constitute a publication. They argue that this Court can only exercise jurisdiction over this case if it finds that they distributed the Film in

Colorado, which Lucescu has sworn he did not do. Lucescu even goes so far as to claim that "The Complaint is free of allegations that Mr. Lucescu published anything."[50]

22.    In reality, the Complaint expressly pleads in at least fourteen instances that Lucescu, along with Byrne and TAP, published the Film,[51] including multiple allegations that they published the Film in Colorado.[52] And Colorado law is clear that Defendants' creation of the Film constitutes a publication.[53] In any case, there can be no dispute that in addition to producing the Film, Defendants all took active roles in distributing the Film, as Dr. Coomer also expressly pleaded in the Complaint several times, including twice in the first paragraph.[54] The authority relied upon by Defendants for arguing otherwise is, therefore, readily distinguishable.

23.    "Publication of a defamatory matter is its communication intentionally or by a negligent act to one other than the person defamed." *Card v. Blakeslee*, 937 P.2d 846 (Colo. App. 1996); *see also* RESTATEMENT (SECOND) OF TORTS § 577 (1977). Colorado jury instructions take a broad view to the term "publication," noting that "published" applies to all means of communication including words, pictures, and gestures. CJI – Civil Ch. 22.7. "This instruction is applicable to persons who originally published the statement and also (except to those who only deliver or transmit the statement) to persons who repeat or otherwise republish the statement." *Id.*; *see also* Instruction 22:24; RESTATEMENT (SECOND) OF TORTS § 578 (1977). "Comment b to Restatement § 578 makes clear that one who republishes a defamatory statement may be liable to

---

[50] Lucescu Mot., at p. 8.

[51] *See* Plaintiff's Complaint at ¶¶ 13, 16, 18, 76, 87, 89, 95 (two separate express allegations), 103, 107 (three separate express allegations), and 115 (two separate express allegations).

[52] *Id.* at ¶¶ 16, 18, 103.

[53] *See, e.g., Card v. Blakeslee*, 937 P.2d 846, 850 (Colo. App. 1996).

[54] *Id.* at ¶¶ 1 (two separate express allegations), 42, 64-66, 118.

the same extent as the original speaker because each publication causes a new harm to the plaintiff's reputation." *TMJ Implants, Inc. v. Aetna, Inc*., 498 F.3d 1175 (10th Cir. 2007). "The Rule does not relieve from liability one who prints and puts upon the market a libelous newspaper, book, or magazine even though its contents are prepared by a third person, ***nor does it relieve the producer who presents a play***, even though the author had technically published the libel by submitting it for publication." RESTATEMENT (SECOND) OF TORTS § 581 (1977) (emphasis added). As a result, Defendants Byrne and Lucescu's production of the Film, which included substantial financial, creative, and editorial input from both men, constitutes a publication.

24.     Byrne and Lucescu largely focus their arguments attempting to distinguish between "production" and "distribution."  Relying on *John E. Reid and Assocs., Inc. v. Netflix, Inc.*, No. 19 CV 6781, 2020 WL 1330657, at *5 (N.D. Ill. Mar. 23, 2020), Defendants claim that "federal courts have consistently refused to impute the actions of those who published a work to those who created a work."[55]  But *Reid* does not support their argument.  In *Reid*, the court addressed a Netflix television series that was written and directed by Ava Duvernay and co-produced by Array Alliance Inc.  Duvernay and Array were both sued for defamation as a result of one line in the final episode of the television series that called the plaintiff's business practices into question.  The court noted that "nowhere does [the complaint] allege that either Array or Duvernay exercised any control over Netflix, or instructed Netflix to offer the series for streaming in Illinois, or did anything else to purposefully target Illinois via Netflix." *Id.* at *5.  The *Reid* opinion goes on to distinguish that case from a case directly on point, *Calder v. Jones*, 465 U.S. 783, 785-86 (1984), noting that in *Calder*, even though neither defendant ever visited California, one conducted

---

[55] Byrne Mot. at p. 16; Lucescu Mot. at p. 9.

research by calling people that were located there, and the other approved the subject of the article and edited it in its final form, knowing that there was a significant audience for the article in California. The court noted those facts in *Calder* amounted to more than "mere untargeted negligence." *Id*.

25. This case is easily distinguishable from *Reid* for several reasons. First, Defendants make no argument that a separate third-party was responsible for the distribution of the Film into Colorado, as Netflix did in *Reid*. Nor can they. Defendants created the distribution platform for the Film themselves, intended for the Film to reach Colorado audiences, controlled the means and direction of distribution into Colorado, and directly profited from distribution into Colorado.[56] In addition to creating a platform to distribute the Film, TAP owns the copyright to the Film and has the means to allow or limit the means of its distribution as it sees fit, which it did in this case.[57] Furthermore, and also unlike *Reid*, here both Lucescu and Byrne had a relationship with Oltmann that led to his inclusion in the Film, and Lucescu has publicly taken responsibility for contacting Oltmann and vetting his claims.[58] Both men knew that Oltmann had a sizable following in Colorado through both his political organization, FEC United, and his Conservative Daily podcast, and Byrne even hired Oltmann to assist with creating the distribution platform for the Film to target as many people as possible.[59] Acting as agents of TAP, both Byrne and Flynn made repeated appearances on Oltmann's podcast, which is routinely recorded in Colorado, where they promoted

---

[56] *See* Plaintiff's Complaint at ¶¶ 64-66, 89-91; *see also* Dec. of Eric Coomer at ¶¶ 3-4, 7-19.

[57] *See* Dec. of Eric Coomer at ¶¶ 13-15, 19.

[58] *See* Dec. of Eric Coomer at ¶¶ 7-8, 10, 19-21, 22-25.

[59] *Id.* at ¶ 22.

TAP's work and sought donations to the organization.[60]  The *Reid* opinion further affirms *Calder* in noting that "the crux" of the court's analysis is that "the injury to the plaintiff's reputation in the estimation of the California public – connected the defendants' conduct to California, not just to a plaintiff who lived there." *Id.* citing *Walden v. Fiore*, 571 U.S. 277, 288 (2014).  In this case, and as discussed more fully below, the effect of Defendants' conduct has been to injure Dr. Coomer's reputation with the Colorado public, thus further supporting this Court's jurisdiction.[61]

26.     Byrne and Lucescu also rely on *Colo'n v. Akil*, 449 Fed. Appx. 511, 514 (7th Cir. 2011), for the proposition that non-resident producers of a television show are not subject to personal jurisdiction in another state when they play no role in broadcasting the show in that state. *Colo'n* is easily distinguishable.  In that case, the plaintiff attempted to hold CBS Studios, Inc. liable for publication of a television program in Indiana, in part by imputing to CBS Studios, Inc., the contacts of its parent company, CBS Corporation.  The court found that while CBS Corporation had more extensive contacts, CBS Studios, Inc., which was in New York and had only distributed the program at issue in California, did not.  *Id.*  The court then found that the remaining defendants could also not be haled into court in Indiana because the plaintiff did not show that the defendants acted with knowledge that they would cause harm to her in Indiana because "the evidence was undisputed that none of the defendants knew of her or her script before Colo'n filed her suit." *Id.* citing *Mobile Anesthesiologists Chi., LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440, 445 (7th Cir. 2010).  Here, Dr. Coomer has not confused corporate entities, and there can be no dispute that Defendants were very familiar with Dr. Coomer and the fact that he

---

[60] *Id.* at ¶¶ 19-20, 26.

[61]  *See* Plaintiff's Complaint at ¶¶ 102-03; *see also* Dec. of Eric Coomer at ¶ 27.

lived in Colorado before they published and distributed the Film into Colorado. It was also public knowledge that Dr. Coomer had already filed suit against the Film's star in Colorado where he described the damages he had suffered in Colorado.[62]

27.      Byrne and Lucescu's reliance on *Palnik v. Westlake Ent., Inc.*, 344 Fed.Appx. 249 (6th Cir. 2009) is similarly misplaced. In *Palnik*, the plaintiff sued the producers and the distributors of the film *Steal Me* in federal court in Ohio, alleging that the film played two of his copyrighted songs without his permission. The distributors settled, leaving only the film's producers as defendants. The court in *Palnik* held that "the focus is on how and why the product was in Ohio; in particular, cases have emphasized the strength and nature of the relationship between the producer that put the product in the stream of commerce and the distributor that actually guided the product to Ohio." *Id*. at 250. The court emphasized the distinction between a producer who was "merely aware" of the fact of national distribution, as opposed to a producer who sought nationwide distribution by contracting with a distributor for sales "throughout the United Stated." *Id*. (citing *Bridgeport Music v. Still N the Water Publishing*, 327 F.3d 472, 483 (6th Cir. 2003).

28.      Both Byrne and Lucescu not only produced the Film, but also took an active and controlling role in the Film's distribution, thus collapsing the distinctions drawn by the court in *Palnik*.[63] Byrne and Lucescu sought national distribution of their Film, including to Colorado, then ensured that distribution would occur through their own efforts, which included working directly with Oltmann to build the distribution platform and target the audience that he promised

---

[62] *See* Dec. of Eric Coomer at ¶ 7.

[63] *See* Dec. of Eric Coomer at ¶¶ 3-4, 11-13, 16-18.

to provide.[64]  This case is further distinguished in that in *Palnik*, the court found that the plaintiff

could have met his burden by "merely [asserting] the likelihood that, should he be permitted to

look for it, the required relationship would be found to exist." *Id*. at 253.  Here, Dr. Coomer has

made that assertion.[65]

29.     Finally, Byrne and Lucescu direct the Court to *Weller v. Flynn*, 312 F.Supp.3d 706

(N.D. Ill. 2018), which addresses a case where a film's producers, Reese Witherspoon and Bruna

Papandrea, were found not to have been personally liable for the actions of the film's distributor,

Twentieth Century Fox.  As discussed above, no such distinction between producers and

distributors exists in this case. *See id*. at 717.

> ### ii.      *Defendants purposefully availed themselves of the state of Colorado under the harmful effects framework.*

30.     It is well-settled that defamation occurs where it is published to third persons.

*See Walden*, 571 U.S. at 288; *Keeton*, 465 U.S. at 777 (observing that "the tort of libel is generally

held to occur wherever the offending material is circulated").  And, under the harmful effects

framework, purposeful availment is established when the "defendant's *intentional* conduct targets

and has substantial harmful effects in the forum state." *Old Republic Ins. Co.*, 877 F.3d at 907

(emphasis in original); *see also Keohane v. Stewart*, 882 P.2d 1293, 1297-98 (Colo. 1994) ("The

right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt

reflects no more than our basic concept of the essential dignity and worth of every human being—

a concept at the root of any decent system of ordered liberty.").  States have an interest in exercising

---

[64]  *See* Plaintiff's Complaint at ¶¶ 64-66, 89-91; *see also* Dec. of Eric Coomer at ¶ 22.

[65]  *See* Dec. of Eric Coomer at ¶¶ 1, 7, 13, 20-22.

jurisdiction over those who commit such torts within their territory. *Keeton*, 465 U.S. at 776; *see also* C.R.S. § 13-1-124(1)(b) (requiring that "commission of a tortious act within this state" subjects a person to the jurisdiction of the courts of Colorado).

31.     Defendants have proven imminently capable of committing tortious acts within Colorado and targeting substantial harm at Colorado, allowing this Court to exercise jurisdiction over them. Indeed, it is a "[f]unction of the nature of the libel tort" that a defendant's defamation strongly connects it not just to the plaintiff in the forum state but to the forum itself, as among the places where the defamation occurred. *Walden,* 571 U.S. at 287 ("However scandalous a newspaper article might be, it can lead to a loss of reputation only if communicated to (and read and understood by) third persons.") While Defendants argue they should not be subject to this Court's jurisdiction because their communications were made from outside the state, the tort of defamation occurs where the statements are published (*i.e.*, communicated to and understood by third-parties). *See Walden*, 571 U.S. at 288; *Keeton*, 465 U.S. at 777. In this instance, Dr. Coomer has plainly alleged that Defendants' defamatory statements were published, and in fact most acutely felt, within Colorado.[66] Under controlling case law, this allegation—that the tort of defamation occurred in the state of Colorado, where it was heard and understood by Dr. Coomer and directed and distributed to Colorado audiences, is sufficient to give this Court personal, specific jurisdiction over the Defendants.[67]

32.     Defendants argue that the defamatory statements they made were broadcast to a wider audience than just Colorado, and that as a result they can only be held liable in their home

---

[66] *See* Plaintiff's Complaint at ¶¶ 89-91; *see also* Dec. of Eric Coomer at ¶¶ 19-21, 24, 26-27.

[67] *See* Plaintiff's Complaint at ¶¶ 89-91, 102-03; *see also* Dec. of Eric Coomer at ¶¶ 26-27.

states. But this is not the law. Here, Defendants broadcast defamatory statements *related to* Colorado, *in* Colorado, where Dr. Coomer *does* live and work, while using a platform that they created that was built with the purpose and ability to direct the defamatory content at issue to Colorado audiences. At least one Colorado court has already found virtually identical arguments to be unavailing, including with respect to nine different out of state defendants who specifically defamed Dr. Coomer by also publishing the same lies at issue in this dispute.[68]

33.     Specifically, in *Calder v. Jones*, 465 U.S. 783 (1984), the Supreme Court held that personal jurisdiction existed in a strikingly similar defamation case. There, although the defamatory article reached a nationwide audience, the court held that the defendants should have "'reasonably anticipated being haled into court [in California]'" because the article had California as "the focal point both of the story and of the harm suffered." *Id.* at 790, 789 (quoting *World-Wide Volkswagen Corp.*, 444 U.S. at 297). First, "the allegedly libelous story concerned the California activities of a California resident," "impugned the professionalism of an entertainer whose television career was centered in California," and "was drawn from California sources." *Id.* at 788. Second, "the brunt of the harm, in terms both of [the plaintiff's] emotional distress and the injury to her professional reputation, was suffered in California." *Id.* at 789. The court explained that the defendants could not avoid responsibility for the circulation of the article in California simply because they did not control sales decisions; rather, their "intentional, and allegedly tortious, actions were expressly aimed at California" because "they knew that the brunt of th[e] injury would be felt by [the plaintiff] in the State in which she lives and works." *Id.* at 789-90.

---

[68] *Supra*, n.1 ("Applying the *Calder* effects test, the Court finds that as a whole, Colorado was the focal point of Defendants' alleged defamatory statements.")

Thus, jurisdiction was proper "based on the 'effects' of [the defendant's out-of-state] conduct in California." *Id.* at 789 (quoting *World-Wide Volkswagen Corp.*, 444 U.S. at 297-98); *see ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 714 (4th Cir. 2002) (describing *Calder* as holding that "a California court could constitutionally exercise personal jurisdiction over a Florida citizen whose only material contact with California was to write a libelous story in Florida, directed at a California citizen, for a publication circulated in California, knowing that the 'injury would be felt by [the Californian] in the State in which she lives and works'" (quoting *Calder*, 465 U.S. at 789-90)).

34.     The facts are almost identical here, except that Defendants in this case *did* control sales decisions, as discussed above. As the Complaint alleges, Defendants' false allegations concerned Dr. Coomer's work and employment at a Colorado-based business and explicitly tied that work and employment to a larger alleged conspiracy to overturn the results of the election.[69] Defendants knowingly relied on Coloradan sources for their information and purposefully coordinated with those sources to defame Dr. Coomer.[70] Defendants' defamation of Dr. Coomer was from information allegedly gained in Colorado and from events that allegedly occurred in Colorado.[71] Defendants then published their defamation in Colorado by creating and profiting from a platform that was designed to and abled them to direct the Film to Colorado.[72, 73] It was easily foreseeable that Colorado internet users would receive Defendants' defamatory content. In

---

[69] *See* Plaintiff's Complaint at ¶¶ 68-88; *see also* Dec. of Eric Coomer at ¶ 21.

[70] *Id*. at ¶¶ 3-6, 30-38, 41-42, 57-62, 72-73, 79-86; *see also* Dec. of Eric Coomer at ¶¶ 10, 22-27.

[71] *Id*. at ¶¶ 3-6, 30-38, 41-42, 57-62, 72-73, 79-86; *see also* Dec. of Eric Coomer at ¶¶ 7, 10, 22-24.

[72] *Id*. at ¶¶ 64-66; *see also* Dec. of Eric Coomer at ¶¶ 3-4, 11-18.

[73] The particularity and depth with which these facts were pled makes them far from "conclusory," as Defendants' motions assert.

fact, Colorado resident and Film co-star Oltmann promoted the Film to his sizable Colorado-based audience, and hosted screenings of the Film in Colorado utilizing the platform that Defendants built for that purpose.[74]  In defaming Dr. Coomer, Defendants knew that the brunt of the injury would be in Colorado and would have a potentially devastating impact there.[75]  The effects of Defendants' false statements occurred in Colorado.[76]  Dr. Coomer has suffered injury, including being subjected to credible death threats and harassment in Colorado.[77]  Dr. Coomer further suffered damage to his professional reputation in Colorado, and ongoing threats and harassment in his new line of work.[78]  Because all these facts tie the focus of Defendant's statements to Colorado, Defendant should have "'reasonably anticipate[d] being haled into court there' to answer for the truth of the statements made[.]"  *Calder*, 465 U.S. at 790 (quoting *World-Wide Volkswagen Corp.*, 444 U.S. at 297).[79]

35.     The United States Supreme Court has recently reaffirmed the principle that the reputation-based effects of libel connect Defendants to Colorado, not just to Dr. Coomer. *See Walden*, 571 U.S. at 287.  It further noted that the strength of that connection is largely a function of the nature of the libel tort, which occurs when it is communicated to third persons. *See id.*; *see also Keohane*, 882 P.2d at 1297 (noting that the injury or damage caused by defamation

---

[74] *See* Dec. of Eric Coomer at ¶¶ 20-21, 26.

[75] *See* Plaintiff's Complaint at ¶¶ 102-03; *see also* Dec. of Eric Coomer at ¶¶ 24, 27.

[76] *Id.* at ¶¶ 102-03; *see also* Dec. of Eric Coomer at ¶ 27.

[77] *Id.* at ¶¶ 102-03; *see also* Dec. of Eric Coomer at ¶ 27.

[78] *Id.* at ¶¶ 102-03; *see also* Dec. of Eric Coomer at ¶ 27.

[79] To be sure, in *Calder*, the National Enquirer had its "largest circulation" in California, 465 U.S. at 790, but the court never suggested that that fact was dispositive.  In any event, Dr. Coomer alleged that a significant portion of the audience tuning into Defendants' defamatory broadcasts were Colorado residents.  *See* Plaintiff's Complaint at ¶¶ 15-17, 89-91; *see also* Dec. of Eric Coomer at ¶¶ 10, 14-18, 20-21, 26-27.

is in the communication that holds him up to contempt or ridicule).  Here, the reputational injury

caused by Defendants would not have occurred but for them publishing false statements in

Colorado to a large Colorado audience.  *See Walden*, 571 U.S. at 287.  Because publication is an

element of libel, Defendants' tort occurred in Colorado.  *See id.*  As in *Calder*, the "effects" caused

by Defendants' defamation—*i.e.*, the injury to Dr. Coomer's reputation in the estimation of the

Colorado public—connected Defendants to Colorado, not just to Dr. Coomer who lived there.  *See*

*id.*  As such, Defendants harmed Colorado citizens with their defamation, not just Dr. Coomer.

*See Keeton*, 465 U.S. at 776 ("False statements of fact harm both the subject of the falsehood and

the readers of the statement.").

      36.     The Tenth Circuit and Colorado courts have continued to rely on *Calder*, while

occasionally deciding cases under distinguishable facts.  *See Far W. Cap., Inc. v. Towne*, 46 F.3d

1071, 1080 (10th Cir. 1995); *Archangel Diamond Corp.*, 123 P.3d at 1200 (applying *Towne* and

noting that, "[i]n short, there [was] no indication that [the forum state] had anything but a fortuitous

role in the parties' past dealing or would have any role in their continuing relationship.").  Unlike

those cases, Colorado's role in this litigation is not fortuitous.  It arises directly out of Defendants

conduct through their publishing and distribution of defamatory statements in Colorado, regarding

a Colorado resident and business, based on Colorado sources, and to solicit sales and donations

from Colorado consumers.[80]

---

[80] The *Towne* opinion itself underscores the importance of specificity in the plaintiff's allegations.  *See* 46 F.3d at
1077 n.5 (10th Cir. 1995).  Unlike the plaintiff in *Towne*, Dr. Coomer has alleged specific contacts between Defendant
and Colorado, including the statements Defendant broadcast to numerous listeners and the fact that it solicited donors
in the forum.  *See Rome v. Reyes*, 401 P.3d 75, 85 (Colo. App. 2017) (noting that facts alleged in a complaint must be
taken as true, and financial transactions are sufficient to establish minimum contacts).

37.     Lucescu's reference to *Dental Dynamics, LLC v. Jolly Dental Grp., LLC*, 946 F.3d 1223 (10th Cir. 2020) is similarly distinguishable from the facts in this case.  There, the plaintiff argued that personal jurisdiction existed solely because the effects of the intentional tort (fraud) were felt in the forum state.  946 F.3d at 1232 (holding that "the allegedly tortious conduct here is only incidental to the forum state").  Dr. Coomer does not argue that jurisdiction is proper *solely* because he felt the effects of Defendants' statements in Colorado.  Rather, Dr. Coomer asserts the defamation itself *occurred in Colorado*, because it was intentionally published in this state.  *See Keeton*, 465 U.S. at 777; *Keohane*, 882 P.2d at 1297-98.  This is in fact the very essence of the tort.  *See Walden*, 571 U.S. at 287.

38.     Defendants' reliance on *Shrader v. Biddinger*, 633 F.3d 1235 (10th Cir. 2011), is likewise unavailing.  There, the plaintiff failed to establish personal jurisdiction by a preponderance of the evidence because, although it alleged the defendant had made contacts with the forum state by sending emails there, the defendant had submitted affidavits squarely denying those allegations.  633 F.3d at 1248 (noting that if plaintiff's allegations "were all we had to consider, [plaintiff] might have satisfied his burden on personal jurisdiction").  By contrast, here, Lucescu and TAP have submitted affidavits that include assertions which are directly contradicted by the evidence and testimony presented in Dr. Coomer's Complaint and sworn declaration, attached hereto, and Byrne has not submitted any additional evidence for the Court's consideration beyond his Motion.[81]  Moreover, in light of Defendants' focus on a Colorado resident and business, and their fundraising and sales efforts in Colorado, the rule articulated in *Shrader* actually *supports*

---

[81] The facts of *Archangel Diamond Corp.* are distinguishable for the same reason.  *See* 123 P.3d 1187, 1195 (Colo. 2005) (noting conflicting evidence presented by the defendant as part of its finding of lack of jurisdiction).

a finding of jurisdiction in this case because Defendants did decidedly more than passively post information online. *Id.* at 1240 (adopting the test for specific jurisdiction arising out of internet activity from *ALS Scan, Inc.*, 293 F.3d at 712 (4th Cir. 2002) that "plac[es] emphasis on the internet user or site *intentionally directing* his/her/its activity or operation *at* the forum state rather than just having the activity or operation accessible there").

39.     Defendants further rely on inapposite cases analyzing passive Internet posts even though Defendants published their statements across numerous media platforms. If one limited their analysis solely to internet posts, Defendants are of course correct that "a person who simply places information on the Internet does not subject himself to jurisdiction in each State into which the electronic signal is transmitted and received," *ALS Scan, Inc.*, 293 F.3d at 714. But Colorado is not just *a* state in which "the electronic signal [was] transmitted and received." Rather, Colorado is *the* state in which the events in the statements allegedly took place and the harm was suffered. Thus, the facts of this case easily satisfy the *ALS Scan* test for Internet posts: "specific jurisdiction in the Internet context may be based only on an out-of-state person's Internet activity directed at [Colorado] and causing injury that gives rise to a potential claim cognizable in [Colorado]." *Id.* Indeed, Defendants directly targeted their statements at Colorado by publishing information closely related to Colorado into Colorado, and by fundraising from Colorado donors.[82] *See Shrader*, 633 F.3d at 1240 ("[A] State may, consistent with due process, exercise judicial power over a person outside of the State when that person (1) *directs electronic activity into the State*, (2) *with the manifested intent of engaging in business or other interactions within the State*,

---

[82] *See* Plaintiff's Complaint at ¶¶ 89-91; *see also* Dec. of Eric Coomer at ¶¶ 19.

and (3) that activity creates, in a person within the State, a potential cause of action cognizable in the State's courts.") (emphasis in original).[83]

40.     Further, unlike in *Giduck v. Niblett*, 408 P.3d 856, 865 (Colo. App. 2014), where the "plaintiffs did not allege that the statements made by defendants were specifically directed at Colorado," Dr. Coomer does allege that Defendants' statements were specifically directed at Colorado (and, in fact, the tort occurred there).[84] In *Giduck*, the court rejected the plaintiff's claim that posting to the Internet was sufficient to establish personal jurisdiction because nationwide statements had a negative impact on him in Colorado. *Id.* By leaning on this authority, Defendants misconstrue Dr. Coomer's position. Dr. Coomer does not assert the Court's jurisdiction based on his own residence and professional identity in Colorado or because Defendants' defamatory campaign against him was passively accessible in Colorado. Instead, jurisdiction is proper in this forum because Defendants' statements were specifically directed at Colorado: they were broadcast directly to a Colorado audience; concerned a Colorado resident and company; were based on a Colorado source; and were used to solicit donations from Coloradans. *See Dorsey & Whitney LLP v. RegScan, Inc.*, 488 P.3d 324, 227, n.4 (Colo. App. Feb. 22, 2018), ¶ 19 (distinguishing *Giduck*

---

[83] The *Shrader* court used *ALS* to distinguish between the "targeted nature of email, which is sent to a particular recipient, compared to the indiscriminate accessibility of an internet forum." 644 F.3d 1235, 1247 (10th Cir. 2011). And significantly, the facts of *ALS Scan* are completely inapposite here. There the Fourth Circuit, held that personal jurisdiction was improper because the defendant acted as a passive website host, not a spokesperson. As the court explained, the defendant "did not select or knowingly transmit infringing [content] to [the forum state] with the intent of engaging in business or any other transaction in [the forum state.]" 293 F.3d 707, 714-15 (4th Cir. 2002). The U.S. Supreme Court recently clarified this distinction further, holding that a company's systematic marketing conduct in the forum state was distinguishable from another's passive digital presence by operating a website. *See Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S.Ct. 1017, 1028 (2021). Far from being a passive internet forum or digital presence merely *accessible in* Colorado, Defendant's conduct was *directed at* Colorado. Its knowing broadcast to Colorado viewers and listeners, and subsequent solicitations of Colorado donors to visit its website, was more than sufficient to subject it to specific jurisdiction in the state.

[84] *See* Plaintiff's Complaint at ¶¶ 89-91, 95-103; *see also* Dec. of Eric Coomer at ¶¶ 3, 7-8, 10, 13, 16, 20-22, 24, 26-27.

where "[c]ontrary to [the defendant's] suggestion, the [plaintiff] isn't relying on its own connections to Colorado to establish jurisdiction").

41.     Defendants' contacts with Colorado are not random, attenuated, or fortuitous.  They are not based on the conduct of others.[85]  They are based on Defendants' own tortious conduct, which was expressly aimed at Colorado.  Defendant's failure to investigate the credibility of its sources for its defamation does not preclude it from liability, but rather bolsters it.[86]  Defendants' contacts with Colorado are not limited to incidental communications.[87]  And despite the national

---

[85] *Cf. Walden*, 571 U.S. at 288-89 (denying specific jurisdiction because defendant's *only* connection to the forum state was through plaintiffs) (not a defamation case); *Anzures v. Flagship Rest. Grp.*, 819 F.3d 1277, 1281 (10th Cir. 2016) (denying specific jurisdiction because defendants' sales activities in Colorado were not jurisdictionally relevant and plaintiff could not rely on his own connection to Colorado) (not a defamation case).

[86] *See Zimmerman v. Al Jazeera Am., LLC*, 246 F.Supp. 3d 257, 283 (D.D.C. 2017) ("[I]f there is evidence that a defendant had an obvious reason to doubt the veracity of a source, then the defendant's failure to investigate the source's allegation prior to publication can be probative of actual malice."); *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 590 (D.C. Cir. 2016) (relying on a facially unreliable source is evidence of actual malice); *Wells v. Liddy*, 186 F.3d 505, 542–43 (4th Cir. 1999) (actual malice may be shown where publisher had reason to believe a source might not be credible); *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968) (the publication of allegations that are "inherently improbable" is strong evidence of actual malice); *Spacecon Specialty Contractors, LLC. v. Bensinger*, 782 F.Supp. 2d 1194, 1201 (D. Colo. 2011), *aff'd sub nom. Spacecon Specialty Contractors, LLC v. Bensinger*, 713 F.3d 1028 (10th Cir. 2013) ("when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation" is evidence of actual malice); *Lohrenz v. Donnelly*, 223 F.Supp. 2d 25, 46 (D.D.C. 2002), *aff'd.*, 350 F.3d 1272 (D.C. Cir. 2003) (same); *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 693 (1989) (noting that "evidence of an intent to avoid the truth was . . . sufficient to satisfy the more demanding [actual malice standard]" which included the failure to review available evidence and failure to attempt to interview known key witnesses); *Kuhn v. Trib.-Republican Pub. Co.*, 637 P.2d 315, 319 (Colo. 1981) ("a reporter's failure to pursue the most obvious available sources of possible corroboration or refutation may clearly and convincingly evidence a reckless disregard for the truth."); *Burns v. McGraw-Hill Broad. Co.*, 659 P.2d 1351, 1361 (Colo. 1983).

[87] *Cf. Rockwood Select Asset Fund XI (6)-1, LLC v. Devine*, 750 F.3d 1178, 1180 (10th Cir. 2014) (denying specific jurisdiction based on a single phone call and a single letter to the forum state) (not a defamation case); *C5 Med. Werks, LLC v. CeramTec GMBH*, 937 F.3d 1319, 1333-34 (10th Cir. 2019) (denying specific jurisdiction based on unrelated trips and a single cease-and-desist letter) (not a defamation case); *Wyles v. Brady*, 822 F. App'x 690, 694-95 (10th Cir. 2020) (denying specific jurisdiction based on telephone calls) (not a defamation case); *Trierweiler v. Croxton & Trench Holding Corp.*, 90 F.3d 1523, 1524 (10th Cir. 1996) (denying personal jurisdiction based on single letter sent to forum state) (not a defamation case).

audience sought, the focal point of Defendants' defamation and the harm suffered was in Colorado.[88]

42.     Courts continue to turn to and apply the *Calder* framework in defamation cases for purposes of determining and upholding personal jurisdiction as the means of defamation continue to evolve.  This is best illustrated in *Gilmore v. Jones*, 370 F.Supp. 3d 630 (W.D. Va. 2019).  In that case, the Virginia plaintiff captured footage of a tragic killing at a protest in Charlottesville, which went viral after he posted it on Twitter.  370 F.Supp. 3d at 642.  The plaintiff filed suit in Virginia against non-resident defendants for defamation and intentional infliction of emotional distress following their national online publication of articles and videos referring to the plaintiff as a "deep state" operative involved in orchestrating the violence.  *Id.*  Despite the national audience defendants intentionally sought, the court upheld a finding of specific jurisdiction over the defendants because the focal point of their publications was a Virginia citizen and a Virginia event and they relied on Virginian sources, which "manifested an intent" to target a Virginian audience.[89]  *Id.* at 655-59.  Similar determinations have been made in libel and defamation cases across the country.[90]

43.     Given that the underlying tort *occurred* in Colorado, Defendants cannot reasonably contend that Dr. Coomer failed to allege sufficient contacts to Colorado as to warrant the Court's

---

[88] *Cf. Far W. Cap., Inc. v. Towne*, 46 F.3d 1071, 1080 (10th Cir. 1995) (denying exercise of personal jurisdiction by Utah courts because the focal point of the parties' relationship involved a lease for a Nevada property governed by Nevada law) (not a defamation case).

[89] Constitutional law scholars filed amicus briefing in support of the plaintiff, noting that a finding of personal jurisdiction under these facts fell squarely within *Calder*.  *See Gilmore v. Jones, et al.*, No. 3:18-cv-00017-NKM-JCH (W.D. Va.) at Dkt. No. 72.

[90] *See e.g., Tamburo v. Dworkin*, 601 F.3d 693, 707-08 (7th Cir. 2010); *Hawbecker v. Hall*, 88 F.Supp. 3d 723, 727-29 (W.D. Tex. 2015); *Jones v. Dirty World Ent. Recordings, LLC*, 766 F.Supp. 2d 828, 835–36 (E.D. Ky. 2011); *Bochan v. La Fontaine*, 68 F.Supp. 2d 692, 702 (E.D. Va. 1999).

exercise of jurisdiction. As the court demonstrated in *Gilmore*, this is so despite the fact that Defendant did not discuss Dr. Coomer exclusively. 370 F.Supp. 3d at 657 (finding the same fact unremarkable, since the 'general thrust and content' of the video was a discussion of 'deep state' forces supposedly underlying a Virginia event"). Rather, personal jurisdiction is appropriate here because Defendants "'manifested an intent'" to target a [Colorado] audience by publishing [statements] and video focused on the political forces supposedly underlying a [Colorado] event and a [Colorado] citizen's role in that event." *Id.* at 657-58.

44. Thus, the case law cited by Defendants does not support the proposition that Defendants have not purposefully availed themselves of the state of Colorado under the harmful effects framework.

### iii. *Defendants purposefully availed themselves of the state of Colorado under the market exploitation framework.*

45. Purposeful availment can also be based on an out-of-state defendant's continuous and deliberate exploitation of the market in the forum state. *Keeton*, 465 U.S. at 781; *see also Old Republic Ins. Co.*, 877 F.3d at 905-06. In finding the forum state had jurisdiction over the non-resident defendant, the court in *Keeton* set a clear example of what constitutes market exploitation in a defamation suit. The plaintiff in that case, a New York resident, filed suit in New Hampshire against the defendant, an Ohio corporation based in California, for libelous statements published in various issues of the defendant's magazine. *Id.* at 772. Even though only a small portion of the relevant issues were sold in New Hampshire, the Supreme Court recognized that the defendant's contacts with New Hampshire need only be such that it is "fair" to compel the respondent to defend a lawsuit in the forum state. *Id.* at 775. Noting that the defendant "produce[d] a national publication aimed at a national audience," the court found "[t]here is no unfairness in

calling it to answer for the contents of that publication wherever a substantial number of copies are regularly sold and distributed." *Id.* at 780-81.

46. Acknowledging *Keeton*'s holding that it is fair to call a publisher to answer for the contents of its publication wherever it is substantially distributed, Defendants nonetheless assert that jurisdiction is improper here because Defendants' statements were not made in exploitation of the Colorado market. Yet, Defendants make no effort to exempt their capitalization on a widespread Colorado audience, let alone a potential customer and donor pool, from being a clear example of market exploitation. Thus, Defendants' attempt to distance themselves from *Keeton* falls well short of the mark. *See Old Republic Ins. Co.*, 877 F.3d at 915 (noting that extensive nationwide advertising is a factor suggesting purposeful direction based on forum state market exploitation); *see also Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S.Ct. at 1030 (finding it fair to exercise jurisdiction over a corporate defendant that conducts business in the forum state).

47. Indeed, Defendants cannot effectively cast doubt on the viability of *Keeton*'s holding, which was recently reaffirmed by the United States Supreme Court in *Bristol-Meyers Squibb Co.* Specifically, the Court affirmed the connection between the purposeful publication of false statements in a forum and the accompanying damages caused within that forum. *See Bristol-Myers Squibb Co.*, 137 S.Ct. at 1782. The Court again recognized the significance of a libel claim in that "false statements of fact harm both the subject of the falsehood and the readers of the statement" in the forum. *See id.* Here, Defendants' statements were made in exploitation of the Colorado market, because Defendants did in fact purposefully publish defamatory statements in Colorado. They used national online platforms to access their audience so as to

disseminate their defamatory statements and solicit both sales of the Film and donations to TAP.[91]

Byrne also repeatedly appeared on Oltmann's Colorado-based podcast, both before and after the filing of this lawsuit in his individual capacity and as an agent of TAP, to promote the work of TAP and directly solicit donations.[92]  Similarly, TAP's president Joe Flynn has made repeated appearances on Oltmann's podcast to promote TAP's work and solicit donations, including on episodes that explicitly defamed Dr. Coomer.[93]  Notably, the Declaration submitted by Joe Flynn on behalf of TAP does not deny seeking or accepting donations, membership fees, or volunteer labor from Coloradans, nor could it.  This situation is directly analogous to that of Sidney Powell and her organization, Defending the Republic (DTR), in related proceeding *Coomer v. Donald J. Trump for President, Inc. et. al*.  There, DTR challenged the Denver District Court's jurisdiction, but the court held that jurisdiction was proper, noting that Powell, acting as DTR's agent, "engaged in fundraising efforts in Colorado to support DTR."[94] Just as in *Keeton*, where the respondent's "regular circulation of magazines in the forum State [was] sufficient to support an assertion of jurisdiction in a libel action based on the contents of the magazine," 465 U.S. at 773-74, Defendants' widespread broadcast of defamatory statements aimed at Dr. Coomer and concerning his work in Colorado places this case squarely under the holding in *Keeton*.

48.     While it is true that Defendants' goal—to undermine the presidential election— required the publication of its statements on a national scale, that does not change the fact that it purposefully targeted a Colorado audience when publishing its defamation and seeking financial

---

[91] *See* Plaintiff's Complaint at ¶¶ 64, 89-91; *see also* Dec. of Eric Coomer at ¶¶ 3-10, 12-13, 16-20, 26.

[92] *See* Dec. of Eric Coomer at ¶¶ 19-20.

[93] *See* Dec. of Eric Coomer at ¶ 26.

[94] *Supra* n.1, at p. 13.

gain through sales of that publication. This is made clear given the source, subject, and content of Defendants' defamation are derived from Colorado, as were the financial donations Defendants solicited as a result. *Rome v. Reyes*, 401 P.3d 75, 85 (Colo. App. 2017) (reversing the district court's finding that it lacked personal jurisdiction in part because the defendant "allegedly engaged in multiple financial transactions [in the forum state] that were substantial in amount and that extended over a relatively significant period").[95]

49. Defendants otherwise impliedly advance the position that they can defame with impunity so long as they do so on a national scale.[96] This has no basis under the law.[97] Just as a defamation defendant cannot escape jurisdiction in one state by publishing its defamation in others, the national reach of Defendants' defamatory statements does not insulate them from Colorado's jurisdiction. *See Gubarev v. Buzzfeed, Inc.*, 253 F.Supp. 3d 1149, 1159 (S.D. Fla. 2017) (finding Florida courts could exercise personal jurisdiction over defendants for its global publication of a controversial dossier because it was aimed at a Florida resident and defendants knew "it would be

---

[95] The significance of where broadcasts are published was further addressed in *TV Azteca v. Ruiz*, 490 S.W.3d 29 (Tex. 2016). There, the Supreme Court of Texas analyzed whether broadcasts originating from Mexican-based broadcasts could allow Texas courts to exercise jurisdiction over the broadcasters. *See* 490 S.W.3d at 47-52. That opinion, which concluded that Texas had jurisdiction, is premised on a distinction between where a broadcast is intentionally published and where it is incidentally received. *See id.* That distinction does not exist here as Defendants purposefully published their defamatory statements through networks with Colorado audiences so as to deliberately exploit that market.

[96] *See* Byrne Mot. at pp. 15-20; Lucescu Mot. at pp. 9-11; TAP Mot. at pp. 6-7.

[97] *See Busch v. Viacom Int'l, Inc.*, 477 F.Supp. 2d 764, 772-73 (N.D. Tex. 2007) (denying personal jurisdiction because plaintiff failed to allege that the forum state was specifically targeted); *Outdoor Channel, Inc. v. Performance One Media, LLC*, 826 F.Supp. 2d 1271, 1281-82 (N.D. Okla. 2011) (same) (not a defamation case); *Annie Oakley Enters., Inc. v. Sunset Tan Corp. & Consulting, LLC*, 703 F.Supp. 2d 881, 893 (N.D. Ind. 2010) (same) (not a defamation case); *Robinson v. Jeopardy Prods., Inc.*, 315 So.3d 273 (La. App. Cir. Oct. 21, 2020) (same) (not a defamation case); *Revell v. Lidov*, 317 F.3d 467, 473 (5th Cir. 2002) (same); *Publ'ns Intern., Ltd. v. Simon & Schuster, Inc.*, 763 F.Supp. 309, 312 (N.D. Ill. 1991) (finding broadcast of a television show in Illinois did not support exercise of personal jurisdiction over the defendant producer in trademark infringement action, but noting that "the context of the instant suit is far different from one alleging, say, defamation, or invasion of privacy") (not a defamation case).

viewed around the world, including in Florida").  Had Defendants not wanted to be subject to Colorado jurisdiction, they should not have published defamatory statements in Colorado, let alone statements germane to a Colorado resident and business and in reliance on Colorado sources.

50.     Defendants' publications through internet platforms also serve as a basis for personal jurisdiction under the market exploitation framework.  In *uBID, Inc. v. GoDaddy Group, Inc.*, the Seventh Circuit analyzed whether Illinois courts could exercise personal jurisdiction over an out-of-state defendant where its contacts with Illinois occurred only through the internet and media.  623 F.3d 421, 424-25 (7th Cir. 2010).  The court held that although the defendant did not have a physical presence outside of Arizona, its "virtual presence in the rest of the country [could] not be ignored."  *Id.* at 424.  Relying on the defendant's national advertising campaigns, which resulted in a number of Illinois customers, the court upheld personal jurisdiction over the defendant because it "thoroughly, deliberately, and successfully exploited the Illinois market."[98]  *Id.* at 427. The court rejected the argument that the defendant could insulate itself from jurisdiction in Illinois because it advertised on a national scale.  *Id.* at 428.  Instead, minimum contacts existed because the defendant "intended to reach as large an audience as possible," which included the millions of potential customers in Illinois.  *Id.*

51.     At its core, the defamation at issue here was part of a plot by Defendants to undermine the presidential election.  Defendants perpetuated this plot—to their own political and financial ends—by publishing their statements on thedeeprig.movie, theamericaproject.com,

---

[98] *Compare uBID, Inc. v. GoDaddy Group, Inc.*, 623 F.3d 421, 427 (7th Cir. 2010) (finding personal jurisdiction where national marketing efforts exploited market in forum state), Pl.'s Compl. at ¶ 88-91 (regarding Defendants' solicitation of financial donations from national viewers and listeners, including those in Colorado), *and* Dec. of Eric Coomer at ¶¶ 7, 13, 16-17, 19, 26-27 (same), *with Giduck v. Niblett*, 408 P.3d 856, 864-865 (Colo. App. 2014) (denying personal jurisdiction where plaintiff's statements were posted passively on the internet).

Rumble, Locals, and other platforms which exploited viewers across the country, including those in Colorado.[99] In broadcasting their defamatory statements into Colorado alongside requests for donations to fund their sham litigation campaigns and bad faith "election integrity" efforts, Defendants further "enjoy[ed] the benefits and protection of [Colorado's] laws—including the enforcement of contracts, the defense of its freedom of speech, and the resulting formation of effective markets." *See Ford Motor Co.*, 141 S.Ct. at 1030 (citing *Int'l Shoe*, 326 U.S., at 319). Defendants' ability to build a reputation and solicit donations in Colorado through national platforms creates a reciprocal obligation that they be subject to Colorado's enforcement of its laws against defamation, in defense of its resident, Dr. Coomer.

### iv. *Defendants' contacts with Colorado gave rise to this litigation.*[100]

52.     To satisfy the "arising out of" prong of the specific jurisdiction test, the defendant's actions "giving rise to the litigation must have created a 'substantial connection' with the forum state." *Archangel*, 123 P.3d at 1194 (quoting *OMI Holdings*, 149 F.3d at 1095) (internal quotations omitted). When Defendants published defamatory statements specifically targeting a Colorado resident, relying on Colorado sources and subjects, originating from Colorado broadcasts, causing harm in Colorado, and in part for the purpose of selling a product to Colorado consumers and raising funds from Colorado donors, they created a substantial connection with Colorado that gave rise to Dr. Coomer's claims in this litigation.

---

[99] *See* Plaintiff's Complaint at ¶¶ 56, 65; *see also* Dec. of Eric Coomer at ¶¶ 3, 5-6, 12.

[100] Notably, Defendants do not argue that their conduct fails to give rise to Dr. Coomer's claims and, thus, this element of specific jurisdiction does not appear to be in dispute.

**B.** *Exercising personal jurisdiction over Defendants' does not offend traditional notions of fair play or substantial justice.*

53.     In assessing whether the maintenance of the suit comports with traditional notions of fair play and substantial justice, the Court considers "(1) the burden on [the defendant] of litigating the matter in Colorado; (2) [the plaintiff's] interests in obtaining convenient and effective relief; (3) the state's interest in adjudicating disputes of this type and vindicating the rights of its citizens; (4) the interstate judicial system's interest in the efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental social policies." *Parocha*, 418 P.3d at 529 (citing *World-Wide Volkswagen Corp.*, 444 U.S. at 297 and *Burger King*, 471 U.S. at 474); *see also Archangel*, 123 P.3d at 1195.  "This inquiry requires a determination of whether a district court's exercise of personal jurisdiction over a defendant with minimum contacts is ***reasonable*** in light of the circumstances surrounding the case." *Archangel*, 123 P.3d at 1195 (internal quotations omitted and emphasis added).

54.     This Court has a strong interest in adjudicating Dr. Coomer's claims because Defendants published defamatory statements targeting a Colorado resident; relying on Colorado subjects and sources; originating from Colorado broadcasts; causing harm in Colorado; and using those statements to make sales and raise funds from Colorado donors.  If, as Defendant argues, the Colorado origin and focus of this conduct combined with the harm felt in Colorado is not enough to support specific jurisdiction, then Dr. Coomer could not establish jurisdiction in *any* state other than the one in which Defendant specifically resides.  But that is not the law.  Rather, Colorado has a significant interest in the adjudication of this case—and Defendant has every reason to answer for its conduct in this jurisdiction.  Defendants in this matter prefer that Dr. Coomer traverse the country to defend his reputation, despite the fact that they injured him in concert as

part of an organized and interconnected campaign. Beyond Colorado's own interest in defending its citizens from tortious behavior, the Court's exercise of jurisdiction in this matter serves the important interstate judicial system's interest in the efficient resolution of controversies. *Parocha*, 418 P.3d at 529.[101] When weighed against these considerations, Defendants' claim that defending their conduct in Colorado presents an unspecified burden that outweighs Dr. Coomer's interests is unpersuasive.[102]

55. Defendants' motions to dismiss for improper venue should likewise be denied. Defendants' proffer cursory arguments that a substantial part of the events giving rise to the claims did not occur in Colorado, such as "no production activities."[103] But Defendants' arguments fail for similar reasons described by the facts and arguments in ¶¶ 1-5, 8-11, 17, 34, 43, 48-52, 54, *supra*. Here, a substantial part of the events giving rise to the case occurred in Colorado. *See, e.g., Graymore*, 2007 WL 1059004, at *14. This is sufficient to support Dr. Coomer's choice of venue.

## RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS PURSUANT TO F.R.C.P. 12(b)(6)

### I. LEGAL STANDARD

56. To survive a motion for judgment on the pleadings, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that

---

[101] *See A + E Television Networks, LLC v. Wish Factory Inc.*, No. 15-CV-1189 (DAB), 2016 WL 8136110, at *11 (S.D.N.Y. Mar. 11, 2016) (considering judicial efficiency as part of its jurisdictional analysis).

[102] *See, e.g.*, Byrne Mot. at p. 21.

[103] *See, e.g.*, TAP Mot. at p. 8.

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A plaintiff must allege sufficient facts to "nudge [] [his] claims across the line from conceivable to plausible." *Id.* at 680. The purpose of this pleading standard is to require fair notice to opposing parties of the claims levied against them and to prevent the assertion of claims with no legal basis. *See Twombly*, 550 U.S. at 555.

## II.    ARGUMENT

### A.    *Dr. Coomer has stated a claim for defamation.*

57.    Dr. Coomer has sufficiently pleaded facts that state a claim for defamation against Defendants. Under Colorado law, the elements for defamation are: (1) a defamatory statement concerning another; (2) published to a third-party; (3) with fault amounting to at least negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special damages or the existence of special damages to the plaintiff caused by the publication. *Williams v. Dist. Court, Second Judicial Dist., City & Cnty. of Denver*, 866 P.2d 908, 911 n.4 (Colo. 1993).

58.    The scope of Defendants' challenge to Dr. Coomer's claim for defamation is limited. Defendants do not challenge the defamatory statements in the Film or that these statements injured Dr. Coomer.[104] Nor could they. The statements are unequivocally false.[105] And the statements are defamatory per se as they impute improper business practices and criminal conduct of the highest order. *See Gordon v. Boyles*, 99 P.3d 75, 79 (Colo. App. 2004). Instead, the Motions are limited to challenging the fact of the Film's publication under the publication standard in element two, and Defendants' liability for the defamation under the fault standard in

---

[104] *See, e.g.*, Byrne Mot. at pp. 4-5; Lucescu Mot. at pp. 3-5; TAP Mot. at pp. 1-13.

[105] *See* Plaintiff's Complaint at ¶¶ 32, 36, 42, 68-70, 73-75, 78-82, 85-87.

element three.[106]  These challenges fail because Defendants did, in fact, publish the Film, and Dr. Coomer is a private citizen whose conduct was not a public concern.[107]  As such, Dr. Coomer need only show negligence, which he has done.  However, even if Dr. Coomer were required to show actual malice, he has more than sufficiently pleaded facts that show at a minimum Defendants published the statements with a reckless disregard for their truth.[108]

### i.    *Defendants published the Film.*

59.    Given that Defendants Byrne and Lucescu premise their arguments with respect to this Court's jurisdiction so heavily on arguments regarding their publication of the Film, Plaintiff incorporates the arguments above herein to the extent allowed for the Court's analysis under the F.R.C.P. 12(b)(6) standard.  For its part, TAP only challenges the fact of publication with respect to their arguments pertaining to Section 230 of the Communications Decency Act, discussed below.  But this argument is unavailing.  They hosted the Film on their website, their agents actively distributed the Film, they used the Film to seek donations on their behalf, and they still own the Film's copyright.  But even without the aid of Dr. Coomer's Declaration containing additional allegations with respect to Defendants' numerous actions supporting a finding that they published the Film, the Complaint itself is sufficient to meet the standard.

60.    Like Lucescu, Byrne too argues that "there are no allegations in the Complaint that Byrne played any role in publishing or republishing – that is, making public by communicating through oral or written words – Oltmann's allegedly false statement that he repeated in the

---

[106] *See, e.g.*, Byrne Mot. at pp. 23-30; Lucescu Mot. at pp. 16-19.

[107] *See* Plaintiff's Complaint at ¶ 9.

[108] *Id*. at ¶¶ 95, 107.

Film."[109]  This argument is as puzzling with respect to Byrne as it is with Lucescu,[110] as the Complaint is replete with numerous allegations that both men, along with TAP, published and distributed the Film, including into Colorado.[111]

61.   Byrne founded TAP with Michael Flynn and then financed the production of the Film, which both men starred in.[112]  Byrne and Lucescu then assembled the Film's cast of characters, publicly vouched for their credibility, and insisted that "What we're doing with this movie is giving you the facts."[113]  Byrne went on to explain the Film's distribution platform, crediting Lucescu with its creation, stating "This has been set up, thanks to Steve [Lucescu] and [director] Roger's [Richards] brilliance."[114]  "You're giving us 500 bucks, make 8,000 in revenue, pay us the 500," he said.  "This has been priced so that patriots can make money."[115]  Lucescu also publicly took credit for creating the Film's distribution model and platform, stating "***We're*** giving you the opportunity to make money."[116]  In addition to financing the Film and co-creating its distribution model and platform, Byrne also starred in the Film, where he presented demonstrable falsehoods as facts almost immediately after the Film begins.[117]  Byrne and Lucescu then

---

[109] Byrne Mot., at p. 23.

[110] *See supra* ¶ 21; It is possible that Defendants Byrne and Lucescu are only taking allegations into consideration that expressly include either of their names, but Plaintiff expressly defined the term "Defendants" as encompassing Byrne, Lucescu, and TAP in the first paragraph of his Complaint.  As a result, it is not accurate to claim that the Complaint does not contain such allegations with respect to Byrne and Lucescu.

[111] *See* Plaintiff's Complaint at ¶¶ 1, 13, 15, 16, 18, 42, 64-66, 76, 87, 89, 95 (two separate express allegations), 103, 107 (three separate express allegations), 115 (two separate express allegations), and 118.

[112] *Id*. at ¶ 56.

[113] *Id*. at ¶ 58; see also ¶¶ 15-16 (noting reliance on Colorado sources).

[114] *Id*. at 65.

[115] *Id*.

[116] *Id*. at 66 (emphasis added).

[117] *Id*. at 69-70.

introduced Oltmann to the audience with a series of additional falsehoods intended to loan legitimacy where none existed.[118]  They bolstered Oltmann's legitimacy with other outright falsehoods about Antrim County, which were necessary to sustain the false narrative that Oltmann would go on to deliver about Dr. Coomer.[119]  Byrne and Lucescu then gave Oltmann several minutes of free rein to unveil the Film's lynchpin, a completely fabricated story that Dr. Coomer partook in an Antifa conference call, claimed on the call to have rigged the election, and then did in fact rig the election.[120]  The centrality of the Film's false claims about Dr. Coomer is then bolstered by Phil Waldron, who Byrne and Lucescu included to further reinforce Oltmann's credibility.[121]  They then focused on Oltmann once again, allowing him to present a nonsensical and technically infeasible series of claims about how Dominion machines supposedly rig elections.[122]

62.    These were all choices that Byrne and Lucescu made.  They could have made the Film any way they liked, including by not including Oltmann's false claims at all, but they chose to include and indeed focus the audience's attention on them.  Defendants would have the Court believe that the Film somehow conjured itself up out of nothing, and that the assemblage of footage that made its way into theatres, auditoriums, and homes across Colorado and the country through the distribution platform they created was the product of random, unattributable chance.  This is

---

[118] *Id.* at 42, 72-73.

[119] *Id.* at 75-78.

[120] *Id.* at 79-81.

[121] *Id.* at 84.

[122] *Id.* at 85-86.

not the case. The Film did not publish itself. Its publication is the product of Defendants' money, labor, creative and editorial input, and substantial distribution efforts.

> ### ii. *Dr. Coomer's private conduct was not a matter of public concern and, therefore, he must only show negligence.*

63. Defendants first assert that the actual malice standard must apply because this dispute arises from a matter of public concern. Defendants' analysis of public concern is remarkable for its brevity and little else. Rather than engage in the nuanced, fact-specific analysis the law requires, Defendants flatly conclude that their defamatory statements involve a matter of public concern because the 2020 presidential election was a matter of public concern.[123] This superficial analysis fails as the matter at issue concerns Dr. Coomer, a private individual, who was privately employed, and privately conducting his work.[124] Dr. Coomer was not "the election," and the statements at issue in this dispute are not statements concerning the security and accuracy of the 2020 Presidential election, but rather statements repeatedly accusing Plaintiff of partaking in an Antifa conference call; claiming on that call to have rigged the election; and actually rigging the election. These false and entirely baseless accusations were the crux of Defendants' Film.[125]

64. Whether a statement is a matter of public concern is determined by "the content, form, and context of the statements, in conjunction with the motivation or 'point' of the statements as revealed by the whole record." *McIntyre v. Jones*, 194 P.3d 519, 525 (Colo. App. 2008). Generally, a matter is of public concern when the public may have a "***legitimate*** interest in what is being published" or when it involves an issue "about which information is needed or

---

[123] Byrne Mot., at p. 1.

[124] *See* Plaintiff's Complaint at ¶¶ 32-33, 105.

[125] *Id*. at ¶ 72-73, 79-82.

appropriate." *Williams v. Cont. Airlines, Inc.*, 943 P.2d 10, 17 (Colo. App. 1996) (emphasis added). When determining whether a matter is a public concern, courts have considered the scope and nature of the alleged public interest;[126] plaintiff's involvement in the alleged interest;[127] and whether the alleged public interest existed prior to the defamatory statements published.[128] Here, Dr. Coomer was unquestionably a private figure about whom the public had no legitimate interest before the defamatory campaign against him.[129] There was no interest in his private employment or private job performance.[130] There was no nexus between his employment and the allegations of voter fraud.[131] The public interest only arose because of the defamatory statements that Defendants perpetuated.[132] Therefore, the balance of factors necessarily weighs against finding that Defendants' defamatory statements qualify as a matter of public concern.

---

[126] Courts consider whether the matter affects a broad segment of the public, occurred publicly, or affects the public. *Compare, e.g.*, *Diversified Mgmt.*, *Inc.*, 653 P.2d at 1108 (widespread ongoing land-development scheme), *Lewis v. McGraw-Hill Broad. Co., Inc.*, 832 P.2d 1118, 1122-23 (Colo. App. 1992) (community's involvement in a prominent civil rights case), *with, e.g.*, *Williams*, 943 P.2d at 17-18 (pilot's private employment for prominent airline), *McIntyre*, 194 P.3d at 525-26 (bookkeeper's private employment for HOA).

[127] Courts require some nexus between the plaintiff and the public matter. *See e.g.*, *DiLeo v. Koltnow*, 613 P.2d 318, 320-23 (Colo. 1980) (looking to the plaintiff's conduct, not the defendant's to determine public concern); *Diversified Mgmt.*, *Inc.*, 653 P.2d at 1107-08 (same); *Quigley*, 327 F.3d at 1061 (same).

[128] Courts require the public interest to exist prior to and separate from the defamatory statements. *See e.g.*, *Diversified Mgmt.*, *Inc.*, 653 P.2d at 1107-08 ("those charged with defamation cannot, by their own conduct, create their own defense"); *Quigley*, 327 F.3d at 1061 (same); *see also Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1553 (4th Cir. 1994) (identifying "whether the public controversy existed prior to the publication of the defamatory statements" as a factor to consider).

[129] *See* Plaintiff's Complaint at ¶¶ 31-34; *see also Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 86 (1971) (dissent, J. Marshall) (defining private figures as "persons first brought to public attention by the defamation that is the subject of the lawsuit").

[130] *See* Plaintiff's Complaint at ¶¶ 3-4, 20, 31-34; *see also Williams*, 943 P.2d at 17-18 (private employment); *McIntyre*, 194 P.3d at 525-26 (private employment).

[131] *See* Plaintiff's Complaint at ¶¶ 30-34; *see also Quigley*, 327 F.3d at 1061 (defendant's conduct cannot create the public interest).

[132] *See* Plaintiff's Complaint at ¶¶ 79-82, 92-93.

65.     This is consistent with constitutional doctrine that precludes a defendant from creating his own defense.  *Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979) ("Those charged with alleged defamation cannot, by their own conduct, create their own defense by making the claimant a public figure."); *Diversified Mgmt., Inc. v. Denver Post, Inc.*, 653 P.2d 1103, 1107 (Colo. 1982).  In short, a defendant cannot manufacture the public concern.  *Snead v. Redland Aggregates, Ltd.*, 998 F.2d 1325, 1330 (5th Cir.1993) ("A speaker cannot turn his speech into a matter of public concern simply by issuing a press release.").  Thus, when a defendant is able to know, and indeed knew or should have known, that the allegations he raised are baseless, he cannot then avail himself of the heightened standard by simply alleging a "public concern."  *Quigley v. Rosenthal*, 327 F.3d 1044, 1061 (10th Cir. 2003) (citing *Kemp v. State Bd. of Agric.*, 803 P.2d 498, 504 (Colo.1990).

### iii.     Even were Dr. Coomer's conduct a matter of public concern, he has alleged actual malice.

66.     Because Dr. Coomer is not a public official or figure, and because Defendants' statements do not involve a matter of public concern, Dr. Coomer does not need to prove actual malice as an element of his defamation claim.[133]  However, even were the heightened actual malice standard to apply, Dr. Coomer has sufficiently alleged that Defendants acted with actual malice in publishing their defamatory statements.

67.     Actual malice "requires at a minimum that the statements were made with reckless disregard for the truth."  *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 686 (1989);

---

[133] *See Enigma Software Grp. USA, LLC v. Beeping Computer LLC*, 194 F.Supp. 3d 263, 288 (S.D.N.Y. 2016) (rejecting challenges to actual malice in a motion to dismiss, finding "[t]his argument fails at the threshold" because the Court could not *on the pleadings* conclude the actual malice standard applied.).

*Diversified Mgmt., Inc.*, 653 P.2d at 1110-11. To prove actual malice, "the plaintiff must demonstrate that the defendant in fact entertained serious doubts as to the truth of the statement . . . or acted with a high degree of awareness of its probable falsity." *Lewis v. McGraw-Hill Broad. Co., Inc.,* 832 P.2d 1118, 1122-23 (Colo. App. 1992). Here, Defendants premise their argument entirely on their subjective knowledge of the falsity of their statements and make no argument with respect to their reckless disregard for the truth. Plaintiff's Complaint, however, pleads numerous facts that are sufficient to establish actual malice by a variety of different means, only one of which is necessary for the Court to deny Defendants' motions.

68.     Courts have considered countless circumstantial factors as sufficient to establish that a defendant has acted with actual malice, including: when a story is fabricated by a defendant or is the product of his imagination;[134] when a defendant relies on anonymous sources;[135] when a defendant had reason to know his source was unreliable;[136] when the allegations made are inherently improbable;[137] when a defendant intentionally avoids the truth;[138] when a defendant's

---

[134] *St. Amant v. Thompson*, 390 U.S. 727, 731-32 (1968).

[135] *Id.*; *Eramo v. Rolling Stone, LLC*, 209 F.Supp. 3d 862, 872 (W.D. Va. 2016).

[136] *St. Amant*, 390 U.S. at 732 (""[R]ecklessness may be found where there are obvious reasons to doubt the veracity of the informant."); *Celle v. Filipino Rep. Enters., Inc.*, 209 F.3d 163, 190 (2d Cir. 2000); *Wells v. Liddy*, 186 F.3d 505, 542–43 (4th Cir. 1999) (actual malice may be shown where publisher had reason to believe a source might not be credible); *Zimmerman v. Al Jazeera Am., LLC*, 246 F.Supp. 3d 257, 283 (D.D.C. 2017) ("[I]f there is evidence that a defendant had an obvious reason to doubt the veracity of a source, then the defendant's failure to investigate the source's allegation prior to publication can be probative of actual malice."); *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 590 (D.C. Cir. 2016) (relying on a facially unreliable source is evidence of actual malice).

[137] *St. Amant*, 390 U.S. at 732 (the publication of allegations that are "inherently improbable" is strong evidence of actual malice); *Spacecon Specialty Contractors, LLC. v. Bensinger*, 782 F.Supp. 2d 1194, 1201 (D. Colo. 2011), *aff'd sub nom. Spacecon Specialty Contractors, LLC v. Bensinger*, 713 F.3d 1028 (10th Cir. 2013) ("when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation" is evidence of actual malice); *Lohrenz v. Donnelly*, 223 F.Supp. 2d 25, 46 (D.D.C. 2002), *aff'd.*, 350 F.3d 1272 (D.C. Cir. 2003) (same).

[138] *Harte-Hanks Commc'ns, Inc.*, 491 U.S. at 693 (noting that "evidence of an intent to avoid the truth was . . . sufficient to satisfy the more demanding [actual malice standard]" which included the failure to review available evidence and

allegations conform to a preconceived storyline;[139] and when a defendant has a financial incentive to make the defamatory statements.[140]

69.    Dr. Coomer makes all of these allegations against Defendants, which must be accepted as true. *See Lobato*, 218 P.3d at 367.  First, Dr. Coomer sufficiently alleged that Oltmann fabricated the false allegations against Dr. Coomer, which Defendants adopted.[141]    Second, Dr. Coomer alleged that Oltmann's story was premised on anonymous sources, which Defendants equally relied upon.[142]  Third, Dr. Coomer alleged that Defendants had several reasons to know that their source, Oltmann, was unreliable and his story inherently improbable.  Oltmann does not have any relevant credentials or official verification (such as a recording) of his hearsay claims about Dr. Coomer.[143]  Oltmann conducted no legitimate investigation in support of his story and purposefully avoided the truth of it.[144]  Oltmann has no evidence in support of his story.[145]  Instead, Oltmann's story is built on an alleged Google search of anonymous speakers from an unrecorded call that he claims to have infiltrated.[146]    In reality, Oltmann made up that story and instead

---

failure to attempt to interview known key witnesses); *Kuhn v. Trib.-Republican Pub. Co.*, 637 P.2d 315, 319 (Colo. 1981) ("a reporter's failure to pursue the most obvious available sources of possible corroboration or refutation may clearly and convincingly evidence a reckless disregard for the truth."); *Burns v. McGraw-Hill Broad. Co.*, 659 P.2d 1351, 1361 (Colo. 1983).

[139] *Harris v. City of Seattle*, 152 Fed. App'x 565, 568 (9th Cir. 2005) ("[E]vidence that a defendant conceived a story line in advance of an investigation and then consciously set out to make the evidence conform to the preconceived story is evidence of actual malice, and may often provide to be quite powerful evidence."); *Gilmore v. Jones*, 370 F.Supp. 3d 630, 674-75 (W.D. Va. 2019); *Eramo v. Rolling Stone, LLC*, 209 F.Supp. 3d 862, 872 (W.D. Va. 2016).

[140] *See Brown v. Petrolite Corp.*, 965 F.2d 38, 47 (5th Cir. 1992) (finding circumstantial evidence of motive can establish actual malice).

[141] *See* Plaintiff's Complaint at ¶¶ 2, 30-37, 59, 61-62, 72-73, 79, 81-85, 92-93.

[142] *Id.* at ¶¶ 32, 97-101.

[143] *Id.* at ¶¶ 96-101.

[144] *Id.* at ¶¶ 31-32, 96-101.

[145] *Id.*

[146] *Id.* at ¶¶ 82, 96, 99.

conducted the alleged Google search on November 11, 2020, two days after his initial claims about Dr. Coomer, and deliberately altered the title of the screenshot to suggest a September 26, 2020, search date, then lied about having done that under oath.[147]  Oltmann then kept this alleged call secret for two months—despite almost daily podcasts—only to remember *after* the election and *after* advancing other election fraud theories.[148]  Fourth, the story he advanced involves facially impossible election interference.[149]  Fifth, like Defendants, Oltmann had a preconceived storyline of election fraud and desire to prove it.[150]  Sixth, like Defendants, Oltmann had political motivations and general ill will.[151]  Seventh, like Defendants, Oltmann had financial incentive to defame Dr. Coomer.[152]  That Defendants relied on Oltmann as their sole source to advance allegations against Dr. Coomer constitutes actual malice.[153]  Eighth, Dr. Coomer also alleged Defendants intentionally avoided the truth.  Defendants did not contact Dr. Coomer or Dominion regarding the allegations; disregarded reliable sources refuting the allegations; and conducted no investigation before actively promoting the allegations.[154]  Ninth, Defendants have yet to issue a retraction further evidencing their actual malice.[155]  Any one of these allegations alone could support a finding that Defendants acted with actual malice when they published false statements

---

[147] *Id.* at ¶¶ 31, 82, 99.

[148] *Id.* at ¶¶ 31-32.

[149] *Id.* at ¶¶ 2-3, 69-70, 72-73, 79-82, 85-87.

[150] *Id.* at ¶¶ 30-32.

[151] *Id.* at ¶¶ 35-42.

[152] *Id.* at ¶¶ 30-36.

[153] *Id.* at ¶¶ 15, 80, 95.

[154] *Id.* at ¶¶ 78, 80, 95, 107.

[155] *Id.* at ¶ 124 (demanding retraction).

about Dr. Coomer. That Dr. Coomer has sufficiently alleged all of them warrants denial of Defendants' motions.

70. In another lawsuit where Byrne was also sued for defamatory statements surrounding the 2020 presidential election, Byrne made similar arguments, to no avail. *See U.S. Dominion, Inc. et. al. v. Byrne*, Case No. 1:21-cv-02131-CJN, (D.D.C. 2021), Memorandum Opinion, Apr. 20, 2022, a copy of which is attached as **Exhibit 2**. In that case, the court analyzed numerous allegedly defamatory statements that Byrne published regarding Dr. Coomer's former employer, Dominion Voting Systems. The court found that "a reasonable juror could find that at least some of Byrne's statements, including these, are so 'inherently improbable that only a reckless man would believe' them." *Id*. at p. 11 (*citing U.S. Dominion, Inc. v. Powell*, 554 F.Supp. 3d 42, 63 (D.D.C. 2021)). The court concluded that "a reasonable juror could find that Byrne acted with actual malice." *Id*.

   iv.    ***Defendants' statements are not protected statements of opinion.***

71. For a statement to be actionable as defamatory, it must express or imply a verifiably false fact about the plaintiff. *Milkovich v. Lorain Journal Co*., 497 U.S. 1, 19-20 (1990). "An opinion based on undisclosed facts is contrasted with an opinion which is based on circumstances set forth by the publisher and which support the proffered opinion." *Burns v. McGraw-Hill Broadcasting Co., Inc*., 659 P.2d 1351, 1359 (Colo. 1983). Opinions which imply the existence of an undisclosed defamatory factual predicate may support a cause of action in defamation. *Id*. at 1360. "If a listener cannot evaluate the alleged defamatory language because no basis for the statement has been disclosed, a defamation action may properly be brought." *Id*.

72.     Here, all of the statements at issue either expressly state the verifiably false facts that Dr. Coomer partook in an Antifa conference call, that he claimed on that call to have rigged the election, and that he did in fact rig the election, or they necessarily imply those verifiably false facts or rely upon stated facts that are verifiably false.  As such, any claims about Dr. Coomer by Defendants necessarily imply and rely upon the verifiably false claims at issue in this dispute.[156]

73.     Defendants' statements are also premised on numerous undisclosed facts, which remain undisclosed to this day and serve to prevent Defendants' listeners from evaluating the basis for the statements.  For example, at no point have Defendants ever disclosed numerous essential facts about their false claims regarding Dr. Coomer, including, but not limited to, facts surrounding the call itself, the other participants on the call, Oltmann's fabrication of evidence to support his narrative about the call, Oltmann's repeated admissions both in writing and on video that he could not confirm the anonymous speaker's identity, and various other matters essential to constitute a full disclosure of relevant facts.[157]  "When one uses language which invites an inference that an individual has acted significantly at variance with community standards, and one fails to provide a factual basis for the derogatory characterization, then one 'knowingly risks the likelihood that the statements and inferences are false and thereby forfeits First Amendment protections.'" *Burns*, 659 P.2d at 1362 (*citing Kuhn v. Tribune-Republican Publishing Co.*, 637 P.2d at 319).

74.     Furthermore, Defendants themselves have also repeatedly insisted that they are not presenting their opinions, but instead verifiable facts.  Defendants have assured their audience that

---

[156] *See* Plaintiff's Complaint at ¶ 58.

[157] *Id*. at ¶ 82.

they were presenting "They stand for truth," that "What we're doing with this movie is giving you the facts," and "This isn't conspiracy theory."[158] This Court should take Defendants at their word.

> ### *v.*    *The Communications Decency Act does not immunize TAP from liability.*

75.    TAP asserts that Section 230 of the Communications Decency Act immunizes it from liability for publishing the Film on its own website. This is not accurate. Section 230 contains two subsections that protect computer-service providers from some civil and criminal claims. *See Bennett v. Google, LLC*, 882 F.3d 1163, 1165 (D.C. Cir. 2018). The first, and the one relevant here, states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). That provision "immunizes internet services for third-party content that they publish, including false statements." *Marshall's Locksmith Serv. Inc. v. Google, LLC*, 925 F.3d 1263, 1267 (D.C. Cir. 2019).

76.    TAP first asserts that its own website, which hosted the Film that it owns the copyright for and profited off of, and in which all of its board members prominently featured, is immune from any liability for this publication, apparently simply because it is a website. This is not and cannot be the case. A so-called "information content provider" does not enjoy immunity under section 230. *Klayman v. Zuckerberg*, 753 F.3d 1354, 1356 (D.C. Cir. 2014). Any "person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service" qualifies as an "information content provider." 47 U.S.C. § 230(f)(3); *Bennett*, 882 F.3d at 1166 (noting a dividing line between service and content in that 'interactive computer service' providers—which

---

[158] *See* Plaintiff's Complaint at ¶¶ 58, 76.

are generally eligible for CDA section 230 immunity—and 'information content provider[s],' which are not entitled to immunity"). "This is a broad definition, covering even those who are responsible for the development of content only 'in part.'" *Universal Commc'n Sys. Inc. v. Lycos Inc.*, 478 F.3d 413, 419 (1st Cir. 2007). Even if TAP's "homepage" were an "interactive computer service," which it likely is not, TAP would still be liable here, as their own cited authority readily confirms. "[A]n interactive computer service that is also an 'information content provider' of certain content is not immune from liability arising from publication of that content. *F.T.C. v. Accusearch Inc.*, 570 F.3d 1187, 1197 (10th Cir. 2009) (citations omitted). As discussed throughout this response, TAP and its agent Byrne played an active role in developing the content in the Film, and their contribution to that content is confirmed by their having copyrighted the rights to the Film, which they still own.

77.     Like Byrne and Lucescu, TAP next attempts to claim it did not publish the Film, and that Plaintiff never pleaded they did, despite the numerous express allegations in Plaintiff's Complaint describing TAP's publication of the Film.[159]   Also like Byrne and Lucescu, TAP provides no indication of who it alleges did publish the Film, opting instead to default to an apparent suggestion that the Film published itself. Again, it did not. TAP, Byrne, and Lucescu did. Section 230 does not immunize their conduct.

**B.      *Dr. Coomer has stated a claim for intentional infliction of emotional distress.***

78.     Dr. Coomer has pleaded facts that establish a claim for intentional infliction of emotional distress. The facts supporting that claim include and build upon the facts underlying

---

[159] *See* Plaintiff's Complaint at ¶¶ 17, 54, 56, 64-65.

Dr. Coomer's defamation claim.[160]  A claim for intentional infliction of emotional distress requires proof that "(1) the defendant(s) engaged in extreme and outrageous conduct, (2) recklessly or with the intent of causing the plaintiff severe emotional distress, and (3) causing the plaintiff severe emotional distress."  *Mackall v. JPMorgan Chase Bank, N.A.*, 356 P.3d 946, 955 (Colo. App. 2014) (citing *Archer v. Farmer Bros. Co.*, 70 P.3d 495, 499 (Colo. App. 2002), *aff'd*, 90 P.3d 228 (Colo. 2004)).

79.     Here, the scope of Defendants' challenge to Dr. Coomer's claims is also limited. Lucescu, for example, makes no argument whatsoever with respect to Dr. Coomer's claim for intentional infliction of emotional distress.  Byrne includes a single footnote, without any corresponding authority, asserting that Dr. Coomer's claim for intentional infliction of emotional distress must be dismissed "because [it] depend[s] upon [his] defamation claims."  Byrne Mot., at p. 5, n. 4.  TAP, however, asserts that the claim must also be dismissed for failure to allege actual malice.  TAP Mot., at p. 13.  Again, Defendants do not challenge the specific conduct underlying this claim.  Instead, they defer to their arguments with respect to Dr. Coomer's claim for defamation.

80.     Dr. Coomer alleged Defendants engaged in extreme and outrageous conduct when they defamed Dr. Coomer.  Extreme and outrageous conduct exists when "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'"  *Han Ye Lee v. Colorado Times, Inc.*, 222 P.3d 957, 963 (Colo. App. 2009).  Courts have found allegations of extreme and outrageous conduct sufficient in:

---

[160] *See* Plaintiff's Complaint at ¶¶ 30, 35, 37 (describing Dr. Coomer as "a traitor" and "corrupt," and stating that the "treason" he committed was "punishable by death").

a. Unverified statements by a newspaper that a wife failed to testify in her husband's murder trial, impugning the wife's integrity and implying the wife was disloyal;[161]

b. Statements that a tenant would have special influence in a judicial proceeding against a landlord and mocking the landlord's serious and unfortunate physical condition;[162]

c. Reports of child abuse by an unlicensed mental health provider when allegedly made in bad faith;[163]

d. Repeated accusations of theft with no evidence beyond a polygraph test when questioning the employee;[164]

e. Repeated requests for payment and threats to garnish wages without judgment;[165]

f. Derogatory comments by a supervisor to pregnant employees;[166] and

g. Racial slurs directed in an employment setting.[167]

81. These cases illustrate that statements—when they defame, denigrate, harass, and threaten—can constitute extreme and outrageous conduct. Here, it is difficult to comprehend statements more extreme and more damaging than the ones Defendants made regarding Dr. Coomer both in nature and scope. Defendants repeatedly, without evidence, falsely accused Dr. Coomer of conspiring to overturn the presidential election. This is alleged criminal conduct committed against every citizen of the United States. These facts are more than sufficient to give

---

[161] *Han Ye Lee*, 222 P.3d at 963-65.

[162] *Meiter v. Cavanaugh*, 580 P.2d 399, 401 (Colo. App. 1978).

[163] *Montoya v. Bebensee*, 761 P.2d 285, 286-90 (Colo App. 1988).

[164] *Ellis v. Buckley*, 790 P.2d 875, 877 (Colo. App. 1990).

[165] *Rugg v. McCarty*, 476 P.2d 753, 754-56 (Colo. 1970).

[166] *Donaldson v. Am. Banco Corp. Inc.*, 945 F.Supp. 1456, 1465-66 (D. Colo. 1996).

[167] *Mass v. Martin Marietta Corp.*, 805 F.Supp. 1530 1543-44 (D. Colo. 1992).

rise to a claim for intentional infliction of emotional distress against Defendants. *See Han Ye Lee*, 222 P.3d at 963-64.

82.     TAP's efforts to apply the heightened fault standard of actual malice to Dr. Coomer's claims of intentional infliction of emotional distress are flawed.   TAP relies exclusively on *Anderson v. Colo. Mountain News Media, Co*., No. 18-CV-02934-CMA-STV, 2019 WL 6888275, at \*7 (D. Colo. Dec. 18, 2019) (*quoting Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 56 (1988)) for the proposition that "[W]hen an allegedly defamatory publication pertains to a matter of public concern, a plaintiff' 'may not recover for the tort of intentional infliction of emotional distress without showing … that the publication contains a false statement of fact which was made with 'actual malice' …" TAP Mot., at p. 13.   But, as described above, the lies about Dr. Coomer are not a matter of public concern.   Neither *Hustler Mag. v. Falwell* nor principles emanating from *New York Times v. Sullivan* require actual malice for *all* intentional infliction of emotional distress claims arising from defamation.[168]   Colorado courts, including the appellate court in *Lewis v. McGraw-Hill Broad. Co. Inc.*, 832 P.2d 1118 (Colo. App. 1992) do not require actual malice simply because an intentional infliction of emotional distress claim arises from defamation.   *Lewis*, 832 P.2d at 1121-25.   Rather, the appellate court there required actual malice because the underlying defamation was a matter of public concern.   *Id.*   Courts have not deviated from limiting actual malice to matters involving public officials, public figures, and public concern in the context of intentional infliction of emotional distress claims.   Rather, courts merely apply that standard to ancillary claims when implicated in the defamation claim.   Second, Dr. Coomer is

---

[168] *See Lewis*, 832 P.2d at 1121-25 (involving a matter of public concern); *Hustler Mag. v. Falwell*, 485 U.S. 46, 50-57 (1988) (involving a public figure); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964) (involving a public official).

not a public official or figure, and Defendants' defamatory statements against him were not a matter of public concern. As such, Dr. Coomer does not need to prove actual malice as an element of his intentional infliction of emotional distress claim. Third, even were the heightened actual malice standard to apply, Dr. Coomer has sufficiently alleged that Defendants acted with actual malice in publishing their defamatory statements, as discussed above. As Dr. Coomer has sufficiently pled his claim for intentional infliction of emotional distress, Defendants' 12(b)(6) challenge to this claim should be denied.

**C.** **Dr. Coomer has stated a claim for unjust enrichment.**

83. As with the claim for intentional infliction of emotional distress, Byrne and Lucescu do not make any argument with respect to Dr. Coomer's claim for unjust enrichment, instead summarily asserting without authority that it too must be dismissed for failure of Dr. Coomer's defamation claim. This is not accurate. For its part, TAP does engage with the claim, but misstates the law with respect to its application.

84. TAP asserts that an unjust enrichment claim in Colorado requires that a plaintiff allege the following: "(1) a benefit was conferred on the defendant by the plaintiff; (2) the benefit was appreciated by the defendant; and (3) the benefit was accepted by the defendant under such circumstances that it would be inequitable for it to be retained without payment for its value." TAP Motion, at p. 15-16 (*citing Tan v. Det-CO, Inc.*, No. 17-CV-01678-NYW, 2018 WL 922133, at *5 (D. Colo. Feb. 15, 2018). TAP then relies on this recitation of elements and argues that the claim must be dismissed because "Plaintiff fails to allege a 'benefit' that *Plaintiff conferred* on any defendant." *Id*. at p. 16 (emphasis in original).

85.     The Colorado Supreme Court, however, expressly overruled this test for an unjust enrichment claim in 1998.[169] Specifically, the Court stated, "Because experience has demonstrated some flaws in the old test, we now clarify and restate the test for recovery under a theory of unjust enrichment as: (1) at plaintiff's expense (2) defendant received a benefit (3) under circumstances that would make it unjust for defendant to retain the benefit without paying." *DCB Const. Co., Inc. v. Central City Development Co*., 965 P.2d 115, 119 (Colo. 1998). The Colorado Supreme Court has more recently reaffirmed the test above, albeit in a slightly modified order. *See Lewis v. Lewis*, 189 P.3d 1134, 1141 (Colo. 2008) (holding that a party claiming unjust enrichment must prove "(1) the defendant received a benefit (2) at the plaintiff's expense (3) under circumstances that would make it unjust for the defendant to retain the benefit without commensurate compensation."). As a result, the current test in Colorado does not include the "conferred on" language that TAP relies upon.

86.     The claim of unjust enrichment is a judicially-created remedy designed to undo the benefit to one party that comes at the unfair detriment of another. *Salzman v. Bachrach*, 996 P.2d 1263, 1265 (Colo. 2000). Application of the doctrine does not depend upon the existence of a contract, express or implied in fact, but on the need to avoid unjust enrichment of the defendant notwithstanding the absence of an actual agreement to pay for the benefit conferred. *Cablevision of Breckenridge, Inc. v. Tannhauser Condominium Ass'n*, 649 P.2d 1093, 1097 (Colo. 1982). The scope of this equitable remedy is broad, "cutting across both contract and tort law, with its

---

[169] TAP is correct that the *Tan* case employed the test they cite, but the court in *Tan* appeared to rely on a 2007 case, which quoted a case from 1996, preceding the Colorado Supreme Court's express clarification of the test in *DCB*. *See Tan*, at *12 (*citing Does v. Rodriquez*, No. 06-cv-00805-LTB, 2007 WL 684117, at *5 (D. Colo. Mar. 2, 2007) (*quoting Humphrey v. O'Connor*, 940 P.2d 1015, 1021 (Colo. App. 1996)).

application guided by the underlying principle of avoiding the unjust enrichment of one party at the expense of another." *Harris Group, Inc. v. Robinson*, 209 P.3d 1188, 1205 (Colo. App. 2009) (*quoting Robinson v. Colo. State Lottery Div*., 179 P.3d 998, 1007 (Colo. 2008). "Trial courts must engage in fact-based inquiries, and then make extensive factual findings, to determine whether a party is entitled to recover under an unjust enrichment claim." *Id.* The trial court must ultimately decide whether the whole circumstances of a case point to the conclusion that the defendant's retention of any profit is unjust. *EarthInfo, Inc. v. Hydrosphere Resource Consultants, Inc.*, 900 P.2d 113, 119 (Colo. 1995).

87.     Here, Defendants made a Film whose central premise relied on outright lies about Dr Coomer.  Defendants then charged a fee to distribute these lies around the country and the state of Colorado, and on information and belief, Defendants made a substantial profit from these efforts. Without the lies about Dr. Coomer, the Film would have lacked a central animating villain to motivate sales and to tie together otherwise disparate allegations made in the Film. Dr. Coomer has suffered a variety of both economic and non-economic damages as a result of Defendants' use of his name and reputation to turn a profit.  Under these circumstances, allowing Defendants to retain these benefits would be unjust, and would in fact serve to incentivize defamation for profit.

**D.     Dr. Coomer has stated a claim for civil conspiracy.**

88.     Dr. Coomer has alleged facts that establish Defendants engaged in civil conspiracy. The facts underlying this civil conspiracy claim include and build upon the facts that support Dr. Coomer's defamation and intentional infliction of emotional distress claims.  To prevail on a claim for civil conspiracy, a plaintiff must prove five elements: "(1) two or more persons, and for this purpose a corporation is a person; (2) an object to be accomplished; (3) a meeting of the minds

on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof." *Walker v. Van Laningham*, 148 P.3d 391, 396 (Colo. App. 2006).

89.     Here, Dr. Coomer alleged Defendants conspired to defame Dr. Coomer so as to promote baseless allegations of election fraud.  But Defendants do not actually engage with Dr. Coomer's civil conspiracy allegations.  Instead, they argue that the claim must be dismissed because no underlying crime or tort occurred.  As argued above, Dr. Coomer has sufficiently pleaded claims for defamation, intentional infliction of emotional distress, and unjust enrichment and any are sufficient to sustain a finding of civil conspiracy.

90.     Only TAP provides an actual argument against the civil conspiracy claim, asserting that "at least one co-conspirator must be a Colorado resident and have committed an act in furtherance of the conspiracy in Colorado." TAP Mot., at p. 7 (*citing Giduck v. Niblett*, 408 P.3d 856, 866 (Colo. App. 2014)).  But the court in *Giduck* did not conclusively hold that a conspiracy claim must include a resident co-conspirator, and addressed the question only for purposes of determining jurisdiction in Colorado.  *See id*. ("***Assuming without deciding*** that a civil conspiracy could potentially establish jurisdiction in Colorado …") (Emphasis added).  Here, jurisdiction is established by Plaintiff's other claims, as discussed above.  The *Giduck* Court cited *Gognat v. Ellsworth*, 224 P.3d 1039, 1053-54 (Colo. App. 2009) in its analysis, but even *Gognat* deferred on the question of whether a conspiracy claim could establish jurisdiction, instead finding that "Mr. Gognat did not allege, much less establish, that either [Colorado resident] Mr. Smith or the nonresident defendants performed substantial acts in Colorado in furtherance of the alleged conspiracy." *Id*. at 1054.  Here, Plaintiff has plainly alleged that the non-resident defendants did take actions in furtherance of the conspiracy here in Colorado, and established jurisdiction through

other his other claims.  As a result, while still an undecided question, the court's observations in *Giduck* and *Gognat* with respect to a potential need for a Colorado co-conspirator strictly for purposes of establishing jurisdiction do not serve to require dismissal of Plaintiff's claim here.

91.    Because Defendants do not challenge the merits of the civil conspiracy claim itself, Defendants' motions to dismiss Dr. Coomer's claim for civil conspiracy should be denied.[170]

## CONCLUSION

As set forth above, Dr. Coomer has sufficiently established that this Court has personal jurisdiction over Defendants.  Defendants' challenge to this Court's exercise of personal jurisdiction is based on misunderstandings of the governing law, as well as misapplications of case law to the facts of this case.  Colorado is an appropriate forum—and in fact *the most appropriate* forum—to adjudicate Dr. Coomer's claims.  Plaintiff has sufficiently alleged all of his claims for relief.  Defendants are subject to this Court's jurisdiction and must answer for the harm they caused in this forum.

## PRAYER

For these reasons, Plaintiff Eric Coomer, Ph.D. respectfully requests that the Court deny Defendants' Motions to Dismiss Pursuant to F.R.C.P.12(b)(2), 12(b)(3), and 12(b)(6).  Dr. Coomer further requests such other and further relief to which he may justly be entitled.

---

[170] Dr. Coomer's claim for injunctive relief is not addressed herein because it necessarily rises and falls on the validity of the well-pleaded tort claims.

Respectfully submitted this 25th day of October 2022.

Respectfully submitted,

_____/s/ Charles J. Cain_____
Charles J. Cain, No. 51020
ccain@cstrial.com
Bradley A. Kloewer, No. 50565
bkloewer@cstrial.com
**Cain & Skarnulis PLLC**
P. O. Box 1064
Salida, Colorado 81201
719-530-3011/512-477-5011 (Fax)

Thomas J. Rogers III, No. 28809
trey@rklawpc.com
Mark Grueskin, No. 14621
mark@rklawpc.com
**RechtKornfeld PC**
1600 Stout Street, Suite 1400
Denver, Colorado 80202
303-573-1900
**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Plaintiff's Omnibus Response to All Defendants' Motions to Dismiss pursuant to F.R.C.P. 12(b)(2), 12(b)(3), and 12(b)(6) has been served on all counsel on this 25th day of October 2022, using the CM/ECF system which will send notification of such filing to the following email addresses:

**Counsel for Defendant Patrick Byrne**
Robert N. Driscoll
rdriscoll@mcglinchey.com
Alfred D. Carry
acarry@mcglinchey.com

**Counsel for The America Project, Inc.**
Christopher W. Dempsey
cdempsey@abelbeanlaw.com

**Counsel for Defendant Steven Lucescu**
Laurin M. Mills
laurin@samek-law.com

_____/s/ Charles J. Cain_____
Charles J. Cain

61