# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

ERIC COOMER, Ph. D.,          )
                                   )

      Plaintiff,               )
                                   )

         vs.                 )    Case No. 1:22-cv-01575-RM-SKC
                                   )

PATRICK BYRNE, *et al.*,       )
                                   )

      Defendants.          )
_____)

## DEFENDANT PATRICK BYRNE'S
## <u>MOTION TO DISMISS COMPLAINT</u>

MCGLINCHEY STAFFORD PLLC
Robert N. Driscoll
Alfred D. Carry
1275 Pennsylvania Avenue NW, Suite 420
Washington, DC 20004
Tel: (202) 802-9999

*Counsel for Defendant Patrick Byrne*

Dated: June 9, 2023

# TABLE OF CONTENTS

Pages

I.     INTRODUCTION ................................................................................................... 1

II.    BACKGROUND ..................................................................................................... 5

III.   LEGAL STANDARD .............................................................................................. 11

     A.     Standard of Review for Dismissal under Rule 12(b)(2) ....................................... 11

     B.     Standard of Review for Dismissal under Rule 12(b)(3) ....................................... 11

     C.     Standard of Review for Dismissal under Rule 12(b)(6) ....................................... 11

IV.   ARGUMENT ........................................................................................................... 12

     A.     The Court Lacks Personal Jurisdiction Over Byrne ............................................. 12

          1.     There is No Basis to Assert General Jurisdiction Over Byrne................. 12

          2.     There is No Basis to Assert Specific Jurisdiction Over Byrne ................ 13

     B.     Venue is Improper in this District......................................................................... 20

     C.     Coomer Has Failed to Plead a Defamation Claim ................................................ 21

          1.     Byrne did not publish Oltmann's allegedly false statement .................... 22

          2.     The contention that Byrne's comment defamed Coomer by implication is specious because no reasonable listener could conclude that the comment was "of and concerning" him ...................... 23

          3.     Ideas or questions, however embarrassing or unpleasant to the subject, cannot support a defamation claim.............................................. 24

          4.     The Complaint fails to allege facts establishing that Byrne published any of the challenged statements with actual malice .............. 27

V.     CONCLUSION....................................................................................................... 30

# TABLE OF AUTHORITIES

Pages

Cases

*Abbas v. Foreign Pol'y Grp., LLC*,
    975 F. Supp. 2d 1 (D.D.C. 2013),
    *aff'd* 783 F.3d 1328 (D.C. Cir. 2015) ................................................................. 27

*Amr v. Virginia*,
    58 F. Supp. 3d 27 (D.D.C. 2014) ....................................................................... 19

*Anderson v. Colorado Mtn. News Media Co.*,
    2019 WL 3321843 (D. Colo. May 20, 2019) ..................................................... 22

*Anderson v. Cramlet*,
    789 F.2d 840 (10th Cir. 1986) ........................................................................... 24

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................................... 12

*Bauman v. Butowsky*,
    377 F. Supp. 3d 1 (D.C. Cir. 2019) ................................................................... 25

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ..................................................................................... 12, 24

*Benton v. Cameco Corp.*,
    375 F.3d 1070 (10th Cir. 2004) ......................................................................... 12

*Bose Corp. v. Consumers Union of United States, Inc.*,
    466 U.S. 485 (1984) ........................................................................................... 29

*Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cnty.*,
    137 S. Ct. 1773 (2017) ....................................................................................... 16

*Brokers' Choice of America, Inc. v. NBC Universal, Inc.*,
    861 F.3d 1081 (10th Cir. 2017) ......................................................................... 25

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985) ..................................................................................... 14, 20

*Calder v. Jones*,
    465 U.S. 783 (1984) ........................................................................................... 16

*Chapin v. Knight-Ridder, Inc.*,
    993 F.2d 1087 (4th Cir. 1993) ........................................................... 26

*Colo'n v. Akil*,
    449 F. App'x. 511 (7th Cir. 2011) ...................................................... 15

*Consulting Eng'rs Corp. v. Geometric Ltd.*,
    561 F.3d 273 (4th Cir. 2009) ............................................................. 18

*Coomer v. Donald J. Trump for President, Inc.*,
    2022 WL 12611311 (Denver Dist. Ct. May 13, 2022) ...................... 27

*Coomer v. Lindell*,
    2023 WL 2528624 (D. Colo. Mar. 15, 2023) ................................... 27

*Coomer v. Make Your Life Epic LLC*,
    2023 WL 2390711 (D. Colo. Mar. 7, 2023) ..................................... 27

*Coomer v. Salem Media of Colo., Inc.*,
    No. 2021CV33632, slip op. (Denver Dist. Ct. Aug. 15, 2022).......... 27

*Croixland Properties Ltd. Partnership v. Corcoran*,
    174 F.3d 213 (D.C. Cir. 1999) .......................................................... 23

*Curling v. Raffensperger*,
    493 F. Supp. 3d 1264 (N.D. Ga. 2020) ............................................ 25

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014)........................................................................... 13

*Deripaska v. Associated Press*,
    282 F. Supp. 3d 133 (D.D.C. 2017)................................................... 25

*Diversified Management Inc. v. Denver Post, Inc.*,
    653 P.2d 1103 (Colo. 1982)........................................................... 5, 22

*Doering v. Cooper Mountain, Inc.*,
    259 F.3d 1202 (10th Cir. 2001) ........................................................ 12

*Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*,
    514 F.3d 1063 (10th Cir. 2008) ........................................................ 19

*Eaton v. Meneley*,
    379 F.3d 949 (10th Cir. 2004) ............................................................ 2

*Emps. Mut. Cas. Co. v. Bartile Roofs, Inc.*,
    618 F.3d 1153 (10th Cir. 2010) ........................................................ 11

*Ervin and Associates, Inc. v. Cisneros*,
  939 F. Supp. 793 (D. Colo. 1996) ..................................................... 11

*Fairfax v. CBS Corp.*,
  2 F.4th 286 (4th Cir. 2021) .............................................................. 30

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
  564 U.S. 915 (2011) .......................................................................... 19

*Grynberg v. Ivanhoe Energy, Inc.*,
  490 F. App'x 86 (10th Cir. 2012) .................................................... 13

*Harte-Hanks Commc'ns, Inc.*,
  491 U.S. 657 (1989) .......................................................................... 28

*Hartleib v. Weiser Law Firm*,
  861 F. App'x 714 (10th Cir. 2021) ..................................................... 3

*Herbert v. Lando*,
  781 F.2d 298 (2d Cir. 1986) ............................................................. 29

*Int'l Shoe Co. v. Washington*,
  326 U.S. 310 (1945) .......................................................................... 19

*J. McIntyre Mach., Ltd. v. Nicastro*,
  564 U.S. 873 (2011) .......................................................................... 15

*Jankovic v. Int'l Crisis Grp.*,
  822 F.3d 576 (D.C. Cir. 2016) ......................................................... 28

*John E. Reid and Associates, Inc. v. Netflix, Inc.*,
  2020 WL 1330657 (N.D. Ill. Mar. 23, 2020) ................................... 15

*Keeton v. Hustler Magazine, Inc.*,
  465 U.S. 770 (1984) .................................................................... 14, 19

*Klayman v. Zuckerberg*,
  753 F.3d 1354 (D.C. Cir. 2014) ....................................................... 22

*Knapp v. Post Printing & Publ'g Co.*,
  144 P.2d 981 (Colo. 1943) ............................................................... 24

*Livnat v. Palestinian Authority*,
  851 F.3d 45 (D.C. Cir. 2017) ........................................................... 14

*McFarlane v. Sheridan Square Press, Inc.*,
  91 F.3d 1501 (D.C. Cir. 1996) .................................................... 28, 29

*McIntyre v. Jones,*
    194 P.3d 519 (Colo. App. 2008) ................................................................. 21

*Miles v. Ramsey,*
    31 F. Supp. 2d 869 (D. Colo. 1998) .......................................................... 24

*Milkovich v. Lorain Journal Co.,*
    497 U.S. 1 (1990) ..................................................................................... 24

*New York Times Co. v. Sullivan,*
    376 U.S. 254 (1964) ............................................................................ 21, 23

*Old Republic Ins. Co. v. Cont'l Motors, Inc.,*
    877 F.3d 895 (10th Cir. 2017) ................................................................... 13

*OMI Holdings, Inc. v. Royal Ins. Co. of Canada,*
    149 F.3d 1086 (10th Cir. 1998) ..................................................... 11, 14, 20

*Palnik v. Westlake Entertainment, Inc.,*
    344 F. App'x 249 (6th Cir. 2009) .............................................................. 15

*Partington v. Bugliosi,*
    56 F.3d 1147 (9th Cir. 1995) ..................................................................... 26

*Peck v. Trubune Co.,*
    214 U.S. 185 (1909) ................................................................................... 23

*Phantom Touring, Inc. v. Affiliated Publ'ns,*
    953 F.2d 724 (1st Cir. 1992) ...................................................................... 26

*Reddick v. Craig,*
    719 P.2d 340 (Colo. App. 1985) ................................................................ 22

*Reuber v. Food Chem. News, Inc.,*
    925 F.2d 703 (4th Cir. 1991) ....................................................................... 2

*Revell v. Lidov,*
    317 F.3d 467 (5th Cir. 2002) ..................................................................... 18

*Rosenbloom v. Metromedia, Inc.,*
    403 U.S. 29 (1971) ............................................................................... 22, 28

*Sanchez v. Miller,*
    2016 WL 675816 (D. Colo. Feb. 19, 2016) .............................................. 11

*Schwartz v. Am. Coll. of Emergency Physicians,*
    215 F.3d 1140 (10th Cir. 2000) ................................................................. 22

*Scott v. Buckner Company,*
 388 F. Supp. 3d 1320 (D. Colo. 2019) ........................................................ 11

*Shrader v. Biddinger,*
 633 F.3d 1235 (10th Cir. 2011) ........................................................... 14, 16

*Smith v. U.S.,*
 561 F.3d 1090 (10th Cir. 2009) ................................................................. 12

*Snyder v. Phelps,*
 562 U.S. 443 (2011).................................................................................. 21

*Soma Med. Int'l v. Standard Chartered Bank,*
 196 F.3d 1292 (10th Cir. 1999) ........................................................... 11, 14

*Spacecon Specialty Contractors, LLC v. Bensinger,*
 713 F.3d 1028 (10th Cir. 2013) ........................................................... 22, 28

*St. Amant v. Thompson,*
 390 U.S. 727 (1968).............................................................................. 28, 30

*Tah v. Global Witness Publ'g, Inc.,*
 991 F.3d 231 (D.C. Cir. 2021) .................................................................... 28

*Tal v. Hogan,*
 453 F.3d 1244 (10th Cir. 2006) ................................................................... 3

*Tripwireless Inc. v. Borrego,*
 2019 WL 12248967 (D. Colo. Nov. 4, 2019) .............................................. 11

*U.S. v. Ahidley,*
 486 F.3d 1184 (10th Cir. 2007) ................................................................... 3

*Universal Leather, LLC v. Koro AR, S.A.,*
 773 F.3d 553 (4th Cir. 2014) ..................................................................... 16

*Walden v. Fiore,*
 571 U.S. 277 (2014)............................................................................. 14, 18

*Webb v. Virginian-Pilot Media Cos.,*
 752 S.E.2d 808 (Va. 2011)......................................................................... 24

*Weller v. Flynn,*
 312 F. Supp. 3d 706 (N.D. Ill. 2018) ......................................................... 15

<u>Statutes</u>

28 U.S.C. § 1391.......................................................................................... 21

Colo. Rev. Stat. § 13-1-124 ........................................................................................ 14

Other Authorities

Restatement 2d Torts § 578 ......................................................................................... 22

Rodney Smolla, 1 Law of Defamation, § 4:40 (2d ed.)............................................. 23

Pursuant to Rule 12(b)(2), 12(b)(3), and 12(b)(6) of the Federal Rules of Civil Procedure, Defendant Patrick Byrne ("Byrne") moves this Court to dismiss Plaintiff Eric Coomer ("Coomer")'s Complaint for lack of personal jurisdiction, improper venue, and failure to state a claim upon which relief can be granted. In support of this motion, Byrne relies on the supporting points and authorities provided below.

Prior to the filing of this motion, and in accordance with Local Civil Rule 7.1(a) and Judge Moore's Civil Practice Standard IV.N.2.a, counsel for the parties met and conferred by videoconference and phone on June 1, 2022 to discuss what Defendants believed to be deficiencies in the Complaint. During this pre-motion conference, the undersigned discussed the pleading deficiencies asserted in Byrne's previously filed motion to dismiss. (*See* Doc. 31, 64.) In full preview of such arguments in support of dismissal, Coomer's counsel again declined to amend the Complaint.

## I. INTRODUCTION

This case warrants dismissal principally because the Court lacks personal jurisdiction over Byrne and because venue is improper here. The case also fails because Coomer has not stated a viable cause of action against Byrne; rather, Byrne merely serves as an attractive deep pocket in Coomer's latest attempt to recover damages for someone else's purportedly false claim.

Although this case touches upon the hotly-contested outcome of the 2020 presidential election and long-debated vulnerabilities of electronic voting machines—both matters of public concern—this is not the first time that a court has considered a defamation case about highly charged political controversies. In reviewing such claims, courts have often noted the law's preference for airing those debates in the court of public opinion, rather than in a court of law. *See, e.g.*, *Eaton v. Meneley*, 379 F.3d 949, 956 (10th Cir. 2004) ("Plaintiffs in public debates are

1

expected to cure most misperceptions about themselves through their own speech and debate.");
*Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 717 (4th Cir. 1991) ("the burden for
demonstrating falsity surely lies with the opposing public figures in a public controversy—a
demonstration better made on the field of polemical battle than in a defamation suit.").

True enough, this principle does not immunize persons who engage in genuinely
defamatory and malicious speech, including speech relating to matters of public concern. But it
does suggest that in this context, courts should be attuned to the importance of exercising their
gatekeeping function to distinguish between allegedly false speech that may offend participants
in political debate—perhaps even understandably so—and the much narrower category of false
speech the law deems to be genuinely defamatory as uttered with actual malice. This distinction
is at the heart of why Byrne's request for dismissal for failure to state a claim should be granted.

Factually, this case arises out of a roughly two-minute segment from a nearly two-hour-
long documentary film called *The Deep Rig*, which concerns the latest presidential election and
surrounding reliability of electronic voting machine technology. Like many documentaries, *The
Deep Rig* has a point of view, which it makes no pretense about. At the same time, for more than
20 years, election observers, including members of Congress, have raised security concerns that
the outcome of elections in the United States might be affected by inaccurate or unreliable
election technology or persons looking to exploit weak security or manipulate ballot counting.[1]

---

[1] At the pleading stage, a court may consider extrinsic documents when they are: (1) integral to
the plaintiff's claim and incorporated into the complaint, (2) not being relied upon to prove the
truth of the matters asserted therein, or (3) when they relate to matters about which a court may
take judicial notice. *See Hartleib v. Weiser Law Firm*, 861 F. App'x 714, 719 (10th Cir. 2021);
*Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006); *U.S. v. Ahidley*, 486 F.3d 1184, 1192
n.5 (10th Cir. 2007) (and this includes another court's publicly filed records "concerning matters
that bear directly upon the disposition of the case at hand."). The articles, court records, and
other documents referenced in this motion are not cited for the truth of the matters asserted, but
to show the public discussion and public issue regarding election integrity and the security of

For example,

- On January 9, 2020, CEOs of the three companies that make more than 80% of the country's voting machines testified before Congress to answer questions from lawmakers about the security of their machines, cybersecurity practices, and susceptibility to hacking given their design or ability to connect to the internet.[2]

- On March 26, 2020, the HBO documentary *Kill Chain: The Cyber War on America's Elections* premiered, which also addressed potential election security vulnerabilities and contained interviews regarding these issues with Senators James Lankford (R-Okla.), Mark Warner (D-Va.), Ron Wyden (D-Or.), and Amy Klobuchar (D-Minn.), all of whom expressed reservations about certain voting machine vulnerabilities.

The "election was rigged" cry is hardly novel and has a long history. For as long as there have been elections, there have been fears that somebody might rig or steal them. History shows that in the contested race of 1800, supporters of Aaron Burr insisted that Thomas Jefferson had cheated him out of the presidency. Allegations of stolen elections similarly plagued the 1824 contest between Andrew Jackson and John Quincy Adams. In more modern times, four out of the last six presidential elections have been subject to accusations that they were "stolen" or "rigged." But all these types of statements amount to nothing more than heated rhetoric and hyperbolic expressions of constitutionally protected speech, and they are not actionable as defamation.

* * *

Nearly an hour into *The Deep Rig*, the documentary presents Joseph Oltmann

---

voting machines, which is important to the Court's determination of the issues presented—namely, whether the challenged statements in this case relate to a matter of public concern.

[2] Ben Popken, *Voting machine makers face questions from House lawmakers – but more remain*, NBC News (Jan. 9, 2020), *available at* https://www.nbcnews.com/tech/security/voting-machine-makers-face-questions-house-lawmakers-more-remain-n1113181 (last visited Jun. 9, 2023); House Hearing, 116th Congress-2020 Election Security-Perspectives from Voting System Vendors and Experts, GovInfo (Jan. 9, 2020), *available at* https://www.govinfo.gov/content/pkg/CHRG-116hhrg41318/pdf/CHRG-116hhrg41318.pdf (last visited Jun. 9, 2023).

("Oltmann"), who discusses his experience with Coomer. Oltmann claims he infiltrated an Antifa conference call on which he overheard Coomer say he made sure Trump would not win the election. Coomer denies the accusation. In fact, Coomer has filed at least four other lawsuits before this one in the Colorado state and federal courts involving the exact same claim.[3]

Apparently without taking personal jurisdiction into account at all, however, Coomer now comes to this Court attempting to hold Byrne liable for Oltmann's accusation since he repeated it in *The Deep Rig*. But Byrne is not a resident of Colorado (Compl. ¶ 10), and the documentary did not premier in Colorado (Compl. ¶ 57), much less get produced or filmed in any way in Colorado (Lucescu Dec. ¶¶ 4-9 [Doc. 86-1]). Because Coomer has brought claims against Byrne in Colorado—a jurisdiction in which Byrne has no relevant contacts, either generally or specifically—federal due process law requires dismissal of the claims against Byrne for want of personal jurisdiction. To find otherwise would render personal jurisdiction so loose that, in the digital age, a defamation claim would essentially be exempt from personal jurisdiction requirements and could proceed anywhere the alleged defamed party is located. That is not the law. Similarly, because a commonsense appraisal of the events having operative significance in this case shows that nothing occurred in Colorado, this action must be dismissed for improper venue reasons should it survive jurisdictionally at all.

Regarding the merits, defamation claims such as those alleged here in the Complaint are

---

[3] Oltmann's statements are at the center of at least four other pending lawsuits: (1) *Coomer v. Donald J. Trump for President, Inc., et al.*, which Plaintiff filed on December 22, 2020 in Colorado state district court in Denver as Case No. 2020CV034319; (2) *Coomer v. Salem Media of Colorado, Inc., et al.*, which Plaintiff filed on November 13, 2021 in Colorado state district court in Denver as Case No. 2021CV033632; (3) *Coomer v. Make Your Life Epic LLC, et al.*, which Plaintiff filed on December 22, 2021 in Colorado federal district court as Case No. 1:21-cv-03440-WJM; and (4) *Coomer v. Michael J. Lindell, et al.*, which Plaintiff filed on April 4, 2022 in Colorado state district court in Denver and was subsequently removed to Colorado federal district court on May 5, 2022 as Case No. 1:22-cv-01129-WJM.

subject to the highest possible bar under defamation law: proof of actual malice. In cases involving constitutionally protected speech related to matters of public concern—like election integrity or the reliability of electronic voting machine technology which are at issue here— Colorado law is distinct in that it provides even greater protection than federal First Amendment jurisprudence. *See Diversified Management Inc. v. Denver Post, Inc.*, 653 P.2d 1103, 1105-08 (Colo. 1982) (requiring the actual malice standard for fault in a defamation case under Colorado law as long as the speech at issue involved a matter of public concern, regardless of whether the defamed party is a public figure or official).

The allegations here do not meet this high bar. Instead, the Complaint contains allegations by Coomer that are not relevant or defamatory as against him. Other times, the Complaint contains allegations about statements that are not false or defamatory. Other times still, the Complaint eschews simple pleading and a chronological presentation to distract from the post-hoc nature of the facts alleged and Coomer's inability to plead what Byrne knew and what Byrne was aware of at the time the alleged statements were made. Actual malice must be based on what Byrne *actually* knew at the time the challenged statement was made, not on what a plaintiff thinks he *should* have known. Because the most Coomer has alleged is the latter, the claims must be dismissed.[4] Byrne's motion to dismiss should be granted.

## II.  BACKGROUND

The most recent presidential election occurred on November 3, 2020. The bitter battle for the White House between then President Donald Trump and former Vice President Joe Biden

---

[4] Coomer's remaining claims of intentional infliction of emotional distress, civil conspiracy, unjust enrichment, and an injunction fail because they depend upon Coomer's defamation claims, which fail as a matter of law. Byrne also adopts and incorporates by reference the additional dismissal arguments of Lucescu and TAP (Doc. 86, 87) as to why these remaining claims fail.

produced no clear winner by election night, with the race being too close to call and millions of votes still uncounted. By November 7, many news organizations called the 2020 election for Joe Biden. But public controversy surrounding the election results was far from over, with lawsuits being filed across the country raising allegations of voter fraud and voting machine problems, and other post-election result challenges and audits being pursued in various states.

Patrick Byrne is the founder and former chief executive and director of the online retail giant Overstock.com. (Compl. ¶ 10.) Having left Overstock in 2019, and given the swell of national media attention on the serious charges being made about election integrity and the vulnerabilities of electronic voting machines in the aftermath of the 2020 presidential election, Byrne took an interest in the subject and decided to write a book on the issues.[5] His efforts culminated into *The Deep Rig*, a documentary film that lasts approximately an hour and forty-five minutes and was produced by Steven Lucescu ("Lucescu"). (Compl. ¶ 1.) Byrne is credited as a co-producer in name only. (Compl. ¶ 1.) The America Project, Inc. ("TAP") owns the copyright to the film. (Compl. ¶ 1.)

*The Deep Rig* opens on a black screen with white text, archive footage, and news clippings. It features many different people and interviews. Approximately 53 minutes into the film, the documentary introduces Oltmann. Oltmann is a Colorado based political activist and business owner, who founded the nonprofit corporation FEC United. (Compl. ¶ 30.) Oltmann is also a former co-host for the podcast called the Conservative Daily. (Compl. ¶ 31.)

Prior to the film, on November 9, 2020, Oltmann reported on his podcast that he attended a conference call with Antifa where an individual named Eric told the attendees: "Don't worry about the election, Trump is not gonna [sic] win. I made f-ing sure of that." (Comp. ¶ 31.)

---

[5] The Complaint does not allege Byrne defamed Coomer in the book. (Compl. ¶ 92.)

Oltmann reported that he had identified that individual as Eric Coomer, then Director of Product Security and Strategy for Dominion Voting Systems, Inc. ("Dominion"). Ten days later, the legal team for the Trump campaign, led by prominent former federal prosecutors, held a national press conference to speak about election issues and Coomer's role in an alleged fraud. (Compl. ¶ 36.)[6] Oltmann then gave a number of interviews to a variety of other news organizations on his claims about Coomer. (Compl. ¶ 35.) Oltmann even signed a sworn affidavit attesting to his story about Coomer for use by Trump's legal team in their post-election related lawsuits.[7]

At minute marker 1:12:47, Oltmann identifies himself onscreen.[8] "My name is Joe Oltmann. I'm a data company CEO based out of Denver, Colorado." (Comp. ¶ 72.) Seconds later, Oltmann retells his experience with Coomer:

> I set out to figure out who the Antifa activists were, and then as the story goes, that's when I discovered Eric Coomer. . . . [I]n September of 2020, I set out to infiltrate Antifa. And I did. So, I met a guy that was part of Antifa and he said, I've got to figure out a way to get out, but I'm too deep into the process. And I said, well the first thing that could happen is we could dismantle it, and an easy way to dismantle it is to uncover who is running Antifa. So he got me on a phone call. They were talking about how they needed to fortify and continue to do the things that they were doing, not just in Colorado Springs, but in Denver and all over Colorado. And a guy named Eric started speaking, and when Eric started speaking, he started talking again about how they needed to fortify and not give up. They asked, who's Eric, who's Eric. And somebody came back and said, oh, Eric's a Dominion guy. As he continued to speak, somebody else interrupted him and said, hey, what are we going to do if Trump wins? And he responded, don't worry about the election. Trump's not going to win. I made fucking sure of it. So,

[6] S*ee also Rudy Giuliani Trump Campaign Press Conference Transcript November 19: Election Fraud Claims*, REV (Nov. 19, 2020), *available at* https://www.rev.com/blog/transcripts/rudy-giuliani-trumpcampaign-press-conference-transcript-november-19-election-fraud-claims (last visited Jun. 9, 2023).

[7] *See* Affidavit of Joseph Oltmann dated Nov. 13, 2020, filed at Record Document 9-6 in the civil action styled *Freehan v. Wisconsin Elections Comm'n*, bearing Case No. 2:20-cv-01771-PP before the Eastern District of Wisconsin.

[8] A nonparty appears to have created a social media post on Loom.com, archiving the livestreamed premier of *The Deep Rig*. This video archive is *available at* https://www.loom.com/share/36db4fc626df467b82f1fb9def1949af (last visited Jun. 9, 2023).

I hung up the phone, started doing research on Eric. I didn't know Eric was Coomer, I just knew Eric. I'm kind of a research junky, so I just went through and started gathering information. Went and listened to YouTube videos to make sure that the voice I heard on the call was the same voice to match up to that particular individual. . . . November 3rd, we all know what happened. We went to sleep that night with President Trump being handily ahead. We woke up the next morning that Biden had won and nothing to see here. And I'm sitting at my friend's place, and I get this text message. It's like Joe, you need to read this article. And as I went through the article and it talked about in Georgia, in several precincts, that this system during the election on election day actually went down. And there is a description inside of the article that said why it went down, that they had to do an update in the middle and took it down for four hours. But the person that gave the update was Eric Coomer. And at that moment my heart sank. That's when I knew. That's when I knew that there was a– you know, Dominion Voting Systems was in 28 states. That's when I started to realize that this guy Eric Coomer, when he said on that call don't worry about Trump, he's not going to win. That's when I knew that there was a high probability that he affected the election.

(Comp. ¶¶ 79-81.) Coomer denies Oltmann's accusations as false. (*See generally* Compl.)

*The Deep Rig* was shown for the first time on June 26, 2021 at a livestreamed special event held in Phoenix, Arizona, followed by a live Q&A between host Ann Vandersteel and the film's co-producers, director, and other panel members. (Compl. ¶ 57.) Coomer alleges no other public screening of the film occurred besides the premier in Arizona. (*See generally* Compl.)

The Complaint notes that the film received some social media attention on Twitter by Oltmann's nonprofit company FEC United. (Compl. ¶¶ 90-91.) In a pair of tweets on July 29 and August 3, 2021, FEC United—under the Twitter handle @FEC_United—promoted a screening of *The Deep Rig* at an FEC United movie night at Fervent Church in Colorado Springs. (Compl. ¶¶ 90-91.) Critically, the Complaint contains no allegation that *The Deep Rig* actually played at Fervent Church as promoted. Further, there is no allegation as to who or what parties licensed, authorized, paid for, or contracted for *The Deep Rig* to be played at Fervent Church. Significantly, however, by Coomer's own admission, Byrne did not have rights to the film, and thus Byrne could not have granted a license for its publication. (Compl. ¶ 56.) Moreover, the licensor, together with FEC United or Fervent Church—not Byrne—would have been the parties

responsible for publishing the film at such a movie night in Colorado Springs in any event.

On June 24, 2022, almost a year after the documentary premiered, Coomer filed his five-count complaint against Byrne, Lucescu, and TAP asserting claims for defamation (Count 1), intentional infliction of emotional distress (Count 2), conspiracy (Count 3), unjust enrichment (Count 4), and injunctive relief (Count 5). The defamation count attempts to attribute liability to Byrne based on four challenged statements in the Complaint.

Statement 1: First, Coomer seeks to hold Byrne liable for the statement Oltmann made—i.e., that Coomer was on an Antifa conference call where he said he would subvert the 2020 presidential election by making sure Trump would not win. Because Oltmann repeated this statement in *The Deep Rig*, and Byrne is credited as its co-producer, Coomer contends Byrne is liable for purportedly republishing Oltmann's allegedly defamatory statement.

Statement 2: Second, Coomer alleges he was defamed during the live Q&A session after the film premier, where Byrne said:

> We had been going through the operating manuals of these equipment companies and saw these crazy facts. Like, you could adjudicate, that when the machine doesn't read your vote, it goes into a pile to be 'adjudicable.' And it might build up a stack of a thousand, not actual paper ballots but digital images. It's right there in the operator's manual, the precinct administrator can come by with a mouse click, drag 'em over and give them to Joe Biden or whoever they want. It's so obviously a design flaw that I was horrified.

(Compl. ¶ 59.) According to Coomer, this comment "impliedly defame[d]" him because he "helped secure the patents for Dominion's adjudication feature[.]" (Compl. ¶ 59.)

Statement 3: Third, Coomer alleges he was defamed on The Eric Metaxas Show, hosted by New York radio personality host Eric Metaxas, where Byrne on July 6, 2021 said:

> Eric Coomer's name shows up in a lot of places. It shows up in Arizona. It shows up in Georgia. Resetting, Dominion reloaded, which, it's illegal, you have a safe harbor under the law which up until about 60 days before the election you can put new software in your equipment, but you can't update after 60 days. They were updating, they took down— I think  Fulton County— they took it offline in

Georgia, or maybe it was Coffee County. They took it down and uploaded new software in the middle of the day.

(Compl. ¶ 92.)[9]

Statement 4: Fourth, Coomer alleges he was defamed on the Conservative Daily podcast hosted by Oltmann and co-host Max McGuire, where Byrne on September 28, 2021 said:

*Byrne*: The Dominion machines have a setting that it turns out internally they have that same device that looks for Vote Secure Paper, and they can be set to look for that. If something is not Vote Secure Paper, it gets sent, it gets diverted, either electronically or physically. So those machines have that setting. But there's a secret way, that no one would have known about to turn that setting off while making it look like it was turned on. Very few people know about that. It's not the kind of thing that election officials in Maricopa would have known about, but it is the kind of thing that Dominion employees would know about, that there's this secret setting. Very few people in the industry even knew that this exists, but you can have it look like it's voting, checking to make sure every paper is Vote Secure Paper, while in fact it's ignoring. That's how we believe this was set for this election, because it didn't identify even when it was 100% fake, it didn't find it. Well, who could have done that? I don't know. I have a few hypotheses on who did that. I have three candidates I'll tell you first. There were two Dominion employees as a [unintelligible] to the Maricopa County board in this election, and there was a third employee you may have heard of who advised them from up above, specifically on the paper issue. You'll never guess his name.

*Oltmann*: Let me say.

*McGuire*: Is he a baker?

*Oltmann*: Is he a baker? Does he now call himself a baker that happens to have a Ph.D. in nuclear engineering? Who goes by the name of Eric Coomer? Might be.

*Byrne*: Might be.

(Compl. ¶ 93.) Byrne now moves this Court to dismiss the Complaint for want of personal jurisdiction, improper venue, and failure to state a claim.

---

[9] *Billionaire Patrick Byrne Talks About Being Enlisted by a Federal Agency To Bribe Hillary Clinton*, The Eric Metaxas Radio Show (Jul. 6, 2021), *available at* https://rumble.com/vjihax-patrick-byrneannounces-his-brand-new-documentary-on-2020-election-fraud-th.html (last visited Jun. 9, 2023).

### III. LEGAL STANDARD

**A.      Standard of Review for Dismissal under Rule 12(b)(2)**

When personal jurisdiction is challenged by a Rule 12(b)(2) motion to dismiss, the

plaintiff bears the burden of establishing that jurisdiction exists. *Soma Med. Int'l v. Standard*

*Chartered Bank*, 196 F.3d 1292, 1295 (10th Cir. 1999). To carry that burden at the pleading

stage, without an evidentiary hearing, the plaintiff must make a prima facie showing of personal

jurisdiction. *Id.*; *OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1090 (10th Cir.

1998). Where the undisputed factual allegations, accepted as true, fail to make such a showing,

the court lacks personal jurisdiction. *Id.*

**B.      Standard of Review for Dismissal under Rule 12(b)(3)**

"The standard under Rule 12(b)(3) is generally the same as a motion to dismiss for lack

of personal jurisdiction." *Tripwireless Inc. v. Borrego*, 2019 WL 12248967, at *3 (D. Colo. Nov.

4, 2019). Plaintiff "has the burden to establish that venue is proper" in the forum district. *See*

*Ervin and Associates, Inc. v. Cisneros*, 939 F. Supp. 793, 796 (D. Colo. 1996). Determination of

proper venue "does not require the court to choose the best venue or determine which forum has

the most, or most significant, contacts with plaintiff's claims." *Sanchez v. Miller*, 2016 WL

675816, at *3 (D. Colo. Feb. 19, 2016). "Moreover, unless the balance is strongly in favor of the

defendant, the plaintiff's choice of forum should rarely be disturbed." *Scott v. Buckner Company*,

388 F. Supp. 3d 1320, 1324 (D. Colo. 2019) (cleaned up). However, courts are to "accord little

weight to a plaintiff's choice of forum where the facts giving rise to the lawsuit have no material

relation or significant connection to the plaintiff's chosen forum." *Emps. Mut. Cas. Co. v. Bartile*

*Roofs, Inc.*, 618 F.3d 1153, 1168 (10th Cir. 2010) (cleaned up).

**C.      Standard of Review for Dismissal under Rule 12(b)(6)**

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must contain

sufficient factual matter to "state a claim to relief that it is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A plaintiff must plead more than the mere possibility of relief, for naked assertions of wrongdoing require some factual enhancement. "Factual allegations must be enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 545, to one that is "plausible on its face," rather than merely "conceivable." *Id.* at 570. A complaint asserting facts "merely consistent with" a defendant's liability "stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court may consider documents attached to the complaint, or incorporated into the complaint by reference, matters of which courts may take judicial notice, or documents appended to a motion to dismiss if they are referred to in the complaint, central to the plaintiff's claim, and the parties do not dispute the documents' authenticity. *Smith v. U.S.*, 561 F.3d 1090, 1098 (10th Cir. 2009).

## IV.  ARGUMENT

### A.    The Court Lacks Personal Jurisdiction Over Byrne

When sitting in diversity, which is the sole basis for subject matter jurisdiction asserted here (Compl. ¶ 13), federal courts may only exercise personal jurisdiction over a nonresident defendant where both state law and federal due process law are satisfied. *Doering v. Cooper Mountain, Inc.*, 259 F.3d 1202, 1209-10 (10th Cir. 2001). "Colorado's long arm statute is coextensive with constitutional limitations imposed by the due process clause. Therefore, if jurisdiction is consistent with the due process clause, Colorado's long arm statute authorizes jurisdiction over a nonresident defendant." *Benton v. Cameco Corp.*, 375 F.3d 1070, 1075 (10th Cir. 2004). In the Complaint, Coomer alleges this Court has personal jurisdiction over Byrne. It does not.

### 1.    There is No Basis to Assert General Jurisdiction Over Byrne

There are two possible paths to satisfying the requirement of personal jurisdiction. The first, general jurisdiction, permits a court to assert jurisdiction over a defendant based on a forum connection unrelated to the underlying suit. Due process permits general jurisdiction based on "only a limited set of affiliations with a forum," in which the defendant can be "fairly regarded as at home." *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014). For individuals, this is generally limited to the individual's domicile. *Id*. at 137 ("the paradigm forum for the exercise of general jurisdiction is the individual's domicile."); *Grynberg v. Ivanhoe Energy, Inc.*, 490 F. App'x 86, 95 (10th Cir. 2012) (same).

Here, there can be no dispute that this Court lacks general jurisdiction. The Complaint readily admits Byrne "is an individual resident of Florida" and lists a Florida address for him. (Compl. ¶ 10.) Coomer has not pled sufficient facts to establish that this is an "exceptional case" in which there are "continuous and systematic" contacts in Colorado to create a new home for Byrne there. *Daimler*, 571 U.S. at 139. Because Byrne is neither domiciled nor "at home" in Colorado, there is no general jurisdiction over him in Colorado.

## 2.    There is No Basis to Assert Specific Jurisdiction Over Byrne

The second type of personal jurisdiction is specific jurisdiction. The minimum contacts test for specific jurisdiction encompasses three distinct requirements. First, the defendant must have purposefully directed his conduct into the forum state. Second, the plaintiff's claim must arise out of or relate to the defendant's suit-related forum conduct. Third, the exercise of jurisdiction must be reasonable under the circumstances. *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 904 (10th Cir. 2017). "The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant 'focuses on the relationship among the defendant, the forum, and the litigation.'" *Walden v. Fiore*, 571 U.S. 277, 283-84 (2014) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984)). This affiliation "must arise out of contacts

that the 'defendant *himself*' creates with the forum State." *Id.* (emphasis in original) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). It is "the defendant's contacts with the forum State itself, not the defendant's contacts with the persons who reside there," that control. *Id.* And the defendant's "suit-related conduct must create a substantial connection with the forum State." *Id.*

As it relates to defamation cases, the Tenth Circuit places an emphasis on a defendant "intentionally directing his/her/its activity or operation at the forum state[.]" *Shrader v. Biddinger*, 633 F.3d 1235, 1240 (10th Cir. 2011). In this respect, courts examine the content of the challenged statement and "look to indications that a defendant deliberately directed its message at an audience in the forum state and intended harm to the plaintiff occurring primarily or particularly in the forum state." *Id.* It is not enough for plaintiffs to make bare allegations or conclusory statements of personal jurisdiction. *Soma Med. Int'l*, 196 F.3d at 1295; *OMI Holdings, Inc.*, 149 F.3d at 1091. Moreover, a district court "need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts." *Livnat v. Palestinian Authority*, 851 F.3d 45, 56-57 (D.C. Cir. 2017).

Here, Coomer relies on the Colorado long-arm statute, C.R.S. § 13-1-124, asserting this Court has personal jurisdiction "because Defendants transacted business in Colorado and committed tortious acts within Colorado." (Compl. ¶ 14.) But Coomer offers no more than boilerplate personal jurisdiction paragraphs that make conclusory allegations relating to the jurisdictional elements. (Compl. ¶¶ 14-18.)

Coomer has not alleged that Byrne's conduct was purposefully directed to Colorado, or arises out of or relates to Byrne's contacts in Colorado. In fact, Coomer's allegations show just the opposite. The Complaint alleges that the named defendants defamed Coomer "using national

platforms and broadcasts" (Compl. ¶ 15 & n.3) that premiered locally in Arizona, but were "livestreamed online to a national audience" (Compl. ¶¶ 57-58), which purportedly included Colorado residents. Allowing personal jurisdiction under such circumstances would amount to universal jurisdiction, which the Supreme Court has rejected. *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 886 (2011) (holding that it is the defendant's "purposeful contacts with [the state], not with the United States, that alone are relevant").

Coomer also fails to allege any concrete facts establishing that Byrne ever set foot in Colorado, much less transacted any business or committed a tort in Colorado. At most, Byrne is alleged to have been a co-producer of the film. But when it comes to personal jurisdiction analysis, federal courts have routinely treated those who may have created or produced a work differently from those who published the work. *See, e.g.*, *John E. Reid and Associates, Inc. v. Netflix, Inc.*, 2020 WL 1330657, at *5 (N.D. Ill. Mar. 23, 2020) ("[t]he forum-targeting actions of distributors are not generally imputed to the people [who] created the distributed product."); *Colo'n v. Akil*, 449 F. App'x. 511, 514 (7th Cir. 2011) (nonresident producers of a television program were not subject to personal jurisdiction in Indiana because they played no role in broadcasting the show in Indiana); *Palnik v. Westlake Entertainment, Inc.*, 344 F. App'x 249, 252-54 (6th Cir. 2009) (no personal jurisdiction over nonresident producers who played no role in the movie's distribution in the forum state); *Weller v. Flynn*, 312 F. Supp. 3d 706 (N.D. Ill. 2018) (no personal jurisdiction in Illinois over the two nonresident producers because the actions of the Twentieth Century Fox production company could not be imputed to the individually named producers; there were no allegations that the individually named producers took part in any publication efforts of the film in Illinois, and thus, there could be no finding that the individually named producers purposefully targeted Illinois in any way); *see also Calder v.*

*Jones*, 465 U.S. 783, 790 (1984) (whether the Floridian authors could be hauled into California is not based on the actions of the magazine company for whom the authors had written the allegedly defamatory article).

There must be an affiliation between the nonresident defendant, "the forum, and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State" such that the suit involves the "adjudication of issues deriving from, or connected with" those contacts. *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cnty.*, 137 S. Ct. 1773, 1780 (2017). *Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553, 559 (4th Cir. 2014) (the "qualifying contacts with the forum state [must] also constitute the basis for the suit."). As the unassailable Declaration of Steven Lucescu makes plain, no production or filming activities relating to the documentary film ever occurred in Colorado.

> No activities relating to the production of *The Deep Rig* occurred in Colorado. Many *Deep Rig* production activities occurred in Arizona. . . . I chose Phoenix because my Director of Photography and a substantial portion of the production team (i.e., camera operators, grips, data manager, sound technician, etc.) live in the Phoenix area.

(Lucescu Dec. ¶¶ 4-9 [Doc. 86-1].)

In addition, in terms of audience and content, *The Deep Rig* and Byrne did not make Colorado "the focal point of the message." *Shrader*, 633 F.3d at 1239. To the contrary, the film did not specifically target a Colorado audience; rather, Byrne allegedly "sought a national audience." (Compl. ¶¶ 16, 57-58). Although Oltmann—a Coloradan—appears in the film, Oltmann is hardly the focus of the film. He is one of over twenty different cast members who also appear as themselves in the film. (Compl. ¶ 49.) Moreover, although the film discusses Dominion, Dominion is a national voting machine company that supplied election related services to nearly half of American voters spread across "at least thirty different states during the 2020 presidential election." (Compl. ¶ 20.) Further still, the content of *The Deep Rig* is about the

2020 presidential election, and it addresses perceived election fraud issues and voting machine security concerns in about a half-dozen states that do not include Colorado, but instead Nevada, Arizona, Wisconsin, Michigan, Pennsylvania, and Georgia. (Compl. ¶¶ 69-70.)

For example, the film focuses "at length" on the audit that took place in Maricopa County, Arizona. (Compl. ¶¶ 70 and 88.) The documentary also covers the events of what happened in Antrim County, Michigan. (Compl. ¶¶ 75-79.) Antrim County is a Republican-leaning county. This county used Dominion voting machines, and on election night, the county reported in its unofficial totals that Biden had won 7769 to 4509. (Compl. ¶¶ 51, 78 & n.102.)[10] Two days later, on November 5, 2020, the county issued "corrected" unofficial results, this time reporting that Trump won 9783 to 7289. This correction increased the total vote tallies for Trump by roughly 5000 votes. On November 6, the county reported yet another total, this time with Trump winning 9748 to 5960.

Naturally, these fluctuating vote totals raised concerns given the fact that Michigan was very close and numerous counties in Michigan used Dominion voting machine equipment. In response to these concerns, Michigan Secretary of State Jocelyn Benson issued a statement on November 6 that said Antrim County had misreported totals due to user error in the compilation of unofficial results by an Antrim County clerk.[11] Subsequently, as part of litigation brought by a Michigan resident, Russell Ramsland and his company Allied Security Operations Group ("ASOG") authored a report after making a forensic inspection of the Antrim County Dominion

---

[10] *See* Michigan Senate Oversight Committee, *Report on the November 2020 Election in Michigan* (Apr. 9, 2021), at 15-16, *available at* https://misenategopcdn.s3.us-east-1.amazonaws.com/99/doccuments/20210623/SMPO_2020ElectionReport.pdf (last visited Jun. 9, 2023).

[11] *See* The Office of Secretary of State Jocelyn Benson, *False claims from Ronna McDaniel have no merit* (Nov. 6, 2020), at https://www.michigan.gov/sos/0,4670,7-127-93094-544676--,00.html (last visited Jun. 9, 2023).

machines, which concluded that the erroneous initial vote totals were a result of error in Dominion's software. Regardless of the ultimate truth of the ASOG report, it had documentary significance for *The Deep Rig* because the fact that changes in vote totals occurred at all due to user error means that voting machine manipulation is not inherently improbable, as what can happen unintentionally due to user error can just as easily happen intentionally.

As for the other challenged statements, Byrne's comment at the live Q&A occurred while at the film premier in Arizona to a live audience in Arizona. (Compl. ¶ 57.) Byrne's other allegedly defamatory remarks were on a nationally syndicated radio show and an online podcast, while a guest on The Eric Metaxas Show and Conservative Daily, respectively. (Compl. ¶¶ 92-93.) And the Complaint contains no corresponding jurisdictional allegation that Byrne appeared for either of these shows from a location in Colorado or recording studio in Colorado.

Ultimately, the only connection to Colorado is that Oltmann and Coomer live there. However, under well-established case law, that is not good enough. The Supreme Court has emphatically held that "it is the defendant's conduct that must form the necessary connection with the forum State [and be] the basis for its jurisdiction over him." *Walden*, 571 U.S. at 284-85. *See also Revell v. Lidov*, 317 F.3d 467, 473 (5th Cir. 2002) ("the plaintiff's residence in the forum, and suffering harm there, will not alone support jurisdiction"); *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 281 (4th Cir. 2009) (the "place the plaintiff feels the alleged injury . . . must ultimately be accompanied by the defendant's own contacts with the state if jurisdiction over the defendant is to be upheld.").[12]

_____

[12] This due process requirement ensures that an adequate link exists between the nonresident defendant's in-state actions and the plaintiff's claims, as the converse would impermissibly "elide[] the essential difference between case-specific and all-purpose (general) jurisdiction." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 927 (2011).

Simply put, Coomer's bald assertion that personal jurisdiction lies in Colorado because Byrne knew his actions "would be felt in the state of Colorado; the injury would occur in Colorado; and that his defamatory messages would be directed at Colorado" (Compl. ¶ 15) falls well short of Coomer's burden to plead specific facts sufficient to make a prima facie case of specific personal jurisdiction in Colorado. *See, e.g.*, *Amr v. Virginia*, 58 F. Supp. 3d 27, 34 (D.D.C. 2014) ("A plaintiff must plead specific facts providing a basis for personal jurisdiction."). In addition, Coomer's conclusory claim that due process is satisfied here because the claims "arise from statements Defendants published in Colorado . . . based on statements made in Colorado about events which supposedly occurred in Colorado, for the purpose of targeting an individual resident of Colorado" (Compl. ¶ 18) improperly lumps all Defendants together in a manner that is inconsistent with the individualized personal jurisdiction analysis that the law requires. *Keeton*, 465 U.S. at 781 n.13 ("[e]ach defendant's contacts with the forum . . . must be assessed individually.")

Even if the "purposeful direction" and "arising out of" conditions for specific jurisdiction are met (which they are not), a district court "must still inquire whether the exercise of personal jurisdiction would offend traditional notions of fair play and substantial justice." *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1080 (10th Cir. 2008) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

In *Burger King Corp. v. Rudzewicz*, the Supreme Court outlined a non-exhaustive list of factors that should be considered as part of this fairness analysis, which include: "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief," among others. *Rudzewicz*, 471 U.S. at 477; *OMI Holdings, Inc.*, 149 F.3d at 1095 (same).

With respect to the burdens on the parties, Coomer is a resident of Colorado, Lucescu is a resident of Arizona, and Byrne and TAP are both domiciled or headquartered in Florida. As is the case in a lawsuit where the parties come from different states, one side will inevitably have to bear the inconvenience of litigating "on the road." Yet, forcing Byrne and the other named defendants to travel across the country, far outside of their home jurisdictions, to answer a Colorado lawsuit asserting claims that relate to conduct that occurred outside of Colorado would be unreasonable.

A state may "have an important interest in providing a forum in which their residents can seek redress for injuries caused by out-of-state actors." *OMI Holdings, Inc.*, 149 A.3d at 1096. But not in a case like this one here. None of the defendants are at home in Colorado. None of the alleged co-conspirators are at home in Colorado. None of the members of the production team are located in Colorado. And although Oltmann—whose name appears 203 times in a 68-page complaint with 126 numbered paragraphs—is a resident of Colorado, Oltmann is not a party to this lawsuit. Coomer has no legitimate basis for refusing to litigate in another federal district court of the United States, say the Middle District of Florida, and there is no reason to think that another federal court would be unable to adjudicate Coomer's claims fairly and effectively. This Court should dismiss Coomer's action for want of personal jurisdiction.

## B. Venue is Improper in this District

Even if there were a basis for this Court to assert personal jurisdiction over Byrne, venue is still improper in Colorado. The federal venue statute lists three categories for determining appropriate venue. 28 U.S.C. § 1391(b). Coomer claims venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and (b)(3), on the grounds that "a substantial part of the events and omissions giving rise to the claims in this Complaint occurred in Colorado . . . and because Defendants are subject to the Court's personal jurisdiction in Colorado." (Compl. ¶ 19.)

Here, no defendant resides in Colorado. (Compl. ¶¶ 10-12.) Additionally, a substantial part of the events giving rise to the claims did not occur in Colorado. Again, no production or filming activities of the documentary film occurred in Colorado. No producers, directors, filmmakers, production team members, or editors are located in Colorado. Other than the fact that Coomer and one cast member (Oltmann) reside in Colorado, there is no other Colorado connection. Because a commonsense appraisal of the events having operative significance in this case shows that venue is not proper here in this district, the case should be dismissed for improper venue.

### C.     Coomer Has Failed to Plead a Defamation Claim

The First Amendment enshrines a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open[.]" *New York Times Co. v. Sullivan*, 376 U.S. 254, 271 (1964). Nowhere is this constitutional promise more important than when dealing with speech on "public issues." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011).

Regarding Coomer's defamation claim, the elements of a cause of action for defamation are: (1) that the defendant made a false and defamatory statement of and concerning the plaintiff; (2) that the defendant published the statement without a privilege to a third party; (3) that the defendant acted with fault amounting to at least negligence in publishing the statement; and (4) either that the statement was actionable as a matter of law irrespective of special harm, or that the publication of the statement caused the plaintiff special harm. *McIntyre v. Jones*, 194 P.3d 519, 523-24 (Colo. App. 2008).

If the alleged defamatory statement involves a matter of public concern, the plaintiff must prove the statement was made with "actual malice"—that is, with knowledge of falsity or reckless disregard as to whether the statement was false or not. *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29 (1971). Colorado courts have expressly adopted *Rosenbloom*. *See Diversified*

*Mgmt.*, 653 P.2d at 1110; *Spacecon Specialty Contractors, LLC v. Bensinger*, 713 F.3d 1028, 1034 (10th Cir. 2013). Colorado law also applies the actual malice standard to purported republishers of statements about matters of public concern. *See, e.g.*, *Reddick v. Craig*, 719 P.2d 340, 343 (Colo. App. 1985); *Anderson v. Colorado Mtn. News Media Co.*, 2019 WL 3321843, at *9 (D. Colo. May 20, 2019).

Coomer has failed to plead the requisite elements to state a defamation claim.

### 1. Byrne did not publish Oltmann's allegedly false statement

First, only those who "publish" defamatory statements can be liable for defamation. Publication is a legal necessity for defamation liability to attach. While it is generally true that one who republishes defamatory matter originated by another is subject to liability as if he or she had originally published it, *see, e.g.*, *Schwartz v. Am. Coll. of Emergency Physicians*, 215 F.3d 1140, 1145 (10th Cir. 2000) (citing Restatement 2d Torts § 578), Byrne did not publish or republish Oltmann's allegedly false statement.

This is so because the terms "publisher" and "producer" are not the same. "Publisher" means "one that makes public." *Klayman v. Zuckerberg*, 753 F.3d 1354, 1359 (D.C. Cir. 2014). There are no allegations in the Complaint that Byrne played any role in publishing or republishing—that is, making public by communicating through oral or written words— Oltmann's allegedly false statement that he repeated in the film. Byrne did not write it in his book. (Compl. ¶ 92.) Byrne did not write it in any script or screenplay for the film; indeed, there are no allegations in the Complaint as to any screenplay writer for the documentary. (*See generally* Compl.) Further, Byrne did not publish, distribute, broadcast, license, or otherwise contract for the publication or portrayal of the film. Byrne did not even have the rights to do that. (Compl. ¶ 56.) Rather, Byrne is accused of being a mere co-producer or promoter of the film (*see generally* Compl.), which is not the same as being a publisher of the film.

**2.** **The contention that Byrne's comment defamed Coomer by implication is specious because no reasonable listener could conclude that the comment was "of and concerning" him**

Second, the constitutional right to free speech requires a plaintiff to plead that the alleged defamatory statement is "of and concerning" the plaintiff. *New York Times*, 376 U.S. at 288-89. A "plaintiff need not be cited by name for the defamation to be 'of and concerning' him." Rodney Smolla, 1 Law of Defamation, § 4:40 (2d ed. May 2022 Update). If there is no explicitly literal reference, a plaintiff may sustain his burden "by way of colloquium, that the defamatory statement refers to him." *Id.* That is, "it suffices that the statements at issue lead the listener to conclude that the speaker is referring to the plaintiff by description, even if the plaintiff is never named or is misnamed." *Croixland Properties Ltd. Partnership v. Corcoran*, 174 F.3d 213, 216 (D.C. Cir. 1999) (citing *Peck v. Trubune Co.*, 214 U.S. 185, 188-90 (1909)).

Coomer complains that Statement 2—Byrne's comment at the live Q&A—was defamatory by implication because Coomer "helped secure the patents for Dominion's adjudication feature." (Compl. ¶ 59.) In alleging this, Coomer essentially rewrites Byrne's statement as though he specifically called Coomer incompetent. Just reading Byrne's actual statement shows how tenuous this assertion is. Byrne did not mention patents or patent skills. Byrne did not imply Coomer was ignorant or unfit in his trade. Byrne did not suggest that Coomer does not have the ability or acumen to help secure a patent, or design an adjudication feature for Dominion or voting machines. Indeed, Byrne did not mention or refer to Coomer, Dominion, or patent application abilities at all.

Allegedly defamatory words must be taken in their "plain and ordinary meaning" and be understood by how people would normally understand them. *Anderson v. Cramlet*, 789 F.2d 840, 844 (10th Cir. 1986); *Knapp v. Post Printing & Publ'g Co.*, 144 P.2d 981 (Colo. 1943) (same). "The province of the innuendo is to show how the words used are defamatory, but it cannot

introduce new matter, nor extend the meaning of the words used, or make that certain which is in fact uncertain." *Webb v. Virginian-Pilot Media Cos.*, 752 S.E.2d 808, 811 (Va. 2011). In this case, Byrne's comment does not carry the defamatory sting that Coomer complains about. Instead, Coomer uses his own self-serving perception to introduce new matter, taking Byrne's actual words well beyond their ordinary meaning.

A complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Coomer has not alleged sufficient facts to plausibly establish that Byrne's comment is about Coomer, or is reasonably capable of the defamatory meaning alleged. No reasonable listener could find that Byrne is referring to Coomer, or that Coomer's estimation in the community for securing patents or writing adjudication features has been lowered by this statement. It should be dismissed.

### 3. Ideas or questions, however embarrassing or unpleasant to the subject, cannot support a defamation claim

Third, it is settled law that an actionable statement must be both false as well as defamatory. Substantial truth is a defense. *See Miles v. Ramsey*, 31 F. Supp. 2d 869, 875 (D. Colo. 1998). So is the lack of provability. That is, statements that lend themselves to varying interpretations are insufficient for a defamation claim because they cannot be proved false.

For example, theories, conjectures, expressive ideas, or "loose, figurative, or hyperbolic" language is not actionable because such language cannot "reasonably be interpreted as stating actual facts." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21-22 (1990); *Brokers' Choice of America, Inc. v. NBC Universal, Inc.*, 861 F.3d 1081 (10th Cir. 2017); *Bauman v. Butowsky*, 377 F. Supp. 3d 1, 10 (D.C. Cir. 2019) ("expressions of a subjective view, an interpretation, a theory, conjecture, or surmise are not provably false and thus cannot undergird a claim of defamation."). In the same way, statements that amount to imaginative ideas, rhetoric, or questions cannot be

false and defamatory. The First Amendment protects the right to the freedom of thought—"constitutionally speaking, there is no such thing as a false idea." *Bauman*, 377 F. Supp. 3d at 10.

Here, Statements 3 and 4 are not actionable. The statement "Eric Coomer's name shows up in a lot of places" (Compl. ¶ 92)—and purported implication that Coomer is therefore worthy of suspicion—lacks provability. *See, e.g.*, *Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 147 (D.D.C. 2017) (whether plaintiff's "business deals are worth investigating is not a verifiable statement of fact"); *Bauman*, 377 F. Supp. 3d at 11 (statement that plaintiff's involvement was "extremely suspicious" lacks provability and "therefore is not actionable"). The statement simply amounts to Byrne's constitutionally protected opinion.[13] Similarly, Byrne's statement that Coomer "might be" the Dominion employee who knows or is responsible for a voter machine setting is constitutionally protected conjecture (Compl. ¶ 93), for "inquiry itself, however embarrassing or unpleasant to the subject, is not accusation." *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1094 (4th Cir. 1993).

In *Chapin*, the court considered an article published in the Philadelphia Inquirer that

---

[13] It bears noting, however, that Coomer's name *did* show up in a lot of places like "Arizona" and "Georgia." (Compl. ¶ 92.) For instance, Coomer defended the security and reliability of Dominion's voting machines on behalf of the State of Georgia defendants in the *Curling v. Raffensperger* litigation in the Northern District of Georgia, which received saturation coverage by the news media. In that case, District Judge Amy Totenberg issued an opinion that credited the testimony of an "array of experts and subject matter specialists [who] provided a huge volume of significant evidence regarding the security risks and deficits in the [Dominion] system." *Curling v. Raffensperger*, 493 F. Supp. 3d 1264, 1278 (N.D. Ga. 2020). Judge Totenberg warned that Dominion's technology "presents serious system security vulnerability and operational issues" caused by "fundamental deficits and exposure"—risks the court found "neither hypothetical nor remote." *Id.* at 1340-41. The court concluded that "national cybersecurity experts convincingly present evidence that this is not a question of 'might this actually ever happen?'—but 'when it will happen.'" *Id.* at 1342. Coomer has also appeared in the Arizona press. *See, e.g.*, Howard Fischer, *New lawsuit seeks to invalidate election*, Arizona Capitol Times (Dec. 2, 2020), *available at* https://azcapitoltimes.com/news/2020/12/02/new-lawsuit-seeks-to-invalidate-election/ (last visited Jun. 9, 2023).

questioned the finances of a charity program run by plaintiff through which people could send gift packages to soldiers stationed in Saudi Arabia. *Id.* at 1091. In one purportedly defamatory section of the article, the author posed a question regarding plaintiff's involvement in the charity: "Who will benefit more from the project—GIs or veteran charity entrepreneur Roger Chapin of San Diego and Falls Church, Va., the organizer of the campaign?" *Id.* at 1093-94. While acknowledging that the question was "pointed, and could certainly arouse a reader's suspicion," the court ruled that it could not "reasonably be read to imply the assertion of the false and defamatory fact—pocket-lining—of which plaintiffs complain." *Id.* at 1094. Instead, the court held that the "question simply provokes public scrutiny of the plaintiffs' activities." *Id.* Plaintiffs also challenged another portion of the article in which the author wrote, "it is not clear where the rest of the money goes." *Id.* at 1095. The court held that the author was not making a false assertion, but rather was "invit[ing] the public to ask." *Id.* at 1096. That one of the possible answers to that question was that "Chapin is a dishonest man who pockets the difference" did not make the statement defamatory. Other courts that have considered whether a question can support a defamation claim have reached similar conclusions.[14]

Byrne's question cannot be read to imply the meaning Coomer alleges: that Coomer might be the Dominion employee who knows or is responsible for voting machine settings.

---

[14] *See, e.g.*, *Partington v. Bugliosi*, 56 F.3d 1147, 1155-57 (9th Cir. 1995) (asking "Had Walker's lawyer not read the theft trial transcripts? Our copy had ended up in a warehouse; perhaps theirs had too" was not defamatory); *Phantom Touring, Inc. v. Affiliated Publ'ns*, 953 F.2d 724, 730 (1st Cir. 1992) (questioning whether plaintiff was "trying to score off the success of Andrew Lloyd Webber's 'Phantom,'" was not defamatory because it "reasonably could be understood only as [the author's] personal conclusion about the information presented, not as a statement of fact"); *Abbas v. Foreign Pol'y Grp., LLC*, 975 F. Supp. 2d 1, 115-16 (D.D.C. 2013), *aff'd* 783 F.3d 1328 (D.C. Cir. 2015) (asking "Are the sons of the Palestinian president growing rich off their father's system?" and "Have they enriched themselves at the expense of regular Palestinians—and even U.S. taxpayers?" are questions, or at most statements of opinion, and thus are not defamatory).

Though Byrne may believe that, and that conclusion is a possible answer to the question posed by Byrne, he asked a question—"Well, who could have done that?"—which undeniably invites the listener to form his or her own opinion, and the listener could arrive at a different conclusion. The fact Coomer would prefer that listeners do not answer the question in the affirmative is not sufficient to support a defamation claim.

4. **The Complaint fails to allege facts establishing that Byrne published any of the challenged statements with actual malice**

Finally, Coomer's defamation claim fails for want of actual malice. Initially, there can be no doubt that the actual malice standard applies here because the challenged statements relate to a matter of public concern. A number of courts have recently reached this same conclusion, including two federal district courts and two Colorado state trial courts adjudicating other litigation involving Coomer and Oltmann's statement. *See Coomer v. Lindell*, 2023 WL 2528624, at \*5 (D. Colo. Mar. 15, 2023) ("*Lindell*"); *Coomer v. Make Your Life Epic LLC*, 2023 WL 2390711 (D. Colo. Mar. 7, 2023) ("*Make Your Life*"); *Coomer v. Salem Media of Colo., Inc.*, No. 2021CV33632, slip op. at 5 (Denver Dist. Ct. Aug. 15, 2022) ("The Court finds this matter is a public concern because the public has a real legitimate interest in fair and secure elections as part of the democratic election process."); *Coomer v. Donald J. Trump for President, Inc.*, 2022 WL 12611311, at \*33 (Denver Dist. Ct. May 13, 2022) ("In this case, the Defendants' statements concerning Coomer's alleged involvement in election fraud . . . relate[ ] to existing public concerns about security of voting machines and thus, their statements have 'the potential to impact many members of the public or the public as a whole.'" (quoting *Spacecon*, 713 F.3d at 1036)). And it is of no moment that Coomer is a "private individual." (Compl. ¶ 105.) "If a matter is a subject of public or general interest, it cannot suddenly become less so merely because a private individual is involved, or because in some sense the individual did not

27

'voluntarily' choose to become involved." *Rosenbloom*, 403 U.S. at 43.

Actual malice is a "famously daunting" standard. *Tah v. Global Witness Publ'g, Inc.*, 991 F.3d 231, 240 (D.C. Cir. 2021). Few people are able to establish it. *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1515 (D.C. Cir. 1996). It is "not satisfied merely through a showing of ill will or malice." *Harte-Hanks Commc'ns, Inc.*, 491 U.S. 657, 666 (1989). Further, it "is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968); *Spacecon*, 713 F.3d at 1046 (failure to pursue "all possible sources" of information before publication does not show actual malice). Rather, it requires clear and convincing proof that the speaker "in fact entertained serious doubts as to the truth" of his statements, or acted "with a high degree of awareness of . . . probable falsity." *St. Amant*, 390 U.S. at 731. This level of serious doubt requires a showing that the speaker actually "harbored subjective doubt." *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 589 (D.C. Cir. 2016).

Coomer's complaint fails on numerous fronts to plead sufficient facts to support an inference of actual malice. This inadequacy can best be demonstrated by closely examining a subset of the allegations. Coomer asserts "Oltmann has no relevant experience . . . to conduct any of the supposed analysis he claims to have conducted." (Compl. ¶ 73.) Even if true, this only implies that *Oltmann knew* the falsity of his claims, not Byrne. Coomer also contends Byrne knew or should have known about the falsity of Oltmann's claims because of publicly available information—specifically, a May 13, 2022 Colorado state court ruling. (Compl. ¶¶ 38 and 100.) But this ruling cannot create a reasonable inference of actual malice for the simple reason that it was issued in May of 2022, months after the challenged statements were made.

It is hornbook law that post-publication events have no impact whatever on actual malice,

as the existence or non-existence of such malice focuses on what the defendant knew or did not know as of the date of the alleged defamatory statement. *See, e.g.*, *Herbert v. Lando*, 781 F.2d 298, 305-06 (2d Cir. 1986) (information acquired after publication is not relevant). *McFarlane*, 91 F.3d at 1508 ("the inference of actual malice must necessarily be drawn solely upon the basis of information that was available to and considered by the defendant prior to publication."); *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 498 (1984)) (actual malice must be shown "at the time of publication").

In this way, the allegations surrounding the defamatory statements in *Make Your Life* and *Lindell* differ so substantially that these cases are unhelpful to Coomer. For example, the defendants in *Make Your Life* are alleged to have embarked on a months-long tour called "The Reawaken America Tour," during which they traveled throughout Colorado and other states repeating Oltmann's assertions. *See Make Your Life*, 2023 WL 2390711, at *2. These tour events "post-dated" the September 2021 "reporting on and public release of a Trump Campaign memorandum finding Dr. Coomer had no connections to Antifa." *Id.* at *2 and n.3. No comparable allegations are asserted against Byrne. Here, the challenged statements were all made outside of Colorado, months before the foregoing public reporting.

In *Lindell*, the complaint alleged that Lindell hosted a "Cyber Symposium" where he and the other defendants "published statements repeating the false allegations against Dr. Coomer." *Lindell*, 2023 WL 2528624, at *2. It also alleged the defendants later held a "Colorado Election Truth Rally" in April 2022 on the steps of the Colorado State Capitol at which Lindell, referring to supposed election fraud, said "It started with Eric Coomer and Dominion based right here in Colorado." *Id.* at *3. Because the complaint pled Lindell made these comments after being served with Coomer's defamation lawsuit which denied the defendants' claims about him, the

court could infer actual malice based on the defendants' disregard of contradictory information after receiving it. *Id.* at *6-7. The court could also infer actual malice based on a purported profit motive due to the allegations that Lindell encouraged audiences to purchase MyPillow products, using promotional discount codes like "Eric," at the same time as the defendants allegedly made defamatory remarks about Coomer. *Id.* at *2 and 10. No remotely similar factual allegations exist here with respect to Byrne.

In this case, Coomer's complaint at most alleges the existence of publicly available information that, had Byrne known about or investigated further, would have tended to cast doubt on the claims that Oltmann was making. But this public information was not known to Byrne, much less available to him, at the time of the alleged publication. Even if it were, "[r]ecklessness is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." *Fairfax v. CBS Corp.*, 2 F.4th 286, 293 (4th Cir. 2021) (quoting *St. Amant*, 390 U.S. at 731). And for all of Coomer's prolixity, that is all his allegations amount to. These and other errors plague the remainder of Coomer's purported allegations of actual malice.

## V.   CONCLUSION

For all of these reasons, Byrne respectfully requests that this Court enter an order dismissing Coomer's complaint with prejudice, granting such other and further relief the Court deems just and proper.

Dated: June 9, 2023                    Respectfully submitted,

                                       /s/Robert N. Driscoll
                                       /s/Alfred D. Carry
                                       Robert N. Driscoll
                                       Alfred D. Carry
                                       McGlinchey Stafford PLLC
                                       1275 Pennsylvania Avenue NW, Suite 420
                                       Washington, DC 20004
                                       Tel: (202) 802-9999
                                       Fax: (202) 318-1084
                                       rdriscoll@mcglinchey.com
                                       acarry@mcglinchey.com
                                       *Counsel for Defendant Patrick Byrne*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was electronically filed in this case with the

clerk of the court and served on this 9th day of June, 2023 through the Court's CM/ECF system,

which will send notification of this filing to all counsel of record.


                                       /s/Alfred D. Carry
                                       Robert N. Driscoll
                                       Alfred D. Carry
                                       *Counsel for Defendant Patrick Byrne*