## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

Civil Action No. 8:24-cv-00008-TPB-SPF

ERIC COOMER, Ph.D.,
     Plaintiff

v.

PATRICK BYRNE, STEVEN LUCESCU, and
THE AMERICA PROJECT, INC., a Florida non-profit corporation,
     Defendants

---

## PLAINTIFF'S MOTION FOR LEAVE TO FILE AMENDED COMPLAINT

---

Pursuant to Florida Rule of Civil Procedure 1.190, Plaintiff Eric Coomer, Ph.D. (Dr. Coomer) files this Motion for Leave to File Amended Complaint, and in support states:

### I.    INTRODUCTION

1.    Despite having filed his Complaint nearly two and a half years ago, Dr. Coomer did not have access to discovery from Defendants Patrick Byrne (Byrne) and Steven Lucescu (Lucescu) until October 25, 2024.[1] That discovery has revealed substantial evidence supporting a claim for punitive damages against all Defendants, and lending further factual support to a finding of actual malice.

---

[1] The timeline surrounding this issue is laid out in greater detail in Dr. Coomer's pending Motion to Compel. *See generally*, Doc. 170.

2.    The Court's initial Case Management and Scheduling Order was issued on April 4, 2024, and set a deadline of June 11, 2024, to amend the pleadings. Doc. 136. The Court did not deny Defendants' Motion to Stay Discovery until after that deadline, on July 31, 2024. Doc. 150. Even then, Defendants Lucescu and Byrne did not actually produce any discovery until October 24, and 25, 2024, respectively. Defendant The American Project, Inc. (TAP) has still not disclosed any documents, and that failure is the subject of Dr. Coomer's currently pending Motion to Compel. Doc. 170.

3.    Defendants sought to have this case transferred from Colorado to Florida. After prevailing in that effort, they then sought to have this Court apply Colorado law to these proceedings. The parties' choice of law arguments remain pending before the Court. *See generally*, Docs. 123, 125, 126, 130, 135. If Florida law applies, then Dr. Coomer does not require the Court's leave to plead a claim for punitive damages, but instead only requires leave to file an amended pleading after the deadline for amending pleadings has passed. If Colorado law applies, then Dr. Coomer requires this Court's leave to seek punitive damages, and could not have sought the relief requested herein until after Defendants finally made their initial disclosures.

4.    The Court has declined to apply Colorado's anti-SLAPP statute to this proceeding. *See* Doc. 150. The Court noted that more generally, however, it "has not yet determined whether Florida or Colorado law applies to this action." *Id.*, p. 5. In an abundance of caution, Dr. Coomer has, therefore, adhered to the

heightened pleading requirements of Colorado law with respect to his First Amended Complaint, and accordingly seeks the Court's leave to file that amended pleading to the extent the Court determines Colorado law does apply.

## II.    CONCISE STATEMENT OF RELIEF REQUESTED

5.    Dr. Coomer seeks leave to file his First Amended Complaint (FAC), a copy of which is attached hereto as **Exhibit 1**.  A redline version showing the specific additions to the FAC is attached as **Exhibit 2**.  The FAC adds a claim for punitive damages, adds new allegations with respect to post-Complaint conduct by Defendants, and provides additional information and detail on Defendants' creation and distribution of *The Deep Rig*.

## III.    STATEMENT OF THE BASIS FOR RELIEF

6.    Under either Florida or Colorado state law, Dr. Coomer is not permitted to plead a claim for punitive damages until "after the exchange of initial disclosures pursuant to rule 26 of the Colorado Rules of Civil Procedure" or "unless there is a reasonable showing by evidence in the record or proffered by the claimant which would provide a reasonable basis for recovery of such damages." *See* C.R.S. § 13-21-102(1.5)(a); Fla. Stat. Ann. § 768.72(1).

7.    Defendants Lucescu and Byrne made their first disclosures in this case on October 24 and October 25, 2024, respectively.  Defendant TAP still has not produced any documents, and that non-disclosure is the subject of Dr. Coomer's currently pending Motion to Compel and Motion for Sanctions.  *See generally*, Doc. 170.  Nonetheless, many documents disclosed by both Defendants Lucescu

and Byrne include communications with agents of TAP who were acting on its behalf with respect to the claims at issue in this dispute. Byrne himself served as Chairman of TAP's board of directors throughout the production and distribution of the Film.[2] Those disclosures warrant an amendment of Dr. Coomer's Complaint to add a claim for punitive damages.

8. Specifically, Defendants' disclosures demonstrate that all Defendants in this action acted with a high degree of awareness that the harm complained of in this dispute would occur, and they nonetheless proceeded with production, distribution, and monetization of *The Deep Rig* (the Film) anyway. In addition, Defendants persisted with efforts to exacerbate the harm complained of in the Complaint after having been served with this lawsuit.[3]

9. Lucescu, for example, had for several months prior to release of the Film collected various forms of evidence disproving the false allegations about Dr. Coomer presented in the Film.[4] He had emailed himself copies of various fact checks, debunkings, and related articles all affirmatively disproving the allegations about Dominion Voting Systems in general, and about Dr. Coomer in particular.[5]

---

[2] **Exhibit 1**, FAC at ¶ 14; *see also* **Exhibit 3**, TAP's Supplemental Response to Plaintiff's First Set of Written Discovery, p. 8 (Sep. 12, 2024).

[3] As also discussed in Dr. Coomer's Motion to Compel and for Sanctions, Defendants have arbitrarily refused to produce any documents created after the filing of Dr. Coomer's lawsuit. Dr. Coomer assumes these documents further reflect conduct warranting a claim for punitive damages, but publicly available evidence of Defendants' post-Complaint conduct is alone sufficient to support the claim.

[4] **Exhibit 1**, FAC at ¶ 75; *see also* **Exhibit 4**, various emails from Lucescu to himself over several months prior to the Film's release.

[5] *Id.*

4

He even sent himself a copy of Dr. Coomer's December 9, 2020 op-ed in The Denver Post denying the false allegations, describing the threats against him, and calling for an end to the dissemination of lies about him.[6]  Lucescu was well aware of Dr. Coomer's already pending defamation lawsuit against the Film's star, Joe Oltmann (Oltmann), and he knew that Newsmax had issued a public retraction and apology to Dr. Coomer.[7]

10.    Lucescu, like Byrne, exercised substantial control over the substance and content of the Film, but at no point does the Film present any of the body of countervailing evidence in Lucescu's possession at the time of the Film's production and release.  Despite a wide variety of potential content to focus on, including various other topics discussed by Oltmann,[8] the Film maintains its focus on Dr. Coomer as the lynchpin of the supposed plot to rig the 2020 presidential election.

11.    For his part, Byrne exercised control over the content of the Film, including with respect to minor matters like background music, scene transitions, and character chyrons.[9]  In fact, the contract that Byrne and Lucescu entered into to create the Film expressly referenced Byrne's "heavy hand" in selecting the content that would ultimately be included in the Film, and required that he have

---

[6] *Id.*, pp. 30-33.

[7] **Exhibit 1**, FAC at ¶ 75; *see also* **Exhibit 5**, Lucescu text messages with Joe Oltmann (Aug. 1, 2021).

[8] **Exhibit 6**, Lucescu notes on Oltmann footage.

[9] **Exhibit 1**, FAC at ¶ 61; *see also e.g.,* **Exhibits 7-8**.

constant and immediate access to all Film footage as it was recorded.[10]  As the contract anticipated, Byrne had access to the raw cuts of Film footage as Lucescu recorded them, and through various viewings Byrne provided a wide variety of feedback on the Film's substance and narrative arc.[11]  Notably, at one point Byrne instructed Lucescu to remove a scene about Georgia election worker Ruby Freeman, instructing Lucescu to "Take out Ruby Freeman social media Confession.  Some uestion [sic] about whether it was authentic or not."[12]  At no point did Byrne ever raise similar concerns with respect to the Film's Coomer content, despite equally glaring red flags about the reliability of those claims.  In fact, Byrne instructed Lucescu to add footage of Dr. Coomer to the Film.[13]

12.    Byrne too was aware of Dr. Coomer's existing defamation lawsuit.  In fact, he served as a member of the board of one of the entities that had already been sued by Dr. Coomer, Defending the Republic, Inc.[14]  Byrne was also aware of Oltmann's constant calls for violence, and publicly aired his deep misgivings about them.[15]  Byrne also knew Oltmann to be a fraud with little to no technical expertise.[16]

---

[10] **Exhibit 1**, FAC at ¶ 55; *see also* **Exhibit 9**, "The Big Rig" Investor's Agreement, p. 2 (Feb. 17, 2021).

[11] **Exhibit 1**, FAC at ¶¶ 60-61; *see also e.g.,* **Exhibits 7-8**.

[12] **Exhibit 1**, FAC at ¶ 61; *see also* **Exhibit 7**, p. 2.

[13] **Exhibit 1**, FAC at ¶ 61; *see also* **Exhibit 8,** p. 2 (Byrne: "get video that attaches (Kumar video)").

[14] **Exhibit 1**, FAC at ¶ 76.

[15] **Exhibit 1**, FAC at ¶¶ 116-117.

[16] *Id.*

13.     Throughout the production and distribution of the Film, Byrne served as Chairman of the Board for TAP.[17]  He actively promoted TAP in conjunction with promotion and distribution of the Film on multiple instances, both before and after the Film's release.[18]  Despite having initially sought to personally profit off of the Film, Byrne ultimately directed his share of proceeds from the Film to TAP.[19]  The Film itself promotes TAP multiple times.[20]  Similarly, Joe Flynn was a TAP board member throughout the production and distribution of the Film.[21]  He was actively involved in managing the Film's finances and in negotiating contract terms with Lucescu relating to the Film.[22]

14.     Despite their awareness of numerous reasons to doubt the accuracy of Oltmann's claims, Defendants have all refused to retract their false claims about Dr. Coomer after numerous requests from him that they do so.[23]  In fact, in TAP's and Byrne's case, they have doubled down.  Just days after being served with this lawsuit, which described the falsity of the claims at issue and the resulting harm at length, TAP issued a press release promoting a re-release of the Film in Naples,

---

[17] **Exhibit 1**, FAC at ¶ 14; *see also* **Exhibit 3**, TAP's Supplemental Response to Plaintiff's First Set of Written Discovery, p. 8 (Sep. 12, 2024).

[18] **Exhibit 1**, FAC at ¶¶ 65-66, 68, 114-115, 118-120.

[19] **Exhibit 1**, FAC at ¶ 66; *see also* **Exhibit 9**, "The Big Rig" Investor's Agreement (Feb. 17, 2021).

[20] **Exhibit 1**, FAC at ¶¶ 89, 109-110.

[21] **Exhibit 3**, p. 8.

[22] **Exhibit 1**, FAC at ¶ 62; *see also* **Exhibits 10-11**, Flynn emails regarding establishment of The Deep Rig Movie, LLC in Wyoming; *see also* **Exhibit 12**, Flynn/Lucescu texts regarding payments due relating to Film production.

[23] **Exhibit 1**, FAC at ¶¶ 161-164; *see also* **Exhibit 13**.

Florida.[24]  Byrne even gave public statements affirming the "truth" of the content presented in the Film.[25]  Byrne has persisted with publishing easily falsifiable claims about Dr. Coomer to his audience of millions almost to the present day.[26]

15.    Disclosures to date also confirm the numerous efforts taken by all Defendants to promote, distribute, and profit from the Film.  During creation of the Film, Byrne and Lucescu shared ideas to distribute the Film in theaters, get the Film streaming on various online platforms, and sell the Film to viewers online directly for a fee.[27]  Then-president of TAP, Joe Flynn, assisted these efforts by registering The Deep Rig Movie, LLC in Wyoming, and securing an EIN for that entity.[28]  Flynn also assisted with distributing payments to contractors who had worked on the Film,[29] and he partook in discussions with Lucescu, Byrne, and Oltmann about distributions strategy for the Film.[30]

16.    Defendants' disclosures are also noteworthy for what they do not contain.  Nowhere, for example, is there any evidence that any Defendant ever made any effort whatsoever to contact either Dr. Coomer or Dominion Voting Systems to determine whether the allegations about Dr. Coomer were true or even

---

[24] **Exhibit 1**, FAC at ¶ 118; *see also* **Exhibit 14**, TAP Press Release (July 7, 2022).

[25] *Id.*

[26] **Exhibit 1**, FAC at ¶¶ 121-122; *see also* **Exhibit 15,** @PatrickByrne, X (Nov. 14, 2024).

[27] **Exhibit 1**, FAC at ¶¶ 63, 65, 73; *see also* **Exhibit 19**.

[28] **Exhibit 1**, FAC at ¶ 62; *see also* **Exhibits 10-11**, Flynn emails regarding establishment of The Deep Rig Movie, LLC in Wyoming.

[29] **Exhibit 1**, FAC at ¶ 62; *see also* **Exhibit 12**, Flynn/Lucescu texts regarding payments due relating to Film production.

[30] **Exhibit 1**, FAC at ¶ 73; *see also* **Exhibit 16**, TDR Distribution Strategy Meeting invitation.

possible. Similarly, Defendants' disclosures are devoid of any evidence whatsoever that Dr. Coomer actually did anything improper or nefarious with respect to the 2020 election. In fact, Defendants cannot even identify or articulate any theory by which Dr. Coomer could have personally rigged the 2020 election. The recklessness of their conduct in publicly accusing Dr. Coomer of egregious criminal conduct without any evidence whatsoever is self-evident.

## IV.   LEGAL MEMORANDUM SUPPORTING REQUEST

17.    As noted, the parties' Motions regarding choice of law analysis remain pending. *See generally*, Docs. 123, 125, 126, 130, 135. Dr. Coomer has no preference on which pleading standard the Court applies with respect to this Motion, and both the facts and the law support Dr. Coomer's claims regardless of jurisdiction. As discussed in the pending briefing, as well as herein, Defendants' conduct occurred in, was directed at, and has harmed Dr. Coomer in both jurisdictions.[31] Colorado's standard is arguably higher, and multiple federal courts there have allowed amendment of Dr. Coomer's pleadings on virtually identical grounds in related proceedings.[32] In any case, Dr. Coomer provides authority from both jurisdictions, and defers to the Court's preference on which standard to apply.

---

[31] *See, e.g.*, **Exhibit 14**; *see also* Doc. 1, Plaintiff's Original Complaint describing Defendants' conduct directed at Colorado.

[32] **Exhibit 17**, *Coomer v. Lindell et. al.*, Case No. 22-cv-01129-NYW-SKC, Order Granting Motion to Amend (D. Colo. July 7, 2023); *see also* **Exhibit 18**, *Coomer v. Make Your Life Epic LLC et. al.*, Case No. 21-cv-3440-WJM-KAS, Order Granting Motion to Amend (D. Colo. Sep. 19, 2024).

### A.    *Legal Standard—Florida*

18.    Florida Rule of Civil Procedure 1.190(a) provides, in pertinent part, that "[l]eave of court [to amend pleadings] shall be given freely when justice so requires."  In accordance with the rule, Florida courts follow a liberal policy with regard to the amendment of pleadings so that claims may be determined on their merits.  *See Burr v. Norris,* 667 So.2d 424, 426 (Fla. 2d DCA 1996) (finding that the trial court's denial of the plaintiff's motion to amend "was an abuse of discretion in light of Florida's liberal policy of allowing amendments to pleadings"); *see also Dausman v. Hillsborough Area Reg'l Transit,* 898 So.2d 213, 215 (Fla. 2d DCA 2005) ("Leave to amend should be freely given, the more so . . . when the amendment is based on the same conduct, transaction[,] and occurrence upon which the original claim was brought."  (first alteration in original) (quoting *Spolski Gen. Contractor, Inc. v. Jett–Aire Corp. Aviation Mgmt. of Cent. Fla., Inc.,* 637 So.2d 968, 970 (Fla. 5th DCA 1994))).  "A party may, with leave of court, amend a pleading at or even after a hearing and ruling on a motion for summary judgment."  *Dausman,* 898 So.2d at 215 (quoting *Yun Enters., Ltd. v. Graziani,* 840 So.2d 420, 422 (Fla. 5th DCA 2003)).

19.    Such amendment of pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment, but failure so to amend shall not affect the result of the trial of these issues.  Fla. R. Civ. Pro. 1.190(b).

20.    In any civil action, no claim for punitive damages shall be permitted unless there is a reasonable showing by evidence in the record or proffered by the claimant which would provide a reasonable basis for recovery of such damages. Fla. Stat. Ann. § 768.72(1).  A defendant may be held liable for punitive damages only if the trier of fact, based on clear and convincing evidence, finds that the defendant was personally guilty of intentional misconduct or gross negligence. "Intentional misconduct" means that the defendant had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage.  Fla. Stat. Ann. § 768.72(2)(a). "Gross negligence" means that the defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of person exposed to such conduct. Fla. Stat. Ann. § 768.72(2)(b).

21.    In the case of a corporation or other legal entity, punitive damages may be imposed for the conduct of an employee or agent only if the conduct of the employee or agent meets the criteria of Fla. Stat. Ann. § 768.72(2) and the legal entity actively and knowingly participated in such conduct; the officers, directors, or managers of the legal entity knowingly condoned, ratified, or consented to such conduct; or the legal entity engaged in conduct that constituted gross negligence and that contributed to the loss, damages, or injury suffered by the claimant.  Fla. Stat. Ann. § 768.72(3)(a-c).

22.    The heightened pleading requirements of Fla. Stat. Ann. § 768.72,
however, do not apply in federal diversity actions. *Cohen I v. Office Depot, Inc.*,
184 F.3d 1292, 1299 (11th Cir. 1999) ("We hold that the pleading requirements of
Florida Statutes § 768.72 are inapplicable in federal diversity cases"); *rev'd on
other grounds in Cohen II v. Office Depot, Inc.*, 204 F.3d 1069, 1072 (11th
Cir. 2000) (expressly adhering to holding in *Cohen I* finding that Florida Statute
§ 768.72 conflicts with F.R.C.P. 8(a)(3) and "leav[ing] that part of our earlier
opinion intact.")

23.    A trial court's ruling granting or refusing a motion to amend a
complaint is reviewed for abuse of discretion. *Armiger v. Associated Outdoor
Clubs, Inc.*, 48 So. 3d 864, 868 (Fla. Dist. Ct. App. 2010) (*citing Mathis v. Coats,*
24 So.3d 1284, 1289 (Fla. 2d DCA 2010). "It is an abuse of discretion to disallow
amendment of a pleading unless it clearly appears the amendment would prejudice
the opposing party, the privilege to amend has been abused, or amendment would
be futile." *Colandrea v. King,* 661 So.2d 1250, 1251 (Fla. 2d DCA 1995).

**B.    *Legal Standard—Colorado***

24.    Ordinarily, Rule 15(a)(2) and Rule 16(b)(4) of the Federal Rules of
Civil Procedure would apply when, as here, a party seeks to amend its pleading
after the deadline set in the Scheduling Order. *See Coomer v. Lindell et. al*., Case
No. 22-cv-01129-NYW-SKC, Order Granting Motion to Amend (Dist. Ct. Colo.

July 7, 2023)[33] (*citing Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n,*
771 F.3d 1230, 1240 (10th Cir. 2014)).  First, the party must establish good cause
under Rule 16(b)(4).  *Id.*  Only if the party establishes good cause does the court
turn to whether amendment is proper under Rule 15(a).  *Id.* at 1242; *Pumpco, Inc.
v. Schenker Int'l, Inc.*, 204 F.R.D. 667, 668 (D. Colo. 2001).

25.    With respect to exemplary damages, however, Rules 15(a)(2) and
16(b)(4) do not apply.[34]    Colo. Rev. Stat. § 13-21-102 governs proposed
amendments concerning exemplary damages.  Pursuant to § 13-21-102(1.5)(a), a
plaintiff cannot move for exemplary damages in the initial pleading and may seek
to amend the pleading to add a claim for exemplary damages "only after the
exchange of initial disclosures pursuant to rule 26 of the Colorado rules of civil
procedure" and if he establishes prima facie proof of a triable issue.  *See*
C.R.S. § 13-21-102(1.5)(a).  Even with the application of § 13-21-102, however, the
court may deny a motion to amend to add exemplary damages because of delay,
bad faith, undue expense, or other demonstrable prejudice.  *Stamp v. Vail Corp.*,
172 P.3d 437, 449 (Colo. 2007).

26.    Section 13-21-102 provides that an award of exemplary damages is
permissible when "the injury complained of is attended by circumstances of fraud,
malice, or willful and wanton conduct."  C.R.S. § 13-21-102(1)(a).  "'[W]illful and
wanton conduct' means conduct purposefully committed which the actor must

---

[33] **Exhibit 17**, pp. 7-10.

[34] *Id.*, p. 8.

have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff." *Id.* § 13-21-102(1)(b). The purpose of the award of punitive damages is to punish the wrongdoer, not compensate for injuries. *See Lira v. Shelter Ins. Co.*, 913 P.2d 514,517 (Colo. 1996).

27.    As to the requirement of a prima facie showing, "[p]rima facie evidence is evidence that, unless rebutted, is sufficient to establish a fact." *Stamp*, 172 P.3d at 449. Such proof is established by, "a reasonable likelihood that the issue will ultimately be submitted to the jury for resolution." *Id.* (*quoting Leidhold v. Dist. Ct.*, 619 P.2d 768, 771 n. 3 (Colo. 1980)). Parties may offer this proof in the form of discovery and by evidentiary means. *Id.* "The question of whether the plaintiff has established sufficient proof to add a claim for exemplary damages lies within the sound discretion of the trial court." *Id.* In reviewing the Motion to Amend, the Court considers only the "preliminary question" of whether Plaintiff has made a prima facie showing that the injury complained of is attended by willful and wanton conduct, not whether he will ultimately prevail. *Am. Econ. Ins. Co.*, 2007 WL 160951, at *4.

## V.    ARGUMENT

### A.    *Good cause warrants amendment of Dr. Coomer's Complaint.*

28.    As noted above, the deadline for Dr. Coomer to amend his Complaint was June 11, 2024. *See* Doc. 136. However, the Court did not allow discovery to proceed until roughly seven weeks after that deadline had passed, on July 31, 2024.

Doc. 150.   Even then, Defendants did not actually abide by their disclosure obligations until months later, in late October 2024.  Defendant TAP still has not abided by those obligations.

29.    Both prior to and following those disclosures, Dr. Coomer has made numerous efforts to work with Defendants to move discovery forward.   As described in Dr. Coomer pending Motion to Compel, those efforts have only partially succeeded. *See* Doc. 170.

30.    In both Colorado and Florida, leave to amend is to be freely given when justice so requires.  In this instance, Dr. Coomer seeks leave to amend his Complaint based on newly disclosed evidence that warrants the amendments in question.  The amendment is not sought for purposes of delay, bad faith, undue expense, or demonstrable prejudice.  On the contrary, Dr. Coomer seeks to avoid all of those potentialities by seeking this leave now.  No depositions have yet occurred, nor has the deadline for expert disclosures passed.  The current case schedule is subject to a pending motion to amend which would extend all deadlines by an additional ninety days.  Defendants do not contest this additional time is necessary.  The additional pleadings are a natural and foreseeable outgrowth of Dr. Coomer's already pending causes of action, and the bases for the additional claim for punitive damages are and have been well-known to Defendants.

**B.    *Additional allegations with respect to punitive damages are warranted.***

31.    Under Florida law, Dr. Coomer does not require the Court's leave to seek punitive damages.  *Cohen I v. Office Depot, Inc.*, 184 F.3d 1292, 1299 (11th Cir. 1999) ("We hold that the pleading requirements of Florida Statutes § 768.72 are inapplicable in federal diversity cases").  As a result, if the Court determines that Florida law applies, then Dr. Coomer is allowed to plead a claim for punitive damages as a matter of course and the Court need only determine that good cause warrants amendment of the Complaint, as discussed above.  In any case, and as discussed below, even if the Court were required to engage with the substantive merits of Fla. Stat. Ann. § 768.72, Dr. Coomer's FAC presents prima facie evidence that all Defendants' conduct in this case constitutes both "intentional misconduct" and "gross negligence" as defined by the statute.

32.    A claim for punitive damages (or "exemplary" damages, as defined by Colorado law) is similarly warranted if the Court determines Colorado law should apply to this issue.  Indeed, multiple divisions of the Federal District Court in Colorado have already allowed claims for exemplary damages to proceed against multiple other defendants in related cases filed by Dr. Coomer.[35]  The rationale applied by those courts is equally applicable here.

---

[35] *See* **Exhibits 17-18**.

33.    Awards of punitive damages are not available in a defamation case unless the plaintiff is able to demonstrate actual malice.  *Hendrickson v. Doyle*, No. 14-cv-02013-WJM-KLM, 2015 WL 2106225, at *3 (D. Colo. May 4, 2015).

34.    Actual malice "requires at a minimum that the statements were made with reckless disregard for the truth."  *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 686 (1989); *Diversified Mgmt., Inc. v. Denver Post, Inc.*, 653 P.2d 1103, 1110-11 (Colo. 1982).  To prove actual malice, "the plaintiff must demonstrate that the defendant in fact entertained serious doubts as to the truth of the statement . . . or acted with a high degree of awareness of its probable falsity."  *Lewis v. McGraw-Hill Broad. Co., Inc.*, 832 P.2d 1118, 1122-23 (Colo. App. 1992).  Reckless disregard "cannot be fully encompassed in one infallible definition" and is not limited to specific bases.  *St. Amant v. Thompson*, 390 U.S. 727, 730 (1968).    Instead, actual malice can be inferred from objective circumstantial evidence, which can override a defendant's protestations of good faith.  *Brown v. Petrolite Corp.*, 965 F.2d 38, 46-47 (5th Cir. 1992).  Circumstantial evidence of actual malice can include when a defendant relies on anonymous sources[36]; when a defendant has reason to know that a source is unreliable[37]; when the allegations made are so inherently improbable that only a reckless person

---

[36] *Id.*; *Eramo v. Rolling Stone, LLC*, 209 F. Supp. 3d 862, 872 (W.D. Va. 2016).

[37] *St. Amant*, 390 U.S. at 732; *Celle v. Filipino Rep. Enters., Inc.*, 209 F.3d 163, 190 (2d Cir. 2000); *Wells v. Liddy*, 186 F.3d 505, 542–43 (4th Cir. 1999); *Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 283 (D.D.C. 2017); *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 590 (D.C. Cir. 2016).

would publish them[38]; when a defendant intentionally avoids the truth[39]; when a defendant's allegations conform to a preconceived storyline[40]; and when a defendant has an incentive or motive to make the defamatory statements.[41] All of these bases are reflected in the proposed amendments.

35.     In addition to showing circumstances of fraud, malice, or willful and wanton conduct as required by C.R.S. § 13-21-102(1)(a), the proposed amendments also demonstrate actual malice. The additional allegations, supported by evidence uncovered in discovery, support a finding that Defendants relied on anonymous sources, had reason to know their source was unreliable, published inherently implausible claims, avoided the truth, sought to affirm a preconceived narrative, and had ulterior motives for publishing the false claims.

36.     For Lucescu's part, he was well aware of numerous reasons to doubt the false claims about Dr. Coomer, and had in fact been collecting compelling evidence to refute those claims for many months prior to the release of the Film.[42] He had no evidence whatsoever to suggest that the Coomer claims were true.

---

[38] *St. Amant*, 390 U.S. at 732; *Spacecon Specialty Contractors, LLC. v. Bensinger*, 782 F. Supp. 2d 1194, 1201 (D. Colo. 2011), *aff'd sub nom. Spacecon Specialty Contractors, LLC v. Bensinger*, 713 F.3d 1028 (10th Cir. 2013); *Lohrenz v. Donnelly*, 223 F. Supp. 2d 25, 46 (D.D.C. 2002), aff'd., 350 F.3d 1272 (D.C. Cir. 2003).

[39] *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 693 (1989); *Kuhn v. Trib.-Republican Pub. Co.*, 637 P.2d 315, 319 (Colo. 1981); *Burns v. McGraw-Hill Broad. Co., Inc.*, 659 P.2d 1351, 1361 (Colo. 1983).

[40] *Harris v. City of Seattle*, 152 Fed. App'x 565, 568 (9th Cir. 2005); *Gilmore v. Jones*, 370 F. Supp. 3d 630, 674-75 (W.D. Va. 2019); *Eramo*, 209 F. Supp. at 872.

[41] *See Brown v. Petrolite Corp.*, 965 F.2d 38, 47 (5th Cir. 1992).

[42] **Exhibit 1**, FAC at ¶ 75; *see also* **Exhibit 4**, various emails from Lucescu to himself over several months prior to the Film's release.

Importantly, Lucescu knew that Dr. Coomer had sued Oltmann for defamation, that he was the subject of death threats and harassment as a result of the claims, and that his career in the elections industry had been ruined by Oltmann's lies.[43] Despite being in possession of all of this information, Lucescu inexplicably proceeded with production of a Film that accused Dr. Coomer of a heinous crime that he did not commit.

37.     Through his various efforts to promote the Film, and enrich himself through its distribution, Lucescu repeatedly and publicly affirmed the absolute "truth" of the allegations in the Film.[44]  He assured the Film's audience that he had vetted the Film's claims,[45] when he had done nothing of the sort.  There can be no serious argument that Lucescu did not "realize[] [his conduct] as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff."  C.R.S. § 13-21-102(1)(b).

38.     The same applies to Byrne and TAP, for whom Byrne was acting as an agent at all times relevant to this dispute.  Byrne had access to the same information that Lucescu did, and exercised his contractually guaranteed "heavy hand" in the selection of content in the Film.[46]  Byrne recognized the danger of publishing false claims, and went out of his way to remove similar claims with

---

[43] *See* **Exhibit 4**.

[44] **Exhibit 1**, FAC at ¶¶ 70-72.

[45] **Exhibit 1**, FAC at ¶ 72.

[46] **Exhibit 1**, FAC at ¶ 55; *see also* **Exhibit 9**.

respect to Georgia election worker Ruby Freeman.[47]  He took no action with respect to the Coomer claims, despite knowing that Oltmann was untrustworthy, unreliable, unqualified, and dangerous.[48]

39.    Most remarkably, Byrne and TAP doubled down *after* being served with this lawsuit.  They went so far as to issue a press release explicitly re-releasing the Film after they had already been sued over its contents.[49]  Byrne then issued a public statement on behalf of TAP affirming the "truth" of the Film's demonstrably false allegations.[50]  Under Colorado law, this type of conduct gives rise to a trebling of exemplary damages.  In relevant part, the statute states as follows:

> (3)    [T]he court may increase an award of exemplary damages, to a sum not to exceed three times the amount of actual damages, if shown that:
>
> (a)    The defendant has continued the behavior or repeated the action which is the subject of the claim against the defendant in a willful and wanton manner . . . during the pendency of the case; or
>
> (b)    The defendant has acted in a willful and wanton manner during the pendency of the action in a manner which has further aggravated the damages of the plaintiff when the defendant knew or should have known such action would produce aggravation.

C.R.S. § 13-21-102(3)(a-b).

---

[47] *See* **Exhibit 7**, p. 2.

[48] **Exhibit 1**, FAC at ¶¶ 116-117.

[49] **Exhibit 14**.

[50] *Id.*

40.    In light of the foregoing, a claim for exemplary damages against all

Defendants is warranted under Colorado law.

## CONCLUSION

41.    For all of the reasons stated herein, Plaintiff Eric Coomer, Ph.D.

requests an order granting leave to file his First Amended Complaint and for such

other and further relief to which he may be entitled to receive.

Respectfully submitted this 10th day of January 2025.

Respectfully submitted,

_____/s/ Bradley A. Kloewer_____

Charles J. Cain, CO Atty No. 51020*
ccain@cstrial.com
Bradley A. Kloewer, CO Atty No. 50565*
bkloewer@cstrial.com
**CAIN & SKARNULIS PLLC**
P. O. Box 1064
Salida, Colorado 81201
719-530-3011
512-477-5011 (Fax)
*Appearing via Special Admission
**ATTORNEYS FOR PLAINTIFF**

## Local Rule 3.01(g) Certification

Counsel for Movant certifies:

a.     Plaintiff has conferred with Defendants regarding the relief requested herein;

b.     Defendant Lucescu is opposed to the relief requested in this Motion. Defendant Byrne's counsel will not take a position until after reviewing the Motion and FAC and did not respond to whether there would be any circumstance where he would not oppose a motion to include exemplary damages.  Plaintiff will update the Court on Byrne's position if and when one is provided to Plaintiff.  As of this writing, Defendant TAP has not provided a position; and

c.     Conferral regarding the relief requested herein was via email correspondence.