# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

ERIC COOMER,

      Plaintiff,

v.                                    Case No. 8:24-cv-8-TPB-SPF

PATRICK BYRNE, STEVEN
LUCESCU, and THE AMERICA
PROJECT, INC.,

      Defendants.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS

This matter is before the Court on "Defendant Steve Lucescu's Motion to Dismiss for Failure to State a Claim Pursuant to Rule 12(b)(6) and Special Motion to Dismiss under Anti-SLAPP Statute" (Doc. 123), the "Motion to Dismiss by The America Project, Inc. under Rule 12(b)(6) for Failure to State a Claim and Special Motion to Dismiss under Anti-SLAPP Statute" (Doc. 125), and "Defendant Patrick Byrne's Motion to Dismiss Pursuant to Rule 12(b)(6) and Special Motion to Dismiss Pursuant to C.R.S. § 13-20-1101" (Doc. 126). Plaintiff filed a response in opposition. (Doc. 135). Upon review of the motions, response, court file, and record, the Court finds as follows:

## Background[1]

Plaintiff Eric Coomer has sued Defendants Patrick Byrne, Steven Lucescu, and The America Project, Inc. ("TAP"). Coomer, formerly Director of Product Strategy and Security with Dominion Voting Systems, Inc., alleges that Defendants are responsible for producing and distributing a film titled *The Deep Rig*, which falsely accused Coomer of involvement in an effort to "rig" the 2020 Presidential election. Coomer's complaint asserts counts for defamation, intentional infliction of emotional distress, conspiracy, and unjust enrichment. Defendants have moved to dismiss the complaint on various grounds.

### *Allegations of the Complaint*

The complaint's narrative describes the intersecting paths of two individuals in the months leading up to the premiere of *The Deep Rig*, non-party Joseph Oltmann, and Defendant Patrick Byrne. Oltmann, a "Colorado based political activist and supporter of President Trump," stated in a November 9, 2020, podcast that almost two months earlier he had infiltrated an Antifa conference call. During the call, an unknown participant referred to by others as "Eric" and further identified on the call as "the Dominion guy," stated that he was going to make sure that President Donald J. Trump did not win the election. Following the call, Oltmann by Internet searches purportedly identified "Eric" as Eric Coomer, with Dominion Voting Systems, a supplier of election hardware and

---

[1] The Court accepts as true the facts alleged in Plaintiff's complaint for purposes of ruling on the pending motions to dismiss. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint."). The Court is not required to accept as true any legal conclusions couched as factual allegations. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986).

software with its United States headquarters in Denver, Colorado. Although Oltmann claimed the call occurred before the election, only after the election did he purportedly realize the significance of what Coomer had said on the call. Oltmann then set out to spread allegations that Coomer had perpetrated election fraud, appearing in interviews and on podcasts raising these claims, as well as communicating with Trump's legal team, who repeated Oltmann's accusations.

Meanwhile, Byrne in the summer of 2020 began "scripting a narrative" that the 2020 presidential election would be "rigged." Byrne was in contact with a group of individuals known as the Allied Special Operations Group ("ASOG"), which was "studying" or "organizing" on the subject of election fraud. By October 2020, ASOG had begun "laying out the preconceived narrative they intended to promote if and when Trump ended up losing the election . . . ." Following Trump's defeat in November 2020, Byrne "accelerated his work with ASOG to try and introduce their preconceived narrative that voting machines were somehow responsible for Trump's loss into mainstream news coverage." When an individual filed suit in Michigan in late November challenging the results of a local election in Antrim County, Byrne "flew the ASOG team to Michigan . . . ." The plaintiff in that suit thereafter filed a report prepared by ASOG that concluded the voting software used there generated a high volume of errors, which leads to "bulk adjudication of ballots with no oversight, no transparency, and no audit trail" and to election fraud.[2]

---

[2] The complaint describes "adjudication" as a long-accepted and necessary part of any voting system in which election officials determine voter intent by examining questionable or unreadable ballots. Dominion's voting systems offered an optional feature for electronic adjudication. Coomer alleges he helped develop patents for the feature that made the system more transparent, secure, and easily auditable.

In the months following the Capitol riot on January 6, 2021, Byrne and Michael Flynn founded Defendant TAP and then financed the production of the film *The Deep Rig*. TAP owns the copyright on the film and received some of the film's profits. Defendants Byrne and Lucescu produced the film, which premiered at an event in Arizona on June 26, 2021. The event featured a panel that included Byrne, Lucescu, Oltmann, and others. Lucescu responded to a question from the moderator by referring to the individuals featured in the film as heroes who "stand for the truth." In an earlier podcast, Lucescu had stated that the movie would present "the facts" and "everything we have proven." Byrne and Lucescu both explained how people could make money by obtaining a license to show the film and charging others to see it.

Coomer alleges the film offers "a series of disparate and unsubstantiated conspiracy theories that the election was somehow rigged," presenting through various interviews with Oltmann and others "competing theories as though each somehow constitutes a piece of what would be a vast, unprecedented and impossible conspiracy" to commit election fraud. However, "every proposed theory features some element casting doubt on the reliability of voting machines manufactured by Dominion," Coomer's former employer.

In the film, Byrne lays out a theory of election fraud involving six cities and asserts that vote counting in these cities was "shut down" at some point, followed by a large injection of votes for Biden, resulting in a narrow Biden win in each state. An ASOG employee named Phil Waldron appears and suggests a connection between Antifa and the result in the 2020 election. Oltmann then reappears, claiming that he created a mathematical model of some sort analyzing the election results, which was "validated" by

government officials he met with.  Matthew DePerno, an attorney who represented the

plaintiff in the Michigan lawsuit noted above, appears to promote the legitimacy of the

ASOG report concerning voting in Antrim County.

Oltmann then returns and lays out his story that (1) he participated in an Antifa

conference call, (2) Coomer stated on the call that he would rig the election, and (3)

Coomer thereafter did rig the election.  Oltmann describes his supposed realization of

Coomer's role as follows:

> November 3rd, we all know what happened. We all went to sleep with
> President Trump handily ahead. We woke up the next morning and Biden
> had won. And nothing to see here. And I'm sitting at my friend's place, and I
> get this text message. It says Joe, you need to read this article. And as I went
> through the article, it talked about in Georgia, in several precincts, the
> system on election day actually went down. And there was a description
> inside of the article that said why it went down. That they had to do an
> update in the middle and that took it down for four hours. But the person
> who gave the update was Eric Coomer. And at that moment my heart sank.
> That's when I knew. That's when I knew that there was a, you know,
> Dominion Voting Systems was in 28 states. That's when I started to realize
> that, you know, this guy Eric Coomer, when he said on that call 'Don't worry
> about Trump, he's not going to win.' That's when I realized that there's a high
> probability he affected the election.

The film also features videos of Coomer demonstrating the adjudication function on

Dominion voting machines, followed by Oltmann providing a theory of how the machines

could rig elections, a theory the complaint describes as "technically infeasible" and

"nonsense."

Coomer alleges that Oltmann's statements about Coomer participating in an

Antifa call and then rigging the election using the Dominion voting machines were false

and defamatory, and that Defendants are liable for publishing them through the film.

He alleges that as a result of Defendants' actions, his reputation has been damaged, he

can no longer work in the elections industry, and he has suffered frequent, credible death

threats and chronic periods of turmoil and severe emotional and physical distress.

***Procedural History***

Coomer originally filed this suit in federal court in Colorado. Defendants moved to

dismiss under Rule 12(b)(2) for lack of personal jurisdiction and Rule 12(b)(6) for failure

to state a claim. The court ruled that Defendants were not subject to personal

jurisdiction in Colorado. Rather than dismiss the case, the court denied the motions to

dismiss and transferred the case to this District under 28 U.S.C. § 1631. In doing so, the

court noted that Coomer had filed related cases raising similar claims that had survived

motions to dismiss, from which the court concluded Coomer's claims in this case likely

had merit. *Coomer v. Byrne*, No. 1:22-cv-01575-RM-SKC, 2024 WL 3570593, at *7 (D.

Colo. Jan. 8, 2024).[3]

Following transfer to this Court, Defendants filed motions to dismiss under Rule

12(b)(6) along with arguments for dismissal under the Colorado anti-SLAPP statute,

Colo. Stat. § 13-20-1101 *et seq.* The Court in a previous order ruled that Colorado's anti-

SLAPP statute is inapplicable in federal court because it is procedural in nature and

conflicts with several applicable Federal Rules of Civil Procedure. *See* (Doc. 149). The

---

[3] *See Coomer v. Make Your Life Epic LLC*, 659 F. Supp. 3d 1189, 1207 (D. Colo. 2023) (denying
motion to dismiss under Colorado anti-SLAPP statute), *appeal dismissed*, 98 F.4th 1320 (10th
Cir. 2024); *Coomer v. Lindell*, No. 22-cv-01129-NYW-SKC, 2023 WL 2528624, at *13 (D. Colo.
Mar. 15, 2023) (denying motion to dismiss). After the transfer of the case to this district, a
Colorado court of appeals affirmed the trial court's ruling on a motion to dismiss under Colorado's
anti-SLAPP statute that Coomer had shown a reasonable likelihood of success on similar claims
against at least some of the defendants. *See Coomer v. Donald J. Trump for President, Inc.*, 552
P.3d 562 (Colo. Ct. App. 2024). Additionally, the district court in the *Lindell* case denied the
defendants' motion for summary judgment. *See Coomer v. Lindell*, No. 22-cv-01129-NYW-SPB,
2024 WL 3989524 (D. Colo. Aug. 29, 2024).

Court accordingly denied the motions to dismiss to the extent they relied on the anti-SLAPP statute, leaving for determination Defendants' arguments for dismissal under Rule 12(b)(6), addressed below.

## **Legal Standard**

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing the [plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a). While Rule 8(a) does not demand "detailed factual allegations," it does require "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To survive a motion to dismiss, factual allegations must be sufficient "to state a claim to relief that is plausible on its face." *Id.* at 570.

When deciding a Rule 12(b)(6) motion, review is generally limited to the four corners of the complaint. *Rickman v. Precisionaire, Inc.*, 902 F. Supp. 232, 233 (M.D. Fla. 1995). Furthermore, when reviewing a complaint for facial sufficiency, a court "must accept [a] [p]laintiff's well pleaded facts as true, and construe the [c]omplaint in the light most favorable to the [p]laintiff." *Id.* (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). "[A] motion to dismiss should concern only the complaint's legal sufficiency, and is not a procedure for resolving factual questions or addressing the merits of the case." *Am. Int'l Specialty Lines Ins. Co. v. Mosaic Fertilizer, LLC*, 8:09-cv-1264-T-26TGW, 2009 WL 10671157, at *2 (M.D. Fla. Oct. 9, 2009) (Lazzara, J.).

# Analysis

## *Defamation*

### Choice of Law

Defendants contend that the issues on Coomer's defamation claims are governed by Colorado law.  Coomer generally relies on Florida law, but argues that there is no conflict between Colorado and Florida law on the standards governing defamation.  Because this case was transferred here under 28 U.S.C. § 1631, Florida law, including its choice of law principles, applies.  *See Viernow v. Euripides Dev. Corp.*, 157 F.3d 785, 793 (10th Cir. 1998) ("[Section] 1631 makes it clear that whenever an action is transferred for want of personal jurisdiction, the law of the transferee state controls.").  Under Florida law, a court need not engage in a comprehensive choice of law analysis where the laws of the relevant states plainly do not differ, or where any differences would not lead to a different outcome on the facts of the case.  *In re: Jan. 2021 Short Squeeze Trading Litig.*, 76 F.4th 1335, 1346 (11th Cir. 2023); *Tune v. Philip Morris Inc.*, 766 So. 2d 350, 352 (Fla. 2d DCA 2000).  In such a "false conflict" situation, the court "should avoid the conflicts question and simply decide the issue under the law of each of the interested states." *Wells Fargo Bank, N.A. v. Barber*, 85 F. Supp. 3d 1308, 1315 (M.D. Fla. 2015) (quoting *Cooper v. Meridian Yachts, Ltd.,* 575 F.3d 1151, 1171 (11th Cir. 2009)).

The basic elements of defamation under Colorado and Florida law are largely the same.  The parties discuss three potential differences.  First, Colorado's anti-SLAPP statute, invoked by Defendants, differs from Florida's statute.[4]  But this difference is

---

[4] "SLAPP" stands for "Strategic Lawsuits Against Public Participation," which are meritless lawsuits intended to chill the exercise of political or legal rights.  *See, e.g., Tobinick v. Novella*, 884 F.3d 1110, 1114 n.1 (11th Cir. 2018); *Coomer v. Make Your Life Epic, LLC*, 659 F. Supp 3d at 1196.

irrelevant because the Court has previously ruled Colorado's statute inapplicable in federal court proceedings like this one.  Second, Florida, unlike Colorado, by statute requires notice to the defendant before filing a suit for defamation.  *See* § 770.01, *F.S.* Florida courts, however, have limited the statute's application to media defendants, i.e., those who "speedily disseminate news or editorial content to the public."  *See, e.g.*, *Mazur v. Ospina Baraya*, 275 So. 3d 812, 818 (Fla. 2d DCA 2019).  Defendants do not appear to fall within the protection of the statute.

A third difference is that Colorado, unlike Florida, requires non-public figure plaintiffs to prove actual malice when their defamation claims are based on statements relating to matters of public concern.[5]  Defendants argue that under Colorado law, the actual malice standard applies to Coomer's defamation claims.  Coomer has declined to offer any argument or authority opposing application of Colorado's rule, and he concedes that every court to address his claims has applied the actual malice standard.  While not expressly agreeing that standard applies, Coomer states he will "spare the Court from argument against a standard that his Complaint readily meets anyway."  Accordingly, for purposes of the pending motions, Coomer has waived application of a lesser standard that would apply under Florida law.  *See Goodnight v. Boston Sci. Corp.*, 548 F. Supp. 3d 1325, 1335-36 (S.D. Fla. 2020) ("[J]ust as a party may stipulate to the application of a state's legal regime, a party may, through its briefing (or otherwise), waive its choice-of-

---

[5] While Florida and Colorado differ on whether the actual malice standard applies, the jurisdictions do not differ on the nature of the standard itself, discussed below, which is derived from federal case law under the First Amendment.  *See, e.g., Diversified Mgmt., Inc. v. Denver Post, Inc.,* 653 P.2d 1103, 1106 (Colo. 1982) (adopting the same standard for actual malice applied under the First Amendment to cases involving public figures); *Coomer v. Donald J. Trump for President, Inc.,* 552 P.3d at 581 (citing *Diversified Management*).

law arguments implicitly—which is exactly what BSC did here.") (citing *Sun Life
Assurance Co. of Canada v. Imperial Premium Fin., LLC*, 904 F.3d 1197, 1208-09 (11th
Cir. 2018)).  With this final potential difference between Colorado and Florida law
eliminated, a detailed choice of law analysis is unnecessary.

Elements of Defamation

A defamation claim generally requires the following: (1) a defamatory statement;
(2) that was materially false; (3) concerning the plaintiff; (4) published to a third party;
(5) fault amounting to at least negligence; and (6) either actionability of the statement
irrespective of special damages, or the existence of special damages.  *See, e.g., Coomer v.
Make Your Life Epic LLC*, 98 F.4th 1320, 1327 (10th Cir. 2024); *Coomer v. Donald J.
Trump for President, Inc.*, 552 P.3d 562, 581 (Colo. Ct. App. 2024); *Turner v. Wells*, 879
F.3d 1254, 1262 (11th Cir. 2018) (reciting similar elements under Florida law).  As
discussed above, where, as here, the defamatory statements relate to a matter of public
concern, Colorado law requires that the plaintiff also allege and prove that the
statements were made with actual malice.  *Coomer v Donald J. Trump for President*, 552
P.3d at 581.

Statements by Joseph Oltmann in *The Deep Rig*

The Court will first examine the parties' arguments as to the alleged defamatory
statements in the film *The Deep Rig*, and then address additional allegedly defamatory
statements made by the individual defendants.

*Publication*

Defendants argue that the complaint insufficiently alleges that they published the
defamatory statements in *The Deep Rig*.  TAP briefly asserts in its motion to dismiss that

the complaint does not allege it "published any defamatory statements."[6]  Defendants Byrne and Lucescu address the point at greater length, arguing that "producing" and "promoting" a film are not the same as "publishing" statements made in the film. Coomer responds that persons who republish defamatory statements by others may be liable for defamation, and argues the allegations of the complaint are sufficient to demonstrate Defendants' responsibility for the content of the film.

The complaint alleges that all Defendants produced and distributed *The Deep Rig*, that TAP holds the copyright on the film, that it has hosted the film on its Internet home page, and that it received profits from the film.  Byrne (a founder and director of TAP) and Lucescu are alleged to be coproducers of the film and appeared at events promoting it.  Byrne also appeared in the film itself.  The complaint further alleges that Defendants acted with actual malice, that is, with knowledge that the alleged defamatory statements were false or with reckless disregard for the truth.

Defendants cite authorities that discuss "publication" as an element, but none involves similar facts or holds that producers of a film can never be subject to liability. The Court has located no Colorado or Florida case law on point, although a treatise on Colorado law states that "[a]n editor, publisher, owner, or reporter of a newspaper or broadcasting company who has been involved in the publication" of defamatory matter may be liable.  Colo. Prac., *Pers. Injury Torts and Ins.* § 32:18. Publication. (3d ed. Nov. 2024).  The Florida Supreme Court has held that "every one who takes part in the publication . . . is charged with publication." *Doe v. Am. Online, Inc.*, 783 So. 2d 1010, 1017 (Fla. 2001) (quoting *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 332 (4th Cir. 1997)).

---

[6] TAP's arguments with respect to the Communications Decency Act are discussed below.

Consistent with this proposition, case law from other jurisdictions generally holds that anyone who causes or participates in the publication of defamatory matter or who aids or abets another in publishing the matter can be liable.  *See, e.g., US Dominion, Inc. v. Fox News Network, LLC*, 293 A.3d 1002, 1040 (Del. Super. Ct. 2023) ("[A]ll who take part in the procurement, composition and publication of a libel are responsible in law and equally so.") (applying New York law and quoting *Treppel v. Biovail Corp.*, No. 03 CIV. 3002(PKL), 2005 WL 2086339, at *3 (S.D.N.Y. Aug. 30, 2005)); *Van Horne v. Muller*, 691 N.E.2d 74, 77 (Ill. App. Ct. 1998) ("[O]ne who requests, procures, or aids or abets, another to publish defamatory matter is liable as well as the publisher."), *aff'd in part, rev'd in part on other grounds*, 705 N.E.2d 898 (Ill. 1998) (holding that "[a]ll persons who cause or participate in the publication of libelous or slanderous matters are responsible for such publication") (quotation omitted); *Di Giorgio Corp. v. Valley Labor Citizen*, 67 Cal. Rptr. 82, 87 (Ct. App. 1968) ("[I]n the absence of a privilege, anyone who actively participates in the publication of a false and libelous statement is liable for special, general and even punitive damages."); *see also* Restatement (Second) of Torts § 581, comment c ("The rule does not relieve from liability the publisher who prints and puts upon the market a libelous newspaper, book or magazine even though its contents are prepared by a third person . . . .").

Each Defendant is alleged to have been involved in producing or distributing the film *The Deep Rig* and to have acted with knowledge of falsity or with reckless disregard of the falsity of Oltmann's statements in the film.  The relationship between the individual Defendants and TAP, the extent of the involvement of each Defendant in the film project, and whether that involvement is sufficient to impose liability must await

further factual development on a more complete record.  *See Tavoulareas v. Piro*, 759 F.2d 90, 136 (D.C. Cir. 1985) ("Responsibility for publication is a factual question which is normally for the jury to resolve."), *vacated in part on other grounds*, 763 F.2d 1472 (D.C. Cir. 1985).  Accordingly, Defendants' motions to dismiss the defamation claims against them based on insufficient allegations that they published the alleged defamatory material are denied.

*Actual Malice*

As noted above, under Colorado law, a plaintiff alleging defamation based on a statement regarding a matter of public concern – which the 2020 election plainly was – must prove that the statement was made with actual malice, that is, "actual knowledge that it was false or with reckless disregard for whether it was true."  *Coomer v. Donald J. Trump for President, Inc.*, 552 P.3d at 591 (quotation omitted).  The test for actual malice is a subjective one.  Thus, the issue is not whether "a reasonably prudent [person] would have published, or would have investigated before publishing," but rather whether the defendant "in fact entertained serious doubts as to the truth of [the] publication, or was highly aware of its probably falsity[.]"  *Id.* (quotation omitted).

At the pleading stage, the plaintiff must set forth "facts sufficient to give rise to a reasonable inference that the false statement was made 'with knowledge that it was false or with reckless disregard of whether it was false or not'" under the substantive standards set forth above.  *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964)).  Defendants argue that the complaint fails to sufficiently allege actual malice.  Coomer argues that he

has pleaded circumstantial facts from which actual malice can be inferred and therefore the complaint is sufficient.

A plaintiff will rarely have evidence of the defendant's mental state. *Coomer*, 552 P.3d at 592. Actual malice, therefore, may be proven with circumstantial evidence "that would permit the *inference* that the defendant acted with actual malice based on all the circumstances." *Id.*; *see Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989) ("Although courts must be careful not to place too much reliance on such factors, a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence[.]"). Such evidence may include a combination of factors such as the inherent improbability of the defamatory claim, reason to doubt the veracity or reliability of the source, the lack of any attempt to corroborate or refute a questionable claim by consulting the most obvious sources, and the defendant's awareness of "other credible information contradicting the claim." *See Coomer*, 552 P.3d at 591-92; *see also Hunt v. Liberty Lobby*, 720 F.2d 631, 643 (11th Cir. 1983) (holding that actual malice may be inferred from circumstances such as improbable allegations and reliance on anonymous or other questionable sources).

The Court agrees with Defendants that Coomer's complaint and his arguments at times appear to focus on demonstrating actual malice on the part of Oltmann, who is not a party, rather than on the part of Defendants. Coomer also points to events and information that arose after distribution of the film. Nevertheless, the Court concludes that Coomer's complaint otherwise alleges facts that, taken together, sufficiently plead actual malice.

First, Oltmann's story about the Antifa conference call, Coomer's alleged boast that he would ensure Trump's defeat, and his subsequent actions to rig the election were explosive and inherently improbable.  The complaint alleges that Oltmann was known by Byrne to be a partisan activist with some extreme views.  The identification of the speaker on the purported Antifa phone call as "Eric" from "Dominion" came only from anonymous participants on the call.  Despite learning of the plan to rig the upcoming election months before it took place, Oltmann made his accusations public only after the election, a fact which should have aroused suspicion and called for careful investigation.

In addition, substantial evidence widely published prior to the film's premiere in June 2021 would have alerted Defendants that Oltmann's story was probably false.  In November 2020, the United States Cybersecurity and Infrastructure Security Agency published a report concluding that there was "no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised" during the election process.  Also in November 2020, fifty-nine computer scientists and election security experts issued a joint letter concluding that no credible evidence had been presented to support a conclusion "that the 2020 election outcome in any state [had] been altered through technical compromise."  In December 2020, Coomer filed suit against other defendants, including Oltmann himself, alleging Oltmann's statements about him were false.  In the same time frame, it was publicly reported that United States Attorney General William Barr had concluded that claims of widespread fraud were without support.  The Trump campaign filed numerous lawsuits immediately after the election, most of which had been rejected by the courts long before June 2021.

In March 2021, Alex Halderman, a computer science and computer security expert and co-chair of Michigan's Election Security Advisory Commission, issued a report commissioned by the Michigan Secretary of State and Attorney General.  Halderman concluded that problems with the vote tabulation in Antrim County, Michigan, contrary to the film's presentation a few months later, involved human error but no security breaches or deliberate misconduct, and had nothing to do with the adjudication feature, which was not used in Antrim County.  In April 2021, Newsmax, a defendant in another defamation suit brought by Coomer based on similar allegations and statements, issued a public apology and retraction pursuant to a settlement.

In short, the improbable and inflammatory nature of the accusation, Defendants' reliance on biased and otherwise dubious sources, the lawsuits by Coomer, the debunking of claims of fraud and the courts' rejection of lawsuits filed by the Trump election team, which were widely reported and therefore likely known by Defendants, would have given them serious reason to doubt Oltmann's statements about Coomer. Yet, the complaint alleges, Defendants presented these damaging allegations concerning Coomer without conducting any investigation into whether they had a basis in fact. Defendants instead relied exclusively on Oltmann, making no effort to contact corroborating sources such as the participants on the alleged Antifa call or Coomer himself.  *See Coomer v. Make Your Life Epic LLC*, 659 F. Supp. 3d 1189, 1207 (D. Colo. 2023) (holding that a failure to pursue obvious sources of corroboration or refutation of Oltmann's claims provided clear and convincing evidence of actual malice), *appeal dismissed*, 98 F.4th 1320 (10th Cir. 2024).  The foregoing allegations, taken together, are sufficient to support an inference that Defendants acted with actual malice.  *See Coomer*

*v. Lindell*, No. 22-cv-01129-NYW-SKC, 2023 WL 2528624, at *7 (D. Colo. Mar. 15, 2023)
(holding that Coomer's complaint sufficiently alleged actual malice based on the nature
and source of the defamatory accusations, the defendants' lack of investigation and
reliance only on Oltmann, and their disregard of reliable sources refuting the
accusation).

<u>Other Statements by Defendants</u>

Coomer's defamation claims as to Byrne and Lucescu refer to additional
statements alleged to have been made by them personally.

*Statements by Byrne*

The complaint challenges statements by Byrne individually at the screening of the
film and in subsequent interviews regarding specific aspects of the Dominion voting
machines' operations.  These statements relate to three areas: the adjudication feature,
taking voting machines offline for updates, and a feature called "Vote Secure Paper" or
"Security Paper."  Byrne argues these statements cannot support a defamation claim
because they do not concern Coomer at all or because, at most, they refer only to his
*possible* involvement in these matters, which Byrne argues is a matter of nonactionable
opinion or conjecture.

Coomer offers no response to Byrne's points and does not discuss these statements
in his memorandum.  It therefore appears Coomer has abandoned any reliance on these
statements as a basis for his defamation claim.  In addition, the complaint's allegations
of actual malice focus on assertions by Oltmann in the film relating to the Antifa call
rather than on the voting machine features described in these statements by Byrne.  For
example, while the complaint alleges that Oltmann made false statements in the film

regarding the adjudication feature, the alleged falsity claimed by Oltmann relates to the erasure of the original digital images of the votes. The challenged statement by Byrne regarding adjudication, on the other hand, is alleged to be false because the Dominion machines do not allow "bulk adjudication."

Accordingly, as pleaded, and in the absence of briefing by Coomer, Coomer may not proceed on a theory that these statements by Byrne involve actionable defamation. If Coomer files an amended complaint and intends to pursue a defamation claim based on these statements, he should draft his amended allegations bearing in mind Byrne's arguments and should include clearer allegations as to how these specific statements were false and why Byrne would have known they were false or acted with reckless disregard of their falsity.

*Statements by Lucescu*

The complaint alleges that at the film's premiere Lucescu praised those appearing in the film as "heroes" and "patriots" who "stand for truth." The complaint also quotes Lucescu as explaining opportunities to make money from the film. Lucescu argues that the first statements constitute nonactionable opinion and neither set of statements refers to Coomer or defames him. As with the statements by Byrne discussed above, Coomer offers no response to Lucescu's motion on this point. The complaint refers to these statements and others by Lucescu as part of its overall narrative but does not allege these statements constituted actionable defamation. Accordingly, Coomer may not pursue a defamation claim based on these statements.

Communications Decency Act

TAP argues that the claims against it are barred by the Communications Decency Act ("CDA"), 47 U.S.C. § 230.  The CDA provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1).  By the terms of the statute, the immunity applies where the defendant merely provides or uses an interactive computer service and is not itself an information content provider with respect to the content at issue.  The latter is a person or entity "responsible in whole or part for the creation or development of information provided through the Internet or any other interactive computer service."  47 U.S.C. § 230(f)(3).  Thus, where the defendant developed or materially contributed to the content at issue, the CDA does not preclude liability.  *See Fla. Abolitionist v. Backpage.com LLC*, No. 6:17-cv-218-Orl-28TBS, 2018 WL 1587477, at *5 (M.D. Fla. Mar. 31, 2018); *F.T.C. v. Accusearch, Inc.*, 570 F.3d 1187, 1197 (10th Cir. 2009) (holding that a computer service "that is also an 'information content provider' of certain content is not immune from liability arising from publication of that content.").

Immunity under the CDA is an affirmative defense.  *E.g., Ricci v. Teamsters Union Local 456*, 781 F.3d 25, 28 (2d Cir. 2015).  As such, it may be the basis for a Rule 12(b)(6) dismissal only where its application is apparent from the face of the complaint.  *Id.*; *E-Ventures Worldwide, LLC v. Google, Inc.,* 188 F. Supp. 3d 1265, 1273 (M.D. Fla. 2016).  TAP is alleged to have done more than host the film on its website.  It owns the copyright on the film and obtained profits from its distribution.  TAP's founder and director Byrne is alleged to have produced the film and appeared in it.  It cannot be determined from the

face of the complaint that TAP was merely an interactive service provider as opposed to a content provider. As discussed above, the extent to which each Defendant was involved in creating the film must be determined on a more complete record. Accordingly, TAP's motion to dismiss is denied as to this ground.

### *Intentional Infliction of Emotional Distress*

The elements of intentional infliction of emotional distress under Florida and Colorado law are essentially the same: intentional or reckless conduct that is extreme and outrageous and causes severe emotional distress. *See Mackall v. JP Morgan Chase Bank, N.A.,* 356 P.3d 946, 955 (Colo. Ct. App. 2014) (Colorado law); *Lopez v. Target Corp.*, 676 F.3d 1230, 1236 (11th Cir. 2012) (Florida law). The level of outrageousness required is "extremely high." *Coors Brewing Co. v. Floyd*, 978 P.2d 663, 666 (Colo. 1999). It requires conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (quoting Restatement (Second) of Torts § 46, comment d); *Lopez*, 676 F.3d at 1236.

Two federal district judges and a state appellate court in Colorado have concluded that allegations by Coomer of similar conduct by other defendants rose to the necessary level to state a claim for intentional infliction of emotional distress. *See Coomer v. Lindell*, 2023 WL 2528624, at *12; *Coomer v. Make Your Life Epic*, 659 F. Supp. 3d at 1206-07; *Coomer v. Donald J. Trump for President, Inc.*, 552 P.3d at 600-01. The Court need not address this issue, however, because Defendants argue only that the failure to allege actual malice or otherwise plead a viable defamation claim requires dismissal of

the emotional distress claim.  As the Court has found the allegations of defamation

sufficient as to at least some of the alleged defamatory statements, this argument fails.

Accordingly, the motions to dismiss are denied as to this ground, without prejudice

to Defendants' ability to challenge this claim at the summary judgment stage or at trial.

## Conspiracy

Defendants argue that a claim for civil conspiracy requires an underlying tort as

the object of the conspiracy, and that because the tort claims for defamation fail, so does

the conspiracy claim.  As the Court has denied the motions to dismiss with respect to

defamation, the conspiracy claim may also proceed.  The motions to dismiss are therefore

denied as to this ground, without prejudice to Defendants' ability to challenge this claim

at the summary judgment stage or at trial.

## Unjust Enrichment

Coomer's unjust enrichment claim alleges that Defendants profited from

distribution of the defamatory film, that this conduct also damaged Coomer, and that

Defendants should not be allowed to retain the profits of their misconduct.  It appears

from the complaint that the profits Defendants obtained from distributing the film came

from third parties, not from Coomer.  Defendants argue that Coomer's failure to allege

that he conferred a benefit on Defendants is fatal to this claim.

The Court concludes that the complaint fails to state a claim for unjust enrichment

under either Florida or Colorado law.  Under Florida law, a plaintiff asserting an unjust

enrichment claim must plead that he or she conferred a direct benefit on the defendant.

*See Kopel v. Kopel*, 229 So. 3d 812, 819 (Fla. 2017) (holding that unjust enrichment

requires that "the plaintiff must directly confer a benefit to the defendant"); *Chiquita*

*Fresh N. Am., L.L.C. v. Port Everglades Terminal, LLC*, 372 So. 3d 277, 281 (Fla. 4th DCA 2023) (same; collecting cases).  The complaint alleges no such benefit, and the unjust enrichment claim is therefore insufficient under Florida law.

Coomer argues that under Colorado law as stated in *DCB Construction Co. v. Central City Development Co.*, 965 P.2d 115, 119-20 (Colo. 1998), the benefit need not have been conferred by the plaintiff, but need only have been received by the defendant "at plaintiff's expense."  The terminology used by the court in *DCB* differs somewhat from the language in earlier Colorado cases referring to a benefit "conferred on the defendant by the plaintiff."  But it appears the court's revised statement of the elements of unjust enrichment was intended to address issues other than the source of the alleged benefit. *See id*.  In *DCB*, the benefit conferred "at plaintiff's expense" consisted of construction work performed on a landlord's building by the plaintiff, a contractor hired by the tenant, which increased the value the building, thereby benefiting the landlord.  *Id*. at 120. Nothing like that is present here.

While the Court has located no case directly on point in either Florida or Colorado, cases from other jurisdictions have declined to allow claims for unjust enrichment in the defamation context.  *See, e.g., Salem Media Group, Inc. v. Awan*, 301 A.3d 633, 658-59 (D.C. 2023) (noting that "courts have rejected similar claims brought by defamation plaintiffs because the plaintiff never conferred a benefit on the defendant in the way that unjust enrichment claims typically require"); *Organovo Holdings, Inc. v. Dimitrov*, 162 A.3d 102, 126-27 (Del. Ch. 2017) (holding that a defendant is not enriched "at [the plaintiff's] expense" where the plaintiff "did not make any payments or financially contribute to the profits defendants received," which came from shares bought and sold

on the stock exchange); *Ventura v. Kyle*, 825 F.3d 876, 887 (8th Cir. 2016) ("[W]e reject Ventura's assertion that Ventura conferred a 'benefit' on Kyle by Ventura's mere existence as a colorful figure who might inspire people to make up stories about him."); *Alharbi v. TheBlaze, Inc.*, 199 F. Supp. 3d 334, 360-61 (D. Mass. 2016) (agreeing with the Eight Circuit's analysis in *Ventura*).

Absent relevant authority to the contrary, and Coomer provides none, the Court declines to extend the theory of unjust enrichment to the situation presented here. Accordingly, the claim for unjust enrichment is dismissed without prejudice and with leave to amend.

## Conclusion

For all the foregoing reasons, Defendants' motions to dismiss are granted in part and denied in part. The complaint states a claim for defamation based on Defendants' publication of defamatory statements by Oltmann in the film *The Deep Rig*. The alleged statements by Byrne and Lucescu individually, however, will not support a claim for defamation as pleaded. The claim for unjust enrichment in the fourth count of the complaint is dismissed without prejudice. The motions to dismiss are otherwise denied. Coomer may file an amended complaint on or before February 10, 2025.

Accordingly, it is

**ORDERED**, **ADJUDGED**, and **DECREED**:

1. "Defendant Steve Lucescu's Motion to Dismiss for Failure to State a Claim Pursuant to Rule 12(b)(6) and Special Motion to Dismiss under Anti-SLAPP Statute" (Doc. 123) is **GRANTED IN PART** and **DENIED IN PART** as set forth herein.

2. The "Motion to Dismiss by The America Project, Inc. under Rule 12(b)(6) for Failure to State a Claim and Special Motion to Dismiss under Anti-SLAPP Statute" (Doc. 125) is **GRANTED IN PART** and **DENIED IN PART** as set forth herein.

3. "Defendant Patrick Byrne's Motion to Dismiss Pursuant to Rule 12(b)(6) and Special Motion to Dismiss Pursuant to C.R.S. § 13-20-1101" (Doc. 126) is **GRANTED IN PART** and **DENIED IN PART** as set forth herein.

4. Plaintiff may file an amended complaint on or before February 10, 2025.

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, this 14th day of January, 2024.

**TOM BARBER**
**UNITED STATES DISTRICT JUDGE**