UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ERIC COOMER,

        Plaintiff,

v.                                                                  Case No. 8:24-cv-8-TPB-SPF

PATRICK BYRNE, et al.,

        Defendants.

_____/

**ORDER**

Before the Court is Plaintiff Eric Coomer's Motion for Sanctions and for Order to Show Cause as to Defendant Patrick Byrne[1] and His Attorney Peter Ticktin. (Doc. 281). Byrne, through Mr. Ticktin, responded in opposition (Doc. 284) and Coomer filed a notice of supplemental authority (Doc. 294). Upon due consideration, Plaintiff's motion is granted in part and denied in part.

## I.      Background

The background of this matter has been explained in numerous prior Orders, *see, e.g.*, (Docs. 214, 243, 307, 329), but bears repeating here with some supplementation. This is one of many cases arising from the aftermath of the 2020 presidential election, and specifically from allegations regarding voting services provided by Dominion Voting Systems ("Dominion"). (Doc. 197). Plaintiff is the former director of product strategy and security for Dominion. (*Id.* at ¶ 1). Defendant Byrne served as the Chairman of the Board for Defendant The America Project ("TAP") and is credited as a producer of a film about the

---

[1] There are other named Defendants in this action, but the instant motion is only directed at Defendant Byrne and his counsel, Mr. Ticktin.

2020 election entitled "The Deep Rig." (*Id.* at ¶¶ 10, 14). Defendant TAP owns the copyright for the film and has been the recipient of at least a portion of its profits. (*Id.* at ¶ 12).

"The Deep Rig" is styled as a documentary and purports to expose a number of ways that the 2020 election was fraudulently influenced to ensure the election of President Joseph Biden with each theory featuring some element casting doubt on the reliability of voting machines manufactured by Dominion. (*Id.* at ¶¶ 3, 119). Plaintiff claims that various allegations in the film about him and Dominion have been debunked and are provably false. *See generally* (*Id.*). As a result of these false claims, Plaintiff has received countless credible death threats, has suffered from severe emotional distress, and has suffered harm to his reputation, privacy, safety, and earnings. (*Id.* at ¶¶ 131, 137). In light of these issues, Plaintiff initiated this action and has been represented for the duration of the action by attorneys Charlie Cain and Brad Kloewer with Ashley Morgan also appearing later in the case. (Docs. 1, 3, 228).

Plaintiff initially filed this case in the District of Colorado (Doc. 1) but it was transferred to this District in January 2024 (Doc. 99). In October 2024, the Court granted the parties' joint motion for a stipulated protective order to govern confidential information exchanged during discovery. (Docs. 162, 163). The parties then engaged in written and document discovery, including the exchange of records and negotiations regarding the content and scope of the requested information. (Doc. 213).

During discovery, the Court denied attorney Stefanie Lambert Junttila's ("Ms. Lambert") motion for special admission to represent Defendant Byrne. (Doc. 214). Defendant Byrne filed a motion for reconsideration a month after the motion's denial on the same day his new lead counsel, Mr. Peter Ticktin, appeared. (Docs. 219, 220). The motion

for reconsideration was denied shortly thereafter on July 16, 2025. (Doc. 221). Discovery

continued in this case with Mr. Ticktin continuing the represent Defendant Byrne.

On November 11, 2025, Mr. Ticktin sent Mr. Kloewer an email chain with the subject

of "FW: Re: CONFIDENTIAL SETTLEMENT OFFER[.]" (Doc. 281-3). The initial email

appears to be from Mr. Ticktin to Ms. Lambert earlier in the day while the second email is

directed to Mr. Kloewer with Ms. Lambert being cc'ed. (*Id.* at 2). In the email sent directly

to Mr. Kloewer, Mr. Ticktin offered to "help" Plaintiff because

> Mr. Oltmann has served a subpoena on Ms. Lambert for documents including
> the Dominion discovery. We are moving to Lift the Protective Order, and one
> way or another, whether through that lawsuit[2] or otherwise, Mr. Oltmann and
> authorities who are very interested, will find the evidence of Mr. Coomer's
> criminal involvement.
>
> At this very moment, investigations and prosecutions by the Department of
> Justice, the Federal Bureau of Investigations, Homeland Security, and the
> Department of National Intelligence are underway, and the indictment against
> Smartmatic in Case No. 24-cr-20343[3] was recently superseded by the DOJ. It
> seems that Dominion has set up Mr. Coomer to hang him out to dry.

(*Id.*). Mr. Ticktin went on to offer:

---

[2] This appears to be the matter Dominion brought against Byrne for defamation in which Ms. Lambert
previously represented Defendant Byrne and in which Mr. Ticktin currently represents him. *U.S.
Dominion, Inc., et al. v. Byrne*, Case No. 1:21-cv-2131-CJN-MAU (D.D.C. Aug. 10, 2021). Defendant
Byrne (through Mr. Ticktin) filed a motion to either lift the protective order in that case completely
or, alternatively, lift it for the limited purpose of permitting Ms. Lambert to respond to a subpoena
issued in another defamation case brought by Plaintiff in Colorado against Mr. Jospeh Oltmann and
others, *Coomer v. Donald J. Trump for President, Inc., Joseph Oltmann, FEC United, & Shuffling Madness
Media, Inc. d/b/a Conservative Daily, et al.*, Case No. 2020-cv-34319 (Denver Cnty. Dist. Ct.) ("Denver
Case"). *Id.* at (Doc. 166). The motion remains pending with the latest development being a motion
filed by Ms. Lambert on June 17, 2026, asking the Court to permit her to respond to Mr. Oltmann's
subpoena. *Id.* at (Doc. 188)

[3] This is apparently a reference to a criminal case pending in the United States District Court for the
Southern District of Florida. *United States v. Bautista, et al.*, Case No. 1:24-cr-20343 (S.D. Fla.). A
superseding indictment was entered in that case in October 2025 in which Smartmatic, a company
that provides voting machine and election services, and others were indicted based on allegations
involving money laundering and paying bribes to a Philippine government official in connection with
contracts related to the 2016 Philippine national election. *Id.* at (Doc. 264) (S.D. Fla. Oct. 16, 2025).
Neither Mr. Ticktin nor Ms. Lambert are attorneys of record in that action nor was Plaintiff a subject
of the superseding indictment.

3

Neither my client nor I are threatening to do or not do anything. We are simply offering to help for no benefit. It is obvious that your client is stuck in a labyrinth. We are offering to help, as we see that his best bet, and his only chance, is for him to turn state's evidence.

Mr. Coomer is a necessary witness who links Smartmatic with Dominion in the criminal enterprise. This is a critical time for Mr. Coomer to provide full transparency related to David Moreno, John Poulos, Staple Street, etc.

Ms. Lambert is a well experienced prosecutor and more recently a federal criminal defense counsel. Mr. Byrne should waive any conflict of interest and permit Ms. Lambert and me to join your legal team and arrange for full immunity by the DOJ in exchange for truthful testimony from Mr. Coomer related to his role in election law violations, money laundering, bribery, fraud, treason, etc. She is certain that there is a high probability that she could obtain full immunity for Mr. Coomer.

In fact, we may need to assist Mr. Coomer in the Witness Protection Program.

If this interests your client, please let me know.

(*Id.*).  The prior draft email is largely similar, but there are some notable differences.  For example, in the draft email, the end of the last full paragraph ends with ". . . his role in election law violations, money laundering, bribery, fraud, treason, *and 18 USC 1512 for bringing the defamation cases*."  (*Id.* at 4) (emphasis added).

Approximately one month after this email, on December 15, 2025, Mr. Kloewer took Defendant Byrne's deposition on Plaintiff's behalf.  (Doc. 281-2).  Near the end of the deposition, Mr. Kloewer appears to ask Defendant Byrne about whether the November email was an offer to settle the case.  (*Id.* at 281-2 at 282:1-282:3).  Mr. Tickin interjected that Defendant Byrne was "not in a position to – to discuss that," but stated that he "was very clear in the letter" that it was not an offer to settle this action but was "a confidential settlement offer in regard to other situations." (*Id.* at 282:4-282:14).  When challenged about whether the email was subject to evidentiary protections, Mr. Ticktin accused Mr. Kloewer

4

of "trying to use this thing against" him.    (*Id.* at 282:16-282:24).    Mr. Ticktin further

elaborates:

> Your client is a traitor.  Your client is going to be prosecuted as far as I know
> under the criminal laws of -- of the United States.  He's in a lot of trouble.  And
> I -- and I know that there were efforts that were made to be able to turn him so
> that he could be a help to our country, which you are not, apparently. Shame
> on you. Shame on you.  Okay. I don't blame you for representing a traitor to
> the United States because he's entitled to counsel.
>
> . . .
>
> But you take this letter that I gave you in good faith to try to save your client's
> ass, and try to use it against my client?  My god. It shows your character and
> who and what you are.  And I'm – I'm thankful I'm not one of you.
>
> . . .
>
> Don't you see the dark clouds coming from your client's head yet? And I tried
> to save him from the storm. And you're -- and you're trying to use that against
> us. Shame. No. We're not going to discuss this.

(*Id.* at 282:25-283:25).

Defendant Byrne then noticed Plaintiff's deposition for 9:00am on January 27, 2026,

at the Courtyard Marriott in downtown Tampa, Florida.    (Doc. 281-1).    Prior to the

deposition, Plaintiff filed a motion for a protective order to limit the lines of questioning

Defendant Byrne could explore during his deposition.    (Doc. 274).    The Court denied

Plaintiff's motion without prejudice.  (Doc. 279).  There was no discussion about attendees

of Plaintiff's deposition in this motion.  *See generally* (Doc. 274).

On the day of Plaintiff's deposition, however, there were a number of parties in

attendance at Defendant Byrne's invitation, appearing either in person or remotely over

Zoom.  (Doc. 281-14 at 2:11-25).  Plaintiff was in attendance with Mr. Cain and Defendant

Byrne was present with his attorney Peter Ticktin.  (*Id.* at 281-14 at 2:1-10).  Those attending

in person included Ms. Lambert as "co-counsel on behalf of the Defendant Patrick Byrne,"

Ben Cotton as Defendant Byrne's expert consultant, Jason Ickes as Defendant Byrne's IT consultant, and Mr. Oltmann. (*Id.* at 2:11-12, 21-22). Those present over Zoom included attorneys Andrea Taylor and Robert Tyler, Mark Cook and Shawn Smith as Defendant Byrne's expert consultants, and Mr. Oltmann's attorney at the time, Andrea Hall. (Doc. 292 at 3); (Doc. 281-14 at 3:22-3:24).

The deposition was taken in a conference room at the hotel. (Doc. 281 at 1); (Doc. 284 at 5). The room was large and had been set up with several tables forming the shape of a "U." (Doc. 281-18); (Doc. 284 at 5). When entering the room through the door, the "U" opened to the left, making the left and right sides of the "U" span the length of the room while the shorter end was to the right. (Doc. 281-18). Mr. Ticktin, Defendant Byrne, and, with the exception of Mr. Oltmann, those third parties attending the deposition in person were sitting on the long side of the "U" that was closest to the door. (Doc. 284 at 5). Mr. Oltmann was seated on the opposite long side of the "U" almost directly across from the door. (Doc. 281-18); (Doc. 284 at 5). The court reporter, Michelle Lagoa, was seated on the same side as Mr. Oltmann, albeit a few chairs away. ((Doc. 281-18); (Doc. 284 at 5). Finally, Plaintiff and Mr. Cain were seated on the short side of the "U." (Doc. 284 at 5).

Plaintiff was unaware that Mr. Oltmann would be attending the deposition, so, prior to the start of the deposition, Plaintiff objected to Mr. Oltmann's presence. (Doc. 281-14 at 3:5; 3:24-5:15). As noted, Mr. Oltmann is a defendant in another defamation case, the Denver Case. Mr. Oltmann owns a gun shop in Colorado and hosts a daily podcast on which he has called for Coomer's and his attorneys' executions. *See, e.g.*, (Doc. 281-13 at 4) (Mr. Oltmann states: "Judges, governors, mayors. You want to know where I think the highlight should be, where we should have the red light on it? It should be on the forehead of Eric Coomer . . .

6

[and] the lawyers of Eric Coomer. That's where it should be placed. 100%."); (*Id.*) (Mr. Oltmann says: "I want people to go to jail. I want their chests to cave in because they're in I want people to go to jail. I want their chests to cave in because they're in front of a firing squad front of a firing squad, because that's what happened to the American people."). These prior statements are a substantial basis for Plaintiff's objection to Mr. Oltmann's presence at the deposition. (Doc. 281-14 at 3:5; 3:24-5:15).

Because the parties could not reach an agreement, Plaintiff contacted the undersigned's chambers to resolve the dispute. (Doc. 281 at 8-9). While waiting for the Court's response, Plaintiff and Mr. Cain waited in the hotel lobby near a coffee shop while Defendant Byrne, Mr. Ticktin, and the other attendees waited in the deposition room. (*Id.* at 9).

At approximately 9:47am, prior to the hearing with the Court, Mr. Ticktin approached Plaintiff and Mr. Cain. (Doc. 281-15 at 0:23). His approach and the ensuring events in the lobby were captured by a hotel security camera. (Doc. 281-15). Mr. Ticktin had come to ask them to return to the deposition room and so that they could contact the undersigned's chambers about the dispute. (Doc. 281 at 9); (Doc. 284 at 6). Mr. Cain informed Mr. Ticktin that he had already contacted chambers and was awaiting a call from chamber's staff. (Doc. 281 at 9); (Doc. 284 at 6). Mr. Ticktin became upset because he considered the call to be an inappropriate *ex parte* communication and "in an assertive and patronizing way," yelled at Mr. Cain "[d]on't do it again." (Doc. 281 at 9); (Doc. 281-15 at 0:25-0:36); (Doc. 281-16 at 3); (Doc. 284 at 6).

Mr. Cain got up to speak with Mr. Ticktin. (Doc. 281-15 at 0:36). The two conversed and then Mr. Cain, shaking his head, moved to walk in the direction of the deposition room.

(*Id.* at 0:37-0:50). Mr. Ticktin mirrored Mr. Cain's movement by also turning to start walking in the same direction but in front of Mr. Cain. (*Id.* at 0:50-51). Mr. Ticktin then stopped abruptly, turned back to Mr. Cain, and said something. (*Id.* at 0:51-0:52). Mr. Cain appeared to continue walking one step toward Mr. Ticktin after Mr. Ticktin stopped, getting closer to Mr. Ticktin. (*Id.* at 0:52). Mr. Ticktin looked angry and immediately leaned into Mr. Cain and raised his right fist. (*Id.* at 0:52-0:53). Instead of punching Mr. Cain, Mr. Ticktin shoved him backwards and walked off, continuing in the direction of the deposition room. (*Id.* at 0:53-55). Mr. Cain was pushed backward a couple of steps but continued to follow Mr. Ticktin a few steps behind. (*Id.* at 0:54-0:57). Mr. Cain purportedly said "come on old man" as they started walking. (Doc. 281 at 9). The initial discussion and altercation caught the attention of at least four other people in area, who turned to watch the two attorneys. (Doc. 281-15 at 0:37-0:57).

Mr. Ticktin then stopped and turned around again after walking approximately ten feet. (*Id.* at 0:57). Mr. Ticktin appeared to remain upset and appeared to continue yelling at Mr. Cain. (*Id.* at 0:57-0:58). . (*Id.* at 0:57-59). When Mr. Ticktin stopped, Mr. Cain did not immediately stop but continued walking until he was in front of Mr. Ticktin. (*Id.* at 0:57-1:01). Mr. Cain stopped a couple of feet in front of Mr. Ticktin and the two appear to talk for a brief moment. (*Id.* at 0:57-1:01). Mr. Ticktin then stepped toward Mr. Cain, dropped his left shoulder, and again shoved Mr. Cain a few steps backward and continued walking toward the deposition room again. (*Id.* at 1:01-1:09). Mr. Cain followed Mr. Ticktin, again walking a few steps behind. (*Id.* at 1:05-1:09).

Approximately two minutes after Mr. Ticktin first approached Plaintiff and Mr. Cain, Mr. Ticktin arrived back in the deposition room. (Doc. 281 at 10); (Doc. 284 at 11). At least

8

one person, Ms. Lagoa, saw at least one of the shoves by Mr. Ticktin.  (Doc. 281-17 at 3). When Mr. Ticktin arrived back in the room, he announced that he had been provoked by Mr. Cain and that the shoves were self-defense.  (Doc. 281-17 at 3).  Then, when Mr. Cain arrived, he and Mr. Ticktin continued discussing Mr. Cain's call to the undersigned's chambers.  (Doc. 281-17 at 3).

Defendant Byrne then put himself between Mr. Cain and Mr. Ticktin and told Mr. Cain not to touch his attorney.  (Doc. 281-17 at 3).  While the parties disagree on portions of the next events and the submitted evidence is incomplete, it appears that Defendant Byrne shoved Mr. Cain at least once and slapped Mr. Cain on the neck with the back of his hand while saying "[s]top poking me, you are provoking me."  (Doc. 281-17 at 4).  Plaintiff, after hearing the commotion, came to the deposition room where he recorded the end of the altercation.  (Doc. 281-17 at 4); (Doc. 281-18).

In it, Defendant Byrne can be seen walking away from the right side of the room to directly before the door.  (Doc. 281-18 at 0:04-0:07).  He appeared agitated and then turned and spoke to Mr. Cain, saying "the next time you do one of these with your hand, that's a fight" while extending his right arm and pointing at Mr. Cain with his finger.  (*Id.* at 0:07-0:10).  Defendant Byrne then stepped closer to Mr. Cain while others in the room repeatedly said his name, "Patrick," and warned him that there was a camera behind him.  (*Id.* at 0:10-0:15).  Defendant Byrne then took a step back and pushed past Mr. Cain, knocking into his shoulder, and causing Mr. Cain to take a couple of steps back.  (*Id.* at 0:14-0:17).

Defendant Byrne then turned around, saw the camera, and explained that he was trying to protect Mr. Ticktin from Mr. Cain by trying to separate them.  (*Id.* at 0:26-0:31. Byrne then demonstrated the pointing gesture that Mr. Cain had purportedly been doing.  (*Id.*

9

at 0:26-0:31).  Plaintiff and Mr. Cain then left the deposition room to wait for the Court's call. (Doc. 281-17 at 4).

The hearing started at approximately 9:55 a.m., a couple of minutes after Plaintiff and Mr. Cain left the room.  (Doc. 281 at 11); (Doc. 281-17 at 4).  Plaintiff, through Mr. Cain, brought the motion to exclude Mr. Oltmann from the deposition explaining that he was a fact witness and there were security concerns based on his previous threats.  (Doc. 281-14 at 6:1-8:19).  Mr. Cain also informed the Court of the altercations with Mr. Ticktin and Defendant Byrne and expressed his reservations about proceeding with the deposition but agreed to if Mr. Oltmann was not present.[4]  (*Id.* at 8:6-19).  As to the altercations, Mr. Cain told the Court that:

> About ten minutes ago, Mr. Ticktin came outside to start the deposition.  He then confronted me.  He pushed me, raised his fist, as if to strike me. There was a discussion after that I came into the deposition room. Patrick Byrne did the same. Pushed me, tried to bait me, and assaulted me, and part of that is on video.  So I have a lawyer pushing me, and I have his client doing the same thing.

(Doc. 281-14 at 7:16-25).

For Mr. Ticktin's and Defendant Byrne's part, Mr. Ticktin claimed that Mr. Oltmann was present as an expert:

> MR. TICKTIN: Right.  Mr. Oltmann is an expert in these fields.  He has a cyber company, a data company, he has that kind of information. He's also the key person in this case. . . . But I'm relying on him to be here to be able to help give me guidance for taking the deposition of Eric Coomer[.]
>
> . . .
>
> THE COURT:· . . . The issue that I need to address right now is, you're saying Mr. Oltmann is -- is serving as an expert in this case?

---

[4] The Court asked Mr. Cain whether the deposition should proceed at the courthouse.  (Doc. 281-14 at 9:24-10:8).  Mr. Ticktin objected because of the time loss.  (*Id.* at 14:16-15:15).  The deposition was ultimately conducted at the hotel.  (*Id.* at 15:16-16:25).

MR. TICKTIN: Not as an expert witness.  Only as an expert.  The rule doesn't require that to be in the room, they have to be an expert witness in the case, the rule requires that they be an expert, and -- and that's what he is.

THE COURT: He's been retained by your law firm?

MR. TICKTIN:· No, no, no. In fact -- no, but he's been working with me. He -- and -- and, you know, we've all hooked up to be able to get questions from him. He's sitting in another part of the room where he types the questions. They come out to a computer where I can see it, and I'm needing this.

(Doc. 292-3 at 12:9-15; 13:17-14:8).  As to the altercations, Mr. Ticktin told the Court:

I'm amazed, absolutely amazed, by this attorney and the -- he had - - he had – I'm going to be 80 years old, Your Honor, and within a week.  I'm not a fighter. I've never had a record of fighting anyone, in any case, ever, and this attorney pushed his body up against me, trying to intimidate me out in the other room. It was heard by people that were in the -- this room. They know that he started it.  And -- and I did push him away from me. I'm not a weakling, but at the same time, I'm – I've never been in a situation where I've been assaulted before in a case, and this young man, he -- you can see his struck -- his stature. He looks like he's made out of muscle, and I'm not. So, we have this man who was the aggressor, who's now complaining, I think we -- and so, I just want to make it clear on the record that I did push him away from me after he pushed his body into mine to assault - - and he assaulted me.

(Doc. 281-14 at 10:23-11:18).

The Court granted Plaintiff's motion to exclude Mr. Oltmann from "physically being present at the deposition." (*Id.* a 15:16-15:18).  Mr. Oltmann was, however, permitted to listen into the deposition remotely.  (*Id.* at 15:18-15:21).  Mr. Oltmann and Ms. Hall both agreed to be bound by the Court's protective order concerning confidential information and the deposition. (Docs. 162, 162-1, 163, 292-4, 292-5).  Mr. Oltmann did attend the deposition remotely from his room at the hotel but came down from his room during breaks to talk with Defendant Byrne and Mr. Ticktin.  (Doc. 281 at 18); (Doc. 284 at 13).  Plaintiff's deposition apparently continued until approximately 6:30pm with no further issues.  (Doc. 281 at 3); (Doc. 284 at 13).

11

The day after Plaintiff's deposition, Defendant Byrne appeared for an interview on Lindell TV. (Doc. 284-20). Among other things, he discussed the altercations between himself and Mr. Cain and between Mr. Ticktin and Mr. Cain. (*Id.*). He represented that Mr. Cain came into the deposition room and was "bumping up on" Mr. Ticktin and getting up in his face. (*Id.* at 3:20-3:25). Defendant Byrne then states that he got up, got in Mr. Cain's face, and "apparently . . . stamped on [Mr. Cain's] foot a couple of times." (*Id.* at 3:35-3:45). Defendant Byrne then again accused Mr. Cain of pointing at him to bait him after which, Defendant Byrne admits to putting his fingers at the base of Mr. Cain's throat to back him up. (*Id.* at 3:45-4:11). He states that he touched Mr. Cain to keep him out of his face or to keep him from getting to Mr. Ticktin. (*Id.* at 4:11-4:22). He blamed Mr. Cain for attempting to instigate a fight in order to have the deposition cancelled. (*Id.* at 5:30-5:40).

Defendant Byrne also claimed that there were several "tough guys" or "antifa type guys but just ruffians" waiting to come into the deposition room. (*Id.* at 4:40-5:00). He stated that his team had two or three green berets in the deposition room who were unarmed but that there was "another guy who was armed." (*Id.* at 5:00-5:25). Because of the green berets and the armed individual, Defendant Byrne claimed that, had the people purportedly waiting outside of the deposition room come in, it "would not have gone very well for them." (*Id.* at 5:25-5:31).

## II.    Discussion

Against this backdrop, Plaintiff brought the instant motion in which he requests the following sanctions: 1) an award for the sum of Plaintiff's attorney's fees and costs incurred because of Defendant Byrne's and Mr. Ticktin's conduct for which Defendant Byrne and Mr. Ticktin would be jointly and severally liable; 2) "[r]emoval of Ticktin and his law firm as

counsel of record from this case;" 3) "[i]nitiation of proceedings against Ticktin pursuant to"

the Court's local rules; 4) "[r]eferral of Ticktin to the Florida State Bar Grievance Committee

for consideration of any additional punishment resulting from the conduct;" 5) "[a]n order

that Byrne pay all expenses for security at any additional out of court proceedings ;" 6) an

order that required Defendant Byrne and his counsel "to provide notice to Plaintiff at least

ten days in advance of any deposition specifying the attendees they intend to have present;"

and 7) an order that Defendant Byrne, his counsel, and "their invitees, contractors, and agents

be ordered not to carry deadly weapons inside the physical location of any further proceeding

conducted outside of the courthouse."  (Doc. 281 at 23-24).  Plaintiff's request for sanctions

is grounded in Section 1927 of the United States Code, the Court's inherent authority, Rules

26 and 30 of the Federal Rules of Civil Procedure, the Court's Local Rule 2.04, Florida Rules

of Professional Conduct 4-3.3(a), 4-3.4(g), and 4-8.4(a)-(e), and the Florida criminal statutes

related to assault and battery.  (Doc. 281 at 13-15).  Defendant Byrne responded in opposition

and asked in his response that Plaintiff and Mr. Cain instead be sanctioned the ways described

in Plaintiff's motion.  (Doc. 284).

### A. Sanction Authority

The Court's authority to sanction comes in many forms.  A sanctions award under 28

U.S.C. § 1927 or a court's inherent authority requires a showing that the violating party acted

in bad faith.  *Hyde v. Irish*, 962 F.3d 1306, 1310 (11th Cir. 2020); *BankAtlantic v. Blythe Eastman*

*Paine Webber, Inc.*, 12 F.3d 1045, 1049 (11th Cir. 1994).  Section 1927 provides:

> Any attorney or other person admitted to conduct cases in any court of the
> United States or any Territory thereof who so multiples the proceedings in any
> case unreasonably and vexatiously may be required by the court to satisfy
> personally the excess costs, expenses, and attorneys' fees reasonably incurred
> because of such conduct.

13

28 U.S.C. § 1927.  The Eleventh Circuit interprets the statute as imposing three requirements:

> First, the attorney must engage in "unreasonable and vexatious" conduct. Second, that "unreasonable and vexatious" conduct must be conduct that "multiplies the proceedings."  Finally, the dollar amount of the sanction must bear a financial nexus to the excess proceedings, *i.e.*, the sanction may not exceed the "costs, expenses, and attorneys' fees reasonably incurred because of such conduct."

*Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1239 (11th Cir. 2007) (quoting *Peterson v. BMI Refractories*, 124 F.3d 1386, 1396 (11th Cir. 1997)).  Under section 1927, "the party moving for sanctions must show *objective* bad faith."  *Hyde*, 962 F.3d at 1310 (emphasis in original).  In the Eleventh Circuit, this means showing that an attorney acted "knowingly or recklessly."  *Id*. (quoting *Schwartz v. Millon Air, Inc.*, 341 F.3d 1220, 1225 (11th Cir. 2003)). This is a "high standard" that requires the moving party to show that the other side's behavior "grossly deviate[d] from reasonable conduct."  *Amlong*, 500 F.3d at 1240, 1242.  An attorney must "knowingly or recklessly pursue a frivolous claim or needlessly obstruct the litigation of a non-frivolous claim."  *Id*. at 1242.  Section 1927 does not apply to parties.  Sanctions under section 1927 are discretionary, and the court, for equitable reasons, may decline to impose them.  *Olson v. Reynolds*, 484 F. App'x 61, 64-65 (7th Cir. 2012).

A court may also impose sanctions for litigation misconduct under its inherent power. *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1306 (11th Cir. 2009).  This power "is both broader and narrower than other means of imposing sanctions."  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991).  It extends to a full range of litigation abuses and is "vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases."  *Miller v. Midland Credit Mgmt., Inc.*, No. 20-13390, 2021 WL 4240972, at * 2 (11th Cir. Sept. 17, 2021) (quoting *Chambers*, 501 U.S. at 43).  This power "must be exercised with restraint and discretion."  *Id*. (quoting *Roadway Express, Inc. v. Piper*, 447 U.S.

14

752, 764 (1980)).[5]  A court may exercise this power "to sanction the willful disobedience of a court order, and to sanction a party who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons."  *Marx v. Gen. Revenue Corp.*, 568 U.S. 371 (2013) (citing *Chambers*, 501 U.S. at 45-46)).

"In the context of inherent powers, the party moving for sanctions must show *subjective* bad faith."  *Miller v. Midland Credit Mgmt., Inc.*, No. 20-13390, 2021 WL 4240972, at * 2 (11th Cir. Sept. 17, 2021) (emphasis in original).  This standard can be met either (1) with direct evidence of the attorney's subjective bad faith or (2) with evidence of conduct "'so egregious that it could only be committed in bad faith.'"  *Id*. (quoting *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1224-25 (11th Cir. 2017)).  "The high standard of finding bad faith cannot be met in the absence of fraud on the Court, proof of forum shopping, unreasonable and vexatious multiplying of proceedings, pursuing a case barred by the statute of limitations, or purposely vexatious behavior[.]"  *Absolute Activist Value Master Fund v. Devine*, 2019 WL 3491962, at * 11 (M.D. Fla. Aug. 1, 2019), *affirmed* 826 F. App'x 876 (11th Cir. 2020).  "Sanctions under the Court's inherent authority may include monetary penalties, adverse inferences, and the striking of claims or defenses."  *Saunders v. Signature Flight Support*, LLC, 2024 WL 5671955, at *15 (M.D. Fla. June 4, 2024), *report and recommendation adopted*, 2024 WL 5671946 (M.D. Fla. Sept. 12, 2024).

Moreover, Rule 30 provides that the "court may impose an appropriate sanction— including the reasonable expenses and attorney's fees incurred by any party—on a person who

---

[5]  A district court must comply with due process when imposing sanctions under its inherent power. *Chambers*, 501 U.S. at 50.  Due process requires that either the party seeking sanctions, or the court give the attorney notice that his or her conduct may warrant sanctions and why.  *In re Mroz*, 65 F.3d 1567, 1575 (11th Cir. 1995).  And the court must give the attorney the opportunity to respond orally or in writing.  *Id*. at 1575-76.  Here, the Court did so.

impedes, delays, or frustrates the fair examination of the deponent." Fed. R. Civ. P. 30(d)(2).

And this Court's Local Rule 2.04 provides that:

> In addition to a judge's sanction or use of another grievance mechanism, the court can — after a hearing and for good cause — disbar, suspend, reprimand, or otherwise discipline a member of the Middle District bar or a lawyer appearing by special admission.

M.D. Fla. R. 2.04(a) (2025).

Finally, the Florida Bar regulates the conduct of attorney's it licenses to practice. Florida Rule of Professional Conduct 4-3.3 requires that "[a] lawyer shall not knowingly: (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer[.]"  Florida Rule of Professional Conduct 4-3.3(a).  Florida Rule of Professional Conduct 4-3.4 relates to a lawyer's fairness to opposing counsel and states that a "lawyer must not: . . . present, participate in presenting, or threaten to present criminal charges solely to obtain an advantage in a civil matter[.]"  Florida Rule of Professional Conduct 4-3.4(g).  Florida Rule of Professional Conduct 4-8.4 governs lawyer misconduct and states that:

> A lawyer shall not:
>
> (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;
>
> (b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects;
>
> (c) engage in conduct involving dishonesty, fraud, deceit, or misrepresentation, except that it shall not be professional misconduct for a lawyer for a criminal law enforcement agency or regulatory agency to advise others about or to supervise another in an undercover investigation, unless prohibited by law or rule, and it shall not be professional misconduct for a lawyer employed in a capacity other than as a lawyer by a criminal law enforcement agency or regulatory agency to participate in an undercover investigation, unless prohibited by law or rule;

16

(d) engage in conduct in connection with the practice of law that is prejudicial to the administration of justice, including to knowingly, or through callous indifference, disparage, humiliate, or discriminate against litigants, jurors, witnesses, court personnel, or other lawyers on any basis, including, but not limited to, on account of race, ethnicity, gender, religion, national origin, disability, marital status, sexual orientation, age, socioeconomic status, employment, or physical characteristic;

(e) state or imply an ability to influence improperly a government agency or official or to achieve results by means that violate the Rules of Professional Conduct or other law[.]

Florida Rule of Professional Conduct 4-8.4(a)-(e).  Finally, Rule 4-1.7(a) provides that

a lawyer must not represent a client if:

(1) the representation of 1 client will be directly adverse to another client; or

(2) there is a substantial risk that the representation of 1 or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

Florida Rule of Professional Conduct 4-1.7(a).

Concerning the Florida criminal statutes related to assault and battery cited by Plaintiff, neither of these statutes empower the Court to provide the relief Plaintiff seeks.

### B. Sanctionable Conduct

Given the nature of this case and today's political climate, it comes as no surprise that the passions of parties and their counsel became inflamed during this litigation.  But that is no justification for the abhorrent conduct put on display.   Physical altercations, threats of violence, and provocations have no place in these legal proceedings.  A statement so obvious, it should go without saying.

The version of the events put forth by Mr. Ticktin and Defendant Byrne strains credulity.  Rather, it is established that Mr. Ticktin asked Mr. Cain to come to the deposition

room.  Then, after berating Mr. Cain in a "patronizing" tone for contacting the undersigned's chambers to request a hearing, Mr. Ticktin turned on his heel and walked back toward to the deposition room.  Mr. Cain followed a few steps behind before Mr. Ticktin stopped abruptly and turned around.  While it looks like Mr. Cain stepped into Mr. Ticktin's space before reacting to Mr. Ticktin's sudden stop, it is clear that Mr. Ticktin leaned into Mr. Cain before shoving him backwards.

Even if the Court were to entertain Mr. Ticktin's insistence that Mr. Cain intentionally bumped into him first, there are two issues.  Firstly, Mr. Ticktin could and should have simply walked away.  Secondly, Mr. Ticktin's second shove is damning.  Mr. Cain was following several steps behind Mr. Ticktin after the first shove.  It was Mr. Ticktin who again stopped.  Mr. Cain then moved past him and put an obvious amount of space between himself and Mr. Ticktin as they talked.  It was Mr. Ticktin who took a step toward Mr. Cain, dropped his left shoulder, and shoved Mr. Cain again.  This distance between the two attorneys contradicts Mr. Ticktin's claim that Mr. Cain crowded him and prevented him from walking away.  If Mr. Ticktin felt Mr. Cain was standing too closely, he again could have asked Mr. Cain to step back or simply walked away.

The Court is also unpersuaded by all of Defendant Byrne's rationalizations.  While Defendant Byrne readily admitted to stomping on Mr. Cain's feet and pushing him backwards before the videotaped altercation (albeit in somewhat of a braggadocios tone), Defendant Byrne did not see the altercation in the lobby and was going off what Mr. Ticktin told him when he came back into the deposition room.  This excuse, however, does not extend to the altercation caught on video.  Defendant Byrne claims that he was continuing to defend Mr. Ticktin, but the video undermines this narrative.  Defendant Byrne is shown walking away

18

from where Mr. Ticktin and Mr. Cain were standing.  Then, when Defendant Byrne body checked Mr. Cain, he pushed Mr. Cain closer to Mr. Ticktin.  And there is again no evidence of Mr. Cain laying hands on either Defendant Byrne or Mr. Ticktin.

Moreover, it appears that Mr. Ticktin and Defendant Byrne fully intended to disrupt the deposition.  They had to expect that bringing Mr. Oltmann to the deposition would at least raise an objection from Plaintiff.  The recordings of Mr. Oltmann's threats are not so innocuous that Plaintiff and Mr. Cain overreacted in demanding that he leave.  This is especially true because Defendant Byrne and Mr. Ticktin also apparently planned for a confrontation as they purportedly brought green berets and someone who was armed.  Put simply, Mr. Ticktin and Defendant Byrne knowingly turned a routine legal proceeding into a powder keg and ignited it.  Those eight minutes became the subject of extensive motion practice that would not have otherwise been brought which undoubtedly multiplied these proceedings.

Other of Mr. Ticktin's behavior is also cause for concern.  It is apparent from the November 2025 email chain and from Defendant Byrne's deposition that Mr. Ticktin continued operating as though Ms. Lambert was co-counsel on behalf of Defendant Byrne in this matter.  This is despite the Court's denial of her admission and the Circuit's upholding of that decision.  Ms. Lambert was apparently sent Mr. Ticktin's draft email to edit it, and she was specifically designated as co-counsel at Defendant Byrne's deposition.

Mr. Ticktin's November 2025 email and his comments at Defendant Byrne's deposition are also disconcerting for other reasons.  Implicit in these statements is a threat to Plaintiff that he would face criminal prosecution unless he dropped the defamation actions and accepted Mr. Ticktin's, Ms. Lambert's, and Defendant Byrne's help.  The implications

19

of this are troubling on many levels.  Moreover, Mr. Ticktin's waxing poetic about his opinions of Plaintiff and Mr. Cain on the record at a deposition is far beneath his station as an officer of the court.

All this being said, while Mr. Ticktin started the confrontations and Defendant Byrne escalated them, there were several instances in which Mr. Cain could have de-escalated the situation but did not.  For example, after Mr. Ticktin shoved Mr. Cain the first time, Mr. Cain could have told Mr. Ticktin that he was going to remain with his client in the lobby until the hearing.  The request had already been made to the undersigned's chambers requesting a call back, so Mr. Cain knew the Court's call was imminent.  Indeed, the time from Mr. Ticktin approaching Plaintiff and Mr. Cain to the beginning of the hearing was only eight minutes.  Moreover, Mr. Cain readily admits to calling Mr. Ticktin "old man."  This type of childish name calling is unbecoming of a member of the legal profession.  As was Mr. Cain having to be ushered away by his own client after engaging in a heated verbal altercation with Defendant Byrne.

Ultimately, the Court expects all parties to conduct themselves with integrity and professionalism.  This is especially true of all attorneys admitted to practice in this District.  Therefore, in light of Mr. Ticktin's and Defendant Byrne's conduct, the Court awards Plaintiff the attorneys' fees and costs associated with bringing this motion and Plaintiff and Mr. Ticktin are jointly and severally liable for this sum.  *Peer*, 606 F.3d at 1316 (under their inherent authority "district courts have broad discretion to determine whether to impose sanctions and the nature or amount of those sanctions."); *Amlong*, 500 F.3d at 1237–39 (stating that an abuse of discretion standard applies to a court's decision about sanctions under section 1927 and its

inherent authority, which "recognizes the range of possible conclusions the trial judge may reach").

The Court will refer this matter, pursuant to the Court's Local Rule 2.04, to the Tampa Division Grievance Committee to investigate alleged lawyer misconduct and report to the chief judge a recommended resolution of the allegations. The Grievance Committee may, in its discretion, refer the matter to the Florida Bar. M.D. Fla. R. 2.04(c)(4)(C).

Moreover, to address the security concerns, the Court has already ordered that no attendee of an out-of-court proceeding is permitted to bring any weapon. (Doc. 320). The Court will also require that any future depositions and mediations be conducted at the courthouse. The parties must contact the undersigned's chambers at least two-weeks prior to the deposition or mediation to secure a location for the proceeding. The parties may also move to conduct any other out-of-court proceedings at the courthouse provided that the motion is filed at least two-weeks prior to the proceeding and good cause is shown.

The Court is not, however, persuaded that it is necessary or prudent to disqualify Mr. Ticktin and his law firm from representing Defendant Byrne. Trial is set to begin in October and the Court is disinclined to provide another reason to further drag out this litigation. The Court has put safety measures in place and any further conduct of this nature with be met with swift and dire consequences.

### III.     Conclusion

In sum, because of Mr. Ticktin's and Defendant Byrne's egregious disregard for legal proceedings in this matter, they are jointly and severally liable for Plaintiff's attorneys' fees and costs associated with bringing the motion. The Court will also refer this matter to the Tampa Division Grievance Committee to investigate alleged lawyer misconduct and report

to the chief judge a recommended resolution of the allegations.  All counsel and parties are warned that the Court will not tolerate any further conduct resembling that which occurred at Plaintiff's deposition.  The lack of professionalism and civility in this case is staggering. The Court demands better.[6]

Accordingly, it is **ORDERED**:

(1) Plaintiff's Motion for Sanctions and for Order to Show Cause as to Defendant Patrick Byrne and His Attorney Peter Ticktin is **GRANTED IN PART AND DENIED IN PART**;

(2) Plaintiff's motion is granted to the extent that he is awarded the attorneys' fees and costs associated with bringing this motion to be paid by Defendant Byrne and/or Mr. Ticktin;

(3) Plaintiff's motion is granted to the extent that all future mediations and depositions are to occur in the Tampa Courthouse using the process described herein;

(4) Plaintiff's motion is granted to the extent that the Court hereby refers this matter to the Tampa Division's Grievance Committee to investigate alleged lawyer misconduct and report to the chief judge a recommended resolution of the allegations.; and

(5) Plaintiff's motion is denied in all other respects.

---

[6] Plaintiff also requests fees pursuant to Rule 26.  Rule 26 governs the disclosure of information during discovery provides that where motions to compel discovery are denied or denied in part, the party from whom discovery was sought could be awarded the expenses associated with defending the motion.  Fed. R. Civ. P. 26(c)(3) (incorporating Fed. R. Civ. P. 26(a)(5) by reference).  Rule 26 does not apply because Plaintiff does not seek a protective order.

**ORDERED** in Tampa, Florida on June 29, 2026.

SEAN P. FLYNN
UNITED STATES MAGISTRATE JUDGE