**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

ERIC COOMER, Ph.D.,
    Plaintiff

v.                                                    Case No. 8:24-cv-00008-TPB-SPF


PATRICK BYRNE, STEVEN LUCESCU, and
THE AMERICA PROJECT, INC.,
    Defendants

---

**PLAINTIFF'S UNOPPOSED MOTION FOR LEAVE
TO ATTEND MEDIATION REMOTELY
AND UPDATE ON MEDIATION STATUS**

---

Eric Coomer, Ph.D. (Plaintiff or Dr. Coomer) files this Unopposed Motion

for Leave to Attend Mediation Remotely and provides the Court with a status

update:

> **"I should have slugged him, or at least that is what he deserved."**
> --Peter Ticktin, referring to assault on opposing counsel[1]

### I.    SUMMARY

1.    Dr. Coomer requests leave of Court to deviate from its standard

practice and grant Plaintiff and his counsel leave to attend mediation remotely.

The request is not made without due consideration and good cause. The

circumstances of this case are sufficiently unique to merit the deviation.

---

[1] *See* **Exhibit 1**, *He was Trump's boyhood friend. Now he's pushing Trump to declare a 'national emergency' and seize control of the midterms.* CNN, July 6, 2026.

1

2.    The Court set the mediation deadline for August 1, 2026. (Doc. 307). Due to July conflicts, on June 22, 2026, the mediator suggested August 25 and 26 dates. Plaintiff accepted either date. Just prior to filing this Motion, Byrne's counsel indicated he has a conflict with the above dates but did not provide alternative dates.

## II.    REQUEST FOR LEAVE TO ATTEND MEDIATION REMOTELY

3.    To preface, Plaintiff also prefers this Court's default rule requiring in person mediation (and status conferences).

4.    However, the considerations described below, including statistical data demonstrating that remote mediations are as effective (in terms of obtaining a successful result) as in person mediations, weigh heavily in favor of a departure from the norm.

5.    **Physical risk.**    Plaintiff and counsel are appreciative of the prophylactic measures already taken by the Court. *See, e.g.,* (Doc. 320). There nonetheless remains an unwarranted risk of in person contact with Defendant Patrick Byrne (Byrne) and his counsel.

6.    Magistrate Judge Flynn's jury room and the courthouse itself are secure sites; however, Plaintiff still must travel to the mediation in an insecure environment. This is not an abstract concern. Byrne believes he is a CIA asset, stating in his deposition, "I have committed crimes for – that would land me in prison for 10,000 years. Most of them I did under the direct supervision of the CIA and FBI."[2] He travels with ex-members of U.S. Special Forces.[3]

_____

[2] **Exhibit 2**, Depo. Tr. Patrick Byrne at 214:13-24, (Dec. 15, 2025).

2

7. Byrne has unlimited funds to sow chaos. According to public reporting, Byrne resigned from his position as CEO of overstock.com following his public disclosure in August 2019 of his romantic relationship with Maria Butina, a Russian agent who was subsequently jailed.[4] Byrne contemporaneously liquidated his stock in overstock.com when he resigned, netting approximately $90 million from that one transaction alone.[5]

8. Byrne testified that he is funding ongoing "witness protection" for approximately fifteen anonymous Venezuelan "defectors" and their family members both in the United States and overseas.[6] Byrne testified he has "many of our Green Berets" living with these witnesses.[7]

9. Plaintiff is literally exhausted from five years of harassment from individuals like Byrne who continue to relitigate the results of the 2020 presidential election. Those who continue to beat this drum are, generally speaking, people who have not been held to account or believe they are unaccountable. The effect of this constant drumbeat on American's faith in our elections and, hence, democracy is dire. According to a recent Economist/YouGov Poll, 28% of Americans—including half (50%) of Republicans and 9% of Democrats—believe that the 2020 presidential election was "rigged," with an

---

[3] *Id.* at 230:7-8.

[4] https://time.com/5659811/overstock-ceo-russian-spy-conspiracy-theory/

[5] **Exhibit 3**, Forbes, *Overstock's Former CEO Patrick Byrne Unloads His Entire Stake* (Sept. 19, 2019, Updated Dec 15, 2020).

[6] **Exhibit 2** at 136:11-138:5; 235:5-242:1.

[7] *Id.*

3

additional 19% unsure.[8]   The broader messaging is working, even without evidence, and there is no incentive for motivated actors to cease spreading false claims and innuendo.  Byrne is no exception.

10.    Plaintiff has been subjected to unparalleled vitriol, volatility, and recklessness both in extensively documented pre-trial matters and in the national media as the latest quote above the CNN article attests.[9]  And, of course, Byrne has already publicly admitted to physically striking Plaintiff's counsel.[10]  Plaintiff is living outside of the country to avoid this type of behavior and the risks to his physical safety that it presents.  He does not feel safe in this environment and wishes to limit his risk to his trial appearance.

11.    **Established methods of deterrence have proven ineffective.** Bad faith mediation conduct is sanctionable.  *Cf. Ceus v. City of Tampa*, 803 Fed. Appx. 235, 251 (11th Cir. 2020) (denying sanctions for excusable failure to attend mediation teleconference).  That said, the threat of potential mediation sanctions will not compel Byrne to conduct an in person mediation in good faith or mitigate against the next surprise.  This will invariably lead to more motion practice where Plaintiff seeks to recover these costs as well, in addition to the extraordinary expense Plaintiff has already incurred during the four years this case has been

---

[8] The Economist/YouGov Poll

[9] **Exhibit 1**.

[10] **Exhibit 4**, Lindell TV, *The Absolute Truth with Emerald Robinson* interview with Patrick Byrne at 4:02-4:06 (Jan. 28, 206); https://caincloud.egnyte.com/dl/tx3wXMV4GVWK.

4

pending. Given the likelihood of continued misbehavior, granting Plaintiff remote attendance will help mitigate a portion of this harm.

12.     The best predictor of future behavior is past behavior. Byrne and Defendant The America Project (now also represented by the Ticktin Law Group) have already been sanctioned twice by the Court for discovery violations. (Docs. 213 and 243). Following those sanctions, even more outrageous conduct occurred at Plaintiff's deposition resulting in a third sanction. (Doc. 332). Nothing in the record in this case or the others previously cited to the Court suggests sanctions for further misconduct has had or will have a deterrent effect. For example, on *July 9, 2026*, after the Court issued its June 29, 2026 Order (Doc. 332), Mr. Ticktin appeared unannounced at the remote deposition of Joe Oltmann in the *Coomer v. Donald J. Trump for President, Inc., et. al.* case pending in Denver, Colorado. This, of course, harkens back to Mr. Oltmann's unannounced attendance at Plaintiff's deposition in Tampa. Mr. Ticktin is not an attorney of record in the *Trump* case, was previously denied *pro hac* status, and was not an authorized attendee. When asked to leave, he refused. Ultimately, Mr. Ticktin was excluded from the deposition when the videographer cut his feed.

13.     Similar conduct is already affecting the mediation process in this case. On June 18, 2026, the mediator, Jon M. Philipson, proposed several July mediation dates to the parties. After the parties requested additional dates due to July conflicts, Mr. Ticktin stated on June 21 that "for reasons I cannot discuss right now, we may have a problem with that plan," apparently referring to the August

mediation. Mr. Ticktin then went on to repeat his familiar mantra that "Judge Barber made it clear that he wants the Magistrate Judge to make determinations regarding your motion for sanctions, so, you may be disqualified before that date."[11]

14.    On June 22, 2026, the mediator then proposed dates on August 25 or 26. Plaintiff accepted both dates later that same day. Byrne's counsel has not confirmed *any* mediation dates as of this filing (a passage of 18 days).

15.    **Byrne has already prepared for his worst-case scenario.** Successful resolution of civil cases typically hinges on a defendant's evaluation of his or her liability exposure and associated financial risk posed by an adverse judgment. Byrne has demonstrated no such concerns, but not for the reasons one would typically expect.

16.    Byrne's potential financial exposure in this case is uninsured. Thus, there will be no adjuster or other independent decision-maker with settlement authority at mediation. Byrne has reportedly moved his assets into gold, silver, and cryptocurrency as a means of asset protection.[12] This is consistent with Byrne's deposition testimony, where he stated he has "sold all my homes, my jet, everything. I have no – I still have an address in Florida. I move around a lot. I'm overseas a lot still. But even in the U.S., I have no residence."[13] While Plaintiff has

---

[11] **Exhibit 5**, email chain between counsel and Jon Philipson beginning June 18 through June 22.

[12] **Exhibit 3**, ". . . Byrne said he would be putting the proceeds into gold, silver and cryptocurrencies. He referred to these investments as "countercyclical to the economy."

[13] **Exhibit 2** at 25:12-16.

6

no direct information on Byrne's asset transfers, it appears he had prepared himself for the potential of an adverse verdict in this and other cases and from his fear of retribution by the "Deep State"[14] through opaque financial maneuvering and liquidation.  There is no basis, therefore, to believe he would voluntarily pay any amount to settle this case from secreted funds.  In fact, Plaintiff fully expects *he* will be asked to pay Byrne to settle Plaintiff's claims, assuming Byrne intends to mediate.

17.    This is borne out by Byrne's November 11, 2025, "Confidential Settlement Offer," *see* (Doc. 332 at 3-4), where Byrne tied his settlement leverage in this case to the threat of Plaintiff's criminal prosecution.  The drumbeat of baseless threats of criminal prosecution has, like the election fraud claims, remained steady.  The vagueness of Mr. Ticktin's June 21 email to the mediator and Plaintiff's counsel about "reasons he cannot discuss" impacting the mediation may be a reference to these very machinations.

18.    **Cost of in person mediation is prejudicial to Plaintiff under these circumstances.**  For good reason, a plaintiff is expected to have factored in the cost of in person mediation when he or she files a complaint.  Plaintiff's argument in seeking leave for remote attendance is that this expectation assumes regular order exists.

---

[14] **Exhibit 6**, New York Times, *Overstock C.E.O. Takes Aim at 'Deep State' After Romance With Russian Agent* (Aug. 15, 2019).

19.    Plaintiff is living overseas.  He left the country in 2024 in search of security and anonymity.  He remains an American citizen.  His departure from his home in Colorado and his country, where he served as an election worker for 15 years, was not something that was anticipated in 2022 when this case was filed. Plaintiff will have to book international travel to attend mediation in Tampa.  He is currently unable to book any travel because of Byrne's non-responsiveness. Likewise, Plaintiff's counsel's principal office is in Austin, Texas, but he resides in Colorado.  The cost and additional time associated with travel from out of state (recall this case was originally filed in Colorado) and overseas and related lodging is estimated to be $10,000.  This expenditure would be worthwhile if there was a reasonable expectation of a traditional good faith mediation under traditional norms as this Court surely expects.  Those circumstances are not present here.

20.    **Remote mediations are effective.**  Remote mediations have been shown to have similar success rates.[15]  In the attached study, mediators reported the following findings:

> ODR [remote or online mediation programs] at the EEOC is more flexible that IPM [in person mediation].  There is increased use of caucusing, increased sharing of important documents, a significant reduction of the time pressure element found in IPM, scheduling flexibility including the ability to extend the time of mediation and/or quickly reconvene a mediation to maintain settlement momentum, the added value of physical separation of the parties' safe space, increased/varied communications lanes, the positive role played by insurance adjusters, and the real-time ability to invite other persons such as a key decision-maker into the mediation.

---

[15] **Exhibit 7** at 8, 9, 13, *Equal Employment Opportunity Commission Mediators' Perception of Remote Mediation and Comparisons to In-Person Mediation*, E. Patrick McDermott, Ph.D. and Dr. Ruth Obar, Ph.D. (Feb. 18, 2022).

8

21.    While some of these factors are inapplicable to the present case, the findings do provide a reasonable basis to conclude that, when considering the other factors mentioned above, a remote mediation will not be a significant departure from the effectiveness of an in person mediation. According to the survey, settlement rates between the two forms of mediation were virtually identical—70.9% for remote mediations compared to 71.9% for in person mediations.[16] Plaintiff believes the only additional benefit to an in person mediation in this case might occur *if* Magistrate Flynn himself intended to be directly involved in the mediation process as provided under Local Rule 1.02 and by the District's practice standards.[17] Plaintiff is not aware of the Court's intentions in this regard and, therefore, cannot weigh in on the matter.[18] Assuming the status quo remains, Plaintiff contends remote mediation has a substantially similar potential for success while simultaneously addressing the significant concerns raised herein.

22.    For all of these reasons, leave is warranted in this rare instance to attend mediation remotely, and Plaintiff respectfully requests he and his counsel be granted such leave.

---

[16] **Exhibit 7** at 9, 25.

[17] The "Mediation and Settlement" provision states, in part, "In limited circumstances, a judge may order the parties to attend a settlement conference before a magistrate judge, whether at a party's request, a request by all parties, or on the judge's own initiative. A settlement conference before a magistrate judge proceeds in much the same way as a mediation before a private mediator."

[18] To be clear, Mr. Philipson is by all accounts an excellent mediator and Plaintiff is more than satisfied with his qualifications, reputation, and experience.

9

## II.   MEDIATION STATUS

23.   As set forth above, mediation has not been scheduled.  The relevant communication regarding scheduling is attached as **Exhibit 5**.

24.   The mediator has been responsive and active in working with Plaintiff's counsel.  He has informed the parties of the physical location of the mediation and suggested dates on August 25 and 26.  Plaintiff accepted these dates. On July 8, 2026, the mediator informed Plaintiff's counsel that he was still awaiting confirmation from Byrne and his counsel regarding those dates.  Eighteen days (June 22-July 10) have passed without a confirmation from Byrne.

25.   Plaintiff is cognizant of the fact that the proposed dates are several weeks after the Court's deadline and intends to file a request for a short extension of the deadline until August 31, 2026.

## III.   CONCLUSION AND PRAYER

For the foregoing reasons, Plaintiff Eric Coomer, Ph.D. respectfully requests the Court deviate from its requirement of in-person attendance at mediation for himself and his counsel and allow attendance via Zoom or other videoconferencing platform.  Plaintiff further requests such other and further relief, both general and special, to which he may be justly entitled.

Respectfully submitted this 10th day of July 2026.

_____/s/ Charles J. Cain_____

Charles J. Cain, CO Atty No. 51020*
ccain@cstrial.com
Bradley A. Kloewer, CO Atty No. 50565*
bkloewer@cstrial.com
**CAIN & SKARNULIS PLLC**
P. O. Box 1064
Salida, Colorado 81201
719-530-3011
512-477-5011 (Fax)
*Appearing via Special Admission

Ashley N. Morgan*
Texas Bar No. 24091339
Colorado Attorney No. 61713
amorgan@cstrial.com
**CAIN & SKARNULIS PLLC**
303 Colorado Street, Suite 2850
Austin, Texas 78701
512-477-5000/512-477-5011 (Fax)
*Appearing via Special Admission
**ATTORNEYS FOR PLAINTIFF**

## Local Rule 3.01(g) Certification

Counsel for Movant certifies:

a.  Plaintiff has conferred with Defendants Byrne and The America Project regarding the relief requested herein;

b.  Counsel for Byrne and The America Project do not object to remote attendance at mediation; and

c.  Conferral regarding the relief requested herein was via email.