**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

ERIC COOMER, Ph.D.,
　　Plaintiff

v.　　　　　　　　　　　　　　　　　Case No. 8:24-cv-00008-TPB-SPF


PATRICK BYRNE, STEVEN LUCESCU, and
THE AMERICA PROJECT, INC.,
　　Defendants

**PLAINTIFF'S RESPONSE IN OPPOSITION TO PATRICK BYRNE'S
MOTION FOR SUMMARY JUDGMENT**

Eric Coomer, Ph.D. (Plaintiff or Dr. Coomer) files this Response in Opposition to Patrick Byrne's Motion for Summary Judgment (the Motion), and states as follow:

**"[T]he most plausible explanation is that [Byrne] is not credible, fabricates awesome and farfetched narratives to garner attention in the media, and fabricated the defamatory story at issue in this case to damage Plaintiff's reputation."**

--Hon. United States District Judge Stephen V. Wilson[1]

**I.　　INTRODUCTION**

In the Motion, Defendant Patrick Byrne (Byrne) focuses on four elements of Plaintiff's defamation claim: (1) publication; (2) of and concerning the Plaintiff; (3) actual malice; and (4) material falsity.　Byrne also seeks summary judgment on

---

[1] **Exhibit 1**, *Biden v. Byrne*, Case No. 2:23-cv-09430-SVW-PD, Order Granting Plaintiff's Motion for Default Judgment, Awarding Nominal and Punitive Damages, Granting Plaintiff's Motion to Enforce Sanctions, Denying Defendant's Request to Appear and Motion to Set Aside Default, and Denying as Moot Various Pending Motions and Applications (Doc. 376, p. 14, July 10, 2026).

1

Plaintiff's intentional infliction of emotional distress cause of action, as well as his claims for exemplary damages and permanent injunctive relief.

With respect to the first two elements of defamation, Byrne recycles the same argument he made unsuccessfully at the dismissal stage of the case: that he did not publish defamatory statements because he only financed *The Deep Rig* (the Film).  Byrne argues he cannot be liable for other men's words, and from that premise, argues that none of his own statements were of and concerning Dr. Coomer.  As the Court explained at length in the Order Denying Byrne's Motion to Dismiss, everyone who takes part in a defamatory publication may be subject to liability.[2]  It does not matter if the defamatory statements about Plaintiff did not flow from Byrne's lips because Byrne published defamatory statements about Plaintiff.  Byrne is not a passive benefactor of the Film.  He was a producer,[3] the Film is described as based on his book,[4] he had editorial control over the Film,[5] and he appears frequently in the Film and endorses the truth of its contents.

Plaintiff does not contest that the heightened actual malice standard applies in this case.  However, Byrne takes the wrong route to reach that result. Dr. Coomer is not a limited purpose public figure, rather, the defamatory statements involve matters of public concern.

---

[2] *See* Order Granting in Part and Denying in Part Defendants' Motions to Dismiss, pp. 10-13 (Jan. 14, 2025) (Doc. 175).

[3] *See* **Exhibit 2**, *The Deep Rig*, at 7:52; *see also* **Exhibit 3**, Opening Credit of The Deep Rig.

[4] *Id*.

[5] *See, e.g.*, **Exhibit 4**, "The Big Rig" – Investor's Agreement, p. 1 (Feb. 17, 2021); *see also* **Exhibit 5**, emails from Byrne to Lucescu (May 12-13, 2021).

2

Byrne misstates the law with respect to what constitutes actual malice. Dr. Coomer can demonstrate Byrne published the defamatory statements with actual malice through circumstantial evidence and need not present direct statements from Byrne that he "knew the gist was false or seriously doubted it." (Doc. 334, p. 16). *The Deep Rig* purports to be a documentary, and it portrays Dr. Coomer as the villain at Dominion Voting Systems who orchestrated unprecedented election crimes. Byrne's insistence that he believed Oltmann—a solitary source, unqualified to opine on whether election fraud occurred[6]—is not sufficient to warrant summary judgment. A jury could reasonably find that Byrne's investigation into the facts portrayed in the documentary was grossly inadequate and fueled by his motivation to spread election misinformation.

Byrne attempts to argue there is no genuine issue of material fact as to material falsity without ever directly stating what he contends to be the "gist" or "sting" of the statements. The "gist" or "sting" of the defamatory statements about Dr. Coomer in *The Deep Rig* is: (1) Dr. Coomer rigged the 2020 presidential election in favor of President Biden; and (2) Dr. Coomer admitted to doing so on an "Antifa call." Byrne provides no summary judgment evidence demonstrating that the 2020 presidential election was rigged, much less by Dr. Coomer. As to the "Antifa call," the only summary judgment evidence Byrne attached to the Motion is Dr. Coomer's testimony that he was never on such a call. (Doc. 334, p. 8).

---

[6] **Exhibit 6**, Declaration of Dr. J. Alex Halderman, ¶ 28 (Apr. 14, 2025).

3

Byrne has not carried his summary judgment burden.

## II.     RESPONSE TO MOVANT'S STATEMENT OF FACTS

1.     Admitted.

2.     Admitted.

3.     Admitted.

4.     Denied to the extent the statements are falsely characterized as "opinion."  Claims that Dr. Coomer rigged the election are statements of fact that are provably false.

5.     Denied.  The Court has already considered and rejected Byrne's mistaken understanding of "publication" in its Order Denying Defendants' Motions to Dismiss.  *See* Doc. 175, pp. 10-13 (Jan. 14, 2025).

6.     Denied.  *See* Response to No. 5.

7.     Denied.  As discussed below, Byrne had an active role in numerous aspects of creating, editing, distributing, and promoting the Film.  *See also* Response to No. 5.

8.     Denied.

9.     Denied.  Dr. Coomer is repeatedly named in the Film.

10.     Denied to the extent that Byrne did "name" multiple counties where he asserted that election fraud did occur.

11.     Denied.  Byrne was actively involved in selecting the Film's content.

12.     Denied.

13.     Denied.

4

14.     Denied that Byrne did not have ultimate say over the Film's content. Also denied to the extent Byrne now attempts to identify former Defendant Lucescu as "the producer."  Byrne also produced the Film.[7]

15.     Denied to the extent this this statement asserts Dr. Coomer held the roles of "Chief Software Architect" or "Senior Vice President for Software and Development" for Dominion Voting Systems.

16.     Denied.  This statement misquotes the testimony cited.

17.     Denied.  Dr. Coomer's testimony has been consistent.

18.     Admitted.

19.     Admitted that Dr. Coomer re-posted a satirical social media post.

20.     Admitted.

21.     Admitted.

22.     Admitted.

23.     Admitted.

24.     Admitted that Dr. Coomer has filed multiple lawsuits, but denied to the extent those lawsuits are characterized as "the same 2020-election accusation."

25.     Admitted.

26.     Admitted.

---

[7] See **Exhibit 3**.

5

### III.    STATEMENT OF MATERIAL FACTS

27.    Dr. Coomer provided a Statement of Material Facts in his Motion for Summary Judgment filed on July 1, 2026.  (Doc. 333, ¶¶ 1-26).  This Response includes additional facts relevant to arguments raised in Byrne's Motion.

28.    On February 17, 2021, Byrne and Lucescu entered into a contract titled "'The Big Rig' – Investor's Agreement" for production of *The Deep Rig* (the Contract).[8]

29.    This included a "$250,000 Investor Contribution" from "Investor Patrick Byrne, or his designated Company."  Under the Contract's terms, Byrne was to receive "payback of initial $250,000 Investment **Prior To** any Net Profits distribution" as well as "Additional 33% of all Net Profits collected from any, and all, distribution."[9]  (Emphases in original).

30.    Other relevant portions of the Contract include, but are not limited to, the following:

> Patrick Byrne will provide "best efforts" to facilitate himself, and all known parties, all available knowledge, all available information, and all contacts and his encouragement to same, to facilitate the production, and filming of this documentary.
>
> All footage will be uploaded to an "IO" site as soon as possible after each filming day.  Patrick will receive a unique personal login to access, and view all footage as it is uploaded.  As the rough edits are being assembled, literally as we are filming each day, Patrick will have instant and continual access, and hence, "a heavy hand" input as requested, whether for any clip to make the edit, or not to make the edit.

---

[8] **Exhibit 4**, "The Big Rig" – Investor's Agreement, p. 1 (Feb. 17, 2021).

[9] *Id.*

> Due to the current state of prevalent censoring of any election fraud content, Patrick will be participatory in all discussions and decisions regarding both; widespread free distribution, and/or for-profit distribution.[10]

31.   Production of the Film began shortly thereafter, with various interviews being recorded throughout the spring of 2021.[11]

32.   On May 12, 2021, Byrne emailed Lucescu seventeen different notes after reviewing the footage that had been produced to date.[12]  Those notes touched on a variety of different topics, including chyrons for different characters, background music, use of subtitles, and multiple substantive edits.  For example, Byrne instructed Lucescu to "Take out Ruby Freeman social media Confession. Some uestion [sic] whether it was authentic or not"[13] and "add headlines and news article splash screen highlighting the reported water main break that turned out to be leaking toilet."[14]

33.   Lucescu responded the next day, stating, "Hola Brother.  These are awesome notes.  I'm getting them to my Editors right now to start implementing into the cut."[15]

34.   On June 27, 2022, Byrne was upset with the state of the Film and sent Lucescu a series of additional edits to the footage.  He stated, "We are exploring

---

[10] *Id*., p. 2.

[11] **Exhibit 7**, Lucescu Depo. Tr. at 64:5-12 (Feb. 18, 2025).

[12] *See* **Exhibit 5**, emails from Byrne to Lucescu (May 12-13, 2021).

[13] *Id*., p. 2.

[14] *Id*.

[15] *Id*., p. 1.

7

our legal options should you continue to resist making the changes that I am now INSTRUCTING you to make."[16]  He went on to say, "Here is the immediate change upon which I insist:  You must take down the Livestream and only put it up when Doug's face is blurred throughout."[17]

35.    Byrne went on to identify numerous substantive changes to the Film, including where to cut commentary by certain characters as well as the style and substance of subtitles.  Byrne concluded, "I am no longer interested in making requests of you and asking you to pass them to Roger to whomever edits adn [sic] they never get done.  Someone is editing this.  That person has a physical body, and is sitting in front of a machine somewhere.  I want to know where that person is, what town he is in.  I want to go fly to that person, sit next to that person, and watch the Film frame by frame as these changes are made.  Tell me who or where that person is please so that I may spend Monday and Tuesday with him."

36.    Lucescu acquiesced to Byrne's demands, responding, "We will re-edit the footage of Doug blurred out, back into it, as you have requested, and then remove the four minutes of Austin talking out of the live stream."[18]

37.    Disputes between Byrne and Lucescu persisted into the following month, with Byrne insisting that Lucescu sign a new contract.  On July 21, 2021,

---

[16] **Exhibit 8**, email from Lucescu to self, copying and pasting June 27, 2021 text exchange with Byrne.

[17] *Id.*, p. 2 (this is in reference to inclusion of Doug Logan, who at the time was working with a private company, Cyber Ninjas, that was conducting an audit of election results in Maricopa County, Arizona.)

[18] *Id.*, p. 1.

8

Lucescu sent Byrne a "Letter of Understanding" that stated in relevant part, "Final changes that [Byrne] made including the removal of Sidney Powell, and over 75 other changes in the edit came with him approving a total of just over $200,000 since May 25 when the Sidney footage removal began up to the week ending July 9."[19]

38.    Ultimately, Byrne and Lucescu were unable to reach an understanding, and on July 28, 2021, Byrne texted Luescu, "Steve, I just read your latest crazy letter to the attorneys.  All communications between us are now complete and you are on block.  Don't even bother trying to write me. Communicate through attorneys only.  The America Project looks forward to making ITS film available to the public."[20]  (Emphasis in original).

39.    On July 7, 2022, just six days after being served with Plaintiff's Complaint,[21]  The America Project issued a press release to PRNewswire titled, "Election fraud documentary 'The Deep Rig' To Premiere in Naples Florida on July 22, 2022."[22]    The press release stated, "Patrick Byrne, the founder of Overstock.com and co-creator of The America Project, will hold a special screening of his documentary The Deep Rig, based on his bestselling book of the same name."  It went on to state that, "businessman-turned-activist Patrick Byrne

---

[19] **Exhibit 9**, Letter of Understanding (July 21, 2021).

[20] **Exhibit 10**, text messages from Lucescu to Byrne, pp. 2-3 (July 28, 2021).

[21] *See* **Exhibit 11**, Proof of Service, indicating service of summons on July 1, 2022, (July 7, 2022).

[22] **Exhibit 12**, The America Project, Election fraud documentary 'The Deep Rig' To Premiere in Naples Florida on July 22, 2022, PRNEWSWIRE (July 7, 2022).

9

is planning a re-release of his bestselling book and documentary The Deep Rig, which addressed how election fraud cost Donald J. Trump re-election to the White House in 2020." Byrne was quoted in the press release, stating:

> When I first released The Deep Rig, many in the media and political establishment castigated the findings as dangerous, untrue, and completely fabricated. We knew then, as we do now, that the evidence clearly pointed to widespread voter fraud across America during the 2020 elections. I am incredibly grateful that someone like Dinesh D-Souza has reached the same conclusion and hope that the new evidence we present with this re-release will help the American people understand the root causes of election fraud in the United States of America.[23]

40.    TAP invited dozens of its employees to this event.[24] TAP's corporate representative confirmed in his deposition that this re-release did occur and was well attended.[25]

## IV.    LEGAL STANDARD

41.    Under Federal Rule of Civil Procedure 56, the moving party seeking summary judgment bears the initial burden to identify the portions of the record that he believes show the absence of a genuine issue of material fact. When the non-moving party bears the burden of proof on an issue at trial, as is the case here, the moving party must either: (1) show that the non-moving party has no evidence to support his case; or (2) present affirmative evidence demonstrating that the

---

[23] D'Souza was also subsequently sued for defamation in connection with his election fraud film "2,000 Mules." The Film's publisher, Salem Media, subsequently withdrew both the film and the book from circulation, and D'Souza issued a public apology to the Plaintiff. See Tom Dreisbach, Publisher of '2,000 Mules' election conspiracy theory film issues apology, NPR (May 31, 2024), available at https://www.npr.org/2024/05/31/g-s1-2298/publisher-of-2000-mules-election-conspiracy-theory-film-issues-apology.

[24] **Exhibit 13**, TAP re-release invite list (July 12, 2022).

[25] **Exhibit 14**, The America Project 30(b)(6) (Johnson) Depo. Tr. at 168:2-169:11.

nonmoving party will be unable to prove his case at trial. *See Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (plaintiff carried his burden to show there was a triable issue of fact as to actual malice).

42.    If the moving party meets his initial burden, then the burden shifts to the non-moving party to show the existence of a genuine issue of material fact. *Id*. The non-moving party "must either point to evidence in the record or present additional evidence 'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.'" *Id*.

43.    "[A] claim should go to trial if 'there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Edmondson v. Velvet Lifestyles, LLC*, 43 F.4th 1153, 1159 (11th Cir. 2022) (*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "Because '[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . [t]h evidence of the non-movant is to be believed, and all justifiable inferences are to be draw in his favor.'" *Edmondson*, 43 F.4th at 1160.

44.    Dr. Byrne does not address whether Colorado or Florida law applies with respect to Plaintiff's claims, but it ultimately does not matter for the purposes of the Court's inquiry here because there is a "false conflict" situation. *See* Doc. 175, pp. 8-10.

## V.   ARGUMENT

**A.   Byrne may be held liable for publishing defamatory statements, regardless of who spoke them.**

45.    Under Colorado law, "[a]n editor, publisher, owner, or reporter of a newspaper or broadcasting company who has been involved in the publication" of defamatory matter may be liable.  Colo. Prac., *Pers. Injury Torts and Ins.* § 32:18. Publication.  (3d ed. Nov. 2024).  *See Coomer v. Salem Media of Colo., Inc.,* 2025 COA 2, ¶ 58, 565 P.3d 1133, 1148 (Colo. App. 2025) (affirming trial court's order denying special motion to dismiss defamation claim based on Corporon's publication of his own and Oltmann's statements); *Schwartz v. Am. College of Emergency Physicians*, 215 F.3d 1140, 1145 (10th Cir. 2000) (republisher of a defamatory statement made by another remains subject to liability); *TMJ Implants, Inc. v. Aetna, Inc.*, 498 F.3d 1175, 1196 (10th Cir. 2007) ("one who republishes a defamatory statement may be liable to the same extent as the original speaker because each publication causes a new harm to the plaintiff's reputation"). Similarly, under Florida law, "every one who takes part in the publication . . . is charged with publication."  *Doe v. Am. Online, Inc.*, 783 So. 2d 1010, 1017 (Fla. 2001) (quoting *Zeran v. Am. Online, Inc.,* 129 F.3d 327, 332 (4th Cir. 1997)).  As the Court has previously explained, case law from other jurisdictions similarly holds that anyone who causes or participates in the publication of defamatory matter or who aids or abets another in publishing the matter can be liable.  *See* Doc. 175, p. 12 (listing cases).

12

46.    Byrne was heavily involved in the publication of the Film.  Byrne had the idea to create the Film, and he financed, produced, and promoted the Film.[26] He had editorial control over the Film and exercised that editorial control, for example, by making the decision to exclude Sidney Powell's interviews from the Film.[27]  Byrne is featured in the Film endorsing the truth of its contents.[28]  He made an introductory statement for the Film "[t]o encourage people to watch the movie."[29] Byrne was involved in discussions about the distribution model for the Film.[30] Byrne promoted the Film on his social media pages and on podcasts.[31]

47.    Byrne's attempts to distance himself from responsibility for the Film are not supported by the facts or the law.  Byrne does not cite any authority for the proposition that Film producers can never be subject to liability for defamation. While Byrne disclaims that he had a connection to the defamatory statements about Dr. Coomer: (1) Byrne is featured in the Film proclaiming the truth of its contents (see infra at ¶ 58); and (2) in promoting the Film, immediately after the interviewer referenced Oltmann being sued for defamation, Byrne affirmed

---

[26] *See* supra at ¶¶ 28-38; Byrne Deposition, 27:6-28:12 (idea/financing); 28:23-30:23 (financing, **Exhibit 15**).  *See* **Exhibit 2**, *The Deep Rig*, at 7:55 (producer).

[27] **Exhibit 7**, Lucescu Depo. Tr. at 71:15-72:23.

[28] **Exhibit 2**, *The Deep Rig*, at 0:01.

[29] **Exhibit 15**, Byrne Depo. Tr. at 104:5-17.

[30] *Id*. at 90:2-90:18.

[31] **Exhibit 16**, Coomer Declaration, at p. 4-5.  **Exhibit 17**, Anne Vandersteel, Oregon Townhall with Patrick Byrne, STEEL TRUTH PODCAST, May 28, 2021, at 40:20

13

Oltmann's contributions to the Film, stating it was "terrific" to have Oltmann "explaining to the public what's happened."[32]

48.    Byrne may be held liable for his role in the publication of the defamatory statements under Colorado and Florida case law.

**B.    The defamatory statements in *The Deep Rig* are of and concerning Dr. Coomer.**

49.    To be actionable, a defamatory statement must be "of and concerning" the plaintiff.  *Parekh v. CBS Corp.*, 820 F. App'x 827, 833 (11th Cir. 2020).  A plaintiff need not be named in the publication, but 'the communication as a whole [must] contain[ ] sufficient facts or references from which the injured person may be determined by the persons receiving the communication.'"  *Mac Isaac v. Twitter, Inc.*, 557 F. Supp. 3d 1251, 1258-59 (S.D. Fla. 2021) (quoting *Wolfson v. Kirk*, 273 So. 2d 774, 779 (Fla. 4th DCA 1973)).  *See Coomer v. Make Your Life Epic LLC*, 780 F. Supp. 3d 1129, at fn. 5 (D. Colo. 2025) ("Coomer need not show that Defendants expressly and specifically uttered his name in each published statement in order to satisfy the identity element of the defamation analysis.").

50.    There can be no serious question as to whether the defamatory statements at issue in the Film are of and concerning Dr. Coomer.  He is visually depicted in the Film and identified by name.  Oltmann identifies Dr. Coomer by

---

[32] *Id*. at p. 8-9.  *See* **Exhibit 18**, Anne Vandersteel, Big Announcement - Byrne and Flynn, STEEL TRUTH PODCAST, June 21, 2021, at 50:45.

14

name in relaying the story about the Antifa call and again when he accuses Dr. Coomer of affecting the results of the election.[33]

## C. The actual malice standard applies, but only because the statements involve a matter of public concern.

51.     Dr. Coomer does not contest that the actual malice standard applies in this defamation case, but it applies because the defamatory statements involve a matter of public concern.  *See Coomer v. Donald J. Trump for President, Inc.*, 552 P.3d 562, 581 (Colo. App. 2024) (similar defamatory statements accusing Dr. Coomer of rigging the 2020 presidential election involved matters of public concern and actual malice standard applied).

52.     Dr. Coomer is not a public figure.  He had "no general fame or notoriety in the community" prior to the defamation campaign waged against him by a group interested in spreading election misinformation.  *See Gertz v. Robert Welch*, *Inc.*, 418 U.S. 323, 352 (1974).  Dr. Coomer has never held a public office. *Id*. at 345.  The fact that Dr. Coomer worked for Dominion Voting Systems and in the field of election security does not make him a limited-purpose public figure.  *Id*. at 352 ("it [was] plain that petitioner was not a public figure" despite petitioner being active in the community and professional affairs, serving as an officer of civic groups and professional organizations, and publishing several books and articles on legal subjects).

---

[33] *The Deep Rig*, at 56:47-57:50.

15

53.    Nor does the fact that Dr. Coomer authored an op-ed published in the Denver Post and filed defamation lawsuits.  Litigants do not automatically become public figures for the limited purpose of the litigation, by virtue of being "drawn into a public forum against their will in order to attempt to obtain the only redress available to them."  *Time, Inc. v. Firestone,* 424 U.S. 448, 457 (1976).  There is "little reason why these individuals should substantially forfeit that degree of protection which the law of defamation would otherwise afford them simply by virtue of their being drawn into a courtroom."  *Id*.  Dr. Coomer should not be considered to have forfeited his privacy due to his attempts to obtain redress *after* he was involuntarily thrust into the limelight.  To find otherwise would run contrary to the public policy purpose behind the distinction between private and public figures in defamation actions.  Public figures "have voluntarily exposed themselves to increased risk of injury from defamatory falsehoods concerning them" whereas private figures have not willing subjected themselves to and are likely to "lack effective opportunities for rebuttal."  *See Gertz*, 418 U.S. at 343, 345.

54.    Byrne argues that Dr. Coomer was a limited-purpose public figure because he re-posted a satirical piece about Antifa on his private Facebook page to his 300 "Facebook friends."  Byrne cites no authority on that point.  Were a person to become a limited purpose public figure on a topic by virtue of making a post to a private social media account, the distinction between private and public figures would collapse entirely.  *Id*. at 351 (rejecting argument that would "distort the plain meaning of the 'public official' category beyond all recognition").

**D.    Circumstantial evidence supports a jury finding of actual malice.**

55.    Actual malice is a subjective standard, "[b]ut that does not mean that a defendant can defeat a defamation claim simply by 'testifying that he published with a belief that the statements were true.'"  *Coomer v. Donald J. Trump for President, Inc.*, 552 P.3d 562, 591 (Colo. App. 2024) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)).

56.    Actual malice may be—and routinely is—proved through circumstantial evidence and reasonable inferences drawn from the speaker's conduct, the inherent improbability of the published claims, the failure to investigate when investigation was readily available, and the refusal to retract in the face of contrary information.  *See St. Amant*, 390 U.S. 727, 731-32 (1968); *Coomer v. Donald J. Trump for President, Inc.*, 552 P.3d at 591.  "[I]ll will or motive, when combined with other evidence, may amount to actual malice."  *Don King Productions, Inc. v. Walt Disney Co.*, 40 So.3d 40, 44 (Fla 4th DCA 2010) (citing *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989) (plaintiff may prove defendant's state of mind through circumstantial evidence, such as evidence of motive)).

57.    In applying the actual malice standard to publishers of a film, courts consider the format, tone, and direction of the film.  *See Lovingood v. Discovery Commc'n, Inc.*, 800 Fed. Appx. 840, 847 (11th Cir. 2020) (in determining use of "altered historical dialogue" in a dramatization was not itself evidence of actual malice, the court stated, "[w]e find most telling, however, the overall format, tone,

17

and direction of the film."). Courts "must take into account how a reasonable viewer would understand the contents of the scene(s)" at issue. *Id*.

58. At the outset, *The Deep Rig* purports to be a documentary. *C.f. Lovingood,* 800 Fed. Appx. at 847-848 ("a reasonable viewer would understand . . . he is not watching a documentary film"); *Basulto v. Netflix, Inc.*, 1:22-CV-21796, 2023 WL 7122970 (S.D. Fla. Sept. 20, 2023) ("Given the Film's status as a docudrama, the actual malice inquiry . . . 'must take into account how a reasonable viewer would understand the contents of the scene.'"). A documentary is defined as being "based on or re-creating an actual event, era, life story, etc., that purports to be factually accurate and contains no fictional elements."[34]

59. The Film opens with Byrne endorsing the truth of its contents:

We're delivering this free of charge because you deserve to know the truth. In my experience, people watching this movie literally grow shocked and upset and that's because they come to realize that the most fundamental atomic concept in our tradition has been violated. That fundamental concept is consent of the governed. As is determined in elections that are free, fair and transparent, which the November 2020 election manifestly was not.[35]

60. He later states: "My only interest is honestly conveying the truth for historical purpose."[36]

61. The Film portrays Dr. Coomer as being part of a conspiracy to rig the 2020 presidential election. *See Fairstein v. Netflix, Inc.*, 20-CV-8042 (PKC), 2023

---

[34] *See* https://www.dictionary.com/browse/documentary (last visited July 22, 2026).

[35] **Exhibit 2**, *The Deep Rig*, at 0:00-0:42.

[36] **Exhibit 2**, *The Deep Rig*, at 11:30-11:37.

WL 6125631 (S.D.N.Y. Sept. 19, 2023) (denying motion for summary judgment as there was sufficient evidence to permit a reasonable trier of fact to find that defendants acted with actual malice in publishing scenes in Netflix series about The Central Park Five). Contrary to Byrne's assertion in the Motion, Oltmann is not presented as "one voice among many;" no counterpoint is presented. Oltmann's account is presented as truth. He describes the Antifa call in certain terms, stating that Dr. Coomer said "Don't worry about the election. Trump's not going to win. I made fucking sure of it."[37] Oltmann describes there being "a high probability" that Dr. Coomer "affected the election."[38]

62.    Rather than presenting the subject "as a mystery," the documentary presents widespread fraud as a certainty. The Film features General Flynn, who vouches for the legitimacy of the election fraud narrative. "This is not fake news. This is reality. We cannot fake the American people out and lie to the American people about what the reality is. And the reality is that they were lied to. That this system is totally broken. The United States of America election system broke down."[39] The Film concludes with an Epilogue about the 2020 election being "riddled with fraud" that "resulted in a stolen election" and a lengthy call to action.[40]

---

[37] **Exhibit 2**, *The Deep Rig*, at 53:01-56:47.

[38] *Id.*, at 56:47-57:50.

[39] *Id.*, at 1:34:16.

[40] *Id.*, at 1:39:30-145:35.

19

63.    Oltmann's story about the Antifa call, Dr. Coomer's alleged boast that he had made sure Trump would not win, and Dr. Coomer taking part in rigging the 2020 presidential election are extraordinary and far-fetched.[41]  A reasonable jury could find by clear and convincing evidence that Byrne acted with actual malice despite Byrne's professions that he published with a belief that Oltmann's statements were true because the "allegations are so inherently improbable that only a reckless man would have put them in circulation" and "there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports."  *St. Amant*, 390 U.S. at 732.  *See Hunt v. Liberty Lobby*, 720 F.2d 631, 646 (11th Cir. 1983) ("jury certainly could have determined that 'only a reckless man' would circulate a story announcing that the CIA was going to cover up its role in the Kennedy murder by admitting that E. Howard Hunt was involved" and disregarded testimony by defendants' agents that they believed the information was plausible.).  The existence of a vast conspiracy that is ignored by the government but uncovered by a relatively unknown podcaster is so inherently improbable that only a reckless man would believe it.  *See US Dominion, Inc. v. Powell*, 554 F.Supp.3d 42, 63 (D.D.C. 2021) (reasonable juror could conclude a similar claim the election fraud conspiracy was proven by spreadsheet on an internet blog was inherently

---

[41] Multiple federal courts have already evaluated identical or materially indistinguishable assertions and concluded that they are "so 'inherently improbable that only a reckless man would believe' them." *See U.S. Dominion, Inc. v. Byrne*, 600 F. Supp. 3d 24, 34 (D.D.C. 2022); *see also U.S. Dominion, Inc. v. Powell*, 554 F. Supp. 3d 42, 63 (D.D.C. 2021).  *See also Coomer v. Make Your Life Epic LLC*, 659 F.Supp.3d 1189, 1204 (D. Colo. 2023) ("evidence tend[s] to show not only that the election fraud as alleged by Oltmann was technically impossible, but also that the claim of Dr. Coomer's involvement in the September conference call was supported by fabricated evidence.").

20

improbable).

64.     Byrne relied exclusively on Oltmann, and there were obvious reasons to doubt his account.  Oltmann was involved in litigation with Dr. Coomer before the Film was published.[42]  *Hunt*, 720 F.2d at 645 (fact that article author had been involved in litigation with the CIA was a reason to doubt veracity).  The identification of the speaker on the purported Antifa phone call as "Eric, the Dominion Guy" came from an anonymous participant on the call.[43]  *See Coomer v. Salem Media of Colo., Inc.*, 565 P.3d 1133, 1147 (Colo. App. 2025) ("Oltmann relayed a statement from an unverified, anonymous source . . . [t]he connection between the statements on the call and Coomer is inherently tenuous."); *St. Amant*, 390 U.S. at 732 (professions of good faith are not likely persuasive where a story is based "wholly on an unverified anonymous telephone call").

65.     Oltmann's story changed over time—he went from being unsure if it was Dr. Coomer on the call to being certain it was him, and he went from describing it as a telephone call to describing it as a Zoom call.  The first time that Oltmann told the story about the Antifa call, in the November 9, 2020 episode of his Conservative Daily podcast, Oltmann stated three separate times that he could not say for certain that the voice on the Antifa call was Dr. Coomer's.[44]  The next day, in an email to One America News, Oltmann confirmed "I cannot verify on this

---

[42] **Exhibit 15**, Byrne Depo. Tr. at 180:8-10.

[43] **Exhibit 2**, *The Deep Rig*, at 54:42.

[44] **Exhibit 19**, Oltmann's Depo. Tr. at 100:18-101:22.

call that it is the same Eric . . . ."[45]  Oltmann initially said it was a telephone call, and then changed his story to saying it was a Zoom call.[46]  He has not identified any other people that were on the alleged call.[47]

66.    Byrne had a motive to ignore any evidence that did not support his belief that the 2020 presidential election was fraudulent.  Byrne believed the election had been rigged as soon as the morning after the election.[48]  By November 7, 2020, Byrne was meeting with Powell and Giuliani at Trump Tower to coordinate efforts to challenge the election results.[49]  Byrne was assisting in Powell's "Kraken lawsuits" by organizing the flow of information from people who claimed to have reports of election fraud.[50]

67.    Byrne conducted a grossly inadequate investigation of Oltmann's story and then presented Oltmann's claims as truth to support his preconceived narrative of election fraud.  Despite casting the Film as a documentary, Byrne never conducted basic factchecking.  Byrne never attempted to verify Oltmann's story about the Antifa call, but instead "took his word" for it.[51]  Byrne did not ask

---

[45] *Id*. at 128:9-130:23; *see* **Exhibit 20**, identified during the Lucescu Deposition as Exhibit 10.

[46] *Compare, e.g.,* **Exhibit 2**, *The Deep Rig*, at 55:10, indicating he "got on a phone call" and that he subsequently "hung up the phone," to **Exhibit 19**, Oltmann Depo. Tr. at 133:4-25, claiming that it was actually a Zoom meeting.

[47] *Id.*, at 79:2-22.

[48] **Exhibit 15**, Byrne Depo. Tr. at 48:7-48:10.

[49] *Id.*, at 50:14-50:19.

[50] *Id.*, at 52:2-54:14.

[51] *Id.*, at 181:21-182:15.

Oltmann how Oltmann was able to get access to the call.[52]  Byrne does not know

what the format of the call was—whether it was a telephone call or a Zoom call.[53]

He does not know if there was a recording of the call.[54]  Byrne does not know who

else was on the Antifa call or even how many other people were supposedly on

the "Antifa call."[55]  Byrne did not ask if Oltmann took notes or review Oltmann's

notes from the call.[56]  Nor has he made an effort to find out what other evidence,

if any, Oltmann had to support his story about the call.[57]  Byrne never attempted to

reach out to Dr. Coomer to directly ask him if the story was true.[58]

68.    Byrne claims that he found Oltmann to be reliable, not because

Oltmann had any relevant experience in election security, but because Oltmann

was a CEO with similar political views.  Byrne first interacted with Oltmann on the

evening of January 6, 2021 when they were both spending time with Rudolph

Giuliani in Washington, D.C.[59]  Byrne gave "weight" to Oltmann's story about the

Antifa call based on Oltmann being "a CEO of tech company," stating he "wouldn't

expect a guy like that to make it up."[60]  But when Byrne he was asked if was familiar

---

[52] *Id*., at 177:18-178:3.

[53] *Id*., at 100:16-100:19 ("I'm not sure I was aware of that being a Zoom or telephone call.").

[54] *Id*., at 62:9-62:14; 185:11-185:20.

[55] *Id.*, at 182:16-186:2.

[56] *Id.*

[57] *Id.*, at 182:16-186:2.

[58] *Id*., at 187:13-189:4.

[59] *Id*., at 67:1-68:12.

[60] *Id*., at 207:3-207:14.

23

with PIN Business Network, Oltmann's company, Byrne testified he did not know.[61] Byrne testified he had "never watched [Oltmann's] podcast other than the times I've been on it."[62] Oltmann being a Trump-supporting businessman of some sort was enough for Byrne, who took Oltmann's extraordinary claims at face value and published them as fact in the documentary.

69.    Oltmann was not qualified to evaluate whether the election was rigged. As Dr. J. Alex Halderman explains in his Declaration: "Oltmann has no discernable expertise in election security . . . no prior experience with election administration or computer security. Without such expertise, he was unqualified to assess whether Dr. Coomer plausibly could have engaged in a plot to rig the election."[63]

70.    Byrne acknowledged there are reasons to doubt Oltmann's story. He did not incorporate Oltmann's story about the Antifa call into his book because he was "not going to hang my hat on somebody saying that they heard" something "if there is not a recording."[64] Byrne testified that a story where one side said it happened and the other said it did not was "not going to get people to take it seriously" or "get a national investigation started based on that."[65]

---

[61] *Id.*, at 216:24-217:1.

[62] *Id.*, at 193:17-193:19.

[63] **Exhibit 6**, Declaration of J. Alex Halderman, at ¶ 28.

[64] **Exhibit 15**, Byrne Depo. Tr. at 63:18-64:14.

[65] *Id.*

24

71.    Yet, Byrne ignored sources that conflicted Oltmann's story, such as the November 2020 report from the United States Cybersecurity and Infrastructure Security Agency,[66] which Byrne decries as a "cover-up."[67]  Byrne dismissed the December 1, 2020 statement by then-U.S. Attorney General William Barr,[68] calling it "nonsense" and "blue smoke and mirrors."[69]

72.    Byrne ignored public statements by non-governmental sources, such as Dr. Halderman.  On November 13 and 14, 2020, Dr. Halderman appeared on Fox News to debunk claims that the presidential outcome had been hacked.[70]  In an open letter dated November 16, 2020 and reported in *The New York Times* on that day, Dr. Halderman and 58 other leading election security specialists emphasized that hacking claims were inherently improbable and carried a high burden of proof, stating "Anyone asserting that a U.S. election was 'rigged' is making an *extraordinary* claim, one that must be supported by persuasive and verifiable evidence."[71]

73.    The jury is not required to believe Byrne's professions of good faith. The sum total of the inferences properly drawn from the foregoing evidence

---

[66] **Exhibit 21**, CISA Statement

[67] **Exhibit 15**, Byrne Depo. Tr. at 270:21-272:2.

[68] **Exhibit 22**, Barr Statement.

[69] **Exhibit 15**, Byrne Depo. Tr. at 272:8-273:23.

[70] **Exhibit 6**, Declaration of J. Alex Halderman, at ¶ 14.

[71] *Id.*, at ¶¶ 15-17.

25

constitutes clear and convincing evidence which would support a jury determination that Byrne published the defamatory statements with actual malice.

**E.      The only summary judgment evidence in the record shows the "gist" or "sting" of the defamatory statements is materially false.**

74.      "A statement is false if the substance or gist of the statement was inaccurate." *Hebert v. Ritter,* 2025 WL 869399, at \*2 (Colo. App. Mar. 20, 2025) (citing *Jogan Health, LLC v. Scripps Media, Inc.*, 565 P.3d 1160, 1168 (Colo. App. 2025)).

75.      Byrne's focus is misplaced; he looks only to the statements that came out of his own mouth.  Byrne does not direct the Court to any evidence to substantiate the gist of the statements he published about Dr. Coomer.  The gist of those statements is two-fold: (i) Dr. Coomer was motivated by ideology and confessed to rigging the 2020 presidential election to his ideological group; and (ii) there was, at a minimum, a high probability that Dr. Coomer affected the election results against President Trump by using his position at Dominion and technology he helped develop.  There is no credible, non-speculative evidence supporting those propositions.

76.      Dr. Coomer has produced evidence that would support a jury finding that the gist of the statements about him are materially false.  As to the Antifa call, Dr. Coomer has provided a sworn statement that he was "not a part of any such call, if it occurred."[72]  Dr. Coomer attested that he has "no knowledge, role, or

---

[72] **Exhibit 16**, Declaration of Eric Coomer, at ¶ 34.

involvement in manipulating, altering, or creating fraudulent ballots or records during the 2020 election or any prior election."[73]  Dr. Halderman opines, "following numerous audits and investigations, I am unaware of any credible evidence whatsoever that the 2020 presidential election outcome was altered by technical manipulation."[74]  To the contrary, Dr. Halderman opines "there is strong evidence that the election outcome was *not* hacked by Dr. Coomer or anyone else."[75]

77.    Settling Defendant Lucescu—a co-producer of the Film—has acknowledged in writing that Oltmann "has never produced any evidence beyond his sworn statement that Dr. Coomer interfered with Dominion voting machines or voting software, or that Dr. Coomer claimed to have done so," and that there is no evidence Dr. Coomer "participated in a conversation with members of Antifa." Lucescu further conceded that the Film's claims were not "vetted for truth or accuracy."[76]

**F.    Oltmann's statements about Dr. Coomer are actionable.**

78.    Byrne argues that his own statements and Oltmann's are opinions rather than actionable assertions of fact.  Dr. Coomer is not proceeding on a theory that the statements from Byrne's mouth are actionable defamation.  (Doc. 175, p. 18).  But Oltmann's statements are.

---

[73] *Id*.

[74] **Exhibit 6**, Declaration of J. Alex Halderman, at ¶ 22.

[75] *Id*. at ¶ 23.

[76] **Exhibit 23**, Lucescu Statement (May 15, 2026).

27

79.    "[T]here is no 'wholesale defamation exemption for anything that might be labeled 'opinion.'"  *Coomer I,* 552 P.3d 562, 588 (Colo. App. 2024) (rejecting argument that similar defamatory statements were mere opinion) (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990)).  There is a two-part test for distinguishing between actionable assertions of fact and a nonactionable statement of pure opinion: (1) whether the statement is sufficiently factual to be susceptible of being proved true or false; and (2) whether reasonable people would conclude that the assertion is one of fact.  *Id*.

80.    Oltmann's statements about Dr. Coomer are not statements of opinion, they are statements of fact.  He describes the Antifa call as an event that occurred.[77]  He describes knowing to a high degree of probability that Dr. Coomer affected the election results.[78]  These statements can be proved true or false— either Dr. Coomer was on an Antifa call and bragged about making sure Trump would not win, or he did not.  Either Dr. Coomer manipulated the results of the 2020 presidential election, or he did not.  The Film is labeled a documentary, and a reasonable person would view the statements at issue as assertions of fact.

81.    Multiple other courts have analyzed the same or similar statements and concluded that they are not mere political invective or opinion statements.  *Id*.; *Coomer v. Make Your Life Epic LLC*, 780 F.Supp.3d 1129, 1143-1147 (D. Colo.

---

[77] **Exhibit 2**, *The Deep Rig*, at 54:52.

[78] *Id*., at 56:45.

28

2025); *Coomer v. Salem Media of Colo., Inc.*, 565 P.3d 1133, 1144-45 (Colo. App. 2025).

**G.      Byrne published defamatory statements that damaged Dr. Coomer.**

82.    As an initial matter, "[t]he traditional categories of defamation per se are imputation of (1) a criminal offense; (2) a loathsome disease; (3) a matter incompatible with the individual's business, trade, profession, or office; or (4) serious sexual misconduct." *Gordon v. Boyles*, 99 P.3d 75, 79 (Colo. App. 2004) (internal citations omitted).  Claims of election rigging impute criminal conduct and conduct incompatible with Dr. Coomer's trade or profession. Damages to the plaintiff's reputation are presumed as a matter of law, and the plaintiff need not plead or prove special damages. *Id.*

83.    Plaintiff can show that he has sustained actual damages as a result of Byrne's defamatory publication.  Dr. Coomer will testify at trial concerning the mental anguish and reputational harm that he has suffered as a result of Byrne's publication of the Film.  His testimony alone is sufficient.  *See Keohane v. Wilkerson*, 859 P.2d 291, 302-303 (Colo. App. 1993) (holding that defamed plaintiff's testimony that he was "devastated" by the article and that learning of the alleged allegations that he had accepted a bribe made him feel worse was sufficient to support jury award, stating "Keohane's testimony is sufficient to permit the jury to conclude that he suffered actual damage.").

84.    Dr. Coomer testified by deposition and will testify at trial that his reputation has been damaged and he has been subjected to death threats that

29

were directly related to the false, defamatory statements being spread by Byrne and others.[79]  He has suffered severe emotional and physical distress.[80]  The Film was viewed by people working in elections.[81]  As a result of the defamatory statements imputing Dr. Coomer with rigging the 2020 election, he has lost his career in the elections industry.[82]

**H.    Summary judgment is not proper on Plaintiff's claims for intentional infliction of emotional distress and request for exemplary damages and injunctive relief.**

85.    As a throw-away argument, in a page-and-a-half of the Motion, Byrne lumps together Dr. Coomer's intentional infliction of emotional distress claim with his request for exemplary damages and injunctive relief.  (Doc. 334, pp. 21-22). These slap-dash arguments are without support and must be denied.

86.    Byrne does not spend much time addressing the separate elements of the intentional infliction of emotional distress claim.  He asserts without authority that financing a documentary does not meet the standard for outrageous conduct but essentially regurgitates the arguments about the defamation elements as a reason why the intentional infliction of emotional distress claim also fails.  The arguments above and summary judgment evidence attached to this Response demonstrate that summary judgment ought not be granted on the intentional

---

[79] **Exhibit 24**, Coomer Depo. Tr. at 46:9-46:22.

[80] *Id*., at 92:1-94:10.

[81] *Id*., at 40:13-41:5.

[82] *Id*., at 39:5-39:17.

infliction of emotional distress claim.  Byrne was not simply a financier but had a "heavy hand" in the creation and distribution of the Film.  He took part in publishing defamatory statements about Dr. Coomer even after a point in time when he reasonably should have known of the death threats that Dr. Coomer had received due to the claims he rigged the 2020 election.  And he responded to this lawsuit, which included descriptions of death threats that Dr. Coomer had faced and a demand for retraction, by issuing a press release insisting the claims were true and re-releasing the Film at a public event in Naples.  This is outrageous conduct. *See Make Your Life Epic LLC*, 659 F.Supp.3d at 1206 (addressing similar conduct).

87.    Byrne's argument concerning exemplary damages is puzzling and unavailing.  Dr. Coomer did not make a claim for exemplary damages until after seeking leave to do so.  (Docs. 173, 175, 177, and 185).  As demonstrated above, Dr. Coomer can establish the underlying tort and requisite state of mind by clear and convincing evidence.  The issue of punitive damages should be submitted to the jury.

88.    Byrne contends that Dr. Coomer's request for an injunction must be dismissed because the injunctive relief sought would constitute an impermissible prior restraint.  Plaintiff merely "seeks permanent injunctive relief to remove all Defendants' defamatory statements upon final adjudication of the claims at issue." (Doc. 197, at ¶ 147).  Plaintiff does not seek a prior restraint on future statements. *See Miracle Surrogacy, LLC v. Monelllo-Fuentes*, No. 25-CV-21575, 2026 WL

251776, at *10 (S.D. Fla. Jan. 30, 2026) (where Plaintiff sought to have Defendants "remove or retrack the defamatory statements," Plaintiffs' requested injunction was not a prior restraint on speech and fell within the narrow exception recognized by Florida law); *see also Deligdish v. Bender*, No. 6:23-CV-417-DCI, 2023 WL 5016547, at *12 (M.D. Fla. Aug. 7 ,2023) (listing cases where the Middle District has held that narrowly tailored injunctions prohibiting speech already found to be defamatory by the jury are not invalid prior restraint when a judgment for monetary damages would not afford the plaintiff effective relief from a continuing pattern of defamation).

## VI.    CONCLUSION AND PRAYER

For the foregoing reasons, Plaintiff Eric Coomer, Ph.D. respectfully requests that the Court deny Defendant Patrick Byrne's Motion for Summary Judgment. Plaintiff further requests such other and further relief, both general and special, to which he may be justly entitled.

Respectfully submitted this 22nd day of July 2026.

> */s/ Charles J. Cain*
> Charles J. Cain, CO Atty No. 51020*
> ccain@cstrial.com
> Bradley A. Kloewer, CO Atty No. 50565*
> bkloewer@cstrial.com
> **CAIN & SKARNULIS PLLC**
> P. O. Box 1064
> Salida, Colorado 81201
> 719-530-3011
> 512-477-5011 (Fax)
> *Appearing via Special Admission

32

Ashley N. Morgan*
Texas Bar No. 24091339
Colorado Attorney No. 61713
amorgan@cstrial.com
**CAIN & SKARNULIS PLLC**
303 Colorado Street, Suite 2850
Austin, Texas 78701
512-477-5000/512-477-5011 (Fax)
*Appearing via Special Admission
**ATTORNEYS FOR PLAINTIFF**