| | |
|---|---|
| **COUNTY COURT, CITY AND COUNTY OF DENVER, COLORADO**<br>1437 Bannock Street, Courtroom 159<br>Denver, CO 80202<br><br>**PETITIONERS:**<br>ERIC COOMER, CAIN & SKARNULIS, PLLC, RECHT KORNFELD, P.C. et. al.<br><br>v.<br><br>**RESPONDENT:**<br>JOSEPH OLTMANN | Filed in the County Court<br>City and County of Denver, Colorado<br>JUL 06 2026<br>COUNTY COURT<br>CLERK OF COURT<br>City & County of Denver, Colo.<br>Certified to be full, true and correct copy of the original in my custody.<br>OCT 19 2026<br>SEAL<br>BY [signature]<br>DEPUTY CLERK |
| | **Case Number: 26W258**<br>**Division: Civil**<br>**Courtroom 159** |

**RULING REGARDING PERMANENT PROTECTION ORDER HEARING**

This matter came before the Court on May 8, 2026, for hearing on Petitioners' request for a Permanent Civil Protection Order pursuant to C.R.S. § 13-14-106. Petitioners appeared through counsel David Beller, Charles Cain, and Bradley Kloewer. Respondent appeared through counsel David Willson. The Court received testimony from Respondent, Bradley Kloewer, Charles Cain, James Allbee, and Patrick Hogarty. Having considered the witness testimony, admitted exhibits and applicable law, the Court enters the following findings of fact and conclusions of law:

## RELEVANT PROCEDURAL HISTORY

1. On March 6, 2025, Petitioners filed a Verified Motion for Civil Protection Order against Respondent.
2. That same day, the Court entered a Temporary Civil Protection Order requiring Respondent to remain at least one hundred yards from Petitioners and prohibiting direct and indirect contact, including communications directed to Petitioners through social media.
3. The Court conducted the permanent protection order hearing on May 8, 2026.

## FINDINGS OF FACT

### I. Nature of the Dispute

4. This case concerns whether Respondent's public commentary concerning the 2020 presidential election, alleged election misconduct, and related litigation constitutes protected political speech under the First Amendment, or instead, unprotected true threats. Through his podcast and social media platforms, Respondent has repeatedly accused Petitioners of participating in widespread election fraud, governmental corruption, and treason.

5. Petitioners contend that Respondent's communications evolved over several years into an escalating pattern of threats. They argue that his repeated references to treason, military tribunals, hanging, firing squads, blood, and violent punishment - viewed individually and collectively - constitute true threats and stalking by credible threat under Colorado law.

6. Respondent denies making any threat of unlawful violence. He maintains that his communications constitute protected political speech on matters of public concern and that, although his rhetoric is frequently provocative and hyperbolic, he consistently advocated for governmental investigation, prosecution, and punishment through lawful processes rather than unlawful acts of personal violence.

### II. Respondent and His Communications

7. Respondent hosts the podcast *Untamed Nation*, which is broadcast approximately five days each week on multiple platforms, including Rumble, Spotify, and Apple Podcasts. Respondent testified that the program reaches approximately 300,000 listeners each month and primarily addresses election integrity, governmental corruption, and judicial conduct.

8. Respondent testified that he became convinced, following a conference call in September 2020, that Petitioner Dr. Eric Coomer participated in efforts to influence the 2020 presidential election. The Court makes no findings regarding the truth or falsity of those allegations. Those issues are not before the Court. The Court does find, however, that Respondent sincerely holds those beliefs, and those beliefs provide the context in which the challenged communications were made.

9. Respondent acknowledged that he routinely employs inflammatory language when discussing public officials and perceived political adversaries. He admitted referring to Petitioners and others as "demons," "evil," and similar derogatory terms.

10. In both the challenged communications and his testimony, Respondent consistently characterized his references to "treason," "tribunals," "consequences," and similar terms as calls for legal accountability rather than unlawful violence.

11. Respondent further testified that he has never directed his audience to commit unlawful acts and is unaware of any instance in which his statements resulted in unlawful conduct by third parties.

12. Respondent testified that he and his family have themselves been the subject of threats and safety concerns, including reports of armed individuals appearing near his residence. He testified that these experiences informed his public statements regarding personal security and his descriptions of being "ready" to defend his family if confronted at his home.

13. Respondent testified that he concludes each podcast by encouraging listeners to "pray, stand, speak and act," followed by prayer. He further testified that he encourages political action through lawful means rather than becoming "the very thing that people are fighting against."

**III. Overview of Challenged Communications**

14. Petitioners introduced numerous exhibits spanning 2020 through 2026 consisting of Respondent's podcasts, social media posts, and other public communications. Because the central issue before the Court is whether Respondent's statements constitute protected speech or unprotected true threats, the Court includes extensive quotations from the challenged communications. The precise language used, the context in which the statements were made, and the progression of the communications over time, are all relevant to the Court's constitutional analysis.

15. The exhibits contain repeated references to treason, military tribunals, hanging, firing squads, blood, consequences, and punishment. Some statements specifically identify Petitioners or their counsel by name; others concern broader political issues or public officials not involved in this case.

16. The Court does not evaluate any individual statement in isolation. Rather, it considers each communication in light of its content, context, chronology, intended audience, surrounding circumstances, and relationship to Respondent's broader course of conduct.

## IV. Communications Specifically Referencing Petitioners

### A. Communications (2020–2021)

17. Petitioners introduced a Parler post dated December 5, 2020 (Exhibit 10), which they contend depicts Dr. Coomer's residence. Respondent initially testified that he had "no idea" if he created the post and later denied it accurately reflected anything he had posted. Respondent further testified that he unsuccessfully attempted to obtain records from Parler concerning the post, but it no longer existed.

18. The Court does not credit Respondent's testimony that he had "no idea" whether he created the post. Respondent's name appears at the top of the post. Mr. Kloewer testified that Respondent previously acknowledged during a deposition that he could have made the post. The Court also notes, however, that the alleged post was made more than five years before the hearing, and no evidence was presented that it was subsequently disseminated or resulted in any further action.

19. In a December 14, 2020, podcast (Exhibit 11), Respondent stated: "I have people in Salida that are literally following him around and saying, all right Joe, here is where he is next, here is where he is at next, he is staying in this basement, he is at his house now." Respondent acknowledged making the statement but denied directing anyone to follow or surveil Dr. Coomer. He testified that individuals living in Salida independently contacted him after encountering Dr. Coomer and voluntarily shared information regarding Dr. Coomer's whereabouts. Respondent testified that he never did anything with the information about Dr. Coomer's location or activities.

20. In a December 16, 2020, podcast (Exhibit 12), Respondent stated: "I haven't even started giving out the information that I have on Dr. Coomer. I found his bank accounts." Respondent acknowledged making the statement but testified that he never publicly disclosed any financial information. No evidence was presented that Respondent disclosed or otherwise disseminated Dr. Coomer's bank account information.

21. In a May 3, 2021, podcast (Exhibit 13), Respondent stated: "I have pictures of Coomer in other places. It's really disturbing, actually." Respondent did not specifically recall the statement but did not dispute the accuracy of the recording.

22. Petitioners also introduced an October 14, 2021, social media post in which Respondent wrote, "It's called the Constitution for a reason. Piss up a rope, you're trash. Coomer's a liar and his attorneys are leftist terroristic lying trash. Truth is hard to swallow for the devil."

23. Respondent testified that, during this period, he believed he was assisting investigators in alleged election misconduct and viewed his commentary as exposing governmental wrongdoing.

**B. 2025 Communications**

24. Petitioners introduced multiple exhibits from 2025 reflecting Respondent's continued public commentary regarding Petitioners and related litigation.

25. In a September 4, 2025, podcast (Exhibit 4 and 32), Respondent stated: "And you have these smug pieces of trash like Sheila Reiner, who do the biddings of people like…Eric Coomer… Brad Kloewer… Charlie Cain… I'm going to do a whole show just on the lawyers for Coomer. They want to post my address and do all that stuff, I'm going to post their stuff. Let's post it all so you all can reach out and talk to these feckless, cowardly, lying sons of bitches…" Respondent testified that the statement reflected his belief that Petitioners and their attorneys were complicit in crimes committed against the country. No evidence was presented that Respondent thereafter posted Petitioner's addresses or any other addresses.

26. In an October 1, 2025, podcast (Exhibit 26), Respondent proposed "a cage match" with Charlie Cain or Brad Kloewer and stated that Mr. Kloewer would initially be given a bat, "but when I take that bat away from you, I'm going to make you eat it." Respondent acknowledged proposing a cage match, stating, "I did. That would be funny. I mean, in hyperbolic speech, probably that would be fun." He did not specifically recall stating he would make Mr. Kloewer "eat" the bat but testified that the proposed event was intended as a charity fundraiser.

27. In an October 2, 2025, podcast (Exhibit 5), Respondent stated: "I sent an email to the lawyers for Eric, because I had to send a check…Not only is Eric Coomer complicit, but you're complicit in the crimes that were committed, and I'm not going to stop until you pay… One way or another, you're going to pay." Mr. Kloewer testified that this statement was made shortly after Respondent had been ordered to pay a fee in the defamation case. Respondent testified that,

for the preceding six years, Petitioners have repeatedly lied about him and that his family has lived in fear of retaliation as a result.

28. In an October 7, 2025, podcast (Exhibit 14), Respondent stated: "Judges. Governors. Mayors. You want to know where I think the highlight should be, where we should have the red light on it? It should be on the forehead of Eric Coomer, John Poulos, Lord Malloch Brown, the private equity firms that actually funded them, the lawyers of Eric Coomer. That's where it should be placed. 100%."

29. Respondent testified that his reference to a "red light" was intended to signify heightened scrutiny or investigative focus, not a weapon, targeting device, or call for violence.

30. The Court finds the October 7, 2025, statement presents the closest question in the record. Unlike many of Respondent's statements, which are framed in terms of prosecution, tribunals, or legal consequences, this statement employs imagery that could reasonably be understood as referring to physical targeting.

31. The Court nevertheless considers the statement in its full context. It was directed at numerous individuals and entities, contained no express directive that anyone take action, and was not accompanied by planning, instructions, or any call for immediate conduct. The statement also appeared within Respondent's broader pattern of rhetorical exaggeration and political commentary. The Court therefore evaluates the statement as part of Respondent's overall course of communication and not in isolation, consistent with the totality-of-the-circumstances framework.

**C. 2026 Communications**

32. The evidence also includes several communications from 2026 reflecting Respondent's continued public commentary concerning Dr. Coomer, the other Petitioners, and related litigation.

33. In a February 10, 2026, podcast (Exhibit 17), Respondent posted an image of David Beller, identified him as Dr. Coomer's counsel, accused him of participating in an alleged fraud scheme, and stated: "I want them arrested for treason, I want them tried for treason. When found guilty, I want them hanged…"

34. Respondent testified that his statements about being tried for treason and facing the consequences refer to what he believes to be the lawful punishment for treason following criminal conviction.

35. In a March 3, 2026, social media post (Exhibit 6), Respondent alleged Dr. Coomer participated in widespread voting fraud and asserted that Dr. Coomer's attorneys were complicit in the alleged conduct. The post concluded: "Only they did not count on people like me who frankly now want blood. I want them all to pay for treason and stealing the voice of the people…I want them to pay and pay they will…Free Tina Peters. No matter what it takes, bring her home and force the arrest of these seditious demons." Respondent testified that the post reflected his views regarding election misconduct and litigation involving Tina Peters.

36. In a March 6, 2026, post (Exhibit 22), Respondent wrote: "I have never threatened any of them. I have said they will go to prison and they should be tried for treason…I guess that does come with the consequences." The post reiterated allegations of corruption involving Dr. Coomer, members of the judiciary, and other public officials before concluding: "I'm going to seek justice through the injustice system…let's see how this goes."

37. The Court finds that, like Respondent's earlier communications, the 2026 statements consistently frame the alleged wrongdoing in terms of arrest, prosecution, trial, and punishment for treason, while at the same time employing increasingly inflammatory rhetoric, including references to "blood," "seditious demons," and severe consequences.

38. The Court considers these communications within the broader context of Respondent's course of conduct, including statements directed at Petitioners as well as statements concerning public officials and political issues more generally.

39. The Court heard insufficient evidence to make findings regarding any rulings entered by the federal court concerning Respondent's appearance at a deposition in a separate litigation. The Court therefore makes no findings on that issue.

**V. Communications Not Specifically Targeting Petitioners**

40. Petitioners also offered evidence of Respondent's public statements that did not specifically reference Petitioners. The Court considers these communications as contextual evidence bearing on the nature and progression of Respondent's rhetoric over time.

41. In a December 29, 2020, podcast (Exhibit 47), Respondent discussed anticipated unrest surrounding January 6, 2021, and stated: "We're ready… If Antifa shows up, we're going to kick their teeth in." Respondent asserted that his statements were not hypothetical.

42. During a November 17, 2021, podcast discussing the Kyle Rittenhouse case (Exhibits 42–43), Respondent stated: "I want a thousand Kyles to take to the street." The same broadcast also included references to public unrest, pitchforks, gallows, and other violent imagery in the context of the political conflict.

43. In a June 20, 2024, podcast (Exhibit 30), Respondent stated: "And I'm going to tell you something else. A large part of me does want blood. I want blood. Am I proud of that? No. I know vengeance belongs to God, but man it has been a hard four years."

44. In a July 30, 2025, podcast (Exhibit 7), Respondent stated: "President Trump should want absolute blood. He should. I want blood. I want blood. I want consequences." Respondent testified that these comments arose during a broader political discussion and were not directed at Petitioners.

45. Respondent was asked if he wanted people to be hung. He responded, "Did I say that I wanted you to be hung? No. Did I say that I wanted Brad to be hung? No. Did I say I want Cain to be hung? No. No, no, no. I said people who betray the country and commit treason should be hung. It's literally in the Constitution. It's law. If you don't like law, change it."

46. In an August 21, 2025, podcast (Exhibit 27), Respondent stated: "The only thing that has kept the people that are hurting me safe is my restraint in recognizing there is a system and I have to play within it.... all I am waiting for is for that system to disappear... I am done with all of it." Respondent testified that the statement reflected frustration with existing institutions rather than an abandonment of legal remedies.

47. In a related segment from the same broadcast (Exhibit 28), Respondent stated: "So we're prepared for violence...we don't seek it. We don't seek it."

48. In a September 5, 2025, social media post (Exhibit 31), Respondent wrote: "we are coming for the demons and clowns. Wait for the knock, hide in your basement, accountability is coming and with the sharp edge you deserve."

49. In an October 7, 2025 podcast, Respondent stated that the judge in the Tina Peters case "should actually face a firing squad. He committed treason." Respondent acknowledged the statements, but testified if someone is found guilty of treason, the penalty is death.

50. On October 9, 2025, Respondent stated in a podcast (Exhibit 15), "Let me tell you what you've got to do. You ready? You've got to arrest the 50,000 people, including judges, attorneys, congressmen, governors, mayors, secretaries of state, attorney generals. Just grab 'em

on up, take 'em all down to a military tribunal, and then have a quick trial. And have them either serve the rest of their life in a federal prison or face a firing squad, which frankly I prefer because it wasn't a victimless crime what happened in our country."

51. In an October 16, 2025, podcast (Exhibit 2), Respondent stated: "I carry a gun everywhere I go… and I am prepared to use it." Respondent testified that he was referring to lawful firearm ownership and personal self-defense, not to Petitioners or any other identified individual. He further testified that he owns firearms, his business involves firearms sales, and he encourages firearm ownership for lawful self-defense in what he perceives to be societal instability. Respondent acknowledged holding or displaying a firearm on his podcast "many times" because it helps generate revenue for his store.

52. Respondent acknowledged that on February 28, 2026, he posted, "I need everyone to go out and buy guns and ammo right now." He testified that the post followed the Iranian bombing activity and reflected his concern about possible retaliation against the United States.

**VI. Petitioners' Witness Testimony**

53. Bradley Kloewer testified that he has represented Dr. Coomer since December 2020.

54. Mr. Kloewer testified that his firm routinely monitors Respondent's public communications, including his podcasts and social media postings.

55. Mr. Kloewer testified that Respondent has referenced Petitioners, their counsel, and their law firms in his public communications while frequently referring to them using derogatory terms, including "trash" and "demons."

56. Mr. Kloewer further testified that Respondent regularly accuses Petitioners and others of treason and repeatedly states that treason is punishable by death.

57. According to Mr. Kloewer, Respondent's communications occur frequently, sometimes multiple times per week and, on occasion, multiple times in a single day.

58. Mr. Kloewer testified that Respondent's rhetoric has increased both in frequency and intensity over time, particularly in connection with ongoing litigation involving Petitioners.

59. Mr. Kloewer testified that, as a result of Respondent's communications, Petitioners have implemented additional security measures, altered their security practices, and reported their concerns to law enforcement.

60. Mr. Kloewer also testified that counsel sent Respondent a cease-and-desist letter in October 2025 expressing concern that Respondent's rhetoric had become increasingly threatening. According to Mr. Kloewer, Respondent nevertheless continued publishing podcasts and social media posts thereafter.

61. Charles Cain testified that he is the managing partner of Cain and Skarnulis and that members of his firm have expressed concern regarding personal safety in light of Respondent's public statements.

62. Mr. Cain further testified that the firm incurred expenses for additional security in response to those concerns.

**VII. Respondent's Witness Testimony**

63. James Allbee testified as an expert in threat assessment. He described generally accepted methodologies used to evaluate potential threats, including the assessment of escalation patterns, behavioral indicators and relevant associations.

64. Patrick Hogarty testified that he serves as the producer of Respondent's podcast and is present for most recordings.

65. Mr. Hogarty testified that the podcast principally addresses political corruption, election integrity, and related issues.

66. Mr. Hogarty also testified that Respondent has expressed concern regarding threats to his own safety and the safety of his family.

67. The Court has considered all of the admitted exhibits and testimony, including communications specifically identifying Petitioners, communications directed toward broader political subjects, the testimony concerning Respondent's intent and purpose, and the testimony concerning Petitioners' perception of the communications. The foregoing findings are intended to summarize the evidence most relevant to the issues before the Court and are not intended as an exhaustive recitation of every statement or exhibit admitted at hearing.

## CONCLUSIONS OF LAW

**I. Applicable Law**

68. Pursuant to C.R.S. § 13-14-106(1)(a), a civil protection order shall be made permanent if the Court finds, by a preponderance of the evidence, that the respondent has committed acts

constituting grounds for issuance of such an order and that, unless restrained, the respondent will continue to commit such acts or acts designed to intimidate or retaliate against the protected person.

69. C.R.S. § 13-14-104.5(1)(a) authorizes issuance of a civil protection order to prevent assaults and threatened bodily harm, domestic abuse, emotional abuse of the elderly and at-risk adults, sexual violence, and stalking.

70. C.R.S. § 13-14-101(3) defines stalking by reference to C.R.S. §18-3-602, which includes repeated acts of following, approaching, contacting, or placing a person under surveillance, or repeated communication that would cause a reasonable person to suffer serious emotional distress. Stalking may also include a credible threat made to another person in connection with repeated communication.

71. Harassment under C.R.S. § 18-9-111 is not itself an enumerated basis for issuance of a civil protection order under § 13-14-104.5. However, conduct constituting harassment may also satisfy statutory grounds where it independently meets the definition of stalking, threatened bodily harm, or another enumerated basis. *See In re Wiggs,* 566 P.3d 1032 (Colo. App. 2025). Likewise, menacing under § 18-3-206 is not an independent statutory basis, but may overlap with conduct constituting threatened bodily harm.

**II. First Amendment Principles**

72. The First Amendment, applicable to the States through the Fourteenth Amendment, guarantees the right of free speech. These protections are broad but not absolute, and certain categories of speech fall outside First Amendment protection. *Virginia v. Black*, 538 U.S. 343 (2003).

73. "'True threats" are not protected speech. They include statements in which the speaker "means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Id.* at 359.

74. The word "true" in the term "true threats" distinguishes protected speech – such as hyperbole, jests, or other statements - from statements that, in context, "convey a real possibility that violence will follow." *Counterman v. Colorado*, 600 U.S. 66, 74 (2023).

75. Advocacy of force or violence, standing alone, does not remove speech from First Amendment protection. *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 927 (1982).

Such advocacy is protected unless it is "directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 448 (1969).

76. Abstract advocacy of force is distinguishable from "preparing a group for violent action and steeling it to such action." *Noto v. United States*, 367 U.S. 290, 298 (1961)(distinguishing between the statement of an idea which may prompt its hearers to take unlawful action and advocacy that such action be taken).

77. Whether speech constitutes a true threat requires consideration of the totality of the circumstances, including content, context, speaker, audience, whether speech is directed at identifiable individuals, and whether the communications reflect escalation into directive or operational conduct.

78. Accordingly, the Court must distinguish between (1) advocacy of lawful consequences within the judicial system, (2) rhetorical hyperbole or exaggerated expressions of anger, and (3) statements communicating a serious intent to engage in unlawful violence.

**III. Application to Statements Referencing Petitioners**

79. The record reflects repeated references by Respondent to Petitioners and related individuals in connection with allegations of election misconduct, fraud, and wrongdoing.

80. Over an extended period of time and across multiple platforms, Respondent used language including "treason," "tribunals," "hanging," "firing squad," "blood," and "consequences."

81. Such language is serious and, when directed at identifiable individuals, may reasonably cause alarm. However, the constitutional inquiry is whether, in context, the statements communicate a serious expression of intent to commit unlawful violence, as opposed to advocacy of accountability through legal or political processes.

82. The record reflects that Respondent repeatedly framed punishment in terms of prosecution, tribunals, arrest, and legal consequences. His recent statements explicitly reference operating within or through existing systems, including "I'm going to seek justice through the injustice system. Let's see how that goes." On March 3, 2026, he called for "the arrest of these seditious demons." Earlier communications similarly acknowledged "recognizing there is a system and I have to play within it."

83. There is no evidence that Respondent identified a specific unlawful act to be carried out against Petitioners or expressly directed others to engage in unlawful violence.

84. There is no evidence of instructions for immediate action or conduct suggesting preparation, coordination, or facilitation of violence.

85. The record contains no evidence that any third party interpreted Respondent's statements as instructions to commit violence, nor evidence of resulting acts or attempts to violence.

**IV. The "Red Light" Statement (October 2025)**

86. The Court is particularly concerned with Respondent's October 2025 statement referencing placing a "red light" on the forehead of Petitioners and others. Standing alone, the statement evokes imagery that may reasonably be understood as targeting.

87. The Court therefore evaluates the statement separately within the totality of the circumstances.

88. The statement does not expressly direct unlawful action or identify any specific act to be carried out. It references multiple individuals and entities, suggesting generalized rhetorical expression rather than individualized operational targeting.

89. The statement was not accompanied by instructions, coordination, or subsequent conduct indicating escalation or preparation for violence.

90. Considering the statement in context and in totality of Respondent's other communications, the Court finds it constitutes rhetorical excess, albeit troubling, rather than a serious expression of intent to commit unlawful violence.

**V. Contextual Communications Not Specifically Targeting Petitioners**

91. The record includes additional communications not specifically referencing Petitioners, which the Court considers for contextual purposes.

92. These communications contain references to political conflict, violent imagery, and hypothetical unrest. While relevant to tone and context, they do not independently establish targeting or intent towards Petitioners.

93. The record contains no evidence of logistical instructions, operational planning, or coordination with third parties to harm Petitioners or any third party.

94. The record likewise contains no evidence that any specific act of violence occurred or was attempted as a result of Respondent's communications.

95. Respondent's statements about being "prepared" or "ready" are conditional in nature, often premised on hypothetical institutional breakdown rather than immediate unlawful action. *See Watts v. United States*, 394 U.S. 705 (1969)(statements during a political debate expressly made conditional on future event were protected speech).

**VI. True Threat Analysis**

96. Although Respondent's language is often extreme, and could be perceived as offensive and even alarming, severity of rhetoric alone will not remove speech from First Amendment protection. *See Texas* v. *Johnson,* 491 U.S. 397, 414 (1989). The issue before the Court is whether Respondent's communications constitute "true threats" that fall outside the protections of the First Amendment.

97. The record contains no evidence of calls or directives for immediate unlawful action, no evidence of preparatory conduct, and no evidence of violence or attempted violence resulting from Respondent's communications.

98. There is no evidence that Respondent expressly directed others to engage in unlawful conduct or violence against Petitioners. *See Claiborne Hardware,* 458 U.S. at 927.

99. Considering the record as a whole, the Court finds that the communications do not constitute a serious expression of intent to commit unlawful violence toward Petitioners.

100. Under *Counterman*, criminal liability for true threats requires at least recklessness as to the threatening nature of the communication. Because the Court finds that the statements at issue do not constitute true threats, it need not reach the mens rea issue in this civil context.

101. The Court recognizes that Petitioners testified regarding their subjective fear and the steps taken in response to Respondent's communications, including implementation of additional security measures and contact with law enforcement. The Court further acknowledges the seriousness with which Petitioners experienced Respondent's statements and the understandably concerning nature of repeated references to violence, tribunals, the death penalty, and punishment. However, under controlling First Amendment standards governing true threats, the existence of subjective fear, even when sincerely and reasonably held, is not sufficient to establish a constitutional true threat. The Court must instead determine whether the

communications, viewed in their full context, constitute a true threat or stalking as defined by Colorado law.

102. Because the Court does not find that Petitioners have established by a preponderance of the evidence that Respondent's communications constitute "true threats" or stalking as defined by Colorado law, the statutory basis for a permanent protection order is not satisfied. Petitioners also sought relief under the "threatened bodily harm" basis in C.R.S. § 13-14-104.5(1)(a). For the reasons set forth above, the Court finds the record does not establish a credible threat of unlawful bodily harm sufficient to satisfy that statutory ground.

**THEREFORE, IT IS ORDERED THAT:**

The Temporary Protection Order issued against Respondent is vacated and the case is dismissed.

Dated this 6th day of July, 2026.

BY THE COURT

Hon. Marguerite Conboy

COUNTY COURT SEAL THE CITY AND COUNTY OF DENVER COLO.