**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

ERIC COOMER, Ph.D.,
Plaintiff

v.

Civil Action No. 8:24-cv-00008-TPB-SPF

PATRICK BYRNE, et al.,
Defendants

---

**EXHIBIT 1**

---

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ERIC COOMER, Ph.D.,

Plaintiff,

Civil Action No.

vs.

8:24-cv-00008-TPB-SPF

PATRICK BYRNE, et al.,

Defendants.

VIDEOTAPED DEPOSITION OF STEVEN LUCESCU

February 18, 2025 - 9:15 a.m.

1075 Peachtree Street NE

Suite 3625

Atlanta, Georgia

J. David Brown, B-1401

INDEX OF EXHIBITS


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | 2/17/2021 "The Big Rig" - Investor's Agreement | 31 |
| Exhibit 2 | video clips | 82 |
| Exhibit 3 | 5/12 and 5/13/2021 email chain between Messrs. Byrne and Lucescu | 89 |
| Exhibit 4 | 12/9/2020 email from Mr. Lucescu | 110 |
| Exhibit 5 | 9/28/2021 email from Mr. Lucescu | 115 |
| Exhibit 6 | screenshot of Mr. Flynn from film | 118 |
| Exhibit 7 | screenshot of Mr. Byrne from film | 122 |
| Exhibit 8 | 3/26/2021 Halderman Antrim County report | 152 |
| Exhibit 9 | 5/6/2021 text message from Mr. Lucescu to Mr. DePerno | 155 |
| Exhibit 10 | 11/10/2020 email chain from Mr. Oltmann to Ms. Scott | 171 |
| Exhibit 11 | 5/1/2021 text chain between Messrs. Lucescu and Oltmann | 177 |
| Exhibit 12 | 8/1/2021 text chain between Messrs. Lucescu and Oltmann | 181 |
| Exhibit 13 | Parler post | 199 |
| Exhibit 14 | marketing deck | 205 |
| Exhibit 15 | 4/13/21 Memorandum of Understanding | 218 |
| Exhibit 16 | 5/24/2021 email chain between Messrs. Richards, Joe Flynn, Lucescu, and Buffalo Registered Agents | 225 |
| Exhibit 17 | 6/22/2021 email from Joe Flynn to Mr. Hanks | 228 |





| | | |
|---|---|---|
| Exhibit 18 | 6/16/2021 Limited Liability Company Operating Agreement for The Deep Rig Movie LLC | 229 |
| Exhibit 19 | 8/4/2021 text chain between Messrs. Hall and Lucescu | 233 |
| Exhibit 20 | 8/10/2021 text chain between Messrs. Heard and Lucescu | 237 |
| Exhibit 21 | 7/23/2021 text chain between Messrs. Joe Flynn and Lucescu | 245 |
| Exhibit 22 | 7/28/2021 text chain between Messrs. Byrne and Lucescu | 251 |
| Exhibit 23 | 8/31/2021 email from Mr. Lucescu | 261 |
| Exhibit 24 | 8/2/2021 text chain between Messrs. Joe Flynn and Lucescu | 264 |
| Exhibit 25 | 6/28/2021 text chain between Messrs. Issa and Lucescu | 267 |
| Exhibit 26 | 7/23/2021 Assignment and Royalty Agreement | 271 |


INDEX TO EXAMINATIONS


| | PAGE |
|---|---|
| By Mr. Kloewer | 5 |




APPEARANCES OF COUNSEL:

On behalf of the Plaintiff:
BRADLEY A. KLOEWER, ESQ.
CHARLES J. CAIN, ESQ.
Cain & Skarnulis PLLC
327 East First Street
Salida, Colorado 81201
719.530.3011

On behalf of Steven Lucescu:
LAURIN H. MILLS, ESQ.
CLARK FONDA, ESQ.
Werther & Mills, LLC
800 Connecticut Avenue NW
Suite 300
Washington, D.C. 20006
202.599.5006

On behalf of The America Project:
CHRISTOPHER W. DEMPSEY, ESQ. (via Zoom)
Dempsey Law, PLLC
50 North Laura Street
Suite 2500
Jacksonville, Florida 32202
904.760.6272

On behalf of Patrick Byrne:
ALFRED D. CARRY, ESQ. (via Zoom)
Dickinson Wright LLP
1825 Eye Street NW
Suite 900
Washington, D.C. 20006

Also Present:
ALEXIA SHARP (via Zoom)
ERIC LUCAS, Videographer



PROCEEDINGS

THE VIDEOGRAPHER: Today's date is February the 18th, 2025 and the time is approximately 9:15 a.m. This will be the videotaped deposition of Steven Lucescu.

Would counsel present and on the Zoom please identify themselves for the record.

MR. KLOEWER: Here on behalf of Plaintiff Dr. Eric Coomer, I'm Brad Kloewer. I'm joined by co-counsel Charlie Cain.

MR. MILLS: Laurin Mills and Clark Fonda on behalf of Mr. Lucescu.

MR. DEMPSEY: Christopher Dempsey on behalf of The America Project, Inc.

MR. CARRY: And Alfred Carry on behalf of Patrick Byrne.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness. Thank you.

STEVEN LUCESCU

having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. KLOEWER:

Q Good morning, Mr. Lucescu.

A Good morning.
Q My name is Brad Kloewer. I'm counsel for Dr. Eric Coomer. We met briefly before the deposition this morning. I'll be taking your deposition today.

Before we proceed I believe we need to get some representations on the record; is that correct?

MR. MILLS: We just did.

MR. KLOEWER: All right. We'll proceed then.

MR. CARRY: No. I'm sorry, this is Alfred Carry on behalf of Patrick Byrne. There is an objection that I just want to state for the record. Today's deposition was noticed by Plaintiff, this deposition of Mr. Lucescu. And as we indicated to Plaintiff's counsel, there is going to be a change of counsel on behalf of Patrick Byrne meaning myself, Alfred Carry, and my current co-counsel, Bob Driscoll, are exiting the case.

I understand that Plaintiff's counsel has unilaterally excluded the transitioning attorney, her name is Stephanie Lambert, from being able to merely attend this deposition, and I object to that. I object to Plaintiff



unilaterally excluding her from this deposition. There's no basis in the Federal Rules of Civil Procedure for unilaterally excluding a party's chosen counsel absent a court order or a properly granted protective order under Rule 26(b).

Depositions are not closed proceedings. They're open to the parties and their counsel unless restricted by such a court order or rule. No such court order or rule exists in this case. And as I indicated prior, she wouldn't be conducting any examination, she would merely be attending.

The fact that her pro hac vice motion is pending does not bar her attendance. Indeed like I understand that courts routinely allow attorneys to participate while their application is under review. Although we weren't asking for her to be able to participate, just merely attend, which we thought would be practical in light of her entering the case as successor counsel.

To my knowledge I haven't heard any legitimate objection that provides valid grounds to exclude her, and I want to note this issue for the record so that Dr. Byrne can seek any appropriate remedy.



MR. KLOEWER: In response to that, Mr. Carry indicated to us an intent to substitute counsel more than seven weeks ago on January 6th. Since that time there have been numerous emails between counsel asking why substitution hadn't been filed indicating ongoing delays with respect to scheduling Mr. Byrne's deposition. We have still not received a response or deficiency notice from Mr. Byrne to written discovery that was issued many months ago, all of those on the basis of this pending substitution of counsel.

We have indicated our opposition to Ms. Lambert's entry of appearance on this case. When Mr. Carry states that he hasn't heard a basis for that objection, it is because Ms. Lambert has not filed a pro hac motion. There's no motion pending in the district court. Had she done so, we would have had the opportunity to seek a protective order and to object to her admission to this case.

The bases for that are numerous including, but not limited to, her recent disqualification as counsel in the Dominion case which is very closely related to this one wherein the court noted a series of egregious discovery



abuses and specifically highlighted that her conduct had put Dominion employees at risk of their safety. Our client has been the subject of threats which is the basis of this lawsuit.

We are very concerned about Ms. Lambert's participation in this case given her history of disregarding court orders, flouting discovery protocols, and putting Dominion employees at risk through her own conduct. We are also concerned that Ms. Lambert is facing criminal charges herself as a codefendant with one of the key witnesses in this case, Matthew DePerno in Michigan.

She's also had pro hac admission applications denied in the state of Pennsylvania given misrepresentations about her disciplinary history to the court in Pennsylvania. In that instance the court noted that had she been admitted, she would have shared in sanctions that were issued against her intended co-counsel in that proceeding.

Given the foregoing and, as I indicated, there are other bases for our objection as well, we demand an opportunity to be heard by the court before allowing Ms. Lambert to enter an appearance

in this case. And the extreme delay of more than 40 days until just last night when we got an email at 4:18 from Ms. Lambert which attached an entry of appearance which, again, has not actually been filed with the court. So there's no indication that she actually is counsel nor have we had an opportunity to be heard.

There's no prejudice to Mr. Byrne or his eventual counsel should Ms. Lambert be admitted that would result from simply having access to review the deposition transcript and the video which will of course be provided to Byrne's current counsel of record. So we intend to proceed with the deposition and we'd like to get started.

BY MR. KLOEWER:

Q Mr. Lucescu, I'd like to start by getting a little bit into your background before we get into the specific substance of this dispute. Can you tell me what do you do for a living?

A I have worked in the film industry since 1978, so I produce, direct, and perform action sequences in these films.

Q All right. Let's break that down a little bit. You produce, direct, and perform

Page 10

action sequences. How many films have you produced?

A Produced, I believe five or six.

Q And what does -- can you give me sort of a broad overview. And this will be clear throughout the deposition, I am not a member of that industry, so you may have to explain things to me like I'm five years old because it is all fairly new to me. What does production of a film entail?

A As far as I know, there is no clear definition for it. It is varied amongst every film I have worked on, over a thousand different productions in all, and not one of them is identical.

Q Can you give me sort of a broad strokes view of what generally a producer is expected to do or what you understand their role to be in just broad terms.

A When I am hired on any of the films that I do, we enter an agreement to produce that sequence, that film, that segment, meaning we have to achieve a goal namely by a director or studio to put something on film.

Q So that sort of leads into my next question. And that's a pretty broad explanation

Page 11

you have given there. Who gives the instruction to the producer, who gives -- creates that vision that you are hired to create?

A Again, it is varied. It depends on -- I have worked on films that are driven by an actor who wants to do a film they have a passion project for, and they -- we take all the directions from that actor. Other ones we have studio heads, other ones we have people that finance the film. There's executive producers that make decisions based on the overall structure of the film. There's no one answer I can give you that will satisfy that question.

Q Maybe it would help to delineate a bit what the role of the director is. In my mind the director and producer seem to have a lot of authority in shaping the film. Would you agree with that?

A They have a lot of input based on whatever decisions need to be made. Usually it is the director's vision that is trying to be achieved.

MR. DEMPSEY: This is Christopher Dempsey attending remotely by prior agreement of counsel. We cannot see the witness on video anymore.

Page 12

THE VIDEOGRAPHER: The time is 9:25. We are going off the video record.

(Recess 9:25-9:43 a.m.)

THE VIDEOGRAPHER: 9:43 we're back on the video record.

BY MR. KLOEWER:

Q All right, Mr. Lucescu, we are back on the record. We had some technical difficulties to resolve there. While we were off the record I realized I got a bit distracted in the beginning, so I'd like to just go back very briefly and just go through some ground rules that will hopefully ease the deposition as we go through. Have you ever had your deposition taken before?

A No.

Q Well, I'm sure your counsel helped prepare you for this, and I don't want to hear about any of your communications with your counsel throughout today. I'm sure one of them will object if I overstep in that regard. But a few important things to remember.

Number one, David is my right here is the most important person in this room. He's taking down every word we say, so it is important that you and I not speak over each other. It's possible as

Page 13

we proceed you will anticipate a question I'm going to ask and start answering it. Just ask you let me finish my questions so we have a clear record because there is going to be a document that reflects everything that we discuss here today.
There's a lot to go through as you can imagine from the stack of documents to my left. But this is not a marathon. If you need a break, just let me know, we can take a break. We'll take time for lunch, go to the bathroom, whatever. The only thing I ask is that if there's a question on the table, we don't take a break then, finish a topic before we proceed.
If I ask you anything that you don't understand or that isn't clear, just let me know and I will rephrase my question. If you answer the question, I'll assume you understood it how I meant. So please ask me to clarify if something is not clear.
A Okay.
Q And we have already discussed the video exhibits a couple of times. I don't need to go over that again. I believe that's the bulk of the ground rules, so we can proceed from there.
All right. Before all of that we were

Page 14

talking about the different roles that folks play in creating a film. You talked a little bit about producers, and we were just starting to talk about what a director's role is. Can you give me a little more context for what a director typically does. Understanding that every project is different, but in broad strokes what is a director's role in a film?
A Well, typically a director is hired to get whatever the concept of the film is into a finished product. He has an idea of whether he's following a script, he could be part of the writing aspect of it or the rewriting aspect of it, alters the script in whatever manner he sees fit for his vision. And then he takes all the footage that's assembled during the course of the film and he works with the editors to produce a final film.
Q And going back to my prior question, how is a director's role distinct from a producer's? What are some things a director does that a producer does not do for example and vice versa?
A Director is mainly the creative aspect of it, creates the actual product, where the producer does all the aspects of getting it onto film. So hiring from car services to pick actors up to

Page 15

getting camera equipment there, if a camera malfunctions how do we get a new one and how do we fix the problem that's coming up in order to keep the day flowing and not sitting there doing nothing.
Q I see. And what role does a producer have in determining the content of a film, a finished product?
A Well, in my experience I don't believe they have much control of the content. They're hired to, as I said, put things on the actual camera to get it on film. It is usually the director that directs the content of what that is going to be.
Q And does a script, is that typically the document you rely on for determining what the content of a film will be?
A Correct.
Q Have you ever been involved in any films that did not involve a script?
A I don't believe I can answer that with a yes or no.
Q It sounds like probably no.
A Yeah. It is hard because a script would be a broad term. Usually a script would be a

Page 16

document that you would pick up physically and have from start to finish what it is. Other scripts are just ideas one after another.
Q Was there a script for The Deep Rig?
A There was.
Q And have you produced that script in this case?
A Roger Richards is the director, and he basically is the one who had it since he's the one in control what was being asked of each person.
Q We'll talk about Mr. Richards a bit more. But since you mentioned him, do you know where Mr. Richards is today?
A I do not. I have not talked to him in years.
Q When was the last time you spoke with him?
A I would have to guess, but it would be sometime in late 2021 or early 2022.
Q Are you familiar with any of the work that he's produced since then or --
A No.
Q -- if he has?
A No.
Q Do you have any shared acquaintances that

Page 17

might know of his whereabouts?
A No.
Q Do you know if he's alive?
A I do not.
Q You haven't contacted Mr. -- well, have you spoken with Mr. Richards regarding this lawsuit?
A No, not at all.
Q Is he aware this lawsuit has been filed?
A No idea.
Q And just to be sure I wrap this up, do you know anyone who would know where Mr. Richards is today?
A I do not believe so. I was asked these questions during questions that I believe you gave me, and I gave all information I had for anybody to do with Roger, the addresses, the phone numbers, the emails that I had for him, and a couple of his partners at his company. That's all I have.
Q How did you meet Mr. Richards?
A I met him in 2020 when my wife was involved on another project, something she was doing to assist some -- some event that they were conducting in North Carolina I believe, and Roger was part of that. He started talking to her, found

Page 18

out about my extensive work in the film industry, and then contacted me to produce a film for him in 2020.
Q And what film was that?
A It was a movie called A Thousand Pieces.
Q What was the subject matter of that film?
A It was dealing with agents from the FBI, the CIA, the NSA.
Q With respect to what?
A Their experiences within the agencies.
Q Was there a specific subject matter of the film or was it a general look at experience within federal agencies?
A I don't -- I can't say if there was a specific agenda that Roger had. He was just talking to agents who had worked for these agencies for an extensive period of time, and he was dealing with their experiences within those agencies.
Q That was with specific respect to the assassination of JFK, correct?
A It had a little bit to do with that. It was actually that was my initial assumption as well because of the name of it because I know of a quote from JFK. But JFK had a very small mention in the film as far as I can remember.

Page 19

Q Did you have a positive experience working with Mr. Richards on that film?
A I did.
Q And was that the first film that you had produced?
A No. I was executive producer on a couple of other films.
Q Which other films did you produce prior to A Thousand Pieces?
A There's one called Road To The Ring, a boxing film with Evander Holyfield.
Q Any others?
A I'm not sure. I can't remember.
Q How long did it take you to film A Thousand Pieces?
A It was a while ago, so I am going to somewhat guess at the answer. It was a few weeks of filming.
Q How did you and Mr. Richards divvy up roles with respect to that film, meaning what were your responsibilities and what were his responsibilities?
A Again, I was producing it, making sure that camera equipment showed up where it needed to be, locations were secured, the actors showed up,

Page 20

lighting was set up in a room, that kind of thing.
Q Who identified the actors that took part in that film?
A I believe Roger identified all of them.
Q Did you have any role in that?
A I don't believe so.
Q So moving forward through time, it seems like you made that film in 2020; did I hear you correctly?
A Yes.
Q And Mr. Richards obviously went on to direct The Deep Rig as well. When did you first start working on The Deep Rig?
A I believe Roger first talked to me about it in late 2020.
Q Roger approached you about it?
A Yes. It was his idea.
Q And do you know if he had been in touch with -- had he read the book, was that the purpose or the basis of his interest if you know?
A Read?
Q The book The Deep Rig by Patrick Byrne.
A I don't think the book existed at that time.
Q So how did Mr. Richards have this idea

Page 21

for this film then?
A He had an idea based on a lot of the election fraud discoveries that were happening and a lot of anomalies that were being discovered with the voting process, and that was his basis of the film. It had nothing to do with the book The Deep Rig at that time.
Q Did you begin discussing that project before or after the election?
A I don't recall. It was around the same time I believe.
Q You had --
A Sorry. It must have been after the election seeing that Roger -- I can't -- I can't recall the exact date.
Q Well, you would agree, both you and Mr. Richards had concerns prior to the election that the results would not be accurate, correct?
A I don't think it entered my mind. I was -- I'm not an American citizen, I'm a Canadian. My wife is an American citizen. So it didn't really enter my realm until Roger brought it up.
Q You weren't worried that the election would be rigged against then former now current President Trump in late 2020?

Page 22

A I was aware of the possibility that a lot of people were talking about.
Q Where were you hearing about that possibility?
A Mainly news clips, articles, and really not very much until Roger started talking about it.
Q So how did your discussions with Mr. Richards prior to Byrne's publication of The Deep Rig, take me from those prior discussions up to the actual production of The Deep Rig. In other words, how did you sort of narrow the focus of this film to Mr. Byrne's book?
A That was a long time ago. I think once we started talking about the film, Roger asked me if I would produce the film with him based on his ideas much like we had done with A Thousand Pieces, and he had produced some list of a bunch of different people he had thought to be notable and knowledgeable in the election and the election fraud theories.
Q Do you still have that list today?
A I would have to look for it. I don't know.
Q Did you read The Deep Rig yourself?
A I did.

Page 23

Q When did you read it?
A I am not, again, a hundred percent sure of the exact date. But I did read it before Patrick published it.
Q How did you get an advanced copy of the book?
A Patrick gave it to me.
Q When did you meet Mr. Byrne?
A I believe I initially met him approximately November of 2020.
Q Was he already working on the book at that point?
A I didn't know that. I didn't have any knowledge of The Deep Rig book that he had written until sometime in January I believe.
Q And what were the circumstances of your meeting Mr. Byrne?
A I met him on a phone call that Joe Flynn set up.
Q Did you know Joe Flynn previously?
A I did.
Q How?
A Joe was in the film A Thousand Pieces.
Q Why was Mr. Flynn putting you in contact with Mr. Byrne?

Page 24

A Because he believed that Patrick had an extensive knowledge of the election fraud and some of his people that he was involved with.
Q Had you indicated to Mr. Flynn previously your interest in producing a film like this?
A I did. We were talking about it just in general conversation.
Q And did he put you in touch with Mr. Byrne for that purpose after that conversation?
A He did.
Q And how soon after you met Mr. Byrne on this phone call did he provide you a draft copy of The Deep Rig?
A I am not certain. He talked about a web page that he had, I believe Deep Capture is what it was called, he directed me to that. I looked at some of the clips he had. And at some point after that, it wasn't a long period, but I'm not sure of the exact time span.
Q Did you meet him in person or just on the phone?
A Only on the phone initially.
Q When did you first meet him in person?
A First time I actually met him in person was in January 2021.

Page 25

Q Did you meet him in Washington, D.C.?
A I did.
Q Were you with him on January 6th?
A I saw him around January 6th. I am not sure the day was -- he was really busy on the 6th. I believe I saw him on the 5th and I don't think I did see him on the actual 6th.
Q Did you discuss The Deep Rig when you saw him?
A We did.
Q Was that the purpose of your meeting him in person to discuss the film?
A It was to discuss -- I don't believe the film existed at that point as a film. It was a concept that Roger had.
Q And were you with Mr. Byrne on the evening of January 6th?
A I don't believe so. No, actually I was not.
Q Were you ever with Mr. Byrne in the Willard Hotel?
A I don't know that hotel.
Q Did you have any interaction with Joe Oltmann on January 6th?
A I don't believe so.

Page 26

Q You have heard Mr. Oltmann state that on the evening of January 6th, Mr. Byrne requested a pardon from Rudy Giuliani, correct?
A Sorry. Can you repeat the question.
Q You have heard Mr. Oltmann state that he was with Patrick Byrne and Rudy Giuliani on the night of January 6th, and that Mr. Byrne requested a pardon for Mr. Giuliani, correct?
A I don't recall that.
Q Joe Oltmann has never told you that?
A I don't recall that at all.
Q Have you read the complaint that was filed in this case, Mr. Lucescu?
A The complaint regarding me --
Q Yes.
A -- or any other complaint?
Q The complaint that was filed against you by our client, Dr. Coomer, did you read that document?
A Yes, I would have.
Q You don't recall reading descriptions of that interaction between Mr. Oltmann and Mr. Byrne?
A If you have a document I can review, then I would be happy to go over it and see if it refreshes my memory.

Page 27

Q I don't have a copy of the complaint with me. It is a lengthy document. I was just curious based on your recollection.
So you met Mr. Byrne in person for the first time you think on January 5th in Washington, D.C. for purposes of discussing the film; is that fair?
THE WITNESS: Can I pause for one second.
MR. KLOEWER: Sure.
THE WITNESS: Clark, your computer is -- I'm not seeing anybody anymore. I don't know if they can see me.
(A pause was had in the proceedings.)
BY MR. KLOEWER:
Q So you met him on the 5th. When was the next time you spoke with Mr. Byrne?
A I believe it was on the 7th or 8th before -- when he left.
Q You met with him again in person?
A I did.
Q And was he with Mr. Oltmann at that time?
A I never -- I don't believe I saw Joe at all in Washington.
Q What was the topic of your conversation with Mr. Byrne on the 7th?

Page 28

A I think we just talked about President Trump's speech the day before and just general conversation over the events of the day, closing of the city. He was staying in a different hotel than I was.
Q Did you discuss his efforts to secure a pardon for Mr. Giuliani?
A I did not.
Q Do you know why Mr. Byrne was seeking a pardon for Mr. Giuliani?
MR. MILLS: Object to the foundation.
BY MR. KLOEWER:
Q Did he ever -- did you ever discuss --
MR. CARRY: I join in that objection.
BY MR. KLOEWER:
Q Did you ever discuss the basis for Mr. Byrne's concerns about his belief that he needed a pardon?
MR. MILLS: Object to the foundation.
BY MR. KLOEWER:
Q Is that a no? Sorry. I should have told you before to --
MR. MILLS: You can answer the question.
THE WITNESS: I can?
MR. MILLS: Yeah.

Page 29

BY MR. KLOEWER:
Q You can answer.
A I don't believe so. I don't recall any of the subject matter.
Q And just to be clear, I should have mentioned this at the beginning as well. David is taking down everything we say, so gestures, nodding, hand gestures, things like that can't be captured on the record. So I just ask for a clear yes or no to questions.
A I understand.
Q Okay. So you spoke with him on the 6th or 7th. Did you discuss the production of the film at that time?
A Not that I can recall at all.
Q When was the next conversation you had with Mr. Byrne regarding production of The Deep Rig?
A I am not certain of the exact first date we talked about it, whether was in January or in February. But it was sometime in that time range.
Q And were you discussing -- well, let's do this. I'll show you an exhibit here and we'll place that in time.
MR. KLOEWER: Chris, I'm going to send an

Page 30

email now. I might need to send a couple emails here with all these exhibits. I'm going to send the first one and then I will respond with a second one that includes additional documents. So give me one second before I admit this first exhibit.
MR. DEMPSEY: Thank you. And I received the email video clips emails and downloaded the folder, so that one I have.
(Plaintiff's Exhibit 1 marked)
BY MR. KLOEWER:
Q So I'm marking as Exhibit 1 a document which has been produced by Mr. Lucescu. It is Bates labeled Lucescu 8697. And I apologize, am I pronouncing your name correctly?
A That's fine.
MR. KLOEWER: All right. Give me one second to ensure that our --
MR. MILLS: Are you going to hand us a copy?
MR. KLOEWER: Oh, yeah. You probably want one of those too.
Chris, let me know when you got that. As I indicated, it is Lucescu 8697.
MR. CAIN: Are you sending it to Alfred too?

Page 31

MR. KLOEWER: And Alfred. Yes, I sent it to everybody.
BY MR. KLOEWER:
Q Do you recognize this document, Mr. Lucescu?
A I do.
Q What are we looking at here?
A This was an initial agreement that I had between my production company, Advanced Cinemagraphic Technologies, and Patrick Byrne.
Q And I'm refer you to the second page of this document real quickly just for the date at the bottom. This appears -- the signature blocks indicate a date of February 17th, 2021. Do you see that?
A Correct.
Q Is that a correct date of this signing to the best of your recollection?
A Yes.
Q So between that time when you spoke with Mr. Byrne in Washington, D.C. on you said January 7th or 8th and this signing on February 17th, did you have additional conversations with Mr. Byrne about production of this film?

Page 32

A I did.
Q And how did those conversations take place? Were they on the phone? Were they in person?
A They were always on the phone.
Q And why is that?
MR. CARRY: Hey, Brad, before you -- sorry, this is Alfred Carry. Before you go onto your next question, can we just press pause. I'm still waiting for these exhibits to come through.
MR. KLOEWER: Yeah. That was a pretty large email. I see it sitting in my out box here. Hopefully that arrives momentarily.
MR. CARRY: I did receive an email at 10:05 a.m. this morning with several screenshots and a few PDF documents.
MR. KLOEWER: That's the first one. The second one appears to still be sitting in my out box. Hopefully you'll be receiving that shortly. And the second email should include the document we're looking at.
(Off-the-record discussion)
BY MR. KLOEWER:
Q I can ask you more generally, Mr. Lucescu, while we're waiting for those to come

Page 33

through. What is Advanced Cinemagraphic Technologies?
A It is a company that I opened I believe in 1999 that I use for producing films, anything to do with the film industry.
Q And so 1999, what do you mean anything to do with the film industry?
A Well, because I work in various aspects of the industry.
Q So when you are retained to work on a project, do you bill your clients through this LLC; is that a fair assumption? Or tell me what you mean by that.
A Yes.
Q And what was Advanced Cinemagraphic Technologies' role with respect to The Deep Rig?
A To produce the film.
Q Who are the members of that LLC?
A Myself.
Q Anybody else?
A No.
Q And where is that LLC registered?
A In New York.
Q Okay. We can look through here in a minute.



MR. KLOEWER: Chris, how are you looking on the emails? Did you get a copy?
MR. DEMPSEY: Not yet, sir.
THE WITNESS: Can I --
MR. KLOEWER: Let me send you --
THE WITNESS: -- actually amend --
MR. KLOEWER: -- just this one.
THE WITNESS: -- that answer?
MR. MILLS: Sure.
A It was actually, I'm sorry, but when you say where is it registered, initially my accountant registered it in Delaware and eventually changed it to New York. So I don't know what the correct answer is to your question.
(Off-the-record discussion)
MR. DEMPSEY: Sorry to interrupt. This is Chris Dempsey. My other suggestion is that the exhibits are too heavy megabytes-wise to come through. I can send you a Dropbox link --
MR. KLOEWER: That's fine.
MR. DEMPSEY: -- and you can send it through that.
MR. KLOEWER: Have you not received Mr. Lucescu's production in this case?
MR. DEMPSEY: The what?



MR. KLOEWER: Have you received Mr. Lucescu's document production in this case?
MR. DEMPSEY: Yes.
MR. KLOEWER: Alternatively we can just refer to those documents by Bates label so that we can proceed here.
MR. DEMPSEY: Sure, we can do that. And you can pause before each question so that I can go into the voluminous discovery production and locate the document referenced or we can cooperate. I think it will come. And if not, like I said, I'll send you a Dropbox link. You can just upload and they're there. And if I can share that with Mr. Carry on behalf of Byrne as well.
MR. KLOEWER: Sure.
BY MR. KLOEWER:
Q So looking at this document, Mr. Lucescu, the second paragraph here after reference to Advanced Cinemagraphic Technologies said: It is the intent to immediately open a separate Deep Rig, LLC solely for producing broadcast quality documentary.
Why was it the intent to create this separate LLC?
A I believe every film that I have ever



worked on always has a specific company that's set up exclusively for that project.
Q Why is that?
A I don't know.
Q So this provision was included in this contract just in deference to industry standards or was this -- what was this LLC going to do?
A I don't understand that aspect, the financial aspect of the industry. It is not my area of expertise.
Q Let me ask you this before I proceed. Who drafted this document?
A I drafted it with input from Roger and Patrick. It was a combination of all of our conversations, mine with Patrick, mine with Roger, and then I put all the ideas together in one document.
Q Did that happen over email or were you sitting together jotting down notes?
A Mostly on the phone.
Q Was this reviewed by counsel for either yourself or your entities or Mr. Byrne?
A I can't speak for Patrick or Roger. I used agreements that I use on any film that I work on, and just basically took the skeleton of it and

adapted it for this.
Q Do you have the draft versions of this document prior to this one in your possession?
A This is all I have.
Q All right. That same second paragraph it refers to, it says: And also using The Deep Rig manuscript that he has provided, he being Mr. Byrne.
Was that manuscript, did that serve as the script for the film?
A I don't believe that would be the script of the film. It was a portion of it.
Q And was that just a copy of The Deep Rig book or was it a separate document that was adapted for film?
A Again, at this moment in time I believe the book still didn't exist. It was a draft version that Patrick had provided. It had a lot of information in it. I shared it with Roger, immediately told him about it. And that's where the name The Deep Rig came from is from Roger's initial idea and his initial name of his project and then he changed it to The Deep Rig.
Q And do you have a copy of that manuscript that was the basis of this agreement in your

Page 38

possession today?
A I'm sure I have it from one of the original documents Patrick sent me. I don't have it with me today.
Q Have you produced that manuscript in this case?
A I believe that you would have access to it since it was on my phone that Patrick sent me, and you have access to all that information.
Q All right. So we have already gone through a bit of your prior relationship with Mr. Richards here in the third paragraph. The delivery schedule here indicates that this was -- and I'm reading from the end of the fourth paragraph under the Understanding section -- it states to be locked and ready for airing and distribution by approximately May 2021, just three months after the signing.
Is that a typical time frame for a film like this?
A Again, there's no typical time anything. It is dictated by who's in control of that, and that's what Roger -- that's the time frame that Roger gave me. He edits it, he fine-tunes it, he color corrects it, that's his job, and then he

Page 39

distributes that.
Q Was there a particular need to produce and release this film so quickly?
A I don't know that.
Q Let's look at the second section, Investment. It states total production cost is $250,000. Do you see that portion?
A I do.
Q And it says investor Patrick Byrne or his designated company receives, and there's two bullet points here. A states payback of initial $250,000 investment prior to any net profits distribution.
How did you arrive at this $250,000 number?
A That was the total cost that we believed it would cost based on prior work with Roger. He gave me what it was going to cost him to direct it, what it would cost him to edit it, and then have ready for distribution. So then I added the cost of film crews, location, travel, hotels, food, taxies, car rentals, rental of camera equipment, lights, all that stuff to come up with a figure of two-fifty.
Q And Mr. Byrne identified as an investor here. Was this a loan to you to create the film

Page 40

and to pay him back that money?
A Patrick was investing the money to make the film.
Q But did he expect to be paid back from you for that $250,000 investment?
A My initial conversation with Patrick was that he agreed to provide the $250,000 to produce the documentary, and he did not actually ask for the payback of two-fifty. He only asked for 33 percent of all net profits if he decided to release it on a paid subscription level. But he reserved the right to release it for free. So his understanding and my understanding was that the $250,000 was to produce it. And if it was released, then he would receive 33 percent.
Q 33 percent of any -- well, let's take a look at what the document says. Bullet point two says additional 33 percent of all net profits collected from any and all distribution.
So I'm clear, he was going to get that two hundred and fifty back and then he gets 33 percent of the profits generated after that point; is that fair as your understanding of what the agreement was?
A Of what the final agreement was. That

Page 41

wasn't the initial agreement.
Q Well, tell me this: How did that differ from the initial agreement?
A I explained it earlier but I'll say it again. Patrick originally requested only 33 percent of net profits. He only requested B.
Q I see.
A I didn't believe that was fair. As he invested $250,000, I thought the fair thing to do would be for him to receive all of his income back first since that was an investment. And after he received all that money, whatever net profits were made would then be distributed on whatever.
Q I see. So tell me, where was the other 67 percent of net profits supposed to go?
A It was being distributed to myself, to Roger, to their distribution company. I believe the figure that Roger gave me was 40 percent goes right to the distribution platforms that he deals with.
Q Which distribution platforms were you contemplating at that time?
A All of them came from Roger since that's what his company along with his partner claimed they could provide. And he quoted a company that



he had used before on several of his films as being something called I believe 191 The Orchard.
Q And his company, what are you referring to when you say his company?
A He has a company called Auyrn which he calls as his distribution company.
Q That's one of my -- I was going to ask you that as well. And how did you produce that?
A I believe it is Auyrn. I'm not part of it, so I don't know it. But I believe it is called Auyrn. It's A-U-R-Y-N I believe.
Q Good. And who is Mr. Richards' business partner you mentioned?
A Leon Kennedy.
Q Leon Kennedy?
A Leon Isaac Kennedy I believe.
Q And who is Mr. Kennedy?
A He's his partner.
Q In addition to being his partner, do you know anything about Mr. Kennedy?
A I don't.
Q What's his background?
A I have only met him several times.
Q And do you know if he had worked with Mr. Richards on other projects in the past?



A From their discussions, they had worked on several projects for sure. Leon did have a background years ago as an actor. He told me he did a fight scene in some movie with other actors that I worked on with -- I don't recall who they were. He just told me a little bit about it. But it was many years ago.
Q Moving onto the next section, Profits For Investor. Looking at the top of the second page of this document states investor Patrick Byrne and/or his designated company will receive 33 percent of all producer's profits realized. We discussed that already.
A Correct.
Q It says for the $250,000 investment, Patrick Byrne will receive 33 percent of the producer's profits for the earning lifetime of, quote, The Deep Rig (working title) documentary. Producer profits are the proceeds or profits forwarded to the company (i.e. working title LLC that will be formed) after the investor has received, and then there's two items here we'll discuss in a minute.
I'm trying to understand the role of this LLC as we discussed before in the very beginning.



And I know you said that's not your focus. But when it says these proceeds are forwarded to the production company, I presume that means Deep Rig, LLC. Is that your understanding of what was intended here that the proceeds would go to that LLC?
A What specific line? You have gone through several lines there, so just which one are you referring to just so I can read it?
Q Yeah. It is the last little section of that paragraph labeled Profits For Investor. I'm looking at the top of page 2.
A Right.
Q And it is the paragraph that begins with Producer Profits --
A Okay.
Q -- are the proceeds.
A Okay.
Q So I'm just trying to focus on this forwarded to the production company that will be -- and production company, was that supposed to be Deep Rig, LLC indicated at the top?
A That would have been. That was my understanding.
Q So that entity is the vehicle for getting

money back to Patrick Byrne; is that fair?
MR. MILLS: Object to the foundation.
You can answer.
A A working title of a film is developed so that it is unique to that film. Because what this refers to is once the film is turned over to the distribution company, in this case it would have been 1091 is my understanding, because Roger and Leon have used them in the past. So they used their Auyrn Company as part of that distribution, and they would then use 1091 as the distribution company.
They have a relationship -- again, this is my understanding because I don't deal with that aspect -- but my understanding is that 1091 has relationships with Apple iTunes, with Amazon, with Netflix, with all the different streaming companies, and they would have control of that. They distribute it, they keep track of all the income that comes in from each of those other people, iTunes, Netflix, Amazon, all that, sales of DVDs, whatever.
Whatever they decide to distribute, they keep track of that. They provide a document showing this is how much they brought in and then



here's the net profits. Because they take their 40 percent off and whatever their advertising costs would be and on and on, and then they provide that income. That would go into the Deep Rig, LLC and that would be our net profits.
Q I see. So the distributors send that money back. The Deep Rig, LLC has a bank account, that's the sort of central hub where distributions go out to people like Patrick Byrne and -- were you expecting to also be paid out of that LLC?
A I was.
Q What was your profit share as you understood it at the time that this was entered into?
A It would have been approximately 20 percent.
Q Of those net proceeds that we have just have been discussing?
A Of the net. Of whatever --
Q Yeah.
A -- came back in the net proceeds.
Q And is that memorialized in a separate document somewhere?
A Never was. We never finalized it.
Q Would that have been an agreement that



you had with Patrick or is that a separate agreement that you would have had with Roger Richards and the distributors?
A It would have been with Roger and the distributors. Patrick sold the expectation was 33 percent. That was his request and that's the way it would have to be worked out.
Q And he was expecting you to apportion the 67 percent on your own through these distribution companies in working with --
A Correct.
Q What about the stars of the film, were they intended to be paid as well?
A They were not initially. We didn't know -- I certainly didn't know who they were all going to be, what aspect they would bring in, what level of importance they would have, the amount of time they would give. So everything is usually commensurate to your input into a film. So I likened the interviewees of this documentary to be like an actor in a film, and actors all get residuals, they all get a portion of it based on who they are and what they put into a film.
Q Did you have sort of a residual agreement for proceeds that was provided to stars of the



film --
A No.
Q -- as a condition of their involvement?
A No.
Q Why not?
A Because none of them expected any of it.
Q Did you have those discussions with any of those folks prior to filming?
A I did not.
Q And just wrapping up that paragraph we were just looking at, it says those -- defines those profits after the investor has received. We have already talked about bullet point one. Bullet point two says minus the standard and applicable marketing, accounting, and distribution costs. Are those items -- marketing, accounting, distribution -- are those typically the role of a producer of a film?
A No. That would be the distribution company.
Q And that's a separate entity that you were anticipating --
A That was Roger's distribution company.
Q And that's the Auyrn company?
A Auyrn and then 1091. And again, I had no

aspect of any kind of input with them. He claimed to have his network set up, he claimed he did it before, and that's what he requested.
Q Moving forward to this Further Cooperations and Understandings Section. It says Patrick Byrne will provide, quote, best efforts access to facilitate himself, all known parties, all available knowledge, all information, and all contacts and his encouragement to same to facilitate the production and filming of this documentary.
Why was access to Mr. Byrne such a priority for this document?
A I think once the decision to change Roger's initial name of the project to The Deep Rig, if he was going to maintain The Deep Rig, he just wanted to have -- to be sure that Patrick would continue along with whatever he could to follow up aspects that he had found in the book The Deep Rig.
Q Could you have made this film without Patrick Byrne?
A Well, that's a very difficult question to answer.
MR. MILLS: Because it is hypothetical.



BY MR. KLOEWER:
Q Let me ask you this way: Was Mr. Byrne's input essential to the narrative arc of the film?
A If it was to maintain the title The Deep Rig, the initial concept of the film did not have Patrick Byrne in it, didn't know the existence of Patrick Byrne when Roger came to me with the idea.
Q Do you view Mr. Byrne as an essential character in the -- let me ask you this way: Do you believe the 2020 presidential election was rigged?
A At the time that I produced this film, there -- I believed that there was an incredible amount of evidence showing that it was.
Q That's not exactly my question. But did you believe that it was? Not a belief about the amount of evidence but the -- was it rigged, yes or no, is my question?
A Then my question to you would have to be in order to answer that, in what time frame?
Q At the time this agreement was entered into.
A So what I answered was at the time that I produced this film, I believed that the evidence that I saw and heard from all these different



people, they had overwhelming evidence to prove that it was.
Q It sounds like your opinion has changed since then, correct?
MR. MILLS: Object to the foundation. Go ahead, you can answer.
A To this day I still have not seen the results of what I believed to be very firm evidence of the fact. And I don't understand the legal process and I don't understand how evidence that appeared to show the fraud still hasn't produced any viable results to show that in the courts.
BY MR. KLOEWER:
Q So as you sit here today, do you believe that Dominion Voting Systems rigged the 2020 presidential election?
A Again, a difficult question to answer in the way that you have phrased the question. Dominion voting machines produces equipment that is computerized and electronic, and I believe that all computer equipment can be hacked and can be manipulated as we have well documented evidence of viruses targeting some of the biggest data companies in this world.
Q Well, that's a slightly different --



that's an answer to a question I didn't quite ask. I understand that systems can be hacked and systems can be vulnerable. My question is did anyone at Dominion Voting Systems proactively manipulate the 2020 election results?
A I don't know that.
Q Have you seen any evidence to support a belief that anyone working for Dominion Voting Systems manipulated the 2020 presidential election results?
A I was provided with an extensive document by Joe Oltmann for Eric Coomer who I believe was the VP of Dominion Voting Systems or Dominion software. I have seen that name several times. I don't know which one is correct.
Q Sure. We can --
A Dominion.
Q For the purposes of this deposition --
A Dominion being --
Q -- we'll just --
A -- Dominion --
Q -- refer to them --
A -- encompassing all --
Q -- as Dominion.
A -- of that.

Q There we did it. That is my mistake. I'm as bad as anybody at this.
For purposes of this deposition we'll refer to Dominion Voting Systems just as Dominion, so my apologies, David.
A So to continue, please repeat the question.
Q We'll go back. Have you seen any evidence that anyone working for or acting on behalf of Dominion manipulated the 2020 presidential election results?
A I was provided with an extensive document by Joe Oltmann, I believe it was a 118-page document, that he had produced, him and his company, his data guys, had assembled a very extensive document with a lot of information showing the ability for the machines to do things that I quite frankly found incredulous that they would be able to be manipulated in that manner.
Q I don't have a copy of the document in front of me, but I believe from your description you may be referring to a document you have produced called Eric Coomer: Pawn, Plant, or Perp. Does that sound familiar?
A I believe that's the title that Joe used.



Q And this is the document that you are basing --
A Yes.
Q And it is your recollection that document includes evidence that Eric Coomer manipulated the 2020 presidential election results?
A I believe it -- I believe it contains document that Joe believes he did. Because I did not go through 118 pages. I was given it -- I was given that document -- actually given the document after Joe had already been on film. He had discussed it with me through several phone calls and hours of conversations I had with him prior to that.
Q Did you request that document prior to filming him?
A I did.
Q Did he -- it sounds like he didn't provide it?
A He did not.
Q Did that concern you?
A It did not. Because I didn't meet Joe Oltmann until February 23rd, 2021 I believe. I didn't actually have a conversation with him at all in any way until that date. Or sorry -- yeah, I



believe it was February 23rd. Might have been February 21st. I'm not sure of the exact date, but it was around that time frame. Because the day after I talked to Joe, I actually was on a plane going to Phoenix to start setting up filming in Phoenix.
Q So you filmed Mr. Oltmann in Phoenix, and then he provided that document to you after you filmed him. Do I understand that correctly?
A He had it with him and he was referring to it during the filming when Roger was interviewing him. And then Roger requested that could we absolutely get that document because he needed quotes from it for his -- that Roger required for his edit.
Q Do you know who wrote that document?
A My understanding is Joe Oltmann did. Or under his control, him, his company, his guys. That was what was represented to me.
Q Did Mr. Oltmann ever discuss somebody that he has referred to as The Researcher with you?
A No.
Q I'll represent to you that Mr. Oltmann has represented that document was produced to him by a third party that he has only identified as The



Researcher. That's the basis of my question, if you have any idea who the person that actually wrote that document?
A I do not. I only know that he referred to him, his company, his team of people.
Q And it sounds like after having received a copy of that document, you didn't review the entire document?
A I did not. I provided it to Roger. Because at that point it is literally not in my scope of requirement. I'm moving on to interviewing other people. I'm interviewing four or five people in a day.
Q So whose scope of requirement would a review of that document be?
A Roger would have.
Q Who was making the ultimate decision on what content to include in the final version of the film?
A Roger. It was his job to edit it.
Q Mr. Byrne, did he have input in that process as well?
A He did. In the initial stages he did not and then eventually he did take over some responsibility.

Q Let's take a look back at this document here. The second paragraph states --
A Are you on page 2 still?
Q Page 2, yes.
A Yep.
Q Under that Further Cooperations and Understandings section.
A Okay.
Q It states: All footage will be uploaded to an IO site as soon as possible after each filming day.
What's that IO refer to?
A It was -- to me it was a term that Roger used that he sets up. So at the end of each day, he could have his cameraman, my cameraman, upload the footage to Roger's site so his editors could start beginning to assemble it into clips; they could start to break it down and make notes on what was talked about at what timeline so he had access to be used in editing later.
Q So Mr. Byrne wanted to have -- well, let's look at the next sentence here. Patrick will receive a unique personal login to access and view all footage as it is uploaded.
I'll just proceed through here so we can

Page 58

get through this line of questioning. As the rough edits are being assembled, literally as we are filming each day, Patrick will have instant and continual access and hence, quote, a heavy hand input as requested.
So it sounds like Mr. Byrne was very involved with selecting the substance of the film during production, correct?
A The, quote, reason why it is a heavy hand is that was a term that Patrick used. His initial discussions with me would be that he wouldn't have part of the edit because that was Roger's initial requirement that he -- Roger is the creative end of all of it, so he wanted that input, hence, why he puts a Roger Richards Film in the final edit.
Ultimately Patrick had input into some of the final edits that Roger was doing because I don't believe -- I believe that he was not happy with what some of the things he was getting back for the money he spent.
Q And this it sounds like that heavy hand, that inclusion in this contract, did Mr. Byrne request a reference to his authority to decide the content of the film be included in this contract?
A He actually did not. I added that based

Page 59

on -- again, this is an understanding that I had with Patrick, so anything that came up in our discussions, I put it on paper so that we could look at it, discuss it, and then say yeah, that's correct. And then we just move on from there and start producing the film.
Q I see. It says -- the next paragraph begins: The parties intend to enter into a more formal agreement which will include all of the above terms and conditions.
Did you ultimately enter into a more formal agreement than this one?
A No.
Q Why not?
A This is a standard clause that is given to me by all studios and films that I work on, so it is included in every contract that I have signed. And like I have mentioned, I have done thousands of productions over my career. So I simply insert that in there because it is an industry standard. Sometimes people exercise that option, sometimes they don't.
Q Was there ever any effort to accomplish that more formal agreement or did it just was this it?

Page 60

A There was an attempt by The America Project and some of its employees or workers -- I don't know how I would define them -- in particular somebody by the name of Faaiz Khan who tried to -- he sent me a document and wanted me to sign it, but he changed the complete context and scope of what this agreement was.
Q And that was provided to you on behalf of The America Project; is that right?
A I believe it was -- I believe it was to be designated as The America Project because they were named -- definitely named in it. I can't recall the entire document. To be very frank, I didn't even read through the entire document because I stopped after the first couple of pages when I saw very glaring differences over the fundamental belief of what was this document and then what they were then projecting.
Q Yeah. We'll look at some of those communications in a bit.
A Yeah.
Q So you said Mr. Khan, did you pronounce it Fize?
A I believe it is Faaiz. Again, I'm sorry, I don't know the exact spelling. But it is like

Page 61

F --
Q A-A-I-Z.
A -- A-A-I-Z, yes, and then K-H-A-N I believe is his last name.
Q Sorry, David, I'm violating my own rule there. I recall the spelling, so it is F-A-A-I-Z.
And he was an employee of The America Project as you understood it?
A I believe so.
Q And he ultimately reached out to you to revise this contract for what purpose?
A Once The America Project became involved in it, again, I know he worked for them because he had an America Project address, email address, and he was the designated person for me to communicate with instead of Patrick. So Patrick no longer talked to me about it, he appointed Faaiz as the person to talk to.
Q You said once The America Project became involved. When did they become involved?
A I am not sure of the date. It was after I had finished filming and Roger was still editing from what my understanding of the timeline is.
Q We'll get into that a bit more in this next section here.



MR. KLOEWER: I'm at a break. We've been going about an hour. You want to take a quick break?
MR. MILLS: Perfect. I was about to ask for it.
MR. KLOEWER: We'll go off the record. We'll take ten minutes here.
THE VIDEOGRAPHER: The time is 10:48 -- 46. We're going off the video record.
(Recess 10:46-11:05 a.m.)
THE VIDEOGRAPHER: 11:05 we are back on video record.
BY MR. KLOEWER:
Q Okay, Mr. Lucescu, before the break we were finishing up discussing the contract that you signed with Mr. Byrne on February 17th, what's been labeled as the Investor's Agreement. I want to move forward through time and discuss the actual production of the film. So after you signed this agreement, how long did it take before you started filming interviews?
A I believe my first day of filming was February 25th I believe.
Q And who did you -- who or what did you film on that day, February 25th?



A On February 25th I started with Lieutenant General Michael T. Flynn and then I believe I got a little bit of Patrick and Sidney Powell that day.
Q How do you know it was February 25th? Do you have a calendar somewhere, a production schedule?
A During the course of reviewing the documents, I went over it. But I remember that time frame anyway because of when it was. I know when I produced -- the filming of it was the latter part of February and the beginning of March.
Q But do you have a written calendar of production events like interviews and other things that you did?
A I don't.
Q So were the interviews the first step then? Obviously you signed it on the 17th. Eight days later you have the first interview with General Flynn. What happened in the interim, anything?
A Well, in the interim I would have had to wait for Patrick to forward the funds, which didn't happen immediately. It happened at some point later. Otherwise, I wouldn't have even considered



moving forward because there weren't funds to do it at that point. I just continued having conversations with whatever names would pop up in conversations over potential interviewees for the film.
Q And who were those conversations happening with about potential interviewees?
A Well, initially with Roger and then with Patrick and then with Joe Flynn. And then if they mentioned somebody, then I would talk to that person that would then mention somebody else. And based on the area of expertise of each person and their credibility, then I would move on with establishing more names.
Q Did you have a script at this point?
A Again, the script that existed for this project was based on one that Roger had just put together in a loose form of what he wanted to achieve. I didn't see his questions he was going to ask. I didn't see exactly what he was going to do. I didn't know that until he was actually asking the questions of the interviews. And again, it didn't concern me. It wasn't my -- it wasn't my job to do that.
Q It wasn't your job to vet the potential

characters in the film?
A No.
Q Did you play any role in ensuring that the different interviewees were presenting accurate information in the film?
A Again, to me that was Roger's area where he was going to edit it together in whatever manner he saw fit. I established the contact with the people, found out if they were willing to appear to do an interview, and then to ensure that they had a flight to get there, showed up at a location, had a hotel room if needed, had food for breakfast, lunch, dinner, that type of thing; again, the physical aspect of getting them on camera.
Q Did you ever publicly claim that you were responsible for vetting the interviewees of the film?
A I don't believe so.
Q And it is your testimony today that Mr. Richards would have been responsible for that process?
A Correct.
Q Did you feel that you had any responsibility to ensure the content of the film was accurate?

Page 66

A Again, I have no -- I had no control and have no control over the editing of what is presented. It is, again, not my job. My job is to get it on camera. That is my job, not any other aspect.
Q That's fair. I'm just wondering if you felt that you had any responsibility to ensure the accuracy of that content anyway?
A I did not. My responsibility is to get it on film. I have no say in the finished product over what it is. That's not my job.
Q Did you raise any concerns during the production of the film that some of the information may not be accurate?
A I can't recall in that exact terminology of it not being accurate. I was certainly looking forward to seeing the evidence that would be produced.
Q Well, part of the -- the film was to present evidence to the public that the election was rigged, wasn't it?
A Correct.
Q So you were in the process of assembling that evidence for public consumption, right?
A Once again, I don't fully understand your

Page 67

question. But to answer what I believe it is, my job was to get people on camera.
Q And did you determine who those people were or did somebody hand you a list and say call these people?
A It started with a list that Roger gave me. And as each person was talked to, if they brought up somebody else to talk to that had knowledge of this, then I would talk to that person. I would certainly see who they were, you know, who was Matt DePerno.
Matt DePerno was a constitutional attorney based out of Michigan. I would look who he was. Oh, wow, he's definitely heavily involved. Sounds interesting what his theories are. Don't know where they're going to go because it was very early on. So let's see what happens. Ultimately Matt DePerno ran for attorney general in Michigan. You know, he had ideas and we discussed them and then got him on camera talking about them.
Q Was he on the original list provided to you by Mr. Richards?
A No.
Q Who was on the original list?
A I can't recall. There were many people

Page 68

on it, some we never even talked to.
Q Were there people you talked to and conducted interviews with that were not ultimately included in the film?
A Yes.
Q Who?
A The main one that comes to mind is Sidney Powell.
Q You did interview her on multiple occasions for the film, right, or just the once?
A Well, we interviewed her in one time span in Phoenix, Arizona. It was over the course of several days because she wasn't in every location.
Q Why was she included in the film initially?
MR. MILLS: I'm going to object to the form of the question. I don't think she was ever included in the film. She was interviewed.
BY MR. KLOEWER:
Q There was an intent to include Ms. Powell in the film, correct?
A There was.
Q Why was she an intended speaker in the film?
A Because she had an extensive knowledge of

Page 69

what was occurring with different precincts and election anomalies and things along the nature of the film. And I was -- I was advised by several people that were already part of our group of people that we were interviewing, they brought her name up as oh, yeah, you should talk to Sidney. She had a lot of information in this.

Q Who were those several people that recommended her?

A Mike Flynn and Joe Flynn because Sidney represented Michael in his case with the Mueller investigation and subsequent to his role as the National Security Advisor to President Trump.

Q Did Mr. Byrne recommend her as well?

A I don't know if he recommended her. I believe I mentioned her to him, and he said yeah, Sidney would be great.

Q Do you know if the Flynns and Mr. Byrne were involved with Ms. Powell's organization Defending the Republic at that time?

A There was a lot of different companies that were being formed back in that time frame. I wasn't part of any of them, so I really can't give you a 100 percent positive answer. I know that some of them had some involvement. I don't know



exactly what it was. I don't know the percentages of their involvement. I don't know the extent of their involvement.

I know that they were associated. And then subsequently some left, formed other ones, left, formed other ones on into different versions of what those initial ones were. I do know that Defending the Republic was Sidney Powell's. I know that America Project was something with Patrick Byrne. I know that ultimately America's Future is with General Flynn.

So that's my final understanding of where they all ended up. How they got there, again, I wasn't part of any of it.

Q So you filmed interviews with Ms. Powell over a couple of days; did I hear you correctly?

A Yes.

Q And why wasn't she ultimately included in the film?

A Patrick decided that she wasn't going to be included in the final edit, and he instructed Roger to -- well, he instructed me to have Roger remove her from the film.

Q What was your understanding of why she was removed?



A No idea.

Q You don't know why Patrick Byrne --

A I don't know.

Q -- instructed that she be --

A I know that they had a difference of some --

MR. CAIN: Y'all are talking over each other again. David is going to hit you with something. So that's why I was holding my hand up.

MR. KLOEWER: Don't worry. He'll hit me first or he should.

BY MR. KLOEWER:

Q So to repeat the question, you don't know why Sidney Powell was removed from the film --

A I do --

Q -- by Mr. Byrne?

A I do not.

Q You didn't have a discussion with him about that?

A My understanding is that they just had a personal difference that they no longer agreed on something. And because Patrick funded the project, to me he had the ultimate say.

Q You didn't ask what this is all about?

A If somebody tells me it is personal, I



don't pry.

Q Do you know if it involved running of Defending the Republic?

A I know nothing else other than what I have just said, literally.

Q You're aware that Dr. Coomer sued Sidney Powell as well, right?

A I don't know any details about it. But I have seen headlines that he sued pretty much a lot of people.

Q And you know she settled with him, right?

A I don't.

Q You know her law firm, Sidney Powell, P.C., settled with Dr. Coomer?

A I don't.

Q Do you know that her entity Defending the Republic settled the lawsuit with Dr. Coomer?

A I do not. I do not know any details of what Sidney Powell has done in any of her lawsuits other than the limited amount I had with her with Michael Flynn back in September of 2021 or 2020.

Q What happened to the footage of Sidney Powell that was going to be included in the film?

A I don't know. I assume just scrubbed on the drives that Roger had and never to be used

because she's not -- she wasn't part of it.
Q Where would that footage exist if it still exists?
A Only Roger would know that. He had it up on that IO drive or a website, it is a cloud server, so it was up on that. So they would edit on that. They would provide the edits. I know it was up for a while. I have not even looked at that site to see if it even exists anymore. I don't know if it does. I haven't looked at it in years.
Q If it does exist -- so did you ever have your credentials for that website revoked?
A I don't know that. I very rarely went on it because I was too busy with actually filming people on it and doing that kind of work. He would have a trailer that he would make that would be specific for somebody in the film, so I would look at some of those clips. But for the most part Roger would send me an iMessage with a video clip because iMessage just was an easy way for him to send me a video clip of that person. So he produced many trailers for each person.
Q Was that footage housed on any third party, you know, just for security purposes in case there was a, you know, computer crashed or



something, there was no backup of film footage?
A Again, my understanding -- I didn't have any of that. My understanding was that Roger did have multiple locations that he had it on.
Q And that IO server you have mentioned, that was administered by a third party I presume?
A Again, I have no part of it, no knowledge of it. Didn't set it up. Didn't control it.
Q Do you recall the website that you had to log in through to see that video footage?
A I don't. I can probably find it in some email or text message. But you would probably have that somewhere because I really did not go on it.
Q Other than Ms. Powell, was there anybody else you interviewed for the film that did not ultimately make the cut and the final version?
A I would have to look at a list of people that were -- that we interviewed. I know there were a lot of potential interviewees that fell apart at the last minute.
Q Like who?
A People like Ryan Hartwig, Melissa Carrone. Again, it has been -- it has been four years since that time, so I don't recall all the times. Jesse Morgan.



Q Who's Jesse Morgan?
A He was a USPS truck driver who had claimed that he had witnessed hundreds of thousands of ballots being shipped across from New Jersey -- across the New Jersey-New York state line, federal offense number one; across New York to Pennsylvania state line, federal offense number two. So because he had -- he seemed to be a credible witness, I wanted to talk to him about that. He initially talked to me about it, and then he later on advised me that he couldn't talk about it.
Q Do you know why?
A I don't. Because I was actually quite shocked. Because mere weeks after that, I saw him with a YouTube video stating exactly what I asked him to talk about. So I found it incredulous that he wouldn't do it and then he did mere weeks later.
Q What about Conan Hayes, did you interview him?
A I did.
Q Was he included in the ultimate footage of the film?
A He was.
Q And he went by a pseudonym in the film, correct?



A Correct.
Q And which one was he?
A 25.
Q 25. Who is Conan Hayes?
A He was a part of a cyber team and one of the cyber security experts who spent his life on data analysis and data anomalies and software and the intricacies of computers.
Q When you say he spent his life on that, what's the basis of your belief that --
A His -- his discussions with me about that after I was referred to talk to him by a couple of different people he was working for at the time analyzing different results in different areas.
Q Who was he working for at the time?
A I believe Matt DePerno was one. I believe Patrick brought his name up. I don't know if he was working for Patrick at all, but I know Patrick knew about him. And again, if I thought people, you know, were knowledgeable enough of any subject matter to be in the film, if they had somebody else, welcome to talk to them, put them on film.
Again, my job, get people on film; get whatever knowledge they have on film. Roger is

going to go through it all and figure out what is correct and what is not and how he assembles this final aspects.

Q So Roger was going to ensure that the statements made by those people were factually accurate before producing the film?

A I can't speak for Roger. I mean he's got a creative vision he wants to achieve. And again, that's his -- that's his job, his control.

Q So for Mr. Hayes for example, did you make any effort to confirm that his credentials were what he claimed they were?

A Did I personally?

Q Yeah.

A I did not. I talked to him initially saying I got your name from whoever it was at the time. I understand you're working on this part of it. I mean after the film at various different times, I saw him on Senate committees and Supreme Court hearings and things as a witness.

Q You saw Mr. Hayes in those?

A I believe -- I believe it was Mr. Hayes. I believe I saw him. I saw a whole bunch of people that I wanted to talk to. I believe he was one of them that was ultimately witnesses in other cases.



I watched many of them on the screen after -- much after the film was released.

Q Are you aware that Mr. Hayes spent most of his adult life as a professional surfer?

A I know that he was a surfer. He talked about being a surfer. The extent of what he was or how much he spends his time I don't know.

Q Do you know that after concluding his career in surfing, he went on to start the clothing brand RVCA Boardshorts?

A I heard he had -- I heard he was involved in a clothing company of some kind.

Q So was he doing this cyber work in conjunction with running the clothing company as you understand it?

A I don't understand that question, in conjunction with.

Q Well, I believe you stated before that he had spent his life working with different agencies and doing cyber work. And I am wondering how that squares with a career in surfing and running a clothing company. Was he doing those activities simultaneously as you understood it?

A I would -- I would believe so. I don't think there's any other possibility to being able



to do totally -- two totally different things at the same time.

Q Joe Oltmann says Conan Hayes is a Fed. Do you agree with that?

A I have never heard Joe say that. And I don't know what else to say to that.

Q Do you watch Oltmann's podcast?

A I don't.

Q You haven't heard him state that Mr. Hayes is the reason why Tina Peters is in jail today in Colorado?

A I have not.

Q And just to button it up, you haven't seen any independent documentation to confirm that Mr. Hayes has any credentials in cyber security, have you?

A I have not.

Q What about Todd Sanders, was he in the film?

A He was.

Q Was he 75?

A He was.

Q Who is Mr. Sanders?

A Again, Mr. Sanders is a cyber security expert who has worked for many different people



from what his conversations were with me. He was advised to be talked to as part of the team of 75/25. They worked together. And they were working for various other people in different areas on the analysis of data.

Q Was Mr. Hayes employed by Mr. Byrne at that point?

A I don't know that.

Q Have you seen footage of Mr. Byrne discussing Mr. Hayes's involvement with the break-in of the Mesa County Clerk's Office?

A No.

Q Were you aware that Mr. Byrne was speaking with Mr. Hayes in real-time as he copied the servers in Mesa County?

A I have no knowledge of it whatsoever.

Q We'll transition here. I want to show a couple clips. This will be the first of several. And I want to focus a bit first on the promotional efforts that were made for the film. I want to stick to this topic of fact-checking and vetting of witnesses for now.

MR. KLOEWER: So as I indicated, David, I'm going to give you this flash drive. It has 24 clips on it. We will mark this as Exhibit 2. And

as we proceed forward, I will refer back to Exhibit 2, clip 1 or clip 5, whichever are included on these.
Clark, I have a copy for you and I've already provided electronic copies to counsel that is joining us remotely.
(Plaintiff's Exhibit 2 marked)
BY MR. KLOEWER:
Q So the first clip I want to look at is Exhibit 2, clip 6. These are -- I understand there are many of them. There are a couple dozen. They're mostly pretty short.
A Okay.
Q They're anywhere from ten seconds to maybe two minutes at most.
Before we get into this, do you recall what promotional efforts you undertook to help promote the film before its release?
A Did I personally?
Q Yes.
A I didn't do any promotional efforts. I was part of them, but I didn't -- it wasn't -- again, it is not my area of expertise. It was Roger Richards and his company.
Q Well, you were on Ann Vandersteel's show



for example, right?
A Correct.
Q And you did interviews on there every day for a couple weeks, right?
A No.
Q No?
A I believe she did it for one week, not a couple weeks.
Q But your purpose of being interviewed by her was to promote the film, right?
A Correct.
Q And some of those interviews were just you and some included other stars of the film, right?
A I don't believe so. I believe I was always on with other people. Because she contacted me in order to talk to each of them, and I talked to them to see what days they were available for her on her request.
Q So the first clip we're going to look at is Exhibit 2, clip 10. I'm going to slide this over a little bit, and if you can just make angle yours. I just want you to be able to see the screen here to the extent you're able.
A If you just rotate it 90 degrees, I'll be



able to see it fine.
Q I'm trying to get the frame a little bigger so you can see. So I'll represent on screen here that this clip 10 includes an image of you in the top left corner, Mr. Richards is just below you in the bottom left corner, we have Joe Flynn on the bottom, Ann Vandersteel on the top right, and Bobby Piton is on the bottom right. And this clip is 54 seconds so ...
THE WITNESS: So Chris, can you and Alfred see this?
MR. DEMPSEY: Well, I believe opposing counsel identified this as clip 6 which --
MR. KLOEWER: That's incorrect. Clip 10. My error. Clip 10.
THE WITNESS: Clip 10. You had a puzzled look on your face, so that's why I asked.
MR. DEMPSEY: No, it is not the same 6.
MR. CARRY: This is Alfred Carry. Does it make sense for one of us just to share our screen so we can all collectively see it at the same time? And I'm happy to do that. I can share my screen, load up the clip 10. Can we do it that way?
THE WITNESS: I have no ...



MR. KLOEWER: That's fine. I don't know if it is necessary. But if it is easier, we can do it that way.
MR. FONDA: I'd offer but --
MR. CARRY: The only thing is we may not be able to --
MR. KLOEWER: Yeah. Yeah. That's fair.
MR. CARRY: Let me see if I can do that. One second.
MR. KLOEWER: Whenever you're ready.
MR. CARRY: I'll just push play.
(Video played.)
MR. KLOEWER: Alfred, are you on an accelerated speed? Are you watching at like 1.25 or something?
Let's pause this here and go off the record. Alfred, I think you might be playing a little fast, like 1.25.
THE VIDEOGRAPHER: 11:33 we're going off the video record.
(A pause was had in the proceedings.)
THE VIDEOGRAPHER: 11:35 we're back on the video record.
BY MR. KLOEWER:
Q Let's try this again. Showing Exhibit 2,

clip 10.
(Video played.)
Q Were you able to hear that, Mr. Lucescu?
A Yeah.
Q So here you're representing that you always researched before putting somebody on. Did you hear yourself say that?
A Yep.
Q And that you stand behind the people who are in the film?
A Correct.
Q Is that still true?
A Correct.
Q So it sounds like at the time at least you were making public statements that you were involved in the vetting of these people's claims. Do you agree with that?
A I don't understand the scope of the vetting of them. So if you can clarify that.
Q Fact-checking, ensuring the accuracy of what they said, things of that nature.
A For me when I heard a person's name, I would for instance go back to Matt DePerno since I was referred to talk to him, I talked to Matt, I looked up who Matt was. I didn't know his name. I

Page 86

didn't know Eric Coomer's name. I didn't know Joe Oltmann's name. I didn't know any of these people when I started. They were brought up along the way. People brought them up. I would look for what I could find.
Many times that's in the middle of me filming somebody. I'm making sure the lights and the camera, everything is working. Somebody brings up a name, who is that guy, do they have any validity, what kind of claims do they have, who are they. I don't know. Found out what they had to say, talk to them. Said hey, what about this guy, he's got -- he has to talk about USPS route that he drove with all these fraudulent ballots.
Q You mentioned a couple before like Melissa Carrone and Mr. Hartwig. Did you interview anybody other than Ms. Powell that you ultimately determined their claim could not be included in the film because it was not accurate?
A I can't recall anybody right now. I really don't recall anybody else that we actually interviewed. There were many people that we wanted to interview. Some just could not work it out in their schedule. Other ones thought they would be able to make it and then last minute several of

Page 87

them, like the two I mentioned that came to mind immediately was Melissa and Ryan because both of them have children and their children were sick at the moment they were supposed to come.
Q But it sounds like there was never a time when you had footage that you wanted to have in the film and said we just can't proceed with this because it is not accurate; that didn't happen, did it?
A Again, I don't believe so. Because I didn't have -- I was in no way involved with the edit, so I don't know what Roger has for whatever everybody said. I wasn't present for every single statement that was made by every person.
Because as I mentioned, I'm now working on who's going to be up next, who's going to be this afternoon, who's going to be tomorrow, who's going to be next week, who's going to be in Florida, who's going to be in D.C. I'm doing all that at the same time. So I don't know -- I don't even know what was recorded by each person.
Q Did you have access to those interviews if you wanted to review them?
A I would only have to assume that they would all be on the IO if I had the time to go

Page 88

through all that.
MR. KLOEWER: I'm going to mark this as Exhibit 3. This has been produced as Lucescu 9109.
MR. DEMPSEY: 9109, what exhibit is that going to be? This is Chris Dempsey.
MR. KLOEWER: This will be Exhibit 3.
MR. DEMPSEY: Thank you.
(Plaintiff's Exhibit 3 marked)
BY MR. KLOEWER:
Q Do you recognize this document, Mr. Lucescu?
A I do.
Q Hopefully I won't have to do this too many times. But since this is our first one, I want to be sure I know who we're dealing with here. Up top is pretty obvious, pmbyrne@protonmail.com, so that's Patrick Byrne. Is this how you always communicated with Mr. Byrne for purposes of this film, through this email address?
A No. In fact, I -- I don't think we had very many emails from my recollection with Patrick. Most of our conversations were phone, actual phone conversations and text messages. I believe that was the majority of our discussions.
Q But this is his email address, correct?

Page 89

A I believe it is, yes.
Q And we see the date here is May 13th, 2021. It says to Lucescu, that's steve.lucescu@gmail.com. Is this the email address that you typically used when communicating with Mr. Byrne?
A Yes.
Q Are there any other email addresses that you used in communicating with Mr. Byrne?
A That is generally the email I use, I give out to everybody to use. I had another address years ago. I don't believe I have ever used that address. I had a Proton address. But again, I don't believe I used it for the film.
Q What did you use that email address for?
A I just very rarely use it.
Q What was the purpose of the account?
A Of Proton?
Q Yes.
A Because there was talk of Gmail not being a secure email, and I contemplated moving it over to Proton which was supposed to be fantastic. But I know I very rarely used that email.
Q Did you check your Proton mail account to confirm or deny if there were any communications in

Page 90

that account relevant to this dispute?
A I believe we looked at them when I was with FTI because we had questions over different platforms that they weren't able to access right away, and I just opened my phone up to them for whatever they requested.
Q And they didn't find anything in that email account relevant to this dispute?
A I don't know what they found. I have never seen the extensive amount of data that Laurin has told me they have collected. I had no control of it. They asked me a question. I unlock my phone, had it with them. They hooked it up to their computer. All I know is I spent 22 hours in Atlanta that day from start to finish before I pulled back in my driveway.
Q What about this Chris G, do you know who this person is, the cc line there? It is ChrisG0731@protonmail.com?
A I don't actually recall who Chris is. It would have been somebody from Patrick obviously since Patrick initiated the email. I recognize the Granito, cgranito@proton, as being somebody who works with him, and it is possible it is the same person.

Page 91

Q Is him Patrick Byrne?
A Oh, him, yes, Patrick, since I said he initiated the email.
Q Does the name Catherine Granito sound familiar?
A Oh, correct, that is Catherine. So I guess it wouldn't be Chris.
Q The first line Mr. Byrne says: Do you have any idea about how you will distribute? Do you know how to organize and manage premiers?
We'll discuss that a bit later. I'm more interested in the bottom of this page and the second page of this thread. But first in the middle of this page this is from you at 12:55 a.m. It says: Hola Brother. These are awesome notes. I'm getting them to my editors right now to start implementing them into the cut. We'll also start looking into the Fort Bragg and Fort Campbell areas.
So it appears that Mr. Byrne is relying on you for editing to some extent, right?
MR. MILLS: Object to the foundation. Go ahead.
A Yeah, I thought I answered that clear for you before. I was the middleman with Roger. I

Page 92

talked to Roger and I talked to Patrick. Patrick didn't talk to Roger. Roger was the creative end of all of it, and he made it very clear to me that he didn't want to have to deal with anybody else to interfere with his creative process.
So when it says I'm getting them to my editors right now to start implementing them into the cut, that's a request from Patrick over a list that he gave me. I simply took that list and send it to Roger, and that's the extent of my involvement with that.
BY MR. KLOEWER:
Q And if these edits, which we'll look at a few in a minute, if these weren't made, Patrick would take issue with you for that, correct?
A Correct.
Q So he had authorized you to manage this process of the film?
A I don't know if authorized is the best word. But requested is certainly the word that I would use.
Q There's a long list of various edits here. We're not going to go through all 17 of them. I want to just look at one or two. But just to give a little context here, number 1 says: The

Page 93

opening credit of the movie should start off with, quote, a quick review of the last five years or words to that effect.
Do you see that?
A Yep.
Q So to my mind this seems like a fairly granular specific detail of the film that Mr. Byrne is giving you feedback on. Was he involved with managing the content of the film at this granular level throughout the production?
MR. CARRY: Objection to the form.
BY MR. KLOEWER:
Q You can still answer.
THE WITNESS: I still answer?
MR. MILLS: Yes.
A Again, I can't speak for Patrick Byrne. Many people brought things up when they would see something. If one of the interviewees saw something, oh, I wasn't clear on my answer. This is what I'm concerned. I would send -- I would just send the notes to Roger.
Nobody talked to Roger except for me. Nobody else talked to everybody else except through me. They would just simply hand me the piece of paper, I would turn and hand it to the appropriate



person.
So in that particular case that he referred to, he had -- he had an idea. Where that idea would go, how it would fit in, not my concern. It is -- it is finished. It is going to Roger. Roger will look at it. Oh, I understand this. If he understood the concept of it, he did what he thought best. If he didn't understand it, he goes what does he -- what does he mean by that. I pick up the phone. Hey Pat, what do you mean by this. And then relay the message back.
Q Was this change, as just an example, was this incorporated in the film?
A I actually -- I actually don't recall that. I remember us talking about that now that I see it again. But I can't recall if it ever was in the final -- the final film.
Q But if Patrick wanted something in the film, you made sure it was in there, right?
A No and yes.
Q To the best of your ability did you attempt to --
A I would relay the message to Roger. And quite frankly I felt very sorry for Patrick for having to continue to ask me to do something that I



would give to Roger that Roger never fulfilled his obligation. So I felt terrible because I felt it is my responsibility to provide what he requested and yet he wasn't getting it.
Q But Byrne had the ultimate call on what was included in the film or not, right?
A Again, by the end of the editing of this film, I had virtually nothing to do with it at all. Because at that point Patrick now had one of his guys sitting in the room physically with Roger. And now I'm guessing, and if you like me to guess, I'll finish the answer. And if not, then I won't, sir.
Q Go ahead.
A The guess is that he just got fed up with Roger not delivering what he would promise. Because I certainly knew I was fed up with Roger not delivering what he would promise.
So he finally sent somebody to Portland that I was paying the hotel room for the editing, I was paying for the equipment, I was paying for the computer, I was paying for their food and everything else. When I say I, I'll make it clear, it was not me personally, Steve Lucescu. I was paying for it with money that Patrick provided for



the film.
Q And when you say his guy, that's Faaiz who we talked about before?
A No. I don't believe Faaiz was part of this at all. It was somebody else. Again, I believe it was somebody named Patrick Weaver, but I'm not a hundred percent sure that was the name. I'd have to somehow try and figure that out through text messages. You probably actually have that answer though.
Q Let's move down to number 3 on this list. It is page 2 of that document I handed you. It says: Take out Ruby Freeman social media confession. Some question about whether this was authentic or not.
A Correct.
Q Who is Ruby Freeman?
A I don't know. We didn't interview her. I believe -- the name is vaguely familiar. I know she was somebody who was in the news at the time. Roger found a news clip of her from somebody else. He would just insert clips into there.
Again, I wasn't part of the editing, so any answer I give you, I would not be fully knowledgeable of it. But that would be my extent

based on that. Because there were people that Roger would just pop in from news clips that would then be this isn't relevant, take it out.
Q Were you aware that Ms. Freeman was accused of rigging the election results here in Georgia?
A I believe so. I believe that was -- she had some involvement in it. Again, this is four years ago --
Q Sure.
A -- for me now. So I didn't interview her. I didn't know her. She was not brought up to me to go talk to or find out. It was simply something that Roger just found a clip and threw it into his creative vision of the film.
Q Well, was this clip of Ms. Freeman removed from the film?
A I actually can't recall whether it was or not.
Q Well, I'll represent to you that I haven't seen it, and I have watched the film several times.
A Okay.
Q So I'm wondering why it was removed.
A Well, again, I can only give you an



answer based on what I'm reading. And I was never present in any of the conversations. It clearly says some question about whether it was authentic or not. Leaves it open to a pretty big range of possibilities. But clearly Patrick had some concern over Ruby Freeman's confession. What that is I don't know.
Q Did Mr. Byrne ever raise any concerns with you about the claims about Dr. Coomer in the film?
A I don't believe so. I believe he also relied on Joe Oltmann's knowledge. I mean I didn't know who Eric Coomer was when we started the film. I had no idea. The only person that talked about it, the best that I can recall, in the film was Joe Oltmann. They only talked about Eric Coomer for a very minuscule amount of time in the overall one and three-quarter hours of the film. It is a very small part.
Q Did you have any concern about whether the claims about Dr. Coomer were authentic or not? Or rather accurate. I said authentic. That's what's stated in the email here. But did you have concerns that those claims may not be true?
A Again, for me I didn't look at that as



any part of my responsibility. My responsibility was to get people on tape, and I do -- I believe then and I still believe now from my knowledge that Joe Oltmann believes everything he told me about what he researched on Eric Coomer.
So I don't really know how to answer your question other than I believe that Joe Oltmann firmly believes what he represented, which is to me that's all I needed. It is his First Amendment right to express what he believes, get it on tape, see where it pans out with everything else.
Q Well, did you believe what Joe Oltmann told you?
A I believed it was a possibility for sure. Because he presented it and he had video clips. I mean while we were filming, he would pull his phone out and show me video clips of things that Eric would say that quite frankly I found incredulous that somebody who owned a software company like Dominion software. Or whether he owned it or not, again, I don't know the structure of the company. But somebody who would be representative of that company would put a public comment out about one side or the other.
To me my belief would be you remain



neutral and unbiased. And if somebody is so firmly biased about one person, then it leaves a lot of credibility to the possibility that they would do something against that person.
Q Did Mr. Oltmann ever show you anything that Dr. Coomer said admitting to rigging the 2020 election?
A I know he brought things up to me that we did ask him. I was under the belief that he had more evidence -- I thought he actually had the Zoom recall recorded. I thought that at the time. I asked him for more documentation when he was being filmed. Because Roger said hey, can we get this infographic that Joe had made.
And he talked about he had a copy of it. He showed it when he was being filmed. I don't know if it was even in the film. I don't know. Roger wanted it because he wanted to include it in the film. I can't recall if he did or not. He had different evidence, he had different things he showed me. He, again, flipped open his phone and showed me videos. There was a video of Eric lying to the police. Again, didn't have a lot of credibility if you lie to the police.
Q Well, that didn't happen until September

of 2021, right?
A Again, when he showed it to me and when we talked about it, I'm not a hundred percent sure. I just know that you asked me about verifying credibility of somebody. So to me that just kept going in line with what I believed at the time. I believed the evidence that Joe showed me was factual because it was documented. There were screenshots that I saw of very shocking statements that he publicly put out there.
Q Well, let's be sure we're talking about the same thing. Because you're talking about Dr. Coomer's Facebook posts.
A I don't recall what they were. I just recall that he had posts by him in different -- in various different places. And they -- and they -- again, to me it was just shocking that you have asked me authenticity of somebody. To me that didn't give him much credibility that he would post such vulgar vile comments about somebody.
Q But the film doesn't talk about Eric Coomer's Facebook posts though, does it?
A I don't -- I don't believe it was ever mentioned. Again, I have seen the film one time. Well, actually twice. I have seen it once the very



first time the night before the premier which is the very first it was provided to me that I watched on an airplane flying between Chattanooga and Phoenix. That was the first time I saw it. The second time I saw it was at the premier. The next night. Sorry.
Q But Mr. Oltmann never provided you any evidence that the Antifa call happened, did he?
A He did not other than his testimony.
Q Did that concern you?
A It didn't. I thought Joe was a very credible witness. The way he had presented himself with his knowledge, with his companies, he appeared to have very successful companies. He had an extensive document that had so much information in it. To me it was an incredible amount of information. He clearly had done a lot of research, certainly far more than I could ever do. He used resources that I don't have available.
Q But you didn't make any effort to verify whether that research was accurate, did you?
A I don't believe that's a clear question. I repeated several times that I have looked at various clips, and there are many clips I saw that were in that document that I would see Eric



talking. There were ones -- and again, I don't even know if they came from the document because Joe would open his phone and he's show me ones.
There were training videos Eric Coomer showing -- Dr. Eric Coomer of Dominion software doing a training video showing how you could manipulate the output and how you could delete logs.
My background in computers and computer science and engineering, because that's what I graduated in before I started into the film industry, gave me a very wide opening look at that aspect that you can alter audit logs. That should be impossible to be able to do that. And yet here he is describing how it can be done.
Q It is your belief that the video of Eric Coomer shows him how to -- teaching how to alter audit logs?
A There were videos that were -- that I looked at right there that saw him showing how you could manipulate -- what was presented as manipulating. I didn't even understand exactly what it was. And then Joe would say well, that's -- like it all goes into this adjudication file, and you can take that adjudication file and



just throw it into the trash. And that went in line with what Eric was representing on the video.
Q Well, we'll watch that video in a bit and confirm the substance of what Dr. Coomer stated in that training video in Chicago.
I want to try to focus just on the specific point here. You said you thought Mr. Oltmann had a copy of the Antifa call or recording, correct, that was your belief?
A I did. I thought that to be accurate. I thought he had said that at some point. He later told me that he never had a recording of it. He wished to God he did I believe were his exact words. I certainly never saw it. I certainly never saw anything.
I asked him if I could talk to the person who gave him access so that I could get them on tape to verify and just talk about what they heard. And he said no, they had to remain anonymous.
Q Why?
A Well, I respected that. People want to remain anonymous. You know, I have people that appeared in the film that wanted to remain anonymous, and I had never divulged who those people are until you asked me that question today,

and I understand that I have to answer that question truthfully because I'm under oath. I certainly wish I didn't have to because now I broke my word to them that I would say who they are. I find that hard to sit with.

Q My question is more about did it concern you that Mr. Oltmann was unwilling to provide any evidence to corroborate his story about the Antifa call?

MR. MILLS: Object to the foundation. You can answer.

A Yeah, I'm kind of -- I'm puzzled by the question because Joe's evidence is his testimony. I found him to be a credible person. I thought that he was truthful. I believe he was and I still believe he was. I believe he firmly believes what he told me, and I still think he does now based on conversations with many people who do see things he still is going through and saying.

I don't have many conversations with Joe at all in the last several years. We send the odd text back and forth, you know, merry Christmas, happy new year, that kind of thing. We don't really talk -- we haven't talked about the film, anything along those lines.



Joe was a credible guy. He's the owner of a company who manages data and works in the data analysis. He provided a document that looked exhaustive to me. I mean I couldn't even go through it all. It was too many pages. I just remember it was 118 pages long and it had hundreds and hundreds and hundreds of links of which some I did click on and look at, and at later point those were all scrubbed from the internet.

Q None of those links provided any evidence corroborating that the supposed Antifa call occurred though, did they?

A Again, I didn't ever see -- I thought it was clear before but I'll try and be clear this time. I have never seen any evidence supporting any recording of the call. Because the only person that would be able to provide that to me was Joe Oltmann, and he couldn't provide it.

Q So do you believe that call occurred as you sit here today?

A I do. I still believe what -- or at least I believe that Joe Oltmann believes that. Because that's what he's telling me. Like I still have no reason to not trust Joe.

Q Still?



A Well, I don't -- I haven't been part of his life and I don't. This portion of making this film is four years ago. It is finished. It is wrapped. I have moved on. I have done a thousand productions. Nothing is different for every production I do. I don't -- I don't go back in time and wish that I did something differently. Here's the finished product, here it is, it is done, it is finished. My job is over. I move onto the next project.

Q Well, you're here for a deposition because you have been sued for defamation. You realize that, right?

A I do.

Q Does that give you any reason to doubt Mr. Oltmann or his claims?

A I don't know what to believe for that. I'm very puzzled why I'm sitting in this room with you. I didn't know who Eric Coomer was. I have never talked about Eric Coomer. I have never said a bad word about Eric Coomer.

I know that Joe Oltmann has exhaustive research that he's done on him. I believe Joe Oltmann has what I believe is a First Amendment right to discuss what he believes. That was my



job, to put people who were exercising their First Amendment rights to talk on tape, here it is, Roger, here's the interview you just did.

Q Did you reach out to Dr. Coomer before you put Joe Oltmann in the film?

A I didn't know about Joe Oltmann. Sorry, I didn't know about Eric Coomer until mere days before. And the very next day after I talked to Joe, I was on a plane to start finding locations and do what we call location scout, to look at potential filming locations for the film. For me it was Joe's -- Joe had a lot of testimony. Eric Coomer was only a small part of it.

Q So it is your testimony today you had never heard of Eric Coomer until Joe Oltmann told you about him in February of 2021?

A That's correct.

Q You weren't familiar with the lawsuit that Dr. Coomer had filed against Joe Oltmann and various others including Sidney Powell?

MR. MILLS: When?

A I don't -- I don't recall anything prior to that date. I know that lawsuits existed subsequent to me making the film. I don't know when they were initiated. I only became aware of

them at a later point in time. I certainly didn't know anything about it at the time that I first heard -- the first time I heard Eric Coomer's name was approximately February 23rd of 2021. That's the first time I heard the name Eric Coomer. I didn't know who he was.
BY MR. KLOEWER:
Q You knew Oltmann had been sued when you interviewed him though, right?
A I don't believe I did actually.
Q Well, he talks about being sued in the film. You recall that, don't you?
A I actually can't give you a valid answer for that. I don't believe all the detail -- I mean not believe. I don't recall all the details of the film. I wasn't present for every bit of an interview. And like I said, I have only seen the film twice.
Q We'll review those clips in a minute. We'll go ahead and mark this as Exhibit 4 I believe we're up to; is that correct, Mark?
(Plaintiff's Exhibit 4 marked)
THE WITNESS: Are we done with Exhibit 3?
MR. KLOEWER: Yes, we can set that aside.
MR. DEMPSEY: This is Chris Dempsey. Can

Page 110

you please repeat --
MR. KLOEWER: Yeah.
MR. DEMPSEY: -- which exhibit we're going to.
MR. KLOEWER: We'll mark this as Exhibit 4. It has been marked as Lucescu 6438.
BY MR. KLOEWER:
Q All right. Mr. Lucescu, this appears to be an email from yourself to yourself. It is marked from steve.lucescu@gmail which we established was your email before?
A Yep.
Q We have got a bcc also to Steve Lucescu. Do you typically forward yourself emails? How did this email come into your possession?
A Once I start on any project or potential project, at this point it is a potential project. Because it had to do with election fraud, any article that I would come across, anything, I would simply create a reader view on my phone -- I did this all from my phone. I would see an article on, on this particular one, I got it somewhere on the Denver Post. Don't know how because I don't subscribe to that. Somehow I got that. Somebody -- either somebody brought up hey, here's

Page 111

an article on election fraud or I would find it in a link from another article.
So I would simply create a reader view and then email it to myself. Again, if it had something to do with election fraud, email it to myself, put it into -- put it into a folder.
Q Did you read it at the time?
A I don't -- I don't recall. And I would have to say no. Because if I did, I certainly didn't register Eric Coomer. Because as I stated before, my recollection of my first knowledge of Eric Coomer or the name Eric Coomer was from Joe Oltmann.
I can clearly see the date of this is December the 9th, 2020. So all I can say is the title of the actual article was Guest Commentary: I work for Dominion Voting Systems, stop. That's all I need to know. Dominion Voting Systems, something to do with election fraud, I'm going to forward that to myself.
Q You didn't think the substance mattered?
A It didn't matter to me. I didn't have time to read all these articles. As pointed out to me by FTI, I have in excess of a quarter million emails in my email. I don't have time to read

Page 112

those articles. I see something, I put it in for two reasons. One, many times a link you tick today will give you a different result if you tick on it tomorrow or three months from now. If that happens, that leads you to look at why did they change it, for what reason.
I don't have time to read this right this second. I'm going to forward it to myself. I was getting a lot of information in the news on voter fraud. I literally did not have time to read them all. And it didn't matter to me at that point because I didn't know if I was making the film or not.
Q But you saved it for later use if you did make the film?
A That was the intent.
Q And you already mentioned this email is from December 9th.
A Correct.
Q We can see the date on the article --
A Correct.
Q -- is December 8th. This is an op-ed that Dr. Coomer published denying the false claims about him that were made by Joe Oltmann.
A I still don't know what the article is

Page 113

about. If you would like me to read it over the next --
Q Well, the fact that --
A -- time I could.
Q -- you haven't --
A But I have not read it.
Q Yeah. That's fair. The fact that you haven't read it still to this day I think speaks for itself. You didn't go back to review this --
MR. MILLS: Object to form.
BY MR. KLOEWER:
Q -- before the film?
MR. MILLS: What's your question? You can save the editorials.
BY MR. KLOEWER:
Q You didn't read this article when you were actually producing the film, did you?
A I did not. I quite frankly didn't know it existed.
Q Did you have a specific folder or somewhere that you saved this information for potential use in the film later?
A I did. I had one email folder that anything to do with election fraud went into. The intent was, as I expressed to you earlier, two

Page 114

reasons. I never went back to read any of them because I didn't have a need to. Because to me it would be who would it talk to, who could it lead to, who could you get to appear to talk.
I had so many people on a list that there was nowhere near enough people -- or sorry, nowhere near enough time in a movie unless you were trying to make a six, you know, episode series of people to talk to. It just didn't ever require me to go back to try and find more names and more people and more -- the names just kept popping up with one conversation after another, actual conversations with people like I'd have with Patrick or with Matthew or with, you know, Joe Flynn or whoever else.
MR. KLOEWER: Let's take a look at another one. We'll mark this as Exhibit 5.
THE WITNESS: We're done with 4?
MR. KLOEWER: Yes. You can set that aside.
(Plaintiff's Exhibit 5 marked)
MR. DEMPSEY: This is Christopher Dempsey. Can you please repeat what's marked as Exhibit 5.
MR. KLOEWER: Yes. This is 8381.

Page 115

MR. DEMPSEY: Thank you.
BY MR. KLOEWER:
Q All right, Mr. Lucescu, you see this appears to be another email you sent to yourself --
A Correct.
Q -- correct?
This time it is September 28th, 2021. So this would have been after the film was released. And it is a link to an Associated Press article from December 23rd of 2020, the year prior. Do you see that?
A I see that.
Q Now, we're probably going out of order. I'll show you the clips of Mr. Oltmann here. I just want to confirm it is your sworn testimony today you were not aware that Eric Coomer had sued Joe Oltmann for defamation prior to making the film; is that correct?
A I don't believe so.
Q Did you ever read the complaint filed by Dr. Coomer against Mr. Oltmann?
A I may have seen parts of it at some point in time. I don't recall exactly when. I certainly didn't read it with a fine-tooth comb to go through it. I don't know when I would have glanced at it.

Page 116

I don't know that date.
If you have any -- in my texts that we talked about something with anybody, I would be happy to try and refresh my memory by looking at those. But as I look at this one dated November -- or sorry, dated September 28, 2021, long after six -- months after I filmed Joe Oltmann, literally more than six months after, almost seven months after I filmed him, long after my job was finished on the film, long after it had been edited and aired.
Again, if I just saw -- and even to this day, even to this day if I still seeing anything to do with election fraud, it's out of a habit now, I see it, I just save it and launch it into that folder.
I still don't read them. I just have them. I don't know why. It is just a habit of seeing it, it goes in, it goes into a folder. I probably have 20 different folders of different potential products -- projects that it would be important to have information on.
Q I want to get more into the Oltmann clips in the film. But before we do that, I want to just kind of establish the cast of characters and when

Page 117

it was determined -- we can skip over some of this stuff because we have already looked at it. Let's mark this as Exhibit 6.

THE WITNESS: We're done with 5?

MR. KLOEWER: Yes, we are.

And for the folks on the live stream, I'm afraid I don't have a Bates label for this. This is a screenshot from the -- hey, look at that, it is the very first one. So this is 20250212 at 3:52:45 p.m. Apologize, I know that that's a lengthy citation there. It is just an image of Mr. Flynn from the film. We'll mark this as Exhibit 6. And I'm going a bit out of order, Mr. Lucescu.

(Plaintiff's Exhibit 6 marked)

BY MR. KLOEWER:

Q We'll break for lunch here soon. I want to clean up a couple of small items before we proceed. So what I am wondering, Mr. Lucescu, is this I believe it is pronounced chyron, the image in the bottom left --

A Correct.

Q -- of the screen that identifies the speaker here. It says Joseph Flynn. It says Board Member - The America Project.

Page 118

A Correct.

Q Why is Mr. Flynn identified by that title?

A He would have requested that.

Q And you talked a little bit before about The America Project's involvement with this film. So he was appearing in this film as a member of The America Project by his request; is that your testimony?

A No.

Q Okay. Well, what did I get wrong there?

A I thought I mentioned it earlier. As far as I know, The America Project didn't exist at the time we filmed the movie. I believe that America Project was formed after I finished my filming and sometime before the movie was released.

So in the interim between -- again, I'm getting these dates not exact -- but when I first -- I believe Joe Flynn was around March the 17th or 18th, somewhere in that time frame. Because I know that I only filmed between February 25th and the 18th or 19th of March. That was it. It was a twenty -- it was a three-week shoot in total for doing that.

Sometime after that Joe had changed

Page 119

whatever his previous title was. I don't know what it was before that. But he had -- he would have changed it to Board Member of The America Project.

Q And you changed that on his request --

A I did not.

Q -- prior to the film's release?

A I did not. Roger did. Again, I had nothing to do with the edit. This would be part of the edit. Not my job. Joe would talk to me, tell me what he wanted it to say. I would tell Roger, this is what Joe wants; this is what Patrick wants, this is what Joe Oltmann wants; this is what Bobby Piton wants, this is what every member, this is what they want.

Q I see. What was -- what expertise or what background did Mr. Flynn bring to this film? In other words, how was -- how was he relevant to the subject matter election fraud?

A My knowledge of Joe's involvement was he was -- he was involved with various different groups that had something to do with the election fraud. As I mentioned earlier, I did meet Joe Flynn on another film I did. And he appeared in it, again, a very honest, very honorable, very credible guy, brother to Lieutenant General Michael

Page 120

Flynn.

And he always had information about various aspects. So Roger thought well, we should -- you should probably get Joe on film again. He did great in the first one. We should probably get him on -- on tape again. Joe, you want to appear. Yeah. Okay. And I interviewed him in Florida.

Q What does he do for a living?

A I am not sure.

Q How has he come into possession of this knowledge that you felt was relevant to the film?

A I don't know how he came across it. I am not part of Joe's life on a daily basis. Like I said, he was an -- to me he was an honest, credible person. I believe what he told me was always true. I don't think he ever lied to me.

So he had knowledge that we talked about. As we sit here today, I can't even recall exactly what Joe talked about in the film right now. I can't recall that.

Q A real quick one we'll do here.

THE WITNESS: Are we done with this one?

MR. KLOEWER: You can set that aside. I'll mark this as Exhibit 7.

Page 121

Alfred and Chris, this is another screenshot. Let me try to find the specific numbers. It is an image of Mr. Byrne. Yeah, that's the next one alphabetically, screenshot 250212 at 4:24 p.m.

(Plaintiff's Exhibit 7 marked)

BY MR. KLOEWER:

Q So here we have a similar image. I'm going to ask you a question about the same topic, that chyron there, we see Patrick M. Byrne identified on screen and his title is Founder slash CEO The America Project. Correct me if I'm wrong. Did the same process lead to this identification here, did Mr. Byrne request this designation?

A Again, I believe so.

Q You were aware that Mr. Byrne was the chairman of the board for The America Project at the time, correct?

A That was my belief. That was -- if it is here, then, again, you have asked me numerous times if I verified information. I would have no reason to doubt it. If his name is there, at the point that this was on, I don't even recall when this conversation happened. It might have been with his guy sitting in the editing room with Roger. I



don't know.

I would have to try to look somewhere if there's any kind of documentation when it was changed from a previous reference to overstock or whatever else it was that it was before.

Q You were aware that Mr. Byrne intended for the film to generate revenue for The America Project, right?

A If you refer back to the original document of understanding that I had with Patrick, he wasn't sure if he was -- how he was going to ultimately decide if it was going to be free or if it was going to be a paid thing. He didn't know. He always said he may just release it for free because it was really important for people to understand what had happened.

Q But by the time -- I mean this is the finished product, this is the published product.

A Right.

Q So prior to the time of releasing the film, you were aware that it was intended as a vehicle to generate revenue for The America Project, right?

A I believe that was the intention. Because Roger's distribution company was supposed



to have it distributed, which he never, ever, ever achieved in even a small form. So again, I can't speak for Patrick. I can't speak for whatever it was.

I mean I can look at this as an -- from an objective point of view and think he just wants to bring attention to The America Project that they produced the film. Whether or not it was a hundred percent going to be used for free or money, I don't know when that decision was ever made. And ultimately it was made, he just ultimately just took control of it and put it on The America Project website.

MR. CAIN: Are we hungry?

MR. KLOEWER: We are hungry, and I think this is a good place to break because I'm going to get into more footage from the film. But let's stop there. I think that makes a good reasonable spot to take a break.

THE VIDEOGRAPHER: The time is 12:24. We're going off video record.

(Recess 12:24-1:25 p.m.)

THE VIDEOGRAPHER: 1:25 we are back on the video record.



BY MR. KLOEWER:

Q Okay, Mr. Lucescu, before we broke for lunch we were just talking a little bit about the early scenes of the film identifying Joe Flynn and Patrick Byrne as a board member for The America Project and the CEO and founder of The America Project respectfully.

I want to take a quick look at one clip that's not from the body of the film but precedes it and some versions that we found online, and just ask you a quick question about that.

So we're going to take a look at what has been labeled as Exhibit 2, clip 7. And if you'll bear with me. I may need to adjust the volume here. Well, let's just start with it loud. So we can see Mr. Byrne sitting in a chair here. As I indicated, this scene precedes various versions of the film that we have found online, so I'm wondering if you can tell me a little bit about it.

(Video played.)

Q Did you film that scene, Mr. Lucescu?

A No, I did not.

Q Who did?

A I don't know.

Q Do you know when that was filmed?

A I don't know. I have never seen that clip before, not to the best of my knowledge. I don't recognize the background in it. I don't recognize it as one of the locations we were in.
Q Just so going back to my line of questioning, I had a few questions for you before. As you sit here today, do you know what TAP -- to be clear on the record, when I refer to TAP, I'm talking about The America Project just for ease.
A Correct.
Q What was TAP's role in this film?
A Well, to my knowledge, TAP didn't have a role in this film. TAP didn't exist, as I mentioned previously, until much after I had finished filming to the best of my recollection. I wasn't aware of it and aware of any TAP emails that I can recall with addresses until a much later point in time.
Q At the time of the film's release though, I mean we see references to The America Project --
A Right.
Q -- throughout, right?
A Which I have indicated is six months after, literally six full months after I filmed the film, the actual film.



Q Well, to be clear, the film was released on June 26th.
A Correct. Oh, yes.
Q So just --
A Sorry.
Q -- three months.
A That was six months -- sorry. That was six months for something else we were looking at.
Q All right. We'll look at some emails about that later. I just wanted to do that one first because it's a scene that precedes the film -- the version of the film that's publicly available currently. So I was wondering if you had any input on that. It sounds like you had ceased your involvement with the film by the time that scene was recorded?
A I don't even know that it is publicly available right now.
Q I'm going to show you another clip real quick that involves Mr. Byrne. This is right at the very beginning of the film where he's sort of setting the table for what folks or for the substance of the film. This is Exhibit 2, clip 19. This is another short one. And I'll have a couple of questions for you after we take a look.



(Video played.)
Q Do you recall this portion of the film?
A I do.
Q And did you film that scene?
A I was present in Washington when it was. I wasn't there for every bit of it. The camera crew just -- Patrick wasn't there for that. That's -- which is why you don't see Patrick in that footage, he was not present for it.
At the time it was filmed, it was only an afterthought as we were filming something at the Lincoln Memorial and the south side of the White House, just the area, we happened to see all the names of these states. And Roger was oh, it would be a great idea just to get that. Maybe we can use it. So we filmed it and ultimately he used it for that.
Q And Mr. Byrne did the voiceover at a later date?
A I can only assume so. Like I said, he wasn't there. So when he did it, I'm not sure.
Q And I know you can't speak for Mr. Byrne. But as you understand his theory of how the election was rigged and what he presented in the book, does that comport with your understanding



that these six states or these six cities rather were what was responsible for --
MR. DEMPSEY: Object to the form.
BY MR. KLOEWER:
Q -- false outcome of the election results?
MR. MILLS: You can answer.
A I believe that Patrick does firmly believe that since he has not wavered in what he told me the very first conversations of those states. As I have mentioned to you earlier, I am not familiar with the American voting process not being American. So I am new learning what the electoral vote is and learning what the swing states are and the importance of swing states and how a small number of people in precincts can actually alter vastly the difference of the final overall outcome of an actual election.
Q Would you agree that The Deep Rig, the film was intended to present evidence for this theory that those six cities were responsible for swinging the 2020 election?
A I believe that was the premise of his presentation over how these votes were injected at very weird times that of all the 3,006 precincts around the country, only six of them went down, and

it just happened to be the six of the 3,006 that injected votes in the middle of the night.
Q And did you make any effort to determine what election technology was in place in those six cities during the 2020 election?
A No. Again, my area of expertise was to put things on camera, and that would be outside the scope of what my job was.
Q And you don't hold yourself out as an expert in election technology, do you?
A No.
Q And you don't have any expertise in electric technology, correct?
A Not election technology. But as I mentioned, you use computers, and my foundation is in computers. I built my first computer from scratch in 1980.
Q In 1980. Do you have any training or education in computer science?
A I graduated in electronic engineering.
Q And what year was that?
A 1982. 1981? 1982?
Q And since that time, do you have any additional certifications or have you done any continuing education in that field?

Page 130

A Not formal. I have taken different programs and attended seminars and things over the years, but without frequency and without anything other than my inquisitive background into the electronics and technology since I use that in the film industry.
Q With respect -- with specific respect to election technology, do you have any training or experience --
A No.
Q -- in those systems?
So back to the six cities issue. More specifically, do you know if Dominion Voting Systems machines were used in those six cities?
A I don't.
Q So if I were to represent to you that Dominion did not have contracts for either Philadelphia or Milwaukee, would you have any basis to dispute that?
A Not right now I don't. But my film is not about Dominion software. My film was about election fraud overall from any shape or form, not about Dominion software or Eric Coomer.
Q Well, that raises an important point. If Dominion was not operating in Philadelphia or

Page 131

Milwaukee in 2020, then Eric Coomer could not have impacted the election results in any way, right?
MR. MILLS: Object to the form.
A I am confused by your question. There's multiple parts in that. As I just stated previously to your question, this film which you have now asked me about in general as a complete project how it relates to Dominion, and my film wasn't about Dominion software, it is about election fraud, period. Whether Dominion is part or not, I didn't set out to prove that. I didn't set out to show that. I set out to show election fraud, period. Didn't matter from where it came.
BY MR. KLOEWER:
Q Well, you weren't -- you weren't trying to set out theories, you were presenting facts, right?
A What I believed to be facts, yes.
Q So we'll see some clips in here about Dominion Voting Systems, about the adjudication function, about Eric Coomer. Those were what you believed were facts that you were presenting, correct?
A Correct.
Q So --

Page 132

A Presenting I'll retract. Filming I'll confirm. I wasn't presenting them. I was filming them to make it clear.
Q Sure. But your intent was that the public would consume that information with an understanding that it was factual, correct?
A Again, confused by the question. Again, I can only say that I did not present it and my job is not to present it. My job was to put it on film and then let Roger edit it together in what made sense with each person's -- their facts, what they believed to be true, how they correlated with everybody, and it kind of fit in that puzzle. I'm just trying to understand the terminology you're using when you say present.
Q Sure. Well, maybe this will help. Let's take a look at Exhibit 2, clip 11. This is a short one but just to sort of put in context what I'm trying to understand.
(Video played.)
Q So here you're taking more responsibility for presenting that information, would you agree?
A No, I am not. That interview, as I have indicated to you, was filmed the week prior to the release of the film. I have also said it several

Page 133

times that I did not see Roger's film until my flight between Chattanooga and Phoenix the night before the premier on June the 25th.
Anything you see that you just played me happened before I even saw the film, period. So once again, it is not my presentation. I am repeating information that Roger has told me is going to be in the film. So that's what that comment has to do with.
Q And you knew the Oltmann segments were in the film, right?
A I believed him that they would be in the film. I had no reason to doubt that he wouldn't be in there.
Q And after the film's release, you haven't ever made any efforts to distance yourself from the film or its substance, have you?
A I don't understand that. I don't have anything to do with it. I have said that, and that's the fact of the matter. I don't have anything to do with it.
Q Well, you're still identified as the producer on the film, right?
A I will be identified I'm the producer of the film as long as that edited movie still exists

Page 134

just like I have on a thousand other films whatever title I have on it.
Q That's still on your IMDb page, right?
A I believe it is.
Q Have you ever issued a retraction of any of the content in The Deep Rig?
A No.
Q Have you ever issued an apology for any of the content in The Deep Rig?
A No.
Q You're aware that Eric Coomer has demanded a retraction from you in this case, right?
MR. MILLS: Object to the foundation.
A Eric Coomer has never contacted me.
BY MR. KLOEWER:
Q Well, you're aware that the lawsuit demands a retraction, correct?
A I believe that that could be part of it. There's a lot of statements in the lawsuit, so I hire attorneys to represent that and ...
Q And you received a copy of our retraction demand after the Fox News settlement, correct?
MR. MILLS: Object to the foundation.
A I believe so.

Page 135

BY MR. KLOEWER:
Q Why haven't you retracted the claims about Eric Coomer in the film?
A I don't -- I don't believe that I have to take direction from Eric or anybody until it is shown to me that I have to do that. I have no reason to spend my time and money on something outside of my job is completed but I haven't been paid for and I'm no longer associated with the film.
Q Well, you're spending your time and money on this lawsuit, right?
MR. MILLS: Is that a question?
MR. KLOEWER: Yes.
A I am.
BY MR. KLOEWER:
Q And that's actually interesting. Who's paying for your legal defense in this case?
MR. MILLS: You don't have to answer that.
Instruct him not to answer.
MR. KLOEWER: Well, it is discoverable, Laurin.
MR. MILLS: No, it is not. But move on. I have instructed him.

Page 136

MR. CAIN: Basis?
MR. KLOEWER: What's the basis?
MR. MILLS: Privilege. You're not entitled to inquire into my financial relationship with my client. Move on. I instruct him --
MR. KLOEWER: I am not asking about your financial relationship.
MR. MILLS: Okay. I've instructed him not to answer. You can argue with me all you want. It's not going to change.
MR. CAIN: Let's just get the basis on the record and we'll move on.
MR. MILLS: Yeah. It is privileged.
MR. CAIN: And that's attorney-client or what?
MR. MILLS: Correct.
MR. CAIN: What is the privilege?
MR. MILLS: Attorney-client.
MR. CAIN: Thanks.
BY MR. KLOEWER:
Q Do you share Mr. Byrne's belief that those six cities had to produce inaccurate results in order to rig the 2020 election?
MR. CARRY: Objection to the form and lack of foundation.

Page 137

A And I am a little confused by your question because I will never and can never speak for what Patrick Byrne's thoughts are.
BY MR. KLOEWER:
Q Let's move through the film a little bit. I want to talk about another star of the film, a guy by the name of Phil Waldron. Can you tell me who is Mr. Waldron?
A Colonel Phil Waldron is a U.S. Army veteran, served the country for many decades and specialized in cyber security.
Q And how did you meet Mr. Waldron?
A I am not 100 percent sure which person directed me to contact Phil Waldron. It might have also been Matt DePerno but I'm not a hundred percent sure right now. Again, I ask you that you would have seen texts from my phone that you have been provided that if it indicates something, then please tell me and it will refresh my memory.
Q Sure. I didn't see anything in there -- this isn't a gotcha. I was just curious who --
A No. No. Again, I can only answer what -- what I know.
Q Yeah. Let's take a quick look at Exhibit 2, clip 2. This is a short clip of

Page 138

Mr. Waldron explaining a bit of his background.
(Video played.)
Q It is just a short clip there. What do colour revolutions have to do with the 2020 election?
A No idea. Don't know if they do or don't.
Q Why was this included in the film?
A Don't know. Didn't edit it.
Q Did you record this scene?
A I did.
Q You didn't have any discussions with Mr. Byrne about including this content?
A I didn't have any discussions with anybody about including anything since I wasn't part of it.
Q When he says our team, who's he referring to?
MR. MILLS: Object to the foundation.
A Again, I can't speak for Colonel Phil Waldron. I don't know. I know he's part of a group of people that have been used and I have seen clips on C-SPAN and court cases where he's talked and given evidence and he's one of a member of a team. I don't know what that team is.

Page 139

BY MR. KLOEWER:
Q Are you familiar with the Allied -- I'm going to mix it all up now. ASOG is the acronym, the Allied Security Operations Group?
A I believe that's the group I'm talking about that Phil was a part of.
Q And when he says they were approached by -- well, he doesn't say by who. Do you know who his team was approached by?
A No idea. I'm not part of ASOG and am not part of privileged conversations Phil Waldron has.
Q What is your understanding of what ASOG does or did?
A Involved in cyber security and analysis of data, anomalies in data.
Q Do you have any idea who ASOG worked for?
A No idea.
Q Do you think that -- well, let's take a look at another clip from Mr. Waldron. This is Exhibit 2, clip 16.
(Video played.)
Q This one is referring to the Open Societies Foundation there. Are you familiar with that organization?
A I'm not. I have heard the name but I

Page 140

don't know very much at all about it.
Q And their record didn't capture the images on screen, there were various images of the investor George Soros. Are you familiar with that individual?
A Again, heard the name. No idea what his business is.
Q Are you aware of any connection between --
MR. CARRY: Brad, I'm sorry, before you go into the next question, I think -- and Chris can speak to this too -- I'm not hearing all of your words to your questions and I didn't get the name of the clip or the number of the clip that you just shared.
MR. KLOEWER: Sure. Sorry. Let me adjust my microphone. Can you hear me a little better now, Alfred?
MR. CARRY: Yes. I don't know if you can move yourself closer to like the mic that is for Zoom. That would be helpful.
MR. KLOEWER: Yeah. It is occurring to me I'm obviously coming through the laptop that's sitting in front of the deponent right now. So I'll try to speak up and speak a bit more clearly.

Page 141

Is that better?
MR. CARRY: Yes. Thank you so much. And what was the clip number that you just showed?
MR. KLOEWER: That was clip 16.
MR. CARRY: Great. Thank you.
MR. KLOEWER: Yep.
BY MR. KLOEWER:
Q Mr. Lucescu, are you aware of any links or connections between Eric Coomer and George Soros?
A No, I am not.
Q Are you aware of any connection between Eric Coomer and the Open Societies Foundation?
A I am not.
Q Are you aware of any connections between Eric Coomer and colour revolutions?
A I am not.
Q Are you aware of any connections between Eric Coomer and any political movement?
A I am not.
Q We'll come back to Mr. Waldron in a bit. I'd like to talk about somebody you just mentioned a moment ago, Matt DePerno. Who is Mr. DePerno?
A Again, I answered that he is a constitutional attorney in Detroit, Michigan who



eventually ran for attorney general. He was representing clients in Michigan in Antrim County I believe that had evidence of fraud being committed in their county.
Q And how did you meet Mr. DePerno?
A I was referred to call him by Patrick.
Q When did Mr. Byrne make that referral?
A Again, four years ago. It was a long time ago. Lot of conversations with many people since then. I would only be able to guess at approximately mid-February to the third week of February, somewhere in that time frame.
Q When did you first meet Mr. DePerno in person?
A I believe March 1st, 2021 in Phoenix, Arizona at the Isos where I was filming.
Q So Mr. DePerno's scenes then presumably were filmed at that time, early March of 2021?
A Correct. March 1st I believe.
Q And that's just based off of your recollection? I know we asked about that before.
A Yeah, I remember it being -- I remember it being a date of March 1st, March 2nd, somewhere in that time frame. But definitely very early on in March because he was in that location which was



the first location after the Michael Flynn/Sidney Powell/Patrick location.
Q Did you have any conversations on the phone with Mr. DePerno prior to him showing up to conduct his interview?
A I did.
Q What did you discuss?
A Election fraud.
Q Can you be more specific. What aspects of election fraud did you discuss with Mr. DePerno?
A He had knowledge of the way votes were being manipulated and controlled and altered, evidence of ballots being added into the system I believe. I mean this is the general theme of everybody in the film, so they all had what they represented as very credible evidence which is why they eventually appeared on film.
Q Did you discuss Dr. Coomer with Matt DePerno?
A I don't recall if -- I don't recall if Eric Coomer's name was brought up by Matt DePerno. I can't recall that. I do know that Matt introduced me to Joe Oltmann which is why I eventually talked to Matt -- to Joe Oltmann was on Matt DePerno's recommendation. He highly



recommended Joe because of his extensive research into election fraud, but I can't remember if he actually mentioned Eric Coomer or not. I don't know.
Q Let's take a look at a clip of Mr. DePerno in the film. This is Exhibit 2, clip 3. And this one is a bit long because it features a clip of Eric Coomer which we briefly discussed before. I'll play the whole thing for you here.
(Video played.)
Q All right. Did you see any evidence from Mr. DePerno that people did access those systems as he was describing, said we want to see if people accessed systems on election day?
A Again, like Joe Oltmann, Matt DePerno had a very extensive, exhaustive amount of information pretty much about the pile that you have there beside you. He had a lot of documents that he brought with him. I didn't see them at all before. I didn't even see them when he was there. He only pulled some out and talked about some of them during the filming of his segment. I did see parts of him being filmed. I was working on the next location, the next camera setup, other things at

the same time.
Q Did you review those documents after the scenes involving Mr. DePerno were filmed?
A No, I didn't. I know Roger sat with him for several hours and went through things with him.
Q Why didn't you review them?
A Again, it wasn't my job. I don't know how many times I have to answer that to you. I was not part of that process. My process, to try to be clear to you, is the physical capture of the interviewees on film including securing locations, getting cameras, getting lights, getting footage, having the camera people there, having the grips there, the electrics, the makeup people, the hair people, paying for the location, getting food for everybody. That is my job on the film. I don't understand why you keep asking me the same question over and over.
Q Sure. I understand. And just to be clear, the purpose of the deposition is to understand what you know.
A Okay. Okay.
Q And what the basis of your knowledge is. To a certain extent there's going to have to be some repetition because we're going to go through a

Page 146

number of other witnesses.
A I'm fine. I'm just trying to answer your questions so that -- I feel that I'm not answering it correctly and I'm trying to.
Q You're being clear. I just from my side I don't mean to seem as though I'm harassing you by asking the same questions. I just have to check every box as we go through.
A I'm sorry, I'm not taking it as harassment. I just I'm trying to give you an answer. You got a big stack of documents there that I don't know how we're getting through.
Q Don't worry. I already know we will not be addressing many of these. We've gone through a lot.
Why is this clip of Eric Coomer in the film?
A I don't know. Roger put it in. Even watching it again now, I don't really see the relevance to it. I don't know. I don't know what it was supposed to represent. Maybe because I need to see what's before and after it in much greater scope. I don't know. It looks like it is a training video that he's instructing and it is similar to ones that I did see.

Page 147

Q So you would agree that the context of this video would be important for the audience to understand it?
A I would hope so.
Q Have you seen this entire video before?
A I can't recall if I saw the entire video. I don't know what entire video would be. There are many videos that are available that could be an hour long and then there's versions that could be 30 minutes long and versions that could be 10 minutes long and versions that could be 32 seconds long. I don't know.
I know that strikes a familiarity with me. But I also saw half a dozen different training videos where they all appear to be the exact same thing as that. So I can only think it is part of the same group of videos that I did see.
Q Do you know where this video came from?
A I don't.
Q So you didn't find this video yourself?
A I did not.
Q What is your understanding of the term adjudication? Do you know what adjudication means in the context of election technology?
A Well, I don't know what it means. I know

Page 148

what my understanding would be, and I can tell you that.
Q Yes. That's what I am looking for.
A My understanding is if there's any type of a problem with a ballot, any problem whatsoever. That could be a torn corner so that the imaging bed of the scanner cannot pick it up because one of the marks are misaligned. There could be erroneous marks placed on the ballot because somebody used a Sharpie instead of a ballpoint pen or the wrong color. Somebody could have put not a complete mark. Somebody could have made a mark outside of the defined area that you're allowed to check in. Somebody might have put an X instead of a checkmark or a checkmark instead of an X or filled it in or not filled it in.
Whatever each person has, it is stipulated what you must do. If something falls outside of that, then the machine as far as I know cannot make the determination because it falls outside the scope of its programming. So it now marks that ballot as being insufficient evidence to proceed, and it takes it out of the system and puts it into an adjudication file that a human must now look at.

Page 149

And I believe all of this that I have just repeated is in line with what the election act of the country stipulates. So that's my understanding of what that is.
Q And have you made any effort to familiarize yourself with local or state laws regarding adjudication?
A No.
Q Do you know how long adjudication has been a feature of electronic voting systems?
A I do not.
Q Do you know if other voting technology suppliers other than Dominion also have adjudication functions in their software?
A I do not know anything about other programs at all.
Q Do you know if Dominion software allows users to adjudicate more than one ballot at a time?
A Do I know or have I heard and had it described to me?
Q Well, let's start with the latter question. Have you heard that described to you?
A Okay. So I'll back up for a second to say if you ask me if I know anything about Dominion software, I am not a programmer for Dominion. I am

Page 150

not aware of its full functions, what it can or can't do, so which is the basis of my response. So now having said that, please repeat your question.
Q Who have you discussed the adjudication function of Dominion systems with? This may be a good place to start.
A I believe adjudication has been brought up by almost everybody that appeared on camera at one time or another.
Q Mr. DePerno goes on to discuss this ASOG report. Are you familiar with the report produced by the Allied Security Operations Group?
A I believe -- I know there's a report that I know as Exhibit 6 in one of Matt DePerno's cases. And I believe it has a title similar to Allied Systems, I believe it does, but I don't know if it has all -- I don't know if it has ASOG on it, the full thing that you just quoted. I don't know that.
Q The report I'm referring to, we're about to watch a clip from it.
A Okay.
Q It is discussed in the film. It was a report that Mr. DePerno submitted in conjunction with the Antrim County litigation that he filed

Page 151

on --
A Do you know who was in that report, who conducted the actual technical aspect of it?
Q The named author is Russ Ramsland.
A All right. So that's the one I'm talking about. I believe it is a 23-page document.
Q That's the one. Let me show you a quick clip here. This is clip 17.
(Video played.)
Q The reason I was asking you about the timing of this is because of these statements that Mr. DePerno makes right here. And I'm going to show you another exhibit here. This is the biggest one. And we're only going to look at a couple of different pages from it. But we will mark this as Exhibit 8.
(Plaintiff's Exhibit 8 marked)
MR. KLOEWER: Chris and Alfred, we're looking at the document, the PDF that has been identified as the Halderman Antrim Report dot PDF.
MR. DEMPSEY: This will be Exhibit 9?
MR. KLOEWER: This is Exhibit 8.
THE WITNESS: 8.
MR. DEMPSEY: 8. Okay. Thank you.
THE WITNESS: Chris and Alfred, I know

Page 152

you can't hear much, so that's why I'm right directly in front of the screen. So I'll repeat it when you guys -- if you guys don't hear it.
MR. DEMPSEY: Thank you.
MR. CARRY: Thank you.
BY MR. KLOEWER:
Q Mr. Lucescu, have you ever seen this document before?
A I don't believe so. It is a big document.
Q You see the page 1 indicates a date of March 26th, 2021. Do you see that?
A Let me get to it. Oh, right on the cover page. There's no page listed on it. Okay.
Q Does the name J. Alex Halderman mean anything to you?
A No.
Q You're not familiar with Dr. Halderman's work in any way?
A (Shakes head negatively).
Q I'll represent to you --
A Sorry. I nodded. Sorry. No, I am not familiar with him.
Q I'll represent to you that he's a computer scientist at the University of Michigan

Page 153

who produced this report that was submitted in the Antrim County litigation. Were you aware of that?
A No.
Q I want to come back to this exhibit, but let me show you the next one real quickly just to sort of frame the context of my question.
MR. MILLS: Do you know -- I just have a question.
MR. KLOEWER: Yes.
MR. MILLS: I know the date of the report. But when was this actually presented in the litigation as you represent?
MR. KLOEWER: That's a good question. I couldn't confirm that right now. But I can get you an answer and provide that to you.
MR. MILLS: Yeah. I mean I just want to make that clear. Because if you're going to ask questions to Mr. Lucescu based on the assumption that this was part of the litigation as of this date, I will object.
MR. KLOEWER: We'll confirm that and take your objection under consideration.
We'll mark this next as Exhibit 9. Alfred and Chris, this has been previously marked as Lucescu 404.

Page 154

(Plaintiff's Exhibit 9 marked)
BY MR. KLOEWER:
Q Okay. Mr. Lucescu, we're looking at a brief text message exchange here which appears to be from May 6th of 2021. Do you see that?
A I do. And I am very troubled with it.
Q The top left indicates the recipient is Matthew S. DePerno, and it is a text message that you appear to have sent to him at 11:31 a.m. I'll read that for you. It says: Hola Brother. Just watching the screener of The Deep Rig last night and getting close to locking it for the final on air version. Let me know what time would work for a short call. I think we should include some of your latest findings and reports to add to your segment. All the best Matt. Talk soon.
A Okay.
Q Did you have a call with Mr. DePerno in early May?
A I cannot recall when -- each time I talked to Matt. I did talk to him several times before the film. I talked to him after it. I'm just thrown by this.
Laurin, the reason I'm having trouble is because I have a phone number on here that I didn't

Page 155

even own at the time of 2021. I'm troubled by that. I don't understand how that's there. So that's what I'm troubled with.
Anyway, I am not going to be able to recall a phone conversation with Matt in detail, on what day, for how many seconds or minutes or anything unless you can refresh me what it was about.
Q That's okay. I don't need down to that level of granularity. What I'm curious about is did Mr. DePerno tell you that this report had been issued?
A Once again, I'll try and --
Q The Halderman report, sorry, the prior exhibit, Exhibit 8.
A I'll try and answer this complete and thorough for you this time. I don't know this name. To the best of my knowledge, I have never seen this report. I didn't know of its existence until you send it to me -- just gave it to me. There is 55 pages approximately here. 54 pages. Never seen it. Didn't know of its existence. Don't know what's in it.
Q Was there any sort of fact-checking process that occurred before the final version of

Page 156

the film was released on June 26th where you or anyone else to your knowledge went back to see if the representations in the film were accurate as of the date of the release?
A I can't speak for what Roger did. I don't know what he did. It is his project. It is his edit. It is his film. Again, I was not part of the edit of the film.
Q You have probably answered most of my questions with respect to the report then. The one thing I want to clarify, are you aware of representations made by the ASOG report about adjudication that occurred in Antrim County, do you recall those?
A What I do recall about the 23-page report that I know to be Exhibit 6, because I know that Matt did send me that somehow. I don't know how he got it. But I did get -- I recall it to be a 23-page report that was known as Exhibit 6 for his case. And what it did was it showed how the same set of ballots going through a machine produced different results for the exact same set of ballots. That's what I recall of that document.
Q More broadly before I proceed with the reports, do you know -- are you aware of any

Page 157

connection between Eric Coomer and the adjudication process beyond the video that we just watched?
A No.
Q Do you know what, if anything, Eric Coomer has to do with the adjudication function of Dominion systems?
A I have no knowledge of it.
Q Have you ever reviewed any of the patents on which Dr. Coomer's named as one of the inventors?
A I just heard that he has patents with Dominion software. Numerous patents is what I was told. I don't know if they're true or not.
Q Is it your belief that Antrim County, the Antrim County machines utilized Dominion's adjudication feature?
A I am trying to recall my specific conversations with Matt DePerno, and I know for certain that machines were used. Whether I can tell you if they were Dominion or not, I believe that they were represented as Dominion machines, but I don't know that.
Q If I were to tell you that Antrim County had not purchased the adjudication feature from Dominion, would you have any basis to dispute that?



A I would have no knowledge of it one way or the other.
Q All right. We won't belabor the report then. Let's talk about Joe.
THE WITNESS: Are we done with 8 and 9?
MR. KLOEWER: We are, yes. You can set those aside.
BY MR. KLOEWER:
Q We have discussed a bit of Mr. Oltmann's claims about the Antifa call. I'm going to show you a clip from the film regarding that claim and I'll have a few more specific questions. But as I indicated, we have discussed some of them already. So I'll show you what's been labeled as Exhibit 2, clip 18. This one is a bit longer. It is about a minute and a half.
(Video played.)
Q Lot to unpack there. How did Joe Oltmann infiltrate Antifa?
A Well, number one, I don't know. I can tell you what he presented to me.
Q Did you ask him how he infiltrated Antifa?
A I did.
Q What did he tell you?



A He told me that he met a guy, and he was not clear over where he met him. But he had access to this meeting that they had, and he provided Joe with the credentials to get into that meeting.
Q Did you ask any follow-up questions about where he met this person? Did you try to get more clarity from Mr. Oltmann?
A Personally I only tried to see if I could get the name of the guy so I could contact him and put him on film. That was -- that was, again, what I was trying to do is get people on film talking about it.
Q And Mr. Oltmann refused to provide you that information?
A Correct.
Q Did he give you an indication that he had that information?
A Well, by him telling me that he was given the login to it would only indicate that he has to know him in some capacity.
Q But do you know if Mr. Oltmann ever infiltrated any other Antifa meetings?
A I don't know that.
Q Do you know if ever attended any Antifa meetings?



A Again, I'm not part of Joe Oltmann's life. I know of the one meeting he had that he talks about at this film for the one day for the several hours that I interviewed him. That was it.
Q When he says the speakers were talking about how they needed to fortify, what did he mean by that?
A I don't know.
Q Who were the other participants on the call?
A I don't know.
Q Did you ask?
A Other -- all he represented was there were other Antifa members including Eric Coomer.
Q How many people were on the call?
A Don't know.
Q Did Mr. Oltmann see any of those other participants' faces?
A I don't believe he ever said any part of it. I asked him if he had a recording of the call. At that point I didn't really use Zoom all that often. But I do -- I did know that you had the ability to record if the host allowed you to.
So I said -- I asked him, by any chance, did you record it. Because of course I thought

that will be great. If you have footage that you recorded, that will be great to put in. That would be fantastic. And he told me unfortunately I didn't record it. So the other guy might have. I'm going to try and get it was the way it was left. But again, I talked to him for two hours filming one day.
Q He told you the other guy might have recorded it?
A He said something along the way that there might be a way for him to be able to get it.
Q Did he give you a reason why he couldn't identify the source?
A He only represented as the guy wanted to remain anonymous. I would only -- I can only assume something that he would present, and a lot of people want to remain anonymous for fear of retaliation from somebody else once they come out in the open.
Q Did you offer to obscure this individual's identity like --
A I did.
Q -- you did with the anons in the film?
A I did.
Q And how did Mr. Oltmann respond to that?

Page 162

A He said the guy's not interested in having himself known at all.
Q Did Mr. Oltmann check with the source to see if he would consent to an anonymous presentation?
A I would -- I can, again, only assume it. I wasn't spending every second with Joe. I was off, as I mentioned earlier, in other parts of that building getting ready for the next remainder of the hours and hours we had ahead of us. So I would only come in and out and hear portions of it. I would ask him at a break. He would, you know, try and come up with an answer and tell me whatever. And I never got -- I just never got anymore information other than that.
Q Did you ask if any of the other participants on the call have a recording?
A I didn't know anybody else. I only knew Joe, and so anything I asked was through Joe. So Joe, can you provide it.
Q And Mr. Oltmann stated that he was trying to identify Antifa journalists. Do you recall that?
A I can't recall that specific term.
Q Has Mr. Oltmann ever identified to you

Page 163

any other members of Antifa that he uncovered or identified?
A All the information I have on that call you're seeing in whatever clips you have from that film. My knowledge of Joe's involvement with Antifa and that call is specifically one time for that time frame that I taped him, one single time within I believe less than a two-hour time span on one day in Phoenix, Arizona.
Q So as far as you know, Mr. Oltmann's efforts to infiltrate and identify Antifa members, those yielded a single individual, Eric Coomer, that's the only person you have ever heard Oltmann specifically identify as being an Antifa member; is that correct?
A That's correct.
Q Mr. Oltmann states at the end of that clip that he started watching YouTube videos to confirm the voice. Did you hear him say that?
A Yes.
Q Did Mr. Oltmann tell you when he underwent that process of attempting to confirm the voice of Eric Coomer?
A My recollection was he did it right away. Like he -- he heard this, he start doing his

Page 164

research. Again, I don't know -- the 118-page document I have referred to several times, I don't know if he did that in one night or if he did that in three years. I don't know. I don't know the scope of it.
I know he did a lot of research to come up with that document. When he did it, who he did it with, who helped him, if anyone helped him, I don't know. I don't know anything about it other than this is the 118-page document on the research I have on Eric Coomer.
Q I asked you before if you watch Conservative Daily. Do you watch Oltmann's podcast?
A I do not. I have actually not seen a single episode of it.
Q You were never a guest on the show?
A Yes.
Q You're aware that Mr. Oltmann has podcast called Conservative Daily?
A I am -- I am aware of it. I, you know, know that he's on it. Someone would say hey, I saw Joe's podcast. And I would get emails originally, I would get some emails from Joe -- not from Joe but from that just -- just quoting, you know, his

Page 165

podcast. Again, I literally just don't have the time to follow a daily podcast for anybody.
Q So I'm sure I know the answer to this question. But just to be clear, did you ever watch the November 9th, 2020 episode of Conservative Daily where Joe Oltmann first made his claims about Eric Coomer?
A You were right with your initial part of that, I have, once again, not seen a single episode of his podcast.
Q Would it surprise you to hear that Mr. Oltmann repeatedly acknowledged in that podcast that he could not identify Eric Coomer as being on that call?
MR. MILLS: Object to the foundation.
A Well, if you're telling me that, then -- then I am guessing at my answer. If you would like me to guess, I'm happy to guess but --
BY MR. KLOEWER:
Q Let's watch a couple of clips.
A Okay.
Q I'm going to show you what's been labeled as Exhibit 2, clip 21. These are all fairly short. These are from Mr. Oltmann's original publication asserting that Dr. Coomer partook in an Antifa call

Page 166

where he admitted rigging the election. This episode is called Dominion, Big Tech and How They Stole it. It is still on YouTube if you'd like to review at your leisure. This is just 8 seconds.
Now, I'll represent for you, we see Mr. Oltmann is identified as Joe Otto on the right-hand side here. He was previously operating under a pseudonym. Clearly he's admitted to being the individual behind that pseudonym. The individual on the left is Max McGuire, Mr. Oltmann's former podcast host.
(Video played.)
Q First time you've seen that?
A First time I've seen it.
Q We'll move on to clip 22.
(Video played.)
Q First time you have heard Mr. Oltmann say he can't be sure based on the videos?
A Very first time.
Q Last one, clip 23.
(Video played.)
Q Now that you have seen these clips, Mr. Lucescu, does that give you any concern about the accuracy of Mr. Oltmann's story?
A I really don't know how to answer that

Page 167

question since my involvement with the film was long, long ago, and it would be irrelevant what I think or what I see at this point. I can't change what Roger produced and released. It is done and over for me.
Q I'll show you this real quick just to --
MR. CARRY: Hey, Brad, before you move onto the next question, I think I missed when you said that -- you made a representation of when these clips were made and where they were put. I didn't quite hear that. Would you mind sharing that again.
MR. KLOEWER: Sure. Those clips came from the November 9th, 2020 episode of Conservative Daily podcast. The title of the episode is dominion, Big Tech and How They Stole It. You can find that on YouTube now if you're so inclined. If we have not disclosed it, I'm happy to do so. We have the full catalog of Conservative Dailys saved on our server if you'd like them.
MR. CARRY: Thank you.
MR. KLOEWER: Yes.
BY MR. KLOEWER:
Q Mr. Lucescu, I don't know if you noticed in that video that I just showed you, can you see

Page 168

that Mr. Oltmann was reading a document as he made those -- as he was describing --
A I see him glancing down. I can't really see the clarity of that.
Q Did Mr. Oltmann ever provide you any of the notes he claims he took during that call?
A He did not. I know Roger did ask him for them, and I do not know if he ever provided them. I do not believe he ever provided anything to me. There were only two documents that I can recall that Joe actually provided to me. That's the best of my recollection right now. One of them was that 118-page document and one of them was that infographic I mentioned this morning. Those are the only two that I am aware of that he actually provided.
Q Did you personally ever request the notes that he took?
A I asked him if he could forward any -- any documents he had, if he could forward them to Roger. Because Roger asked him right there, he asked him then. I said just please, can you get them to him. He wants to have that.
There was no follow-up. There was no other request from Roger. So again, I can only

Page 169

assume that if he got anything, he got what he wanted. If he didn't, he didn't think it was relevant. I don't know.
Q So when you got a copy of that 118-page document we have discussed, did Mr. Richards provide you that or were you included on the communication from Mr. Oltmann?
A I -- I -- I am trying to remember when I -- you know, how I actually got it, and I'm not a hundred percent sure. I know that Joe gave it to me and I know it was on March 1st. I know we were having problems getting documents from some of the people trying that they were just air drop them.
So I don't know if Joe air dropped it to me or if he texted it to me through iMessage or if he emailed it. For me I would say that you probably have that answer if you have gone through. Because I certainly have not gone through looking to see where that one came from.
Q I just wanted to confirm if perhaps there were documents provided to Mr. Richards that you did not receive a copy of.
A I would -- again, I'm assuming with the phrase that you don't know what you don't know. So I'm not part of -- I don't need to be a part of all

Page 170

the information. Once Roger had established communication with anybody, he could have asked somebody else at any time, and I would not be part of it. Because again, I am not -- it is not necessary to. And I don't demand it and I don't require it and quite frankly, I don't care at this point. I'm done. I've done my job and I'm finished.
Q I'll show you this one just real quick just for purposes of getting it in the record. We'll label this as Exhibit 10. I think you've already answered my questions with respect to this given your representations just now.
(Plaintiff's Exhibit 10 marked)
MR. KLOEWER: Alfred and Chris, this one is labeled in the folder as OAN-2 through 4. It is a three-page document.
MR. MILLS: Has this been produced in this litigation?
MR. KLOEWER: I'm not sure that it has, which is part of the reason why I wanted to be sure to get it in here. I believe you have requested disclosures from other parties, and I believe we would have produced those, but I don't have a specific Bates label in this case. I can confirm

Page 171

that, and I'm happy to supplement with this production afterwards if we have not done that.
BY MR. KLOEWER:
Q So Mr. Lucescu, I'll just represent to you that this document was produced to us in the lawsuit filed against Mr. Oltmann in Denver District Court. One of the defendants in that case was OAN, One America News Network. Are you familiar with that entity?
A I have heard of it. I know OAN. I just don't know much about it.
Q Did you ever watch OAN?
A I would see an odd clip here or there on it. There were a lot of different news clips I would see, different people. If I -- if you know of any of the actual people on the screen, it might refresh who they're associated with.
Q Are you familiar with Chanel Rion?
A I know the last name Rion. Charles. Is there a Charles Rion?
Q There's Charles Herring.
A Oh, Charles Herring. Okay.
Q Is the --
A I'm not --
Q -- son of --

Page 172

A I'm not sure.
Q -- the CEO.
A Okay. So I'm not. I'm not sure.
MR. MILLS: I know Chanel No. 5.
MR. KLOEWER: Same spelling, yes.
A No, Rion just -- when you said Rion, I have heard the name but I can't recollect.
BY MR. KLOEWER:
Q She was the White House correspondent for OAN during the first Trump administration, and she produced a segment called Dominion-izing the Vote that started Mr. Oltmann.
A Okay.
Q Do you recall seeing something like that --
A No.
Q -- in November?
This is an email that Mr. Oltmann sent to OAN on November 10th, 2020. Do you see that date at the top?
A I do. I just don't -- it is only going to somebody -- on my paper it only says Taylor Scott. I have no idea who that is.
Q Yes. I know you have never seen this document before. I would be surprised if you had.

Page 173

But that's actually part of my question. I want to scroll down to the second page of this email to Ms. Scott. The third full paragraph there --
A So let me back up. Is that what you're talking about?
Q That's the paragraph I'm looking at.
A Okay.
Q And the right side of the third line down Mr. Oltmann states: As the call carried on a person who called themself Eric was on the call. Now I want to start that I cannot verify on this call that it is the same Eric but let me tell you as I jotted down notes what I discovered. This is from my notes.
And the reason I'm asking this question again, because I know I just asked you if you had notes from Mr. Oltmann, we have recently -- fairly recently learned that Oltmann claims to have two sets of notes. Did he provide you any notes whatsoever?
A Again, I have never seen any documents from Joe Oltmann that I can recall except for the two documents, the 118-page document that we started our conversations off this morning and the infographic that I mentioned, a single page

Page 174

document. Those are the only two I am aware of.
Q Did you ever discuss those communications with OAN?
A No.
Q All right. We can set that one aside. You're aware that OAN had settled with Dr. Coomer as well, correct?
A Again, I'm not. I am not up to date with any of the lawsuits that are occurring or have occurred or settled or not settled. I don't know.
Q So then same question with Chanel Rion, you're not aware that she settled with Dr. Coomer?
A (Indicating).
Q On that note though, you were aware before the film was released that Newsmax had settled with Dr. Coomer, correct?
A Again, I can't -- I cannot recollect anything to do with any of those lawsuits or anything. I can only repeat again, I am not aware of any knowledge of Eric Coomer until Joe Oltmann brought him up. We talked about him not one day.
I do not believe that anybody else in the film talked about Eric Coomer. I don't believe anybody else brought the name up. It is possible. I see it. Again, but it doesn't pop in my mind.

Page 175

The film is not about Eric Coomer. It is not about Dominion software. So a very, very small part of it.
Q Well, since you mentioned it, just real briefly, let's look at Exhibit 2, clip 6. This is another clip of Mr. Waldron.
(Video played.)
Q That was the wrong clip.
A I was going to say.
Q You were waiting for a reference there to Coomer. I apologize, I didn't want to start in the middle. This is Mr. Waldron acknowledging that Antrim County did not utilize electronic adjudication, which is why it is in the exhibits. My apologies. Let me try to find the correct exhibit here with respect to Mr. Waldron.
So the clip hopefully, we'll find out, that I hoped or intended to show you was Exhibit 2, clip 14. Let's try this one more time.
(Video played.)
Q Do you recall that scene with Mr. Waldron discussing --
A Well, I can't --
Q -- Dr. Coomer?
A I can't recall him saying that. I see

Page 176

you that it is part of the finished film. I still don't recall Phil being an expert of Eric Coomer. And it is only confirms the same thing I say, he's repeating that Joe Oltmann brought him up. So it is not his knowledge of Eric Coomer, it is Joe Oltmann's knowledge of Eric Coomer.
Q Did you ever discuss any independent knowledge that Phil Waldron has about Eric Coomer with Phil Waldron?
A No.
MR. KLOEWER: Let's mark this as Exhibit 11. This is Lucescu 713.
(Plaintiff's Exhibit 11 marked)
BY MR. KLOEWER:
Q Now, I have just handed you a text exchange with Joe Oltmann. The relevant feature here is the date on the right-hand side, May 1st, of 2021. About four or five lines down Mr. Waldron says: And dealing with this Newsmax bs.
Do you know what Oltmann was referring to here? And I realize it is a few years ago. If you can try to refresh from the conversation.
A I don't. I recall -- I recall a couple of things about Joe and his house, one of them he had a bomb threat, and somebody had mailed an

Page 177

envelope of white powder to his house, his daughter opened it. It freaked her and her mother out. They immediately called police. He sent me -- I remember he sent me a photo of this incredible amount of responders, fire departments, HAZMAT suits, all kinds of stuff like that. Again, I don't know the time frame.

I'm looking at this is May 1st which, you know, it is a couple of months after I filmed him, so it could be around that time. I know he was -- I know he mentioned several times that he had to, you know, fear for his life and his family's life and things like that. So I can -- I can only guess it is something along those lines.

Q Sure. We'll talk that those claims in a minute here. What I'm trying to -- this is May 1st of 2021. I'll represent to you that on April 30th of 2021, a notice of settlement with Newsmax was filed. Did Mr. Oltmann tell you that Newsmax had settled their lawsuit with Dr. Coomer on that date?

A Again, I really don't -- do not recall any real details of any lawsuit. The only one that I really am aware of is the -- is the Dominion lawsuit with Fox because it made headlines everywhere because of the amount of money. That's

Page 178

the only one I really have knowledge of. I don't have knowledge of any of these other lawsuits.

Q Do you recall discussing the Newsmax settlement with Mr. Oltmann?

A I don't. I mean I'm looking at this, and he mentioned and I literally say what's the latest with Newsmax. I have no idea about it. And it's in response to him saying in dealing with this Newsmax bs. Which again, so I'm like okay. Well, what is that? What is the Newsmax bs?

Q Reviewing this now, does it concern you that Mr. Oltmann wouldn't -- didn't tell you the actual issue with Newsmax?

MR. MILLS: Object to the form and the foundation.

A And I actually am puzzled by the question. I don't understand the question. You're asking me something as we sit here four years later after I filmed him about a project that I haven't had anything to do with for three years. And for me to go back in time and discuss and even think about whether I should be concerned, it doesn't matter to me. It is over. It's done. It is a finished project. The file is closed. It is away. I don't have any part of it. So I really don't

Page 179

understand what that is.

BY MR. KLOEWER:

Q Well, you stated before that you had no reason to doubt Mr. Oltmann's credibility. Do you recall that?

A Correct. At that time.

Q And this lawsuit is still pending and we have a pending demand for retraction on you to retract your statements about Dr. Coomer.

A Okay.

Q So I'm just wondering if looking back and realizing that a significant event had happened that Mr. Oltmann did not disclose to you, if that gives you concerns about his credibility?

A Can I ask you to clarify something you just said. You have a pending lawsuit against me --

Q Yes.

A -- to retract my statements about Eric Coomer. Can you please tell me what my statements about Eric Coomer are.

Q Mr. Lucescu, your counsel will have an opportunity to ask Dr. Coomer --

A Oh.

Q -- questions --

Page 180

A Okay. Because I'm puzzled by the question. I don't understand it then. I don't know your question.

Q I'm sure they can provide you a copy with the court's order denying --

A Okay.

Q -- your motion to dismiss. We can proceed. I was just wondering if Mr. Oltmann had told you at the time.

Now, after that, do you recall discussing the Newsmax settlement with Oltmann at some point later in time?

A I don't -- I don't recall any other lawsuit at all, again, discussed with anybody in any detail whatsoever.

MR. KLOEWER: Let's mark this one as Exhibit 12 if we could. This is the Lucescu 818.

(Plaintiff's Exhibit 12 marked)

BY MR. KLOEWER:

Q All right. Mr. Lucescu, this is another text message exchange from August 1st of 2021, so that's about three months later. If you look at the link, about four -- it looks like somebody sent a link to an article, that you sent a link to Mr. Oltmann, and the substance -- the title of that

Page 181

article appears to be Dominion Worker Drops Newsmax From Lawsuit After Network Apologizes For Allegations. Do you see that?
A Oh, yes. Okay. At the very top in that line. Yes, I see that.
Q Okay. And I want to look at your response. It is about three messages up from the bottom. You state: Great video. You have every right to be pissed off and every bit is founded in fact. This is utterly despicable what they have gotten away with so far and continue to get away with. It is beyond immoral. It is absolutely criminal.
What are you describing as being beyond immoral about the Newsmax settlement?
A I don't recall. Because I don't even recall what this -- what this video is about or anything. I don't recall any details of it whatsoever.
Q Do you recall what you were describing as absolutely criminal?
A No. I would have to look at the video, watch it again, and see what was relevant at the time three and a half years ago.
Q And then your response two lines from the

Page 182

bottom you state: Exactly why this film has to go out now. People everyone have to have access to it and then a series of follow-ups as the evidence continues to be revealed. Can you talk?
Why would the film -- why would release of the film be important in response to Newsmax settling with Eric Coomer?
A Anything I tell you is going to be a guess. As I have stated, I don't recall this at all. I would have to watch it. So I can only assume that at this point in time since it is still fairly close after the premier, which was the end of June, so a little more than a month before, at this time I am -- I am guessing, but I'm thinking that Joe might still be involved with discussions on trying to distribute the film because he was -- he had -- at some point he had an idea on distributing.
When Roger's entire team of people fell through in every single aspect of distribution, Joe had mentioned that he has connections that he might be able to distribute it. This conversation would be, yeah, there's evidence in the film showing the election fraud. I still believe that.
I have not got paid anything for the film

Page 183

ever. So like get it out, get the film out. It is relevant now. Get it out now because it is still in the news. To get it out when it is not in the news, it's yesterday's news, no one watches it. So that's the only thing I -- and I'm literally guessing based on just this conversation because I don't -- I don't really fully recall it.
Q But when Eric Coomer is in the news is what you're referring to?
A I don't know that. I just said to you I don't even know what this article is about. I can only now guess that you're pointing that the Dominion worker is Eric Coomer; is that correct? Because I don't know that. I don't know who Dominion worker drops Newsmax -- because nowhere does it say Coomer here, and that didn't even enter my mind until you just said that. I'm thinking this could be Melissa Carrone. She was a Dominion worker, and that's why I wanted to get her in the film. So I don't know that. I really do not recall this. I'm happy to watch the video if you want to take the time to do that.
Q Did you ever see the Newsmax retraction video?
A Which one is that, this one here?

Page 184

Q Yes. Where they issued an apology to Dr. Coomer.
A I don't recall it.
MR. KLOEWER: We'll take a look at that after the break. Because we could all use a few minutes. And I have realized that the video is clip 24 which neither Chris nor Alfred has access to because I added that to my exhibits this morning and they got exhibits from my paralegal. So I will get them a link to that video right now so that when we proceed, everybody is on the same page. So let's take ten minutes.
THE VIDEOGRAPHER: The time is 2:47. We are going off the video record.
(Recess 2:47-3:02 p.m.)
THE VIDEOGRAPHER: 3:02 we are back on the video record.
BY MR. KLOEWER:
Q Mr. Lucescu, before we broke we were talking about the Newsmax settlement and the discussions about that in Exhibit 12 that I have handed you there. It sounded like you haven't actually seen that retraction video; is that correct?
A That's correct. And I'd like to clarify.

Page 185

I read this over our break. I read through the entire page this time. And I realize that when you asked me about the questions at the bottom of the page about great video and exactly why this one has to go out now, those comments do not relate to the link that you were pointing out up above that was the Epoch Times link.
Q Okay.
A Okay. It is pretty clear when you go further down, Joe says his first response after that video is go to my telegram, which means he's got a telegram channel that he had just posted something on. And he says watch the video and look at the last three posts.
I can't tell you what that video was. I can't tell you what the three posts are. I have no recollection of it. I don't know it. I just know that based on what he's saying right there, I would have gone to his telegram channel, I would have looked at the video, I would have seen the post that he posted, and then I would have continued the conversation with him. So I don't know if you realize that, but that's what it looks like to me in this one. It is not to do with that link.
Q I did not realize that, and I appreciate

Page 186

the clarification. So glad we cleared that up. Let me take -- we'll take a look at this retraction video, what's been previously marked as Exhibit 2, clip 24.
THE WITNESS: We're finished with this 12, right?
MR. KLOEWER: I'm going to refer back to it --
THE WITNESS: Okay.
MR. KLOEWER: -- for one second after we take a look at this. So it's about a minute and half.
(Video played.)
Q Do you watch Newsmax regularly, Mr. Lucescu?
A I don't, not regularly. I have seen the odd clip here or there from them.
Q Did you watch Newsmax around the time of these events, late 2021?
A I know -- I know the Newsmax name had come up. It was referred by several people, not solely to do with this film, just other people, other friends of mine that I have, they might send me a link to it. I don't recall it being like one of my places to look at, but I do know of its

Page 187

existence.
Q Let's take a look back at that Exhibit 12 that you are holding there, and we'll look more towards the top of the page here. I know the bottom of the page we have discussed what was probably a different subject.
But up here in connection with that link, which you sent at 7:45:25 p.m., the exact same second apparently I'm assuming this commentary was included with the link, you state Newsmax are a it says hunch, I believe it is probably supposed to be a bunch, Newsmax are a bunch of fascist cowards and pathetic losers.
Do you see that?
A I do.
Q Do you know why you would be referring to Newsmax as fascists in conjunction with this news piece about Dr. Coomer?
A To the best of my recollection, this is not my typical language that I use when I talk about anybody. I believe I'm forwarding something to Joe that somebody else had sent me, and I just copied and pasted it. I believe that's what that is.
Because, again, this is not my language.

Page 188

I don't think you'll -- I mean I look at this myself and think I don't say that. I don't think you'll find another text with me using that same kind of terminology anywhere.
Q Do you agree with that sentiment?
A You know, again, I don't know enough about Newsmax and I don't follow them with any regularity, so to me this is completely out of context right now.
Q Let's move on. Let's take a look at Exhibit 2, clip 13. This is another clip of Mr. Oltmann from the film. This one is a little bit shorter.
(Video played.)
Q Do you know what Mr. Oltmann means there when he says the system went down?
A I don't. All I can recollect from that is that the software system was part of those several precincts where for one reason or another they just stopped tabulating votes for a period of time. He's explaining it to me. I'm listening to that.
And just from me thinking as he's saying it, this is incredible that a software update would have to be done on the actual election date. To me

Page 189

that's completely irresponsible and incredulous that that would even happen ever for any reason. It leads me to believe somebody didn't do their job.
Q You would agree that was an inherently improbable thing to happen, right?
A I thought it was incredible that that would actually have happened, yeah.
Q Did you confirm that it actually did happen?
A Once again, I did not. It was not my job to do so. He said it on film. The first time I ever heard him say it. It's on film. It goes to Roger. Roger does it to tie it in to whatever he does to make his film.
Q Do you know if Dominion Voting Systems technology was involved in whatever Mr. Oltmann is describing?
A I don't.
Q I am going to show you another clip here. It is the longest one I'm going to show you all day, so you can take comfort in knowing they'll be shorter after that. But this is a lengthy segment presented by Mr. Oltmann in the film where he presents a flowchart that he created, and I'll have

Page 190

a few questions for you afterwards. This is Exhibit 2, clip 4.
(Video played.)
Q Do you have any idea what Mr. Oltmann is talking about here?
A Vaguely.
Q And you're not familiar with how election processes work in the United States; is that right?
A That's correct.
Q So do you know -- did you ask anybody else if this was accurate before including it in the film?
A Once again, I will tell you that I did not include it in the film. Joe did not present to me what he was going to talk about while he was being filmed. So he would answer questions that Roger presented to him and he would answer those questions.
That pictogram that you just showed on the screen is the infogram that I talked about earlier today of one of the two documents that Joe provided that day. Because of him talking about it, he didn't -- he didn't -- you know, he just showed it and said here, this is what it is. And Roger asked if you could send an actual high

Page 191

resolution copy of it that he could use in the film.
Q Well, that was an animation we saw. Was that --
A It was an animation of the actual document I told you that Joe Oltmann actually forwarded.
Q So when was the animation created?
A I don't know. It was sometime during the editing process.
Q After the interview?
A Absolutely. We didn't know it existed before the interview.
Q What did you expect Mr. Oltmann to be discussing before the interview? Why did you have him come to Arizona?
A Because he was highly recommended by Matt DePerno who I thought was a very credible and trustworthy person who was very knowledgeable since he was involved in court cases and ongoing battles in Antrim County, so he was very prevalent in the news of the time, so he was part of it. He said Joe has a lot of pertinent information. You have to, you know, talk to him. And I'm happy to introduce you to him.

Page 192

Q So you had no idea what Mr. Oltmann was going to talk about before he sat in front of that camera?
A No idea.
Q Did Mr. Richards to your knowledge have discussions with Mr. Oltmann prior to the interview about what he was going to discuss?
A I am not a hundred percent certain. I don't believe so. Because of the timing of when I met Joe, I know at some point Roger asked me to put him in contact with Joe. So I called Joe and said hey, Roger wants to talk to you. Can you talk to him. And then I put them together.
So I can't tell you where that occurred. I do not believe it would have been before he got filmed because we didn't know what Joe was going to talk about. He literally, you know, talked about his knowledge. He talked about infiltrating this Antifa call, and he just was going to talk about that. I mean this was something that came up on the day. I had no idea, you know, that he even had this diagram until he showed up there on the day with it.
Q Are you aware of anyone involved with The Deep Rig making any effort to confirm if that

Page 193

diagram made any sense at all?
A I don't. I mean, again, I am not part of that whole process. So I give the information to Roger, Roger assembles it, he edits it, he puts up the final thing, and he gives it back at the very end.
Q Have you ever spoken with anyone who confirmed or lended support to this theory that fake ballots and phantom ballots can be entered into Dominion technology?
A I believe Bobby Piton talked about that a little bit as well in a different way and a different manner. I believe his testimony and his way he presented, for some reason Bobby's popping in my mind about phantom ballots. I can see him saying the word phantom ballots. And I don't know whether that was in the film or whether that was me talking to him and he was talking about it.
But he goes -- he's a very -- he refers to himself as a quan. He's a mathematician. He went through a whole bunch of very highly advanced mathematical formulations that made sense. Whether or not they were relevant I don't know. Again, it wasn't -- I was intrigued by him talking about it, but it wasn't part of my area of what I was to do

Page 194

in the film.
Q Does Mr. Piton have any background or experience in election technology?
A I don't know that.
Q Mr. Oltmann was featured fairly prominently in the promotional materials for the film, correct?
MR. MILLS: Object to the foundation.
A Yeah, I don't know the extent of the promotional materials that went out. Each one of the individuals that talked in the film were given a short clip of themselves that Roger produced for each one individually so that each had their own trailer. You're familiar with trailers for movies?
Q Sure.
A So Roger made a trailer for each person that featured them in the trailer. So he would take clips of the movie, clips of the person talking, and then he would give them to each one of them. My understanding is it was so they could use it for their own promotion of, you know, what they were working on. Each one had an individual basis of what they wanted it for.
Q Where were those trailers -- were they published to YouTube or were they put on websites?

Page 195

How were those used?
A I have no idea.
Q Were you involved in discussions about promoting the film or distributing those?
A No. The only -- the only part that I was involved with was Ann Vandersteel asking me if she could be in a podcast. And I -- we talked about this briefly with my attorneys. I believe it was somebody else --
MR. MILLS: Don't discuss what you discussed with us.
THE WITNESS: I'm sorry. Okay.
BY MR. KLOEWER:
Q And you did some interviews with Ms. Vandersteel and Mr. Oltmann to promote the film, right?
A Repeat that question, please.
Q Do you recall doing interviews with Mr. Oltmann and Ms. Vandersteel to promote the film?
A We talked about it and you showed videos earlier on this.
Q Let's take a look at one of those. This is an interview you did with just Mr. Oltmann. This is a much lengthier interview where

Page 196

Mr. Oltmann spends a while talking about the lawsuit and his concerns about the judge in the case in Denver. I'm going to show you a part that alludes to something you discussed earlier. So this is Exhibit 2, clip 9.
(Video played.)
Q You agree with that sentiment today that attacking somebody's house or their home is the lowest of the low?
A I do.
Q And you described the attacks that Mr. Oltmann had described as being very cowardly, people that would behave that way attacking someone's home?
A I do.
Q And I think you mentioned it before -- and correct me if I'm wrong -- were you referring to that incident with the powder allegedly being sent to Mr. Oltmann's house?
A I was.
Q Did he tell you that his daughter opened that package by the way?
A I believe -- that's what I said earlier, and I believe that's what he said. It was his daughter or his wife, but I believe it was his

Page 197

daughter. That's what struck me. Because when I say family, that's what it refers to. I have daughters of my own. I have kids of my own. Somebody wants to try and hurt them, they're going to have a hard time doing that.
Q Do you know if any charges were ever brought as a result of that?
A I don't know anything else about that other than what Joe sent me that photo of, what happened. And I believe I asked him about it at some point in the future, did you ever find anything out. I don't recall anything concrete coming from it.
Q Did he ever tell you that that was a package sent from a window company working on his house?
A No, he did not.
Q Did he tell you that there was graphite in the box?
A He did not.
Q I show you what we'll mark as Exhibit 13.
A We're done with 12?
Q Yeah. Did you make any effort to familiarize yourself with Joe Oltmann's social media presence either at the time you were filming

Page 198

the interview or beforehand?
A I don't -- I don't believe I did because I wasn't on Instagram or Twitter.
Q Were you ever on Parler?
MR. KLOEWER: And Chris and Alfred, I've just handed out what we'll mark as Exhibit 13. This is a PDF labeled 20201205 Oltmann Parler re: Coomer house.
Q I'm sorry, Mr. Lucescu, you may have answered me. I was distracted.
A That's all right.
Q Were you on Parler --
MR. MILLS: Did you hand him a copy?
THE WITNESS: I didn't get a copy yet.
(Plaintiff's Exhibit 13 marked)
MR. DEMPSEY: I apologize, can you identify the exhibit one more time. I'm having trouble --
MR. KLOEWER: Yeah. It is a PDF. It's got a red bar across the top. It's labeled 20201205 Oltmann Parler re: Coomer house.
MR. DEMPSEY: I found it. Thank you.
BY MR. KLOEWER:
Q So were you a follower of Mr. Oltmann's on Parler or on MeWe or Gab or anything during the

Page 199

December 2020 time frame?
A I -- I don't believe so. I -- I really can't tell you. I did open accounts on several other things. But I can tell you I never used them. So this is very unfamiliar to me. I don't recall ever seeing this before.
Q You don't recognize that image?
A No.
Q I'll represent to you that's where Dr. Coomer used to live in Salida, Colorado. That is an image of his home.
Let's take a look at what Mr. Oltmann had to say here. He says: I've been busy doing 15 interviews in the last two days. Was told today after questioning why the MSM has not picked up Eric Coomer, that I was breaking something they are running away from. What the living hell is that supposed to mean? Antifa in the middle of 28 states, by proxy of one of the largest shareholders in Dominion Voting Systems. So it is up to you. Blow this shit up. Share, put his name everywhere. No rest for this shitbag. Eric Coomer, Eric Coomer, Eric Coomer. This shitbag and the corrupt asshats in Dominion Voting Systems must not steal our election and our country. Eric, we are

Page 200

watching you.
That's the first time you have seen this?
A First time.
Q You would agree with your what you just described a moment ago as people attacking other people's houses or homes as the lowest of the low, correct?
A I stand by that.
Q And you would agree that this was a cowardly thing for Joe Oltmann to do, right?
A I certainly don't approve of it.
Q Does seeing this change your opinion about Mr. Oltmann in any way?
A I am very disappointed to see this. I don't -- there's no date on this. I don't recall the date you said.
Q I'll represent to you it is December 5th of 2020.
A Sorry, December 5th of?
Q 2020.
A That's prior to the package that he received with the powder in it, so there goes my train of thought.
Q Well, on that topic, have you ever heard or seen any evidence -- I know you told me you saw

Page 201

a photo from Mr. Oltmann surrounding the package incident. Has he ever shown you any other documentation or evidence that the threats he claims to have suffered occurred?
A No. Just again, I only saw a photo that had a lot of emergency vehicles that, again, I can't represent it is his street or it is his house. I don't know that because I've never been to his house and never seen it.
I can only say this is what he gave me and said this is outside my front door right now, HAZMAT suits and fire trucks and quarantine tape and all this kind of stuff where the neighborhood is freaking out. You know, that is the scenario that he presented to me.
Q Do you have any reason to believe that Eric Coomer had anything to do with that incident?
A I do not. And Joe did not tell me it was Eric Coomer.
Q Has Mr. Oltmann ever told you that Eric Coomer was personally involved in any of the threats against him?
A I don't believe so.
Q And you have never seen any evidence to suggest that Eric Coomer has partaken in any



conduct like that?
A Again, I will try to be clear that Eric Coomer did not exist to me until Joe Oltmann brought him up, and I don't recall having any other conversations about Eric with anybody. So I don't know him. I don't know who he is. I don't know the extent of his involvement. Certainly not anything else other than that one isolated couple of hour interview.
Q Just real quick and we'll wrap this line up. I meant to ask after the video --
A Done with 13?
Q -- of the flowchart.
You can set that aside, yes.
With respect to that flowchart, do you have any idea what Mr. Oltmann's credentials are, like his background, like his education?
A I do not. I know -- all I know is, as I repeated earlier or as I stated earlier that he has a large data tech company in Colorado. I can't verify anything that he does do. I can only tell you what he told me it does.
So again, I have no reason to -- he didn't deliver anything on the distribution end of things which was claimed that that's something he



could do to Patrick. And as far as I know, it just never worked out.
Q Well, that's actually the next topic I want to discuss is the distribution of the film, so we can transition from the film itself there. Mr. Oltmann wasn't involved with distribution of the film early on, was he?
A No, not at all.
Q So in the beginning how did you plan or anticipate or hope to distribute the film? So I'm going to like February, March while you're still filming, what was the sort of thought process of how you're going to get this film out there?
A Well, we did talk about it. You'll recall me saying that Roger and Leon and their Auyrn network distribution had alliances and business relationships with Jim at 1091, The Orchard. That's all I know about it, Jim at 1091 The Orchard. They had previously released Roger's films, so they had a relationship together.
I was curious about it, and I actually asked Roger if he could introduce me to Jim so I could -- again, I was just curious about it just because I want to learn something new. He would not introduce me to him. He said oh, Jim is really



private. He only deals with us.
And I kind of thought that odd, but at the same time it was like okay, he, you know, he doesn't want to give away one of his sources, one of his secrets, whatever. It was irrelevant, you know, that I was disappointed with that. But it wasn't part of my area of expertise, so it didn't involve me. So I just okay, fine.
So that was Roger's sole job in the distribution. He assured us, us meaning me and Patrick, that he had a distribution network that was very successful that he used on his prior films.
Q Let's take a look at what has been labeled Lucescu 4210. Label this as Exhibit 14.
(Plaintiff's Exhibit 14 marked)
BY MR. KLOEWER:
Q Do you recognize this document, Mr. Lucescu?
A I do.
Q What are we looking at here?
A This is a document that Roger provided. He provided it to me. He may have sent it at this point in time. This looks like an actual distribution proposal. And I'll refer to you,

there's no pages on it the way you presented it to me, so I will refer to the diagram, this page, where I had mentioned 1091 The Orchard, so you can see 1091 The Orchard is the distribution company.

So this is just -- and you'll see along the bottom Netflix, TV -- Apple TV, Hulu, Prime Video, Tubi, this is all the people he says he has connections to get it on. So he was presenting this as a document as proof that this is what he uses, so he needs another quarter of million dollars from Patrick to distribute his film.

Q Did Patrick give him an extra quarter million dollars for that purpose?

A I'm not sure of the exact amount, but there was never a payment that was specifically solely only for distribution. But it was definitely a large portion of some of the subsequent payments that were paid above the 250,000.

Q Since you mentioned it, I was curious about that, and we'll look at some subsequent communications that referred to $625,000 spent on the film. How much did the film ultimately cost to -- from start to finish as you understand it?

A I believe it was -- it was never



absolutely finite in the end because there was portions that were not paid for. I didn't receive any money at all, so that now brings the overall number down. I believe the final number that was paid out was about a hundred and -- or sorry, 820,000 or something like that.

Q And were you submitting sort of additional, I don't know the terminology in your industry, but additional work orders or additional invoices for these costs that were accruing beyond the $250,000?

A The initial $250,000 was to film the initial slate of people in those four locations that we had discussed, so we knew that's what it was going to cost to do. Once there were additional requests made to alter what was becoming the finished product, then all of that came with a cost. And Roger would say I can do that, I can remove that person, but that's going to cost an extra $50,000, so that will be added in. Oh, I can do that. Yeah, I can change the title sequence. That's going to cost an extra $20,000.

Whatever it was, he kept coming up with numbers of what it would cost, and it was just -- it would just be paid. It was okay, we'll just



send you another advance. So the two-fifty, you mentioned the six-twenty-five. So there was two-fifty, two-fifty, and then I believe -- I thought it was more than six-twenty-five. Maybe it was six-seventy-five. I'm not a hundred percent sure. I'd have to go back and look at.

But again, whatever it was, I believe there was two hundred -- two hundred and fifty initial, then another two hundred and fifty and then another final amount that brought it up to six-twenty-five.

And then there were more changes when he did all of the end part of -- I mentioned to you about the final editing that was being done when he sent his own guy there. And then there was the premier that added on, the live stream premier that was another add-on at the very end that Roger's company, again, said that they can handle, and it came with a, you know, hundred thousand dollar price tag kind of thing. So that left an outstanding $210,000 I believe over and above that six-twenty-five or whatever that figure was. There was -- I recall it was about 210,000 of which ultimately I received a hundred and ninety-five to pay it.



Q So were these written requests for additional funding beyond that 250,000?

A They were mostly phone conversations we would have saying -- you know, he would say I want this, I want this, I want this. And then I would talk to Roger and say well, you're doing the editing, you're doing this next phase, what is that going to cost. Oh, I would have to rent this. I would have to get this. I need an extra guy. I need this. And he'd just give me a figure.

And I would just go back and say okay, this is this much, this is this much. I believe there are some texts that verify numbers like that. And then there would be a final text with Patrick telling his accountant to send -- wire the money again and it will be sent forward.

Q So Patrick was the one fulfilling these requests for additional money out of his personal account?

A No, it would not be personal because it came from a corporation.

Q What was the corporation?

A I believe it was Haverford or Haliford something. Haverford something. Again, I can verify the exact name, something along that line.

Q And what account would that money go into?
A Advanced Cinemagraphic Technologies.
Q Into your LLC --
A Yes.
Q -- for your company?
A Because then I paid each person, whether they provided a location, whether it was an Airbnb for location rental, whether it was hotel rooms, whether it was airfare, whatever it would be, camera, food as mentioned previously.
Q And that entity, Advanced Cinemagraphic, is that still in operation?
A It is although I haven't done anything with it since that -- since this film actually.
Q And you stated before you're the only member of that LLC?
A I am.
Q And have you maintained the records of the financing that came through that entity for this film?
A Meaning?
Q If -- do you have records of all the money that was spent on the film?
A I do. I have bank statements from the



bank that the account -- the money was sent to.
Q So you were tasked with paying all the vendors and all the third parties?
A Yes.
Q And which bank do you have an account with?
A M&T Bank.
Q M&T. And is that in New York where --
A It is.
Q -- the LLC is registered?
So going back to what I have handed you here, the document that's labeled Confidential Information. The second page identifies it as a marketing deck. What was the purpose -- who compiled this document?
A Roger did. Well, I can only say Roger and his team. I don't know what individual actually did it. But Roger is the one who gave this to me, he's the one who claimed he put it together, and he's the one who sent it to me.
Q And why did he send it to you?
A Because I have always been the one who was the middleman with Patrick. I was always the one with discussions. He understood that Patrick would pay the corporation and the corporation would



pay the vendors.
Q If you look at page 4 of that document, it says Producers Notes up top.
A Yes.
Q I'm mostly wondering about the left-hand column there. It appears to be a chat between various people. Can you tell me what are we looking at on that left-hand side? The top line says Next Cloud Introduction. Below it says Deep Rig Design. Are those different individuals?
A I don't know. I'm not part of any of those. I don't appear in that text. I've never really seen that regardless that it's on this. I didn't even pay attention to it. I thought it was just some kind of a graphic that was thrown in. RRR would be the only one that I knew was Roger Richards. Roger R. Richards is his name. Roger Ramsaur Richards I believe is his name, and he quite often would say RRR.
Q Ramsaur?
A Something like that. Ramsaur, something like that. R-A-M-S-U-E-R or something like that. WokeMobile I believe is one of his editors. But again, I am not a hundred percent sure because I have never seen these -- I have never seen this and



I'm not part of that if that was a real text.
Oh, well, I can tell you that that symbol on the top of the page is the Auyrn network symbol which is his company. So now that would be everything to do with him and his Auyrn network. That's what it appears like to me.
Q And you mentioned before that he was proposing or he was going to be needing more money to utilize these distribution platforms. This will sound like a silly question. But the intent of spending more money is to make more money, right?
A Correct.
Q And the idea was for both you and Mr. Richards to profit off this film?
A I should amend that when I say correct. To make more money would be a general term I believe. Because it still wasn't a hundred percent clear to me whether or not it was going to be released for free or not. So it was either to make more money or to distribute it to more people, to get the film out there. I mean it is pretty useless to make a film and put it in a drawer, spend that kind of money and then put it in a drawer. What's your purpose for it? If nobody sees it, then you've basically just spent money for





Veritext Legal Solutions
800-336-4000

what I would believe would be no reason.
Q You expected to be compensated for your work on the film, right?
A I did.
Q And your intent -- and correct me if I'm wrong -- you stated before that that original working contract with Patrick Byrne didn't really delineate how that other 67 percent was going to be distributed, correct?
A Correct.
Q But you expected that both you and Mr. Richards would collect an equal share; is that right? Like he was 20 percent and you were 20 percent?
A I believe somewhere around there. Again, I was never really sure. Because then this number of 40 percent came from Roger for the distribution which completely blows the math all of a sudden. These are all things that come in after the fact.
And I am the middleman, so I am the one who's representing that we can do this and I can produce this film and get everybody on tape, and then I'm getting numbers from Richards that is where did that come from, how is this an extra $50,000.



Q Did you have concerns that Mr. Richards was not telling the truth about how much this stuff was going to cost?
A Cost is relative. And what is expensive to one person is peanuts to another. So if you accelerate time frames that you need things, that can drastically increase fees because people are now working 20 hours a day instead of eight hours a day, which can triple the amount every day.
So to me it wasn't absurd. It was just incredulous to me that wow, you know, Patrick has paid a lot of money so far, Roger. Like he's paid a lot. And I was quite shocked when I finally got final invoices from Roger and some of the things that I paid him. Because I quite often would pay him amounts of money that he would just say we need another 25,000, and I would do a wire transfer because I'm on a plane. And we need the money and we need to pay this, we need to secure this piece of equipment or we need to secure this location, we need to do this. Adrian needs it for this, whatever. He would give me excuses but never really be clear what they were for. I trusted him.
It was only after the film was over, done with, premiered after June 26th, I said guys, I



need these final invoices from you. I need to have them so that, you know, I can forward them to an accounting company to produce everything. And they sent me invoices where I was shocked at some of the numbers that were being paid for these people that ...
Q Did Mr. Byrne express any frustration or disbelief to you about the costs as they accrued?
A I don't believe he did. He just would ask how much it would cost. I would talk to Roger. I would see what it was. This was by far the largest budget picture Roger had ever worked on. For me it was I have worked on $300 million pictures, so to me it wasn't like a stupid amount. It was just for this project that as far as I knew from Roger himself what his budgets were, this was far more money than what he had had on his previous projects.
Q Well, it sounds like the film landed at several times the amounts that was initially anticipated, right, if you started out thinking it was going to be two-fifty?
A Well, again, that's relative, right? It is like you buying a car and you thinking it is going to be a $20,000 car. And then you go in and



the salesman talks to you and you buy a $40,000 car instead. Well, you still got a car. You got a car. It is not the same car. Oh, now you want more options? You want more options? Oh, so you got to spend another $20,000 on top of that.
I can't give you another analogy in a film, but that's basically what the analogy that works is that the $250,000, you had -- you had what you were promised to get. You changed this much that you need, it is going to cost this much more. Why? Roger, how much is it going to cost? How much is your end going to cost?
Q But Mr. Byrne was -- it sounds like he didn't push back too much on those extra amounts, he just cut the check and --
A He -- he -- he didn't for the initial two extra payments. There was a period of time where I believe he was very frustrated and he wasn't going to pay anymore, and that came into play the contract you had talked about earlier. So at that point there was a time in there where I didn't know what was going to happen with these outstanding hundred and -- $210,000 in expenditures.
Q I see. Let's take a look at what's been disclosed as Lucescu 4206.

THE WITNESS: We're done with this one?
MR. KLOEWER: Yes. And we'll label this as Exhibit 15.
(Plaintiff's Exhibit 15 marked)
MR. DEMPSEY: What's the Bates one more time? I apologize.
MR. KLOEWER: 4206.
THE WITNESS: It is a Memorandum of Understanding is the title of the document.
BY MR. KLOEWER:
Q Now, I think you alluded to this document a bit before when we were discussing Mr. Richards' company here. But this appears to be a side agreement with a separate distributor. Would you agree with that?
A I would tell you now at this point that this document is completely irrelevant to the film itself. This is -- if you go to number 4, sub D, the Auyrn Company will receive 10 percent of all profits for their services. This is -- and number 2, the Ekklesia, LLC has pre-advanced. This has nothing to do with me. Ekklesia is Roger's partner Leon, that's his company. Auyrn is the distribution company that is owned by -- to my understanding, I don't know for sure -- but what

Page 218

they told me was owned by Roger, Leon, Leon's wife Maureen, and Adrian Youngblood. Those are the four who worked together previously.
So this document was provided to me by Leon, and I basically just ripped it up because I'm not dealing with you, Leon. I never did deal with you on this film. You have nothing to do with this. Why are you now getting involved?
Q Well, you have answered many of my follow-up questions with this document. Noted obviously the last page is not signed, so I was curious what --
A That's why --
Q -- the basis --
A -- it wasn't signed --
Q -- for this --
A -- because it got ripped up before I even got to the last page.
Q But Auyrn ultimately did play a role in the film, didn't they?
A Well, that's an interesting question. It wasn't to my knowledge. It was a shock to me quite frankly that their -- that their emblem was on the screen that Roger delivered. Because the premier of the film when Patrick and I saw it, there were a

Page 219

lot of things that Roger had interjected into the premier that we had no knowledge of. And even though we were in the building, we were in a back room, green room, and they were playing a preamble similar to trailers that you would see in a movie theater that I had no knowledge that they did that.
And part of that was solely to promote their Auyrn network because they believed that they were ultimately going to get this premier, including their preamble, out to millions of people which was their -- their statement not ours. I don't believe anybody saw it but anyway.
Q Did they -- did Mr. Richards ultimately execute another agreement with Auyrn?
A With -- you mean with us, with me, or Patrick or both?
Q Well, I'm wondering if a version of this document was ultimately signed --
A No, never.
Q -- with different --
A No. I said it never went anywhere. The only reason I question your question is I don't know anything about the Auyrn network, so whether they did any agreement I don't know. Certainly not with this film they didn't.

Page 220

Q All right. Who is Adrian Youngblood?
A Adrian is, again, one of the owners in the Auyrn network. She works with Roger. And she did I would have to say a negative amount on the film. Because she never delivered anything that they promised to. She got paid exorbitant amounts of money to do nothing. And in fact, do nothing but cause me grief to have to do what she was paid to do and me not get paid anything. So I ...
Q Who's Adam Walbert?
A Adam Walbert is one of the videographers on the film provided by Roger, a friend of Roger's and one of the editors with Roger who is one of the guys who sat in the room with Roger in Portland, Oregon that I referred to earlier as paying for the hotel, the food, the transportation, the equipment, all that stuff. He sat there with Roger editing on a day-by-day basis.
Q And remind me, when was the last time you spoke with Mr. Richards?
A I don't know the exact date. I know it was years ago. He sent me two -- two texts weeks, months apart. I don't -- I don't recall. I never responded to them. I have no desire to -- to ever work with him or talk to him again. As you can

Page 221

tell --
Q It sounds like you left on bad terms; is that fair?
A Well, bad terms is -- a lot of money was stolen as far as I am concerned, and I feel --
Q From you?
A And I feel bad for Patrick because I believe Patrick didn't get what he paid for. And I feel responsible because I am the one who said I can deliver the film because I trusted somebody that I clearly shouldn't have, and I will never do it again.
Q So you believe Mr. Richards stole from Mr. Byrne and from you, correct?
A Whether I say stole, I mean he got paid a lot of money that he shouldn't have got paid, and I believed I was being cornered and handcuffed in order for him to work to deliver the final product that I thought I absolutely had to provide to Patrick, and he was not providing it.
Q Who is Zero Hour Alchemy?
A That was another company that I used mainly in Canada. I didn't know where this film was going to go, but I have used that company before. It was actually my wife and my company.



We actually haven't used it since I believe 2019 or something like that. So it had actually no part of this film other than it's named because I'm one of the members of the company, so I wanted it on there just in case we would do something with it.
Q And is that another single member LLC?
A Like I mentioned, my wife and I.
Q So she's the only other member?
A Yeah.
Q I don't know what the Canadian equivalent is, if you refer to it as an L --
A It is the --
Q -- LC --
A -- same thing.
Q -- there.
A Well, they don't -- they don't call it an LLC. They just call it a personal service corporation. But it is Zero Hour Alchemy, Inc., so it is incorporated.
Q And where is that incorporated?
A In Toronto.
Q Toronto. And do you have a bank account associated with that --
A No.
Q -- in Toronto?



A Like I said, we have not used it since 2019. No bank accounts exist for it, nothing exists. We literally have not used it. So it didn't actually do anything on this film whatsoever. I literally put it on because it is I'm the one making the film and I -- this is my company, I want it on there just in case I can use it to my advantage at some point in the future. If it is not on, I can't use it. If it is there and I don't use it, it doesn't matter.
Q So when you see the Zero Hour Alchemy logo in the intro scene, that was you putting that in there and you had the authority to get that scene in the movie?
A Well, it was I gave that to Roger and said here, I don't have one for Advanced Cinemagraphic Technologies. I don't have an intro like that. Somebody made that one for me, and I said here's the one I have, you know, use it. Because to me it is just like having a trailer that you see -- or not a trailer but a logo in front of any film so ...
Q Let's take a look at Lucescu 8957. We'll mark this as Exhibit 16.
(Plaintiff's Exhibit 16 marked)



BY MR. KLOEWER:
Q This is going back to a topic we have briefly discussed at the beginning of the deposition this morning regarding the LLC that was established for this movie.
MR. DEMPSEY: Brad, I'm sorry, you said 89 what?
MR. MILLS: 57.
MR. KLOEWER: 57. 89 --
THE WITNESS: 89 --
MR. KLOEWER: -- 57.
THE WITNESS: -- 5, 7.
MR. KLOEWER: Yep.
THE WITNESS: It looks like that.
BY MR. KLOEWER:
Q And as is often the case with these email threads, they kind of go in reverse order with the first email in the thread at the bottom of the document and the most recent at the top. If we scroll down sort of near the bottom of the first page, the date indicated is May 24th, 2021, and it is an email to jflynn064@gmail. Who's email address is that?
A That's Joe Flynn.
Q And it is forwarding him -- the Subject

line is Thank You for Your Order with buffalo Registered Agents LLC. Do you know what exactly are we looking at here? What is this correspondence about?
A Well, first I can tell you I had really nothing to do about it, so -- to do with this whatsoever. So anything I tell you is going to be information that I have been told by Joe and Roger.
Q Sure. That's fine.
A Okay. So that's -- I just want to make it clear, I really don't have finite information on this.
Joe was instructed, not by me, to form a bank account to use for the final product of The Deep Rig. So Joe through his business contacts, accounting, lawyer, whatever, he told me that Wyoming is supposed to be the best place to open it for this type of thing. I don't know that. It goes back to my conversation that I told you about, my first -- my company my accountant opened it up in Delaware. Oh, you got to do it in Delaware. Because back in 1999 you opened in Delaware. At some point in the future, tax laws change, you have to switch it to New York. Okay. They go ahead and they switch it to New York.

Page 226

He told me he needs to open it in Wyoming. He opens it in Wyoming. And him and Roger are on that bank account.
Q And why is Joe Flynn doing this? What I mean is why Joe Flynn? Why not someone else?
A I -- I don't know that. I don't know how it was initiated. I certainly wasn't opposed to it because, you know, yeah, makes sense, you need to have a bank account for the LLC that you have opened.
Q Was that part of his role with The America Project?
A Well, as far as the -- I look at the date of the email as being May 24th, I would -- I would have to guess at that. But that would be appropriate for a time of when I believe The America Project had started.
Q And we'll look at a quick follow-up. This is actually two documents. Well, we'll label the first one as Exhibit 17. This is Lucescu 3802. This is a quick one.
THE WITNESS: We're done with this one?
MR. KLOEWER: Yep.
(Plaintiff's Exhibits 17 marked)

Page 227

BY MR. KLOEWER:
Q Another email on the same topic from the same email address, jflynn064@gmail, to Tom Hanks. I'm assuming this is not the same Tom Hanks that we're all familiar with?
A The accountant you're talking about? Yeah, it is not Tom Hanks.
Q Correct me if I'm wrong. Maybe there was more star power on this film that I realized. But who is Tom Hanks?
A As far as I know, he's an accountant.
Q And you're cc'd on this along with Mr. Richards. It says: Tom, enclosed is a current Operating Agreement for The Deep Rig Movie, LLC. Current principals are myself and Roger Richards the director who is Steve partner on the film.
What I want to look at is the attached document, but just giving you a brief look at the correspondence that attached it to give us some context.
A Uh-huh (affirmative).
MR. KLOEWER: What number are we at?
THE WITNESS: This is 17. So that would be 18.
(Plaintiff's Exhibit 18 marked)

Page 228

BY MR. KLOEWER:
Q Now I am going to hand you Exhibit 18. You can set 17 aside.
A Aside.
Q This is the Limited Liability Company Operating Agreement that was the next document sequentially, Lucescu 3803.
Did you review this document when you received it, Mr. Lucescu?
A I only glanced through it. I knew that I wasn't named on it. I knew I wasn't a part of it. I knew that. I think Joe just sent it to me so I had a record of it.
Q I just want to focus your attention on a couple of clauses in this document. If you go down to the second page looking at Article 3.1, paragraph labeled Profits and Losses.
A Yeah.
Q Do you see that?
It says: For financial accounting and tax purposes the company's net profits or net losses will be determined annually. Profits and losses will be allocated to the members in proportion to each member's relative capital interest in the company.

Page 229

We just said this, but the only two members of this LLC were Mr. Richards and Mr. Flynn, right?
A Correct.
Q Did it concern you that you were not included on the profit distribution for this film at this time?
A It didn't because it was presented to me by Joe, who I trusted and still trust. As I mentioned earlier, I think he's a very credible, honest person. And he simply said I have to open up this company right away so we have to get it done and opened so it is on it. We'll amend it later at whatever -- whatever we need to. Because no money was going in there yet.
Q But he needed to open it so that money could go in, right?
A Again, you're asking me to guess because I wasn't part of the conversations why he did, when he did, the day he did, anything like that. I can only repeat what he said to me.
Q Well, what was your understanding as to why this LLC needed --
A Because if they --
Q -- to be separate?

Page 230

A -- moved forward with a distribution system, then they would need someplace for it to go.
Q I see.
A Because, again, the date of this document is around -- already after the initial date that Roger had promised he could have the film ready for. And then he missed that date and he went to another date. And then he missed that date and went to another date. And I can repeat that three or four times before we got to June 26th.
Q All right. On the next page, paragraph 4.4, do you see that, Chief Executive Manager?
A 4.4. Yep, I do.
Q It says: The Chief Executive Manager has primary responsibility for managing company operations and for carrying out the decisions of the managers.
Who was the chief executive manager of this LLC?
A Again, I'll apologize but I have no knowledge anything about the technical aspects of this document.
Q All right.

Page 231

A But to me this is just a form document that comes out from the accountant who -- who opens the corporation, and to me that would just be a standard phrasing that would be then a boilerplate that would then be adapted later.
Q And again, I'm not trying to hide the ball here. I'll tell you on page 10, if you flip to the last -- well, page 10 of this document, the signature block for the --
A On?
Q -- Chief Executive Manager identifies Joseph Flynn as the chief executive manager of this entity. Do you have any reason to disagree with that?
A I'm trying to find the page number on this.
Q Sorry. It is page 10. The Bates label would be 3812.
A Oh, I see it now. Okay. I see that now. And to be fair, that's the first time I ever really paid attention to it.
Q And just I may anticipate your answer based on what you just said, but is it your understanding that any money that went into that account that Joe Flynn would have control over that

Page 232

as the chief executive manager?
MR. MILLS: Object to the foundation. You can answer.
A Again, my understanding is that if it went ahead with distribution in any manner and money was brought in, it would go into this corporation. But at some time before that we would have discussions about the very structure. Nothing definitive, nothing concrete, but just something that needed to be done for legal reasons which is not my area of expertise.
BY MR. KLOEWER:
Q All right. You can set that exhibit aside.
Mr. Lucescu, how many people ultimately viewed the film?
A I have absolutely no idea.
Q Did you ever -- well, were you able to track the views of the film at any point?
A Never.
MR. KLOEWER: Mark this as Exhibit 19. This is Lucescu 279.
(Plaintiff's Exhibit 19 marked)
BY MR. KLOEWER:
Q Who is Rick Hall?

Page 233

A He had nothing to do with this film. He's a personal friend that has zero to do with this whatsoever.
Q I'm not concerned --
A No. No.
Q -- with --
A I'm just letting you know.
Q I'm primarily concerned with the last line here. This is a text message from August 4th, 2021. You say: Thanks, Brother. Yep - 250,000 views in the first day.
What's the basis for that --
A That's something --
Q -- number?
A -- Rogert told me.
Q Okay. Do you have any reason to doubt that number?
A Well, I do now.
Q Well, do you know where Mr. Richards was getting his numbers from?
A Part -- part of the money that I paid to him was for a web design team, some kind of a marketing type thing that would follow the money through -- ultimately they had this system that they were trying to -- that he convinced us that he



was developing or had developed that would be take down proof, so no amount of attacks on the site would be able to take it down. He described it as a hydra. If you cut off one head, two heads pop up and so on every time that happens.
So any of this kind of thing came from him, any views. I know there were a lot of people that somehow got a copy of the film. They somehow screen-recorded it which they told me they wouldn't be able to do on the platform, guaranteed me. Roger said there's no way you can -- they'll be able to record this. Okay. Great.
And then I get a text from Joe Flynn saying how is this already up. I believe it was two days later. So I am on the phone with Roger, what the hell is going on. How can this be up on pirated sites. I thought you told me that was impossible. Something else that didn't materialize.
Q So you personally didn't have access to this same interface that Mr. Richards did providing these numbers?
A Not only did I not have access to the same interface, I didn't have access to any interface whatsoever that may have existed.



Q Who did have access to that other than Mr. Richards?
A You'll have to clarify. When you say who had access to this, what is this?
Q The metrics, the numbers for the film, how many people were viewing it, how many people downloaded it.
A I believe that that was solely under Roger's control. I didn't -- I never had access to that whatsoever. I know there was talk of Patrick having access to it. But I don't recall if he ever got access to it. To me my understanding would be Patrick would -- even for some of the clips, to look at the clips. And that was based on conversations where somebody would call me and ask me Patrick doesn't have a link, his link doesn't work.
So of course to be quite frank, I'm pissed. How can him not -- how can he not be provided when I have asked you five times to make sure he has the link. I now look like an idiot to Patrick because he doesn't have a link that works, and I take that as my responsibility.
I get on the phone, I call Roger, get him the fricking link. Can you drop what you're doing.



Drop what you're doing right now and get it done and get that link to him right now. So those kind of conversations would occur. Whether that did for this -- these kind of metrics as you're describing them, I don't know of it.
Q Do you know who the web design team was? Was it a business or individuals or ...
A There were a couple of names that I was instructed from Roger to pay. One of them was Jane Fender. There was another one as well. There were a couple of his -- of his group of people that were involved in this. And the web design team to my understanding were two people, husband and wife team, named Wes and Jojo. And they lived in Australia, which was irrelevant to me. I don't care where anyone lives. They're working in electronics and web design, they can be anywhere in the world and do that. But that's my understanding. I can't tell you how accurate that is. That was what was relayed to me through Roger.
(Plaintiff's Exhibit 20 marked)
BY MR. KLOEWER:
Q Let's look at what I have labeled as Exhibit 20. It may be the same answer that you have just given me but we'll see.

This is Lucescu 449. Again, this is --
(Off-the-record discussion)
BY MR. KLOEWER:
Q Okay. This is with somebody named Josh Heard. Who's Mr. Heard?
A I actually don't recall who he is.
Q And this is from August 10th of 2021. My question is about maybe one, two, three, four, five, the sixth comment down. It is about four lines. It is you, it starts with Hola Amigo at 9:50:12. Do you see that?
A I got it. Been on the road all day?
Q That's the one. The second line down says: This movie is going viral, and the website has been inundated. No complaints with that actually, as we re-launched it a week ago for free and have now had over 10 million views in one week.
What's the basis for that number?
A Again, any numbers like that came from Roger.
Q And it would have been through the same platform that you were just discussing; is that correct?
A My opinion is that Roger repeated numbers to me that were highly overinflated to try and

Page 238

appear credible with what he was supposed to be able to deliver. That's my personal opinion. Because I have never seen any evidence to support any of this.
Q Do you know if Mr. Byrne had access to those numbers, the same numbers that Mr. Richards did?
A I do not.
MR. KLOEWER: Okay. Let's take a break, ten minutes. We'll go off the record.
THE VIDEOGRAPHER: 4:17 we're going off the video record.
(Recess 4:17-4:29 p.m.)
THE VIDEOGRAPHER: 4:29 we're back on the video record.
BY MR. KLOEWER:
Q Mr. Lucescu, are you still in touch with Patrick Byrne today?
A I am -- I would have to say no, not so much. We have exchanged very, very brief text messages to literally where I would say, you know, Merry Christmas and Happy Easter, that kind of thing, Happy birthday. I reach out just to, you know ...
Q Would you say you're on good terms with

Page 239

Mr. Byrne?
A I would like to believe I'm on good terms with Patrick. But I don't think -- I think he lost his confidence in me because of what happened with Roger.
Q Because of how the film played out?
A Because of the non-delivery time after time after time. And then, you know, despite -- despite -- well, you heard many things I have said about what happened in the film that disappointed me, and I can only -- I can only guess that he was even more disappointed.
Q When was the last time you had a substantive conversation with Mr. Byrne?
A Well, that would probably be the premier.
Q Have you seen him since then?
A I think right -- I believe right after the premier I saw him at a rally I believe General Flynn had, and Joe Flynn invited me to come see him because he wasn't too far away. And Patrick was there. But I said hello to him. And, you know, he goes oh, I didn't recognize you. Because I had long hair before when I filmed, but my hair was much like it is now. So he kind of --
But we didn't have any real discussions,

Page 240

didn't have dinner, didn't have anything like that, and didn't spend much time talking to each other. It was literally in passing in the parking lot.
Q Did you contact him after you were served with this lawsuit?
A No. I talked to Joe Flynn.
Q And how did you talk to Joe? Was that on the phone? Was that via email? Text message?
A That was phone call.
Q Have you been in touch with Mr. Flynn since then?
A Again, of any substance, no. We have very short text messages where, again, I'll just say, you know, Merry Christmas and Happy New Year and that kind of thing. On his birthday I'll wish him a happy birthday.
Q Did you exchange any text messages with Mr. Flynn about the lawsuit after you were served?
A I don't believe -- I guess we did talk a little bit about it. Joe --
MR. MILLS: His question is text messages first.
THE WITNESS: Oh, text messages.
A I don't know. I can't recall if I had text messages. I recall -- I recall standing on my

Page 241

deck at home talking to him on the phone. Text messages I'm not sure of. I can't -- I can't say that.

BY MR. KLOEWER:

Q And have you executed any sort of like a common interest agreement with either of the other two Defendants in this case?

MR. MILLS: You don't have to answer that.

MR. KLOEWER: What's the basis?

MR. MILLS: It is privileged, a joint defense privilege.

MR. CAIN: The existence of an agreement?

MR. MILLS: Yeah. Yeah. He -- it is among the lawyers. He's not -- this is not an appropriate question for deposition. I'm going to instruct him not to answer. If you want to discuss it with me offline, you can.

BY MR. KLOEWER:

Q And we have already talked about Roger Richards. You're not really in touch with him anymore. What about Joe Oltmann?

A Same, similar. After the film, that picture he sent me of the HAZMAT suits and all that, we talked around that time. We talked a



little bit after the film because he was telling us he could do something with the distribution. I could see that I really didn't have any control at all left anymore. If he really truly had a distribution network, maybe that was some saving grace for me that I could say hey, Patrick, Joe has this, you know, brilliant idea that might work for you. It didn't pan out either.

And again, they're limited to very, very short curt merry Christmas to you and your family. And, you know, I do that with hundreds and hundreds of people I have worked with over the years.

Q And it sound like you're skeptical that Mr. Oltmann actually created a platform to distribute the movie; is that fair?

A Well, as far as best of my knowledge, it was never distributed ever. So I -- I -- I would have to say no, he didn't produce what he said he could.

Q Did you ever have meetings with Mr. Oltmann's company, Penn Business Network, about a potential distribution model for the film?

A I would say no, I did not. But I also had a couple of conversations with several people with Joe, and I don't know who they were from. So



it is possible they were part of that, but I -- I cannot tell you that I know for certain Penn existed as any place in there. Again, he has data companies that he represented. I don't know exactly who it was that I was talking to in a couple of those meetings.

Q Does the name PiDoxa sound familiar to you --

A No.

Q -- P-I-D-O --

A No.

Q -- X-A?

A No, not that I can recall at all. The one I recall -- the one name that I recall is Apollo, and I don't know if that is a real name or a part of a real name or a first, last name. I don't know that. I just know that that was Apollo will look after that. Talk to Apollo. So I don't -- I never met him. I don't know him.

Q That's the million dollar question. If you find out, let me know.

A No.

Q His real name is Greg Pappas.

A Oh.

Q I can tell you that much.



A Well, there, now you have told me something I didn't know.

Q Let me show you this document.

THE WITNESS: We're done with 20?

MR. KLOEWER: Yes.

(Plaintiff's Exhibit 21 marked)

THE WITNESS: What's the tag numbers so Chris and --

MR. KLOEWER: Yeah. We'll label this as Exhibit 21. This is Lucescu 215.

THE WITNESS: 215.

BY MR. KLOEWER:

Q Okay. This appears to be another text message exchange with Joe Flynn. The date is July 23rd of 2021. And you state at the top: Hola Brother. Good morning. What time does Novo open for the day. There is $195,588.89 in there now and small amounts, 500 to 2000 each day.

What are you talking about here if you recall?

A Novo was the bank that Joe opened up for The Deep Rig LLC that they opened. So Novo was also the bank account where money was being deposited by Roger's team that collected it from I believe the live stream.

Again, I have no real knowledge of this. I'm only repeating information that was given to me. Because once again, I'm going to stress that I had no authority and no access to -- to those kind of -- of amounts, where they came from, whose account, that kind of thing.
Q But it is your understanding that Mr. Flynn opened the bank account for the LLC and that the money from the film went into that bank account -- is that --
A Correct.
Q -- correct?
And again, same question I had before, why is Joe Flynn doing this? And I mean specifically why him and not someone else?
A Again, I can't really answer that question because I don't have finite knowledge of it. I know I didn't have a problem with it because, again, I trusted Joe, you know, and I know he was -- he's the one who introduced me to Patrick. Any involvement that he had there he was at one time, whether it was before or after this or during this I don't know, I don't recall for sure, but I know that for a short time he took over The America Project after his brother left and went

Page 246

onto the American future -- America's Future.
So, again, I don't have finite details in there. These are just bits that I got in conversation that I wasn't part of the -- of the discussion of operation end of it. I just ...
Q Well, we'll take a look at the -- well, let's continue here and then we'll get into that. There appears to be a discussion here about a new agreement. And Mr. Flynn responds, he says: Did you see the agreement. I was instructed to send it until you guys sign it. It is in your in box. Call me if you want.
Do you see that?
A I do.
Q What new agreement is he talking about?
A That was the agreement that I mentioned to you earlier that Faaiz Khan had produced and sent to me that I didn't really get much beyond the second or third page, and I just literally ripped it up and went I'm not even dealing with this. It is fundamentally completely different than what we talked about. And until we correct that, there's no point going any further.
Q What upset you so much about the new agreement?

Page 247

A Faaiz changed the wording of the original document I had with Patrick from an investment to a loan. So now he was indicating that I was now on the hook for a million dollars or $800,000 or whatever it was going to be, which was fundamentally completely not even remotely close to our agreement.
Q Did Mr. Byrne ever try to recover that money from you?
A No.
Q Did you sign the agreement that is referenced here --
A No.
Q -- that was sent to you?
A I mentioned -- I did mention that I ripped it up when I saw it and I refused to go on any further until ...
Q Do you know if Mr. Richards signed that agreement?
A I don't think Roger was even on the agreement. I could be wrong. But I maybe didn't get that far. I don't believe he was part of it.
Q And Faaiz was making these communications with you through his role at The America Project, right?

Page 248

A Correct. Whatever the role was. I don't know exactly what it was. But it was he was the representative that I was instructed to discuss things with moving forward from Patrick.
Q And then down here the second line from the bottom it says: My bank: M&T Bank, 955. That's the bank for Advanced --
A Correct.
Q -- Cinemagraphic --
A Correct.
Q -- you mentioned?
A Correct. Because that's where they -- that's where they needed to --
THE REPORTER: You got to let him finish the question.
THE WITNESS: Sorry. I'm sorry.
MR. MILLS: Count to three.
THE WITNESS: Yes.
THE REPORTER: That's the bank?
BY MR. KLOEWER:
Q Oh, that's the bank that you mentioned before for Advanced Cinemagraphic, correct?
A Correct.
Q And what role did Mr. Flynn have with respect to the contract, like could you negotiate

Page 249

the terms of the contract with him or what was your understanding of what role he was playing here?
A I don't believe he actually had a role in it. I -- as I mentioned earlier, I trusted Joe and I considered him a friend and I knew that he was close with Patrick. So I felt that Joe was a middleman; that if Patrick wouldn't talk to me, maybe he can talk to Joe, and Joe can present my concerns and point of view to him and maybe we can, you know, be friends again kind of thing.
Q Was Mr. Flynn effective in that role in your opinion?
A Well, he -- he certainly facilitated getting the $195,000 from the bank account that they had to pay off the people that were owed for producing the film, the cameramen and the -- and the videographers and the editing and the video wall and all these other things that Patrick told me to go ahead and do. But then I -- I never got that final payment from him. It was being withheld until I signed that proposed agreement.
Q But ultimately the money was released so you could pay those vendors?
A The $195,000 was sent to me and I immediately paid all of it but the final 12 or

Page 250

$15,000 that was owed, and I negotiated with the people who were involved and they were fine with what they got.
Q So ultimately you didn't have to sign the new contract in order to --
A I would --
Q -- get those folks paid?
A -- not sign it, no. Sorry.
Q So why did -- why did -- did they -- did Joe and Patrick just give up on trying to get you to sign it it sounds like?
A I -- I -- I wouldn't say that Joe gave up. I don't think Joe was ever part of it. He was just -- I kind of put him in the middle to try and, you know, kind of ease things up. Because I felt that Patrick was never getting my words and my concerns from Faaiz. I didn't know who Faaiz was. He came in out of nowhere and he -- as far as I know he kind of disappeared out of nowhere too. I don't think he's been a part of it for quite sometime. Again, that was my understanding. But I don't know the workings of The America Project.
(Plaintiff's Exhibit 22 marked)
BY MR. KLOEWER:
Q Okay. You can set that aside. I'll hand

Page 251

you what's been marked as Exhibit 22. This is Lucescu 52. This is another long exchange. We're not going to go through all of it. I'm curious about this third or fourth line down right after Mr. Byrne states Faaiz is involved. So this is from July 28th of 2021. So just above this you're requesting that Mr. Byrne make himself available for a call with Joe Oltmann. Do you remember that?
A Again, I recall the fundamental part of what was going on. Each one of the two had an idea of somehow making this website work, so they were in conversations about that.
Q And the need for the website was what? Why had -- I'm trying to understand why Joe Oltmann is playing this role in the film. Obviously we have seen his role on screen, but this is a very different role for him. So why was -- why were you in discussions with Mr. Oltmann about a website?
A Because he told me that's one of the things his company did, his word -- his quotes, to quote him, I'm a data guy. That's what my company does.
Q Well, just going back, I mean there was a website for the film before Joe Oltmann came along, right?

Page 252

A There was a website, but I -- I -- I believe that this was a way that he could get it to -- to reach more people or do something with it beyond what the original intent was. Again, I don't know what it was because I wasn't really part of the actual conversations regarding that.
Q Was Oltmann being brought in to try to further monetize the film by which I mean to try to increase the profitability of the film?
A That was what he said he could do.
Q And do you know was an agreement ultimately reached with Mr. Oltmann to have him do that?
A If there was, I have no knowledge of it.
Q Looking at your response here to that question, Faaiz involved, about three, four lines down into your response you state: Joe and I went ahead with the verbal okay from Faaiz.
Do you see that?
A I'm trying to find it.
Q It is the fourth line down on the right-hand side.
A Fourth line down. Joe and I -- yeah, got it.
Q With the verbal okay from Faaiz to both

Page 253

of us to proceed as discussed and it is now ready today. So to be fair to Joe Oltmann, he started later that week anyway despite never receiving anything from Faaiz nor receiving the promised hard cost funds, $60,000 now, for the over 700 hours it has taken to build.

Did Faaiz agree to extend hard costs to Oltmann for this website?

A In a three-way conversation that we had previous he did. I -- I think there was tension between the two of them because I believe they both were claiming that they could do what the other one was doing but better.

So I think Faaiz was trying -- again, this is my opinion based on our conversations -- but Faaiz was trying to show Patrick he could do what he did, and Joe was like I have a better way. And Faaiz said, well, if you can do it, then go ahead and do it.

And at the time of this text I had just received that information from Joe that it was 60,000 and 700 hours. I had no idea that that's what it was.

Q And Oltmann was trying to build a website that had a donation portal, right?



A To -- to my recollection that's what it was.

Q And the donation portal was to who? Donate to who, to you or to him?

A No, it would never be to me. So I don't know what the ultimate entity would be, who it would be to. It just wasn't me.

Q Well, the portal was to donate money to The America Project, right?

A The date of this was July 28th. I would -- I would think that at that point that yes, it was to to to The America Project.

Q And actually the last two lines of this message to Mr. Byrne state that. And it says: Then you and I need to talk afterwards. No one else first, just you and I. Then others can do the paperwork that you need. Please don't miss the 11:00 o'clock presentation from Joe. Donations can start flowing in today or tomorrow to TAP.

Does that --

A Again, that was --

Q -- refresh your recollection?

A That was -- that was Joe's words to me, so I am repeating them now, yes.

Q And Mr. Byrne responds to you here. He



said: Enough missives, Steve. You talk out of both sides of your mouth and I don't even bother reading these long messages. He says: You played all kinds of games with Doug's appearance, lied to me that you couldn't get them out of the film.

What's he talking about there?

A Again, I think he's just expressing his frustration with so many things that Roger promised and that he never delivered. Roger basically just did whatever he wanted to do despite what he was instructed that he should do and what we agreed to, he always pushed it way beyond that.

So Doug was Doug Logan who was in the film who when Doug was photographed, it was under the pretext that Doug would remain anonymous and would never be revealed that it was Doug Logan.

So once again, I'll -- I'll repeat that the first time I saw this film was on the plane from Chattanooga to Phoenix where I was looking at it, and I was shocked when I saw Doug's face. I was like my first response -- the only person with me was my wife -- and I said I can't believe that they missed this and they didn't blur this. That's -- what the hell is he doing. So I was shocked. I was very shocked.



I continued watching it. When I saw Doug's testimony and saw the emotion and power in his words, despite the fact that we had promised not to show him, I did agree that it was a powerful statement. So that's how I presented it to Patrick. I said we have a problem. Because right now Roger has now edited the film, and the finished version he's given us has Doug's identity revealed.

So my initial thoughts was I was pissed because it is not what we agreed to. However, I got to tell you that my personal opinion is, it is really powerful. I know that you are close with Doug Logan. You need to look at this because ultimately this is your decision. You need to look at this and you need to decide what we're going to do. Because Roger is telling me he's on standby right now with the editors to decide if he needs to edit that portion out and blur Doug.

Q And just more broadly, when you say Doug's statement was very powerful, you really agreed with the message that the film was presenting, right?

A I did.

Q And you sincerely believe then and now that the election was rigged, right?

A Again, it is a really tough question for me. Because I believe that there are still anomalies that I have witnessed myself that I find it incredulous that they exist, and yet somehow nothing has been done about it; how 23,000 dead people that are dead, that are confirmed dead, that were later admitted dead, that somehow voted in the election. That people from out of state were able to vote in two different states so they now have two votes, not one.

These are things that to me -- again, I'm not an expert on election -- but when I look at that, I say there's fundamentally something wrong here. So that -- that was what that had to deal with.

Q And you were a supporter of President Trump's going into the 2020 election, right?

A Into the 2020?

Q You wanted him to win, to be reelected?

A I'm not an American citizen, so I can't vote. I -- I -- I do believe that he did a lot of great things for the country. I -- I -- I was not so much a believer when he first won, but I quickly saw the things that he delivered were what he promised and that I truly believe that what he was



doing was far better for the American people than anything else. And again, I'll stress that my wife is an American citizen, so I'm partial to that.

Q Sure. So it is fair to say that you supported his reelection campaign?

A I did.

Q Even though you couldn't vote, but you wanted to see him reelected?

A I did.

Q So back to the messages at hand here. Will you scroll down to the second page, the third line down you say: Patrick, I'm totally fine with you changing the deal and now TAP getting 80 percent of all donations from the buttons.

So this is a pretty substantial change to your February 17th contract, isn't it?

A Yeah.

Q Now 80 percent of donations going to TAP, were you fine with that?

A I -- I was fine with it under the -- under the knowledge that I was given about how 501(c)(3) operations work which TAP was. So they had very strict; very, very strict ideas or not ideas but guidelines that they have to follow, how much they can donate or else it is not acceptable.



So I was told that 20 percent was the most they could do. And if they did anymore, it wouldn't be credible. Okay. Well, I don't want to be part of not having something credible. I didn't do this for it to not be credible. I didn't do this to have TAP, which I believe is doing a lot for a lot of people across the States, and I didn't want to have anything to do with that kind of a problem. I didn't want to be problematic.

I felt bad that Patrick had put this money in and he doesn't have anything for it yet. I felt responsible. So at this point I just went I'm done. I don't want to fight. I don't want to argue.

Q There's a lot more back and forth here we don't need to go through in detail. But I am curious about this conclusion at the bottom of page 2 and the top of page 3, it appears to be the last exchange in this conversation. Mr. Byrne states: Steve, I just read your latest crazy letter to the attorneys. All communications between us are now complete and you are on block. Don't even bother trying to write me. Communicate through attorneys only. The America Project looks forward to making its film available to the public.



Is it your understanding that The America Project owns the rest of the film today?

A Yes. I mean based on Patrick owns it. And if he assigns it -- again, I don't speak for Patrick. I don't know what he does or what the legalities do. To me, once again, I'll say Patrick spent a lot of money producing this film. It was my job to deliver a finished product to him. And I think it was a lot more painful process delivering the film than it should have been based on people that I trusted that didn't deliver what they promised.

Q Let me show you real quick what we'll label as Exhibit 23.

THE WITNESS: We're done with 22?

MR. KLOEWER: Yep. You can set that aside.

(Plaintiff's Exhibit 23 marked)

BY MR. KLOEWER:

Q This is Lucescu 3653. Now, this appears to be another email you sent to yourself; is that correct?

A It is, clearly.

Q Dated August 31st of 2021?

A Correct.

Q And it is the Terms and Conditions from the deeprigmovie.online/Terms. Do you know why you would have sent yourself this at the end of August, about a month after that text exchange we just looked at?
A Probably because I -- I just happened to come across it on the website, and I just wanted to preserve a copy of what the terms and conditions that were being put out there. Because I still hadn't made any money on it. I didn't have any way of enforcing making any money on it. I didn't get paid for the work. I didn't get paid for any distribution. I didn't get paid for any residuals. I just wanted to have a copy of what's being presented out there and the attempts to ...
Q Since that time have you ever sought to recover any compensation for the film? Did you ever try to force the issue?
A I -- I don't have the resources to do that with Patrick.
Q So just briefly, we don't have to go through this document very far other than the first page. But it says: Welcome to The Deep Rig Movie. Along with other community-based organizations, and in the interest of transparency, we have

Page 262

established Terms and Conditions for our visitors and contributors to read. We encourage you to read these Terms and Conditions before using any of The America Project's Platforms.
So was this website Platform of The America Project?
A Clearly.
Q And we look down here a little bit, The Deep Rig Movie is in bold under definitions, and it says: The Deep Rig Movie and The America Project refer to The America Project, Incorporated and all its affiliates.
So this is defining The Deep Rig Movie as The America Project; is that fair?
MR. MILLS: Object to the form and the foundation.
BY MR. KLOEWER:
Q Is that your understanding of what we're looking at?
A I -- I -- I don't have an understanding because I wasn't part of it. So honestly I -- I would be totally guessing over what is intended by that phrase.
Q That's fair. We can leave that alone. I was mostly curious why you had sent this document

Page 263

to yourself at that time.
Let's look real quickly at a couple here. Sorry, I'm doing kind of a lightning round here.
A That's okay.
Q I think we all are --
A We're done with this one though?
Q Yep. You can set that aside.
We're to 24 now. Is that right?
A Yes. This last one was 23.
Q So we'll mark Lucescu 228 as Exhibit 24.
(Plaintiff's Exhibit 24 marked)
BY MR. KLOEWER:
Q And just real quickly as an aside, we have looked at a lot of exhibits here today, a lot of text messages and emails. I haven't seen an instance when you haven't recognized a document that you have produced --
A Uh-huh (affirmative).
Q -- right?
So just to be sure, anything that's labeled with this Lucescu label, are those documents that you have produced to us?
A What document are you talking about?
Q Just in general.
A Oh.

Page 264

Q This one says Lucescu up there. I'm just trying to confirm because we don't have an opportunity to address everything in your production. There's a lot. And there's items I'd like to discuss with you. But I just want to confirm the authenticity of the documents we have seen. These are all correct and accurate copies of your records, correct?
A I believe so. I met with a company called FTI which was a bonded legal court appointed firm that extracts data from my phone, and this appears to be a chain of text messages between me and Joe Flynn.
Q Perfect. I just wanted to be sure that there was no dispute over the accuracy or authenticity of any of these documents.
MR. CARRY: I'm going to object to this as improper basis to lay a foundation for authenticity or admissibility of these documents.
BY MR. KLOEWER:
Q So let's look down near the bottom of page 228. On August 2nd at 8:41 it is a long sort of paragraph, it starts with you saying I sent this to Faaiz earlier today.
A Okay.

Page 265

Q Do you see that?
A Yep.
Q We don't need to read this whole thing. I'm just curious, about four or five lines down you state: If you are not interested in working out a deal with me in reference to your statement a week and a half ago with Joe Flynn and I on that call, you stated that you'd, quote, issue a demand letter for the 625,000 that Patrick invested in the project. You say: I have another party that will write that check to Patrick right now.
Who's that other party that would write a check to Patrick Byrne for $625,000?
A That was Joe Oltmann who said he would do that.
Q Joe Oltmann had offered to purchase the film. Was Joe Flynn aware that this was the third party who was willing to purchase the film?
A I -- I -- I cannot recall whether or not I told him that or not. I know Joe wanted to remain anonymous, and he literally just said it in the phone conversation I had with him. He said that's it, I'll write a check for 625,000 right now if that's what it takes.
Q Did he put that in writing to you?



A No. And it wasn't even accurate because six-twenty-five, I believe this was around the time that -- I can't be sure of the timing on this. But there were the issues with there was still no contract, there was still no way of me making any money whatsoever. So if somebody came up with a viable way for me to get paid something, I was like let's bring it to the table and see what can happen with it.
So at this point I -- I -- I think he just repeated that and I just, again, just literally repeated 625,000, which, again, is not accurate because there was another 200,000 that had been paid. I'm trying to refresh my memory in it, but it is a long time ago.
Q I'm going a bit out of order, but that's a good thing. It means I'm doing a little cleanup here as we reach the end. I want to cycle back real quickly to a topic we discussed a little bit ago about tracking the metrics of the film distribution. I'm going to hand you what I am marking as Exhibit 25 which is Lucescu 353.
(Plaintiff's Exhibit 25 marked)
BY MR. KLOEWER:
Q And this may refresh your recollection



about something you were wondering about before or you -- we were discussing. This appears to be a text message with -- exchange with somebody named Christopher Issa. Do you see that? I-S --
A I do.
Q -- S-A.
A I do.
Q From June 28th of 2021.
A Yep.
Q Who's Mr. Issa?
A He was one of the people working with Roger in the -- in that web design team and the control of the live -- I believe he specifically was gearing more towards the live stream end of things. So he was kind of the guy overrunning -- again, I'm half guessing here because it is vague in my mind how -- you know, which one of Roger's guys ever did what.
But based on what I'm reading, I believe that Christopher was the guy who was in control of the live stream. Because I have a list of requests in that first big paragraph of email addresses. Those were all friends that I'm thinking I -- I made this movie, I haven't got paid anything, I certainly don't want any friends and family to have



to pay anything to see it. So these are the people that are my friends, I want to get their email addresses on so they can have a free view and they're not paying anything to watch it.
Q And so yeah, you start out by asking him wondering what our final numbers were for the purchase event and the live stream as well. Patrick is asking. Then you list those folks' email addresses you just described. And he says I'll get those numbers for you.
And I'm sorry if you answered this question --
A That's okay.
Q -- a moment ago. Does he work for an entity, was he working for a specific outfit that was tracking those numbers or he's just a friend of Roger's? What --
A I believe he was under -- under Roger's control to do what, you know, he was told to do. So he was kind of the guy who was tasked with the -- the access to the film at that point, which was right after the premier. So at that point I think that was the only access was on the live stream address that Roger had set up.
Q And the third line from the bottom of

that first page Mr. Issa states: 650 in-person tickets told and then below that he says roughly 2748 live stream.
Do you see that?
A Correct.
Q That's a pretty specific number. Did you have any further communications with Mr. Issa after this communication asking for specific numbers about how many people had viewed the film?
A I really don't recall. I'd have to see it to see if it refreshes -- I didn't have a lot of conversations with Chris. You know, obviously this was one because it was right at the time of the premier. And then after that I don't recall him having anything to do with it after this premier was over. So that was -- those numbers are numbers specifically dealing with June 26th or immediately thereafter.
Q If we look down at the second page of this document, it is 354, the fourth message from the bottom Mr. Issa states: Yes, I have access to thorough analytics. I can see how many times it has been viewed and who is registering for the private event. If an email shows up that we don't recognize, I can ban them from the event.



And you may have just answered this question, but do you know how long Mr. Issa had access to those thorough analytics after this time?
A Yeah, I don't. But I believe it was a fairly short time. Because from my understanding, the live stream was not up for very long. And once they started on it with the other platform, the live stream wasn't available anymore. That was my understanding. But again, I wasn't part of any of the decisions, so I don't know for certain.
Q This is the last one I'll show you, and then we'll take a quick break and I may have a question or two for you after that. But I'll try to wrap --
A We done with 25?
Q Yep, you can set that aside. We'll mark this as Exhibit 26. This is what's been marked as Lucescu 8686.
(Plaintiff's Exhibit 26 marked)
BY MR. KLOEWER:
Q Okay. Do you recognize this document, Mr. Lucescu?
A Yeah. It is the one we talked about that I ripped up when I got to the Whereas, Haverford-Valley subsequently loaned an aggregate.



As soon as I saw the word loaned, I ripped it up and I'm not going any further, because that's fundamentally not what we agreed to and I'm not going to agree with it.
Q So who is Haverford-Valley?
A That was the company I mentioned that sent me the actual money that deposited a wire transfer into my account.
Q That's Patrick Byrne's company?
A Again, I would be guessing. I would know he has something to do with it since it sent me the money.
Q And HV Productions, LLC, what is that?
A No idea. I can guess that HV stands for Haverford-Valley, but I don't know that.
Q That was my guess as well but -- okay. And you never signed this agreement --
A No.
Q -- correct?
A No.
Q And if we scroll to the last or I'm scrolling, if you look to the last page, John Pettway is a manager of HV Productions. Who is Mr. Pettway?
A Well, I only knew John Pettway, I believe



he was an attorney or is an attorney. I believe he's the one who drafted this agreement. Because both Patrick and Faaiz had mentioned his name I think in conversations and texts, don't talk to me anymore. Talk to John and Faaiz.
Q I see. And the last page of that document indicates -- has signature blocks for you first above Advanced Cinemagraphic Technologies, LLC. That speaks for itself.
A Correct.
Q Same with the second line for Zero Hour Technologies --
A Which I don't know who that is.
Q Well, okay. That was my next question. Because Zero Hour Alchemy is your company, correct?
A Correct.
Q Do you know anything about Zero Hour Technologies?
A I don't. That's why I said I have no idea who that is. And I don't know why Roger Richards would ever be listed with me because we don't have any companies to deal with each other ever and never have.
Q That was my last question was why was Mr. Richards indicated here on this. Do you know

if Mr. Richards executed this proposed agreement from Mr. Byrne?
A I don't know if he even got it to be honest. I don't know anything about it because I -- it was sent to me in -- I don't know the name -- DocuSign document. So that was done. I printed it, started to read it, ripped it up.
MR. KLOEWER: Let's go off the record, take a five-minute break. I'll see if I have anything else.
THE VIDEOGRAPHER: 5:15, 5:16 we are going off the video record.
(Recess 5:16-5:26 p.m.)
THE VIDEOGRAPHER: We are on the video record. The time is 5:26.
BY MR. KLOEWER:
Q Okay. Mr. Lucescu, just a few last questions here. One quick one, we discussed your anticipated 20 percent share of revenue earlier in the day pursuant to that first contract from February where you thought that you would get 20 percent and Mr. Richards would get 20 percent. Do you recall that?
A Correct.
Q Is that a standard fee that you would

Page 274

normally collect for a job like this?
A Again, going back to one of my first comments about film production, there is no standard. What it is, it really depends on each separate film that you make has a whole bunch of different conditions that would warrant what amount you -- you could ask for or what you could ultimately get.
Q In your prior films that you produced, is that how much you were paid for your role in production?
A Well, on several of the films that's what I was promised but it is not what I was paid. Similarly, there was no money made on a couple of those films, and oddly enough one of them was with Roger and Leon.
Q Is that Thousand Pieces?
A Yes, I have not received a dime from that one either.
Q But your cut was 20 percent in that agreement or it was supposed to be?
A I believe it was 17 percent and then there was another additional amount for something else that came to another number. But it wasn't a round figure.

Page 275

Q And we talked about, we looked at that marketing deck that Mr. Richards circulated that included reference to all those online streaming platforms. Do you remember that?
A Correct.
Q Netflix --
A Yeah.
Q -- and Apple TV?
Why didn't those streaming platforms stream the film ultimately?
A I don't know. Again, I will be repeating information that Roger told me is that Jim at 1091 decided to not -- actually I can't -- I can't recall his exact reason. It was something to do with Jim at 1091 and something to do with his agreements with the streaming platforms. So I actually don't know the final answer for that.
Q Do you know if it was related to the content of the film, the platforms were unwilling to stream it or was it something else?
A Again, that's why I had to stop because I don't really recall exactly -- I recall that it was kind of a mumbo-jumbo coming from him and it didn't make any sense to me. And ultimately it didn't matter because it just wasn't going to happen.

Page 276

So I don't care why it didn't. I really don't. Just we need to move on. We need to get this done. You were supposed to distribute this. You promised that. Patrick is going to be pissed. What happened.
Q So those were conversations that Mr. Richards was having with the distributors or with 1091?
A Again, I don't know because I wasn't part of any of them. I was thirdhand information.
Q And we discussed a little bit just briefly your political preference in the 2020 election. I'm wondering if -- you're familiar with QAnon?
A I am.
Q And how are you familiar with QAnon?
A I just I have heard of it -- of its existence. I have seen people claiming to be affiliated with it. I have watched some podcasts over a period of time of the Q movement and the QAnon. And some of the anomalies that somehow they can predict, I kind of relate it to how the Simpsons are so accurate in their predictions that happen seven years after they air something. It is kind of like sometimes they're right, sometimes

Page 277

they're not right.
Q Do you consider yourself a member of that QAnon movement?
A No.
Q Did you follow QAnon message boards leading up to the election?
A I know I -- I -- I was aware of some of them and I would check what certain people were saying that were affiliated with it. It was intriguing because when they would post something that they had a timestamp that was authentic from two years ago, and somehow it was a hundred percent accurate. How did they know that. I mean it was -- again, I really do liken it to how did that Flintstones episode from seven years ago just predict what happened tonight.
Q Do you believe there was an individual Q who was producing these Q drops as they were called at the time?
A I -- I believe that there is one person or one person that represents a small group of people that either are the ones making those Q drops or they certainly know who it was because they're the ones who invented the platform that it was on.

Page 278

Q And do you believe that person or people as you described them are actually within President Trump's inner circle or were in his inner circle at the time of the 2020 election?
A No.
Q As we saw some brief references in your text messages to an individual by the name of Austin Steinbart. Is he a friend of yours?
A He's somebody I know. I haven't talked to him in years.
Q Do you believe that Mr. Steinbart was Q?
A I believe that he believes he is Q or was Q at the time. I certainly have not seen any evidence whatsoever to support that during the time or after the time that I had discussions with him about it.
Q And Mr. Steinbart organized the venue for the premier of the film in Phoenix, right?
A Not exactly. The -- this is a little bit of a complicated answer. If I -- if I need to describe all of it, once again, I refer you back to Adrian Youngblood whose ultimately sole responsibility was the live event that was live streamed. She never produced a venue. She never produced equipment for the venue.

Page 279

When I ultimately saw the budget that she had claimed that she had for her proposed setup of which I'd already prepaid because they needed money right away to pay everybody, she had only budgeted a thousand dollars for a projector that was physically impossible to find that anywhere; that I ultimately had to make a deal with a local video company that originally quoted me 40 or $45,000 for the video wall which I ultimately got them down to I believe 15,000 that I paid them for the three days of setting it up, doing it. Again, I needed something. I needed something for the venue.

Austin Steinbart was presented to me through Roger that he had a connection because he lives right there in Phoenix right very close to the Dream City Church, so he had a connection with Dream City Church, and he said he could put me in touch with him -- with them so I could work out a deal.

So I don't know how you would define that as him being responsible. Ultimately yes, if you call him putting me in touch with them. No if I am the one who had to do all the work after that to secure the venue and have video, you know, video frame wall put up and all those other things that

Page 280

needed to be done.
Q How did you know Mr. Steinbart?
A Previously to A Thousand Pieces there was a tentative project on Q and the Q movement and again, I thought it fascinating. And Roger asked me if I would be involved with it, but it never went anywhere.
Q Why didn't it go anywhere?
A I don't know the final answer for that. Something happened with Austin where he was arrested. So I certainly was like okay. Well, this doesn't look good, and I stopped my involvement at that point.
Q And he was released from prison just before the premier of the film, right?
A At some point before. I don't know if it was just before or when it was exactly. I know he was in prison. I know he was in Florence federal prison I believe. But I don't know the details, the fine details of how many days, weeks, months, anything he had.
Q Did your desire or your prior plans to make a QAnon film, did they carry over into your work in The Deep Rig?
A Not -- not at all. At the time -- at the

Page 281

time that we started The Deep Rig, I don't know the details of all the timing with all of these different people. I mean Austin had nothing to do with The Deep Rig. He had nothing to do with it. So I don't know how I can answer a question on his involvement for anything other than ...
Q I just mean did you view The Deep Rig as a vehicle for presenting QAnon themes to a broader public?
A No, never crossed my mind. I don't -- I don't believe we ever even brought it up ever in the movie. I don't believe that. I -- I -- I -- yeah, I guess that's -- that's the answer, I just don't believe it ever even came up in there.
Q Did you believe that if President Trump lost the 2020 election -- so prior to the election did you believe that he could only lose if the election were rigged against him?
A I -- I -- I really believe that President Trump had a phenomenal amount of following which I wasn't seeing from the other side. Literally I would never see the huge crowds of people that would be gathered at every single rally where Trump could have 50,000 to a hundred thousand people show up and other ones I saw from the other side were

Page 282

lucky if there were 25 people that showed up. In fact, many of them had more people show up that supported Trump than did his opponent.
Q So maybe you answered my question, but it sounds like you didn't believe that he could lose the election?
A I thought for sure he was going to win based on the overwhelming amount of people that showed support, not dissimilar from the last election.
Q And if he lost, it could only have been because the election was rigged, right?
A Well, again, the -- the evidence that was presented to me certainly pointed to anomalies that I couldn't understand how that could be possible. Just factual things that just didn't add up to -- to even the laws that were in existence for the elections themself.
Q Have you ever been to Mar-a-Lago?
A No.
MR. KLOEWER: I don't have any further questions. Pass the witness.
MR. MILLS: I have never been either. I have no questions.
THE VIDEOGRAPHER: This concludes the

Page 283

deposition --
MR. KLOEWER: Let's see if we got anything from --
MR. MILLS: Alfred and Chris, any questions?
MR. DEMPSEY: This is Christopher Dempsey on behalf of The America Project. We have no questions.
MR. CARRY: No questions.
THE VIDEOGRAPHER: This concludes the deposition. The time is 5:38. We are going off the video record.
(Concluded 5:40 p.m.)
(Signature reserved)

Page 284

The following reporter and firm disclosures were presented by me at this proceeding for review by counsel:

REPORTER DISCLOSURES

The following representations and disclosures are made in compliance with Georgia Law, more specifically:

Article 10 (B) of the Rules and Regulations of the Board of Court Reporting (disclosure forms)

OCGA Section 9-11-28 (c) (disqualification of reporter for financial interest)

OCGA Sections 15-14-37 (a) and (b) (prohibitions against contracts except on a case-by-case basis).

- I am a certified court reporter in the State of Georgia.
- I am a subcontractor for Veritext Legal Solutions.
- I have been assigned to make a complete and accurate record of these proceedings.
- I have no relationship of interest in the matter on which I am about to report which would disqualify me from making a verbatim record or maintaining my obligation of impartiality in compliance with the Code of Professional Ethics.
- I have no direct contract with any party in this action, and my compensation is determined solely by the terms of my subcontractor agreement.

FIRM DISCLOSURES

- Veritext Legal Solutions was contacted to provide reporting services by the noticing or taking attorney in this matter.
- There is no agreement in place that is prohibited by OCGA 15-14-37 (a) and (b). Any case-specific discounts are automatically applied to all parties, at such time as any party receives a discount.
- Transcripts: The transcript of this proceeding as produced will be a true, correct, and complete record of the colloquies, questions, and answers as submitted by the certified court reporter.
- Exhibits: No changes will be made to the exhibits as submitted by the reporter, attorneys, or witnesses.

Page 285

- Password-Protected Access: Transcripts and exhibits relating to this proceeding will be uploaded to a password-protected repository, to which all ordering parties will have access.



CERTIFICATE

STATE OF GEORGIA:
COUNTY OF FULTON:

I hereby certify that the foregoing transcript was taken down to the best of my ability, as stated in the caption, and the colloquies, questions and answers were reduced to typewriting under my direction; that the transcript is a true and correct record of the evidence given upon said proceeding.

I further certify that I am not a relative or employee or attorney of any party, nor am I financially interested in the outcome of this action.

I have no relationship of interest in this matter which would disqualify me from maintaining my obligation of impartiality in compliance with the Code of Professional Ethics.

I have no direct contract with any party in this action and my compensation is based solely on the terms of my subcontractor agreement.

Nothing in the arrangements made for this proceeding impacts my absolute commitment to serve all parties as an impartial officer of the court.

This the March 4, 2025.

J. David Brown

J. DAVID BROWN, CCR-B-1401



DEPOSITION ERRATA SHEET

Witness Name: Steven Lucescu

I, the undersigned, do hereby certify that I have read the transcript of my testimony, and that:

____ There are no changes noted.

____ The following changes are noted:

Pursuant to Rule 30(7)(e) of the Federal Rules of Civil Procedure and/or OCGA 9-11-30(e), any changes in form or substance which you desire to make to your testimony shall be entered upon the deposition with a statement of the reasons given for making them. To assist you in making any such corrections, please use the form below. If additional pages are necessary, please furnish same and attach.

Page ___ Line ___ Change __________________________
____________________________________________________
Reason for change:
Page ___ Line ___ Change __________________________
____________________________________________________
Reason for change:
Page ___ Line ___ Change __________________________
____________________________________________________
Reason for change:
Page ___ Line ___ Change __________________________
____________________________________________________
Reason for change:



Page ___ Line ___ Change __________________________
____________________________________________________
Reason for change:
Page ___ Line ___ Change __________________________
____________________________________________________
Reason for change:
Page ___ Line ___ Change __________________________
____________________________________________________
Reason for change:
Page ___ Line ___ Change __________________________
____________________________________________________
Reason for change:
Page ___ Line ___ Change __________________________
____________________________________________________
Reason for change:
Page ___ Line ___ Change __________________________
____________________________________________________
Reason for change:

Deponent's Signature

Sworn to and subscribed before me this ___ day of
_______________, ________.

____________________
Notary Public
My Commission Expires:_____________

Laurin@werthermills.com

March 4, 2025

RE: Coomer, Eric v. Byrne, Patrick Et Al

DEPOSITION OF: Steven Lucescu (# 7127324)

The above-referenced witness transcript is available for read and sign.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those on the attached Errata Sheet.

The witness should sign and notarize the attached Errata pages and return to Veritext at errata-tx@veritext.com.

According to applicable rules or agreements, if the witness fails to do so within the time allotted, a certified copy of the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

Page 290

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is transcribed, the transcript shall be furnished to the witness for examination and shall be read to or by the witness unless the examination and reading are waived by the witness and by the parties. Any changes in form or substance that the witness wants to make shall be listed in writing by the officer with a statement of the reasons given by the witness for making the changes. The changes shall be attached to the transcript. It shall then be signed by the witness unless the parties waived the signing or the witness is ill, cannot be found, or refuses to sign. If the transcript is not signed by the witness within a reasonable time after it is furnished to the witness, the officer shall sign the transcript and state on the transcript the waiver, illness, absence of the witness, or refusal to sign with any reasons given therefor. The deposition may then be used as fully as though signed unless the court holds that the reasons given for the refusal to sign require rejection of

the deposition wholly or partly, on motion under rule 1.330(d)(4).

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.