**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

ERIC COOMER, Ph.D.,
Plaintiff

v. Civil Action No. 8:24-cv-00008-TPB-SPF

PATRICK BYRNE, et al.,
Defendants

---

**EXHIBIT 2**

---

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
CIVIL ACTION NO. 8:24-cv-00008-TPB-SPF

ERIC COOMER, Ph.D.,

Plaintiff,

v.

PATRICK BYRNE, STEVEN LUCESCU,
and THE AMERICA PROJECT, INC.,
a Florida non-profit corporation,

Defendants.
__________________________________/

VIDEOTAPED DEPOSITION OF
CARLITO JOHNSON

Taken on behalf of the Plaintiff

DATE TAKEN: November 20, 2025
TIME: 9:12 a.m. - 2:23 p.m.
PLACE: Courtyard by Marriott Tampa Downtown
102 East Cass Street
Tampa, Florida 33602

Stenographically Reported by:

Lisa Gropper, RPR, FPR-C

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
CIVIL ACTION NO. 8:24-cv-00008-TPB-SPF

ERIC COOMER, Ph.D.,

Plaintiff,
v.

PATRICK BYRNE, STEVEN LUCESCU,
and THE AMERICA PROJECT, INC.,
a Florida non-profit corporation,

Defendants.
_______________________________________/

VIDEOTAPED DEPOSITION OF
CARLITO JOHNSON

Taken on behalf of the Plaintiff

DATE TAKEN: November 20, 2025
TIME: 9:12 a.m. - 2:23 p.m.
PLACE: Courtyard by Marriott Tampa Downtown
102 East Cass Street
Tampa, Florida 33602

Stenographically Reported by:

Lisa Gropper, RPR, FPR-C

APPEARANCES

ON BEHALF OF THE PLAINTIFF:

BRADLEY A. KLOEWER, ESQ.
CHARLES J. CAIN, ESQ.
CAIN & SKARNULIS PLLC
P.O. Box 1064
Salida, Colorado 81201
bkloewer@cstrial.com
ccain@cstrial.com

ON BEHALF OF THE DEFENDANT PATRICK BYRNE:

PETER TICKTIN, ESQ.
THE TICKTIN LAW GROUP
270 SW Natura Avenue
Deerfield Beach, FL 33441
pt@legalbrains.com

ON BEHALF OF THE DEFENDANTS STEVEN LUCESCU AND THE AMERICA PROJECT:

CHRISTOPHER W. DEMPSEY, ESQ.
DEMPSEY LAW, PLLC
50 N. Laura Street
Suite 2500
Jacksonville, FL 32202-3646
chris@cdempseylaw.com

ALSO PRESENT:

Stephanie Lambert Junttila
Derek Reid, Videographer (via videoconference)

- - -



INDEX


| Witness | Direct |
|---|---|
| Carlito Johnson | |
| (By Mr. Kloewer) | 6 |


- - -

EXHIBITS


| Plaintiff's | Description | Page |
|---|---|---|
| Exhibit 27 | Plaintiff's Third Amended Notice of Intent to Take Oral and Video Deposition of Designated Representative(s) of The America Project, Inc. | 9 |
| Exhibit 28 | Small Charitable Organizations/Sponsors Registration Application signed 6/18/2021 | 33 |
| Exhibit 29 | Small Charitable Organizations/Sponsors Registration Application signed 8/12/2022 | 46 |
| Exhibit 30 | Small Charitable Organizations/Sponsors Registration Application signed 5/18/23 | 53 |
| Exhibit 31 | Small Charitable Organizations/Sponsors Registration Application signed 6/13/2024 | 60 |
| Exhibit 32 | 2021 Form 8879-TE and Form 990 | 65 |
| Exhibit 33 | 2022 Form 8879-TE and Form 990 | 75 |
| Exhibit 34 | Instagram post | 93 |




EXHIBITS (Cont'd)


| Plaintiff's | Description | Page |
|---|---|---|
| Exhibit 35 | Screenshot of the last image of the film | 117 |
| Exhibit 36 | Rumble post titled Watch The Deep Rig Movie Free | 140 |
| Exhibit 37 | Twitter post | 142 |
| Exhibit 38 | Flash drive | 144 |
| Exhibit 39 | Document titled "Terms and Conditions: The Deep Rig Movie" | 146 |
| Exhibit 40 | Emails | 152 |
| Exhibit 41 | Press release titled "Election Fraud Documentary 'The Deep Rig' to premiere in Naples, Florida on July 21, 2022." | 162 |
| Exhibit 42 | Email dated July 12, 2022 | 168 |


- - -



THE VIDEOGRAPHER: Good morning. We are now on the record. The time is 9:12 a.m. on November 20th of 2025.

This begins the videotaped deposition of Carlito Johnson being taken in the matter of Eric Coomer vs. Patrick Byrne, Steve Lucescu and The American Project Incorporated, case number which is 8:24-cv-00008-TPB-SPF.

My name is Derek Reid, and I am your remote videographer for today; the court reporter is Lisa Gropper, and we are both representing Fortz Legal Support.

Counsel, will you please state your names and whom you represent, after which the court reporter will swear in the witness.

MR. KLOEWER: Here on behalf of the plaintiff, my name is Brad Kloewer. I'm joined by my co-counsel Charlie Cain.

MR. DEMPSEY: Here representing defendants The America Project and Steven Lucescu, I am Christopher Dempsey.

MR. TICKTIN: Good morning. I'm Peter Ticktin. I'm here with Stephanie Lambert as my -- in the capacity of paralegal and -- and I'm here on behalf of Patrick Byrne.

Page 6

THE STENOGRAPHER: Sir, would you raise your right hand for me, please.

(Witness complies.)

THE STENOGRAPHER: Do you swear or affirm the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I swear.

DIRECT EXAMINATION

BY MR. KLOEWER:

Q Okay. Good morning, Mr. Johnson.

A Good morning.

Q My name is Brad Kloewer. I represent the Plaintiff, Eric Coomer. We met just a moment ago before the deposition started. I'll be taking your deposition today.

Before we get started, can you state your full name for the record, please.

A Carl Johann Johnson.

Q And just so I'm clear -- we'll get into this as we get into the documents. I've seen both a Carl Johnson and a Carlito Johnson referred to in some of these documents. Are those both you or is that two different people?

A Those are both me.

Q Okay. I wasn't sure if we were dealing with a

Page 7

senior and a junior or -- or what, but I appreciate the clarification.

Okay. Have you ever had your deposition taken before, Mr. Johnson?

A No.

Q Okay. Well, I'm sure your counsel has prepared you today, but I do want to just go over a few brief ground rules before we start.

A Okay.

Q Number one, the most important person in the room right now is sitting to your left. That's Lisa. She's taking down every word we say, and that means that you and I need to be careful not to speak over each other. I will do my best. I'm one of the worst offenders at this. But there may be times when you anticipate a question that I'm going to ask and you may have an answer for me before I'm done. I just ask that you let me get my question out first so that we have a clean record. Is that fair?

A Yup, fair.

Q And there may be times when -- certainly I do this when I'm reading documents, but if you're speaking very quickly, that can be difficult for Lisa to get down as well. So just try to keep her in mind.

We do have a lot to get through. You can see

Page 8

all the documents I have here today. It's not a marathon though. If you need a break, if you need to use the restroom, we'll break for lunch, just let me know and we can do that. The one thing I ask is that, if there's a question on the table, if we're -- if something is pending, that we get an answer to that question before we take a break. Is that fair?

A (Nonverbal response.)

Q And another thing you've just done that I should note, if you can give me verbal answers please. You just nodded. But again Lisa is taking down everything we say, so if I could get a verbal --

A Right.

Q -- yes or no.

And the other thing is throughout the deposition your counsel may be objecting to some of the questions I ask. That's fine. You can still answer those questions unless he instructs you not to. Okay?

A Okay.

Q All right. I think that covers most of the ground rules, but I -- I probably missed one or two. We may circle back.

So, Mr. Johnson, can you tell me, your current role with The America Project is what?

A I am the current CEO and president of The

Page 9

America Project.

Q All right. And how long have you served in that role?

A I've served as CEO and president since 2023, I think. I was the COO before, but then I got promoted up. I can't remember what month it was.

It was after actually -- Tom Homan was our CEO and president. When he departed to assume his role in the administration, I came in and became the president and CEO.

Q And -- and we'll look at some of the -- the documents and go through the history of the different roles. I just want to be sure I know what -- what position you're serving in now.

I'm going to hand you what we will mark as Exhibit 27. We'll go sequentially from where we left off with Mr. Lucescu.

(Plaintiff's Exhibit No. 27 was marked for identification.)

BY MR. KLOEWER:

Q Okay, Mr. Johnson. Do you recognize the document I've just handed you?

A Yes, I recognize it.

Q And -- and what are we looking at here?

A This is the actual deposition, right, the rule

Page 10

for me to come get deposed?
Q That's right. And I want to direct your attention to the last few pages of this document. If you want to flip forward to what's marked at the bottom as Exhibit A of Page 4 --
A Yup, I have it.
Q -- the top of that says, "Matters Upon Which Examination is Requested." Do you see that?
A Yes.
Q Did you review these topics prior to the deposition today?
A Yes.
Q And are you prepared to provide testimony on the topics listed in this deposition notice?
A I'm prepared to answer all the questions the best of my ability, yes. There's a lot in here I don't know.
Q Well, that -- that's my next question. Are there any topics on this list that you are not prepared to provide testimony on?
And you could take a moment to review. I realize it's a long list.
A Okay.
Q You know what, Mr. Johnson, if you want to just circle the topics on that document in front of you

Page 11

that -- that you're not prepared to answer questions about, that may be the easiest route.
(Soto voce discussion.)
MR. TICKTIN: I want to object to the form of that question.
THE WITNESS: I don't have any objections to any questions --
THE STENOGRAPHER: Sir, I can't hear you if you --
A I don't have any objections to any of the questions you provided. You just wanted me to go over them?
MR. DEMPSEY: Well, just to clarify, I believe counsel for plaintiff has requested that you circle the numbers for items that you have no knowledge or --
THE WITNESS: Okay, sorry. So you don't --
(Indiscernible cross-talking.)
MR. DEMPSEY: That way we know where --
THE WITNESS: Okay.
MR. DEMPSEY: -- (inaudible).
THE WITNESS: I'll do it fast.
THE STENOGRAPHER: That way we know...?
MR. DEMPSEY: Where we're going.
THE STENOGRAPHER: Thank you.

Page 12

MR. DEMPSEY: So if there's a question that you have no information --
THE WITNESS: Okay.
MR. DEMPSEY: -- please circle the number, and then that will help better orient counsel for plaintiff.
A That's it. That's the best I can do for you, sir.
BY MR. KLOEWER:
Q Okay. That's going to be an exhibit for the record, so if you could just --
A Okay.
Q -- read for me which numbers you've circled on there.
A Okay. I circled 1, 2, 3, 4 and 5, and it might just be that I'm not clear about what those -- okay? And then on to 15 and 16. And then 28, 31, 39 and 40.
Q Okay. So just let me make sure I've got those correct here. You indicated 1, 2, 3, 4 and 5, 15, 16, 28, 31, 39 and 40; is that correct?
A Yes.
Q Okay. We can set that document aside for now. I'm probably going to circle back to that.
A Okay.

Page 13

Q As you know, Mr. Johnson, we're here to talk generally about this film, The Deep Rig, and I'll have plenty of questions for you about that a bit later this morning. What I'd like to do and what I think might guide our conversation, hopefully streamline things a bit, is to understand a bit more about The America Project more broadly first so that the questions about the film can be more focused. Okay?
So to that end I want to go through a few documents that have been publicly filed on behalf of The America Project, but before we get there, can you tell me just broadly, what is The America Project?
A It's a 501(c)(4) that we started in April of 2021, and we do mostly advocacy, social welfare work, regarding around these three topics: Election integrity, border security, and rights and freedoms. If you had to set up and look at a pillar of business, that's our three pillars that we work for for our nonprofit.
Q Okay. So you said election integrity, border security, and rights and freedoms; is that right?
A Yes.
Q And tell me a little bit about the first prong you just described, election integrity. What does The America Project do on that issue?

Page 14

A So at our inception, starting with election integrity, we wanted to start providing advocacy, social welfare, and information about the election process.

We were formed shortly after our nation's election in 2020, and we found as citizens that there were some serious issues with our election system, the holistic election system itself. So part of our like-mindedness was to come together and create a nonprofit that started studying exactly what was going on with the election systems and then start providing advocacy and education for it.

Q When you say election systems, what do you mean by that?

A Election systems is anything to do with the types of -- of election laws that vary from state to state. Some of the election systems models in state to state differ from each other. Systems can mean the election management system but there's way more involved upstream of the ballot hitting the EMS. The election system as a whole is everything basically that takes place upstream of a ballot touching a machine. That's part of still the same election system.

So the election ecosystem itself has many parts. That's what I mean when I say that.

Q And -- and does The America Project have a

Page 15

focus on any of those specific parts as you described?

A We're focused on all the phases of an election process, from early voting, from all of the different types of practices that other organizations might do to help encourage voting at the civic level. Certainly we're -- we were involved in that. And that can be everything from simple tasks, patriot tasks, like early voting or registering to vote accurately. That's part of the election system. And as we get wider and we start supporting election systems, we provide more education mostly and advocacy about different types of elections depending on states and whether or not they're prosecuted --

THE STENOGRAPHER: Whether or not they're...?

A -- in accordance with the state law.

THE STENOGRAPHER: Whether or not they're what?

THE WITNESS: Prosecuted in accordance with state law.

A So it can mean a lot. I know it's loaded and it's a lot of words, but the election ecosystem itself, we focused on all of it, from the election management system to what happens after the election management system and votes are tallied, how do you ratify an election, and just working in reverse upstream of that.

Page 16

BY MR. KLOEWER:

Q And you mentioned advocacy. What sorts of things does The America Project advocate for with respect to election integrity?

A Free and fair elections for sure. We advocate for same day voting until we can understand and further come to terms with how much corruption and fissures are involved in the election management side of it, let alone upstream.

So we found when we started our nonprofit there were very traditional ways that were out there to electioneer and then new sophisticated forensic ways that we were seeing, so...

Q And when you -- you mentioned corruption on the election management side. Who are you talking about when you say that?

A If I said corruption on the election management side, that's not what I meant. I meant looking for any types of corruption across the entire election systems, so ballot stuffing, voter den, pooling, smurfing, all these different types of things people do to set the -- bad actors do to set the conditions for an unfair election. That's what I'm talking about. And it includes EMS systems as well.

Q And does The America Project have a priority

Page 17

in that list of items you just listed?

A No. All of them are -- are what we do. We just advocate for them.

Q And what positions does The America Project take with respect to election management technology?

A Our position from the beginning is election management technology can be there but it is not shepherded properly by humans. Election management technology has many shortcomings. There are many different parts of the election management system that are suspect to cyber breaches. We found all of this through years of research and work. So that's what we're talking about.

Q Okay. A couple of follow-ups there.

First of all, does The America Project have any specific policy proposals that it advocates for with respect to election management technology?

A Any policy proposals? Not that I'm aware of. That we submitted somewhere to -- to -- as a part of R&D, I don't recall.

Q Okay.

THE STENOGRAPHER: As a part of?

A R&D or something, or we -- I don't recall.

Maybe I'm misunderstanding your question.

Page 18

BY MR. KLOEWER:
Q Let me rephrase it. Does The America Project take a position with respect to how election management technology should be used when -- when you talk about the advocacy work you do? Do you have a preferred approach to use of election technology?
A For the use of election technology, our preferred approach -- we don't recommend approaches of how to use election technology. We recommend better ways to prosecute elections, and it's not the most optimal way -- in our -- in our research and in our findings, it's not the most optimal way to prosecute an election.
Q Okay. Well, that sort of goes to my question then. What is the better way to prosecute elections --
A Until we can --
Q -- as you described?
A Until we can further commit to a lot more research and a lot more understanding of election management systems, really same day voting, voter ID. And through our old USAID programs, we would go around globally and show countries how to do same day voting effectively and fair without corruption, countries that have millions of citizens. I think and it is our -- always maintained our position that, until we understand

Page 19

really what's going on with the election management systems, it is fair and reasonable to conduct manual same day elections, and that's our -- that's our -- that's our position, whether or not it's going to happen or not, but that's been our position.
Q And as far as electronic vote tabulation systems, if they're used on same day elections with voter ID, does The America Project take any position with respect to --
A Yes. It can -- they can always support the findings of an election with the EMS system, but the actual system itself that was ran ahead, that's the standard, and it's simply backed up by the technology until it can prove otherwise.
THE STENOGRAPHER: Sir, if you would, just let the attorney finish his question completely --
THE WITNESS: Okay.
THE STENOGRAPHER: -- before you begin --
THE WITNESS: Sorry about that.
THE STENOGRAPHER: -- to answer.
That's okay. Thank you.
BY MR. KLOEWER:
Q You mentioned until we know more about election management systems, and I believe you stated previously that, and correct me if I'm wrong, The

Page 20

America Project has done research on this issue itself; is that correct?
A Just research on election management systems as they're used in different elections globally.
Q Okay.
A So we've done global research for sure on how these same EMSs and their technology have been used in other countries, and the results of their elections as well, and to find out if there's common conceptions and misconceptions with the technology, because again throughout pretty much three to four years is where the research began and stopped. We were able to find, and this was our open source research as a private organization, an unbelievable amount of information about how poorly managed and how poorly maintained election management systems are globally.
Q And who's conducting that open source investigation for the --
A It's not an --
I'm sorry, I didn't mean to interrupt you before you finished.
Q No, that's okay. You said this is your open source investigation. Who's conducting that for The America Project?
A This is our information gathering at the -- at

Page 21

The America Project. It's part of our advocacy to find out and, you know, discover what's wrong. So that's us.
Q Yeah. And --
A Nobody's hired us or retained us to do anything like that.
Q Well, I'm asking more specifically who, which individuals within The America Project are conducting that research?
A At the time --
Because where we're at now is only me left in this organization. We're -- we're -- we're shutting down because -- well, there was -- the special use and purpose for it has lapsed. But back when we were -- three years ago I think, I had a pretty decent size operational staff there with me and we conducted our research from there. We had our own operation cell.
Q So you oversaw the research staff that was doing this investigation into election systems?
A Oversaw the research staff. I was the chief operations officer, so yes.
Q And who was on that operations staff?
THE WITNESS: Is that -- is that attorney-client privilege for former employees who no longer work? Can I provide their name?
MR. DEMPSEY: I don't think you -- if you need

to take a break and ask me a question --
THE WITNESS: Oh, I thought I could just ask.
MR. DEMPSEY: No, it's okay. But just to move things along, no, former employees, research assistants that performed tasks on behalf or for The America Project is not privileged information.
THE WITNESS: Okay.
MR. DEMPSEY: Unless they were an attorney.
THE WITNESS: Okay.
A Yeah. Specifically? So you want the names of the gentlemen?
Okay. So first and -- and these -- Jason Ladd, L-A-D-D; John Fogg, F-O-G-G.
I'm going back -- these guys, they worked for us three years ago.
And that -- that's it. That's who was doing the research for -- for it at the time.
Q And does the -- The America Project take any position with respect to the use of Dominion Voting Systems technology in election administration?
A Our -- take a position?
MR. DEMPSEY: Object to --
A For --
MR. DEMPSEY: -- the form.
A Yeah. For example?



BY MR. KLOEWER:
Q Does The America Project have a specific objection to Dominion Voting Systems technology in particular?
A The America Project has an objection to all election management voting systems technology until we can better understand and we can at least prove that it can't be manipulated.
Q So The America Project doesn't feel more strongly about any particular election technology vendor than another; is that fair?
MR. DEMPSEY: Object to form.
You can answer if you can.
A Repeat it again. I'm sorry.
BY MR. KLOEWER:
Q So The America Project doesn't have a stronger position with respect to any one election technology vendor than another?
So, for example, Dominion Voting Systems is one of those companies. ES&S may be the other. Does The America Project take a position with respect to specific vendors?
A The America Project takes the position that the same voting technology in the Dominion Voting Systems is the same technology in the Smartmatic voting



systems.
So our position is those were the systems that during the nation's election in 2020 exhibited the anomalies that first drew us as citizens to form this nonprofit, because it was right there in front of all of us.
Q And what is the basis for the belief that the Dominion Voting Systems technology is the same as the Smartmatic technology?
A It's through -- it's through our independent research we discovered that some of the same technology at the root level is used both in Dominion and Smartmatic.
Q And that was research conducted by Mr. Ladd and Mr. Fogg?
A That was research conducted by The America Project.
Q By those two individuals that you were overseeing?
A By The America Project.
Q Okay. And what evidence did they identify to lead The America Project to that conclusion?
A Evidence for what now?
Q That the Smartmatic and Dominion Voting Systems utilize the same -- are based on the same



technology.
A Evidence, it's seeing indicators. So we saw indicators in the election and also we -- indicators in the election are what started us looking at them.
I'm sorry, I think that's what you're asking but.
Q Which indicators?
A Well, until -- I -- we -- I know. Everybody saw in 2020 with reasonable eyes what -- what had happened in -- in some specific jurisdictions, especially in Michigan, Georgia, Arizona, Wisconsin, where EMS anomalies coupled with other types of electioneering upstream of the machines is what we discovered. So again to say it's only the EMS and what we're looking at, we looked at the whole thing holistically. It started with Dominion Voting Systems and Smartmatic because that was the genesis of the -- of the voting machines issues in 2020.
Q Well, I'm -- I'm asking specifically for which indicators. You said you noticed indicating that Smartmatic and Dominion utilized the same technology. So what are those specific indicators?
A I don't -- I can't go back that far because we did a lot of work to come up with those, but I will tell you from what I recall some of the -- not just the

Page 26

counting -- notwithstanding the voting numbers, the anomalies that we saw on election night and some of the subsequent findings of ballot stuffing in Georgia and other places where the same types of fraud done upstream to make the machines finish the lie is what we -- is what we really started discovering.

So when you say the indicators, it's really you start with something and, to use the word evidence, we -- the indicators were there, but when you start digging, you start discovering more and more what's going on.

Q So when you say these upstream ballot stuffing to -- to make the machines finish the lie --

A Uh-huh.

Q Did I hear you correctly?

A That's one scenario, yes.

So we steadfast believe that, environmentally upstream of ballots ever hitting a tabulator, the conditions have to be set environmentally, and they can be set upstream so that when the machines themselves give you the tabulated votes, the machines match what happened upstream.

Q And when you say the lie, you're referring to the 2020 election results, correct?

A Yes.

Page 27

Q And it's the position of The America Project that the 2020 presidential election was rigged, correct?

A I don't know if you're saying the position that it was rigged, but we found again that there were serious issues with the election itself.

Q Well, it's The America Project's position that the election results were manipulated in a way to reflect an inaccurate result, correct?

MR. DEMPSEY: Object to form.

MR. TICKTIN: Join.

BY MR. KLOEWER:

Q You can answer.

A Hmm?

Q You can answer.

A I'm not going to answer that, no.

MR. DEMPSEY: Well, you have to answer it to the best of your ability. We have preserved the objection, but --

THE WITNESS: Okay.

MR. DEMPSEY: But it's the --

A Can you repeat the --

MR. DEMPSEY: -- kind of question that --

A -- question again please.

THE STENOGRAPHER: One -- one second.

MR. DEMPSEY: It's the kind of question that

Page 28

doesn't call for privileged information. So once we preserve our objection, you have to answer the question to the best of your ability.

THE WITNESS: Okay.

MR. DEMPSEY: Or to the extent you can.

THE WITNESS: Okay.

BY MR. KLOEWER:

Q I'll restate it.

So it's The America Project's position that the election results were manipulated in such a way as to reflect an inaccurate result, correct?

A Yes.

Q And -- and who manipulated those election results?

A We don't know the person or people who manipulated the election. We just see the indicators there that it was manipulated.

Q Who do you believe manipulated the election results?

A Me personally, I don't -- I don't have any belief in one person or group of people that did it.

Q What about The America Project? Does it have a position as to who manipulated the election results?

A Not that I recall.

Q Does The America Project take a position with

Page 29

respect to any foreign manipulation of the election, meaning does it believe that any foreign actors partook in manipulation of the election results?

A I don't recall anything about foreign.

Q Okay. I'm getting a little bit ahead of my outline here, so let's zoom back out.

We'll touch on this more when we get into the film, but speaking about The America Project more generally, can you tell me -- you alluded to this a bit before, but how did you get involved with this organization?

A The way I got involved with The America Project was my -- my friend Patrick Byrne. I had worked for him in other aspects before this. So I had run a couple of companies for Patrick Byrne. This was prior to ever starting the nonprofit space. So when -- when Patrick started deciding that he was going to commit pretty much all of his personal wealth to try to find the forensic truth or to really just find out what happened in the elections --

Because this was before -- this was at the very beginning, August of 2020, when I started hearing and everybody started hearing about what was going on with early mail-in and all these issues with -- with early voting and COVID, and --

Page 30

I'm sorry, what was the question again?
Q How you got involved with all this.
A Yeah. So how I got involved was I just -- I really -- I really did in my own personal convictions have -- want to take -- take part specifically in what we were going to do. So I really wanted to go when the decision was made to maybe form -- formalize, form together and make a nonprofit or some sort of organization that can go out and start studying and finding out what happened.
Q And you mentioned that Mr. Byrne had -- was discussing these things as early as August of 2020. Were you involved with that effort or were you concerned prior to the election?
A I was concerned like everybody was, sure, but I -- but -- yeah.
When there was a decision to come to DC -- and this was after the national election and before Christmas. So when -- November 5th, I can't remember. But from there until probably the holidays, maybe until just before the holidays, that was when everything was going on in the DC area, because there were lots of groups of citizens coming together and trying to find out what was going on and what was wrong. I became a part of that, because we went there as concerned

Page 31

citizens, and we started meeting other like-minded, concerned citizens there in DC.
Q You said you managed some other companies for Mr. Byrne prior to the election. What -- what companies were those?
A One company was a financial technologies company in New York and the other one was a mobile money company in Barbados.
Q Okay. Sorry. A financial technology --
A A financial technologies firm in New York City.
Q Okay. What was the name of that firm?
A TZero.
Q Okay. And then a commodities --
A It is a mobile money company --
Q Okay.
A -- and currency company called B-I-T-T, Bitt.
Q That's the company based out of Barbados?
A Bitt Digital, Inc., yes.
Q Okay. Is that a cryptocurrency entity?
A Well, we did have a crypto, but what we really did was we made mobile money apps for people on the island. They didn't have that technology. So we made them a mobile money app, minted their own nation's money in that mobile money app, and then on the side we

Page 32

maintained a small crypto exchange and a reserve of crypto as a part of our company.
Q Did you have any experience in -- in election management prior to joining The America --
A No.
Q -- Project?
Did you have any experience working in a Secretary of State's office?
A No.
Q No background in election technology --
A Myself, no.
THE STENOGRAPHER: One at a time, please.
BY MR. KLOEWER:
Q Did you ever volunteer with your local county to help administer the election?
A Yes, I volunteered at points along the way in my home state of Arizona for simple stuff such as poll watching and going out and knocking on doors getting signatures.
Q Anything beyond that?
A No.
Q And just going back a little bit, we've touched on Mr. Byrne. Did you speak with Mr. Byrne to prepare for your deposition today?
A No.

Page 33

Q And did you review documents, the -- The America Project's emails or any other documents to prepare for your deposition?
A The ones that I saw, yes. That's all.
Q Is -- the ones that you saw being --
A Well, the ones that are in the court documents are the ones in question.
Q Anything else that you reviewed that has not been disclosed in this litigation?
A Not that I can think of.
Q Okay. All right. So I mentioned we were going to look at a couple of documents that have been publicly filed. I'm going to hand you the first one of these.
I'll tell you now I'm going to hand you four versions of a similar document that are filed each year, and I want to talk about some -- some changes that happened in them. So they look very similar, but I just want you to --
A Okay.
Q -- be aware that they are -- they do feature some subtle differences.
MR. KLOEWER: So this first one we will mark I believe as Exhibit 28.
(Plaintiff's Exhibit No. 28 was marked for

Page 34

identification.)
BY MR. KLOEWER:
Q Take a minute to look at that document, Mr. Johnson, and let me know if you recognize what we're looking at here.
And I'll -- I'll -- to -- to streamline this, for each of these documents, on the last page you can see a signature date, and if I've organized them correctly -- hopefully we'll go in order, but this -- this one I've handed you indicates a signature date of June 18th of 2021. Do you see that on the last page?
A Yes.
Q Okay. And this is a document from the Florida Department of Agriculture and Consumer Services, Division of Consumer Services, and it indicates it's a Small Charitable Organizations Registration Application. Do you see that?
A Yes.
Q And it indicates The America Project Incorporated on the first page there under "Business Information." Do you see that?
A Yes.
Q Okay. I want to draw your attention primarily to the personnel information, so if you'd turn to the second page there.

Page 35

A Okay.
Q You see an individual listed as Officer 1 that's Robert Weaver. Do you see that?
A Yes.
Q Who is Robert Weaver?
A Robert Weaver was our first financial administrator, CFO, for The America Project.
Q And what is Mr. Weaver's background?
A Prior to coming to The America Project, Rob Weaver worked in the first Trump administration in Health and Human Services and --
Or no, he worked -- he applied for -- I think he was in Health and Human Services. He might have applied for the head job of it but didn't get it. But he was in I believe Health and Human Services.
He also, prior to coming to The America Project, was involved a lot in Native American health because I believe he's half Cherokee or half Plains Indian, card-carrying. So because of that he, before us, had a lot of jobs I think in hospitals working in hospital administration and -- and this sort of thing, from what I remember.
Q So how did he get involved with The America Project?
A He got involved with The America Project --

Page 36

the way --
Now, I'll say I don't know how he got involved in The America Project. The way I met him and then he eventually became a part of The America Project, I met him through Sidney Powell's legal team.
Sidney Powell had a legal team and two of the -- one of them named Emily Newman ended up being our first president at TAP. She was a part of Sidney Powell's legal team before that. So she became the first president of The America Project. She knew Rob Weaver because she also worked with him in -- in -- in the administration, some official aspect, and so she introduced Rob to me. That's how I knew Rob Weaver. I did not know him from before I met him. But that's -- that's Rob Weaver.
Q Was Sidney Powell involved with The America Project in the beginning?
A No, she was not. At first she had a nonprofit called Defending The Republic and we were working with her to open up a Florida-based Defending The Republic nonprofit. When the decision was made -- Defending The Republic was nothing but law -- lawfare is what they -- they labeled it at the time. It was going -- and what we wanted to do was have some of the advocacy that I mentioned before: Election integrity, border security,

Page 37

and rights and freedoms.
So it was the Sidney Powell dynamic early. Was she going to be, no. We broke off and made our own nonprofit of -- she was doing Defending The Republic work and we were helping her, and we were considering making that the nonprofit platform of which we would operate off of, but because the focus of that nonprofit, Defending The Republic, was 100 percent lawfare, the interest in doing the other advocacy work wasn't there. So that's really why The America Project formed.
Q And did you personally have a role with Defending The Republic at any point?
A Never really a role, because it was just being built. We were in the middle of building something, kind of like a construction site, and it didn't work, so we kind of abandoned it and started building The America Project. So at first constructing a wider -- a nonprofit that had a little bit of a wider scope of what we could do out and -- and advocate for was really why it didn't work out with Defending The Republic.
Q Did The America Project and the Defending The Republic ever have any joint ventures --
A No.
Q -- that they engaged in together?
A No, sir.

Q Sponsored any events or fundraisers, things of that nature?
A No.
Q Okay. Are you aware that Dr. Coomer filed a lawsuit against both Sidney Powell and Defending The Republic?
A No.
Q You're not aware that --
A I don't think.
Q -- both Sidney Powell --
A Well, I might have heard it back then, but no, I just don't --
Q Okay.
A No.
Q So you're not aware that Sidney Powell and Defending The Republic both settled the lawsuits with Eric Coomer?
A I'm not aware, but I know that -- that there are -- there are lots of lawsuits. I'm sorry, I didn't know that one but.
Q That's okay.
All right. Moving on, the next, Officer No. 2 here, Patrick Byrne, is identified as the chief executive officer. Can you tell me, since you've held that role yourself, what did the chief executive officer



role at The America Project entail? What are the responsibilities of that?
MR. TICKTIN: Object to the form.
You can answer.
A My duties and responsibilities of CEO are to maintain and manage the nonprofit and what employees we had at the time to continue advocating for our three lines of freedom, which were election integrity, border security and rights and freedoms, and just to synchronize resources and people getting those efforts. That's really the CEO/president. It's not in the weeds anymore, but it's just more synchronizing all of the social welfare efforts.
BY MR. KLOEWER:
Q And would you agree that those were the roles Mr. Byrne was playing in his role as chief executive officer at this time?
MR. TICKTIN: Object to the form.
You can answer.
A The roles -- when he was CEO, the genesis of the organization had just started. It's -- we had not even come up to define our pillars yet. You know, there's a lot of work that goes involved, just like a small business, when you start out. If you ask me -- I've run businesses. Am I the same CEO as when the



small company started? In some ways yes, but obviously the organization evolves. So the -- really the mission stays the same, but the roles, you have to be a little flexible in what you're doing.
Our focus in the first year of our organization was what you see. It was the national election and trying to find out everything that was at issue there, but at the same time equally, and you'll see it in The America Project's effort, we're going out and doing -- my job really at the time was to get us out on the ground like we're supposed to and do advocacy, grass roots on the ground. So a lot of that stuff was going on.
But to say Patrick Byrne, he did. We did have some of the same roles. If you think about it, what's the CEO and president responsible for? The conduct and all the -- all the things going on in the company. But because of the stage the company was in then, there's distinct differences in what we did.
MR. TICKTIN: Object. Move to strike in that aspects of the answer were not responsive to the question.
BY MR. KLOEWER:
Q Moving on, the next individual here, Officer 3, Emily Newman, you mentioned her briefly. She was --



was she an attorney?
A Yes.
Q And we see here she's designated as the president. Was she serving as sort of like in-house counsel, as -- as legal counsel in this role?
A No. She was only serving as president.
Q And was she an attorney with Ms. Powell's law firm?
A I don't know what her relationship was with the firm. I know that she was an attorney working for Sidney.
Q Okay. Officer 4 is --
And tell me, how did the roles -- how did the responsibilities of the president differ from those of the -- the chief executive officer?
A That's a good -- good question, because the -- the president --
And here I am, I was the COO. I'd say I was doing everything. But the president and the CEO -- and -- and again this was at a time when TAP was formed. I -- I didn't make the command structure, but you had a CEO and a president.
Now, I believe looking back Joe Flynn was our -- our -- our second president, that when Joe Flynn came in the roles kind of ironed out, somebody that was

Page 42

a little bit more mature and understood and how to make distinct, and just as a president be in charge of the administrative stuff with the staff and just take care of things at the headquarters I guess you could say rather than going out. So I was at the time the chief operations officer, so I was making the sausage.
Q When you say the headquarters, did The America Project have a physical sort of office space where everybody worked at this time?
A Eventually we did get one.
Q And is that the 8388 Tamiami Trail that we see reflected --
A No.
Q -- here?
No?
A No.
Q What is this address referred to? Is that just a mailbox?
A It is. It's an executive office mailbox that was really close to where we set up our hard stand, and that was solely for security and safety reasons that we did that.
Q And when you ultimately did set up a physical location, where was that?
A It was in Venice, Florida.

Page 43

Q Okay. Moving on here, you just mentioned the next individual I was going to ask you about. Officer No. 4 is Joseph Flynn, and he's indicated as a director. What does a director with the organization do?
A I think this -- he -- it is saying that he is on the board and he doesn't have an officer role.
So when this was formed, I think it just took into account that we made the board, which were -- Joe Flynn was at, not serving as an officer at that point, just a board member, and then Emily was the president.
Q And we see yourself listed as Officer No. 5, Carl Johnson as officer. What were your roles with the entity at that time?
A At -- at this time when this was filed I became the chief operations officer at the time this was filed.
Q So this was filed in June of 2018.
Oh, you became the chief operations officer. Sorry, I miss -- I was thinking CEO, but you're talking about CO --
And, to be clear, you said on the record a couple of times the COO. That's --
A COO is synonymous --
Q -- C-O-O?
A -- for chief operations officer.

Page 44

Sorry.
Q Okay. I just want to be sure we clarify that.
And what were your obligations as chief operations officer?
A To carry --
Well, really to apply all the resources that we have and run all of the day-to-day operations. An example would be we would have any one of a Town Hall or a -- or an election integrity event somewhere, so obviously resourcing and getting those together is -- is work, but also -- all of the out -- all of the out -- forward -- forward-facing advocacy that we do, and plus as the COO I kind of have to be the first asshole in the chain and I have to help run the office as well, because --
Again, I don't know if I mentioned this, but at our -- at our height we had a fair amount of employees in the -- in the Venice office, so it became like office space really quick, so -- you know, it's -- COO is kind of always like the first asshole in the chain but has to -- for good reason.
Q That's the professional terminology.
A It is. It's the one that I've used.
Q And the last individual we see here listed as Officer 6 is Jorge Perez. Who is he and what did he do?

Page 45

A Jorge Perez was our first and maybe only chief legal officers. I don't know if we ever had anybody else who had the CLO role that was at The America Project.
Q So he's an attorney I presume?
A He was.
Q Okay. And what was his role? What sort of legal work was he doing?
A Well, that's a great question. He's doing -- he's doing all of the in-house, like basic legal stuff that we need to do just to form and all of -- I don't know -- what would you call those? Day-to-day legal operations for the org, and that's pretty much it, yeah.
Q Can -- your counsel is waiting for an objection. To be clear, throughout the rest of the deposition I don't need to hear about your communications with your legal counsel at any point, but I appreciate your response there, so --
A Okay.
Q Okay. We can set this document aside for now, and I'm going to show you the next year's similar filing. Hopefully these will go a little bit quicker now that we've gotten several of the names out of the way.
MR. KLOEWER: So we'll mark this one as

Page 46

Exhibit 29.
(Plaintiff's Exhibit No. 29 was marked for identification.)
BY MR. KLOEWER:
Q Okay. Mr. Johnson, I'll direct your attention first to the last page of this document once again. Indicates a signature date of August 12, 2022. Do you see that?
A Yes.
Q So we're about a year forward in time at this point from the document we just looked at, and if you want to look at the second page here, again we're looking at personnel information. I don't see titles listed for Mr. Weaver or Mr. Byrne at this point. Do you know what their roles within the organization were?
A And what was the end date of this again?
Q This is August of 2022. So we're about a year ahead of the last --
A So that's still Robert Weaver as CFO I believe. August 2022 --
Wait. August 2022? Yes, he's still -- he was still the CFO at that time, and Emily Newman was still president at that time.
Q And safe to assume that Patrick Byrne was still the CEO?

Page 47

A Yes.
Q Okay. Joseph Flynn indicates in charge of solicitation. What does that mean?
A I don't know. I don't know what in charge of solicitation means.
Q And -- and he's also designated as president. Were he and Ms. Newman jointly serving in that role?
A You know, what I think is because -- I don't know when this is filed. Emily and Rob were terminated at -- in December of 2022, I believe, and in January I believe 2023 or December 2022 is when the president seat officially switched. So Emily was still president. So I don't know what this is. This might be something -- I don't know why that title in there is in charge of solicitation and president, but I can tell you at this point, if this is August when this was physically done, that's not the state of them where it was. That -- that title change for Joe Flynn didn't happen until December, January 2023, I believe.
Q And why were Mr. Weaver and Ms. Newman terminated in December?
A I believe from -- from where I was --
Now you're pulling back some memories.
From where I was, you know, there was some dissatisfaction in Patrick and -- and -- and Emily's

Page 48

performance. It really was performance-based. And unfortunately it -- it was something that -- it was a dance that ended really fast.
Patrick, I having worked for him in other aspects before the nonprofit. He can be very difficult to work for because he has standards that are here, not withstanding he's one of the most -- best bosses you could ever work for, if you can believe that. He's hard but fair. And I think that issue of -- with Emily, it didn't work.
And in the case of Rob Weaver, Rob came with Emily, so it was -- it was -- it was a friendship dynamic really. When -- when Emily's performance in relationship with Patrick started deteriorating, Patrick and -- and Robert's as well, because again I think both he had -- Patrick had an issue with the way Rob was -- was doing his job as well, so that was a -- it was a firing -- well, it was -- Rob Weaver got fired. Then Emily Newman resigned, but...
MR. TICKTIN: Objection and move to strike as outside the scope of the question.
BY MR. KLOEWER:
Q And did that sort of souring of the relationship between Patrick and Mr. Weaver and Ms. Newman, did that have anything to do with his

Page 49

relationship with Sidney Powell at the time?
A No.
Q If we turn the page here, we see a few more individuals. This is why I asked you at the beginning of the deposition if Carl and Carlito were different people. We see Carl Johnson and Carlito listed. I assume from your prior testimony this was an error in the filing?
A This is certainly an error --
Well, they're leaving out filing with the Florida Department of Agriculture, so that's clerical.
Q And we still see Mr. Perez listed here as an officer as of 2022.
Well, to clarify, the last entry here is Carlito Johnson. It indicates officer. Is that the Venice office location --
A Yes.
Q -- that was ultimately established?
A Sorry.
Q Okay.
A Yes.
Q And we've got two more folks here. I assume this is a function of the entity growing in employees and scope of their work, but this name I'm sure I'm going to mispronounce. Is it Rean Wegley, Rane

Page 50

(phonetic)?
A Rean.
Q Rean, okay. That --
Who is Rean?
A Rean Wegley was hired to be our CFO after we --
After we let Robert Weaver go, there was an interim part where I had to put on the hat as CFO. So they're -- they're picking -- so we had a calling card out for a hire. It just took some months to find our hire, and that's who we hired to essentially replace Robert Weaver, but it really was me handing off the keys to her.
Q And --
Well, the last one here. Then I have a follow-up question for you. Who is Mary O'Neil?
A Mary O'Neil came to the organization -- she is the sister of Joseph Flynn, and she came to the organization and became hired as our HR component, our HR administrator.
Q And did Joseph Flynn's brother, General Michael Flynn, did he have any role with The America Project at this time?
A At the time this was here, I don't think so. This was August 2022 at this point?

Page 51

Q Yes.
A He might have still been an adviser. He -- he started out as an -- as an adviser for us. Eventually for his own reasons and for potential conflicts he stopped being the advisor as well, but that was because professionally he was going another direction.
Q Okay. I'll probably have a few follow-up --
A Sure.
Q -- questions on that, but...
And this last page here, "Department's financial report form," do you see that?
A Very last page?
Q Second to last page, sorry.
A Yes.
Q And we see a series of zeros here. Do you know why there was no financial information provided at this time?
A No, I don't. 2022nd -- this was August of 2022.
Q Yeah. So to be clear --
A You know why? Here's what I can guess, is because our first year of -- of nonprofit, you can -- no, you're supposed to register and file an annual report and do your taxes. Well, as a first year of our nonprofit, we filed for an extension, and so we didn't

Page 52

have to declare --
That's the only way I'm thinking why there's zeros there, because we hadn't done that or even submitted a 990 --
Q Okay.
A -- at this point.
Q And we'll look at the next document that -- that supplies some of those numbers.
And to be clear, this financial statement indicates a fiscal year ending 12/31 of '21, so --
A 12/31 of twenty --
Oh, that's what this is from. So this is all from --
Q It's signed as of --
A 2021.
Q -- August '22, but the fiscal year indicated is the end of 2021.
A This is 2021's report then. That's why all those names are still in there. It's not August '22. It just was filed late. So this is all 2021 info.
Q All right. I appreciate that clarification. We'll be sure to clarify that at the outset of the next one.
Okay. You can set that aside.
MR. DEMPSEY: Can -- it doesn't have to be

Page 53

right now, but in the next ten minutes or so can we take a comfort break?
MR. KLOEWER: Yeah, I think so.
MR. DEMPSEY: We've been going about an hour. I don't need to break every hour, but --
MR. KLOEWER: We have, yeah.
MR. DEMPSEY: Wherever it works.
MR. KLOEWER: Let me get through one more of these real quick and then we'll take a quick break.
BY MR. KLOEWER:
Q All right. Let me show you what we'll mark as Exhibit 30.
(Plaintiff's Exhibit No. 30 was marked for identification.)
BY MR. KLOEWER:
Q Okay, Mr. Johnson. So this document, if you look at the end here, signature date is May 18th of 2023. Do you see that?
A Where is the --
Q It's the last page, bottom of the last page.
A Okay.
Q And the page prior also indicates that it's a financial statement for the fiscal year ending 12/31/21. Do you see that?
A This is 12/31/21 again then?

Q Yes. And here we have these numbers plugged in, and I'll get to those --
A Okay.
Q -- in a moment, but I just want to be sure, before we discuss this document here, sort of placed in time how this was occurring.
So looking back to -- so this -- this filing includes a little more information. So I want to direct your attention to the second page here. The third bar down indicates "Major program activities." Do you see that?
A Yes.
Q And I'll read this for you. I'm going to do my best to do it slowly. This is my -- my weak suit is reading things quickly.
But it states, "The organization educates through various means and efforts, including but not limited to grass roots efforts, mass communications, events, publications, public speaking, online and community outreach. Activities are ongoing and conducted by key employees and other individuals, along with independent contractors, public figures and volunteers with knowledge and experience germane to the organization's commission." Did I read that correctly?
A Yes.



Q Okay. I am curious about a few of these items here.
When you refer to mass communications, what is that referring to?
A Mass communications in this refers to really digital communications, because we found, obviously working in the nonprofit and NGO space, the need to be able to communicate in the digital -- in -- just on digits and how to reach people. That's what that means, mass communications.
It can also mean -- we did have some -- some grass roots campaigns where we did provide physical billboarding. I don't know if that counts, you know, mass communications, meaning we actually would reserve things you would drive by on the freeway. That's a form of communicating and put a message up there. But I think in this case mass communications covers that, but especially inside digital space.
Q And what about publications? I assume there's some overlap, but does publications refer to something beyond what you've just described?
A Publications meaning we had some employees, specifically Tim Meisburger, who was an employee of The America Project who had worked for over 30 years at USAID, and he routinely would publish and talk



professionally about election security, election management and all of his experiences globally safeguarding elections.
So I think when we talk about publications, I don't think The America Project's ever itself been authored or penned something that got posted, but definitely our -- some of our employee base, because we would hire and retain some of the experts in the field. So that's I think where they're getting that with publications.
Q And if we turn the page here, again we just see owner management information. Many of these names are the same, a couple are different here. The fourth name down we see Thomas Homan as indicated at the chief executive officer. Do you see that?
A Yes.
Q And who is Mr. Homan?
A He was the chief executive officer immediately after Patrick stepped back.
Q And how did he become involved with The America Project?
A He became involved with The America Project because at our inset we had three pillars. Border security was one of them. And part of our advocacy was to find and retain and hire the foremost professionals



if we could, and we naturally did that with election integrity, but with border security we had found three wonderful people, one of them being Thomas Homan; the other one being Jason Jones; the other one being Victor Avila. They became our advisers for how we would best advocate for border security and what does that mean, and because of that --
And also at that time, if you look at it - it's based in time - the election cycles, where we provided a lot of support, because during election cycles we naturally had more work going out and advocating, and -- and when there wasn't an election cycle, we kind of re-prioritized. So border security became a little bit more -- we were still doing work in the other pillars, but because we wanted to really focus and -- and advocate for the restoration of our nation's border is why we put Tom Homan there. It was really a strategic move to just change the face and shift and go into a border -- which we did. We did about two years of that.
Q And what was his background prior to that time that -- that recommended him for that role?
A He was the Acting Director of ICE. He was a law enforcement official his entire life. He has relationships, good relationships, with the CBP. He has

Page 58

great relationships with other elements of the DOJ and the DOS. That all combined into a JIATF to attack the border security issue. So he was a great hire.
Q And on the next page we see an individual named Amanda Freytes.
Am I pronouncing that correctly? It's F-R-E-Y-T-E-S.
A Yes.
Q And who is she?
A She is -- she was an EA, an executive assistant, and that's why it says "in charge of solicitation." Again, I didn't do these, and I'm not sure why it has this selection on -- on the filing.
Q Okay. And so she was assisting the other officers?
A She did our events for us. She was our event lead. So if you have an event, she plans the whole thing and executes it. That was her job for us.
Q And is it safe to assume that all the individuals listed as officers on these documents, all those all paid positions?
A Yes.
Q And down below here with the financial statement, here's the first time we see a reporting of revenue. It indicates total revenue of $7,738,386, and

Page 59

that's for the fiscal year of 2021; is that correct?
A If that's what it says, 2021, I affirm. Right? This is what this is. This doesn't go beyond 2021? This is the financial report for 2021? Then that looks right to me.
Q Okay.
Okay. We can set that aside.
MR. KLOEWER: We can take a break now. Ten minutes?
MR. DEMPSEY: Yeah, that's fine.
MR. KLOEWER: Okay, perfect. We'll go off the record and then --
THE VIDEOGRAPHER: We're going off the video record at 10:20 a.m.
(Recess taken.)
THE VIDEOGRAPHER: The time is 10:37 a.m. and we are back on the video record.
BY MR. KLOEWER:
Q Okay, Mr. Johnson. Before we went off the record we were looking at a series of documents from the Florida Department of Agriculture. I've got one more of those to look at with you and we'll get through this one quickly.
MR. KLOEWER: I'm going to mark this as Exhibit 31.

Page 60

(Plaintiff's Exhibit No. 31 was marked for identification.)
BY MR. KLOEWER:
Q All right. And as I did with the prior documents, I'll refer you to the last page first. It indicates a signature date of June 13, 2024. Do you see that?
A Yes.
Q And the page prior indicates a financial statement for fiscal year ending 12/31/2023. Do you see that?
A Yes.
Q Okay. So going back to the first page of this document, first question here, we have a mailing address indicated at 316 Mountain Avenue SW, Roanoke, Virginia. Is that a separate office space for The America Project at this time?
A No.
Q What does that address refer to?
A I don't know.
Q All right. We'll turn to the third page here. Again with owners and managers, in this instance Mr. Homan has been designated as a director. Was there a reason for his --
I don't know if it's fair to characterize it

Page 61

as demotion, but he's no longer serving as CEO; is that right?
A He's no longer serving as CEO. He -- the -- he's no longer serving as CEO. He was also a board member. So we used the title director to synonymously refer to a board member I think.
Q And while we're on the topic, The America Project has a -- has a board of directors separate and apart from the officers we've been looking at here, right?
A Yes.
Q And how many board members are there?
A Currently there are two.
Q Okay. But throughout the life of the organization how many have there been? Has that fluctuated?
A Total seats on the board at one time?
Q Yes.
A No, that has been three.
Q And what is the board's role?
A The board's role, like every board's role, is to act with -- fiduciarily for the -- on behalf of the organization and represent its interests as well.
Q And what sorts of decisions is the board responsible for making, if any?

Page 62

A Decisions --
Q Yeah.
A -- at the board?
I've seen at least in my experience now in the nonprofit space and having worked on boards before in traditional places that the boards in nonprofit organizations function -- they don't have the same voting rights and powers as a board would on the total strategic direction of a company. What the board does is it ensures compliance like having financial committees or having votes to -- to make sure you have the right amount of people who agree that a certain amount of money should (inaudible). That's one example.
THE STENOGRAPHER: A certain amount of money should...?
THE WITNESS: A certain amount of grant money would go in a certain direction.
A Those are board decisions. That's one example. It's not the only role of the board, but nonprofit boards function a little bit differently. They're still responsible for the fiduciary responsibilities of the organization, but their influence is not like it is in the private sector.
BY MR. KLOEWER:
Q So Mr. Homan was serving in dual roles at the time as a board member and as a director?

Page 63

A As a director and an officer, yes.
Q Forrest McClean, who is that?
A Forrest is a former employee of the organization.
Q What was his role in management?
A He worked -- I hired him. He was in charge of our -- basically our -- our -- our work cell. He did become the -- he did become the chief --
No, he became the president I believe for a short amount of time. Just for a really short amount of time Forrest became the president. This was the time when Tom departed and then I came back. But for the most part, other than holding a temporary leadership role, he always worked for me in the operations cell.
Q Bernadette Smith, same question.
A She has been on our board and she's only held the role of board director since 2023, I believe.
Q And Michael Spaulding?
A Employee, former employee.
Q And he's designated as a treasurer. Is that similar to the role that --
Well, how does that differ from the CFO position?
A The treasurer title that he had, if I remember correctly, referred to his role as the secretary/treasurer during board meetings, so the secretary/treasurer, and at not the same financial might you'd say. The secretary/treasurer in our organization did not have any power to make financial decisions. The secretary/treasurer simply took all the notes at the board meetings and also consolidated all the financial decisions and then went with the C -- CFO and worked them out. That's all the secretary/treasurer did.

Page 64

Q All right. The second to last page here indicates contributions received in immediately preceding fiscal year $14,261,175. Do you see that?
A Yes.
Q And I presume there are multiple sources here, but can you tell me, what is generating that revenue for The America Project?
A It's donations.
Q All donations?
A All donations.
Q From who?
A Ninety-five to 99 percent of all of the charitable donations from our organization historically has come from one angel donor, and that's Patrick Byrne.
Q So when we see $14 million here, just doing some napkin math, 90 to 95 percent, is it safe to assume that roughly 12 to 12 and a half million of that amount came from Patrick Byrne?

Page 65

MR. DEMPSEY: Object to form.
MR. TICKTIN: Join.
A Possibly even more.
BY MR. KLOEWER:
Q Do you know how much -- how many donation -- or how much revenue The America Project generated or donations they generated from donors other than Mr. Byrne?
A I don't know. I don't have that.
Q Okay. We can set this aside. We are going to transition from one very exciting brand of documents to another. We're going to look at the tax returns now. So try to contain your excitement if you can.
MR. KLOEWER: We will mark this one as Exhibit 32, please.
(Plaintiff's Exhibit No. 32 was marked for identification.)
BY MR. KLOEWER:
Q All right. I've just handed you the 8879 form from 2021 with a signature date of February 23, 2023. Do you see that?
A Yes.
Q Okay. And we've got a signature here from

Page 66

Abare, Kresge & Associates CPAs. Is that the CPA that The America Project utilized to help prepare in their tax returns?
A Yes.
Q I want to direct your attention to Page 8 of this document, so if you'll flip through here a little bit, the top of the --
Well, I guess the top right corner indicates it's Page 7.
A 7, okay.
Q And it states "Part VII Compensation of Officers" at the top. Do you see that?
A Yes.
Q Okay. And we already talked about the officers who were serving in that role in 2021, but here we see those same six individuals again below: Robert Weaver, Emily Newman, Carl Johnson, Jorge Perez, Patrick Byrne and Joe Flynn. Do you see that?
A Yes.
Q The average hours per week listed is -- is 40 for each of those individuals and 30 for Joe Flynn. Do you see that?
A Yes.
Q Is that accurate? Were you working 40 hours a week for the entity at this time?

Page 67

A Yes.
Q Okay. And I should have asked you before, but you mentioned some of your other roles in different industries. Have -- have you had also worked -- has The America Project been your full-time job for the entirety of the time that you've worked for them?
A It was. It's not my full-time job anymore.
Q Okay.
A But it was for a time.
Q Were you ever holding other roles simultaneously while working in your capacity with The America Project?
A No.
Q Okay. And is there a reason why Joe Flynn is working just marginally less than everyone else at this time that you know of?
A I don't recall. I didn't file this.
Q Let's turn to the next page, Page 9, Section B towards the bottom.
I apologize. The document is labeled Page 8 at the top. My notes refer to the PDF, but the top right-hand corner it says "Page 8" and I'm looking at Section B towards the bottom labeled "Independent Contractors." Do you see that?
A Yes.

Page 68

Q The first one indicated here is Patriot Mountain LLC, and the services provided describes physical security and cyber security. Can you tell me, who is Patriot Mountain LLC?
A Patriot Mountain LLC is a private company that provides executive and close protection for individuals that might require it. Their mission is to just cover down and make sure individuals are safe.
Q Is that like --
Well, it indicates physical security. Those, I presume, is human beings who stand and provide security, correct?
A Yes.
Q Okay. And the cyber security component is -- is something different, right?
A I don't recall them ever providing cyber security services for us. I believe that, if I had to guess, that's like what their title of what they provide generally. They never -- we didn't have any cyber security functions from Patriot Mountain.
Q Okay. So they weren't doing, you know -- putting up firewalls for the website, for example, or things of that nature?
A No.
Q Next on this list we see Resilient Patriot

Page 69

LLC. What is that entity?
A I can't recall. I don't know -- I don't remember the name of it.
Q Is that General Flynn's --
A Yes, this is -- this is -- that is -- that's General Flynn's what do you call it, his company that he does his business with. He was a paid adviser for us.
Q Okay. And what -- what strategic consulting was he providing at that time?
A He was providing strategic consulting across the organization on -- on all of our operations.
Q With respect to -- to what? What was he -- what -- what advice was he providing?
A Generally, providing advice as how to synchronize, run and manage a nonprofit organization.
Q Okay. And does he have experience in that field otherwise?
A In the field of synchronizing and organizing people, yes.
Q The third entity we see here is Brisas Suaves LLC, and it indicates they provide election integrity investigations. Who is Brisas Suaves LLC?
A I believe it is the LLC of Joe Flynn, of Joseph Flynn, the brother of General Flynn.
Q Okay. So then in that instance this

Page 70

compensation indicated on the right-hand column, is that separate and apart from his compensation as an officer?
A I'm not sure what he was getting compensated for back then, but I believe that would be -- I'm -- I'm not sure -- separate, yes.
Q Okay. What type of election integrity investigations was Joseph Flynn performing at that time?
A I don't recall.
Q Okay. I'm going to turn through here. My notes indicate Page 22, but that's going to be the PDF. Let me try to find the corresponding page of this document for you.
Okay. If you'd turn to the portion of this document where the page is turned sideways. It's the "Grants and Other Assistance Organizations" portion. And let me know when you're there.
A Schedule where? What is it called?
Q Schedule 1, Form 990. It should be the first page in your document that's in a landscape format.
A Okay. Very first landscape?
Q Yeah.
Okay. This first entity named here is 423 Catkins Maize LLC. Tell me, who is that?
A I don't recall who Catkins Maize is.
Q Do you know what sort of election integrity

Page 71

work they were paid $200,000 for?
A No.
Q What about Cyber Ninjas?
A Cyber Ninjas is the entity that was in charge of conducting the Maricopa County election integrity audit in Phoenix.
Q And we see an amount of $2,750,000 here that was paid to Cyber Ninjas for that purpose; is that correct?
A I believe that all of it's for that.
THE STENOGRAPHER: I'm sorry, repeat that.
THE WITNESS: I believe all of the -- the amount of money was for that. I'm not sure.
BY MR. KLOEWER:
Q What is The America Project's relationship with the Cyber Ninjas?
A Well, there's no relationship now with them.
Q What was their relationship at the time?
A At the time the relationship was we were challenged with conducting a first of its kind audit that hadn't been done before, so they were retained to help lead the technical portion of the audit.
Q And just to circle back to your prior testimony, this $2.75 million number, is it safe to assume that that money --

Page 72

Well, if -- if all of -- if 90 percent of The America Project's money was coming from Patrick Byrne, we can assume that 90 percent of this payment to Cyber Ninjas was paid from him directly as well; is that fair?
MR. DEMPSEY: Object to form.
MR. TICKTIN: Join.
A Paid from him directly, I don't know what that means.
BY MR. KLOEWER:
Q Well, that --
Well, I'll move on. Strike the question.
Next question, Latinos for America First, who is that?
A That was one of several nonprofit organizations that we partnered with. Latinos for American -- for America First specifically advocates for the Hispanic vote and it advocates for the legal Hispanic vote, and that's why we partnered with them, because the same mission, same advocacy.
Q And for the two prior entities as well on this one, are these completely separate organizations or do you have any overlap in ownership in Latinos for America First, for example?
A Completely separate.
Q OGC Law LLC is the next one. Who is OGC Law?

Page 73

A I don't recall who OGC Law is.
Q Do you know -- so I take it you don't know what election integrity legal support they were providing?
A Well, it was -- I'm -- I'm going to assume it was probably some lawfare that we were involved in, because back in the early days again we entered and supported a lot of cases that were trying to fight for election integrity advocacy.
Q How did you identify cases that you were willing to -- to contribute to or partake in?
A How did we identify the cases that we wanted to help?
Q (Nonverbal response.)
A I'm not sure how we did it at the time, but we were certainly reached out to by lots of organizations who had advocacy and they needed help in the form of donations to do that with. As a 501(c)(4), we can issue grants to 501(c)(3)s and other 501(c)(4)s based on the advocacy they're doing and if it approve -- if it gets through our grant process.
Q So is it safe to assume that when you were engaging as -- in lawfare, as you called it, that these were requests that came to you or did -- was The America Project proactively seeking out --

Page 74

MR. DEMPSEY: Object to form.
BY MR. KLOEWER:
Q -- opportunities to --
MR. TICKTIN: Join.
BY MR. KLOEWER:
Q -- to join this litigation?
A I don't recall the dynamic of how it happened.
Q Virginians for America First, who was that and what was the basis of this $250,000 grant?
A Virginians for America First is another election integrity advocacy nonprofit organization. It's based in Virginia. And at the time, based on all of our efforts, we found that the Virginian for America First organization was doing more with less than most organizations in other states, and by that I mean they were able to deploy a very effective ground game to get citizens reengaged in the voting process, and we liked that, so we supported them.
Q Next one, Whistleblower Protection Project, $65,000, what was the purpose for this grant?
A I don't remember that one.
Q Last item we see here on the next page is Women Fighting for America LLC, $20,000 grant relating to border protection. Do you know what the basis for this one was?

Page 75

A Women for -- this goes to our border security line of effort, again finding like-minded organizations who are already out advocating for border security, and that's who we decided to issue grants to, and also we could support them with our own people or just money.
Q All right. We could set that document aside.
MR. KLOEWER: We'll mark this one as Exhibit 33.
(Plaintiff's Exhibit No. 33 was marked for identification.)
MR. KLOEWER: I'm sorry, this is my last one. I know everybody's on the edge of their seat for --
MR. CAIN: Well, hurry up through it.
MR. KLOEWER: -- the last portion of the deposition.
MR. TICKTIN: Hope I have a pillow.
BY MR. KLOEWER:
Q All right. Okay. Similar questions. If I can refer your attention to page -- what's marked as Page 7 on the top right corner, "Compensation of Officers," and we've been through these names already. I just want to confirm that this is accurate, the hours per week that were being worked by specifically Joe Flynn and Patrick Byrne --
THE WITNESS: Can I see --

Page 76

BY MR. KLOEWER:
Q -- at that time.
THE WITNESS: -- that again? What -- what -- what is it, Page 7?
BY MR. KLOEWER:
Q So this document indicates that Patrick Byrne is working 40 hours a week as a director for the entity and that Joe Flynn is working 30 hours a week as a director. Is that accurate?
A That's what this says, yes.
Q All right. Next page, at the bottom, Section B, "Independent Contractors," this list is a bit expanded from the prior year. The first entity listed here is US Election Investment & Lawsuits Incorporated based out of Waterford, Michigan. Do you know what entity is that, or rather what -- what did that entity do for $700,000 for The America Project?
A This was an organization that we retained, and this was specifically oriented toward election integrity efforts during the twenty -- getting ready for midterm election cycle. And so what I'm saying is we retained this company -- it's a data production company, and we retained them to produce political data for us while we were -- well, information. You can call it political data, but it's really environmental information about

Page 77

demographics and other things as they relate to certain elections.
I don't exactly remember the -- the scope, but I know from looking at that name that I -- I remember them as being a data firm.
Q Okay. And was the data they were producing -- I see an address indicated as -- in Waterford, Michigan. Was it specific to the state of Michigan?
A No, I don't think it was specifically the state of Michigan.
Q Was it nationwide data they were providing?
A Yes.
Q And -- and what use was The America Project making of the -- the data that was being provided?
A So we can understand and especially compare and contrast realtime election data that's coming out in the form of polls or in the form of some sort of analysis that somebody does.
What we needed to do is we needed to create a baseline and find out what was real and what was not going on realtime during an election, so basically retaining a data firm to look at and take apart the data that people believe is environmental data for where they're -- for where they're either running or prosecuting an election.

Page 78

It's a really important thing. It's really talking about what reality is on the ground as opposed to what people issue and sell people in the form of data. So it was part of a large effort for us to understand and provide accurate.

Q What sort of --

MR. TICKTIN: Objection. Move to strike as being outside the scope of the question.

BY MR. KLOEWER:

Q What sorts of data specifically were they providing? Was this voter registration rolls? Was this -- do you recall what -- what sorts of information you gained from this entity?

THE STENOGRAPHER: You gained from...?

MR. KLOEWER: This entity.

THE STENOGRAPHER: Thank you.

A Everything environmentally about election terrain. So the history of voting there, the history of maybe demographics inside of -- of a certain geofenced location, what the voting trends were for the last 20 years, that type of data, and some predictive analysis and data that you could draw from it.

BY MR. KLOEWER:

Q The next line we see the same entity, OGC Law. This time we see an address of Pittsburgh, Pennsylvania.

Page 79

Does that refresh your recollection about who OGC Law is or what they were doing?

A No. My guess is it's legal lawfare, election integrity lawfare.

Q Was The America Project involved in any lawsuits in Pennsylvania at the time?

A I recall we were involved in -- in one lawsuit. It was a constitutional lawsuit that we decided to fund. It didn't work out favorably for us, so I'm having trouble remembering what the name of the case was, but it was a large case regarding election integrity in the state of Pennsylvania.

Q And the lawsuits that you were funding, were they ever listing The America Project as a party, like as a plaintiff, or were you primarily funding lawsuits for other individuals to pursue?

A I didn't understand the question. Come again.

Q I'll try to rephrase that.

When The America Project is paying for litigation or engaging in lawfare, was that with -- was the intent to name The America Project as the plaintiff, meaning The America Project is suing someone else --

A No.

Q -- or was the intent to provide financial assistance?

Page 80

A Provide financial assistance.

Q Were there ever any lawsuits that The America Project pursued as the plaintiff, as the party who sued someone?

A Not that I recall.

Q Black Manatee Investment, LLC, who is that?

A I don't remember Black Manatee.

Q What about Mark Lloyd?

A Mark Lloyd was a retained adviser for us again during the same 2022 mid -- mid -- mid-election cycle. He was retained as an election integrity adviser.

MR. TICKTIN: Move to strike the response as outside the scope of the question.

BY MR. KLOEWER:

Q Brian Della Rocca, who is that?

A Brian Della Rocca is a lawyer.

Q And what was he paid $150,000 for?

MR. DEMPSEY: Objection, privileged.

BY MR. KLOEWER:

Q All right. We can turn to, same section of this document, it's Pages 19 to 22 of the PDF. This -- in this instance, I believe this chart is maintained in the normal vertical format, so -- it's a chart that looks like this. It has Page 23 at the bottom of it. Let me know when you are there.

Page 81

A I am there.

Q Okay. I'm not going to duplicate entities we've already discussed, so we can skip over Catkins Maize LLC.

What is Operation Freedom of Choice?

A I don't recall.

Q Every Citizen's Vote, we see a grant of $15,000 here.

A And we issued a Get Out The Vote grant to this organization. That was one of the -- a few organizations that actually prosecuted the Get Out The Vote mission. So we're just issuing cyclic grant -- or grants here at this time and declaring them.

Q Florida Citizens Alliance, $50,000?

A The same.

Q Next page we've got GOPAC, $25,000 for election integrity. Do you know what they did?

A I don't remember that one.

Q Next item, CFEI PAC, $255,422, do you know what the CFEI PAC is?

A Yes, this was a partner organization that we conducted election integrity hearings across the United States with.

Q What do you mean by that, conducted hearings?

A I'm sorry, election integrity town halls. I

Page 82

didn't mean to use the word hearings. These are -- we had 30-plus town halls across the US, and CFEI PAC was our partner organization that went out and did these with us.
Q And what was the purpose of those town halls?
A To provide up-to-the-minute information and realtime voter information obviously for people who are just interested in getting out to vote, but as we saw what happened in November 2020, a lot of Americans got more interested in the whole election process, so we started doing town halls to just educate people on civics again, the history of -- of voting basically, and then we'd bring experts in front of these town halls to talk about how -- ways they can go out and improve election processing in their towns. That's what they were.
Q Okay. And I appreciate the thorough response. Please just keep in mind that Lisa's taking down every word, so try to speak slowly, make sure she can get everything down.
A couple of items down, New Era Medical Generations Tour, scientific study, what does that refer to?
A I don't remember that.
Q A few items below that, Secure MI Vote, I

Page 83

presume that means Michigan, a hundred thousand dollars. Do you recall the basis for that grant?
A No.
Q I'll turn the page here. Faith 2 Direct Action Incorporated, a $15,000 grant, do you know what the purpose of that was?
A No. Again, probably a grant issued that was voted on.
Q And down about four or five lines we see that US Election Investigation & Lawsuits Incorporated. We talked about them before. In this instance we see them being provided a grant of $700,000. Do you see that?
A Uh-huh, I do.
Q And was that separate and apart from the $700,000 they were paid --
A I --
Q -- as a contractor?
A I'm not sure, but I do not think so. There's something clerical that's going on there.
Q Two lines down, Ann M. Howard, PC for legal support, do you recall what Ms. Howard did for The America Project?
A No.
Q Next page here, Frederick Douglas Foundation for public policy education, what was the basis for that

Page 84

$50,000 grant?
A I don't remember that one.
Q Next item we see is Law Office of Stephanie Lambert, $429,875, legal support. What legal support did Ms. Lambert --
MR. DEMPSEY: Objection, privilege.
MR. TICKTIN: Yeah, that's an attorney.
BY MR. KLOEWER:
Q The -- do you have a retainer agreement with Ms. Lambert for purposes of that representation?
A Not that I recall, no.
Q Do you know the answer to that question?
A Say the question again.
Q For what purpose was the Law Office of Stephanie Lambert paid $429,875 from The America Project?
A I'm not exactly --
MR. DEMPSEY: Objection.
A -- sure what --
MR. DEMPSEY: Go ahead.
A I don't know for what specifically.
BY MR. KLOEWER:
Q Same question for Renz Law. Do you know why they were retained?
A No.

Page 85

Q Last item here, Truth for Health Foundation, $120,000 for medical and legal support, do you know what the purpose of that grant was?
A No.
Q Mr. Johnson, I regret to inform you we are done looking at financial documents. We are going to get to the substance of this dispute, so...
Before we get into the -- The Deep Rig stuff though, I just want to sort of understand the status of The America Project today. You mentioned before that it -- I don't believe you said it no longer exists, but what -- what is the status of The America Project? Is it still a functioning entity?
A It's still a functioning legal entity. Our intent is to dissolve it. I'm the only officer left. We still have a board. There's two people on the board, myself and Bernadette. We haven't really had any substantial work that would involve more than one employee for approximately the last year. We've drawn down -- we started drawing down over two years ago, and we did a gradual drawdown to what you see, just myself.
Q Why?
A Well, we really -- I would like to go on longer, but, you know, it's funds, funding, and there are a lot of other groups that have picked up the

Page 86

effort, so I think in the way of looking at a business life, we culminated, so...
Q Well, the documents we looked at indicated that the revenue appeared to be going up, right, 7 million to --
MR. TICKTIN: Object to the form.
BY MR. KLOEWER:
Q -- approximately 14 --
MR. TICKTIN: Object to the form.
BY MR. KLOEWER:
Q -- so --
MR. DEMPSEY: Same. Join.
BY MR. KLOEWER:
Q Was the fundraising dropping off for The America Project?
A The fundraising -- our -- I was charged with getting fundraising, retail fund -- it's very hard to raise funds for a (c)(4), a 501(c)(4), especially one that does the work we do outside of a -- an angel donor or somebody that's really --
And so outside of that, our -- our one angel donor, it is difficult to impossible to raise up enough funds, so...
Q So is it safe to assume that Mr. Byrne is no longer willing to finance the entity?

Page 87

MR. DEMPSEY: Objection, form.
A We don't have any more -- I have no -- no more funds to -- to run the organization.
BY MR. KLOEWER:
Q And -- and that's primarily because Mr. Byrne has stopped putting money into The America Project?
A It's --
MR. DEMPSEY: Objection, form.
BY MR. KLOEWER:
Q You can answer.
A It's primarily because I haven't been able to raise up enough funds to keep the operational costs for it going.
Q Does The America Project hold the position that its objectives were completed that it was advocating for?
A Some.
Q In what regards?
A With respect to election integrity, we spent an incredible amount of time and resources just reeducating the American public on what the election process is. We found that is a huge win for our organization with respect to election integrity, huge strides. We were able to go across all of the borders, from Texas to New Mexico, to Arizona and California, and

Page 88

put on town halls and talk about hard things. I'd like to think we made a big -- big impact there.
So yeah, I'd like to think that a lot of our goals were met.
Q All right. Let's talk about The Deep Rig.
When did you first hear about The Deep Rig, Mr. Johnson?
MR. DEMPSEY: Just for clarification, are you asking Mr. Johnson in his individual capacity or as the corporate representative of The America Project, Inc.?
BY MR. KLOEWER:
Q Well, let's start with the corporate representative, and then you can tell me if you had a prior personal knowledge outside of that.
When in your capacity with The America Project did you become aware of The Deep Rig?
A Maybe February of -- or March of 2021. That's my best guess. Like hearing about it, you know, is probably around then.
Q And what about the second portion? Is the answer different in your personal capacity as Carl Johnson?
A Same.
Q Same, okay.

Page 89

And how did you become aware of The Deep Rig?
And let --
MR. DEMPSEY: For --
BY MR. KLOEWER:
Q -- me start by asking --
MR. DEMPSEY: For --
BY MR. KLOEWER:
Q -- about the book --
MR. DEMPSEY: Hold --
BY MR. KLOEWER:
Q -- Mr. Johnson.
MR. DEMPSEY: Hold on.
MR. KLOEWER: Yeah.
MR. DEMPSEY: For the record, this was only noticed as a 30(b)(6) deposition of The America Project, Inc., the corporate entity only. Mr. Johnson was not noticed for his deposition in his individual capacity, so I specifically request that counsel confine their questions to the corporate representative and not the individual, Mr. Johnson.
MR. CAIN: Yeah, Chris, let's -- I'm sorry to interrupt. Let's take a two-minute break, because I want to clarify something real quick.
MR. KLOEWER: Go off the record.

Page 90

THE VIDEOGRAPHER: All right. Stand by. We're going off the video record at 11:17 a.m.
(Recess taken.)
THE VIDEOGRAPHER: We are back on the video record at 11:18 a.m.
BY MR. KLOEWER:
Q Okay. So with respect to when The America Project became aware of The Deep Rig, let me see if I can differentiate between two items. When did The America Project first become aware of The Deep Rig, the book published by Mr. Byrne?
A Probably the same timeframe, maybe -- maybe April/May of -- of -- of the -- of The Deep Rig book.
What Patrick did was he went to Salt Lake City and wrote a book in two weeks and didn't really tell anybody about it. That's the kind of person he is. He -- he --
So if you -- if you're asking, very shortly, if I recall, from the time -- a book and/or movie, same timeframe.
Q And what was -- what was The America Project's knowledge of the movie project? How did -- how did the entity become aware that the movie was going to be created?
A Patrick told -- Patrick told the company at

Page 91

some point that it was going to be created, I think, and then of what I recall is they went to Arizona to do it.
Q All right. And what was The America Project's involvement with that production at the time?
A Not much. No -- no involvement in production. We weren't charged with producing anything or helping anything when it came to that.
Q The production period, did -- did The America Project know about the -- the interviews that were being conducted of its board members?
A Specifically about board members from The America Project?
Q (Nonverbal response.)
A As in who?
Q Mr. Byrne, for example, as the chief executive officer; Joseph Flynn as a board member, in his capacity as a board member. Was -- was The America Project informed that they were going to -- providing these interviews for the film?
A Informed, we -- we were -- well, they were going to Arizona to shoot it, so if there was some formal notice that our board members were going to be involved in a movie, I don't remember that. I wasn't on the board then.
Q Does The America Project at the time, are they

Page 92

maintaining social media accounts?
A At that time we were struggling to get our website up and going at that time. I don't know -- the web -- I think our own personal website might have just gone live at the same time. That's how I knew everything was.
And as far as the other -- like having social media handles, I wasn't managing them, but I think there were a couple of social media handles.
Q Who was managing The America Project's social media handles at the time?
A I don't recall at the time who was -- who had the -- the -- I don't remember.
Q Do you know who they would have reported to within the organization?
A Social media person? Probably the president.
Q And is it safe to assume that any social media post made on behalf of the entity would have been approved by the president?
A I don't know about that. I wasn't the president at the time.
Q Do you know if there was an approval process for --
A I don't know.
Q -- social media statements?

Page 93

A I don't -- I don't recall.
Q I'll show you what we'll mark here as Exhibit 34.
(Plaintiff's Exhibit No. 34 was marked for identification.)
THE WITNESS: Thank you.
BY MR. KLOEWER:
Q And do you recognize that -- that icon and the handle at the top there, Mr. Johnson? It says "The America Project" --
A Yes.
Q Okay. And the date on this is at the bottom of the image. It's June 26, 2021. Do you see that?
A Yes.
Q I'll represent to you that was the day that the -- The Deep Rig film was released, which we've alleged in the Complaint. Do you know who was handling or who was in charge of this Instagram account for The America Project --
A No.
Q -- at that time?
A I don't remember who was in charge of the...
Q Did you personally attend the premiere of the film in Phoenix on June 26 --
A No.

Page 94

Q -- 2021?
A No, sir.
Q Did other members, other officers of The America Project, attend that premiere?
A Not that I recall, no.
Q I want to read this post here, and I have a few questions for you about it. It states, (as read) "The America Project thanks Steve Lucescu and the many others who worked hard to organize The Deep Rig movie release event. The movie is an event of accounts that all Americans and patriots should know. At The America Project we are committed to preserving and advancing freedom. The movie is a step toward that goal and we will continue to work to secure constitutional and God-given rights."
Why is The America Project promoting The Deep Rig here?
A At its core, The Deep Rig is about election integrity, so for us to support it here, it's the only thing I can think of because it's down the same -- down the same shoot of what we advocate for. So that's why we supported it.
Q When it says, "The movie is a step towards that goal," who's taking that step?
A Taking what step?

Page 95

Q The last sentence here says, "The movie is a step toward that goal and we will continue to work to secure constitutional and God-given rights."
A If you read above it, it says, "At The America Project we are committed to preserving and advancing freedom," and that is in our mission statement and it's a part of each of our pillars, and so what that statement there, it is saying this supports what we support.
Q And that's because multiple members of The America Project, board members, participated and were interviewed in the film, right?
A What board members are you talking about again, Patrick and --
Q Patrick Byrne and Joseph --
A Because Patrick made the movie.
Q Yeah.
A So --
No.
Q And --
A In his personal aspect, he created that movie, so...
Q Have you watched the movie yourself?
A It's been three or four years, but I did watch it.

Page 96

Q You have seen it, okay.
I'm going to show you a couple of clips from that movie and we'll turn to this statement from The America Project here.
And you're familiar with the claims about Eric Coomer that are featured in that movie, right?
THE STENOGRAPHER: I'm sorry, can you please speak louder.
MR. KLOEWER: I'm sorry. Yes.
BY MR. KLOEWER:
Q I said you are familiar about -- with the claims about Eric Coomer that are featured in that film, correct?
A I don't recall the claims.
Q I'm going to show you what has been previously marked as Exhibit 2, Clip 13. So we showed these to Steve Lucescu.
And give me just a minute. The first time is always -- I need to make sure the volume is correct and all that, so...
Okay. So I'm going to show this clip, Mr. Johnson.
(Video clip played.)
BY MR. KLOEWER:
Q So going back to this social media post, why

Page 97

does The America Project believe that this is an account of events that all Americans and patriots should know?
A After showing that?
Q Yeah.
A Well, the -- the --
So I'll take you back to before. We are committed to preserving and advancing freedom, and we're really committed to preserving and talking about and exposing election security issues. That's really what we advocated for. So I think there's a misinterpretation of what this is and the silogy to reach that is not there. This is us talking about -- what the film does is what we advocate for, and that's election security and election integrity. So I don't know what that -- that's about or how this goes to that.
Q Well, this -- this is a portion of the film.
A Uh-huh.
Q And The America Project is stating here that it's an account of events that all Americans and patriots should know. So I'm asking, why does The America Project think that all Americans should hear Joe Oltmann stating these claims about Eric Coomer?
A Aside from Joe Oltmann, the entire movie talks about election security and election integrity and the -- and the need to improve it, and that's what that

Page 98

statement means.
Q But with respect to the statements by Joe Oltmann, are those important statements that The America Project believes all Americans should know?
A I'm not commenting to those statements he's made there. I -- I just explained to you that's what we do and -- and I'm not commenting directly to that person's statement.
Q So is it your position that this statement from The America Project refers to the other portions of the film but not to what Joe --
A No.
Q -- Oltmann said?
A It -- so -- let me be clear. The -- the -- the film itself addresses election security and election integrity, and that's why we supported it.
Q Did anyone at The America Project make any effort to confirm the accuracy of the claims in this film before endorsing it?
A Before endorsing the film?
We've been on a four-year endeavor to find these exact -- to not only --
You know, it's one thing to say we see the anomaly; we're brave enough to come together and start forming and going after and trying to find out what is

Page 99

wrong in spite of all the institutional issues we got from it, everything else. Well, you know, at the -- at the -- at the end of the day, I really stand by that, because showing one clip like that and saying that's what you guys -- no, we support election integrity and election security.
That right there, that statement, don't know anything about it. I don't comment to that statement right there, but the whole culture of the film talking about awareness and awakening everybody up to the biggest issue of all, which is the fissures in our election process.
Q My question was, did anybody at The America Project make an effort to determine if what Joe Oltmann said in the film was true or not?
A Anybody at The America Project?
Q Yeah.
A No.
Q So nobody --
For example, in this clip -- we'll watch a couple more clips from Mr. Oltmann from the film, but in this clip he says he received a text message that included an article that referenced Eric Coomer. Did anybody attempt to see if Joe Oltmann actually had that text message?

Page 100

A I wasn't involved in any of -- of -- of that as far as creating the movie. I don't know anything about that text. I don't know anything about what Joe Oltmann is saying there.
Q So I presume the answer is the same, but I do have to ask. Nobody asked to see an article that supposedly referenced Eric Coomer?
A Not that I recall.
Q Okay. And you've never seen that text message or that article yourself, have you?
A I never have, no.
Q Let's watch another clip here. This was previously marked as Exhibit 2, Clip 18.
(Video clip played.)
BY MR. KLOEWER:
Q Okay. So similar questions I had before. Has anyone at The America Project attempted to determine who this guy was that supposedly got Joe Oltmann on this call?
A No, no effort from us.
Q Why not?
A There's -- The America Project had no role in finding -- of the statements of this guy or anything like where --
Is that what you're asking?

Page 101

Q Well, you stated that you had people on staff who were conducting research on election integrity, right?
A Yeah.
Q And you spent many hundreds of thousands --
A But --
Q -- of dollars for that purpose, right?
A Yeah.
Q And Joe Oltmann is claiming that he has overheard an insider describe a plot to overthrow the election. You would agree with that, right?
A Agree with what?
Q With that characterization that Joe Oltmann is saying that he heard somebody inside Dominion Voting Systems confess to the crime, right?
A That's what -- that's what he said, I guess, yeah.
Q And yet no one from The America Project thought to look into this claim?
A No. We had nothing to do with the production of that movie or that -- that level of investigative research over that. No. We just -- the fact that the company talks -- the fact that the movie talks about election security and election integrity and all -- and when it happened and all the subsequent efforts we

did, that's what we were in for, the election integrity and security aspect of it, not -- yeah.
Q So no one at The America Project thought to try to identify who the other participants on this call were either?
A I can't speak for everybody, but I don't recall any research going on like that at the time.
Q What conversations have you had with other officers at The America Project about Joe Oltmann's claims?
A None. I don't remember ever having any conversation about Joe Oltmann and his claims ever.
Q Has Mr. Oltmann ever made a presentation to the board of The America Project?
A I don't recall anything like that happened. I wasn't on the board then, but I don't remember anything like that.
Q Has he ever been a speaker at any of The America Project events?
A I don't recall. We've done a lot of events, but I don't remember him, no.
Q Who at TAP was responsible for the content in The Deep Rig?
A Nobody at TAP was responsible for any content in The Deep Rig, sorry.



Q Who does TAP contend was responsible for the content in The Deep Rig?
A I'm not going to contend any -- anything like that here. I don't...
Q TAP's a defendant in this lawsuit --
A Yeah.
Q -- and they have no position as to who was actually responsible for the content of the film?
A We weren't producing the film. We had nothing to do with the production of the film, end to end, nothing. So you're asking me --
I don't have an answer for you. We did not have anything to do with the production of that.
Q Okay. And you don't know who did?
A Who had the production of the crew in -- that was taken care of in the state of Arizona where it was shot. Somebody was hired to shoot it.
Q All right. My question is, who is responsible for the content of the film? What is TAP's position about who bears responsibility for the content?
A For what's in the film?
Q Yes.
A Those who produced the film.
Q Steve Lucescu and Patrick Byrne?
A Yes. They're the ones who created the film.



Q Anyone else?
A I -- I'm not assigning -- I don't know -- if you're telling me to assign responsibility for the film --
Is that what you're asking?
Q I'm asking who you believe is responsible for the content of the film, yes.
A Responsible for the content? Whoever the production company was that worked at the time with Patrick, with those people, that's who you might get a better answer from.
Q Okay.
A I don't know.
Q Going back to this statement in Exhibit 34, "At The America Project we are committed to preserving and advancing freedom. The movie is a step towards that goal and we will continue to work to secure constitutional and God-given rights," how does Joe Oltmann's claim about Eric Coomer being on an Antifa conference call preserve or advance freedom?
A I have no -- nothing to say about what Joe Oltmann has said here or the contents of what his --
What I can tell you is that the movie itself definitely helped in -- in -- us to start later advocacy going out and helping election integrity efforts.



So this I don't know. I know what this did to help The America Project.
Q Well, expand on that. What did the film do to help The America Project?
A It -- what it did was it helped us gain an idea of where we could help with on-the-ground election integrity efforts, where America Project can help. America Project can't help with any forensic investigation of stuff like that, but what America Project can do and what we did do successfully for several election seasons and just time in general, was we advocated for border security, election integrity and rights and freedoms. That's what we did.
Q And the film also generated revenue for The America Project, right?
A I don't recall that it generated any revenue for The America Project.
Q You don't have any knowledge about the revenue generated by the film?
A No.
Q Or where that money went?
A No.
Q Who would know that?
A Patrick Byrne.
Q Who else?

Page 106

A That's all I can think of.
Q And to be clear, to -- I want to be sure we're talking about the right things here. What about donations? The film drove donations to The America Project, didn't it?
A I don't recall seeing an uptick in -- in donations from it, but I -- I really didn't work in...
Q I don't mean an uptick. I mean specific --
You're aware that The America Project hosted the film on its website, right?
MR. TICKTIN: Counsel, would you mind speaking a little (inaudible.)
THE STENOGRAPHER: I'm sorry, I didn't hear you.
MR. KLOEWER: Sure. I said --
MR. TICKTIN: I asked counsel to speak a little louder.
MR. KLOEWER: Yeah.
BY MR. KLOEWER:
Q You're aware that The America Project hosted the film on its website, right?
A We might have.
Q You're not aware -- you can't say with certainty --
A I don't remember back that far, but if we

Page 107

did -- if we did host it, we hosted it. Was it behind a paywall or something or was it just free? I don't remember.
Q You don't -- you don't --
A No, I don't.
Q -- recall the payment structure for the film?
A No.
Q Okay. And you prepared for this deposition by reviewing the topics that we provided, correct?
A Yes.
Q Let's watch what's been previously marked as Exhibit 2, Clip 15.
(Video clip played.)
BY MR. KLOEWER:
Q I take it from your prior testimony that The America Project is not --
We just heard Mr. Oltmann say that every single person he talked to validated the information. Did The America Project validate Joe Oltmann's information?
A I don't even know who he's talking about when he says "every single person," so I don't even understand it, really the premise of that.
Q Has The America Project reached out to Joe Oltmann to determine what information he claims to have?

Page 108

A At the time, I don't -- I don't -- no, I don't recall.
Q Since that time?
A No.
Q Has anyone from The America Project been in contact with Mr. Oltmann since being served with this lawsuit?
A No. At The America Project, I don't think so.
Q You haven't made any efforts to determine if there's any evidence to support his claims about Eric Coomer?
A No.
Q And that's because The America Project doesn't believe Joe Oltmann's story about Eric Coomer, does it?
MR. DEMPSEY: Objection, form.
MR. TICKTIN: Join.
BY MR. KLOEWER:
Q The America Project doesn't believe Joe Oltmann's claims about Eric Coomer, does it?
MR. DEMPSEY: Same objection.
BY MR. KLOEWER:
Q You can answer.
A As The America Project, to --
Q Yeah.
A -- to his -- there's so much Joe Oltmann here.

Page 109

I haven't heard that name in three years, so I can't -- I can't answer that. I don't -- I don't know, sorry.
Q I'm going to show you what's been previously marked as Exhibit 7, so we don't need a sticker on this one because I've already got one there.
MR. DEMPSEY: Thank you.
BY MR. KLOEWER:
Q And I apologize for the black and white. It came out in gray sale. This is an image from the film, and it says, "Patrick M. Byrne, Founder/CEO of The America Project." Why is Mr. Byrne being identified as the CEO of The America Project in this film?
A I have no idea. I did not create the movie.
Q In preparing to give testimony today, did you discuss with Mr. Byrne what his role was in the production of The Deep Rig?
A No.
MR. TICKTIN: Objection. Don't answer that question. There's a joint defense --
THE WITNESS: Okay.
MR. TICKTIN: -- privilege, and we're not getting into any of that privileged communication.
MR. KLOEWER: Well, that's an interesting point.

Page 110

BY MR. KLOEWER:
Q When did you enter into a joint defense privilege agreement with Mr. Byrne?
MR. TICKTIN: We're not discussing it.
BY MR. KLOEWER:
Q Have you disclosed the joint privilege agreement in this litigation?
MR. TICKTIN: We're not discussing it.
MR. KLOEWER: He can answer if you've disclosed the agreement.
MR. TICKTIN: We don't need to discuss what type of agreement we have, oral or written.
MR. KLOEWER: Well, it's not --
MR. TICKTIN: We're working together as defendants.
MR. KLOEWER: Are you instructing Mr. Johnson not to answer the question?
MR. TICKTIN: I'm telling you that this is privileged. That's up to his counsel to instruct his client. His client is not my client.
BY MR. KLOEWER:
Q Have you disclosed the common defense agreement in this case?
A I'm not going to answer that.
MR. KLOEWER: Are you instructing --

Page 111

A I'm not going to answer --
MR. KLOEWER: -- your client not to answer that question, Mr. Dempsey?
MR. DEMPSEY: I -- honestly, I think he doesn't know --
THE WITNESS: Yeah.
MR. DEMPSEY: -- and that question --
THE WITNESS: I'm not going to answer something -- I don't even know --
MR. DEMPSEY: -- that answer will cure this entire issue if that is the case.
Do you know?
THE WITNESS: No. I don't even know what you're talking about.
MR. DEMPSEY: No knowledge.
MR. CAIN: Can we go off the record for a second.
THE STENOGRAPHER: Derek, will you take us off the record please.
THE VIDEOGRAPHER: Stand by.
We're going off the video record at 11:46 a.m.
(Discussion off the record.)
THE VIDEOGRAPHER: We are back on the video record at 11:52 a.m.
MR. KLOEWER: Okay. We went off the record to

Page 112

briefly discuss objections raised by counsel for both Mr. Byrne and for The America Project with respect to some questioning regarding Mr. Johnson's knowledge of Mr. Byrne's conduct and the motivations for that conduct in the film. Defendants asserted an objection that responding to that question was -- or questions of that nature was precluded by virtue of a joint defense agreement, which has not been produced to plaintiffs, which we have not seen. We don't know the date of that agreement or its parameters. We believe that the corporate representative has an obligation to consult with Mr. Byrne in order to answer questions that are -- have been delineated or topics that have been delineated in the 30(b)(6) notice, and the defendants generally object to potential lines of questioning by virtue of their joint defense agreement.
So we've had a discussion about that off the record. I believe there's still some disagreement that may arise again, but I want to give the counsel for the defendants an opportunity to state their position on the record.
MR. DEMPSEY: Our position is that the corporate representative of TAP should not be asked

Page 113

about his discussions in the context of joint defense with co-defendants in this action, certainly not specifically. He can, however, be asked about his knowledge as to certain attributes of the film at issue, which he may not have.
As to the particular question at issue, which is whether or not TAP has any knowledge of why or how or under what authority Patrick M. Byrne put, quote, Founder/CEO of The America Project under his name in a Deep Rig film clip identified as Plaintiff's Exhibit 7, that question does not appear to be listed as a topic for this deposition at Section II of the 30(b)(6) notice.
MR. TICKTIN: And I -- I'd like to also say that there's a joint defense privilege and -- as defendants need to be able to confer with each other, and there's no exception to that privilege because of some duty to investigate and find information.
Now, if the witness did have a conversation with his co-defendant and did learn something from that conversation, he certainly can testify as to his state of knowledge, but as to what the communications were, there's no need for that, because the witness can testify as to his state of

Page 114

knowledge. And also it could open the door to all communications regarding joint defendants, which we're not willing to do, although if we find that there is a question that's relatively innocuous and counsel volunteers to waive any waiver of any such privilege, then we would consider that at -- in terms of it being an exception, but there's no reason here for that.

Also, there's -- if counsel wants to know what was learned from co-defendant from prior to when they were co-defendants, then that's res gestae of the issues that are in play and that -- that is all fair game and fair to be asked. It's just the communications -- once the defendants are working together as defendants, they need to be able to have conversations that are privileged which are not eroded because of other considerations.

MR. KLOEWER: Okay. All right. I'll just briefly note, and we can proceed here, that matter No. 3 upon which examination was requested is the scope of Patrick Byrne's authority as your representative or agent, including Patrick Byrne's authority to make statements on your behalf. So we did express and disclose this potential line of questioning and that's included in our notice.

Page 115

MR. DEMPSEY: And if you -- just to add for the sake of completeness, as you may recall, at the outset of this deposition counsel for plaintiff asked the corporate representative of TAP to identify areas that were requested for which he has no pertinent knowledge or information, and item 3 was one of those items identified by the witness circling that number in the deposition notice as an exhibit to this deposition.

So I think if you ask the question, the ultimate question you're asking, you will find his answer is consistent with him circling item 3; that is, has no knowledge.

BY MR. KLOEWER:

Q All right. Let's get back on track here and I'll hand you what's been previously marked as Exhibit 6.

Okay. Similar question for a non-defendant. This is another image from the film. It indicates, "Joseph Flynn, Board Member of The America Project." Do you know why Mr. Flynn is designated by this title in this image?

A No.

Q Would you agree that people watching this film would believe that Mr. Flynn was speaking on behalf of

Page 116

The America Project?

MR. DEMPSEY: Objection, form.

A Not necessarily, no.

BY MR. KLOEWER:

Q Okay. Why not?

A That just doesn't do -- it just doesn't do it for me. It's the same thing with Patrick. It says, "Board member of The America Project." I didn't have any contribution to that, and if I see that and he's talking, I don't assume that he's representing it because of that title. It's just showing his title he is right now, but -- sorry.

Q And just to set the timeframe, the -- would you agree that the film was produced between roughly February and June of 2021?

We saw the -- the release of the film was June 26th of 2021 and you had previously indicated you became aware of The Deep Rig around February or March, if I recall your testimony correctly. Would you agree that the film was created within that intervening timeframe?

A Yes.

Q Okay. And that was the same timeframe that Patrick Byrne was working 40 hours a week in his capacity as CEO for --

Page 117

A Yes.

Q -- The America Project?

And that Joe Flynn was working 30 hours a week in his capacity as board member, right?

A Yes.

Q Okay. I'll show you what we'll mark as Exhibit 35.

(Plaintiff's Exhibit No. 35 was marked for identification.)

BY MR. KLOEWER:

Q Okay. Mr. Johnson, I've just handed you a screenshot of the last image from the film. It's a closing credit, and I'll -- I'll read this slowly here.

It states in quotations, "We The People... a heartfelt thanks to all of you, every single one of you, for not giving up, and for demanding an extremely important election integrity process. Please donate whatever amount you can to the patriotic and heroic efforts, work and achievements of this incredible cause. Www.AmericaProject.com." Do you see that?

A Yes.

Q Why was this included in the film?

A I don't know. I did not put this in there and I don't know who contributed that to the film.

Q Do you know if Mr. Byrne requested that this

Page 118

be included in the film at the time when it was created?
A No, I do not.
Q Do you know if Mr. Flynn requested that this be included in the film at the time it was created?
A No, I do not.
Q Have you discussed with either Mr. Byrne or Mr. Flynn whether they requested this -- what information they requested be included in the film at the time when it was created?
A No.
MR. DEMPSEY: Objection, privilege as to Byrne, depending on time.
Although I think he did just answer the question "No."
A No. At the time, no.
MR. DEMPSEY: So never mind.
BY MR. KLOEWER:
Q Have you ever spoken with Joe Flynn about The Deep Rig?
A Not that I recall. About The Deep Rig, no.
Q You didn't speak to him while the film was being created?
A It's a long time ago. I didn't -- there was -- there was no I guess aura of filmmaking inside of The America Project. We were busy building out our --

Page 119

we just got a hard stand. We had just gotten our building and I was busy building out really what we anticipated at the time as a pretty long operation. So this was not a topic of -- this was something that, if it was talked about, we didn't sit around taking notes, making plans for it. We were building out a nonprofit organization at that exact same time.
Q You didn't talk to Joe Flynn in preparation for this deposition about The Deep Rig?
A No.
Q You didn't ask him if he had any knowledge about how much money that film made?
A No.
Q You didn't discuss with him the bank accounts where money from The Deep Rig downloads flowed?
A No.
Q You didn't talk to him about payments that were issued to any of the vendors who created The Deep Rig?
A No.
Q Do you know if he has knowledge of those matters?
A I don't know.
MR. CAIN: I'm sorry once again to interrupt.
I have a conference call I have to go to at 12:15.

Page 120

It's 12:04. Can we break for lunch at 12:10? Is that okay?
MR. KLOEWER: I was going to suggest that now is a good time to break because I'm about to shift gears to another topic. So if we want to break for lunch now --
MR. TICKTIN: Well, that works.
MR. KLOEWER: Yeah.
MR. TICKTIN: Especially if you've got (inaudible.)
THE WITNESS: Awesome.
THE STENOGRAPHER: I'm sorry, I didn't hear you through the coughing.
MR. TICKTIN: I said, "That works especially if counsel has another responsibility or appointment."
THE VIDEOGRAPHER: Are we all set to go off the video?
THE STENOGRAPHER: Yes.
THE VIDEOGRAPHER: Okay. We are off the video record at 12:05 p.m.
(Recess taken.)
THE VIDEOGRAPHER: The time is 12:58 p.m. and we are back on the video record.

Page 121

BY MR. KLOEWER:
Q Okay, Mr. Johnson. Before we broke for lunch we were talking about The America Project's involvement with this film, The Deep Rig. Would you say -- would you agree with me that other former members of the TAP board, specifically Patrick Byrne and Joseph Flynn, would have more knowledge than you about The America Project's involvement with that film?
A Yes.
Q And on that topic, I'm going to hand you what's been previously marked as Exhibit 21.
Now, this is a text message exchange that was produced to us by Steve Lucescu with Joseph Flynn.
Did you have an opportunity to review documents produced by Mr. Lucescu in this litigation?
A No.
Q Before we get into this, can you tell me a little bit about Steve Lucescu. Does he -- what relation does he have to The America Project?
A No relation to The America Project. The only thing I remember about Steve Lucescu is his long gray hair and that he was a -- that he was a movie producer. I believe he was Native American; I can't remember. But no, nothing more than that.
Q And what does that recollection stem from?

Page 122

Was he involved with The America Project events in any way? Did you see him around?
A No. I saw him -- not at any --
It could have been at an event. I have to -- could have been --
I did see him come to Venice once, so I did see him in Venice, Florida, and, I don't recall, maybe an event, but I only saw him physically maybe two or three times at the most, like the physical presence of him.
Almost no conversation with him either. I didn't have much to say to him.
Q Okay. Well, let's take a look at this document. As I mentioned, it's been previously marked as Plaintiff's Exhibit 21, and I know you haven't seen these before so I'll just sort of orient you at some of the -- the markers we see on this page that we established with Mr. Lucescu in his deposition.
So on the left-hand side we can see the -- the speaker and the phone number.
These are text messages --
A Okay.
Q -- I'll disclose.
And on the right-hand column we see a date and time. So this particular exchange occurred on July 23rd

Page 123

of 2021. Do you see that?
A Yes.
Q Okay. And just to reorient you in time, The Deep Rig was released about a month prior on June 24th of 2021. So this is about 30 days into the -- or -- or subsequent to the -- the premiere of the film.
So I want to direct your attention to the first sort of text line there. Under -- it says "Steve Lucescu" on the left, and he says, "Hola brother. Good morning." Do you see that?
A Yes.
Q It says, "What time does Novo open for the day? There is $195,588.89 in there now, and small amounts, 500 to 2,000, each day or so have been coming in regularly, so please make the transfer for 195K. Then we aren't too far from the invoice amount and most everything can be almost paid."
And then we see Joe Flynn responding. He says, "Did you see the agreement?" Do you see that?
A Yes.
Q Okay. Do you know what this Novo account is that Mr. Lucescu was discussing with Joe Flynn?
A No, I don't know what that is.
Q Do you know why Joe Flynn is --
Well, I'll represent to you that Mr. Lucescu

Page 124

stated in his deposition these were funds that had been generated through sales of The Deep Rig, meaning people paid to download the film. Do you know why Mr. Lucescu would be speaking with Joe Flynn about this matter?
A No.
Q And you didn't -- I know you've answered this before, but I want to be clear with respect to this issue. You didn't have any conversation with Joe Flynn prior to your deposition to determine what his role was with respect to the proceeds that were generated by The Deep Rig; is that correct?
A That's correct, I had no conversation with Joe. I hadn't talked to him in a long time.
Q Were you aware that a bank account with Novo Bank had been opened to accept -- or for the proceeds from the film to be directed to?
A No. I didn't even know that --
I guess that's a bank.
Q And does The America Project have any policies or procedures with respect to when its officers -- how to determine when its officers are acting on its behalf?
And let me ask that a little bit of a different way. How do I know when Joe Flynn is acting on behalf of The America Project or when he's not?
A How do you know?

Page 125

Q Yeah.
A How would you identify him --
Q Yeah.
A -- as working for the -- hypothetically?
Q Yes. How would you --
A He would introduce himself to you as Joe Flynn and he probably would say he's the president of The America Project and then talk to you about whatever he's talking about.
Q Okay. And -- and how would you determine if he was acting on behalf of The America Project with respect to his conduct surrounding the film?
A Acting on behalf of The America Project? I don't know. I don't know how -- I don't know -- I don't see him acting on behalf of The America Project here at all, so I don't see where that connection is.
Q What about acting in his capacity as a board member for the -- or as an officer for The America Project?
A As a --
Was he a board member during this time? So --
Q I don't believe so. I meant to correct my -- my question. In his capacity as an officer. I believe he was identified as --
A He was a --

Page 126

Q -- a director.
A I think at this timeframe he was a board director. He was the director of the board, so he's not an officer.
Q Okay. But in those --
A Or not a president. That's what I'm saying.
Q In those documents we looked at this morning, he was -- he was identified as the director for the 2021 timeframe.
A Right, director meaning board member.
Q Okay. But a compensated officer for --
A Well, a board -- board directors can be compensated for as well. Board director positions are either volunteer or compensated depending on the nonprofit really.
Q And Mr. Flynn asked, "Did you see the agreement?" He says, "I was instructed it to send until you guys sign it." I believe that's a typo there.
Do you know what agreement he's referring to with Mr. Lucescu?
A No.
Q More broadly, are you familiar with the -- I'll generally characterize it as a falling out, but a series of disagreements that Mr. Lucescu had with Mr. Byrne surrounding the creation of this film? Are

Page 127

you familiar with that dispute?
A I'm familiar with the creative dispute.
Q Okay.
A Certainly. That's -- the dispute that I saw and witnessed was definitely a creative -- creative frictions. It all revolved around how the movie was told. It revolved around specifically -- at some point Steve Lucescu was in the movie and Patrick said you're in the movie a little too much. That level of -- of creative differences is -- is what sticks out to me. Any other differences other than that as far as like this, businesses deals, I was not a part of them. I witnessed though the creative difficulties I guess.
Q And you witnessed those in realtime as the film was being created?
A Witnessing, but I just heard -- heard maybe some complaints from Patrick about it.
Q And -- well, what did you discuss with him at the time?
A Exactly what I said, the creative -- that Steve Lucescu was wanting to create the movie a certain way and Patrick didn't like the style. There were huge style differences between those two.
Q And if we look down a little bit -- we don't need to read the entirety of this conversation, but I do

Page 128

want to direct your attention to about two-thirds of the page down. On the right-hand side you can see it's a text message from 9:27:20 a.m., and it starts with, "Actually, don't bother resending it." Do you see that?
A Okay. Yes, I see it.
Q Okay. So Mr. Lucescu says, "Actually, don't bother sending it. It finally opened. Please have Faaiz," F-A-A-I-Z --
Am I saying that name correctly?
A Yes.
Q "-- send an editable document instead of the DocuSign."
Who is Faaiz?
A Faaiz was a CTO for us at The America Project, but also what Faaiz had was basic stuff to do PDFs and stuff like that. So I don't know why Faaiz's name is in here, but he was CTO, and I don't remember the timeframe. It was that timeframe until a few months after that. He was only CTO for a few months.
Q Were you aware that Mr. Faaiz was in frequent contact with Mr. Lucescu about the film?
A No. No, I have no...
Q You didn't review Mr. --
And his last name is Khan, Faaiz Khan. You didn't review any of his communications to prepare for

Page 129

this deposition?
A No.
Q Are you surprised as you sit here today that Faaiz was preparing or sending documents to Mr. Lucescu about the film?
A No, because I don't know Faaiz's role, his complete role at all in that, so that's...
Q But he was, as you indicated, the CTO for The America Project?
A For The America Project, yeah.
Q He goes on to say, "This document is fundamentally wrong starting with the second paragraph referring to the $250,000 as a loan. It is very clear in my agreement with Patrick that I have already given a copy to you and Faaiz via email and I would have thought that Patrick would have given to Faaiz, but he funded the project and it is definitely not a loan."
Are you familiar with the financing for the film, how --
A No.
Q -- how it was paid for?
A No.
Q All right. We don't need to review the entirety of this document, especially if you haven't seen this, so we can set that aside.

Page 130

I'll refer you next to what's been previously marked as Exhibit 22.

A Thank you.

Q Okay. All right. This is a -- a similar -- as you can see, the same format of the document. This was also produced to us by Mr. Lucescu, and we're a few days forward in time now. So you'll note the date on the right-hand side says July 28th, so this is five days after the correspondence we just looked at, and at the top here, the first message from Mr. Lucescu, he states, "Hola Patrick. Joe Oltmann will be reaching out to you this morning if he hasn't already. Will be presenting the new platform that he has been developing for us since July 5th incorporating your requested donation ability to The America Project."

Do you know about this cooperation with Mr. Oltmann to host the film?

A No. I never heard of anything like this. And I -- I'm really confused anyway by what it says, so...

Q What are you confused about?

A I don't understand what he's talking about, presenting a new platform. I don't know what Joe Oltmann's talking about when he's discussing that. I didn't -- I was never involved -- I would have been at some length --

Page 131

I don't even know what he's talking about for this platform, so...

Q Okay. You're not familiar with the website TheDeepRig.movie?

A I'm familiar with the website, but is that what he's talking about, he made the website?

Q Well, it's -- I'm not answering questions here today. I'm --

A Okay.

Q -- asking about your knowledge, so --

A Well, I -- that shows you my knowledge, because you tell me. I don't know.

Q What do you know about TheDeepRig.movie, the website?

A Not much about it. I don't think I even really ever went on it. The Deep Rig website was -- was created specifically for the movie, and there was definitely the need for Chinese walls between The Deep Rig and anything The America Project does. Now...

Yeah, I don't know any of this stuff right here. I haven't seen these -- honestly, I haven't read these texts, so I don't know.

Q Well, explain what you just said, there was a need for Chinese walls between The Deep Rig and anything The America Project does.

Page 132

A That's probably why they had a website.

Q Sorry?

A Why they had a separate website and got it off from hosting on -- on The America Project platform, because that --

All I knew from where I was working at the COO is we were working on the Maricopa audit. So any decision like that to keep stuff away from The America Project in that respect, that was great for me, but just didn't have any length -- any depth of knowledge on that. I was really working hard on the audit and building out a cell.

Q So The America Project was deliberately attempting to distance itself from The Deep Rig?

A No, I wouldn't --

MR. DEMPSEY: Objection to form.

A That's -- yeah, that's -- that's not a -- you clearly misunderstood what I was telling you. We did not --

BY MR. KLOEWER:

Q Okay.

A The America Project -- clearly you misunderstood. We did not deliberately distance ourselves from anything.

Q Okay.

Page 133

A We were just trying to be -- trying to go on with the mission, and Deep Rig was a movie that we had nothing to do with, so I'm just happy to have that. That's all I'm saying. But you -- you misunderstood what I said. That's not what I was saying.

Q So -- so if The Deep Rig -- if The America Project had made any representations on its website about being involved with The Deep Rig, would those be inaccurate?

A I don't recall anything like that happening on our website.

Q What about contracts between The America Project and Mr. Oltmann's company, PIN Business Network, towards the film?

A That does not ring any bell.

Q You didn't review a contract signed between The America Project and PIN Business Network based out of Greenwood Village, Colorado?

A PIN, that does not ring a bell.

Q Did Mr. Khan -- did he have any other -- was he working for anyone else at this time?

A I don't think so. I don't think he had any other job.

Q This -- this text thread largely devolves into personal disputes between Mr. Lucescu and Mr. Byrne,

Page 134

which I don't think we need to get into here, especially since you haven't seen this, but I am -- I would like to direct your attention to the fifth line down here. It's a large block. It says, "Faaiz has been very nonresponsive." Do you see that?
A First page?
Q Yes.
A So you want me to read that?
Q Not all of it. Let me see --
A Okay.
Q -- if I can focus your attention here.
This is about five, six lines down on the right-hand side, a new sentence begins with, "I reached out again to him." Do you see that? It says, (as read) "I reached out again to him to -- to her three days ago --"
A Yes.
Q "-- asking for final input on the actual button design and amounts for the donations to TAP and received absolutely no response again."
Were you aware that Mr. Oltmann was building a platform that would solicit donations to The America Project in conjunction with the film?
A No, and had I -- had I would, it would have been executed. I don't think -- none of this stuff ever

Page 135

happened, but I didn't -- I wasn't aware of any platform. But when they say platform, it sounds to me that's just building another website, some sort of new hosting platform. But no.
Q Okay. So it's your testimony today that this -- you're not aware of Mr. Oltmann ever having completed a hosting platform for The -- The Deep Rig?
A I don't recall it, yeah.
Q All right.
A Whether he's the one that built that or not, I don't know. Maybe he did.
Q And if we look at Page 2 about three lines down, this is a message from the 28th at 10:11:26 a.m. from Mr. Lucescu. He states, "Patrick, I'm totally fine with you changing the deal and now TAP getting 80 percent of all donations from the buttons. As I understand from Joe Flynn and Faaiz, there are some legalities to a charitable 501(c)(4) foundation, and since I don't know anything about that, I'll take their word for it."
Were you involved in discussions about 80 percent of donations for the film going to TAP?
A No.
Q And you didn't speak with Mr. Flynn or -- or Faaiz Khan about these negotiations at the time?

Page 136

A No. I had nothing to do with any -- anything on here.
Q When's the last time you spoke with Mr. Khan?
A At least two and a half years maybe, two and a half years; two years, two and a half.
Q So you didn't speak with him at all to prepare for your testimony today?
A No.
Q Okay. The last part here, if you look to the very last line of this document, it carries over on to Page 3. It's one more line, and it's -- it's Mr. Byrne sort of concluding this conversation after some back and forth. Mr. Byrne states, "Steve, I just read your latest crazy letter to the attorneys. All communications between us are now complete and you are on block. Don't even bother trying to write me. Communicate through attorneys only. The America Project looks forward to making its film available to the public." Do you see that?
A Yes.
Q And you'd agree this is when Mr. Byrne was serving as the CEO of The America Project, right?
A Yes.
Q And he's the -- I believe you described him as the 90-to-95-percent funder of this entity, correct?

Page 137

A Correct.
Q Okay. So you would agree with me that Mr. Byrne is describing The Deep Rig as a film belonging to The America Project here, right?
A I don't see that as belonging to The America Project at all. I think what this was was some sort of formula that the guys on the film are trying to make to put together a new platform, a website.
None of this stuff was ever executed. I would have seen this...
And him saying TAP making it to the public, again that's some -- something they must have been putting together. There's no -- I don't know what The America Project looked forward to making the film available to public is here. But again I didn't see these texts. I wasn't a part of this, so...
Q And it's your testimony that none of this ever happened ultimately?
A I wasn't a part of this. That's my testimony. I wasn't a party to any of this.
Q So you don't have any personal knowledge about whether this project came to fruition or not?
A No.
Q I'll show you what's been marked as Exhibit 24. You'll note the dates here on the right-hand side

Page 138

again shows we're a few days forward in time. This is August 2nd of 2021, and we have another (inaudible) discussion between Mr. --

THE STENOGRAPHER: I'm sorry, we have another what?

BY MR. KLOEWER:

Q -- another text message discussion between Mr. Lucescu and Mr. Flynn. At 8:02:51 at the top Mr. Lucescu states, "Hola brother. How was your weekend? Have you seen the page design from Joe Oltmann yet?" Do you see that?

A Tally. I see it.

Q And there's some back and forth here about some personal matters with Mr. Flynn's family and having contracted COVID I believe. We can skip down a little bit here. But there's a large block of text near the bottom, that 8:41:06 from Mr. Lucescu today. It says, "I sent this to Faaiz earlier today." Do you see that, down near the bottom?

A Yes.

Q "Hola Faaiz. I was just talking to Joe Oltmann as I want to launch my film as soon as possible. Joe does not want to be put in the middle and suggested that we talk to arrive at a satisfactory agreement. Please let me know when you can make a call so we can

Page 139

rough-out an agreement to then have your lawyers draw up ASAP."

Mr. Lucescu referred to this as my film. Would you agree with that characterization?

A I don't know what -- why he's referring to his film and I don't know the ownership of the film, why he's taking ownership like that in this text. I just don't know the context.

Q Well, who does own the film?

A I don't know who owns the film. I don't know -- I don't know who collectively owns it. I don't know who drives it. I don't know who distributes it. I don't know if there's any money being made today or there was any money being ever made. I know that none of the monies or anything related to Deep Rig ever benefited TAP. We have no signs of any type of increase in donations or some unexpected gain from the movie.

In fact, it's the opposite. We had -- we had been for other reasons, not just because of the movie, but because we're a 501(c)(4), and nobody gets tax writeoffs when they donate to, whose mission is pretty -- at the time pretty polarizing. So try to raise funds over that.

Q Okay.

A That was -- yeah.

Page 140

Q So no connection between The America Project and the film at all? You have no idea who owns it?

A I don't know who -- who the principal -- I don't know the status of the movie at this point, no.

Q Mr. Flynn responds down here, "Not much I can do, Steve, at this point unfortunately."

And I apologize if I asked this with the last text message. Were you aware that Mr. Lucescu was -- was reaching out to Joe Flynn to -- to try to arrange some sort of agreement?

A No.

Q Okay. You can set that aside.

MR. KLOEWER: Am I correct, Lisa, that we're at 36?

THE STENOGRAPHER: Yes, you are.

MR. KLOEWER: Okay, good.

BY MR. KLOEWER:

A Okay, Mr. Johnson. I'll hand what you we'll mark as Exhibit 36.

(Plaintiff's Exhibit No. 36 was marked for identification.)

BY MR. KLOEWER:

Q Okay. This is a post. We can see it's on Rumble, posted by The America Project. Do you see that?

A Yes.

Page 141

Q On August 3rd of 2021. It's the day after the text messages we were looking at.

Who -- who at the -- I know you didn't know exactly who was handling the social media accounts. Do you know who controlled The America Project's Rumble account at this time?

A No, I don't know.

Q The text below this states, "Team Freedom: When --" Well, "Watch here: Deeprigmovie online." It says, "Team Freedom: When we premiered The Deep Rig movie in late June we promised we will also release the movie for free so everyone can hear the truth. Here it is today. The movie is free for all of you to watch. Share it far and wide."

So it's my understanding that this website, deeprigmovie, was the project that we just read about with Mr. Oltmann --

A Uh-huh.

Q -- that he was going to be hosting.

Were you aware that The America Project had promoted this website and provided a free link to the film at the time?

A No.

Q Who was involved with building the website to your knowledge?

Page 142

A Our CTO at the time was Faaiz, and Faaiz as the CTO constructed and -- and did all things pertaining to digital. So website, that's my -- it would be Faaiz.
Q Okay. So this would have fallen under his scope of work with the entity?
MR. CAIN: You didn't get an answer to that.
MR. KLOEWER: Yes.
BY MR. KLOEWER:
Q This would have fallen --
A It doesn't fall under mine. It could possibly, yes. That's --
Q All right. It would have fallen under --
A He's the CTO.
Q Okay.
And here we'll -- this one will be quick.
MR. KLOEWER: I'll mark this as 37.
(Plaintiff's Exhibit No. 37 was marked for identification.)
BY MR. KLOEWER:
Q And this is from the same date, a post from The America Project, this one on Twitter. It states, "Deep Rig movie free for you. Here it is today. The movie is free for all of you to watch. Share it far and wide," and we see that link to deeprigmovie.online. Do you see that?

Page 143

A Yes.
Q And we see a few individuals tagged here. I think I can guess who most of them are: Christina_bobb, JosephJFlynn1, HuttonPulitzer. I believe those refer to (inaudible) Joe Flynn --
THE STENOGRAPHER: I believe those refer to...?
MR. KLOEWER: Sorry.
BY MR. KLOEWER:
Q -- to Christina Bob, Joe Flynn, and Jovan Hutton Pulitzer. Do you know who this fourth entity is, UAmerica333?
A No.
Q And, sorry, same question, got to check the box here, do you know who was in control of The America Project's Twitter account?
A No.
Q Okay. What I want to do is show you real quickly the -- the only new clip I have today. So your counsel has that on a -- a flash drive.
MR. KLOEWER: We'll circulate a link with this as well just so you guys have it.
BY MR. KLOEWER:
Q But I want to show you a video. It's about a minute and a half long, and this is Patrick Byrne who

Page 144

provided a -- an introductory statement to the film when it was posted on that website. So this is --
A When it was posted on what website?
Q The deeprigmovie.online, the -- the URL we've been looking at.
And this --
MR. KLOEWER: So what are -- I'm sorry, Lisa. Are we at 38?
THE STENOGRAPHER: Yeah.
MR. KLOEWER: Okay.
BY MR. KLOEWER:
Q So I'll mark that flash drive as Exhibit 38, and this will be clip one. This is a minute and 43 seconds. So we'll watch it, and then I'll have a few questions for you after that. Okay?
A Okay.
(Plaintiff's Exhibit No. 38 was marked for identification.)
(Video clip played.)
BY MR. KLOEWER:
Q Okay. So you heard Mr. Byrne there state -- he's requesting donations to The America Project. You agree with that, right?
A Yes.
Q And he said send us a few shekels to The

Page 145

America Project. You heard him say that, right?
A Yes.
Q What did he mean by "us"?
A The America Project.
Q "Watch it, enjoy it, send us a few shekels and spread the word as far as you can." It's a separate quote, but you'd agree he's -- when he says "us", he's referring to The America Project, right?
A Yes.
Q Okay. And I believe you stated, correct me if I'm wrong, that you -- you had visited the deeprigmovie.online at some point or -- or no?
A You're asking -- for --
I don't think so. I mean, I'm -- I -- I never journeyed the website. I might have looked at it, but it's -- was of little interest to me. I had a lot of work.
Q Did you ever --
MR. KLOEWER: Are we at 39?
THE STENOGRAPHER: Yes.
BY MR. KLOEWER:
Q Were you involved in any discussions to establish terms and conditions for The Deep Rig online website?
A (Nonverbal response.)

MR. KLOEWER: We'll mark this as 39.
(Plaintiff's Exhibit No. 39 was marked for identification.)
BY MR. KLOEWER:
Q Okay. You're familiar with the terms and conditions on websites, right? If you go to the bottom of a website, you can click on a tab that will give you a little more information about that entity. Have you ever done that on a website before?
A Yes.
Q Okay. These are the terms and conditions from the deeprigmovie.online, and I want to direct your attention to a few different portions here.
Specifically, under definitions, "The Deep Rig Movie," it states, (as read) "The Deep Rig Movie and The America Project refer to The America Project Incorporated and all affiliates."
Are you aware that this is how The Deep Rig was presenting itself to its consumers at the time?
A No, I'm not clear on that statement. (As read) "The Deep Rig Movie and The America...refer to The America Project, Inc. and its affiliates," I'm not sure why that's in there, but I didn't have -- I don't know why it says that.
Q You would agree that someone reading this



would understand The Deep Rig and The America Project to be one in the same, right?
A No, I wouldn't get that out of this.
Q What affiliates is this referring to?
A I have no idea. I don't know what -- why they put affiliates in this legal document.
Q Who would have been -- who would have created this document?
A Somebody at The Deep Rig that maybe is a part of their legal team.
Q Who at The America Project would have been involved with creating these terms and conditions?
A I don't know. I don't think anybody in America Project.
Q Let's look down here a little bit. The next heading says, "The America Project's Content." I'll read this here. It says, "All content on The Deep Rig Movie is protected by copyright as a collective work or compilation under the copyright laws of the United States and other countries and The America Project has all rights therein, subject to the limitation of the rights of our licensees and licensors under applicable agreements and arrangements."
Does this refresh your recollection, Mr. Johnson, as to who owns The Deep Rig?



A No, not at all.
Q Is this representation on The -- The Deep Rig website accurate?
A This is the first time I've seen it, so I don't know -- this is a legal document that was generated by a legal team that I have nothing to do with, so you might want to ask them to get specifics, especially with Deep Rig Movie, that part, and its affiliates, and then Deep Rig/America Project's content. I didn't write this. I'm not the source of the document. I'm not the author. I had nothing to do with the legal statements or any statement on the bottom of a website that had to deal with thedeeprig.io.movie or anything. I have no -- I have -- I haven't --
So if you really want to know the answers to that, really, you're searching for them, I -- I would find the person who generated this document, and I don't know who that is or -- or whoever put this together. But I'm not going to speak on behalf of anything. It could -- all of this looks great to me. I can't speak to it. I wasn't there when this was made.
Q I believe you stated previously that Ms. Newman was the president of TAP at this time in 2021/2022; is that correct?
A This is during which specific month and date?



Q The date of this -- you can see the date when this was pulled from The Deep Rig website - it's in the top left corner - is April 21 of 2022. So this would have been about six months into the time when the website was in operation.
A Yeah, so she was --
Q Okay.
A -- still president.
Q Is it possible that Ms. Newman was the individual who drafted these legal terms?
A I would never say something like that, either here or anywhere else. I don't know who drafted this and I'm not going to even guess about who was involved in drafting this. This is somebody from The Deep Rig, some legal team. You can ask her.
Q Okay. Did you review any of Ms. Newman's communications around this time to determine if it was her that had drafted these?
A Reviewed her communications during what time?
Q This -- the timeframe when these terms and conditions would have been written, and that could have been anytime from August of 2021 up until the -- the date of this capture on April of 2022.
A Where would I look for her communications on something like that? I don't even know that this was

Page 150

executed, let alone the hypothetical situation where she's involved in it. So how could I possibly in my mind say -- or go back in the past and wonder if she was involved? I --

Q I'm just wondering --

Because we've already established you didn't review Mr. Khan's communications about this either, correct?

A (Nonverbal response.)

Q So you don't have any knowledge whether they were both directly involved with getting this website set up --

A No.

Q -- and affiliating it with The America Project?

A No.

Q And if we look to the third page of this document, just to button this up, there's another section labeled "Copyright and Trademark."

A Tally. I see it.

Q Yeah. It says, (as read) "All contents of the sites and services are, unless otherwise stated, copyrighted under United States copyright laws and similar laws of other jurisdictions by The America Project Incorporated or our affiliates or partners."

Page 151

Have you reviewed any documents pertaining to the ownership of the trademark or the copyright for the film?

A No.

Q Do you know if The America Project has any documentation reflecting their ownership of these --

A No.

Sorry.

Q -- intellectual property?

A I didn't mean to --

No, I do not.

Q And Ms. Newman and Mr. Khan would have had email addresses for The America Project when they were there, right?

A Yes.

Q Okay. And does The America Project -- has it retained records of those communications?

A Yes.

Q Okay. Let's take a look at what we'll mark as Exhibit --

MR. KLOEWER: 40?

THE STENOGRAPHER: (Nonverbal response.)

MR. KLOEWER: Wow, look at me. I'm keeping track. This is the point where I usually get a little lost. All right.

Page 152

(Plaintiff's Exhibit No. 40 was marked for identification.)

BY MR. KLOEWER:

Q Okay, Mr. Johnson. I've just handed you a document that you --

Well, you tell me. Did you -- do -- have you -- do you recognize this document?

It was produced by The America Project in this litigation.

A These are emails for --

Q If you look at --

MR. TICKTIN: Did you say this is 40?

MR. KLOEWER: Yes, Exhibit 40.

BY MR. KLOEWER:

Q So on the bottom right-hand corner there, you see there it says "TAP00006"? Do you --

A Yes.

Q -- see that?

That indicates that your counsel produced it to us in this -- in this litigation, so --

Have you reviewed these documents?

A Yes. These are part of the items that I produced for you.

Q Now, as is often the case when you print an email thread like this, it's kind of in reverse order.

Page 153

So we need to start at the back to understand --

A Okay.

Q -- how we get to the front.

So the -- the second to last page is labeled Page 11 and it carries over to Page 12, and it is an email from FK. It's FK@americaproject.com, and it states, "Hi Keith. I trust you are well. I am writing to you about DeepRigMovie.online that PIN has been hosting for us. We really appreciate all the work that's been done for us. We have decided to bring it in-house, so I'm hoping we can transfer the website and the Cloudflare account and any other services for the website. I believe there may be some fees that are due," and then in parentheses he says, "$1,200 for December. We will obviously clear that one. Please let me know if there are any others. I look forward to hearing on how and when we can begin that transfer process."

This FK@americaproject, that's Faaiz Khan, right?

A Yes.

Q Do you know who Keith is, keith@pinbn?

A No.

Q Did you ever meet Keith Sawarynski --

A No.

Page 154

Q -- Mr. Oltmann's business partner?
No? Okay.
What fees is he referring to here when he says there are $1,200 fees due?
A I'm not sure. I don't know what the nature of the work is here.
Q You didn't review the agreement that The America Project had with PIN Business Network --
A No.
Q -- prior to your deposition?
A I did not.
Q Looking back at Page 11, Mr. Khan states -- this is about six days later on February 9th of 2022. "Hey guys. Just following up on the request below. Could you please let me know of next steps. Thank you." And here we have that directed to keith@pinbn and chris@pinbn.
Turn back one page to 10 or going forward in time a few weeks, and this is February 23rd.
We just had -- the air turned on, so I'll speak up a little bit so hopefully -- make sure we're making a clear record.
On the 23rd Mr. Khan states, "Joe, hope you are well and 2022 is a great year so far. We haven't spoken in a while. At this time I'm writing to cancel

Page 155

our arrangement for The Deep Rig movie. It would be great if we can take over the assets. Could you please let Chris know so we can get the handoff started. Thank you."
What arrangement is he referring to between The America Project and Joe Oltmann?
A I have no idea what arrangement he is referring to.
Q Okay. Turning back to Page 9, this is the first response from Mr. Oltmann, joe@pinbn.com, on Thursday, February 24th. He states, "We will turn it off. We will not transfer it. Our tech is behind it. Great talking to you. Let me know what you decide. Also need a release from Steve. Please get that done."
Do you know why Mr. Oltmann would be requesting a release from Steve or who Steve refers to?
A No.
Q All right. Now, looking up on this page, this is about three or four weeks later, we get a response from Mr. Khan on March 21st. It states, "Hi Joe. Thanks. I understand. Please turn off the services being provided. From PIN, we do require: The list of everyone that's signed up since that is TAP data; a copy of the movie file since TAP provided it. Thank you sir."

Page 156

What -- were you provided a list of everyone that signed up?
A No, I don't know what he's talking about.
Q You have no familiarity with this topic?
A No.
Q Are you --
A And there was almost a month between when Joe wrote him and then he answered.
Yeah, I have no idea about any of this. Zero.
THE STENOGRAPHER: I have no idea...?
THE WITNESS: About any of this. Zero.
BY MR. KLOEWER:
Q But you stated a moment ago you reviewed these documents prior to this deposition, right?
A Yes, but the contents of this, I -- I --
Q Okay.
A I don't know. You're asking me about the contents of an email. I reviewed these, but I still don't know the context of these conversations or emails.
Q All right. And you didn't make any effort to familiarize yourself with the contents?
A No.
Q Page 8, going back here, this is from Mr. Oltmann. He states, "We need a release from Steve Lucescu. If TAP provided the film, it should already

Page 157

have it. I need all bills paid including any disconnect or close-down costs before we do anything. You can find that provision in the cancellation provision of the contract. Thank you Faaiz."
Have you produced this contract in this litigation?
A I haven't seen any of these contracts, so no.
Q And -- and you haven't --
Well, you just answered my question. You've never --
A I don't have --
Q -- seen the contract --
A I haven't seen it.
Q -- so you didn't review. Okay.
MR. DEMPSEY: Counsel hasn't seen it either.
MR. KLOEWER: Okay.
BY MR. KLOEWER:
Q Looking up at the top of the page, March 23rd, from Mr. Khan, "Hi Joe. The contract does not speak of any close-down or disconnect costs. Your office CFO confirmed that all bills were paid to date. Is there anything outstanding?"
So you would agree with me that Mr. Faaiz appears to be familiar with the contract, right?
A Yes, Faaiz is, or was.

Page 158

MR. TICKTIN: Can I take a -- a biological break?
MR. KLOEWER: Sure. Can you give me one minute to finish this email? I'm just about done and we can take a break. I'll be quick here. I think we've already established most of what I need to know about this document.
BY MR. KLOEWER:
Q Let's just look at the first page of this document, the response from Mr. Oltmann on April 25th of 2022, and -- and he's responding to Mr. Khan's email on April 25th where he says, "When can we expect the email records collected to be sent to us?" Mr. Oltmann states, "Did you not collect it from the donations portal? That was not ours. That was yours. Our data intermingled with your data as we sent over 60,000 people to watch the movie. I will dedup those people and send you the pure info from organic traffic."
How much money was TAP collecting from the donations portal that was set up on this website?
A Can you tell me where you read that from first? Page 11?
Q The very first page.
A Okay.
Q The first page of that document. It's TAP06.

Page 159

A There it is. Got it.
Q Yeah. It's a response from Mr. Oltmann. It's the last message in this thread but the first message on the document. It says, "Did you not collect it from the donations portal?"
A Yeah, I don't know which donations portal they're talking about. I have no idea what that's referring to.
Q And you don't know how much money was raised for that portal?
A No.
MR. KLOEWER: Okay. Let's go off the record. We'll take a break.
THE VIDEOGRAPHER: Stand by. We're going off the video record at 1:48 p.m.
(Recess taken.)
THE VIDEOGRAPHER: We are back on the video record at 1:59 p.m.
BY MR. KLOEWER:
Q Okay, Mr. Johnson. Before we went off the record we were talking about this agreement with PIN Business Network.
THE STENOGRAPHER: Louder, please.
BY MR. KLOEWER:
Q Have you ever seen any analytics that were

Page 160

provided by PIN Business Network about the number of people who viewed the film?
A No, I never saw anything like that.
Q Did you ever see any analytics provided by any third party, maybe not PIN but anyone else, about how many people have viewed the movie?
A No, sir.
Q And you've never reviewed any financial documents reflecting payments made to TAP by virtue of film sales or rentals?
A No.
Q I want to fast-forward in time here a little bit to about just over a year after the lawsuit was filed in this case, and tell me, how did you become aware that Eric Coomer had sued The America Project?
A I don't remember. I'm sure we were maybe officially notified at the building. I don't know. But I just got the word through staff word of mouth there. I didn't --
THE STENOGRAPHER: Through staff...?
THE WITNESS: Staff word of mouth.
A I didn't -- yeah, I didn't see or -- or -- or hold or I didn't get like, what do you call it, hand-billed by somebody. I didn't personally see the original document at all. I just heard that we had been

Page 161

sued.
BY MR. KLOEWER:
Q Was your legal counsel at the time a firm called Abel Bean? Does that sound familiar?
A Abel Bean was a law firm that we retained, but it was a law firm we retained for nonprofit -- a lot of nonprofit compliance efforts we used Daniel Bean for. I remember my work with Bean was largely for solicitation compliance, annual compliance and keeping our 501(c)(4), the designation, legitimate.
Q The reason I ask is the Return of Service on the lawsuit was signed by Abel Bean, the law firm for TAP.
A Okay.
Q And that was on July 1st. I don't have a copy of that, but that's in the court file when the Return of Service was issued.
A Okay.
Q I'm wondering who at TAP read the Complaint at the time it was served. Did you, for example?
A I did not read the Complaint. Perhaps our chief legal officer at the time read the Complaint.
Q Anyone else?
A I don't recall.
MR. KLOEWER: We're going to mark this as 41.

Page 162

(Plaintiff's Exhibit No. 41 was marked for identification.)
BY MR. KLOEWER:
Q And what I've just handed you, Mr. Johnson, is a press release that we found online titled "Election Fraud Documentary 'The Deep Rig' to premiere in Naples, Florida on July 21, 2022." Do you see that?
A Yes.
Q And the date here is 7th of July 2022. That would have been six days after you were served with the lawsuit in this case.
Were you involved with compiling this press release? Because it says, "News provided by The America Project."
A No, I did not do this press release. I wasn't involved in releasing it.
Q Who did?
MR. TICKTIN: What number is this? This is forty --
MR. KLOEWER: Forty-one.
MR. TICKTIN: Forty-one.
Did you have a 39?
A I can't -- I don't recall who was doing press releases for us at the time or who had -- who had that task.

Page 163

BY MR. KLOEWER:
Q Do you know who would have directed --
MR. KLOEWER: 39 may be the --
BY MR. KLOEWER:
Q Sorry. Mr. Ticktin's asking me about Exhibit 39.
MR. KLOEWER: Was that the video exhibit?
MR. TICKTIN: Oh, is that what it was? That's why I don't have it.
THE STENOGRAPHER: No.
MR. TICKTIN: That's okay. I'll compare with the court reporter at the end.
BY MR. KLOEWER:
Q And -- and I'm sorry, Mr. Johnson. I got distracted. Do you know who would have directed the press release here, if not who drafted it?
A No.
Q Who did you talk to at The America Project about the lawsuit after it had been served?
A I don't recall having specific conversations with anybody. I don't have a recall of any sort of meeting. We didn't have any meeting where we said hey, we're getting sued. I don't remember anything like that. All I heard was we're a party to a lawsuit and it's regarding election integrity and possibly like

Page 164

Deep -- Deep Rig Movie.
At that time there were so many lawsuits coming out on everybody and lawfare was abundant. Lawyers were getting rich like that. And so we were a party to -- either on the offensive end or the defensive end of a lot of stuff. So when I -- when there's things that we got a lawsuit, at that time we could wallpaper our bathroom with -- that was our attitude, like big deal. We -- this is part of the risk of doing this job. We didn't -- we didn't say oh, no, we're getting -- we're getting the crap sued out of us; let's sit down and figure out ways to mitigate it. That's not how we were. It never happened like that.
Q Was The America Project facing other lawsuits at the time?
A No. We were facing a lot of -- just as effective as lawsuits is attacks from the media. We were on MSNBC, CNN, CNBC, all of the what we call state-controlled media at the time, which was a deliberate effort to suppress -- a calculated effort to come in and suppress organizations like ours by doing hit pieces. So Rachel Maddow, Chris Cuomo. I can show you the list and videos of -- of people speaking directly to this organization and what it did.
For us as employees, that was part of the risk

Page 165

for us doing what we did, so we were used to it. So seeing a lawsuit come across, we were already getting hit in every way you can get hit, so it just wasn't a blip on our radar. We really -- we just kept executing, so -- sorry, we didn't have to come-to-Jesus moment and say we're getting sued. That didn't happen.
Q Did you recognize the name Eric Coomer?
A No.
Q Did you make any effort to determine who he was?
A No. I don't have -- I found out who he was through reading open source like everybody else does.
Q But not -- not from reading the Complaint?
A Not from reading the Complaint.
Q Have you read the Complaint now?
A No.
Q You've never read the --
A Not the full Complaint, no.
Q Are you aware Dr. Coomer described in that Complaint death threats that had been directed him -- at him as a result of the claims made in the film?
A No, I'm unaware. Our organization has had death threats on us for the last four years. We had them regularly, so -- I'm sorry that he had to go through that.

Page 166

Q Looking back at this press release, if we turn to the third page of this document here, the second paragraph, this is a quote from Mr. Byrne, "When I first released The Deep Rig, many in the media and political establishment castigated the findings as dangerous, untrue and completely fabricated. We knew then, as we do now, that the evidence clearly pointed to widespread voter fraud across America during the 2020 elections."
Those clips we saw on Mr. Oltmann before, is that the evidence that Mr. Byrne is referring to here in this TAP press release?
A I can't speak for what he's talking about in that press release.
Q Is it TAP's position that -- that Mr. Oltmann's claims in the film are evidence that clearly points to widespread voter fraud across America?
A Say that question one more time.
Q Is it TAP's position that Mr. Oltmann's claims in the film are evidence that clearly points to widespread voter fraud across America?
A TAP's -- America Project's position is that the film -- the results of the film, just like the results of other issues that we were discovering with the election process, did -- helped us -- it really helped because having that type of --

Page 167

When they talk about here Dinesh D'Souza, for example, and -- and -- and when -- when Patrick Byrne is saying that, the position of The America Project is Dinesh D'Souza's investigation uncovered election fraud. It wasn't in the election management systems, but it uncovered evidence of fraud.
So when I talk to you like I did before about the wholesale election process, and this is what Patrick's referring to here, that's exactly what it is. The election management system is just one part of the election process.
Q Did anyone at TAP object to re-releasing this film six days after being sued for it?
A I don't recall anybody objecting to the re-release of the film.
Q In fact, you re-released it because you'd been sued over it, right?
A TAP didn't re-release --
MR. DEMPSEY: Object to the form.
A -- anything. We have nothing to do with the film. We didn't release the film.
BY MR. KLOEWER:
Q Well, this is a press release from The America Project.
A I don't -- I'm not speaking to the release of

Page 168

the film, if that's what you're asking.
Q Well, The America Project is sending out a press release saying, "Election Fraud Documentary 'The Deep Rig" to premiere in Naples, Florida on July 21, 2022." You'd agree that The America Project is promoting this event to show the film, right?
A Yes.
Q Okay. And just about everybody that was working for The America Project at the time was invited to that event, right?
A I believe so --
Q Did you --
A -- yes.
Q -- attend that event yourself?
A Yes.
Q Was the lawsuit over this film discussed at that event, that premiere, by anyone?
A No.
Q I'll hand you what we'll mark as Exhibit 42.
(Plaintiff's Exhibit No. 42 was marked for identification.)
THE WITNESS: Thank you.
BY MR. KLOEWER:
Q And this document also has the TAP000061 stamp at the bottom indicating it was produced to us by your

Page 169

counsel in this case.
Is this mailing list -- and I realize it was a couple of years ago. Is it safe to assume that that large block of names at the top, is that everyone who was working for The America Project at the time?
A I believe so.
Q And do you recall -- do you remember attending this event?
A I do. I remember that night.
Q Was it well-attended?
A It was.
Q And the press release indicates that Mr. Byrne, General Flynn will be speaking. Were there any other speakers at that event?
A I don't remember if there were any other besides those two, and I don't even remember listening to them speak. I was outside doing something else.
Q Do you have an estimate about the crowd size, how many folks were there?
A Maybe a hundred, 120.
Q I haven't been to this theater. Was that a sellout crowd?
A I don't remember, and I don't even remember if it was a public theater, I'm sorry. I didn't -- I didn't put the event together.

Page 170

Q It does indicate at the bottom, "So far we are at 118 confirmed guests, so we have a little room to spare." So that -- I guess that would comport with about a hundred people.
All right. At -- at any point has anyone from The America Project ever attempted to contact Eric Coomer or Dominion Voting Systems to confirm if Joe Oltmann's claims about him are true?
A No, not that I know of.
Q Is The America Project in possession of any evidence to suggest that Eric Coomer rigged the 2020 presidential election?
A Any evidence, no.
Q Is there any evidence that -- well, strike that.
I realize this is a little bit of a difficult question to ask you. Does The America Project believe that Eric Coomer rigged the 2020 presidential election?
MR. DEMPSEY: Objection to the form.
A I'm not going to answer that.
BY MR. KLOEWER:
Q Well, I'm going to ask it again. Does The America Project believe that Eric Coomer rigged the 2020 presidential election?
A I'm not going to answer that. Sorry.

Page 171

MR. KLOEWER: Mr. Dempsey, are you instructing your client not to answer that question?
MR. DEMPSEY: No, I'm not.
BY MR. KLOEWER:
Q Okay. Please answer the question, Mr. Johnson.
A Because the -- the investigation still continues, so I'm not going to give you a conclusionary statement to that because back at the time is different than now. There's been a lot more evidence and a lot more things going on. So I'm not going to answer that right now. It still remains to be seen.
Q But as you sit here today there's no evidence that The America Project possesses that makes it confident that Eric Coomer rigged the election, is there?
A No.
Q Circling back to what we sort of addressed a bit before, I want to talk about where the entity stands today.
You said you're the sort of last member of TAP. You've got one other board member; is that correct?
A Yes.
Q And no other employees?

Page 172

A No other employees.
Q Is -- is TAP still fundraising at all?
A We're not fund -- actively fundraising anymore, no.
Q All right. Are donations still coming in?
A There's a small amount of donations that are coming into TAP that total about 1- to $2,000 a month.
Q And are you still on the payroll for TAP?
A No, I'm not on the payroll anymore.
Q Is anyone?
A Nobody's on the payroll of TAP.
Q And when would you estimate TAP sort of wrapped up its operations? How long has it been --
A Our -- our -- my intent is to finish the dissolution of TAP probably within the month. It will be out of Florida Department of Agriculture, so it will be sunsetted as a nonprofit entity within a month.
Q Within a month of today?
A Yes.
Q Okay. And with respect to your preparation for this deposition, the documents we've looked at, were you involved in production of documents that we requested in this case?
A I didn't -- no, I wasn't going getting documents for anything in this, no. I was just

Page 173

answering the -- the -- what he was telling me we had to produce, you know, so that I didn't --
Q All right. And I don't want to know about your communications with Mr. Dempsey, but who at TAP was involved with that document production?
A Involved with the document production?
Q Yeah.
A At the time, probably our CLO. Other than that, I don't know. I -- the timeframe of when all of this discovery happened, I don't -- I'm not sure when people were supposed to give stuff up, so I don't know.
Q And you previously indicated that you had reviewed the documents that have been produced in this litigation. Just to be clear, was that you just reviewed the documents that TAP had produced?
A I -- I don't understand the question, sorry.
Q Am I correct in understanding that, to prepare for this deposition, you only reviewed the documents that TAP had produced?
A Only the stuff pertaining to TAP, yes.
Q Okay. So roughly 70 pages of documents?
A That's about it, yeah.
Q You didn't review anything that Mr. Lucescu had produced, for example?
A No. I don't know anything --

Page 174

Q And you didn't review anything that Mr. Byrne produced?
A No.
Q Okay. And how much time did you spend reviewing documents prior to this deposition?
A Which documents?
Q Anything you reviewed in order to prepare.
A Including what, the documents that --
Q Yeah.
A -- counsel gave me or --
Q Yes.
A -- more?
Q Everything.
A How much time did I take preparing?
Q Yeah.
A Like in lawyer hours?
Q Yeah.
A Lawyer hours, I would -- yeah, that's different. I'd probably say --
MR. TICKTIN: Well --
A -- four hours.
MR. TICKTIN: -- lawyer hours takes what, five minutes?
THE WITNESS: Yeah.
A So four hours.

Page 175

BY MR. KLOEWER:
Q Four hours, okay. And how much is --
A Wrap your mind around that one.
Q Does that include time spent meeting with your counsel?
A No.
Oh, time meeting with my -- with my -- with TAP's counsel? Yes.
Q That's included in the four-hour --
A I'm just putting it --
Q -- umbrella?
A Yeah.
Q Does that include time spent meeting with Mr. Byrne's counsel?
A I haven't met with Mr. Byrne's counsel.
Q You didn't meet with them at all --
A Until --
Q -- before your deposition?
A No. This is the first time I've seen him here.
Q Had you met with him over the phone or -- or discussed your --
A It's been Chris Dempsey.
Q And just so I'm -- I'm completely clear, and I'll wrap this topic up, outside of the -- the documents

Page 176

that were produced in this litigation, did you review any other documents to prepare for today?
A No.
Q Okay. And we've already established you didn't go back and look back through employee emails around this time?
A (Nonverbal response.)
THE STENOGRAPHER: Is that a no?
THE WITNESS: No. Sorry.
BY MR. KLOEWER:
Q I think I'm just about done, Mr. Johnson, but I would --
A Okay.
Q -- appreciate if we could take three minutes off the record real quick to ensure if I've got anything left for you, and we'll circle back in a moment.
MR. DEMPSEY: Sure.
THE VIDEOGRAPHER: Stand by.
We're going off the video record at 2:18 p.m.
(Recess taken.)
THE VIDEOGRAPHER: We are back on the video record at 2:21 p.m.
BY MR. KLOEWER:
Q Okay, Mr. Johnson. Just to button up that topic, and I asked before if TAP has retained all the

Page 177

emails from all its employees, you still have access to those if -- if you wanted to access those communications, correct?
A Possibly. All of our stuff's -- pertaining to that's probably stored, but I --
Did we already go through discovery? So you're saying if you want to...
Q But you didn't make any effort to see if you could go back and review, for example, Mr. Khan's emails?
A No.
Q Okay.
A No.
Q But if you did want to undertake that review, could you?
A I don't know. It would be -- it would be a task.
Q Okay. And you still have access to all of TAP's financial records if you wanted those, right?
A Yes.
Q Is there any records that TAP would have kept that you would not have access to?
A I don't know. I'd have to see if -- what the record is. It depends on how archaic it is. I have access to what we kept on our server, if that's what

Page 178

you're talking about. We kept records, but I -- I don't know. We'll have to see.
Q And do these records include contact information for former employees?
A They could. Our HR component, too, would have that. We used Insperity.
Q And --
THE STENOGRAPHER: I'm sorry, we used?
THE WITNESS: Insperity --
THE STENOGRAPHER: Thank you.
THE WITNESS: -- for our HR component.
BY MR. KLOEWER:
Q Okay, Mr. Johnson. I don't believe I have anything further for you. Have I been professional and courteous to you here today?
A Yes, you have.
MR. KLOEWER: No further questions. Pass the witness.
MR. TICKTIN: Yeah, I'll say that counsel has been very professional.
THE STENOGRAPHER: Okay. Any questions?
THE VIDEOGRAPHER: All right. Are we set to close the record?
MR. KLOEWER: No questions. He'll read.
THE STENOGRAPHER: Okay. And then just --

Page 179

Hold on one second, Derek.
Mr. Kloewer is an automatic order. Mr. Dempsey, would you like to order a copy?
MR. DEMPSEY: I think so.
THE STENOGRAPHER: Okay. And, Mr. Ticktin, copy?
MR. TICKTIN: No, no, no.
THE STENOGRAPHER: Okay.
All right. We're ready to go off the record, Derek.
THE VIDEOGRAPHER: Okay. This concludes today's videotaped deposition. We're off the record at 2:23 p.m.
(Off the video record only.)
THE STENOGRAPHER: Do you need me to follow it up with an email?
MR. DEMPSEY: We just want a -- the transcript copy, not -- I don't care about the video, if that makes a difference.
THE STENOGRAPHER: Yeah, no, that's fine.
MR. DEMPSEY: Okay.
(Deposition concluded at 2:23 p.m.)

Page 180

ERRATA-SIGNATURE PAGE
COOMER VS. BYRNE, ET AL.
CIVIL ACTION NO. 8:24-cv-00008-TPB-SPF
DEPOSITION TAKEN 11/20/2025

Page _____ Line _____:
Now Reads: ________________________________________
Should Read: ________________________________________
Reason for Change: ________________________________

Page _____ Line _____:
Now Reads: ________________________________________
Should Read: ________________________________________
Reason for Change: ________________________________

Page _____ Line _____:
Now Reads: ________________________________________
Should Read: ________________________________________
Reason for Change: ________________________________

Page _____ Line _____:
Now Reads: ________________________________________
Should Read: ________________________________________
Reason for Change: ________________________________

Page _____ Line _____:
Now Reads: ________________________________________
Should Read: ________________________________________
Reason for Change: ________________________________

Page _____ Line _____:
Now Reads: ________________________________________
Should Read: ________________________________________
Reason for Change: ________________________________

Page _____ Line _____:
Now Reads: ________________________________________
Should Read: ________________________________________
Reason for Change: ________________________________

Under penalties of perjury, I declare that I have read the foregoing transcript and that the facts stated in it are true.

________________ ________________________
Date CARLITO JOHNSON

Page 181

CERTIFICATE OF OATH

STATE OF FLORIDA )
)
COUNTY OF HILLSBOROUGH )

I, Lisa Gropper, Registered Professional Reporter, Certified Florida Professional Reporter, Notary Public, State of Florida, certify that CARLITO JOHNSON appeared before me on the 20th day of November, 2025, produced a Florida Driver's License as photo identification, and was duly sworn.

WITNESS MY HAND AND OFFICIAL SEAL this 2nd day of December, 2025.

________________________
LISA GROPPER, RPR, FPR-C
Notary Public, State of Florida
My Commission No.: HH 431780
My Commission Expires: 11/18/2027

Page 182

CERTIFICATE OF REPORTER

STATE OF FLORIDA )
)
COUNTY OF HILLSBOROUGH )

I, LISA GROPPER, Registered Professional Reporter, Certified Florida Professional Reporter, do hereby certify that I was authorized to and did stenographically report the deposition of CARLITO JOHNSON; that a review of the transcript was requested; and that the foregoing transcript is a true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

Dated this 2nd day of December, 2025.

______________________________
Lisa Gropper, RPR, FPR-C

Page 183

Fortz National Services, LLC
25 Division Ave S., Suite 325
Grand Rapids, MI 49503
(844)730-4066

December 2, 2025

Christopher W. Dempsey, Esq.
Dempsey Law, PLLC
50 N. Laura Street
Suite 2500
Jacksonville, FL 32202-3646
chris@cdempseylaw.com

RE: COOMER VS. BYRNE, ET AL.

Dear Mr. Dempsey,

Enclosed please find the deposition transcript of CARLITO JOHNSON in the above-captioned case taken on November 20, 2025.

Please have Mr. Johnson read your transcript copy and sign the attached errata sheet. Make a copy of the errata sheet to attach to your copy of the transcript, and then please forward the original errata sheet back to our office.

Please make arrangements to have this accomplished as soon as possible. The failure to read and sign the deposition could be constituted as a waiver if not accomplished within a reasonable period of time.

Your attention to this matter is appreciated.

Sincerely,
Lisa Gropper, RPR, FPR-C
Certified Stenographer

cc: (via transcript) Bradley A. Kloewer, Esq.