**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

ERIC COOMER, Ph.D.,
Plaintiff

v. Civil Action No. 8:24-cv-00008-TPB-SPF

PATRICK BYRNE, et al.,
Defendants

---

**EXHIBIT 3**

---

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Civil Action No. 8:24-cv-00008-TPB-SPF

---

ERIC COOMER, Ph.D.,

Plaintiff,

v.

PATRICK BYRNE, STEVEN LUCESCU, and
THE AMERICA PROJECT, INC., a Florida
non-profit corporation,

Defendants.

---

VIDEOTAPE VIDEOCONFERENCE DEPOSITION OF JOSEPH OLTMANN

June 9, 2026

---

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Civil Action No. 8:24-cv-00008-TPB-SPF

---

ERIC COOMER, Ph.D.,

Plaintiff,

v.

PATRICK BYRNE, STEVEN LUCESCU, and THE AMERICA PROJECT, INC., a Florida non-profit corporation,

Defendants.

---

VIDEOTAPE VIDEOCONFERENCE DEPOSITION OF JOSEPH OLTMANN

June 9, 2026

---

VIDEOCONFERENCE APPEARANCES:
ON BEHALF OF THE PLAINTIFF:
BRADLEY A. KLOEWER, ESQ.
Cain & Skarnulis, PLLC
P.O. Box 1064
Salida, Colorado 81201
Phone: 719-530-3011
Email: bkloewer@cstrial.com
ON BEHALF OF THE DEFENDANTS PATRICK BYRNE and THE AMERICA PROJECT:
PETER TICKTIN, ESQ.
DAVID PERRY, II, ESQ.
The Ticktin Law Group
270 SW Natura Avenue
Deerfield Beach, Florida 33441
Phone: 954-570-6757
Email: pt@legalbrains.com
ALSO PRESENT:
Jesse Ellis, Videographer
David Beller
Eric Coomer
Stefanie Lambert



PURSUANT TO WRITTEN NOTICE and the appropriate rules of civil procedure, the videoconferenced deposition of JOSEPH OLTMANN, called for examination by the Plaintiff, was taken with all parties present remotely, commencing at 9:13 a.m., on June 9, 2026, before Lisa B. Kelly, Registered Professional Reporter, Certified Realtime Reporter, and Notary Public in and for the State of Colorado.

I N D E X


| EXAMINATION: | PAGE |
|---|---|
| By Mr. Kloewer | 7, 237 |
| By Mr. Ticktin | 202 |

| EXHIBITS: | | PAGE |
|---|---|---|
| Exhibit 56 | Plaintiff's Notice of Service of Subpoena to Testify at a Deposition in a Civil Action | 11 |
| Exhibit 57 | Nine Video Clips | 61 |
| Exhibit 58 | Order Regarding Plaintiff's Motion for Sanctions Pursuant to CRCP 37 and CRCP 107 and Request for Order to Show Cause | 131 |
| Exhibit 59 | Excerpt from transcript of deposition of Joseph Oltmann taken on 12/16/22 | 141 |
| Exhibit 60 | Handwritten notes, one page | 166 |
| Exhibit 61 | Document entitled "The Deep Rig, signups, encourage donations, and show video" | 167 |





| | | |
|---|---|---|
| Exhibit 62 | Document entitled "Analytics, Deep Rig Movie, Deep Rig Website," Events, Events Name | 172 |
| Exhibit 63 | Document entitled "Analytics, Deep Rig Movie, Deep Rig Website" | 176 |
| Exhibit 64 | Card Charges Exported PII Spreadsheet | 185 |
| Exhibit 65 | Card Charges Provided Spreadsheet | 191 |
| Exhibit 66 | Recurring Charges Spreadsheet | 194 |
| Exhibit 67 | Signups Exported PII spreadsheet | 196 |
| Exhibit 68 | Signups Provided spreadsheet | 198 |




P R O C E E D I N G S

* * * * *

WHEREUPON, the following proceedings were taken pursuant to the Federal Rules of Civil Procedure.

* * * * *

THE VIDEOGRAPHER: We are now on the record. The time is now 9:13 a.m., Mountain.

Today's date is June 9th, 2026. This begins the video-recorded deposition of Joseph Oltmann, being held remotely via web conferencing, taken in the matter of Eric Coomer, Ph.D., versus Patrick Bynre, et al.

The videographer is Jesse Ellis and the court reporter is Lisa Kelly, both representing Fortz Legal.

Counsel, will you please announce yourselves and whom you represent, after which the court reporter will swear in the witness.

MR. KLOEWER: Good morning. My name is Brad Kloewer. I represent the plaintiff, Dr. Eric Coomer. I'm joined on the chat by my co-counsel, David Beller.

MR. TICKTIN: Good morning. This is Peter Ticktin, and I represent -- let's see. I

Page 6

represent Patrick Byrne and --
Stefanie, what charity is it that I represent, that we're going to get on the record for?
THE DEPONENT: The America Project.
MR. TICKTIN: The America Project. Thank you. Thank you.
THE DEPONENT: Sorry. That wasn't Stefanie that answered. That was Joe.
THE REPORTER: Yeah. That's no problem. Mr. Perry, did you want to make an appearance or are you In with --
MR. TICKTIN: Oh, I'm sorry. I should have introduced David Perry as joining me as counsel as well.
THE REPORTER: Thank you very much. All counsel participating in this deposition acknowledge that I am not physically present in a deposition room with the deponent and that I will be reporting this deposition and providing an oath remotely.
You further agree that, in lieu of an oath administered in person, the witness declares his testimony in this matter is given under penalty of perjury.
All parties and counsel consent to this

Page 7

arrangement and waive any objections to this manner of reporting and manner of providing the oath.
Counsel, please indicate your agreement by stating your name and your agreement on the record, and then I will swear in the witness.
MR. KLOEWER: This is Brad Kloewer for the plaintiff. We agree.
THE REPORTER: Mr. Ticktin, do the defendants agree?
MR. TICKTIN: Sure.
THE REPORTER: Thank you.
JOSEPH OLTMANN,
having verbally declared under penalty of perjury that his testimony in this case will be the truth, the whole truth, and nothing but the truth, testified as follows:
(Deponent's reply to oath: So help me God.)
THE REPORTER: Thank you.
Mr. Kloewer.
EXAMINATION
BY MR. KLOEWER:
Q. Okay. Good morning, Mr. Oltmann. My name is Brad Kloewer. We've met before. I represent the plaintiff in this case, Dr. Eric Coomer.

Page 8

I know you've had your deposition taken several times before, but I just want to go through some brief ground rules to be sure we're all on the same page here.
I believe this is the first time we have done this remotely, so it may be a little different here.
The most important thing is that the court reporter, Lisa, is taking down every word we say, and it's very important that we not speak over each other.
This will be a trial deposition -- or a trial video, so it's very important that we create a clear record. And I'm going to do my best to not speak over you. I trust that counsel for defendants will do the same so that we get a clean record today.
But there may be times when you do anticipate my question or something like that. I just ask you to be sure to let me get my question out before you respond. Is that fair?
A. Yes.
Q. Okay. And we have a lot to get through, but it's not a marathon. If you need a break at any point, you can let me know and we will go off the record for a bit.

Page 9

The one thing I ask is that we not take a break when a question is pending on the table. Is that fair?
A. Yes.
Q. Okay. Mr. Oltmann, when we were off the record before, I believe you indicated that your counsel, David Willson, is not with you today; is that correct?
A. You guys wouldn't reschedule and he had a -- he had a flight. So yeah. He's not here.
Q. Okay.
MR. TICKTIN: In this regard, I know that there's an objection to the taking of this deposition without counsel, and we also object and join that objection, so the taking of this deposition overall, without counsel for Mr. Oltmann.
MR. KLOEWER: Well, this is all news to me. We haven't been informed that Mr. Willson wouldn't be here or that he had a conflict.
THE DEPONENT: That email was sent on June 1st, actually, it was a Monday, and you were informed. And nobody on your side responded.
So I think -- I think, Peter, you were on that and David was that on that as well.
MR. TICKTIN: Yeah. I know. I know.

Page 10

Don't worry. We don't need to respond to Mr. Kloewer.
MR. KLOEWER: Okay.
MR. TICKTIN: He can be under whatever delusions he wishes.
Q. (BY MR. KLOEWER) The -- well, let's start with this. I'll just mark this as an exhibit here to get us kicked off.
Let me get this full screen. I'm going to share my screen. You let me know if you can see this document.
Can you see that, Mr. Oltmann?
A. Yes.
Q. Okay. Do you recognize this document?
A. Yes.
Q. And this is the subpoena that was issued to you to testify in a deposition in this case; correct?
A. Yes.
Q. All right. And you were served with this personally a few weeks ago in Denver; correct?
A. Yes.
Q. All right. And this subpoena indicates a deposition date of June 1st; correct?
A. Correct.
Q. Okay. And you had indicated that you

Page 11

wouldn't be available for that June 1st deposition because you were going to be in Washington, D.C.; is that right?
A. I don't remember the amount of detail that I gave you.
Q. Okay. And were you in Washington, D.C. last Monday, June 1st?
A. I canceled my flight.
Q. Okay. And -- all right.
MR. KLOEWER: So we'll mark that as Exhibit 57, if we could. Let me get this --
THE REPORTER: Is that Exhibit 56, Brad?
MR. KLOEWER: Oh, sorry. 56, I believe, is where we're starting. That's right. Thank you. So 56. And I'll drop this in the chat.
THE DEPONENT: Yeah. I believe you guys talked to -- that Lynn got a date that was good for me, but that ended up not working for David Willson.
MR. KLOEWER: All right.
MR. TICKTIN: Excuse me. I'm going to direct the witness to answer the question.
THE DEPONENT: Okay.
THE REPORTER: Joe, can you bring your speaker a little closer to you? It's feeling a little -- the audio is feeling a little far away.

Page 12

THE DEPONENT: Unfortunately, it's in the ceiling, so I can try to talk to the ceiling, but --
THE REPORTER: I'm so sorry. That would help me though. That sounds better though. Thanks.
Q. (BY MR. KLOEWER) Okay. So let's get started here, Mr. Oltmann. I would kind of like to just jump right into the facts of this case and we can rewind a little bit if we need to.
But you're aware that this case --
MR. TICKTIN: Objection to the remarks of counsel. Just ask questions, please.
MR. KLOEWER: Well, I'm just trying to sign post to make it a little easier for everybody here.
Q. (BY MR. KLOEWER) So you're aware that this case turns on the publication of the film The Deep Rig; correct?
A. No. No. I have not read the complaint.
Q. Okay. You're familiar with the film The Deep Rig, though; right?
A. I am.
Q. And you were one of various individuals who, I guess you could say, starred in that film; is that fair?
A. I don't think it's anything about

Page 13

starring in it. I don't believe that -- I don't believe that if -- I would not add this to any part of my resume.
Q. Okay. But tell me, when did you first hear about this film?
A. I don't recall.
Q. Do you recall what the context was when you first became aware that this film would be made?
A. No. Not really.
Q. Do you recall who contacted you about the film?
A. No. It wasn't Patrick Byrne.
Q. Okay. Patrick Byrne, you believe he reached out to you for this?
A. No. I said it was not Patrick Byrne.
Q. Sorry. Thank you.
Was it Mr. Lucescu, Steve Lucescu?
A. I don't recall.
Q. Okay. How did you first meet Mr. Lucescu?
A. I believe it was at -- on set with -- I believe it was on set for The Deep Rig --
Q. All right.
A. -- physically.
Excuse me. I'm sorry. What was that?

Page 14

Q. Had you spoken with him on the phone previously?
A. I'm sure I did. Yes.
Q. Did you exchange emails with Mr. Lucescu prior to your interview for the film?
A. I believe -- I believe so, but I think most of our communication happened through Signal.
Q. Were you familiar with The Deep Rig, the book, written by Mr. Byrne?
A. Yes.
Q. Have you read that book?
A. I have not.
Q. So you had not read it, obviously, then, prior to being contacted about the film of the same name either; correct?
A. If I'm being honest, I actually still -- I was this number of days old or years old when I found out he wrote a book called The Deep Rig.
Q. Okay. All right. Did you know who else was going to be working on the film when Mr. Lucescu reached out to you?
A. I did not.
Q. Okay. Since that time, obviously, you've become aware of the other folks who featured in the film; right?

Page 15

A. Yes. You have would have to refresh my memory, but yes.
Q. Okay. Yeah. We'll go through those.
Tell me about Roger Richards. When did you first speak with Roger Richards?
A. Can you tell me who he is?
Q. Mr. Richards was the director of the film.
A. I don't -- I don't actually think that -- I might have met him that day, but I have not had any conversations with him of any consequence that I can remember.
Q. When you say "that day," are you referring to the day that you appeared for your -- the interview that was later featured in the film?
THE REPORTER: I'm sorry. I missed that word, Brad. "To the day that you appeared for your" --
Q. (BY MR. KLOEWER) I believe it was "interview" for that footage that was later included in the film.
A. I think that's the -- I'm fairly sure that's the only time that I've spoken to him or -- but, I mean, I could be wrong, but I don't remember having a conversation with him before or after that.

Page 16

Q. Even following the publication of the film, you never spoke with Mr. Richards?
A. I don't remember. I don't recall having any conversations with him. But there was a conference call sometime after the shooting and -- no, that's not true.
I actually did talk to him in Arizona when they had the premier. So I think -- and I believe that he was on a call, but I don't believe he said anything on the call.
Q. All right. Since that time, you haven't spoken to him since that premier in June of 2021?
A. Correct.
Q. Do you know where Mr. Richards is today?
A. I do not.
Q. What about Joe Flynn? When did you first meet Joe Flynn?
A. I -- I think I met him in -- man. I want to say I met him in Washington, D.C., on June -- or Jan. 4, 2021, but I could be conflating things, just because it's been -- it's been six years.
So I know that I've met him several times at Clay Clark events, and I know that I met him in a room sometime between Jan. 4 and Jan. 7 of 2021.
Q. What was the context of that meeting in

Page 17

the room?
A. He was talking about the stolen election in Georgia and the prediction of how that election was going to go on Jan. 5 of 2021, in which I was absolutely correct.
Q. Who introduced you to Joe Flynn?
A. I don't recall.
Q. And he's been a guest on your podcast a number of times since then; correct?
A. I think so.
Q. When is the last time you spoke with Joe Flynn?
A. I wished him a happy birthday, I want to say it was September -- or it was a happy anniversary, I don't remember -- I believe it was September of 2025.
Q. And you haven't spoken to him since that time?
A. No.
Q. What is your understanding of Joe Flynn's involvement with The Deep Rig?
A. I have -- I don't know. I think -- I believe he was interviewed, but other than that, I don't know.
Q. Do you know what his role was with The

Page 18

America Project?
A. I know he worked for The America Project and worked with it. I still don't understand the structure of The America Project. I pretty much stayed out of the fray of these different organizations.
Q. What about Jovan Pulitzer? He is another one of the featured individuals in the film. You're familiar with Mr. Pulitzer; correct?
A. Oh, Mr. Paper Tiger. Very much, yes.
Q. And you're not a fan of his, I take it?
A. Not even at the -- not even a little bit. He reminds me of Eric Coomer in a lot of respects.
Q. You don't believe Mr. Pulitzer is credible, do you?
A. Not even -- not even remotely.
Q. Were you -- at the time, however, when the film was made, did you have that opinion?
A. Actually, I believe it was around the first time or second time or third time I met him. So I don't -- I think my biggest issues with him is that he creates chaos and that chaos leads to people talking about things that are absolutely ridiculous, and that gives other people fodder to dismiss the actual proof and substance to the stolen elections

Page 19

that happened long before 2020, but 2020, 2022, 2024, and now 2026.
Q. So you don't believe Mr. Pulitzer's theories with respect to election rigging are credible; correct?
A. Which theories are we talking about? Some he adopted from other people as his own work, and others that he just made up were patently false.
No. I don't believe it, most of it.
Q. Okay. So, for example, his work, I believe he describes them as kinematic artifacts, do you believe this is a credible science?
A. No.
Q. Is it a credible theory that could identify evidence of election rigging?
A. So Erich Speckin is an expert. And a lot of the information that Pulitzer misrepresented was information he got from Erich Speckin, who is an actual forensic analyzer. I mean, he's a -- his formality is in forensics related to paper and signatures.
But the kinematic detection is wholly, in my opinion -- it could be a theory. You can look at paper, but you don't have to call it anything.
The theory of looking at paper has been

Page 20

around for 100 years, before we even had machines.
Q. And I believe Mr. Pulitzer is also behind the theory that certain ballots from the 2020 election may have featured bamboo fibers; is that correct?
A. I'm not familiar with that.
Q. Okay. Do you believe that's a credible theory?
A. I'm not familiar with it, so I can't -- I can't -- I couldn't give you an answer, unless you wanted to share something with me that I could read quickly, and then I can tell you whether or not I thought it was or was not viable.
Q. That's okay. We can -- we can move on here.
Are you still in contact with Mr. Pulitzer?
A. No.
Q. When was the last time you spoke with him?
A. Kindly or just spoken?
Q. Just spoken with him.
A. I haven't talked to him in three, four years.
Q. All right. And the last time you spoke with him kindly was presumably sometime before that;

Page 21

correct?
A. Yeah.
Q. All right. What about Matt DePerno?
A. He's a good man.
Q. When did you first meet Mr. DePerno?
A. Jan. -- Jan. 6, 2020- -- no. Jan. 5, 2021.
Q. You met him in Washington, D.C.; correct?
A. I did.
Q. And you subsequently went to visit some folks at the State Department with Mr. DePerno; is that right?
A. I did.
Q. And that was on January 6th?
A. Yes, sir.
Q. You were meeting with counsel for former Secretary of State Mike Pompeo at the time; right?
A. I was.
Q. What was the purpose of that meeting?
A. To review the information related to the rigging of the Georgia runoff election between Democrat and Republican Senators in Georgia.
Q. Mr. Pompeo was not present, was he?
A. He snuck out the back door.
Q. Was he present when you arrived?

Page 22

A. We were told he was, yes.
Q. Did you subsequently speak with Mr. Pompeo about this information?
A. I did not.
Q. After that time -- well, you know that Mr. DePerno also went on to feature in The Deep Rig; correct?
A. I think so. I haven't looked at that in five years.
Q. Okay. Do you consider Mr. DePerno to be credible?
A. 100,000 percent, yes.
Q. Are you still in touch with Mr. DePerno?
A. I am.
Q. When was the last time you spoke with him?
A. About --
MR. TICKTIN: Wait. Wait. Hold on a second here.
When you were speaking with Mr. DePerno, was that -- was he -- is he an attorney?
MR. KLOEWER: Peter, you'll have an opportunity to ask questions when I'm done.
MR. TICKTIN: Okay.
MR. KLOEWER: And --

Page 23

MR. TICKTIN: You're taking an unfair advantage of this person who's not represented by counsel.
MR. KLOEWER: I'm objecting to the speaking objections.
MR. TICKTIN: You can object all you want, but what you're doing is unconscionable. If he spoke to an attorney, there's an attorney-client privilege there, and he should be aware of that.
MR. KLOEWER: Peter -- Peter, you're leading the witness and the speaking objections are improper. And it's not attorney-client if --
Q. (BY MR. KLOEWER) When was the last time you spoke to Mr. DePerno?
A. I believe it was a couple weeks ago. Maybe -- maybe sooner, actually. It might have been either last week or the week before.
Q. Does Mr. DePerno represent you in any capacity?
A. He might, actually.
Q. What do you mean by he might?
A. We are discussing it currently.
Q. Okay. Do you have a retainer agreement with Mr. DePerno?
A. Technically, he has offered to represent

Page 24

me.
Q. Has he ever represented you in any other matter?
A. Not directly.
Q. And what matter is he offering to represent you in currently?
A. That actually might fall under attorney-client privilege.
Q. You said you spoke with him a couple weeks ago?
A. I did.
Q. Okay. How frequently have you been in contact with Mr. DePerno over the years, if you had to guess?
A. I encourage him quite a bit, and I try to reach out just to make sure he's okay. Maybe -- I don't know -- frequently/infrequently.
Q. But consistently over the last five years; is that fair?
A. I don't think a year has gone by without me speaking to him, no.
Q. What about Phil Waldron? Do you know who that is?
A. I do. He's a cyber security expert for the federal government. Worked on things of national

Page 25

security interests for many years.
Q. How did you meet Mr. Waldron?
A. I think -- I think it's Colonel Phil Waldron.
Q. Okay. And how did you meet Mr. Waldron?
A. In Washington, D.C., on Jan. 4, 2021.
Q. Was he present for that same meeting you've had with Joe Flynn?
A. I do not believe so, but I can't -- I don't -- I don't actually know. Again, it's been six years and -- actually, it's been five years, five and a half, but it's -- let me think about this for a minute.
I don't know what -- which meeting happened first, whether it was the meeting of -- at Trump Hotel in D.C. or meeting him in the -- at the hotel -- I don't know what the name of the hotel is -- the -- man -- the hotel in D.C.
Q. The Willard?
A. The Willard, yes.
Q. Had you spoken with Mr. Waldron on the phone prior to that time?
A. Maybe.
Q. Okay. Did you communicate, via email or any other means, prior to meeting him in person?

Page 26

A. Signal.
Q. Do you still have those communications?
A. No.
Q. Do you consider Mr. Waldron to be credible?
A. A million percent, yes.
Q. What about Mike Flynn, Joe Flynn's brother? General Michael Flynn, you're familiar with him; correct?
A. Yes.
Q. When did you first meet Mike Flynn?
A. At a Clay Clark event.
Q. And are you still in touch with Mr. Flynn?
A. I have never been in touch with General Flynn.
Q. You've spoken with him directly though; correct?
A. On several occasions.
Q. When was the last time you spoke with him?
A. 2022.
Q. And what was the context of that conversation?
A. Hi. How are you? Good. Me, too. It

Page 27

was a -- it was a cordial conversation.
Q. Okay. Do you consider him to be credible?
A. I do.
Q. What about Bobby Piton? When did you first meet him?
A. I don't -- I don't know when I met him for the first time. I believe I met him also in -- at the shooting of The Deep Rig.
Q. And had you spoken with him before that time?
A. Probably.
Q. Do you consider Mr. Piton's theories of election rigging to be credible?
A. Yes, I do.
Q. When was the last time you spoke with him?
A. 2023, maybe. 2022. That's not true. I talked to him -- man. It might have been either -- it had to be before the election in 2024. So maybe mid-summer, because we talked about the election in 2024.
I believe that was the last time we spoke. But it was a huge gap in between that conversation and the previous.

Page 28

Q. And last one here, just going through the cast of characters for the film, what about Jesse Binnall? Have you met Mr. Binnall?
A. I have no idea who that is.
Q. You're not familiar with -- he's a lawyer. I believe he has a law firm in Virginia.
A. I have -- I mean, is this someone who was on The Deep Rig?
Q. He was featured in -- for purposes of allowing you to answer the question, yes, he was featured in a few scenes in the film.
A. If he was standing in front of me, I wouldn't even recognize him. So, no. I don't even recall what he would say of substance that I would contribute -- that I would attribute to him.
Q. All right. Let's talk about the film itself. Can you tell me, how much -- how many times were you interviewed for the film?
A. Once.
Q. And where did that interview occur?
A. In Arizona.
Q. Were you invited to Arizona for that purpose?
A. Yes.
Q. By who?

Page 29

A. I don't recall. I believe it was an assistant -- jeez -- an assistant of an assistant. Or no. That's not true. It was an assistant of -- yeah. Yeah. An assistant of an assistant. I think it was the assistant of the camera person that worked for or with Steve, I believe.
Q. And Steve, referring to Steve Lucescu?
A. Lucescu, yes.
Q. All right. And were you interviewed all day? Was it just a brief period of time? Do you recall?
A. I was there for an hour, I mean, maybe an hour and a half.
Q. Did you interact with any of the other folks we just discussed, any of the other people featured in the film, while you were there?
A. No. Is there other people in the thing that you didn't mention -- in the film that you haven't mentioned?
Q. For purposes of this question, I'm just asking about the list of names we just went through, so no.
A. Okay. Perfect.
Q. Did you know what you would be discussing for the interview, prior to the interview?

Page 30

A. The stealing of the election in 2020, and that's pretty much it. No one -- no one sat down with me. No one -- I'm kind of an outsider to pretty much both sides, so no.
Q. Did you provide any information to anyone associated with The Deep Rig, prior to your interview?
A. Can you repeat that question, please? I'm sorry.
Q. Did you provide any information to anyone associated with The Deep Rig, prior to your interview?
A. What kind of information are you asking?
Q. With respect to the statements and the claims you made in the film. So, for example, did anyone ask you to provide any documentation or any evidence about the things that you ultimately discussed in the film?
A. I believe I had a conversation on the phone -- this just is -- is shaking my brain a little bit.
So I believe I had a conversation where I shared the Denver Post article. I shared the -- the sua sponte information with the judge -- I do believe that happened in Florida -- and maybe it was another -- it was the one before that, but I shared the fact that the judge in the case was basically

Page 31

standing on the side of the scales for the Coomer case in Denver.
I believe I shared the antifa posts and some information related to Eric Coomer's behavior. And I think I shared -- so I think that -- I think that's -- I shared, obviously, the model. I shared people that I had had conversations with.
I mean, it was a long conversation on the phone. But I didn't -- I didn't -- I didn't reach out to them. Somebody reached out to me and asked me to -- to share that information.
And so I believe, based on the meeting that I had with Patrick Byrne in early January, Jan. 4, 2021, that that's what precipitated this.
Q. All right. And that's another important question. So you also met Mr. Byrne during that Jan. 4 meeting with -- well, was he part of that meeting with Phil Waldron and Joe Flynn, that you discussed before?
A. He was not. And I don't recall that Joe Flynn and Phil Waldron were connected either. So I don't -- I wasn't -- I was never -- okay.
I don't recall being in a meeting where it was me, Joe, Phil, and anybody else. I remember being in a meeting with Phil Waldron. I remember

Page 32

being in a meeting, informal meeting, with Joe Flynn.
And -- but the meeting that I had with Patrick Byrne, I was by myself in his hotel room when I first met him on, I think it was Jan. 4, or early morning Jan. 5, that I met Patrick Byrne for the first time.
Q. And did he invite you to his hotel room?
A. No.
Q. How did you find yourself in his hotel room, the two of you?
A. Well, he had a suite, so it's not like it was a -- you know, I'm sitting in his room with his bed.
But somebody arranged a meeting and said I needed to talk to Patrick Byrne about the model for Jan. 5, for the Georgia runoff race.
And I explained in detail how they were going to steal the election on Jan. 5, down to the percentages, of the system going down and coming back up, and what the outcome would be. And the fact that they had the ability to create phantom ballots and fake ballots in the system, and that they could manufacture those ballots out of thin air, using the ADA module inside of the Dominion machines, that would look like they were filled out by human hands.

Page 33

So I knew all of this before anyone did an audit, before anyone -- you know, just by taking all of the different information that's out there in the RFPs, RFQs, manuals, Dominion answers that were out there that -- of how the system was able to be manipulated based on the information we had on the 3rd of November.
So somebody made a recommendation. I don't remember or recall who that recommendation was made by. But the first time on that trip to D.C. that I met Patrick was, I was walked up to his suite on the third floor and -- I think it was the third floor -- and I sat in the waiting area of his room. He came out. He sat down with me, we spent about 20 minutes together, and then I left.
Q. Did you know who he was at the time?
A. I think -- I think everyone in tech knows who Patrick Byrne is. Overstock, you know, is kind of a -- was kind of like the MySpace of Amazon.
Q. So you recognized him when he walked in, I take it?
A. No. I just knew of him because you -- you study tech. And I didn't -- I didn't really know who he was, other than -- I knew who he was by name, but I didn't know who he was by any details that I

Page 34

knew about him.
Q. Were you familiar with his other efforts surrounding the 2020 election at that time?
A. I was not.
Q. Did he tell you about any of those efforts during that conversation?
A. He was more interested in the model. And he told me, It's a good theory, you know. And I was, like, This is not a theory. This is exactly how it works. And this is exactly how they're going to steal the election on Jan. 5.
And he was curious how I came to that conclusion. And then Jan. 5 happened. And I think that gave rise to the conversation, and it allowed for Patrick to take me very seriously on, you know, what I saw in the elections and how they were stolen.
Q. So let's talk about that theory, since you've mentioned it a few times here.
I'm going to show you a video that has been previously marked. This was shown in the -- excuse me -- Lucescu deposition. It was marked as Exhibit 2, Clip 18.
THE REPORTER: Brad, before we go, does this have audio in it?
MR. KLOEWER: It does.

Page 35

THE REPORTER: Can we just -- can I put a parenthetical that a video is being played, as opposed to trying to capture the audio correctly off of that?
MR. KLOEWER: You can. That works fine.
THE REPORTER: Thank you.
MR. KLOEWER: And let's -- I'm sorry. I misspoke. This is going to be marked as Exhibit 2, Clip 4.
THE REPORTER: Exhibit 57?
THE DEPONENT: Do you mind if my -- if my assistant brings me in an ice water? Is that -- while we're doing this?
MR. TICKTIN: I'm telling you, your assistant can bring you an ice water --
MR. KLOEWER: That's fine.
MR. TICKTIN: -- whether Mr. Kloewer thinks so or not. But I'm sure he would -- he's a gentleman. I'm sure he would let you have your ice water.
MR. KLOEWER: No objection.
Okay. One moment here. Let me find this. This is not in the right place. Excuse me one moment. You know what? I apologize. My AV clips folder is creating an issue.
Can we hop off the record for just two

Page 36

minutes here while I find this? I think it's the next logical place to go with the discussion, but I don't want to eat too much clock.
MR. TICKTIN: No. I don't mind. Let's go off the record. I did want to ask you about something else, though.
MR. KLOEWER: Okay.
MR. TICKTIN: Just one moment.
THE VIDEOGRAPHER: Going off the --
MR. TICKTIN: No. No.
THE REPORTER: Excuse me.
MR. TICKTIN: Stay there for a minute, just for this part of the conversation.
THE REPORTER: Perfect. Perfect, Peter. We're on the record. Thank you.
MR. TICKTIN: Okay. Good. Yeah. No. I wanted to ask you how long you think you're going to be and -- because you get -- we each get three and a half hours. So I'm wondering -- I don't need a full three and a half. I could give you a little bit of that, if you want, but --
MR. KLOEWER: I haven't seen a cross-notice deposition, Peter, so I'm not -- I'm not -- I don't believe it works that there's an even split. I don't know how --

Page 37

MR. TICKTIN: Do you want me to file one right now? Are you kidding me? That's not the way it works. You don't have to file -- what are you talking about? I'll tag onto your notice.
You're taking the deposition. I have the right to ask questions, too. You can't use up all seven hours for yourself. So I'm just wondering, how long do you think you need because I may be able to give you what you need?
MR. KLOEWER: Yeah. I don't know. It depends on how quickly we get through the information, Peter, so . . .
MR. TICKTIN: Okay. Well, let's figure that at about the five-hour mark, that I take over at that point. Okay?
MR. KLOEWER: We'll see where we're at at that point, Peter.
MR. TICKTIN: Well, no. I'm taking over at that point or moving for a protective order, one or the other. But I need to be able to ask questions, too. We only get seven hours together.
MR. KLOEWER: I appreciate that. I'll do my best to get through the material as quickly as possible.
MR. TICKTIN: Great. I appreciate that.

Page 38

MR. KLOEWER: Okay.
THE REPORTER: Thank you, Jesse.
THE VIDEOGRAPHER: Okay. Going off the record at 9:55 a.m.
(Recess from 9:55 a.m. to 9:57 a.m.)
THE VIDEOGRAPHER: Now back on the record at 9:57 a.m.
Q. (BY MR. KLOEWER) Okay. So as we indicated -- or as I indicated before, I was looking for this exhibit that's been previously marked Exhibit 2, Clip 4.
This is the longest clip I'll show today. It's about 3 minutes and 12 seconds. It's a clip from the film The Deep Rig that includes a flowchart.
And I'm going to play this for you and then I'll have a few questions. So let me share my screen and make sure that you can see it.
THE REPORTER: Brad, is this Exhibit 2 or did you want to mark this as Exhibit 57?
MR. KLOEWER: This has been -- this was previously marked as Exhibit 2, Clip 4.
THE REPORTER: Previously marked. Thank you.
MR. KLOEWER: I'll let you know when we get to the new video exhibits.

Page 39

THE REPORTER: Thank you.
Q. (BY MR. KLOEWER) Okay. Mr. Oltmann, can you see the still frame of the video here?
A. Yeah.
Q. Okay. I'm going to start it.
(At this time a video was played.)
Q. All right. Were you able to see that, Mr. Oltmann?
A. Yes, I was.
Q. Do you stand by this theory today?
A. Yeah. I mean, other than the vernacular of adjudication and some of the other things that I used that were normalized vernacular for me, yeah. I do.
Q. So as you sit here today, more than five years later, this is the still the theory that you believe how election results are manipulated?
A. Well --
MR. TICKTIN: Object to the form. Asked and answered.
A. Remember, the -- that model, that I put up, has been validated by Mesa County, Maricopa County, the work that was done on the audit in New Mexico, the information we found out in Nevada, the stuff that we found in Virginia, the stuff that Maduro

Page 40

is actually talking about right now related to Smartmatic and the connection to Sequoia Voting Systems and Dominion. So yeah.
Q. (BY MR. KLOEWER) Slow down there. What do you mean, it was validated by Mesa County?
A. There was four reports, that were put out in the Mesa County reports, that were done by Jeff O'Donnell and Walter Daugherity.
And the reports there showed separate databases that would be used in order to fraudulently misrepresent or add votes to the tally points in the municipal election in 2021.
So I don't know if you've read those reports. They're actually really good information. I think they're on the internet. I can get you the URL for them.
But there's three, and then a final report that was put out, actually, by Jeff O'Donnell, I think it was a year ago, but --
Q. But no one from Mesa County validated any of this; right?
A. Are you talking about Dan Rubinstein asking Dominion to validate the information related to the crime that was committed by Dominion Voting Systems? That report?

Page 41

Q. I didn't refer to Mr. Rubinstein. I'm saying -- you said this was validated by Mesa County. I'm asking if anyone in Mesa County actually validated this.
MR. TICKTIN: Objection to the form. Improper predicate.
A. No. No. I said that the information in Mesa County -- let me correct the record, if that's what you got from me or if that's what I mistakingly said.
What I said is that the reports in Mesa County validate my model, based upon how the system operates and what the output was in Mesa County, with an unverified, uncertified system that was put in place, that allowed for someone to come in and manipulate that information based upon those -- those things that I said were fault points in the Dominion system.
And if you look at my original diagram, it had six specific things that were problems, leaking points, inside of Dominion Voting Systems. And they had numbers on them.
I believe you're in -- you have this information. If you don't, I can send it over to you. But that original one showed that there was also the

Page 42

ability to use a thumb drive.
It shows that you had the ability to manipulate and add, and do it with mail-in -- I call them absentee ballots, but it's called mail-in ballots because some states have just mail-in ballots, like Colorado and others.
And the ability to basically just put fraudulent stacks of ballots that were never -- never a part of the system, never filled out by a real voter, and which is why you have the separation of the envelopes that happened in Georgia, let's say.
Q. (BY MR. KLOEWER) Well, we're getting a bit far afield here. I'm sticking with Mesa County.
So Mr. Lenberg and Mr. Daugherity, did they have access to the Mesa County election equipment to perform this analysis?
A. I'm sorry. Did who?
Q. Mr. Lenberg and Mr. Daugherity. I believe you referred to them as the two folks who had claimed validated your theory.
A. I said -- I did not say those two people. I said you had Jeff O'Donnell and --
Q. Oh, okay.
A. -- Walter Daugherity.
Q. Yes.

Page 43

A. Jeff Lenberg did a separate analysis in Michigan and was also a part of looking at and validating information related to New Mexico.
Q. Okay. But with respect to Mesa County, did Mr. O'Donnell and Mr. Daugherity have access to the Mesa County election equipment to perform that analysis?
MR. TICKTIN: Objection to the form.
A. So I -- I mean, you could subpoena and depose them, I suppose. But I believe that they used the image and the files that were given to them by -- that basically would have given them access to the information related to the election and the equipment.
Q. (BY MR. KLOEWER) All right. And I believe next you said it was validated by Maricopa County; is that right?
A. 1,000 percent.
Q. Okay. Who, with Maricopa County, validated your theory?
A. Well, again, it's not Maricopa County that validated it. It's the outcome variable of the report that was first generated by Cyber Ninjas in Maricopa County.
So if you look at that report and the fault points and the problems that they had in the

Page 44

election, including the fact that there was over, what, 30 -- 30 precincts in the boxes -- which, by the way, is impossible, because the ballots come in and are sorted per precinct -- but you had -- you had ballot boxes that were filled with up to 30, 32, 31 different precincts, with ballots in each one of those boxes, which shows that they took fake ballots and put ballots in those boxes.
And this was outlined in the original report that I reported on and was sent to me from Doug at Cyber Ninjas, that then was changed by the lawyer of the -- I believe it was the Arizona Senate that said that they had first right to change and/or alter the report in its final.
And the initial report that was put together by Doug, at Cyber Ninjas, said that the system was 100 percent fraudulent and that it was used to steal the election. Or that was the original report. And that I'm sure you can get access to the different versions with Doug Logan.
And that's the one that was provided to me the day of the Clay Clark event in Colorado Springs, Colorado. And that report, itself, again, validated, in part, another way that you could steal the elections.

Page 45

And if you look at what happened in even other states, no one inside of Maricopa County -- I'm finishing my -- I'm finishing my statement on this -- no one inside of Maricopa County would have validated it because those are the very people who were elected by a fraudulent system.
So no one in Maricopa has done anything. No one in Denver has done anything. No one in government, inside of the systems, would do anything for fear of reprisal.
But if you look at the commissioners that were responsible for the elections in multiple cities and multiple counties, multiple precincts, that were required to validate the results, those people, even in 2022, under the penalty of going to jail, were told they had to validate fraudulent results, that they knew were fraudulent, and that were contained in the report in Maricopa County, Mesa County, Nevada, Colorado, Michigan, Minnesota, Virginia. I can go down the line.
Q. Okay.
A. Georgia. I forgot Georgia. Good old Georgia.
Q. I'm trying not to speak over you, but please try to just answer the question that's asked.

Page 46

The Maricopa report, that was actually released by Cyber Ninjas and Doug Logan, that report actually concluded that Mr. Biden had won the election by more votes than previously reported; right?
A. That report -- first of all, an audit is not a recount. And the reason why --
Q. That's not my question.
A. Well --
Q. Look at the report.
A. You're creating a fact out of fiction. That report and that information in that report, specifically the line that said -- by the way, the report was over 100 pages long.
It contained multiple errors and problems that, frankly, would invalidate any election or any system, if it was outside of an election system that was held hostage by people that want to lie to the American people about the fact that we have elections that are real.
So that report was altered by the attorney for the Mesa County Senate -- or sorry -- the Arizona Senate before it was published, because the lawyer had the right to alter the report based on the contract -- and you can read the contract -- based on the contract before the final findings were published.

Page 47

Doug Logan came on to my podcast, and in that podcast he said, Had the original report been presented and pushed out there, we would have a Constitutional crisis. Doug Logan's words.
So no. It was not a recount. It was an audit. And the audit found massive fraud and massive improprieties on behalf of Dominion Voting Systems, Runbeck, and those people that were complicit in that behavior inside of Arizona.
Q. Let's orient ourselves in time here.
This film came out on June 26, 2021. Are you aware of that?
A. I'm sorry. What date?
Q. June 26th of 2021. Do you have any reason to dispute that?
A. I do not.
Q. Okay. And all that you're talking about here with Maricopa, that all happened after that date; right?
A. It did.
Q. Same thing with everything related to Mesa County; correct?
A. I don't -- I don't actually know when the date was where they gained access to and made a copy during the investigation at Mesa County, Colorado.

Page 48

I did not have a conversation with anyone related to Mesa County, other than people asking me what -- where -- you know, what part of the system should they -- should they copy?
That was a simple phone call. I don't even remember who called me. And -- and then at the symposium with Mike Lindell, that's -- the day of that is when I found out about the Mesa County image that was created.
Q. Who had validated this theory as of June 2021?
A. I think a lot of people. You mean validated as of June of 2021?
Q. Yes.
A. I think the validation came in January 4th and 5th, the 5th being the runoff, that the model that I had was, although rudimentary, because I made it in two and a half weeks, was accurate as to the vulnerabilities that were -- can be manipulated inside of the Dominion Voting Systems.
MR. TICKTIN: Okay. I've got to --
THE REPORTER: Peter, hang on a minute. You didn't come through.
THE DEPONENT: Are we taking a break?
MR. TICKTIN: I have to, yes. I have to

Page 49

jump off --
THE DEPONENT: I could use a bathroom break.
MR. KLOEWER: All right. Let's take 15 minutes off the record.
THE VIDEOGRAPHER: Going off the record at 10:15 a.m.
(Recess from 10:15 a.m. to 10:46 a.m.)
THE VIDEOGRAPHER: We are now back on the record at 10:46 a.m.
Q. (BY MR. KLOEWER) Okay, Mr. Oltmann. We just took a break there while Mr. Ticktin had a separate hearing.
Can you tell me, during the break, did you speak with anyone?
A. Yeah. But no one here.
Q. Okay. You didn't speak with anyone from Mr. Ticktin's law firm?
A. I did not.
Q. Did you speak with Ms. Lambert?
A. I did not.
Q. Okay. We were talking about the flowchart that we had looked at before the break.
A. Wait a minute. I sent a text saying, How is the weather up there, to Stephanie. She didn't

Page 50

respond.
Q. Okay. Thank you for that clarification.
We were taking a look at the flowchart that was featured in The Deep Rig. Can you tell me, when did you make that flowchart?
A. December of 2020.
Q. And you didn't have any access to any Dominion election equipment at the time, did you?
A. I did not.
Q. And you've never worked for an election technology company?
A. No, sir.
Q. And you've never worked for a secretary of state's office before?
A. No.
Q. Never worked in administering any election, have you?
A. No.
Q. Okay. What about your education? Tell me, where did you get your degree and from what university?
A. I never finished. Actually, I did kind of finish, but I didn't go and finish.
Q. Okay. So what does that mean? Did you attend university at any point?

Page 51

A. Yeah. I'm still, actually. I probably take a class every semester or every other semester still. I have for years.
Q. And where at?
A. Maryland.
Q. Okay. University of Maryland?
A. Yes.
Q. Okay. So as you sit here today, though, you don't have any degree from any higher education?
A. No. I kind of do that on purpose.
Q. Okay. So --
A. I don't believe in the process, frankly.
Q. Of education?
A. I think education comes in a lot of different ways. I mean, I would put me up against anyone on this call, as far as education and experience or intelligence.
Q. As far as election technology, do you hold yourself out as an expert in election technology?
A. I do not.
Q. Do you have any certifications or any sort of credentials, outside of college or university?
A. I don't -- you're going to have to clarify that for me.
Q. Do you have any certifications in

Page 52

software development, for example?
A. I don't actually know if it gave me certifications but, I mean, I've taken -- I've done all sorts of seminars over the years for AI and tech.
And, I mean, so I guess they give you certifications; although, I don't do it for the certifications. I do it for the knowledge.
Q. So what is your background or experience with respect to election technology?
A. Well, I've learned a lot over the last six years.
Q. Okay. But as of the time when you drafted that flowchart in December of 2020, you had no experience at all; right?
A. Well, I mean, it's not all that uncommon for -- when you're building an election system, it's designed to count votes.
So it's -- I am -- I do hold myself out as a system architect. I've built some incredibly complex systems. And as a result of that, it wasn't very difficult for me to look at the systems within Dominion, which is one of the reasons why I say that I wouldn't have built the system the way they built it if you were trying to create an honest system.
But it wasn't difficult to read through

Page 53

and get information related to how the system operated. It's actually fairly simple.
Q. But you didn't have access to any of those systems at the time or since; right?
A. Yeah. But I don't have access to the blueprints of a motor either, but I can take one apart and put it back together.
Q. Well, have you taken apart Dominion hardware before?
A. Why would I? I'm more concerned with the software than I am the hardware.
Q. Okay. Well, you haven't had access to the software either, have you?
A. No, but I had access to all of the different election Dominion manuals and things like that. I mean, at one point in 2020, there was a company out of Washington that was selling Dominion and ES&S machines online on eBay.
Q. Did you buy one?
A. No.
Q. Okay. So the only Dominion specific information you've looked at is the user manuals?
A. Well, user manuals, RFPs, RFQs, things that they have written, documentation that I was able to get my hands on related to how the system works.

Page 54

I was able to look through some of the stuff that they have in Colorado.
Q. What stuff that they have in Colorado?
A. Manuals.
Q. Okay. So the publicly available documents that are provided to clients of Dominion?
A. Yeah.
Q. And those user manuals include a section on phantom ballots? Is that your testimony?
A. No. They have a section on ADA and the ADA ability -- also, I got to look at some of the architecture of some of the -- what's it called -- the patents that are out there for Dominion.
I mean, I looked at a lot of different information and kind of compressed it together.
Q. Okay. Which of those specific pieces of information talks about phantom ballots?
A. It's not the phantom ballots that are talked about. It's the circumstance by which we saw things happen across the country.
MR. KLOEWER: That's not my question. Objection. Nonresponsive.
Q. (BY MR. KLOEWER) Which piece of information have you looked at that --
A. You have to let me finish because you

Page 55

didn't let me finish. So I'm going to finish. And then at the end of that, if you say nonresponsive, then you can ask the question a different way.
But if you're going to ask me a question without an attorney, then I'm going to finish my statement, and at which you can tell me that I'm not responsive. Not before, but after. Okay?
You said you wouldn't interrupt me. I won't interrupt you. Okay?
So the system itself would not say phantom ballots. There would never be an idea inside the system that says phantom ballots.
What we have is the other circumstances around that and how the system is built and what vulnerabilities -- because that's how we started this entire conversation back in December of 2020.
I was more interested in what Eric says, that none of these votes are his. He says that the system can't be manipulated.
Okay. Let's go find out if Dominion Voting Systems can actually steal elections. That's how it started. More of a curiosity because I was called a liar; right?
So I got in the systems, looked at all the stuff, lost my focus for Eric for a bit -- he just

Page 56

was a part of the cog, as far as I was concerned -- and started looking at the possibilities of what the vulnerabilities would show, that we actually experienced on November 3, 2020.
And then from there, I just started building a system of what the architecture is of the system and how those vulnerabilities were exploited.
And then I built a theory based on that, that I saw inside of the model of what was going to happen in Georgia in the 2020 -- it was perfect, actually. It gave me the perfect opportunity to actually see if everything that I thought about the system was accurate. And it turns out it was.
So the system manual is never going to show it. The system itself was designed to allow any ADA specifically the ability to manufacture ballots out of thin air, because they can manufacture ballots out of thin air.
Q. So you started with the premise that the election was rigged, and then you created a theory to reach that result?
MR. TICKTIN: Objection. Improper predicate.
A. No. Actually, it's quite the opposite. I wanted to see if Eric was just a hyperbolic guy that

Page 57

worked for Dominion and just liked to brag about himself and really didn't have the ability to do it or whether or not the system had the ability to do it.
So I actually set out the opposite, to prove that it was not possible, in hopes that this was just a rogue actor talking about things in a vacuum.
Because, I mean, the idea for me is, are we looking for this systemically across all 50 states? How far -- how deep does this go? How deep does Eric go in different parts of the different systems?
We already know, from a character standpoint, that he has a pretty poor character. So now I just needed to figure out if that was just the way that they operate at Dominion or at other systems.
And since I had a runoff election in Georgia, it was pretty easy to build the model and then say, Hey, look, this is what I think is going to happen before it happened, tell enough people about the theory of what was going to happen in Georgia, before we had access to any, you know, other information.
I think the only thing that I could rely on for -- that was happening in the middle of -- I don't remember in the middle or at the end of me building this model, was the ASOG report, initial

Page 58

preliminary report, that showed that the system, Dominion Voting Systems, was designed to steal elections.

And so I wanted to see if that was true. And I didn't want to rely on anything other than whether or not the information that I was able to look at was accurate.

So the further I got into it, the worse it got. So then I started sending information related to that to people that were having conversations with me.

The first person that had those conversations was, I believe someone close to Sidney Powell. So that's how it all started.

Q. (BY MR. KLOEWER) Who was that?
A. Sidney Powell?
Q. No. Who was this person that was close to Sidney Powell that you spoke with?
A. I don't remember. I think his name was Terry.
Q. Did you formulate that flowchart yourself or did somebody else assist you with that?
A. From a math standpoint, I had a guy that worked for me help me with that -- the initial compiling and statistical probability of those things

Page 59

actually happening.
Q. You conducted a separate statistical probability model --
A. Yeah.
Q. -- with the flowchart?
A. Basically, we built it based on information. I don't really remember the whole concept behind it. But we used mathematical models to look at the probabilities of things happening in different states as they were being reported, such as ballots being delivered at 2:00 in the morning, how that could adversely affect the outcome of the election.

The stuff that we saw in Georgia, the stuff that we saw in Pennsylvania, the stuff that we saw in Colorado, the stuff that we saw in multiple states, we took all of the reports and whistleblower accounts, and then we built that side by side with information that we could get publicly available, and then we just started building scenarios.

And it was --
Q. Who --
A. I'm sorry?
Q. Who was that person that you worked with?
A. Andrew Lerner.

Page 60

Q. Okay. It's true, isn't it, Mr. Oltmann, that you had decided before the election was even called that you would not accept a Biden victory; right?
A. That I would not accept a Biden victory?
Q. Yeah.
A. I don't think I would characterize it that way. I don't believe that there was any ability for him to become the -- for him to be elected.
Q. And that's because you believed that if Biden won, it could only be because the election was rigged; right?
A. I believe that all the indications were there to show that his party was not worried about him being elected, much like they did not worry about President Trump in 2016.

And all the indicators were there to show that Joe Biden could not get anybody to show up to fog a mirror, let alone to support him publicly. And as a result of what we saw happening in real time, because people's behaviors dictate, typically, the outcome of the enthusiasm for either a particular candidate or a particular idea.

And, you know, the fact that Joe Biden had circles and couldn't even fill the circles or

Page 61

didn't have the cognitive ability to even answer a question would lead any normal person to believe that there was no possible -- I've seen this before -- that there's no possible way that he would be a viable candidate or that the people in this country would see him as a viable candidate.
Q. So you didn't believe -- and this is a yes-or-no question. You didn't believe there was any way that a Biden victory would be legitimate; right?
A. Yeah. I don't think I would characterize anything that I said before the election that way.
Q. Well, let's take a look at something you said before the election results were called. And this -- we'll mark this as Exhibit 57. And this is Clip 1 from Exhibit 57. Let me share my screen.

Mr. Oltmann, this is from a November 5th episode of your podcast, Conservative Daily, November 5th --
A. It will really tell the story for me, because I'm going to love answering this one. Go ahead. I've seen it before, but go ahead and play it.
Q. Okay.

(At this time a video was played.)
Q. That was you; right, Mr. Oltmann? I'm sorry. Was the video sharing?

Page 62

A. No.
Q. No?
THE REPORTER: Brad, the audio came through but not a video.
THE DEPONENT: I don't need to see the video, unless you want it to be a video.
Q. (BY MR. KLOEWER) Let me show you just the image so you can see what we were looking at -- or what I was looking at. That's you on the right-hand side; right?
A. Yeah.
Q. And Joe Otto is the pseudonym you used prior to November 9th of 2020; right?
A. Yes.
Q. Okay. So that's you, prior to the election being called, stating that Joe Biden will not become president. You would agree with that; right?
A. I also predicted there would be millions of people that would show up at the Capitol, so I guess I'm clairvoyant.
Q. That wasn't my question. Before the election was called, you were stating that you would not -- that Joe Biden would not become president; right?
A. No. I said that the American people

Page 63

would not accept him being president and that there's no way that he would be president as a result of that.
Q. And you wouldn't accept him as president either, would you?
A. I still don't accept that he was the president.
Q. Before you ever mentioned the name Eric Coomer to anyone, you decided that you would not accept a Biden presidency, didn't you, Mr. Oltmann?
MR. TICKTIN: Objection. This is getting to be not just asked and answered, but multiple times, number one --
THE DEPONENT: I'll answer it.
MR. TICKTIN: Okay. Okay. And number two, it's argumentative.
It's all right. I need to get my objections down so that later on, I can challenge whether he can use it or not. But you can answer.
MR. KLOEWER: I'll reask the question, with -- understanding that you've raised your objection.
Q. (BY MR. KLOEWER) You had decided, before you ever said the name Eric Coomer to anyone, that you would not accept a Biden presidency; right, Mr. Oltmann?

Page 64

MR. TICKTIN: Same objection.
A. I don't -- I don't -- I don't know if that's how I felt at the time. I just think that when you're -- when you're upset about what you can see clearly, you know, President Trump handedly winning every state, and then the video that happened on the -- I think it was The Tonight Show, where Bernie Sanders got on there and described, literally, what was going to happen on November 3rd, and then it happened. And even described the states that would be at issue.
Bernie Sanders did that, I think it was on The Tonight Show, where he said that Trump will be winning. The next day, they will wake up and that they'll count the ballots and then Biden will be declared the winner.
It literally was happening in real time, the way that the Democrats said it would happen. And you didn't know at the time -- we talked about --
Q. (BY MR. KLOEWER) Well, Mr. Oltmann --
A. I'm not finished.
Q. Well, you're --
A. I'm not finished answering the question. And you must let me answer the question. I don't have an attorney here --

Page 65

Q. Do you even remember what the question was?
A. -- hear the question, and then I will not talk over you. Don't talk over me.
So I'm going to answer the question because the question -- you asked me a question. I'm going to answer it. So I'm not done yet.
So at the time, I think we were more concerned with the fact that you had ballots that were showing up at 2:00 in the morning and some of the things that were being said than we were the nefarious nature of the machine companies and their complicity to it.
But when I got -- on November 5th -- 6th -- 5th. If that was the 5th -- let's see. It was -- Tuesday is the 3rd -- 4th, 5th. So it was Thursday.
The next day is when I put two and two together. And I didn't -- you know, I didn't think about it being a Dominion Voting Systems issue or a, you know, ES&S or any of that.
I was thinking the nefarious behavior was just bad actors, that was a continuation of what had happened in the summer of love from the plandemic that was created in 2020.

Page 66

Q. Let's take a look at another video from the next day. This is November 6th of 2020. We'll mark as Exhibit 57, Clip 2. Let me make sure I'm sharing my screen this time. It's about 42 seconds.
(At this time a video was played.)
Q. Okay. By any means necessary. No surrender. No retreat.
That was your position on November 6th of 2020, before you ever published your theory about Eric Coomer; right.
A. It still is my position to this day. My position to this day is that we should not allow people to steal the voice of the American people.
We should not allow fraudulent election systems and fraudulent systems that let illegals vote and chaos erupt inside of our election systems.
And that if we allow that to happen, you have what has happened to our country, which is an absolute degradation over the last eight years of our society, leading to the murder, rape, and misfortune piled upon Americans everywhere across the country.
Q. And you still believe that violence is an acceptable means to challenge election results?
A. I didn't say that. When did I say that?
Q. Mr. McGuire stated that, We're peaceful,

Page 67

and you said, Come on. We're going to break the window and go through. Didn't you say that?
A. So there's a difference between force and violence. Violence is what your side, the side that you represent, Eric Coomer, has suggested.
Violence is what happened to the people in the United States in the summer of 2020. Violence is what happens when antifa shows up to a Christian coffee shop. And violence is what happens over and over and over again when you don't get what you want. You commit violence.
We haven't stood up to that evil that you represent as of yet. And I don't believe that force against evil is violence. I believe it's a consequence for bad behavior.
And, frankly, we should bring back accountability and we should bring back consequences for bad behavior. And I believe it's coming.
So, you know, the slow boil of everything that has happened in this election over the last six years has brought us to a lot of conclusions that you still are walking past and gaslighting.
And it's not a -- it's not a victimless crime, to steal the election, steal the voice of the American people. It proves that we live in a system

Page 68

that you're willing to accept as being substandard just because it favors your outcome.
Q. I will again --
MR. TICKTIN: Let the record just show one thing, that it wasn't Mr. Kloewer that was the one that was violent in our past situation, that was Mr. Cain.
MR. KLOEWER: I'm going to object to the --
Peter, come on. The speaking objections are improper.
I'm going to object to that response as nonresponsive.
Q. (BY MR. KLOEWER) Mr. Oltmann, ultimately, days after the publications we just looked at --
A. You guys ended a deposition. You ended a deposition because of a speaking objection that was trying to overrule, and ended it on a previous -- unless you want it both ways.
You want to not have speaking objections here but have them in the objections for Eric Coomer. And --
MR. KLOEWER: I'm going to reclaim my time here.

Page 69

MR. TICKTIN: Hold on a second. I'm not going to object to you getting a little extra because of that.
And just to explain, Mr. Kloewer is correct. I should not be making speaking objections. And I'm going to make sure I limit them more in the future. I just was trying to add some levity to that, Mr. Kloewer.
MR. KLOEWER: Well, you're aware, Mr. Peter, we don't find that topic to be humorous.
Q. (BY MR. KLOEWER) Moving on. With respect to --
MR. TICKTIN: Yeah. You don't find it -- we don't. Is that the royal we or just you, you know.
Q. (BY MR. KLOEWER) With respect to the publications in The Deep Rig, after the videos we just looked at, days later, for the first time, you made allegations that Eric Coomer was responsible for rigging the election on November 9th, 2020, is the first time you published a podcast on that topic; correct, Mr. Oltmann?
A. I believe so, yes.
Q. Okay. And we're going to go back to what was marked as Exhibit 2. This time I'm going to show Exhibit -- Clip 18 from that --from that exhibit.

Page 70

So let me share my screen here. This one is about a minute and 29 seconds. I have some questions for you once we're through.
(At this time a video was played.)
Q. Okay, Mr. Oltmann. And you stand by this story today; correct?
A. I do.
Q. Okay. Who got you onto that call?
A. R.D. got me on that call.
Q. Okay. But what is R.D.'s real name?
A. Well --
Q. Mr. Oltmann, are you communicating with someone on your laptop right now?
A. I'm not, actually.
Q. Okay. Can you put the laptop away, please, while we're in the middle of a deposition?
THE DEPONENT: Well, hold on a second. I need to take a minute, if I can.
MR. KLOEWER: No. We're not making a break while a question is on the table.
THE DEPONENT: Well, unfortunately, I have to because that is my wife that is actually reaching out to me. My wife. I need 30 seconds.
MR. TICKTIN: Take your time.
THE VIDEOGRAPHER: I'm sorry. Do we want

Page 71

to go off the video record or stay on?
MR. KLOEWER: I'm not going off the record. Mr. Oltmann is taking a break here, but we're not going off the record.
To be clear on the record, Mr. Oltmann has muted his microphone and is now making a phone call.
MR. TICKTIN: To what appeared to be some kind of emergency with his wife.
THE DEPONENT: Sorry. Crisis averted.
Q. (BY MR. KLOEWER) Okay. Mr. Oltmann, the question was, who got you on that call?
A. R.D. did.
Q. What is his real name?
A. Just for the record, I have a disappearing puppy. So it's -- and you may not think it's a big deal, but when a little 10-month-old baby Corgi disappears, it's a big deal.
Q. I appreciate that, Mr. Oltmann.
My question is, who got you on that call?
A. R.D. did.
Q. What is R.D.'s real name?
A. Robert Davis whatever. It's a name, pseudonym name for an activist from the 1800s or something.

Page 72

Q. Yeah. What is his real name?
A. I don't know his real name.
Q. Mr. Oltmann, I'm asking for the name --
A. I gave you the information. Had I not gotten the emails from him that said, Hey, by the way, don't worry about it, after you guys improperly had a judge and a special master interfere with the ability for me to protect my privilege, and you went after me again.
And frankly, the fact that that even happened was kind of a blessing and a curse. Because then you came back and said, I need all the information. And so then my lawyer had to get off the case. And then I had another lawyer.
Then you did everything you can to get David Perry and Peter Ticktin off that case. So now I'm stuck with an attorney that has no defamation experience at all, which is an ethical violation of every way, shape, and form.
And now you want to eliminate the ability. And I've tried to get ahold of him. But had it not been for my attorney putting this stuff into a pleading before she even told him that it was going into a pleading, he probably would have come forward, fully forward.

Page 73

But, unfortunately, then you guys want the information for all the correspondence, but my attorney stated in there that all this was under attorney-client privilege.
So then she doesn't provide it. So then I provide the basic information for it based on him coming forward, which leads me to believe that somewhere along the line, he's watching the case.
And then I provide the information, up and to the point where I didn't provide anything that I told him before was under attorney-client privilege, and so my attorney had to leave the case as a result.
So I'm damned if I do and damned if I don't.
MR. KLOEWER: I'm going to object to that response as nonresponsive.
Q. (BY MR. KLOEWER) Mr. Oltmann, this is not a conversation. This is a question-and-answer deposition.
A. I just answered the question. I answered it in chronological order of everything that happened, including the removal of David Perry and Peter Ticktin, I believe unethically and illegally, in the case of Coomer v. all the people in the Denver case.
But that's not -- it's not uncommon for

Page 74

you to object to it. It's -- but that's common knowledge. So I gave you the information that I had. I made sure you had access to that information.
And the only thing that I have not provided you is any corresponding conversations we had during that time, because Andrea told him it was covered under attorney-client privilege, including having a conversation with another attorney on whether or not that attorney could represent R.D.
MR. KLOEWER: Objection. Nonresponsive.
Q. (BY MR. KLOEWER) You do know this individual's real name. And since the time when you disclosed the Robert Davis Ruffin emails, you have publicly stated that you will not reveal his name, haven't you, Mr. Oltmann?
MR. TICKTIN: Objection to the form. It's argumentative, to put it nicely.
A. I did -- I did respond. As a matter of fact, as soon as he reached out to me, I had --
Q. (BY MR. KLOEWER) That's not my question. That's not my question.
A. I had to reach out to my attorney. He reached out to me. And I was, like, Listen, this is improper. I need you to go through the proper channels. Please contact my attorney, and he did.

Page 75

So he contacted and had conversations with Andrea, not with me, right? Because I wanted to make sure that there was a record of it outside of me. Period.
MR. KLOEWER: Objection. Nonresponsive.
Q. (BY MR. KLOEWER) I'm going to ask a very specific question. Listen to the question I'm asking.
You know his real name, don't you? Yes or no.
A. No. That's the name I have for him.
Q. You didn't make -- you produced notes at one point that indicated numerous other people on that call; correct?
A. Yes.
Q. You didn't make any effort to identify those other people though, did you?
A. I did.
Q. Okay. Who else have you identified as being a participant on that call?
A. I don't remember the list. I did provide it and it was provided to you.
Q. There's specific names. Who did you identify as that being on that particular call?
A. Tay Anderson. That led to, I mean, Sean Beedle.

Page 76

Q. It's your testimony now that Sean Beedle was on that call?
A. I believe she was -- he was. Sorry. I believe he was on that call.
Q. My question wasn't if you believe that Sean Beedle was on that call. My question is, was Sean Beedle on that call? Yes or no.
A. How is that not a different -- I believe that Sean Beedle was on that call.
Q. Okay. Do you know that for a fact?
A. I'm sorry?
Q. Do you know that for a fact?
A. No.
Q. Okay. Who do you know for a fact was on that call?
A. I know -- I have a -- Tay Anderson was on that call.
Q. That's the only one?
A. I would have to go back and look at the notes. It's been six years.
Q. Okay. And you would agree this case has dominated most of your life since that time; right?
A. I believe that you guys have set out to destroy my life because of Eric Coomer, yes.
Q. But as you sit here six years later, you

Page 77

can't name anyone on that call, other than, you claim, Tay Anderson?
A. Well, you went and got an affidavit from Tay Anderson --
MR. KLOEWER: Nonresponsive.
A. -- that outlines everything inside of my notes almost verbatim, and then are now telling me -- and you did that, by the way, with a simple word Tay, even though his name was Auon'tai Anderson, or Auon'tai, whatever it is, Anderson.
And so you knew exactly who to go to based on those notes. And you went straight there and got an affidavit that says, I pinky swear Eric Coomer wasn't on the call.
So I think -- I think Eric Coomer led you to Tay Anderson being on that call, because Eric Coomer was on that call. And I think that's how you got an affidavit that aligned with my notes.
Because Eric Coomer was on the call and knew Tay Anderson was on the call and, therefore, it was easy for him to create an affidavit of Tay Anderson being on the call because he was on the call. But hey, by the way, don't tell anyone that I was on the call.
MR. KLOEWER: Objection. Nonresponsive.

Page 78

Q. (BY MR. KLOEWER) As you sit here today --
A. -- do is you can stop fighting the Tay Anderson affidavit, or subpoena to testify, instead of standing on the side of saying, Hey, he shouldn't have to turn over the Zoom link that he used during that call.
Because if he did that, that could solve a lot of problems. We could walk right over to the NSA and say, Hey, listen, we now have the Zoom link. We have all the information related to it. And then we could find out who was on the call. That would solve a lot of problems. But you guys fought that, too.
MR. KLOEWER: Nonresponsive.
Q. (BY MR. KLOEWER) As you sit here today, the only person that you claim, that you can claim for a fact, was on that call with Eric Coomer is Tay Anderson; correct?
A. I need to go back through the notes in order to say otherwise.
Q. Yes. And how do you know for a fact that Tay Anderson was on that call?
A. I believe that it was the first thing that I thought in the notes, based upon other things

Page 79

that I had seen or heard and --
Q. Did you see his face?
A. No. I didn't see -- I didn't see anyone's face --
Q. Okay.
A. -- except for a couple people that got in and got out.
Q. Was it a Zoom call?
A. It was.
Q. And you didn't see anyone's face?
A. No.
Q. What were their names on the screen?
A. I think I wrote some of those down.
Q. Okay. And you can't identify who any of those people are, as you sit here today?
A. Well, I'm not a part of antifa, so -- and, frankly, there's been -- I've been more focused, over the last five years, on the stealing of elections in 2022, 2024, and now what continues in 2026, than I am about talking about Eric's part, because he supposedly is no longer a part of the system. Which I'm not sure I believe that either.
Q. You didn't even make any effort to identify those other people by their real names, did you?

Page 80

A. Did I make any effort? Oh, sure, I did.
Q. Okay. What did you do?
A. I started trying to figure out what part of this group, based on what R.D. was telling me, were antifa journalists.
Q. So he was giving you additional information about the participants on the call?
A. That's how it all started, just so you know, is I was having a meeting, and in that meeting, which was an FEC meeting, he stated that -- the first time, Hey, I'm with antifa.
The second time that we met, he said, Well, I can -- I can prove to you these are antifa -- these are journalists -- aren't journalists; they're activists. I can get you on a call.
That's what got my attention and that's what got me on the call. And I didn't set out to have that call by myself. I set out to have that call with other people on that; namely, someone I trusted, that was out there defending people in Denver from these diabolical people that were trying to burn down cities and attack Americans inside of their communities.
Q. Are you referring to John Tiegen here?
A. Yes.
Q. Okay. And he's the one who provided a

Page 81

separate affidavit saying the call happened on a different date than the call described in the Anderson affidavit; right?
A. Well, I didn't go to -- I didn't go to Tig and say, Hey, you know, let's go through your calendar. For the integrity of it, I said, Hey, do you remember this? And he's, like, Oh, yeah. Absolutely.
And actually, he approached me on a -- previous to that and said -- I go, Look, we got this kid that is a part of antifa. There's this call. Do we want to -- do we want to do some -- do we want to dig into them? And do we have a call coming up? And so he was supposed to be on that call.
He subsequently -- and by the way, I haven't reviewed his deposition. I haven't done anything. Like, I've stayed completely -- I didn't even show up for his deposition. I didn't -- I didn't talk to him about it afterwards or before, other than the fact that, you know, we joke about, you know, the -- having to be in those things.
And -- but he was supposed to be on the call with me. It wasn't just me having the call. He was supposed to be there.
Q. But you were physically present with this

Page 82

person during this call; correct? R.D. was with you?
A. Yes. Yes.
Q. Okay. And you talked to him about the other participants on the call after it concluded; right?
A. Yeah. I wouldn't say that -- I wouldn't say that we stuck around to talk a lot about it. There was a lot of moving parts. So after I did it, it was kind of an, all right, we got to go.
I had something else going on, so I had to get back to doing the research on it later. But I don't think I -- I don't recall if I did it right then or had a conversation right then.
We did have a conversation, I think a week or so later, and that was -- if I'm recalling correctly -- and that was it.
Q. What did you discuss a week later?
A. Actually, not much to do with the call, more to do with Jesus and his family.
Q. The purpose of him getting you on the call was to identify the people on the call; right?
A. We wanted to find antifa journalists. But, you know, it became pretty clear, I'm not going to get a lot from a meeting with a bunch of people talking about hyperbolic things.

Page 83

And, I mean, other than talking about, I think someone that was killed and Joey Camp, and it wasn't really -- it didn't feel like I got anything much out of it related to any theories or any strategies that I thought would be helpful to me.
Q. But my question was, the point was to identify these people; right? That's why you wanted to be on the call, was to identify them.
A. Right.
Q. But he didn't even do that?
A. What do you mean, he didn't need to do that?
Q. He didn't tell you their names?
A. No. He had talked about people specific to being journalists. I mean, he had talked about Sean Beedle. He talked about the connection to -- specifically, he talked about a deal that happened in Colorado Springs, where there were swastikas and racial things that were written all over a kids' park that -- and he said that the very person that did the writing about that particular incident is actually the person that was responsible for that false flag, Sean Beedle, Heidi Beedle at the time.
So -- and I talked about that, too. I talked about the fact that they would create things

Page 84

that didn't exist in order to give them credibility.
And so --
Q. My point, Mr. Oltmann, you say that he got you on a call to identify members of antifa.
And as you sit here now, you can't identify anyone on that call because you didn't ask him and he didn't tell you what their identities were?
A. No. That's not what I said. That's the words you're putting in my mouth.
Q. Well --
A. That's not what I said at all. You asked for a list of antifa journalists I was able to uncover.
Q. I didn't ask for that.
A. I sent that list to you -- I sent that list to you before.
You want to sit here -- you said this is a deposition. You can ask me questions. I'll answer the questions. That's not what you're doing here.
What you're doing here is trying to say, Well, why didn't you do this and why didn't you do that? Well, why didn't I record it? Because if I would have recorded it, this would have been a much different conversation and your client would be in prison.

Page 85

So, I mean, I got to tell you, I don't -- I did what I thought I was supposed to do at the time. I don't regret any part of it. I took notes. I did my research on the people that were attacking me.
But I didn't get a ton out of that conversation even related to the hyperbolic comments that were made by Coomer, your client.
Q. Did you ask R.D. to tell you the names of the other people on that call? Yes or no.
MR. TICKTIN: Objection. Asked and answered. I guess if he wants to answer it again or not.
MR. KLOEWER: He hasn't answered it.
Q. (BY MR. KLOEWER) Did you ask R.D. to tell you the names of the people on that call? Yes or no.
A. Yes, I did. I do believe I did, yes.
Q. Did he tell you their names?
A. Well, he's the one that said that I think that was Sean Beedle, but he said Heidi Beedle. He's a -- and I said, Was that Tay Anderson? And he's, like, Yeah.
And this is before we knew all about the stuff related to Tay Anderson's deviancy.
There was a couple other people that he

Page 86

told me, that I had on a list, that were antifa journalists.
            And subsequently to this meeting, on October 15th of 2020, before the election, before everything else, I was on a stage in Bandimere Speedway, and I stated that I had infiltrated antifa journalists and that we were coming for them.
            On the 16th of October, a day later, there was an article written about the comments that I made related to the antifa journalists.
            So this wasn't just a, you know, one-off. There was a lot going on at the time. I got articles being written about me. I got a community burning down. I got people that are having to be protected.
            I mean, there was a lot of stuff going on. You got a guy that was murdered. Lee Keltner was murdered by an antifa security guard that worked for 9News that was unlicensed.
            So, I mean, there was a lot going on during this time. So it's not just -- if this was -- if this was the only thing that I had to worry about at the time, that would be one thing. But it wasn't.
            There was people literally suffering. And we were doing everything we could to protect the children, organize people locally and nationally, and

Page 87

make sure that we had enough information about these people that we could credibly go after them for their -- for their comments.
            Eric Coomer, in the middle of this, even at the time when I researched Eric Coomer, I did not realize the significance of Dominion Voting Systems across the country, that research, or, by the way, have access to any of his socials, which I also didn't have access to.
            I mean, you guys have made the statement that I knew about his socials, you know, prior to November 6th. I think it was the 6th. But that's -- that's not true, right.
            November 6th is when I was with Gordon Beckstead, who you also know, but you never tried to depose him either, who could talk about my state of mind and the information I was collecting and what I was trying to kind of work through over the idea that Dominion could have this thing across the entire country.
            So, you know, you've conflated things and said that I don't have things, but I've provided that information to you.
            Now, how I got that information in what conversation, I don't recall. But I do have a list,

Page 88

that you were provided, of antifa journalists and there's a -- there's a line of events that lead up to fully the outcome of uncovering Eric Coomer, including the things that he did himself.
            MR. KLOEWER: Okay. I'm going to object to that entire response as nonresponsive.
        Q. (BY MR. KLOEWER) Mr. Oltmann, did you speak with R.D., prior to publishing your November 9th podcast, to let him know that you were going to be telling this story?
        A. I did not.
        Q. Okay.
        A. I mean, I did speak to him prior to that day, yes, but I didn't --
        Q. Have you talked to him since then?
        A. -- ask him for permission.
        Q. Have you talked to him since that day?
        A. Since -- yes.
        Q. Okay. What conversations did you have with R.D. after November 9th, 2020?
        A. Well, I got emails from him on, I don't know, whatever it was, January or February of this year.
        Q. Okay. Between November 9, 2020, and January or February of this year, did you speak with

Page 89

R.D.?
        A. I spoke with him in, I believe, November or December, January. I think I stopped speaking to him soon after I got sued.
            I don't recall the -- I mean, from a timeline standpoint, I don't recall the last time that I talked to him then. But the only thing I said is that I would protect him and that I would honor my word, and I have.
        Q. What additional information did you request from him about the participants on that call during those November, December, January conversations?
        A. What do you mean?
        Q. What were you discussing with him at the time, other -- what topics did you address in those conversations?
        A. The only thing that came up during that -- in one of those subsequent phone calls that we had, was that people had been asking him if he was the one. And so there was people that are around these circles that were then questioning each other on who it was that gave access to that call.
        Q. Who was asking him that?
        A. I don't know. I'm not a part of antifa.

Page 90

Ask Eric. He was on the call. Maybe he could tell you.
Q. What additional information did you request from R.D. about the identities of the people on that call?
A. What do you mean, what additional information?
Q. Yeah. Didn't you ask him for more information, especially after you had come forward with this story?
A. Well, it's not a story, by the way. It's what happened. I mean, you guys want to sit here and gaslight me, and that's -- frankly, I'm just not going to allow it. You want to browbeat me over stuff.
You can ask me questions. Did you ask him any questions? You don't have to sit here and browbeat me. I'm not going to sit through another deposition where you get to browbeat me. It's not going to happen.
I don't deserve what has happened to me over the last six years. I don't deserve what you have actually done to me and my family. Nobody does.
So you can ask me a question. I'll answer it. I can't go back in time and say something happened or didn't happen, right. I can't go back in

Page 91

time and wish that I had done everything differently so that I would be sitting in a different part in my life, and actually recording it and doing everything else so I could walk away from this. I wish I could have done all that. I really do.
Q. Did you ask him for any additional information about the other participants on that call? Yes or no.
A. Did I ask -- I'm sure I did.
Q. Okay. What did he say?
A. I don't -- I don't recall what he said. At the time, I was dealing with people coming to my home, trying to hurt me and my wife and my kids.
So I really wasn't -- you know, you get to this place, when you're under attack, where people threaten your life, where things just -- everything kind of mumbles together.
And so I don't -- I don't believe that I was asking -- I mean, if I had -- if I had my druthers, back in 2021, I would have asked -- as soon as I got the affidavit from Tay Anderson, I would have filed a motion immediately asking for him to give up the Zoom call and the Zoom link and say, all right, it's fresh, let's get this information.
But unfortunately, my counsel didn't ask

Page 92

for it. I was being attacked viciously. My family was being attacked viciously. And, frankly, it wasn't the top of my deal.
You're going through the equivalent of being in a war zone and the PTSD that comes with it.
MR. KLOEWER: I'm going to object, again, as nonresponsive.
MR. TICKTIN: Well, you keep asking the same questions. And I'm about to start -- I just want to tell you, Counsel, either move on or I'm going to move for a protective order and we'll call the judge.
MR. KLOEWER: Well, he's not answering the questions, which is why I keep asking them.
THE DEPONENT: No. I'm not answering the questions the way you want me to answer the question.
MR. TICKTIN: Yeah.
THE DEPONENT: And you're doing it just to try and get a rise out of me, which you're not going to get, right. So if you want me to get upset, I'm not going to get upset.
I've spent six years doing what you can't do, putting up with people coming to my home, doing harm to me. Going after my wife and my children.
You couldn't live through that world. You haven't had to live through that world. The world

Page 93

you've had to live through is going and picking up Eric Coomer after he drives into a building and negotiating him out of a felony.
That's what you've had to do, right, not me, while he sits there and lies about the fact that he never ran into a building. And literally, you got him out of a crime.
MR. KLOEWER: There's no question on the table.
THE DEPONENT: It's one after another that you try to get him out of a new crime.
MR. KLOEWER: There's no question on the table, Mr. Oltmann.
THE DEPONENT: -- crime he had in 2010. He had a DUI in 2010. Got out of that case as well.
MR. KLOEWER: Objection.
THE DEPONENT: The crimes that he committed --
MR. KLOEWER: This is a narrative. There's no question on the table.
THE DEPONENT: We can put it on the record, the narrative of what he did in California. The fact that at a deposition, he said, No, I was not being -- I was not being charged with a crime that would have put me in jail for a long time, but yet, by

his own words, that's what actually happened, right.
And nothing that he's said has been the truth. But you want to attack me and sit here saying, You should have done things different.
The conversation we're having is not one of answer the question. It's you want to indict me. You want to say that what I'm saying is not true.
And here is the harsh reality for you, Brad. It's 100 percent true. It's 100 percent true. And I'll say -- I'll ask you a question now.
How did I find Eric Coomer? Out of a hat? Out of 2,000 and whatever employees they had, how did I find him? And how does that guy happen to be the only one that we find out later, on our -- on November 2nd, was on a call with CISA, with the guy that said, We'll have the safest, most secure elections in U.S. history?
MR. KLOEWER: There was no question on the table. Let the record reflect that Mr. Oltmann is just going on diatribes, with no pending question right now.
THE DEPONENT: It's not a diatribe. It's actually the ability for me to -- it's therapy, actually.
Q. (BY MR. KLOEWER) Mr. Oltmann, you



actually identified Eric Coomer by your friend, Ryan McBride, didn't you?
A. No. That's not true.
Q. Mr. McBride told you that he had a friend who worked at Dominion before you ever asked to see his Facebook posts; isn't that right?
A. Not true.
Q. Have you reviewed the deposition testimony of Mr. McBride?
A. I have not.
Q. Okay. Let's go back to some clips from the film. I'm going to show you what's been previously marked as Exhibit 2, Clip 13.
MR. TICKTIN: I'm sorry. Counsel, was that -- what was the first name of Mr. McBride?
MR. KLOEWER: Ryan McBride.
MR. TICKTIN: Ryan McBride.
MR. KLOEWER: Okay. I'm going to share my screen and we're going to show this video.
THE REPORTER: This is still on Exhibit 57?
MR. KLOEWER: This was previously marked as Exhibit 2, Clip 13.
(At this time a video was played.)
Q. (BY MR. KLOEWER) Okay. Mr. Oltmann, you



would agree, in these clips, you don't indicate anywhere in the film that you weren't sure that it was Eric Coomer at the time; right?
A. In that clip, no. I didn't say that, no.
Q. Nowhere in the film did you alert the audience that as of November 9th, as least, you weren't sure if the person on the call was supposedly Eric Coomer; right?
A. As of November 9th.
Q. When you first came forward with this story, at that time you weren't sure it was Eric Coomer, were you?
A. Yeah. I was pretty sure it was Eric Coomer. I knew back in September it was Eric Coomer. The Eric Coomer that was on the call was the Eric Coomer of Dominion Voting Systems.
But I didn't have any reason to dig any further into it. I didn't think it was possible to steal an election. I didn't think that it was possible for a manufacturer of voting equipment to be responsible for an election. No. I didn't think that at the time.
Q. You didn't tell the audience of the film that you couldn't confirm it was his voice, did you?
A. I did go through a process to confirm it



was his voice.
Q. And you determined that you could not conclude it was him; right?
A. No. I had people that were telling me, including Max, that, Hey, you should leave yourself open to the possibility it's not him and started using words like allegedly and everything else.
So I knew three days afterwards, when I had somebody in a -- three days, two days -- I had somebody in a restaurant -- or a supermarket that came up to me and said -- basically threatened my wife and my children, that I was over a target.
Because nobody just finds someone in a supermarket, which means that they were following me, and says that -- I mean, two days after, there wasn't a whole lot of heat. Might have been two or three days later. Which caused me to have to get personal security detail.
So you don't -- you don't try to muzzle the person that's lying. You try to muzzle the person that's telling the truth.
Q. Mr. Oltmann, I asked you about confirming his voice, and you're telling me about someone you met in a supermarket at sometime thereafter.
Please focus on the question I'm asking

Page 98

and answer only that question.
A. No. I knew --
Q. You were not able to confirm it was his voice at the time, were you?
A. I was not -- yes.
Q. Okay. So you couldn't confirm his voice, could you?
A. He's got a very distinctive voice.
Q. That is not my question. You didn't confirm it was his voice --
A. I did the confirming of the voice back in September.
Q. It's your sworn testimony today you confirmed it was his voice in September of 2020; is that correct?
MR. TICKTIN: Objection. You don't have to answer the question when it's asked over and over again.
MR. KLOEWER: He hasn't answered the question Peter.
THE DEPONENT: I did.
MR. TICKTIN: He did answer the question --
Q. (BY MR. KLOEWER) Okay. So in September 2020 --

Page 99

MR. TICKTIN: -- more than once.
Q. (BY MR. KLOEWER) In September 2020, you confirmed that the voice you heard on the call was the voice of Eric Coomer; correct?
MR. TICKTIN: You don't have to answer that.
MR. KLOEWER: Yes, you do.
MR. TICKTIN: You don't. He's asked it over and over again. You don't have to.
MR. KLOEWER: Objection noted. You can answer the question.
MR. TICKTIN: It's a form of harassment. If you continue to harass this witness --
MR. KLOEWER: You're obstructing the deposition --
MR. TICKTIN: -- who's not represented -- who's not represented by his attorney.
And I'm not going to stand by and let you do this. You know, you don't -- you know, I let you have a certain amount of license but, you know, you're just being really abusive here.
You don't -- you know, this is a form of harassment, by asking the same questions over and over again. You don't have the right to do that.
MR. KLOEWER: I'm just trying to get the

Page 100

answers, Peter.
Q. (BY MR. KLOEWER) Let's do this: Let's look at what's been marked as Exhibit 57, Clip 3, and then I'll have a question for you about that. This is from your November 9th, 2020 podcast, where you first discussed Eric Coomer.
(At this time a video was played.)
Q. Okay. That's you in the video, on the right-hand side; correct, Mr. Oltmann?
A. Yes.
Q. Okay. Let's watch what's been marked as Exhibit 57, Clip 4.
(At this time a video was played.)
Q. Okay. That's you again; correct?
A. Yes.
Q. Let's watch Exhibit 57, Clip 5.
(At this time a video was played.)
Q. Okay. So three separate times, in that November 9th episode, you confirmed that you could not say for certain that the voice was Eric Coomer's; right?
A. Well, I always like to leave it open for, you know, could I be wrong, right. It's the same way that I live my life, could I be wrong.
But everything that led after that

Page 101

concluded the opposite, right. So you have -- if you're 90 percent sure, you still have to say 10 percent you're not.
And then the further you got, it got to 91, 92, 93 percent, all of a sudden you get to the point where you're, like, got it. Everything is straight.
Q. So there was a chance that you were wrong, that you were acknowledging, when you made those statements?
A. Again, I leave open to -- I personally want to be able to tell people that anyone can be wrong.
Q. All right. And you were acknowledging that you could have been wrong about that by leaving that space; correct?
A. It's actually who I -- it's what I would normally do, yes.
Q. So you were not, then, 100 percent certain that you accurately identified the voice as Eric Coomer's on the call; right?
A. No. I was probably 90 percent sure.
Q. All right. Let's watch what's been marked as Clip 6 from Exhibit 57. This is from the same November 9th episode.

Page 102

(At this time a video was played.)
Q. (BY MR. KLOEWER) Okay. So which portion of the quotation you attributed to Eric Coomer is a paraphrase?
A. Actually, that's just the notes. And so I didn't have a recording in front of me. So, again, it's, this is what I had written down, this is what I recalled, right.
But, you know, whether or not there was -- what I didn't want to have happen is that there be a recording of this that came forward and said -- and all of a sudden, he added a sentence in between it or something.
I wrote down what I heard. And so I wanted to make sure, again, that this is -- if there was a recording -- which it was on a Zoom, so I actually still believe somebody has a recording of this somewhere.
Q. But you're not certain if that quotation is a direct quote?
A. I took notes. I was not -- I didn't record the call. I wish I would have recorded the call.
Q. All right. So when you say -- I'm paraphrasing -- and you don't know what specifically

Page 103

you're referring to?
A. No. I was referring to my notes. I mean, before I did this, I sat down and kind of walked through things that I recalled, my notes, things that I had discussed with Max previously.
Q. So what this anonymous Eric said could have been something different; right?
A. No. No.
Q. So you weren't paraphrasing?
A. I don't even know how you say that, given all the other stuff. I mean, you have, like, an entire file you're fighting to keep, you know, private in Washington, D.C., that has emails that are quite incriminating against Eric.
But you've sealed that so nobody can get access to it. And we have other things that are problematic in this entire deal that lead you back to Eric. I don't even understand the -- I don't understand.
I don't understand why we're actually even in lawsuits anymore. You guys should have walked away a long time ago.
MR. KLOEWER: Objection. Nonresponsive.
Q. (BY MR. KLOEWER) You mentioned something before, and I'm curious. If we go back to that

Page 104

flowchart that we looked at before, where does Eric Coomer come into this, to that flowchart?
A. What do you mean?
Q. What did Eric Coomer do to rig the election?
A. No. The reason why I built the flowchart is because of the comments that were made that you can't -- that Dominion couldn't steal the elections, and that I was sued.
So as soon as I was -- actually, it wasn't even that. It was the article that he wrote. I don't remember the date. But I think it was -- I don't know -- December 7th or December 10th, whatever it was. It was in December. He wrote an article, and in that article he said that I made up all the Facebook posts. Those weren't real. I didn't have a Facebook account. I didn't have a Twitter account, which is also not true.
So --
Q. So my question, Mr. Oltmann, is what --
A. I'm getting to it. I haven't finished. I have not finished.
Q. You haven't started.
A. Yes, I have.
Q. What did Eric Coomer do to rig the

Page 105

election? That's my question. Answer that question, please.
A. So my goal after that, after I got the information about the fact that he was lying about all of that was, okay, can Dominion actually steal the election.
So I wanted -- I set out to figure out how the election could be stolen by Dominion.
So you got a guy named Eric Coomer, that works for Dominion, that is lying about even the Facebook posts. I mean, just the most rudimentary part of this is just the socials itself. He's lying about that.
And I get canceled from all the socials. X took me down. Everyone took me off the market. The entire Internet gets scrubbed of Eric, at Dominion Voting Systems, that also scrubbed the other Eric Coomer, who was a magician. Just took it all down.
And then I set out to figure out, all right, I wonder if Dominion -- we have a runoff election. I wonder if Dominion is -- can actually steal elections. Let's build it.
Q. So what did Eric Coomer do to rig the election? That's my question, which you didn't answer at all in that response. What did he do?

Page 106

A. What do you mean, what did he do?
Q. What did he do to rig the election?
A. He was the head of strategy and security for Dominion Voting Systems, had multiple patents, was intimately involved in the system, dating all the way back to 2005, right.
Q. Okay. So what did he do to manipulate the 2020 election results?
A. Well, I think he's directly responsible for the architecture that led to the stealing of elections, not just in 2020, 2022, and 2024, but going all the way back to 2005.
So I think that -- I actually think that Eric Coomer was recruited, possibly by nefarious actors, and that he went to work for Sequoia Voting Systems under those -- under that guise.
And he's already lied multiple times about what he had or did not contribute to. And now we're in the final hour where you're asking me what he did.
Well, I think he was a part of the group of people that stole the elections in 2020 and before. That's what I think. And I don't think that -- I don't -- if he wouldn't have been on the phone call, I wouldn't even have known boo about Eric Coomer.

Page 107

I wouldn't even have looked for him. I would have still probably looked into Dominion Voting Systems at some point, but I wouldn't be here. I probably would have stepped away from all of it, and we would have gone our separate ways.
All he had to do was admit that, you know, yeah, I was -- I was drinking, and it probably would have been better for him, right.
So if he would have been on that call, I wouldn't have known Eric Coomer's name. I wouldn't have known anything about him. That's the point at which this all started. Not the point where I did anything, but the point that Eric did something, right.
And he has a habit of being, you know -- of being unhinged and doing these things. So this isn't -- this isn't new for him.
Q. After all this time, after all these years, all the efforts you've put in, as you sit here today, you can't identify one single thing that Eric Coomer did to manipulate the election results, can you, Mr. Oltmann?
A. Yeah. I actually can, if you want to sit down and walk through the adjudication process and the actual architecture. Do you want to pull that up? Do

Page 108

you want to pull up the architecture?
Q. Just tell me. What did he do? Just describe it. It's a simple question. It's how --
A. I built a model. I built a model and that model implicates the work that he did inside the system. So, you know, you can say that Eric Coomer himself is, alla, my bad, I'm not a part of it, but he was complicit in building the system that was allowing the elections to be stolen.
And he didn't just do it, by the way, in the United States. He then went to other countries. And for a guy that said that he's not intimately involved in the process, they flew him all the way to Serbia because he's not involved in the process. They had him involved in every conversation related to the systems in 2020, 2019. They had him on the CISA call on November 2nd, 2020. And this is a guy that's not intimately involved.
Here's even more of what I think. I think Eric Coomer is actually one of the kingpins and he just sat in the background.
I don't believe that John Polis could fog a mirror when it comes to building systems. I just don't, right.
So from my standpoint, it stands. But,

Page 109

again, if Eric Coomer wouldn't have been on that call, we wouldn't be having this conversation, because in his own admission, he wasn't public facing. He wasn't public facing.
So there is no finding a guy in the middle of it, that happens to post the antifa manifesto, that happens to put up all this anti-American rhetoric of killing the president and everything else, and then lying in depositions in Georgia, and everything else that he did.
You know, if you got a shoe and it fits you, you're the guy. So there is no other guy. And you're doing the same thing that they've done across in the media for a long period of time, and that is, you know, walk away. You don't have any evidence.
Yes, we do. We have plenty of evidence. We have mountains of evidence, mountains, including people that are whistleblowers --
Q. But you don't have evidence -- you don't have evidence of a single thing that Eric Coomer did, do you?
A. By his own words. His own words. Don't worry about it. Trump is not going to win. I made sure.
Q. Okay. What else?

Page 110

A. You have the adjudication process. You have the information related to the Dominion theft in Arizona, Colorado, you name it, Cast Vote Records, that point directly to manipulation in the system. Mesa County, which then you just -- you tried to cover up by the same nefarious acts that created it to begin with.

I mean, Brad, you can't be this dumb. You're not this dumb, right. You're actually not a stupid guy. You're smart enough to look at the evidence and there's mountains of it.

There's mountains of evidence that the Dominion system architecturally was designed to steal the vote of the American people. Everyone knows it. You guys, literally, are part of a very small group of people that are holding on to the big lie.

And the reality of it is, is that you just need to come clean. If I were Eric, I would go turn State's evidence and make myself have immunity, right.

The reality of it is, he was involved in the system that stole the elections. He was a part of that system, right. And everyone else can see it, except for you.

You want to -- you want to go through

Page 111

this case and say it's not true. It's absolutely true. People don't just believe it's true. We know it's true. And no amount of gaslighting you're going to do is going to change that.

MR. KLOEWER: Nonresponsive.

Q. (BY MR. KLOEWER) Mr. Oltmann, are ES&S systems also rigged?

A. They're all the same substructure. All the systems and the people within these systems have actually rotated through the companies.

I believe that ES&S holds the same abilities to manipulate elections as Dominion does. So does Smartmatic. So does Clear Ballot. They all use the same substructure.

And if you look at the people that went from organization to organization, I believe they're all connected. I believe it's a conspiracy.

And as you start looking at the substructures and how the elections have gone across the country, it's not just Dominion that we have problems with. It's not just Dominion.

We can look at Tarrant County, down in Dallas, Texas. Same thing. Same problems. Miraculously, a guy from Venezuela comes in, becomes the election guy, and it goes from red to blue,

Page 112

miraculously.

Q. Is that a yes? Are ES&S systems rigged? Your answer is yes?

A. I believe they are, yes.

Q. Okay. Did Eric Coomer work for ES&S?

A. No. He worked for the beginning, the genesis, of all this.

Q. He worked at the genesis of ES&S?

A. Yes. If you go back in time and you look at Smartmatic, when they bought Sequoia in 2005, Sequoia was in 17 states and the District of Columbia.

And one of the biggest issues that caused CIFIUS to look under the hood in 2006 wasn't only the issue of Smartmatic, which is a Venezuelan company, that in 2004 stole the election in favor of Hugo Chavez, it was the amount of anomalies that happened in that municipal election in 2006 that led to a referral, that was on top of the problems that they had with the Smartmatic owning Sequoia, which led to a demand that Smartmatic needed to divest from Sequoia, which led to two years of new leadership, that led to finally the sale, which I believe finished in 2011, but really was in 2010.

And the person that was involved in all of that all the way through, including the lawsuits

Page 113

that were created with -- that show that the IP was kept at Smartmatic.

So Smartmatic retained all the IP that was created under the reign, let's call it, of Eric Coomer, et al., that worked there.

And we have a couple people that worked for Sequoia at the time, that worked with Eric Coomer, that have had some interesting conversations and provided some interesting emails related to Eric Coomer's involvement in how the system was built.

So, yeah. I believe that he was there at the genesis. I believe he was necessary, just from a brain standpoint, in order to build the system to do what it did. And I believe that that information was shared with other organizations, and its substructures of Dominion Voting Systems ended up in ES&S and Smartmatic and in Clear Ballot. And as a matter of fact, that's in court records as well.

So I don't -- I mean, I don't know what to tell you. Do I think that all the systems are connected and have the same capabilities? Yes. Yes, I do.

Q. And you think Eric Coomer rigged every single one of them?

A. No. I think Eric bragged about rigging

Page 114

an election, and I think that --
Q. That's not my question. You think Eric Coomer is responsible for some feature of every voting system in the country that leads to inaccurate votes; is that right?
A. That's not what I said. That's not what I said at all.
Q. Okay.
A. Listen. Let me be -- let me be really clear here, okay. Eric Coomer was at the genesis of this build, right. Eric Coomer's brain was used in order to develop the standards and conditions by which elections could be stolen.
Eric Coomer could have done it for Dominion and it would have solved -- I mean, literally, all the states that were the swing states were all, in large part, Dominion Voting Systems.
Q. Not all of them; right?
A. Okay. So which one wasn't?
Q. Was Dominion operating in Wisconsin and Pennsylvania, for example?
A. It was operating in both states. Whether it was operating in all the places that they had problems with, I don't know.
But it did operate in Wisconsin. It did

Page 115

operate in Pennsylvania, yes. Yeah. You have Hart InterCivic, too, which, I mean, you could argue is kind of closely related to Dominion, couldn't you?
Q. Are Hart InterCivic machines also rigged by Eric Coomer?
A. I don't know. I mean, by Eric Coomer. Again, by his own admission, he did X, which set out to me to find out whether or not Dominion Voting Systems could actually steal elections, which led me to writing a model and predicting the outcome of the Georgia runoff election on Jan. 5, 2021.
I'm not clairvoyant. I shouldn't have been able to predict what happened or predict what's called now the Edison Zero, which is the zeroing out of -- basically, the shutting down of the system to bring it back up.
I believe that they didn't quite cook it right, and they basically were trying to fly an airplane that it was in the air and they were hoping they could explain away the what ifs and how comes, which is what they have done by creating chaos in elections, that led them to do what they just did in California, and count ballots for four or five or six or ten days.
So, I mean, we can sit here and go back

Page 116

to what part did Eric play. The reality of it is, he played a part. I believe he played a part. He talked about playing a part. And that's the only reason I looked into Dominion Voting Systems.
If he was innocent in all the other ES&S and Smartmatic, great. Great. But he's not innocent when it comes to Dominion Voting Systems. He's got his fingerprints all over everything.
And when there's smoke, there's fire. And that's where we are. Otherwise, why would he continue to lie, over and over and over again, about -- and diminish the value of what he did -- brought to Dominion. It's crazy.
I mean, he sat in a deposition in Georgia that saw President Trump be indicted in Georgia, and said that he had no ability to touch anything, which is just not true. It's fundamentally not true.
MR. KLOEWER: Nonresponsive.
THE DEPONENT: I mean, you're getting some good stuff here. You know what I mean?
Q. (BY MR. KLOEWER) Who else played a part? You said Eric Coomer played a part. Who else was playing a part with him and what were their parts?
A. Man, based on the -- based on the information that's out there?

Page 117

Q. Yeah.
A. I don't -- I mean, the list is long.
Q. How many people were involved with this plot to rig the election results?
A. More than one. How is that?
Q. How many?
A. More than one.
Q. More than 100?
A. I don't know.
Q. Could be; right? Could it be more than 1,000?
A. I don't think so, no. I don't think that -- I don't think the circle is that big. I think you got a bunch of really not-so-bright people and people that don't understand technology. Like Chris Krebs, that are lawyers, don't have any understanding.
I think that's one of the major problems we have in this country, is the immediacy of people's ability to understand technology and the threats is what led to our ability to have election systems that are not only substandard, but allow for a lack of transparency, black box involvement, and ultimately, the theft of elections across the country that have led to, you know, the demise of our country.
MR. KLOEWER: It's about 12:15 here, in

Page 118

Colorado. Do we want to take a quick lunch break, maybe a half an hour, come back at 12:45? Does that work for everybody?

MR. TICKTIN: Yeah. How long have we spent now on the video?

THE VIDEOGRAPHER: On the video record, give me one moment and let me pull that up.

Currently, we are at two hours and eight minutes on the video record.

MR. KLOEWER: Thank you. Okay. So are we good to hop off the record until 12:45 then?

THE DEPONENT: Can we make it 1:00, only because I was hoping this would go until 12:45 and then I could take a break. I have a lunch meeting from 12:45 on.

MR. KLOEWER: 1:00 is fine with me.

THE DEPONENT: If I can have a 15-minute overlap, if that's okay.

MR. KLOEWER: 1:00 is fine with me.

THE VIDEOGRAPHER: Okay. Now going off the record at 12:13 p.m.

(Recess from 12:13 p.m. to 1:09 p.m.)

THE VIDEOGRAPHER: We are now back on the record at 1:09 p.m.

MR. TICKTIN: Okay. Before you start, I

Page 119

want to just tell you that I spoke to the witness during the break, but not about the deposition and not about this case, but about general things.

So we're -- I'm not prepared to get into what we discussed, because I do represent him privately on other matters, so -- but I just want you to know that that occurred.

MR. KLOEWER: Okay.

Q. (BY MR. KLOEWER) Mr. Oltmann, as we proceed today, Ms. Kelly, the court reporter, mentioned during the break that we've got you going more than 400 words a minute, which is a lot.

And I'm going to try -- we have a lot of information to get through, and we're taking a lot of time on the record. I'm going to be as specific as I can in my questions, and I'm going to ask you, again, to answer only the question that's asked. Okay? Can you try to do that?

A. Are those two things tied together, my 400 words per minute and answering your questions?

Q. I believe so, yes. And I'm trying to ask yes-or-no questions, with simple answers. That's what I'm looking for from you, okay?

A. Well, none of the questions you asked previously were simple questions that yes-or-no

Page 120

answers would suffice.

Q. Well, I'm going to do my best to do that, and I'm asking you to work with me and with Lisa to get through this deposition and to let us all get off the record and go home. And we can't do that if your answers are as long as they've been, okay?

THE DEPONENT: Sorry, Lisa.

THE REPORTER: No problem on my end. The speed is good to keep me going good. No problem. Thanks, Joe.

Go ahead, Brad.

Q. (BY MR. KLOEWER) All right. Mr. Ticktin just made a record that he spoke with you off the record about another matter. What was that matter?

A. It's not of any of your concern.

Q. Well, in what capacity does Mr. Ticktin represent you, outside of this case?

A. On something outside of this case.

Q. Do you have a separate retainer agreement with him?

A. I am not going to speak about my relationship with Peter Ticktin or the matters pertaining in that.

Q. Okay. But you had a call with him during the break about those outside matters; correct?

Page 121

A. We did.

Q. Okay. I want to circle back and try to button up a couple topics we discussed. We discussed an individual you've referred to as R.D.

My question is, how did you meet R.D.?

A. At a FEC United meeting.

Q. How did he introduce himself?

A. I don't remember. I don't remember. I meet a lot of people. The first time he met me -- the first thing that happens when you -- by the way, this is, again, not a yes-or-no answer, so I'm going to expound on this.

You meet a lot of people that come out of the woodwork when you start a movement to give people back the ability to protest bad things that are happening with them in their communities.

And so, you know, the first time that he said that he was antifa, I laughed about it. I thought it was -- I mean, I didn't laugh. I just didn't -- I was, like, Good for you. It wasn't that big of a deal.

And I said, Well, hopefully you get away from it, and that was that. So it was at a church and I don't remember the details surrounding it, but --

Q. Did someone introduce him to you?

Page 122

A. I'm sorry?
Q. Did someone introduce him to you?
A. No. No. No.
Q. He approached you himself?
A. Yeah. Pretty sure. And it was -- yeah. I mean, again, I don't know if anyone was standing with him the first time.
Q. Did he identify himself as R.D.?
A. He actually didn't identify himself, I don't think, the first time at all. I think he just told me who he was. I don't think that he -- I mean, I don't remember the specifics behind it, but I have this saying where, if I meet someone for the first time, you know, I don't -- I catalog them. I don't remember what he called himself or if he called himself.
Q. So the second time you spoke with him is when he identified himself?
A. I think that's the first time that I paid attention to who he was.
Q. Okay. So the second time you spoke with him, he identified himself?
A. Yes.
Q. By the initials R.D.?
A. Yes.

Page 123

Q. Did he give you his contact information at that time?
A. No. I think I gave him mine.
Q. And did he contact you?
A. I mean, subsequently, yes. He did.
Q. Okay. How?
A. Through Signal. Actually, I'm not sure it was Signal. It might have been -- let me look at my phone really quick to give you an idea. It might have been through -- it might have been through a secondary deal.
Like, the only reason I say that is because I think that when he went to try and get ahold of me again, he went through a thing called Threema.
Q. Threema?
A. Threema.
Q. What is Threema?
A. It's an -- it's an app that is a -- it's a -- I don't know. It's an -- it's an app for absolute privacy. It's a privacy app. It might have been Threema.
Q. So you had his contact information saved in your phone at the time; right?
A. Yeah. It's not the way it works. You know, when you're in an app, whether it be Signal or

Page 124

Threema, they tell you who they are.
Q. Okay. So when he contacted you, he told you who he was, when he contacted you through Threema?
A. It could have been Threema and it could have been Signal.
Q. Okay. But through Signal, that would be associated with his phone number; right?
A. Absolutely not.
Q. Okay. You had his phone number?
A. That's not how Signal works. It's not how Signal works.
Q. You had his phone number at one point; right?
A. I mean, I know for a fact that I contacted him through Signal. But, yeah. At one point, I did have his number.
Q. And you deleted it?
A. I deleted it in January of 2021, I think.
Q. Why?
A. Protect him.
Q. By deleting it from your phone?
A. Yes.
Q. So after you were sued, you deleted his phone number to protect him?
A. Yes. Kind of like Eric Coomer deleted

Page 125

all his Facebook profiles and all of his posts before he sued me so that he could cover up the fact that he didn't have his Facebook posts. Or he did it nefariously. I did it to protect somebody from their life being taken.
MR. KLOEWER: Nonresponsive.
Q. (BY MR. KLOEWER) When you just looked at your phone to try to find information, what were you looking for?
A. The name Threema.
Q. Okay. You stated before that he sent you some emails in January or February of this year; is that right?
A. Yeah.
Q. How do you know that that was the same person from 2020?
A. Because I asked him questions.
Q. And he provided satisfactory answers?
A. Yeah. Because it didn't sound like him to start with, I mean, from a vernacular standpoint. Let me see. But I asked him questions like, where did we meet, stuff that he wouldn't know, that he wouldn't have the ability to know. If it wasn't him, he wouldn't be able to answer those questions.
Q. Was it the same email address he had had

Page 126

at the time?
A. I never had his email address before.
Q. What does he look like?
A. What do you mean, what does he look like?
Q. His appearance. Describe it.
A. I'm not going to do that. Same reason why. You have his name. This is -- you know, I don't even think legally you can ask me that question, right.
You can't legally ask me to, you know, here, describe this guy, right. This isn't a police interrogation. This is a deposition.
Q. You can't describe him because you've never actually seen the person you claim is R.D., can you, Mr. Oltmann?
A. Yeah. That's a lie. That's more of the lies that you tell which you build these affidavits for and say, Oh, yeah, but pinky square Eric Coomer wasn't on the call.
Q. Okay. So describe him. What does he look like? What does he look like?
A. I'm going to tell you he's a -- in his 20s.
Q. In his 20s?
A. Yes.

Page 127

Q. Okay.
A. Well, I mean, now I don't think he's in his 20s. Maybe he is.
Q. Okay. How tall is he? Taller than you?
A. No.
Q. Same height? Shorter?
A. I can't recall.
Q. Okay. What is his skin color?
A. Yeah. I'm not doing this. You want a roundabout way to figure out a way you can find him so you can do harm to him. I get it. And that's not -- I gave you the name.
And he reached out to me. I didn't reach out to him.
Q. Well, you said it's not a real name; right?
A. He said it's not a real name. What's funny is that they ran a check on Robert Davis and it came up as -- it pinged when they went to run information on him.
I don't know the -- back when David Perry and Peter Ticktin did represent me, in the case that you had that you had them removed from, they ran a records check against him, and I don't know what the details of that were, but it -- it flagged.

Page 128

Q. Flagged what?
A. I don't know. I don't -- I mean, you will have to ask David Perry after the deal. I don't have any idea. I don't know what that means, right. But I do know that it was irregular.
Q. All right. I want to look at -- real quick at an exhibit that I had meant to discuss a bit briefly.
I'll share my screen with you here, just on the topic of being able to identify Eric Coomer as being on the call. This is an exhibit that's been previously marked as Exhibit 10.
Do you see this document, Mr. Oltmann?
A. Yes.
Q. Okay. And do you recognize this?
A. No.
Q. Okay. The email address at the top says, From Joe at FEC United. That was an email address that you utilized at one point; correct?
A. Yes.
Q. And the date is November 10th, 2020. Do you see that?
A. Yes.
Q. Okay. The Bates stamp on this, you'll see, is OAN00002. Do you see that?

Page 129

A. Yes.
Q. Okay. That indicates that this document was produced to us by One America News in a lawsuit that's currently pending against you.
Does that refresh your recollection as to what we're looking at here?
A. No. But, I mean, it's fine.
Q. Okay. The recipient here is someone named Taylor Scott. And take a minute to read the document, if you can. I can zoom in. I don't know how close you are to your screen.
But take a minute and look at that and I'll have some questions for you once you familiarize yourself with the document.
A. Okay. Okay.
Q. Okay. And that's the first portion of this email. You go on to add a second portion, down here, in bold face font. Do you see that?
A. Yep.
Q. I'm going to direct your attention to the last sentence of this third full paragraph, right here, that I have highlighted. Do you see that?
A. Yeah.
Q. It says, Now, I want to start that I cannot verify on this call that it is the same Eric,

but let me tell you, as I jotted notes, what I discovered.
So this is you stating in writing the same thing you said on your podcast on November 9th, that you couldn't confirm that the voice you heard was Eric Coomer's; right?
A. Yeah. It's kind of like having a murderer that murders someone, and then you have to rely on all the other stuff that you are able to collect related to it.
MR. KLOEWER: Objection. Nonresponsive.
Q. (BY MR. KLOEWER) This is you confirming that you --
A. Yes. I've already answered this question twice before, that 90 percent is not 100 percent, so I wanted to let them know that I wasn't 100 percent sure.
Q. All right. And you repeated that down here a second time in the same email.
"I compared what I remembered hearing with his videos I was able to find, and I think it is a match, but not sure." Those are your words; right?
A. Yes.
Q. Okay. Let's set that aside for now.
Mr. Oltmann, with respect to this



individual R.D., and another individual, you've been repeatedly ordered by multiple courts to provide their identities; correct?
A. I gave the information only because he chose to come forward and only he chose to have a conversation with my attorney and he chose that I divulge that information.
So other than that, I would have saved myself a lot of trouble and about $160,000 had I just known from the beginning that it was a pseudo name, which, by the way, is not uncommon for people in antifa, I guess, to do that. This is a common -- commonplace for them to create names for themselves.
MR. KLOEWER: Nonresponsive.
Q. (BY MR. KLOEWER) You've been ordered multiple times to identify both the individual who got you on this call and the individual who provided you access to Eric Coomer's Facebook posts; correct? That's a yes-or-no question.
A. Yes.
Q. Okay. I'm going to share my screen again. I'm going to mark this one as Exhibit 58.
Okay. Do you see this item on the screen, Mr. Oltmann?
A. Yes.



Q. Okay. It's dated August 29th, 2021, at the top.
A. Yes.
Q. And it's from Coomer v. Donald J. Trump For President, et al. That's a case where you are a defendant currently; correct?
A. Yes.
Q. All right. And this is an order. I'm going to direct your attention to paragraph 6.
It states, Mr. Oltmann shall respond to all questions regarding the alleged antifa conference call, including, but not limited to, questions regarding: A, the date and time of the call; B, the platform on which the call was conducted; C the name, address, and phone number of the individual that provided him access to the conference call; D, the name, address, and telephone number of any other individuals that can corroborate that Mr. Oltmann participated on the call; and E, the name, address, and telephone number of any other individual that participated in the call.
On page 2, we have a second subparagraph F. It states, Additionally, Mr. Oltmann shall provide information regarding the means by which he obtained information regarding Facebook posts that



he attributed to Eric Coomer.
Do you see that?
A. Yes.
Q. Okay. Regarding some of these matters up here, did you ever ask R.D. for the email that gave him a link to this Zoom call?
A. What?
Q. Did you ever ask R.D. for a copy of the email that provided him a link to the Zoom call?
A. No. I don't think so.
Q. Why not?
A. Because I didn't.
Q. And you've never seen a copy of that email, inviting him to that call, have you?
A. I actually don't believe, when we got on, that it was an email. I believe it was a -- man, I want to say it's a Discord or a -- or some other platform. Hold on.
What is that other platform? If it wasn't Discord, it was -- tell me another platform and I'll tell you what it was. It's the -- Reddit. It's either a Reddit deal or a Discord deal.
Q. So a message sent on Reddit contained the Zoom link?
A. Yeah. Yeah.

Page 134

Q. What makes you think that was the case?
A. Because I don't believe it was an email, if I'm remembering correctly. I don't believe it was an email.
Q. Why not? Did he show you a Reddit message?
A. No. It just wasn't in the format. I remember -- I remember looking at the -- you know, as he's looking at it, and it didn't look like it was an email.
I mean, I guess technically it could have been, but I don't think so. I think it was -- I actually think it was Discord, but I could be wrong. Reddit, Discord, one of those platforms.
Q. Did you see the email addresses of the other folks who were invited to that in the cc column?
A. Yeah. So that's not -- I don't -- no. No. And I didn't -- that's not how -- that's not the format by which he gave it to me. It was a phone number and a -- and I believe a password.
Q. So did he give it to you or were you looking at his computer?
A. We were on my computer.
Q. You were on your computer?
A. Yeah.

Page 135

Q. Have you attempted to pull the data from your own computer to determine what links you clicked on and when for Zoom calls around the time?
A. Yeah. That's not the way it works either, by the way. You have a sign-in or you have the join a meeting. And if you go to just join the meeting, you put the meeting ID in, you put a password in, sometimes you don't need passwords, although -- back then -- but I'm fairly sure that he had a password.
And the answer is yes. We actually even went as far as to call Zoom, in December of 2020, and ask them to do a records search from our IP address from the office.
So we did that. We also turned over stuff to someone who took it to the NSA, to see if we could identify the other people that were on that deal.
And we filed a subpoena against Auon'tai Anderson, Auon'tai Anderson, that he fought. I guess you guys helped him fight it, to get access to the Zoom number and the log-in that he used for his affidavit, so that we could use that to back in to who was actually on the call that day, because that would give us the information that we could either, A, take

Page 136

to the NSA, if they would be willing to cooperate, or -- I don't know what that process is -- or take it to Zoom and subpoena them.
So that was a part of the -- of the subpoena that we served on Tay Anderson in this -- in that case.
Q. Did Zoom provide you an answer?
A. Zoom said that there's millions every day and there's no way they could get to it. And I was like, Okay, well, try. So that was --
Q. If it was on your computer, did you click on a link to access this call?
A. No. That's not how Zoom works, Brad. This is actually the problem with our election system, is your lack of ability to understand technology is the same reason why the election technology that we use in our country is bunk.
Q. I clicked a link to get on this Zoom call today, Mr. Oltmann. So I'm asking you if you clicked on a link to get on this Zoom call at the time.
A. Here, let me just -- for the record, I think it's actually probably good that we do this.
If you go to the very bottom of the thing, it just lists it. It literally lists the number and a password.

Page 137

Q. Okay. So that's what you did to access this call, is you took the number and the password and that's how you accessed the Zoom call you're talking about?
A. Correct. I mean, that I can recall, yes.
Q. Okay. So were you logged in to R.D.'s email or his Reddit account to find that log-in information or had he forwarded it to you?
A. No.
Q. Well, it's a one or the other question. So which is it?
A. No and no. Neither one of those things.
Q. So the information was just on your screen somehow and you don't know how?
A. You're just ridiculous. Do you really not know anything about how Zoom works?
Q. I don't know how this call worked and that's what my question is about. So --
A. Let me just -- let me educate you on technology that --
Q. Educate me on this call, Mr. Oltmann.
A. -- you should know about, Brad, and that is, what is the I.D. for the meeting. The I.D. for the meeting is 85290593024. All right. What is the password? Password is 779407. Click. You hit a

Page 138

button and it goes and it lets you in.
Q. All right. We're on the same page.
So my next simple follow-up question is, how were you looking at that log-in information and the password on your computer? Was it through his account or was it through yours?
A. Are you serious right now?
Q. Yes. It's a simple question that you have not answered. Did he open his account or did he -- did he log into his account on your computer?
A. He's on his phone.
Q. So his phone --
A. I'm on my computer.
Q. Okay. Well, there we go. So it was on his phone.
A. He's on his phone. I'm going, What is the -- what is the meeting I.D.? What is the password?
Q. That's what I'm trying to understand, Mr. Oltmann.
A. Join meeting. Join meeting then joins the meeting. I'm not on his phone. I'm not getting any log-in. There's no link to click. That's the same thing that I did in order to get on this that showed up as Aspen Conference Room, right. It's the

Page 139

same thing. It's the same set up.
Q. So he had the information on his phone, and you logged into -- did you log into your Zoom account to get on that --
A. No. You don't log into anything. Like, right now, I'm not logged into anything. I'm not signed into Zoom at all.
Q. Well, when you got on the Zoom call, it said Aspen Conference Room, and now it says Joe Oltmann; right?
A. Oh, my gosh. Yes.
Q. So when you got on the Zoom call with R.D., what account were you utilizing to access that Zoom call? Was it your account, your Zoom account?
A. That's not the way it works. Let me walk you through -- let me talk --
Q. It's a yes-or-no question. Was it your account or not?
A. There is no account. You just have a Zoom. It's just a Zoom. You put the information in, and you hit the little button and it says, Do you want to use the app or do you want to use the browser, and then you pick either app or browser.
And when you hit that button, it will bring up a screen and it will ask you if you -- you

Page 140

know, if this is the information that's correct. And you just take whatever name that's on there, that shows up because it holds onto that, and you just remove it.
It's really simple. None of this stuff is -- you know, it's not -- you would never -- yeah. You're not signed in. The only reason you would sign in is if you were using your particular Zoom account; otherwise, I'm perpetually not signed in. Nobody is signed in.
Q. So you were also ordered to identify the individual who gave you access to Eric Coomer's Facebook accounts; right?
A. Yes.
Q. And that was Ryan McBride; correct?
Correct?
A. Yes.
Q. Yeah. But previously, you -- that's not what you said under oath in the Lindell case, is it?
A. Well, technically what I said is accurate.
Q. Well, it's not, though, because he is the one who gave you access to those accounts, isn't he?
A. Not really. He gave me access to his computer.

Page 141

Q. Let's -- we'll mark this one as Exhibit 59. It's an excerpt from your deposition in the Lindell case, just so we're on the same page here.
You were deposed in that case on December 16th of 2022. Do you remember that?
A. Yeah.
Q. Okay. And I asked you, "And about the individual who provided you those posts, have you given us information about that?"
This is at line 10 of page 345 of that transcript.
You said, "I'm not going to give the information on him."
I responded, "Okay. Was it Ryan McBride?"
Your response, "No;" correct?
A. Yeah. No. But I think you're -- I think you're missing the context. You said about the individual who provided you these posts.
He didn't provide me with the posts. I provided myself with the posts. He just gave me access to his system.
Q. And that's because he told you that his friend, Eric Coomer, worked for Dominion, and you became very suspicious of him; is that right?

Page 142

A. That's not true. You got the timeline wrong.
Q. Well, what do I have wrong?
A. When I was on the call, I looked up Eric, and I saw that there was a connection to Ryan. And he was a volunteer for me. And so I thought he was a part of the inside workings, so I separated myself from him. I had a massive trust issue.
So I didn't mention anything about that until way later, in November. Never said a word to him. I just basically didn't have any conversations with him.
Q. And you ultimately demanded to have access to his computer; right?
A. I did.
Q. And he gave you a link to access his computer?
A. I don't remember. I don't recall the circumstances behind it.
Q. Okay. And through that link that he provided you, you went looking through his computer for information about Eric Coomer; right?
A. Not exactly, no. It's not exactly how it happened.
Q. Tell me how it happened.

Page 143

A. Well, I just was more interested in his social accounts than anything else.
Q. Okay.
A. I was digging in more than just that. I was -- I was digging on everything. At that point, I mean, it's like my brain was on overdrive. I wanted to get to the bottom of it.
Q. Well, you didn't -- you didn't, at the time -- so let's get the timeline right.
You're saying that you somehow saw that Eric Coomer was connected to Ryan McBride when? When did you make that connection?
A. In September.
Q. In September. How?
A. I went looking for connections to Coomer and who were friends of friends. See, that's the thing, is that Eric says that his was a private Facebook account. It wasn't. It wasn't. He didn't -- there's no private Facebook account.
Q. How did you find out that he was friends with --
A. He showed his friends. And so when we went and looked up Eric Coomer, and then you looked up his friends, and it goes and shows people that are mutually associated, and that's how I found it to

Page 144

begin with.
Q. Why didn't you ask Mr. McBride about him at the time?
A. Because I was suspicious. I was suspicious about him volunteering all the time and helping all the time. And the antifa kid and Eric Coomer, it just -- it didn't feel right.
Q. And you were in frequent contact with Mr. McBride during this time, through his volunteering; right?
A. Not after that, I wasn't.
Q. You stopped talking to him at that point?
A. I didn't stop talking to him, but I stopped -- I stopped the communication and the banter.
Q. But when Dominion got in the news after the election, he reached out to you, didn't he, and said, My friend Eric works there?
A. No. That's not how it went. It's backwards.
Q. How is it backwards?
A. What's that?
Q. How is it backwards?
A. Because that's not what happened. When I got the article with Eric Coomer, it wasn't -- he didn't reciprocate and call me. I had to call him. I

Page 145

was pretty pissed.
And I knew at that point that he was connected to Eric Coomer. But Dominion -- just so we're clear, on the 6th of December -- or November, Dominion was not in the news.
Dominion Voting Systems was not in the news on November 6th. They hadn't even gotten to Dominion and did it until I brought up this stuff with Eric Coomer. Nobody was talking about Dominion Voting Systems. No one. They were talking about ballots and boxes and everything else.
There was no Dominion Voting Systems. It wasn't, like, Dominion was, like, high on the list. That's not how it happened at all.
There was the conversation about what happened with the systems down in Georgia, what happened in, you know, somebody driving ballots down, and then what happened in the -- there was no, is Dominion behind that, on November 6th or 5th or 7th.
It wasn't until that Monday that -- or Tuesday that it started heating up on Dominion Voting Systems.
Q. Well, there were some of your acquaintances who were talking about Dominion before you ever talked about it.

Page 146

A. What acquaintances?
Q. What about L. Todd Wood's interview with Russ Ramsland on November 8th?
A. I didn't even know Todd. I didn't know any of these people. I didn't know Russ Ramsland. I didn't know Todd Wood. I didn't follow any of them. I didn't know who they were.
There was no, like, grand conspiracy deal. I wasn't, like, trying to figure everything out with these people. I didn't even know who they were.
Q. Okay. Is this the first time -- is it your testimony that you weren't aware that L. Todd Wood conducted an interview with Russ Ramsland on November 8th, talking about Dominion Voting Systems?
A. Did I know -- no, I did not know about that.
Q. Okay. Well, you followed an account by a guy named CodeMonkeyZ; right?
A. Okay.
Q. And that was a pseudonym for Ron Watkins; right?
A. Yeah.
Q. And you even went on to promote Mr. Watkins' congressional campaign in Arizona years later; right?

Page 147

A. Yeah. But I didn't meet him until 2022 --
Q. Well, he was posting about Dominion before you; right?
A. -- 2021 -- excuse me -- at the symposium.
What's that?
Q. He was posting about Dominion before you; right?
A. No, he wasn't. Nobody was. Not one person was out there talking about it until, literally, I left Gordon's place. And I went home conflicted on whether or not I would say anything about any of this, and he told me to leave it alone. Hand it off to someone else. Let someone else do it.
That's the only time that me and Gordon have ever gone sideways on anything related to our relationship. That was on November 6th. It was before they even called the election.
No one was talking about it. No one. Not -- no one. Absolutely no one. And that was -- that was November 6th. November 6th.
I had the 7th, when I went home. I had the 8th, which was that Sunday. I had heartburn on Monday. Nobody. Nobody, Brad, was talking about it at all. No one.

Page 148

There was nothing. Go check. Go check. Everything on the 5th, everything on the 6th, everything on the 7th, you can run anything you want. Nobody was talking about it until the -- until after I started talking about it. No one. I have Facebook posts --
Q. No one was talking about Eric Coomer either; right?
A. What's that?
Q. No one was talking about Eric Coomer either; right?
A. No, they weren't. But I'll ask you the same question. How did we find Eric Coomer? How did you have a guy, that is an antifa activist, that is a skinhead, is a satanist, is a -- you know, hates President Trump, talks about killing him, talks about murdering police officers.
And this is a guy that runs strategy and security for the voting system that represents 50 percent of the vote of the American people. And then he says that everyone that works with him believes the same thing he does.
And so then you put that together with the patents that he owns and all the other things that we were able to uncover, and it's just a coincidence,

Page 149

that you got a satanist skinhead, who hates the president, and talks about, Hey, Trump is not going to win. I made sure of it. It's absolutely a totally different guy, totally different guy for sure. Makes total sense.
MR. KLOEWER: Objection. Nonresponsive.
Q. (BY MR. KLOEWER) So, Mr. Oltmann, we just have to take you at your word that there was a volunteer for FEC United, who was very involved in that organization, who happened to be Eric Coomer's friend for more than ten years.
We have to take you at your word that you never had any conversation about Eric Coomer with Ryan McBride prior to the events that gave rise to your podcast. That's your testimony?
A. You have to take me at my word?
Q. Yeah.
A. So we have to take Eric Coomer at his word --
MR. KLOEWER: Nonresponsive.
A. I'm not finished talking. I'm still finishing answering the question.
So you have to take Eric Coomer at his word, that he not only was not on the call, but he had nothing to do with fixing the elections, after

Page 150

15 years in the business, starting with a company that was owned by Venezuelan -- Venezuelans, that turned an election, who now we have Maduro in custody, and over 20 Venezuelan whistleblowers, of which some of them put Eric Coomer in the room with other people who have been indicted, specifically Smartmatic executives.
And, yeah. We have to take him at his word, the guy that ran into a building and lied about it over and over and over again, as if it was just standing still, after nearly running someone over, and going into a bar and taking shots with him. That's the guy we have to take -- no. The skinhead -- yeah. Yeah. You have to take my word for it. Yes. Yes.
MR. KLOEWER: Objection. Nonresponsive.
A. I just answered the question. I went all the way around, and then I said yes. You have to take my word for it. That's not nonresponsive, Brad.
Q. To be clear, I'm objecting to the 99 percent of your response that was nonresponsive.
A. But it wasn't nonresponsive. I answered it.
Q. Was anyone else involved in your conversations with Mr. McBride about Eric Coomer?
A. No.
Q. What information did you request from

Page 151

Mr. McBride about Eric Coomer?
A. I didn't. I didn't even request any of the emails that he was -- that I guess he produced related to the subpoena that you guys had. I didn't know anything about that. I didn't go that deep into it, which was pretty revealing, honestly.
But, you know, no. We had very limited conversations after that. And it did cause us to have a more trusting relationship and that led to a pretty extensive friendship. And, you know, he's a good friend.
Q. You never asked him to tell you if he believed if Eric Coomer had rigged the election?
A. I'm sorry. Say that again.
Q. You never asked him for his beliefs about whether Eric Coomer had rigged the election?
A. We may have had that conversation. I don't remember it. We may have had it. It's been six years.
Q. All right. We've been bouncing around a bit here. Let's get back to the film The Deep Rig.
You would agree that you did a lot of work to help promote the film prior to its release; right?
A. I don't think so, but maybe.

Page 152

Q. Were you ever interviewed as part of promotional efforts for the film?
A. I don't recall.
Q. You know who Ann Vandersteel is; right?
A. I do.
Q. Do you recall doing a number of interviews with Ms. Vandersteel prior to the film's release?
A. I don't. It doesn't mean it didn't happen. It just means that I don't remember it.
Q. Okay. Do you recall appearing with Steve Lucescu on Ms. Vandersteel's show to promote the film before it was released?
A. I don't.
Q. What about appearing on the show with Mr. Byrne?
A. I don't recall.
Q. And as far as just appearing by yourself, do you have any recollection of those interviews?
A. No.
Q. We touched briefly on the film's premier a while ago. Do you remember -- do you recall attending that event?
A. Which event?
Q. The premier of The Deep Rig in June of

Page 153

2021?
A. Yeah. I didn't remember the time frame, but yeah. I remember that.
Q. Were you invited to attend that event?
A. I don't recall.
Q. Okay. The venue for that event, we heard from Mr. Lucescu, and there's other information relating to an individual named Austin Steinbart, who helped find that venue.
Do you know who Austin Steinbart is?
A. Steinbart. Why does that sound familiar? Austin Steinbart. Do you have any other information about that individual?
Q. He's utilized the pseudonym Baby Q.
A. Yeah. I wouldn't -- I don't pay attention to any of that. So give me some context behind him, if you would.
Q. I'm wondering -- I'm wondering if you know him or how he came to be involved with the premier of The Deep Rig.
A. Well, I mean, I don't -- I'm not saying that I haven't met that individual. I don't know -- I don't recall him specifically, and I certainly don't -- I mean, it's not shaking trees for me. And I don't deal with people that would call themselves

Page 154

Baby Qs.
Q. And why is that?
A. Because I think it's retarded. I think the idea of using -- I mean, use your name. That's why.
Q. Okay. What about the QAnon movement more generally? You're familiar with that; right?
A. I think it's absurd.
Q. And why is that?
A. Because it's a bunch of ridiculous mixed in with a little bit of truth, and you just -- people get themselves sucked into just stuff that's just nonsense.
It's a movement designed to create chaos so that you can't actually see the fruit of the tree. You can't see the stuff that's really going on.
That's my opinion. So, I mean, I'm sure that there are other people that think the Q movement is legitimate. I just don't.
Q. So were you involved with helping to establish the distribution for The Deep Rig, prior to its release?
A. What?
Q. Were you involved with helping to establish the distribution network for The Deep Rig,

Page 155

prior to its release?
THE DEPONENT: Lynn.
A. Was I involved -- I don't -- I don't know.
Q. (BY MR. KLOEWER) At some point, you helped, through your business, to set up a website for The Deep Rig; right?
A. To set up a website? Yeah. I believe we set up a website.
Q. But that was after the film had already been released; correct?
A. I don't recall timelines. Again, it's -- after six years, it all just kind of squishes together.
Q. Okay. Who were you primarily working with in working out that relationship to host and distribute The Deep Rig? Did you have a point of contact?
A. I don't remember. I thought we provided all the emails and stuff for that. If you have an email that I could look at.
THE DEPONENT: Thank you.
Q. (BY MR. KLOEWER) That's probably the easiest way to do that. Let's start -- I'll show you what's been previously marked as Exhibit 40. That

Page 156

might help to give us some context.
So this email was produced to us by The America Project. It has their bates label here. These emails are in reverse order because they've been printed.
So I'm going to scroll to the last page of this document, which is pages 11 and -- well, let me see here.
A. All right.
Q. 11 and 12.
And the initials here say F.K. Do you see that?
A. Yeah.
Q. Do you recall working with an individual named Faaiz, F-a-a-i-z?
A. Vaguely.
Q. Okay. And who is Faaiz? It's Faaiz Khan, is what the K stands for.
A. I think he worked for The America Project.
Q. Okay. And did you work with Faaiz in figuring out the distribution model for this film?
A. No -- I don't think so. I think that I helped in a meeting to connect them to put it in different platforms, try to get it online to the Apple

Page 157

Store, I think.
I gave him a contact for the Apple Store and maybe Google Play Store.
Q. Okay. So this is sort of fast-forwarding in time. I showed you this so we could give you some names and context to discuss your relationship with them.
But this is dated February 3rd, 2022. Do you see that?
A. Yeah.
Q. And Faaiz is indicating here, he says, Hi, Keith. That's keith@pinbn. Who would that be?
A. Keith was my COO at the time. Actually, he was -- and CEO, because he took over as CEO.
Q. That's Keith Serenski; correct?
A. Yes.
Q. Okay. It says, Hi, Keith. I trust you're well. I'm writing to you about deeprigmovie.online that PIN has been hosting for us.
Can you tell me, what is the -- how is PIN hosting this film? What does that mean in the sense of PIN's role here?
A. They paid us to host a movie.
Q. So does that mean that you have a server, where you kept it, where people could come to the

Page 158

website and find it? Or what exactly does that mean?
A. Yeah. We hosted the site. Yes.
Q. Okay. Did you also help in building out the site, as far as doing the graphics and the -- you know, the links, things like that?
A. I don't -- I don't recall. I mean, we had the capability of doing it, but I don't recall if we did it or not.
Q. Okay. Is that one of the typical services that PIN provides?
A. It's an ancillary service. A necessary evil.
Q. What would you say is the primary service that PIN provides?
A. Data.
Q. Data how?
A. Well, that would be proprietary and that would be a business secret, so I'm going to keep that a secret.
Q. Well, can you describe, just in broad terms, like what does -- why would somebody call PIN? To advertise? To build a website? To do what?
A. Yeah. To build personas. To build data on individuals that engage with them.
Q. Okay. So it's collecting information on

Page 159

people's clients, right, people who click on their links, things like that; correct?
A. No. No. Not at all, actually. It's the opposite of what we do.
We basically track data. We have the ability to use technology that allows for us to develop habits, behaviors, psychographic and geographic behavioral data for individuals, how they actually interact.
And then we use that data to build personas individually that tell us what they're likely to do next. That's called a PPV, propensity of probability value.
So it allows for us to find needles in haystacks, without having to pay to have the haystack see messages.
So the responsibilities to deploy have nothing to do with anything other than the function. It's basically the gun by which you serve the bullet.
The bullet is making sure that you're going to hit your target -- your target. So we're known for reducing costs and increasing effective reach and building on that.
We built a Prometheus platform. So, yeah. It's pretty cool stuff, actually.

Page 160

Q. So is it fair to describe that as just targeted advertising, finding people who are most likely to buy a company's product?
A. No. No.
Q. Okay.
A. Targeted advertising is targeted advertising. Data is data. I can use data any way I want, it's just a matter of what the functionary is of it.
Q. What do you mean when you say "target" then? You said, The gun that finds the target. What are you -- how does --
A. You have individuals in market. So targeted marketing is the function of it, the functionary part of it.
How you do it is the data that says, load the gun with this round and your success rate is 95 percent.
And so we are able to eliminate the white noise and get focused in on what's most important, so the probability of success goes up dramatically.
And then we take that data and we help them develop profiles that tell us how to create individual messaging that aligns with any of those characteristics of the individuals.

Page 161

So, you know, marketing is marketing, and data just informs it.
Q. All right. In the next paragraph of this email from Mr. Khan, he says, I believe there may be some fees that are due. $1,200 for December.
Is that when you were charging The America Project to host the film?
A. I have no idea. It wasn't my -- it wasn't my email. It was an email to Keith.
Q. Sure. Well, let's scroll up here.
We have another email from Mr. Khan a few days later, February 9th, saying, Hey, guys. Just following up on the request below. Could you please let me know of next steps?
And this one cc's an individual named Christopher Wiegand. Who is that?
A. He's my -- he's the CTO.
Q. Okay. Does he still work there?
A. Yes.
Q. Okay. Scrolling up a little bit further, we get to February 23rd, another email from Mr. Khan. This one is directed to you. He says, Joe, hope you are well and 2022 is a great year so far. We haven't spoken in a while. At this time I'm writing to cancel our arrangement for Deep Rig movie. It would be great

Page 162

if we can take over the assets.
Do you see that?
A. Yes.
Q. Okay. And here we see your first response on February 24th. You state, We will turn it off. We will not transfer it. Our tech is behind it. Great talking to you. Let me know what you decide. And need a release from Steve. Get that done, please.
Who is the Steve you're referring to here?
A. I think it's -- I mean, it's been so long, I don't remember this even email chain. But that would be -- I'm sorry. The Steve that worked on The Deep Rig.
Q. Lucescu; right?
A. Yes.
Q. When was the last time you spoke with Mr. Lucescu?
A. I think at Christmastime I sent him a Merry Christmas.
Q. Okay. Have you been in touch with him since the making of the film otherwise?
A. Off and on. I don't -- I don't recall the nature of the conversations, but more the fact that I think that the elections were stolen, and every

Page 163

time new stuff comes up. I mean, and seldomly I would send him something to say hello.
Q. Okay. Are you aware that Mr. Lucescu has apologized to Eric Coomer for the publications about him?
A. No.
Q. Okay.
A. No. Not at all, actually. I would be surprised.
Q. Okay. We can take a look at that later. Let's stick with this email for now.
I'm going to scroll up here to your -- to this portion, March 23rd. This is on TAP, page 8.
It says, We need a release from Steve Lucescu. If TAP provided the film, it should already have it. I need all bills paid, including any disconnect and close-down costs before we do anything. You can find that provision in the cancellation provision of the contract.
So I take this to mean that you had a specific contract with The America Project at some point; right?
A. Yeah. But neither they or us could find it. I assumed -- and this could be an assumption, too -- I assumed that we wouldn't do anything without

Page 164

a contract, but I'm not the one that wrote any contracts.
So it's possible that they operated without a contract. It's improbable, but it's not -- I mean, look, the company is a shell of its former self. So I will say that they didn't follow the same systematic rules that normally I would follow.
Q. When you say the company is a shelf of its former self, are you talking about The America Project or are you talking about PIN?
A. PIN.
Q. Okay. And you tried to find this -- that contract in response to our subpoena; correct?
A. Yes.
Q. All right. And what is your understanding as to why you couldn't find it?
A. I don't know. I couldn't find it. I gave you guys everything, including the raw files for the movie itself. So I gave you everything I had that were in the file.
We had a restructuring of the company, because it was losing millions of dollars, so that happened in 2023, I think, or 2022.
Q. Okay. So let's take a look just at the first email in this thread. This is from TAP, page 6.

Page 165

It's your last response. This is to F.K. -- that's Mr. Khan -- Chris Wiegand, and an individual named Carlito at The America Project.
And to give this context, we need to see his question to you from April 25th, where he states, Thank you. When can we expect the email records collected to be sent to us?
You say, Did you not collect it from the donations portal? That was not ours. That was yours.
So let's pause there. What was the donations portal associated with this website?
A. I don't remember. I don't remember any of this. I mean, this is four years ago, so I don't -- I don't remember this conversation. I don't remember the concept behind sending it. I don't remember any of it.
I don't even remember Carlito, so there's that.
Q. Do you know who Carlito is?
A. I don't.
Q. Okay. You say, Our data intermingled with your data, as we sent over 60,000 people to watch the movie.
How would you -- I take it you track the number of people that clicked on the links to watch

Page 166

the film, and that's where you got that number; is that fair?
A. Correct.
Q. Okay. Let's take a look at something that might help refresh your recollection about some of this because it was so long ago.
Let's take a look at this document you produced called REV 287. And this is zoomed in too far.
THE REPORTER: Is this Exhibit 60, Brad?
MR. KLOEWER: It sure is. Thank you. So 60 is going to be REV 287. And 59 was the Lindell depo excerpt. And I'll drop these in the chat during our next break to try to keep up.
But thank you for keeping me on top of it, Lisa.
Q. (BY MR. KLOEWER) Okay. Do you recognize this document, Mr. Oltmann?
A. No.
Q. Is that your handwriting?
A. No.
Q. Do you know whose handwriting it would be?
A. I do not.
Q. All right. Well, it was produced --

Page 167

A. Hold on. Stop. Stop. Stop. Stop.
Q. Okay.
A. It says, cancel, cancel --
THE REPORTER: Joe, I don't know if you're coming through, for the record.
THE DEPONENT: I'm mumbling because I'm just reading it to figure out.
A. This is an architectural drawing of how the -- this looks like user journey connected to the platforms to be used. Okay.
Q. (BY MR. KLOEWER) Does that help you identify who would have written this?
A. No. It's pretty well-written though. It looks like it does -- follows a good process.
Q. Okay. Well, if that's not yours, then I'll take a look at the next document here.
This one is -- was marked as REV 288, which we'll mark as 61. Take a look at this and tell me if you recognize this one.
A. I do not.
Q. Is this -- so just to summarize here, we'll scroll through here. I'll give you a chance -- this is a four-page document. It's called The Deep Rig Project up top. It says, Signups, encourage donations, and show video.

Page 168

And then we see eight sort of bullet points here with sub points -- ten total bullet points with sub points.
Is this sort of the typical process that PIN would undergo in starting a new project?
A. Yeah. This would be user journey, making sure we have the next mentality. Then we basically use a process to validate all the information in this to make sure we didn't miss anything.
Then we would go back to -- we'd come back to it when it's done to make sure that we -- we -- yeah. We would go back and re- -- rebuild it. I don't know where in the process this would be, but this is exactly what we would do.
Q. Okay. And as you're looking at it now, does that -- do you recall if you were the person who created this document, now that you're looking at it?
A. I mean, I probably contributed to it, for sure, but I don't think I built it, no.
Q. Okay. And the third and fourth pages of this document refers to Deep Rig Project. And we see there are these survey questions that are included here. Some say Preview Movie Only, and then Post View Only.
So, for example, number one says, Before

Page 169

watching the film, how confident were you that the 2020 election was rigged? Do you see that?
A. Yeah.
Q. And it says, Very confident, somewhat confident, or not confident at all.
A. Right.
Q. And number two, we have a post view version, after watching the version, How confident are you that the 2020 election was rigged, and we have the same options.
A. Yes.
Q. Was this survey ultimately hosted on the website that PIN created?
A. Yeah. It was -- it was -- man. Let me think about this for a minute.
I mean, if it's housed on our server, all that information would be on it. We built a post AJAX survey system, if I remember correctly, and it would have allowed for them to put a survey at the beginning of the film, even if it was played online, through a secondary source, they would still have the ability to do it.
So we would have betted, even if they were watching on Google or one of these others, and then at the end, it would do the same thing. They

Page 170

would have the ability to take the post survey.
Q. And that's because they wanted to see how effective the film was at changing people's minds; right?
A. I think it was more designed for the cadence of what people in the public were thinking when they came in and what they were thinking when they left, and whether there was any variation of that.
I mean, this is -- this is pretty standard when you're trying to measure public perception. These questions are pretty benign related to that.
THE DEPONENT: I need to take a quick break, if we can, so I can use the restroom.
I'm sorry. I have to drink lots of water because I'm taking some medication. So nothing that would affect my ability to testify here, but I have to drink lots of water.
MR. KLOEWER: That's fine. We can take a break. We've been going for a while since lunch. So let's hop off and we'll get back on the record at 2:30 Mountain Time, is that fair, seven minutes?
THE DEPONENT: That's perfect. Yeah. Seven minutes or 17 minutes?

Page 171

MR. KLOEWER: Seven. Let's try to hop back on at 2:30, if we can.
THE DEPONENT: Well, 2:30 would be in 17 minutes.
MR. KLOEWER: Oh, yes. That's correct. It would. 2:20 would be seven minutes, so let's do that instead.
THE DEPONENT: Okay. Perfect.
MR. KLOEWER: All right.
THE VIDEOGRAPHER: Going off the record at 2:13 p.m.
(Recess from 2:13 p.m. to 2:23 p.m.)
THE VIDEOGRAPHER: Now back on the record at 2:23 p.m.
Q. (BY MR. KLOEWER) All right.
Mr. Oltmann, before we took a break, we were looking at the survey questions for The Deep Rig website that were pre- and post movie questions.
I reviewed your production and I didn't find the results of those surveys. Do you know if those results were tracked?
A. Yeah. I sent -- I sent all that stuff over to The America Project then. We package it up and send it. We typically don't keep that data, once we send it.

Page 172

Q. And did those results tend to show that the film was effective in changing people's viewpoints?
A. I don't -- I don't recall the outcome. We weren't paid to do an analysis, so we didn't do an analysis on it. We were just -- you know, this is typical of -- anything that we do at PIN would be to measure the results, make sure we understand the outcome.
And so -- but I don't recall the conversation or any of that related to this. I can tell you that that's not typically how it works. You don't try to change someone's mind.
You try to figure out what the public perception is. And so is it cold, warm, or hot? And I don't think there was a lot of people that went through the process that didn't start the process skeptical of the election outcome.
Q. Okay. I want to show just a couple other documents that you produced and just try to understand what they're showing me.
So I'll show you what is marked as REV 277. I'll put that up here in a second. And we'll mark this as 62.
THE REPORTER: Mr. Coomer, you are not

Page 173

muted. I don't know if there's some feedback or something coming through your line. It may be fine. We'll keep going.
Thanks, Brad.
Q. (BY MR. KLOEWER) Okay. This is some -- they appear to be Google Analytics that you produced about The Deep Rig website. Can you see that on your screen?
A. Yes.
Q. So I would like, if you could, to walk me through and describe what some of these metrics are we're looking at.
So this is a document titled Acquisition Overview at the top. And the first box on the top left-hand side indicates Active Users and New Users. Do you see that, right up here?
A. Yeah.
Q. Okay. What is an active user and what is a new user?
A. Well, I think -- do you know when we provided this to you?
Q. Well, that's actually a good place to start. The date range, in the top right corner, indicates February 1, 2021, through August 5th of 2025.

Page 174

A. Yeah.
Q. And I believe this date is consistent with when the subpoena was issued. So --
A. So my guess is -- and this is just -- just because I know the GA4 was implemented sometime in 2022 or '23.
So typically, you can't have 307,000 active users and 313,000 new users. It should be the other way. Like, you should have 370,000, let's say hypothetically, and 313 then new users.
So that disparity typically creates a chart that allows you to chart out, you know, how do you bring people back to -- if your goal is to bring them back to the website.
So you're really looking at retention more than anything else, right. And you try to average, you know, visits on most products at 2.7 to 3.5.
So this is, like, negative. This is -- this shows that everyone's due, which means no one came back.
And that's probably more indicative of the fact that Google swept the data. So they swept the data that was important in this in 2025.
So it still showed -- even the sessions

Page 175

don't add up, if you look at the direct and all that. That doesn't really add up to enough information to be viable.
Q. Well, what is -- to the extent it tells us anything, what do these numbers tell us here, active users and new users?
A. Well, so the problem is, is that new users by first user primary channel group, if you add that up, I don't know what that adds up to, but it doesn't add up to 307,000.
And if you add up the sessions, that certainly doesn't add up to the -- anything that would correspond to the users.
So I can't really tell you. I know that there was more than 307,000 that went to the website.
Q. Okay. What would have classified someone as an active user in this context? Did they have, like, a user name and account? Or what is that -- how do you earn that title?
A. They would have to -- it depends on the criteria, right. So this is an acquisition overview, so these are people that went into the process. They either started the survey or they watched the movie or watched a portion of the movie.
Q. Is there any way I could tell, from

Page 176

looking at this document, which of those groups these people fall into?
A. No. I think -- I think we probably tried to just give you what information we could garner from a very broken system, given the date of 2025.
It doesn't -- if you were to ask for this data back in '22 or '23, you probably would have gotten a better outcome. Because at that point, you would have had all the corresponding data.
It's kind of like Facebook. They -- you know, if you have a live video, it will disappear after 30 days. Google is getting to be the same way, where there's just -- it's so heavy and there's so much data that is, you know, dead, you know, black space, that they just -- they delete it.
Q. All right. Well, let me show you another one you produced, and maybe working together they can give you information that would be a little more helpful.
This one we'll mark as Exhibit 63. It's REV 276. And I'll zoom in here a little bit.
So this is --
A. Can you make it a little bigger, please?
Q. Yeah. So here it says, Events, Event Name, at the top. Can you see that?

Page 177

A. Yeah.
Q. We have the same date range. And then down here, on the lower portion of the page, we have a number of columns that say Event Name, Event Count, Total Users, Event Count Per Active User and Total Revenue.
So can you tell me, what do these names refer to? What is Event Name, first of all?
A. Well, I mean, event can be anything. It can be a page view. Did they scroll? Did they just come in and leave? Did they download something?
Oh, yeah. If you look below, it will have some of the event names.
Q. Yeah.
A. You set the criteria for each one of those. And then those basically funnel up, into the event count.
Now, this says that there's only ten categories. So there's only ten categories. Wow. That's weird.
So this is what I talk about, as far as there's more than ten events. So it basically took what information it had available and it created this report.
But if I had to guess, there's -- you

Page 178

know, any one -- if you go back to the document you had previously, you'll have ten -- ten different -- no, not that one. The one where we basically did the -- before that. The one just before that. Sorry. No. No. No. The one after that. Sorry.

Q. Sorry. My screen is --

A. That one.

Q. Okay.

A. No. The one just to the left of that. Sorry. Yeah. So this right here, I think this had ten, right, ten things that you went through, linked to pages.

So based on this and the questions, the criteria, now go back to the document you just asked me to look at. The next one. Sorry. That's it. No. No. Go back. Yeah. That one.

Q. This is the events here, yeah.

A. Yeah. See where the line is kind of dotted going up?

Q. Here?

A. Yeah. See the dotted line, and it has, like, all sorts of -- it almost looks fuzzy, like, where the --

Q. Yeah. That's the event count by event name over time, the visual graph on the top portion of

Page 179

the document?

A. Yeah. So the problem is, is that if you look at this, it's not represented below, because if it was, it would have had the events that you have -- oh, never mind. You only clicked on the first five. Okay. No.

If you had -- if it was actually corresponding to the data, then that line, all the way up, on page view, would be over a million. And if you look at the criteria on the far right, it shows less than 600,000. See the top, right there?

Q. Yeah.

A. So this is -- this is a broken -- this is a broken metric for analytics. And this just shows that it's collecting some data, but it doesn't know why the data is there.

It's just collecting the layer one or top layer. It's not all the subsequent data and/or secondary events are not recorded either. Because for whatever reason, Google said, Okay, we kept this information but we didn't keep this.

Q. And you mentioned before, but tell me again, was there some event that happened in, I think you said '23 or '24, that may have affected the integrity of this data somehow?

Page 180

A. Yeah. So every year, depending on if the site is -- what I typically say is if someone changes their URL, doesn't renew the URL, doesn't keep it, that can affect it.

If they -- if the account goes dormant. Now, we typically have our -- our talons talents into the analytic data on the Google side historically.

So we would keep this data on account, even if we disconnected it. But once it's disconnected from the site and Google stops collecting data, then they can do this.

But more importantly, I think it was 2023, that they decommissioned Google Analytics -- it might have been 2024, but I think it was 2023 -- they decommissioned Google Analytics and had you go to what's called GA4, which is the Google Analytics, 4th generation.

And as a result, this data would have been in, you know, call it GA3, for lack of a better term, and so this data would be considered obsolete.

And so what you do is you take the data from GA3 and you upload it into the GA4 before the time frame expires, which would have been before 2025.

And if you do that, then you're able to retain historical data going back as long as you want,

Page 181

10 years, 20 years, whatever. But if you don't, then you get broken data links like this.

And you can tell it's broken because, again, if you just look at the count, it should show that -- it could -- the data is not corresponding. There's more than ten -- just based on the events, there's more than ten events.

Q. And if it was a complete data set, is it safe to assume we would see more sort of spikes on this graph, where my cursor is hovering here, indicating when people are visiting the website?

A. So can you unselect that or is this a document?

Q. This is just a PDF I'm showing you with my shared screen here --

A. Yeah.

Q. -- so not interactive.

A. Yeah. I mean, technically, yes; although, it does look like, from here, that there's data going into January. It looks a little rough. It just doesn't correspond to any sort of blip because there's -- it's too low on the totem pole between 0 and 200,000.

Q. Okay. So if I'm understanding you correctly, then, these analytics do not capture the

Page 182

entirety of the traffic that would have been on the website during the time when PIN was hosting it; is that fair?
A. I just don't know. But, again, I don't -- the way it looks right now, it looks incomplete. But I'm not surprised, based on the transition from GA to GA4. But it appears to be incomplete based on what you're showing me.
Q. And we saw that email that you had sent to Mr. Khan in 2022, where you said something along the lines of, We sent 60,000 people to the site.
A. Yeah.
Q. Would that be reflected here or is that not? Where would I find that number?
A. Well, that -- that would be -- those are people that actually completed. And so we would have a separate -- when we packaged up the site, we sent it over, that would be a part of what's called the JSON data. So JSON is J-S-O-N. And it's basically the raw data from the website itself that tells us how people engage and where they came from. And we basically script all those people using UCLIDS or GCLIDS.
Q. And was part of PIN's sort of purview on this project to track the amount of donations that were received as well, or was that -- did that

Page 183

information go directly to TAP?
A. Again, that information would be contained in the credit card processor, as well as the JSON data when we packaged it up and sent it back.
Q. So is that information that would have been in PIN's possession?
A. At some point, yes. But, again, you don't keep credit card information. I think that we provided you a bunch of information previous to this on this, and we tried to take out information related to the -- that was considered case sensitive for -- to make us PCI complaint.
Q. So basically what I'm wondering is, if I were to ask you how much money was donated to the film during the time you hosted it, is that an answer you could give, based on the information you have now?
A. No. No. We looked for it. I mean, you know, we -- we're a data company, so it's -- we did go looking for it. And it was a good exercise for people to figure out how they can get access to legacy data that we normally would, you know, not keep.
Q. Okay. But it sounds like you did provide that information back to TAP at the time, when you returned this -- when you responded to Mr. Khan's email; is that fair?

Page 184

A. Yeah. But I'm not sure that that information -- again, I don't know what information TAP has given you or Patrick has given you. I have no idea. I haven't even looked through this case at all.
What I can tell you is that, if you don't have someone that is data savvy, that knows how to take that data and put it into usable form, it's going to look a lot like obfuscated data would look if you were just to throw a bunch of numbers on a screen with DLLs, right.
It's relatively benign information that you would have to put into a CSD file.
Q. All right. Well, you're anticipating my next line of questioning, probably not intentionally, but I do want to show you a couple other things just real quickly.
We have five Xcel spreadsheets that you provided. And they're going to appear to just be jumbles of data, but I'm wondering if you can just sort of describe for me what I'm looking at on each one.
So the first one here -- and I've kept the naming conventions that were included when you produced them, so hopefully that points you in the right direction.

Page 185

I'm going to label this as Exhibit 64, and it's called Card Charges Exported PII.
A. Oh, no. You don't want to go in that. That's personal identifiable information.
THE REPORTER: I'm sorry, Joe. That was too fast for me, Joe.
Q. (BY MR. KLOEWER) I believe you called that PII for us, Mr. Oltmann.
A. All right. I was just --
Q. Yeah.
A. Okay.
Q. No. I hope so. I mean, take a look. If there's anything -- if there's PII here that shouldn't be -- and I'm happy subjecting this portion of the deposition to the protective order's confidentiality provisions, if that would make you more comfortable. But my belief is that we had this discussion --
A. It wouldn't be me getting sued. It would be you.
Q. Well, I just want to be sure that that's -- I believe we saw that and had you redact out all the PII previously.
A. Yes. I didn't change the naming convention at the top for the file though.
Q. Okay. But just can you tell me what I'm

Page 186

looking at here when I look at this spreadsheet? And it's very long. I'm not going to scroll through the whole thing.
A. Can you make it just a bit bigger, if you would?
Q. Sure. See if I can zoom in here.
A. Just give me 250, if you can. 200 is fine.
Q. Okay.
A. All right. There you go. Can you go to the top, please?
Q. I believe that's -- I'm on line 1 here.
A. Okay. That's weird. Where is the top naming event? Did you ever sort this at all?
Q. I didn't do anything with it. This is -- this is as we received it.
A. Okay. The far number on the A, can you open that up for me, please?
Q. So --
A. So go to A. I'm sorry. If you click on the side of the A, you can make it longer so it opens up the number.
Q. Sure.
A. On the top there. There you go. Okay. Go down so I can see just a few more of those. So

Page 187

those are hashable characteristics of the transaction itself.
Q. Okay.
A. So if I had the ability to hash this data back on individuals, if we were looking inside the system, this could identify the individual.
You hash that data according to -- you know, that data, depending on if it's universal or if that data is a column that came directly from our system -- can you open up D for me, too, please?
Q. Yeah.
A. Can you go down a little more so I can look at more of the figures on that conventions? Okay. Stop. 4-4-8-4-4. So one is going to be an identifier to an individual and one is going to be an identifier to a transaction and/or -- it would really be helpful -- can you open up F for me, too, please?
Okay. There's three codes -- so these can be during the transaction. One of them is going to be the convention for hashing out the individual. Another one could be the convention for hashing out what happened in the transaction. Was it a refund? Was it a purchase? And then inside of that naming will have codes for where the transaction came from.
So those -- these are all hashable

Page 188

things, identifiers for the individuals. The date is the date of the actual transaction. And then if you go further to the right, if you would, the Oak, that's the address.
So I basically nulled out anything that was related to their physical address, but I still gave you the city, state, and ZIP.
The null on the top one, to the right of the ZIP code, just to the right, in K category, would be your second -- it's call the secondary.
So that's basically if you had a ZIP code of 80111, it would be, dash, 2845. So that's your dashing. Null means that there is none for a convention.
The next one over, it says CEAA 1. That right there. So the one in L column, that right there is your hashable data on the individual.
Q. Okay.
A. That can tell me a lot of things. So this is universal to -- you can use this information to -- let's say somebody changes their credit card number, this is the code that would be used by the credit card company for, you know, expiration dates.
The new credit card goes out that can reattach itself if there's any recurring billing. But

Page 189

it also tells us, you know, race, religion, political affiliation, all sorts of other stuff, depending on what it's set up to do.
And then the next one next to it, 626, that's the transaction, and this is going to be the transaction number, I think. Or the -- and the one on end would be something that we asked it, like a credit card on file. It could be anything set up in the system, from an NMI, which I think this was NMI. It could have been auth dot net, but I think it was NMI.
The last one, Q, would be country. Null in country just means that they weren't required to put it in.
And then P, on the null, these are requirement designations on fulfilling the transaction. So it's probably something that you could have used as a secondary to verify the transaction was correct. Yeah.
Q. Okay. So going back, there's a couple columns we didn't look at here. B and C, is it safe to assume this is the amount of the donation or transaction?
A. Yeah. So, yes. Yeah. Yes.
Q. What accounts for the discrepancy here; for example, B has zero and C has 50?

Page 190

A. Whether or not they gave at the beginning of the program or the end of the program.
Q. I see.
A. I'm guessing. Because, again, the naming -- the naming criteria for this is typically unknown, if you don't have it. I mean, I would assume those are dollars, but I can't -- I can't guarantee it.
Q. And would those indicate separate donations or is C sort of the sum total? Because I don't see any indication in the C column of a number that's higher than the B column. So I just --
A. But I don't -- I don't know. I mean, I can -- I mean, if you give me a second, I can try to run one of the criteria numbers, the hashing numbers, and see what it gives me.
I mean, this is the problem with PII, is that you have to be really careful what data you give up. I know that it represents -- the right column would have to represent a final figure. There has to be a final figure in this.
Q. Okay.
A. Right.
Q. So if C is always bigger than B, can I assume that C is the final donation amount? Is that a

Page 191

safe assumption?
A. Yeah.
Q. Okay.
A. And it could be -- it could be that the money at the beginning was given in B. If it showed B, then it was the money given in the beginning. And if it doesn't show B, then it's -- or maybe if it shows zero, then it was in the beginning or the end.
Q. So if I were to just sum total this C column, would that give me an indication of how much credit card donations total were made while PIN was hosting the film? Is that fair?
A. Yeah.
Q. Okay.
A. That's fair.
Q. Okay. Let me show you -- I've got five of these. Hopefully, you've saved us some time by explaining a couple of those. I just want to be sure I understand what each of them is.
So the next one we'll mark as 65.
A. I just want to be really clear. I could be wrong on some of the conventions for the coding because I don't -- I don't have the header on it.
Q. Okay.
A. Which is odd. Which means the header is

Page 192

probably somewhere buried in the document.
Q. This one appears to have headers. This is the one -- an Excel spreadsheet labeled Card Charges Provided.
A. Yeah.
Q. Can you tell me, what would this spreadsheet contain?
A. Can you blow it up for me, please?
Q. Yes.
A. Yeah. All right. So remember when I said the -- each one had their own naming criteria? So the first one it would show is the charge I.D.
Q. Yes.
A. The second would show your sign-up I.D. Third would show your pit page hit I.D.
Q. Yep.
A. So the pit page I.D. would give -- so probably follow somewhat of the same vicinity -- or same convention.
And then there should be a fourth one, if there's three. Is there a fourth one?
Huh. Google code. Okay. Can you go back, please? I don't see the amount. There's the amount.
Q. Yeah. Column B appears to be the amount.

Page 193

A. Yeah. I probably gave it to you, one with the information for the people and one with the information for the credit card itself. They might coexist together.
In other words, if you were to take the day charge, I think what happened -- and, again, I'm not -- I'm not sure of this -- but I think that when you start looking at the date charged, this came directly out of our system that we were able to capture, and the other one was the information that we had just sitting in a file that was the criteria on the PII itself.
Q. Okay. So to understand this sum total of donations made through the website while you hosted it, would I need to add Column B from this, too, Column C from that last one that we just looked at, or is there overlap between these charges?
A. Hit the number 1 on the top right. Just hit the -- no. No. Hit the 1. Hit the 1 again. I'm sorry. The box above that. Sorry. The box above that. Okay. Now hit -- are you on an Apple or --
Q. Apple.
A. All right. Hit control -- or command F and put in 8,000, 8-0-0-0. Yeah. It's the same.
Q. Okay.

Page 194

A. So, in other words, the documents are just redundant, but one is the PII and one is the data we were able to scrape from files that we segmented in.

The reason why I know that is because when we were going through the other one, it showed up as an $8,000 transaction on 8/4/2021.

Q. Yeah.

A. And so you're not typically going to have one on 8/4/2021 and 8/4/2021.

Q. All right. Third one here is labeled Recurring Charges.

THE REPORTER: 66 or same one?

MR. KLOEWER: Yes.

Q. (BY MR. KLOEWER) Same. I'll scroll to the top here. How is this distinct from the set of documents we've looked at, if at all, or is this another duplicative data set?

A. Go down. Keep going. Keep going.

Q. Oh, are you looking for the 8,000 again?

A. No. I'm looking for some changes on the timing deal. That will tell me a lot. Keep going. Okay. Stop. Okay. Go to the bottom, if you would, just so the total of number of files. I don't know how many that is, but -- there you go.

Page 195

Okay. Then just scroll up just a little bit more, just so I can see if there's any other changes in the timing one real quick.

A little bit further. Little bit further. Should be one more out of sync, if I'm right. Okay. Stop. So this -- this will be the mechanism by which somebody gave more than once.

So they either set it up as a recurring donation or they set it up as a -- it could be recurring for one month. It could be recurring for 12 months.

Q. Okay. So these would be a separate category of donors, right, ones that are recurring versus one time?

A. Yeah. I mean, like the top one, the B-O-B one.

Q. Yep.

A. That's a credit card from a card that you actually -- you replenish. It's a replenish card. So, yeah. That would be basically somebody saying that they're giving $5. And that account number on the very top there is one that, like, say you were setting up a separate credit card for just transactions, that's an individual transaction card. So, yeah. These are absolutely set up for recurrings.

Page 196

Q. And is there anywhere I would see how frequently those recurring payments are or how many total recurring payments they made?

A. No. I mean, again, we only hosted this information, I think, until, you know, September or October. Then after that, we turned it over to -- we turned it over to them.

Q. Okay.

A. I was only able to collect this information because I hosted it at that point, right. The second I stopped hosting it or the second I stopped communicating with the transactions is the second that I can't -- I can no longer track this legally.

Q. Okay. Two more here. Signups Exported PII. We'll label this 67.

What am I looking at here, if you can tell?

A. Same thing. These are correlations. This is correlation data. So time stamps will correlate to any credit card data, if there are any.

Can you go to the very bottom of that and show me how many lines there is on that? You're going to want to grab the little thing on the far right and pull it all the way down.

Page 197

Q. Yeah. This is --

A. Yeah. We're good. Yeah.

Q. So we've got about 121,000, here, 920?

A. Okay. Yeah. So this would be -- can you go to the right a little bit, please? Is there any other data on that to the right? Keep going. Okay. There you go. So stop there.

So those are IP address, VPNs, everything else right there on that. So this is -- this is all the correlation data for everyone that signed up, gave an email, gave a phone number on this, on the site itself.

Q. Okay. So this would be distinct -- because a lot of people would have signed up without making a donation; right?

A. Well, so you didn't necessarily have to -- so the way it works is, you didn't have to give any information. You know what I mean? But if you did give the information, it collected the data to make sure that we were compliant on the CAN-SPAM and on the ECI side.

Q. All right. So this would indicate to us people who provided some information?

A. Yes.

Q. All right. But there could have been

people that got on and viewed that provided no information; right?

A. Correct.

Q. Okay. And the other ones we were looking at before, the credit card charges, those are smaller data sets because less people would have donated than simply signed up; is that fair?

A. Yeah. Yes.

Q. Okay. All right. Last one here. Signups provided. We'll mark this as 68.

A. And go ahead and drag that all the way down again, too, from there, if you would.

Q. Okay. So here, our last line is 68,510.

A. Okay. So this would be -- this is probably the number of people that we sent directly to the site. So when we said 68,000 -- or 60,000, this is probably that number --

Q. Okay.

A. -- that we sent. Actually, if you go all the way to the top again, drag it all the way back up to the top. And then drag it all it the way over. Yeah. So -- and what is the name of the file?

Q. This is Signups provided.

A. Yeah. So that would have been signups that we created, just, you know, looking for people



that are likely to engage.

Q. All right. So that one that's Signups Exported, that was 100 and whatever, 20,000 something, that would include people who were -- had signed up on the website not through PIN, that came when you began hosting the site; is that fair?

A. Yeah. And so this would be people that we sent to the site that said, thumbs up, they did something. So they -- then that data becomes theirs, right.

So data is obscured and obfuscated until they make the agreement to allow that data. It's kind of like the privacy deal, where you push the button, yes or no. As soon as you say yes, then you're saying yes to giving the data.

So this is just -- we're two years ahead of time, as far as nobody else was doing it, but we did do it. So just a way of making sure that we're compliant with some of the different state requests, records requests, for how we collect data.

Q. Okay. So I guess my overall question is, if I wanted to know how many total people watched the movie, is that something -- is that a piece of information I could find anywhere in any of these data sets?



A. No. No. I mean, totaled up, no. No. Because you have -- you have secondary sites. Like, you have Rumble and you have YouTube and you have -- there's lots of different -- you have the pirating that happened.

I mean, there was probably 30 sites that went out within 24 hours.

Q. Do you know -- do you have an estimate of how many people watched the movie total, when you consider those other sites?

A. No. I mean, if you gave me a bunch of data sets and said, Here's what I found, I could extrapolate it and tell you, and we could slowly do it, but I'm not sure I could tell you from -- from the limited information we have right now, there's no way to go back and do that.

Q. If there was anyone who did have that information, who would it be, if you had to guess?

A. The World Wide Web. It is -- look, this is the exact -- this is why they call it data science.

It's because you got to go through and you got to figure out, you know, how do you actually extrapolate the data based upon what's on the different platforms.

And so -- and then you have to basically



look at the favorability of that platform, whether or not it would actually ghost or hide that information and whether or not it's accurately reflecting.

If you go look up The Deep Rig right now, you won't find it anywhere on anywhere. There's just not a lot of information on it.

But if you go to Yandex or if you go to Quick Route and you look it up, you'll see there's still, like, 40 different variants of information tied to The Deep Rig.

You can't use Google, though. You can't use Brave or any of that.

Q. Okay. Well, that's helpful.

MR. KLOEWER: So I may have a couple more questions for you. Can we take a quick five-minute break, and when we come back, I may have just a couple final wrap-ups, but I think I'm just about done here.

THE DEPONENT: Yeah. I'm going to grab some water here, so 3:10 or 3:15?

MR. KLOEWER: Let's say 3:10, we'll hop back on.

THE DEPONENT: All right.

THE VIDEOGRAPHER: Going off the record at 3:04 p.m.

(Recess from 3:04 p.m. to 3:13 p.m.)

Page 202

THE VIDEOGRAPHER: Now back on the record at 3:13 p.m.
Q. (BY MR. KLOEWER) Okay. Mr. Oltmann, before we hopped off, I was asking about how many total views of The Deep Rig and if there was a way to determine that. You said the Internet.
Am I correct in understanding that you don't have -- personally, you don't have any knowledge or any idea of the total number of views for that film?
A. I do not, no.
MR. KLOEWER: Okay. I don't think I have any further questions for you right now, Mr. Oltmann. I may after Mr. Ticktin is done, but for now, I'll pass the witness. Thank you for your time today.
THE DEPONENT: Thank you.
MR. TICKTIN: Yes.
EXAMINATION
BY MR. TICKTIN:
Q. Good afternoon, Mr. Oltmann.
A. Good afternoon.
Q. My name is Peter Ticktin. I'm going to ask you some questions. You're laughing because you know who I am. You know me. In fact, we've had discussions.

Page 203

A. Yes.
Q. Now, do you remember being at a deposition involving a deposition of Eric Coomer?
A. Yes.
Q. And for hours on end, did you watch that deposition and watch him testify?
A. I did.
Q. And have you watched him at other occasions or is that the only time you ever actually watched him up and personal?
A. I watched -- I've watched all of his depositions several times.
Q. And does he have a unique voice?
A. Very. I can tell you -- I can tell you how unique it is. Someone -- someone decided it would be funny to create a video using Eric Coomer's depositions, where they synthesized his voice.
And I was walking by the room, and they had it play through the speaker. And I ran in and said, Where is that? What is that? Where did you get that? I knew exactly who it was, and they did it as a way to kind of irritate me.
Q. Have you ever met anybody else that has a voice that is just like Eric Coomer's voice?
A. No.

Page 204

Q. And in terms of that, would you say that the more that you have heard Eric Coomer's voice, the more sure you are or the less sure you are, in terms of the fact that he was the one that was on that phone call?
A. I'm more than sure now, yes.
Q. Okay. So as far as you're concerned, you're absolutely certain that he was the one that was on the telephone call?
A. Yes.
Q. Okay. Now, when you were at that -- on that occasion, did you overhear -- before the deposition was taken, were you aware of a situation that occurred where Mr. Cain had approached me and which resulted in my pushing him away?
A. Yes.
Q. Okay. And before that occurred, were you out there in the general area where Mr. Cain was talking with Mr. Coomer?
A. Yes.
Q. And did you overhear the conversation at that time between the two?
A. On several -- on several occasions, yeah. When I was sitting at the table, two away from them, yes.

Page 205

Q. Okay. And what did you hear Mr. Coomer and Mr. Cain say to each other?
A. Something to the effect of not having the post -- making sure this deposition doesn't happen.
Q. And that was --
A. That was -- it wasn't just before, it was before. Because I went into the conference room, and you came into the conference room afterwards, with Charlie Cain right behind you.
And that is when Eric Coomer started recording. And Patrick Byrne defended you and stood in between. And it got a little boisterous. And at that point, I just kept saying Patrick's name to stop.
Q. All right. And you've been accused by Mr. Coomer of being somebody who is threatening to him. And they tried to basically get some orders against you. Am I correct about that?
A. Yes.
Q. And what was the result of that action that was taken against you by Mr. Coomer --
A. I don't know yet.
Q. -- and his lawyers?
Okay. But in terms of what occurred in that room --
A. They were the aggressors. I mean, you

Page 206

were not the aggressor. Patrick was not the aggressor. You were the aggressor, but -- excuse me they were the aggressors in the deal.

But there was also a comment that Eric Coomer made, when he was walking back in the room, that it will make a good chapter in the book, that Eric Coomer stated as he was walking in with Charlie Cain.

Q. And what did he say at that time?
A. Well, he said that it would make a good chapter, this will make a good chapter in the book.
Q. On, that's what he said.
A. Yeah.
Q. Okay.
A. Which I find offensive, frankly. No part of this book would I want written.
Q. All right. Now, when you made your statement that was in the movie, do you remember the words that you used?
A. Which ones? Related to --
Q. The ones they are trying to hang their hat on here.
A. No. I mean, not particularly. I mean, it's all been the same. I've never deviated from, you know, what happened on the call or what happened after

Page 207

the call.

You know, I haven't -- you know, the vast majority of what I've done over the last six years has very little to do with Eric and more to do with Dominion and their responsibility and the fact that I keep being under attack for doing the right thing. It's cost me dearly.

So, you know, there was the last part that I said in the movie, which is, I'm not sure we can come back from that. And I still believe that to this day. I'm not sure that the damage isn't already done, and I'm not sure that we can come back from all this.

And, you know, hopefully there are arrests and people are held accountable. And I still believe that that's the case. That's going to happen.
Q. Like who would be arrested?
A. The people that are responsible for the election fraud.
Q. Okay.
A. Stealing the voice of the American people.
Q. Do you have an opinion about Eric Coomer as to whether he's a criminal or not?
A. I mean, I believe that he has committed

Page 208

many, many criminal acts that he has never been held accountable for.

There's always been someone there that has got him out of his behavior, whether we're talking about the, you know, three or four DUIs that he has or running into buildings or getting into fights on the side of the road with people that work for him or -- you know, he's done some -- he's done some things in his life that I hope he regrets.

But the largest of that would be subverting the voice of the American people. And no matter what you say about, you know, what we're dealing with now, people have to be held accountable.

And I believe that he is criminally responsible and should be -- should be prosecuted for those crimes.
Q. Well, in fact, if it became learned that, in fact, Dominion was acting for foreign players, like China or Serbia or Venezuela, is your opinion that Eric Coomer is a trader to the United States?
A. It is my opinion --
MR. KLOEWER: Objection to form. Calls for speculation.
Q. (BY MR. TICKTIN) I'm only asking what your opinions are, sir.

Page 209

A. My opinion is that anyone that steals the voice and causes harm to the American people is a trader to our nation. And you don't get to hide that behind, you know, media apparatuses or bully pulpits that allow for you to control the narrative and to silence your critics.

And in the last six years, they didn't anticipate that a guy like me would be willing to fight as hard as I've fought against people that have done real harm to our country and real harm to our people.

And, you know, I didn't grow up with a silver spoon in my mouth like Coomer, or even his attorneys. You know, I came from a place that was super poor.

So not having an opportunity because they want to change the direction of this nation towards this evil is -- it steals from those people that are most in need.

While they say that that's who they're for, the reality of it is they're in it for themselves. And hurting people in our country is the ultimate goal behind the smile and the, Hey, I'm here to help.

So, yeah. I would -- I would say that

Page 210

we're -- the things that they've done and the things that we've uncovered since then, whether it be whistleblowers or Maduro or bookkeepers or the information out of Serbia or China or Mongolia, or any of these other countries, I believe that the consequences are coming.

And I believe that -- you know, I pray for their soul, but I certainly don't pray that they won't be held accountable.

Q. In any event, the comment that you made that -- about the fact that there was someone there named Eric and the fact that it was Eric Coomer, would you state that at this point, that in terms of that comment, that you're certain that it was Eric Coomer, the plaintiff in this case here against Patrick Byrne, that was the one that actually said that with the unique voice that he has?

A. Yes.

Q. And in terms of the comments that you made in that regard, were you speaking -- inferring that he was responsible for any acts that were to steal our country?

MR. KLOEWER: Object to form. I'm sorry.

MR. TICKTIN: You have to let me finish.

MR. KLOEWER: I'm sorry. I thought that

Page 211

was your question.

MR. TICKTIN: No. You knew better. Don't tell me that. You know. Come on. Let's be real. Try some honesty. You might like it.

So could the court reporter please read back what I asked in the beginning, before I was interrupted.

THE REPORTER: "In terms of the comments that you made in that regard, were you speaking -- inferring that he was responsible for any acts that were to steal our country?"

Q. (BY MR. TICKTIN) Okay. Let me ask that. In terms of any comments that you made that may have inferred that he had been responsible for acts to steal our country or to rig the election, would those matters -- were you offering your opinion or a statement of fact?

MR. KLOEWER: Objection to form.

A. Well, I mean, I think the statement of fact is created by the ancillary information that we've been able to collect since November 3rd, 2020.

It remains my opinion fully, and I think the facts support it, and, you know, the thing that most people that get involved in subverting either elections or sovereignty of nations forget, is that if

Page 212

you keep people away from the things, the artifacts that give them access to the ultimate smoking gun, than that is, in essence, the smoking gun.

And everything that comes from the fire that's created or the smoke that's created is the -- not circumstantial evidence, but the evidence of malfeasance that led to the overthrowing of the election results in each state, in each county, and ultimately across the country.

Q. Okay. So you mentioned that you -- in the questions that you were answering for Mr. -- oh, what's his name -- Brad --

A. Kloewer.

Q. Yeah, Kloewer.

In terms of what you were saying there, in terms of the use of the machines, so you were starting to talk about, first, it was Sequoia, then it was Smartmatic.

Can you just explain to us a little bit of what your knowledge is in that regard?

A. Sure. I mean, I probably have too much knowledge, but if you go back in time, Smartmatic was actually founded in Florida -- seems like everything happens in Florida -- in Florida by Venezuelans.

And they basically used that system in

Page 213

order to steal the election in Venezuela, which saw one of the wealthiest countries in the world turn into the most poverty stricken Third World nations in the world in a matter of less than a half of a decade.

And then that software was brought up here to the United States in 2004, late 2004. It was November of 2004.

Clint Curtis testified before Congress, saying that he had a Chinese company in Florida, was asked by Congressman Feeley, who is a Republican, to build an election system that would be undetectable if those votes would be switched.

So Clinton Curtis built that system and went to the deploy that system, from a Chinese company that he worked for in Florida, a Chinese company that subsequently later was found guilty of felonies related to foreign bad actors.

Fast-forward to 2005. After the election in 2004, and knowing all the information that they had in 2004, Smartmatic purchased Sequoia Voting Systems in March of 2005.

And in March 2005, they now were in control of 17 states and the District of Columbia, which is a large portion -- and I don't want to say all of the elections in the 17 states, because that

Page 214

would be inaccurate, but it included Chicago.

So Eric Coomer came to work for Dominion Voting Systems by his own -- or excuse me -- for Sequoia Voting Systems, by his own admission, came to work for them as the chief architect.

And he stated subsequently, in other depositions, that he came in as a contractor and, you know, he ultimately became a chief architect. But the reality of it is, is that that's not -- that's not consistent with what he has said previously by his own words.

And if you fast-forward into 2006, there was a municipal election in Chicago, Illinois. And the person that was there was Eric Coomer. And there was 20 or so Venezuelans that came up to help assist in that election, for that municipal election in 2006.

Some of those people that were in the room and assisting are some of the same ones that became whistleblowers in what is now the case related to or referred to the DOJ and the Office and Director of National Intelligence.

So in 2006, CFIUS, C-F-I-U-S, which is the organization responsible for the national security threats related to critical infrastructure, of which election equipment would be considered back then and

Page 215

further decline now -- or defined now as critical infrastructure, and so said that there was a threat by which, knowing that the elections in 2004 in Venezuela were stolen to favor Hugo Chavez, that having them own the vast majority a large majority -- a large percentage -- excuse me -- of our elections in different states became a threat to national -- our national interests.

So as a result, they were forced to divest. And then two people were put in charge of it. Eric Coomer stayed on through this entire transition.

There were massive irregularities in 2006 in the municipal election in Chicago that caused a whistleblower to go to Congress specifically and talk about those irregularities.

So the only person that's been involved in the entire run-up, including elections in other countries, that saw an entire election building get burned to the ground in one country, is Eric Coomer.

And he's been the one out there selling the product, building the product, being the one that is the chief architect of Sequoia when it was sold to Dominion. He took a lesser role, but really a more important role, in the real eyes of how the cog in the wheel was actually created.

Page 216

So he's got the background in math. He's got the background in applied mechanics, engineering. And I've read his doctorate dissertation probably more times than I know what to do with it. I now know what certain things are that I wish I could forget in my brain related to it.

But he -- he's the guy you would need if you wanted to build a system that could use PID controllers or fixed output environments into an election system.

He's like the -- he's the only smart guy in the entire deal that I think could pull it off, frankly.

And so fast-forward to 2010. They sold to Dominion Voting Systems. Everyone thought that that was a company out of Canada, but the reality is you got to trace it all the way back to Serbia, which Serbian company of Dominion connected to the Canadian company of Dominion, which then had U.S. headquarters in -- but still the organization itself was a quote/unquote Canadian company.

So I know way too much about the structures, the engineers, the office in Serbia, the people responsible for it, the connections to Runbeck, Nowey (phonetic), Cathedral Printing.

Page 217

I know about the connections to WaWay and the roaming networks. And Eric is familiar with roaming networks because he was an intimate person involved in the data center that was built by roaming networks for Dominion Voting Systems overseas.

So I was able to trace a bunch of this stuff back to other companies. And then you look at the Serbian connections to each other, companies across the United States, and I have a pretty good understanding of not just the election systems, but how much of this is funded.

So I don't know if that answered it. You can cut me off anytime, but --

Q. No. That's good. So I want to ask you, in terms of Mr. Coomer, is he -- he's suing you as well; right?
A. Yep.
Q. And he's also suing who else? Donald Trump?
A. The Campaign for Donald Trump.
Q. Campaign for Donald Trump.
A. Yes. Gateway Pundit. I mean, multiple people that have settled.

Since then, I've talked to several other people who have settled and they regret ever settling,

with more information that comes out related to, you know, connections by Serbian coders and some of the connections to other countries.

And now, obviously, the arrest of Maduro has led us to a place where, you know, there's -- there's some imminency to maybe getting some accountability based on what has happened to our country over the last couple decades.

So, you know, I personally -- I've had judge after judge, one that marched in an antifa rally and then became the judge, and then overruled a 20-year judge that retired, in order to give Brad and his group a second bite at the apple, and did so by volunteering that she would overrule a 20-year judge. And that was the first thing she did in a status hearing.

So we know that that judge was directly corresponding or conspiring with counsel for Eric Coomer, in order to open up a door that allowed for them to further persecute me at a hearing related to that sua sponte volunteering of re-looking at a ink dry motion.

So from there, I've not had a good judge on the case, that wasn't just personally appointed by Polis. The current judge is an activist judge, that



by his own admission is activated for the LGBTQ community and that -- and makes sure that he has that badge wherever egos.

This is the same judge that brought in a special master who has violated every rule of law and continues to do the bidding and put their fingers on the scales of justice for that case in Denver.

So, you know, it's been -- it's been six years of this. Six years of depositions, six years of, you know, an absolute hell, while I patiently waited for OD&I and the DOJ to do what was necessary to hold them accountable.

And in the middle of all that, you have the Patrick Byrne v. Dominion case, that has a treasure trove, over 60,000 documents, of which documents related to Eric Coomer and his part in things that could most definitely be considered criminal, that they have sealed in that case to stop both this case and the case for -- that I have in Denver from being adjudicated.

And then you look at the other information directly related to the Fox settlement with Dominion Voting Systems, they were -- have destroyed and/or stopped us from getting access to the information for that case as well.



So, you know, the idea that there is not guilt in what has happened is not supported by the actions of this cartel-like environment that we're dealing with right now, that allows for them to act with impunity, call up new sources and do really dangerous things to the people of our country, while saying that, you know, that we're all just full of it.

Q. And in terms of the -- you mentioned the case in Washington, D.C., which is Dominion versus Patrick Byrne.

A. Yes.

Q. Okay. Are you aware as to whether or not Mr. Coomer has an agreement, like a co-defense kind of agreement or a co-plaintiff type of agreement with Dominion?

A. He does, yeah. I'm aware of a joint defense, if you want to call it defense, or joint offense agreement that he has with Dominion Voting Systems.

Q. Okay. And the judge that made everything secret, all those 60,000 documents or however many there are, are you aware as to whether or not she, in private practice -- she's a recent appointment as a magistrate judge; correct?

A. Yes.



Q. And are you aware that she, in private practice, was actually representing Maduro from Venezuela?

MR. KLOEWER: Object to form.

A. I've heard the allegations, but I've not seen the documentation related to it. I'm one that I want to see it to believe it. I mean, I've seen a lot of stuff that's happened over the last six years that gives me pause, especially on the Internet. And so I don't -- I haven't seen that information firsthand, but I have heard the allegation, yes.

Q. (BY MR. TICKTIN) In terms of Patrick Byrne, how do you know Patrick?

A. I think the guy is an absolute patriot. I think that I met him in January. By the way, we had a falling out because in this, the last six years -- we didn't have a falling out now, but we had one in the middle.

You can't believe anything anyone tells you and you're trying to figure it all out, and figure out who's real and who's not real and who's grifting and who's not grifting, on both sides of the aisle, by the way.

So we're not -- we've got -- we've got -- we've got a good versus evil thing going on in our

country, not necessarily Democrat versus Republican, but -- and I was curious as to why he would ask me certain questions and why he asked for certain things.

And so, you know, him and I got a little sideways for about a year. And then I saw an interview that he did, and I started digging really into Patrick and came out the other side just amazed with just the perseverance of the man himself.

Q. And did you work together with him, in terms of The Deep Rig, or was that just something you did with others that were making the movie?

A. Yeah. I don't know what Patrick's part is, other than he is -- he spent a large majority, if not all of the fortune that he's had fighting for the country. And I think that's probably north of 30-, $40 million that he's spent.

And, you know, kind of like me, we're kindred spirits. You know, we're willing to go broke, which we probably both will through this process. And that's okay.

But, you know, I don't know what involvement he had in The Deep Rig, other than he was deeply involved in understanding the intricacies behind how the elections were stolen and who the players were that would have likely been involved in



it, in his role as working for the CIA and as a, whatever, be an informant or what have you, or his direct involvement or understanding of the government apparatus that, you know, that he's been dealing with for decades.

Q. Did you ever tell him in any way, shape, or form that the information that you gave him or that you gave -- that the statements you made in The Deep Rig were untrue --

A. No. No.

Q. -- or --

A. Quite to the contrary. He sent me a text message in 2022, maybe 2023 -- and this is, by the way, after we got a little salty with each other -- he sent me a text message saying, You were right. You were right all along. Don't worry. Just hold the line. You were right.

So he sent that to me in 2023. And, you know, I've held onto that because here's a guy that's, you know, frankly, been fighting from the front of the line. And, you know, for him to have as much access to information and be able to fund some of the whistleblowers and help to, you know, preserve our nation, that meant a lot. It meant a lot to me.

Q. In terms of Patrick Byrne, did you ever



give him any reason whatsoever to suspect that your information wasn't true?

A. No. No. Everyone says I should have done it differently, this way or that way. Patrick has never even done that. I was, like, listen, I don't -- you're in the middle of something that you're not really familiar with, nor does it even look normal in any way, shape, or form.

So you just -- not everyone reacts the same way and hindsight is 20/20. But the information that I gave him and the information that I've continued to give people and advice I gave people is, to the best of everything that I have, absolutely truthful, and it's cost me everything. It's cost me everything that's really not that important. So, yeah.

Q. In terms of your dealings with Patrick Byrne, in terms of the movie, would you agree with me, or disagree, that he didn't seem to have much of a role?

MR. KLOEWER: Objection to form.

A. I don't believe he had much role. No, I don't. I think he was a facilitator, but -- yeah. He did not. I agree with you.

MR. TICKTIN: Okay. What was the



objection of the form, sir?

MR. KLOEWER: It's a form objection, Peter.

MR. TICKTIN: I understand, but you have to give me an opportunity to cure. You have to tell me it's leading or whatever, you know, whatever your objection is, so that I can cure. You're required --

MR. KLOEWER: Well, if you need to clarify here, I would say it's for speculation. You're calling for speculation as to Peter -- Mr. Byrne's role.

MR. TICKTIN: Okay.

Q. (BY MR. TICKTIN) But I'm asking you -- I'm going to ask this again just to make sure I got this right.

In terms of what you observed, from your own view in terms of the people that were making the movie, The Deep Rig, was Patrick Byrne in charge or was he basically, more or less, out of the picture?

A. I don't ever remember having a direct conversation with him about The Deep Rig related to the operations at all. It was F.K. guy -- K.F. -- F.K. -- and a few other people. I don't think I've ever had an email with him, correspondence over it, or anything else, so . . .

Page 226

It just wasn't -- I mean, I don't know where you're going with it, but he was never present in the sense of, in my view, of giving direction as to The Deep Rig being -- being created.
Q. Okay. And in terms of Mr. Coomer, Eric Coomer, is his -- is his -- was, at that time that the movie came out, was his location and address readily known by people?
A. When The Deep Rig went out?
Q. Yeah.
A. I don't think so. I mean, I don't know. I've never seen one threat, one police report, one anything from Eric Coomer, who talks about that he gets these threats.
I haven't seen one. I haven't seen one thing that would show that people show up to his house, other than a journalist that showed up to his house and people in the city that don't particularly like him that were his neighbors.
So other than that, I don't know of anybody, and I'll say on the side of election integrity, that would even care where he lives, frankly.
Q. Okay. All right. But in terms of where he lives, I mean, does he basically keep that and has

Page 227

he always -- well, let me strike all that. Let me ask you this:
After you heard the conversation, then you realized that it's Eric Coomer, did you attempt to track him down and find him?
A. You mean in September?
Q. At any time. Let me ask you this: Did you ever try to find where he was located?
A. No. I mean, it was pretty well-known, people that reached out to me, that said he was in -- he was in Salida.
Q. In where?
A. Salida.
Q. And where is that located?
A. In Colorado.
Q. Okay. All right.
A. I mean, you had him having barbecues and parties at his house with county clerks and recorders and all sorts of other people in the state apparatus of elections. It was all over the Internet and not even associated with his Facebook page, but other people's Facebook pages.
So it's well-known that he lived up in Sedalia -- Salida -- excuse me.
Q. Okay. All right. Did he ever speak with

Page 228

you about what you said in the movie?
A. Who?
Q. Eric Coomer.
A. Did he ever speak with me?
Q. Have you ever had a conversation with the man?
A. No. No.
MR. TICKTIN: Okay. I'm going to take a few minutes. I'll be back.
THE DEPONENT: Going off the record?
MR. TICKTIN: Yes. We're going off the record.
THE VIDEOGRAPHER: Going off the record at 3:50 p.m.
(Recess from 3:50 p.m. to 3:58 p.m.)
THE VIDEOGRAPHER: We are now back on the record at 3:58 p.m.
Q. (BY MR. TICKTIN) Okay. Yeah. I wanted to ask you a couple things.
First of all, you mentioned something about -- in terms of the production of the movie, The Deep Rig -- let me just strike that. Let me just start the question over again.
In terms of the movie, The Deep Rig, do you have any actual information that Patrick Byrne was

Page 229

actively participating in the production of The Deep Rig?
A. No.
Q. Okay. Now, in terms of Coomer's reputation -- I mean, he's suing for damage to his reputation.
Do you know -- in terms of the other lawsuits -- I mean, this particular suit, it's only for what was said in The Deep Rig. But do you know of other things that other people have said in regard to Eric Coomer?
MR. KLOEWER: Objection to form.
A. I think that -- I think that Eric works for, you know, a pseudo government agency that does the public good, right. And, you know, when you're in that capacity and you're doing the things that Eric Coomer has done to damage his own reputation, it becomes very easy to come to the conclusion that we came to, especially as you dig further into what Dominion is capable of doing.
And then when you see capabilities of what Dominion can do in order to effect an outcome, and that happens, and the chaos which is built into the system with, you know, stored procedures and what can only be described as rootkits -- I don't know what

Page 230

else you want to call it -- stored procedures are kind of the same thing -- that hide, in plain sight, the things that the system is designed to do, and then explain it away with, oh, human error, as if it's okay.

I think that you should be scrutinized. You should be scrutinized when you do things to purposely take away the voice of the people in an environment where it creates victims in our society, and you do so under the guise of, I didn't do anything.

But you make the system also so unapproachable that no one is allowed to even scrutinize or even look under the hood. That's a perfect indication that Eric Coomer, you know, hurt his own reputation.

And he hasn't done himself any favors on the personal side either. But I don't believe that anything that was said by me or others is -- in any line could be characterized as defamation. Not even Mike Lindell, right.

So -- and had it not been for the judge in the Mike Lindell case coming to a finding of defamation, which is wrongful. The judge is not supposed to put their finger on the scales of justice,

Page 231

is not supposed to file in limine to limit the type of information you can discuss.

That's like -- that's like hiding all the evidence and saying, Oh, by way, I'm the victim. That's antithetical to what our system is designed to do.

If the judge in that case, Judge Wang, had not put her finger on the scales and said, I do find that it is per se defamation, then the jury would have never found that there was any defamation at all.

And you can tell by how they ruled, with it not being malicious or the fact that I was found to be both credible and truthful is another problematic thing for not only Coomer, but Dominion Voting Systems and some of these, you know, circus lawsuits that are nothing more than paper tigers, going after people that have really put things on the line in order to get to a place where the American people have free and fair elections.

Q. (BY MR. TICKTIN) All right. Do you feel that, in a sense, that these lawsuits by Eric Coomer -- let's say for a fact which ones there are.

First -- so there's the one against Patrick Byrne. He's suing Patrick Byrne. He's suing you. He sued Mike Lindell. He sued Sidney Powell.

Page 232

He sued the Trump Campaign. Is there anyone else that you know of that he sued?

A. Clay Clark, OAN, Sidney Powell, something Rion, who worked for OAN.

Q. Do you know what it was that these people said about Eric Coomer?

A. They didn't say anything. They allowed me to speak the truth. And so it was a chilling effect, where he was basically suing everyone in order to make it, and then going out in the public and doing a world tour on media platforms, talking about how he's the victim, and frankly -- and lying.

By his own words, he lied in December of 2020 when he said that none of those posts were his and he didn't have social media. And he knowingly lied in order to create more damage to myself. And he knowingly lied about his involvement in the systems as well.

So, I mean, we're just -- it's -- right now, it's almost laughable what has been said by Eric, by his own admission, and what has come out the other side in documentation as to his real involvement in what happened with Dominion, all the way back through Smartmatic, so -- excuse me -- through Sequoia. So -- go ahead. Sorry.

Page 233

Q. Okay. The other -- the other things, though, that anyone is suing for -- words that you said.

A. Where does mine sit with --

Q. I'm asking like, when he sued Sidney Powell, what was it that Sidney Powell either said or published?

A. Well, she didn't. She just repeated the things that Eric Coomer had done and said. And so Sidney Powell, I think -- that was a little bit different because she said that he -- that she had a recording, which I've never told anyone that there was a recording, although I pray that somebody has one.

But, yeah. I think hers is a little bit different and some of the things they said about her. And she also, obviously, had the lawsuit down in Georgia and was an attorney during the 2020 election.

So I don't -- I don't know what the outcome is with that. But I don't even remember what they said that she said.

But they just sued a bunch of people, including my company, which wrecked it, and, you know, FEC United, which I had nothing to do with it.

So they just -- Eric Coomer and his lawyers just basically wreaked havoc on everyone's

Page 234

lives and used lawfare in order to destroy people.
And so it was designed -- this entire thing was designed to destroy people. The process is the punishment. And the collusion that they have with radical, crooked judges is unbelievable and undeniable.
Q. Do you think that -- okay -- that the lawsuits by Eric Coomer are actually brought by his lawyers against you and others to basically silence criticism of the fact that the election was stolen?
MR. KLOEWER: Objection to form.
A. I actually think it's worse than that, frankly. I think it rises to the level of criminal; that they're using it to intimidate, bully, and to silence me against speaking up.
And when it didn't work, they filed for protection orders and said that I was saying things against them that I never said.
So I've never threatened any of them in the last six years. I've never even suggested that I would do harm to any of them. And yet they take any words that I say related to accountability from a man who has been hurt for six years by their actions, not mine.
They just -- they don't stop. It's

Page 235

unrelenting. I think the whole thing is designed to stop the American people from -- just shut up, sit down, and go back to being a slave.
Q. (BY MR. TICKTIN) Now, in terms of the -- I asked you before, but I just want to make sure I got this straight. In terms of your -- the deposition that we had of Eric Coomer, before the deposition started, they were sitting -- do you know where they were sitting in the restaurant area?
A. Say that again.
Q. Okay. Let me ask you this: Before the deposition started --
A. Yeah.
Q. -- and you overheard conversation from Eric Coomer and Mr. Cain, Charles Cain, okay, do you remember hearing the discussion that they had?
A. Yeah. And I think I wrote it down. As soon as I heard it, I wrote it down almost immediately.
Q. Okay. And do you remember what it was that you wrote?
A. No. I'm looking it up though. There it is. I said it at -- I think I just heard Charlie say, We have to find a way not to do this depo, right at the beginning. Was that it?

Page 236

Hold on. Let me see what time that was. Sorry. Give me a second.
It was at 7:00. So I think this is Colorado time or it might be -- it says -- no. This would be their time, so East Coast time, 8:58.
I think I just heard Charlie say, We have to find a way not to do this depo to Coomer before he walked in. So that was at 8:58 in the morning.
Q. Okay. When you say, "I think I heard him say," what do you mean, "I think I heard him say"?
A. Well, that's -- you know, I didn't get the exact words, but We don't -- We shouldn't do this deposition.
Q. Are you certain about the gist of what he was saying?
A. Yes.
Q. Okay. But you're not certain about exactly the order of the words?
A. Yeah. Because right after that, he came in and said that, you know, I couldn't be there.
Q. So that was before he attempted to have you removed?
A. Yes.
Q. Oh, okay. All right.
MR. TICKTIN: Okay. I pass the witness.

Page 237

Thank you very much, Mr. Oltmann. I appreciate your candor.
THE DEPONENT: Thank you.
EXAMINATION
BY MR. KLOEWER:
Q. All right. Mr. Oltmann, I have a few follow-ups for you. I'll try to be quick. I realize we're getting to the end of the day here.
You were asked briefly about a joint defense agreement. You have one of those in place with Defendant Byrne as well; correct?
A. I do.
Q. Okay.
A. And the other defendants in my case.
Q. Okay. Mr. Ticktin also asked you if you had ever attempted to find Mr. Coomer. Do you remember that question?
A. Yeah.
Q. And you said no?
A. Yeah. No. I think that they found -- they found him.
Q. Who is "they"?
A. The people that sent me information on Eric.
Q. Okay.

Page 238

A. I've never gone out and looked for Eric Coomer.
Q. Okay. I'm going to share my screen real quick. We'll take a look at what's been marked as Exhibit 57, Clip 9. This is from December 3rd of 2020.
(At this time a video was played.)
Q. Okay. So you did have people sending you information about Eric Coomer's whereabouts; right?
A. Yeah. But I didn't go looking for him. They sent me -- they sent me a lot of that information you just read, including some of the people that were doing research in Washington over Eric Coomer related to what Eric Coomer has done or was doing, including countries that he went to and so on and so forth.
Q. And much of that -- we discussed this in a deposition -- ultimately, you found out wasn't true; right?
A. Which part wasn't true?
Q. Well, for example, name one of Eric Coomer's dummy organizations around the world.
A. Well, I think what I was referring to there is the number of shell corporations or shell companies that Dominion Voting Systems has set up everywhere.

Page 239

So you have Dominion Voting Systems and you have other subsidiaries that they use in order to hide and to -- they did the same thing when they were up in Canada. They would just create different organizations and move things, like play hide the weenie, and --
Q. Have you ever said that Eric Coomer personally had foreign shell companies in foreign bank accounts?
A. Well, that's the information that came from the researcher. And, you know, frankly, there's a lot of information that came across the bow that people had a lot of things to say.
Q. But Eric Coomer doesn't have any dummy corporations or shell corporations, that you're aware of, does he?
A. I wouldn't say that, no.
Q. Name one.
A. Well, I don't know. I'm not sitting in front of any of the information that was presented to me. But I would say that that's not -- what you're saying is not accurate. I don't believe --
Q. How?
A. I don't believe that he doesn't have corporate accounts that money is flowed into. No. I

Page 240

don't believe that. I don't buy it for a minute.
Q. Okay. What evidence do you have that he does have foreign shell companies?
A. Well, I don't have any in front of me right now, that's for sure.
Q. You've never had that evidence in front of you at any time, have you, Mr. Oltmann?
A. That's not true.
Q. Okay. But you can't name a single one, as you sit here today?
A. Well, I also can't remember the people that I talked to on The Deep Rig. It's been six years. So, I mean, I spent the vast majority of that time, over the last six years, talking about how elections were stolen.
Q. You talked a little bit about what Mr. Byrne knew about your story about the antifa call.
Has he ever asked you for any information about R.D.?
A. Has --
Q. Patrick Byrne ever asked you for information about R.D.
A. I'm sure we talked about it at least once, but I don't remember the specifics of the conversation.

Page 241

Q. Do you remember what you told him?
A. The same thing I'm telling you.
Q. So you don't recall the substance of that conversation?
A. No.
Q. Did he ever ask you for information about the other participants on that call?
A. No. Well, that's not true. I'm sure -- again, I'm sure, through the process, he did, yes.
Q. Okay.
A. But I don't know. Like, I don't know. Patrick is built sort of like me. He's very tactical. He wants to just tactically get things done and make sure that people know exactly what's happening and what had happened, and what happened.
Q. But you just don't have a specific recollection of what he asked or when?
A. I've probably had conversations with 10,000 people over the last six years.
Q. So that's a no?
A. That's a no.
Q. Okay. You stated before, when you were answering some questions from Mr. Ticktin, that you've spoken with other defendants who regretted settling with Eric Coomer. Who are those settling defendants?

Page 242

A. Well, one person --
MR. TICKTIN: Before you answer that, do you have confidentiality agreements --
MR. KLOEWER: Hey, Peter, no. We're not doing a speaking objection.
MR. TICKTIN: Yes, I am. Watch.
A. So I do have --
MR. TICKTIN: If this is privileged, if this is in your agreement --
MR. KLOEWER: Objection, Peter. You're leading the witness.
MR. TICKTIN: I'm not asking a question.
MR. KLOEWER: You're instructing him on how to answer.
MR. TICKTIN: No, I'm not. I'm telling him not to answer --
MR. KLOEWER: You can't tell him not to answer. He's not your client.
THE DEPONENT: Well, he kind of is my --
MR. TICKTIN: Well, you know, that's debatable. I don't know -- he's not my client --
MR. KLOEWER: No, it's not. He's not your client in this case, Peter. It's not debatable. You can't instruct him not to answer a question.
MR. TICKTIN: I'm not instructing him.

Page 243

I'm saying, if this violates -- if to answer this would violate any of your confidentiality agreements --
MR. KLOEWER: Okay. So you're leading the witness and telling him how to respond.
THE DEPONENT: No. No. Not at all. So --
MR. TICKTIN: Look, you decided to go ahead with this, knowing that his lawyer was not available, and we went along with it because we knew that I would be able to warn him of these things. And that's the only reason we went ahead with it because --
MR. KLOEWER: That's not why we went ahead with it, Peter.
MR. TICKTIN: Okay.
MR. KLOEWER: Mr. Willson didn't request any alternative dates for himself.
Q. (BY MR. KLOEWER) Back to the question, Mr. Oltmann.
Which settling defendants told you they regretted settling with Eric Coomer?
MR. TICKTIN: And you heard what I said.
THE DEPONENT: Yeah.
A. So -- well, one person in particular that

Page 244

was given a settlement with you guys, that I'm surprised, because when I was -- when I was told that that was put in front of him, was Steve himself, that he wouldn't settle the deal and he regrets even thinking about it.
That's why I'm surprised that he settled anything and gave anybody any sort of deal.
Q. (BY MR. KLOEWER) Mr. Lucescu told you that he regretted settling?
A. Well, he said he regretted even considering settling. I didn't think he did settle. I thought he pulled it off the table. But maybe he did. It's been a long time since I had that conversation.
Q. Anybody else?
A. Yeah. But what Peter is alluding to is the fact that I am under -- I am under -- there's certain confidentialities that I have related to other things that are happening, other investigations that are currently underway.
Q. So do you have a written agreement with these settling defendants that speaks to those terms?
A. Whether it be written or whether it be understood, I would say that there are agreements of confidentiality that have been reached.

Page 245

Q. Okay. Well, I'll stipulate that this portion of the deposition will be under the protective order in this case.
So which of those settling defendants told you that they --
MR. TICKTIN: You can't --
A. Absolutely not. Absolutely not.
Q. (BY MR. KLOEWER) Do the terms of those agreements specifically include after those defendants are out of the case?
A. I don't actually know. I didn't plug in and follow the case. I just know that there were settlement discussions that were happening. But I'm sure that some were after.
I mean, I will tell you that there are -- there are people and there are other people that have spoken of the information, that is now currently coming out, that regret -- regret it.
Don't regret it from the standpoint that you guys were bleeding them dry financially, because you were, but regret the -- the settlement in whole.
I'm not so sure that those settlements will hold either. So I think -- I think your client has got some problems. And I think those settlements, you're going to find, that some of them are going to

Page 246

clawback I don't know that for sure. I didn't hear that from them. But I would not be surprised if there was a clawback that happened on these settlements over the next couple months.

Q. Okay. So you're not willing to state on the record which of these defendants supposedly told you they regretted settling, other than Mr. Lucescu, and that was prior to him having settled, apparently.

A. No. And I don't think -- I don't think that it's even proper for you to ask me that. It's like having a conversation that has nothing to do with this case.

All right. So you can go back and do what? You can say, You signed an agreement and now you're violating the agreement by talking about this? Is that what you're going to do, so you can put more lawfare in front of him?

I mean, the ultimate goal that you've ever gone to, you and Cain, has been to create as much destruction and hurt as possible against people. And you don't even care. It's as if you guys live in a world where you like it. You like inflicting pain.

So, you know, no. I'm not prepared to answer any questions related to something that, frankly, is none of your business.

Page 247

MR. KLOEWER: Okay. I'll object to that as nonresponsive.

Q. (BY MR. KLOEWER) Mr. Ticktin was asking you a little bit about an interaction that occurred in the hotel prior to Eric Coomer's deposition.

Do you remember those questions?

A. Yes.

Q. You referred to some notes you had. Looks like you were looking at notes you had taken on your computer.

A. Yeah. Actually, it was correspondence with my lawyers.

Q. Okay. Which lawyers?

A. Well, Peter and David.

Q. Okay.

A. It was at the time that they were my attorneys.

Q. Okay. Do you have any objection to producing those notes that you took?

A. It's under client -- attorney-client privilege.

Q. And you stated you overheard Mr. Coomer saying something about the deposition in the lobby?

A. It was Charlie Cain that said something about that. And it was Coomer that said that it would

Page 248

make a good chapter in the book.

Q. Okay.

A. That was Coomer that said that. And it was Cain that said that the deposition shouldn't go forward.

Q. Were you present during the conference call with Judge Flynn, discussing your presence at the deposition?

A. I was not.

Q. Okay. So you didn't hear Charlie Cain state on the record that he wanted to proceed with the deposition; he just wanted you out of there?

A. I don't think that's actually what was said. I think -- I mean, if you want to give me the transcript on that, I can review it.

Q. But you weren't there, so you didn't hear it, did you?

A. I think what was said is that he would continue the deposition if it did not include me being in the room.

And then he made up a bunch of nonsense about being -- feeling threatened and unsafe because I was in the room.

MR. TICKTIN: And besides that, objection to form.

Page 249

MR. KLOEWER: Okay. Mr. Oltmann, I don't believe I have any further questions for you today.

THE DEPONENT: That's it?

MR. TICKTIN: That's it. We're done.

THE DEPONENT: I was ready for some more. I got -- I mean, I was going to go get some popcorn and sit here for a while with you.

THE VIDEOGRAPHER: Should I take us off the record?

MR. KLOEWER: -- Mr. Oltmann, but I think we'll call it for today.

MR. TICKTIN: We're off the record --

THE REPORTER: No, we're not off the record yet. I'm sorry, Peter. Before we go off the record --

MR. TICKTIN: Before we go off the record, yes. I know that David Willson was going to ask to make sure that the witness could read.

THE REPORTER: Perfect.

Before we go off the record, Brad, would you like a copy of the transcript? Would you like your standing order?

MR. KLOEWER: Standing order, please.

THE REPORTER: Perfect. We'll get that to you.

Page 250

Peter, would you --

MR. TICKTIN: What is the standing order? I would like to know, please.

THE REPORTER: He has a standing order for what his preferences are, whether he wants an electronic or a hard copy, whether he wants exhibits or no exhibits. He has decided ahead of time how he wants his transcript prepared and delivered to him on all the case -- all the depositions in this case.

So we have that set in the office to get him exactly what he needs.

Would you like a transcript of this deposition, Peter?

MR. TICKTIN: I'll tell you what I would like, is just would you email me just your name so I can -- I'm not sure whether we'll take it or not, but this way at least I'll be able to contact you and let you know what I want.

THE REPORTER: I will be happy to send you an email. At this point, we will hold.

Joe, it sounds like you're going to read and sign this transcript. So I'll do that through David, your counsel, who has been at some of these with me before.

And with that, Jesse, we can go off the

Page 251

record.

THE DEPONENT: I think that, yes, I'll take the Uber Eats of what Brad wants for his transcript. I'll take whatever he's getting, which is probably the video and the --

THE REPORTER: Do you want to go ahead and order that transcript, Joe, or do you want me to go through your attorney, Mr. Willson?

THE DEPONENT: Go through the attorney, please.

THE REPORTER: That's what I'll do then. Thank you.

Thank you, Jesse.

THE VIDEOGRAPHER: Going off the record at 4:27 p.m., on June 9th, 2026.

WHEREUPON, the within proceedings were concluded at the approximate hour of 4:27 p.m., on the 9th day of June, 2026.

* * * * *

Page 252

I, JOSEPH OLTMANN, do hereby certify that I have read the above and foregoing deposition and that the same is a true and accurate transcription of my testimony, except for attached amendments, if any.

Amendments attached ( ) Yes ( ) No

______________________
JOSEPH OLTMANN

The signature above of JOSEPH OLTMANN was subscribed and sworn to before me in the county of _________________, state of _____________________, this ______ day of ________________________, 2026.

_________________________
Notary Public
My Commission expires:

Page 253

REPORTER'S CERTIFICATE

STATE OF COLORADO )
) ss.
COUNTY OF LARIMER )

I, LISA B. KELLY, Registered Realtime Reporter, Registered Professional Reporter and Notary Public ID 20194029689, State of Colorado, do hereby certify that previous to the commencement of the examination, the said JOSEPH OLTMANN verbally declared his testimony in this matter is under penalty of perjury; that the said deposition was taken in machine shorthand by me at the time and place aforesaid and was thereafter reduced to typewritten form; that the foregoing is a true transcript of the questions asked, testimony given, and proceedings had.

I further certify that I am not employed by, related to, nor of counsel for any of the parties herein, nor otherwise interested in the outcome of this litigation.

IN WITNESS WHEREOF, I have affixed my signature this 18th day of June, 2026.

My commission expires August 6, 2027.

_________________________
Lisa B. Kelly