IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Civil Action No. 8:24-cv-00008-TPB-SPF

ERIC COOMER, Ph.D.,

Plaintiff

v.

PATRICK BYRNE, et al.,

Defendants

---

**PATRICK BYRNE'S PRETRIAL STATEMENT**

---

The Defendant, Patrick Byrne files this Pretrial Statement pursuant to Local Rule 3.06(b) and states as follows:

**(1) the basis for the court's jurisdiction**

The parties agree that this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff, who was domiciled in Colorado at the time the suit was filed, and Defendant, who is domiciled in Florida, and the amount in controversy exceeds $75,000. The parties agree that this Court has personal jurisdiction over Defendant. FED. R. CIV. P. 4(k). The parties agree that venue is proper in this Court pursuant to 28 U.S.C. § 1391.

**(2) a concise statement of the action**

This is a civil case alleging claims of defamation and intentional infliction of emotional distress. The Plaintiff is a former employee of Dominion Voting Systems. The Defendant is Patrick Byrne. The Plaintiff Coomer, claims that the Defendant Byrne, is responsible for publishing statements in a 2021 film called *The Deep Rig*, and that those statements were false and defamatory. The Plaintiff Coomer also claims that Defendant Byrne's conduct amounted to intentional infliction of emotional distress.

The Defendant Byrne denies that the film was defamatory, as he spoke the truth. He also claims that he did not have the editorial control of the movie to be responsible and he was permitted under law to provide a statement of opinion. Moreover, the law in Florida requires a Plaintiff to provide a statement of retraction. None was made in the current case. The 1st Amendment of the U.S. Constitution protects speech on matters of public concern. Also, the Defendant has a fair reporting privilege, especially where he had the right to believe another person's statement. Moreover, the Plaintiff claims that the statement did not cause any harm to Dr. Coomer, and he is so damaged in his reputation that he had no reputation to be harmed. Moreover, for the Defendant, Byrne to be liable, if Mr. Coomer was a public figure or if the defamation involved matters of great public interest, Mr. Coomer must show that Dr. Byrne was malicious. Dr. Byrne claims he was not malicious and did have a well-based belief that Mr. Coomer did do as was said in the movie. In regard to the claim for an Intentional Infliction of Emotional Distress, the claim must fail as the Complaint is a shotgun pleading. All the defenses to the defamation claim apply. Lastly, he failed to mitigate his losses.

**(3) a concise statement of each party's position**

**(A) Plaintiff's claims:**

Dr. Coomer worked in elections for 16 years until 2021. He began his employment with Dominion Voting Systems, Inc. (Dominion) in 2010 and as the Director of Product Strategy and Security from 2013 until May 14, 2021

When Dr. Coomer took over as the Director of Product Strategy, his work focused on the creation of next generation products through close collaboration with customers, and utilizing an understanding of technology and the needs of elections departments across the United States and around the world. Shortly after elections were deemed critical infrastructure, his role expanded to encompass a "Security" focus as a liaison between Dominion and various groups (certification, specifications) focusing on the overall security of voting systems under the critical infrastructure umbrella. Dr. Coomer's work also significantly increased the auditability and transparency involved in applying state laws regarding ballot adjudication.

Leading up to the November 2020 presidential election, Dr. Coomer was thriving in his job, was continually given exemplary performance reviews, and was at the apex of his career.

Shortly after the 2020 presidential election was called for Joseph Biden, a group of political actors, conspiracy theorists, and media figures began circulating false claims about Dr. Coomer. The original source of the claims was Joseph Oltmann, then an obscure businessman and podcaster in Colorado who went by the pseudonym "Joe Otto."

Oltmann claimed on his podcast that he infiltrated a conference call among political activists as part of an ongoing campaign to expose "Antifa" journalists. On the call, which he later described as a Zoom call, Oltmann says that he overhead someone described as Eric from Dominion stating that there was no need to worry about President Trump being elected because he (the anonymous Eric) "had made fucking sure of it." The timing of the call, according to Oltmann, was in September 2020, a few months before the election. While Oltmann never saw any speakers on the Zoom call or made a recording of it, Oltmann claimed he traced the "Eric from Dominion" to Dr. Coomer through a search he conducted after the election results were announced. No other alleged attendee on the call has corroborated Oltmann's account.

Despite the lack of objectively verifiable proof, Oltmann's incredible claims immediately spread like wildfire across various media platforms. The claims propelled Oltmann to a national spotlight, media appearances, and a speaking role at the Ellipse in Washington D.C. on January 5, 2020. According to Oltmann, it was during the visit to Washington D.C. where he met Dr. Byrne.

Dr. Byrne is the former CEO of Overstock.com and a promoter of conspiracy theories regarding the 2020 presidential election. Dr. Byrne claims he has had a lifelong relationship with the U.S. Government, including involvement in the investigation of corrupt U.S. officials. In 2019, Dr. Byrne resigned from Overstock.com following reports of his romantic relationship with Russian agent Maria Butina.

In 2020, Dr. Byrne began promoting various theories that President Trump had actually won the U.S. presidential election. Dr. Byrne was able to obtain access to the Trump administration after the election, including a well-publicized meeting with President Trump, General Mike Flynn, and Sidney Powell at the White House on December 18, 2020. Dr. Byrne ultimately gave testimony before the Jan. 6 Committee.

In 2021, Dr. Byrne self-published his book *The Deep Rig: How Election Fraud Cost Donald J. Trump the White House, By a Man Who Did Not Vote for Him*. Dr. Byrne also promoted his election fraud theories on far-right media outlets such as One America News Network and Newsmax.

On April 30, 2021, Newsmax issued a public apology and retraction of its prior reporting about Dr. Coomer and his alleged role in the "Antifa call" or vote rigging.

Following the Newsmax retraction, Dr. Byrne began doing publicity for the film version he was producing of his book *The Deep Rig*. *The Deep Rig* movie premiered on June 26, 2021, at an event in Phoenix, Arizona (the Film). Dr. Byrne produced, financed, and exercised editorial control over the Film's content.

The stated goal of the Film was to build the membership rolls and raise money for The America Project, an advocacy nonprofit founded by Dr. Byrne. To that end, the Film begins with a plea by Dr. Byrne to contribute to his new group.

Dr. Byrne then describes the central thesis of the Film: that targeted election fraud occurred in key jurisdictions in 2020. According to Dr. Byrne, "You can't do it with widespread election fraud. You do it with narrow, deep fraud in six cities. Those six are

Las Vegas, Nevada, in Clark County; Phoenix in Maricopa; Milwaukee, Wisconsin; Detroit, Michigan; Philadelphia, Pennsylvania; and Atlanta, Georgia."

Dr. Byrne then summarizes how the targeted election fraud occurred through targeted vote flipping which is immediately followed by various "cyber security analysts" discussing computer hacking. The Film segues into a montage about Antifa and revolutions based in Marxist ideology, with Retired U.S. Colonel Phil Waldron tying ideological actors to the election fraud claims.

The Film then introduces Oltmann, who vaguely describes his role in proving election fraud and his model of how it occurred. "I started reaching out to people who were actually involved in it at a very high level, and had positions in government at a high level, and the more information I fed to them, the more they came back and said listen, can you come to Washington D.C.? They all asked me a bunch of questions like how did you come up with this model? I told them about the math, how I actually discounted different values, and every single person that I sat down with validated the information that I was able to create by actually stacking this information on top of each other."

Dr. Coomer makes an appearance at minute 49 of the Film through a video of him from April 13, 2017, where Dr. Coomer was explaining to election officials how electronic adjudication works. Adjudication is the process of resolving cast ballots to reflect voter intent. Common reasons that ballots require adjudication include: write-ins, overvotes, marginal machine-readable mark, having no contest selections marked on the entire ballot,

or the ballot being unreadable by a scanner. These ballots may be marked for adjudication and then presented to a bi-partisan team to confirm voter intent.

The Film then reintroduces Joe Oltmann and features a roughly two minute segment in which Oltmann recounts overhearing a conference call he says involved Dr. Coomer:

> I set out to figure out who the Antifa activists were, and so, as the story goes, that's when I discovered Eric Coomer. So in September of 2020, I set out to infiltrate Antifa. And I did. So I met a guy that was a part of Antifa and he said "I've got to figure out a way to get out, but I'm too deep into the process." So I said, the first thing that could happen is we could dismantle it, and an easy way to dismantle it is to uncover who is running Antifa. So he got me on a phone call. They were talking about how they needed to fortify and continue to do the things that they were doing, not just in Colorado Springs, but in Denver and all over Colorado.
>
> And a guy named Eric started speaking, and when Eric started speaking, he started talking again about how they needed to fortify and not give up. They asked, "Who is Eric?" Alright, "Who is Eric?" And somebody came back and said, "Oh, Eric's the Dominion guy." As he continued to speak, somebody else interrupted him and said, "Hey what are we going to do if Trump wins?" And he responded, "Don't worry about the election. Trump's not going to win. I made fucking sure of it."
>
> So I hung up the phone, started doing research on Eric. I didn't know Eric was Coomer, I just knew Eric. I'm kind of a research junky, so I just went through and started gathering information. Went and listened to YouTube videos to make sure that the voice I heard on the call was the same voice to match up to that particular individual.
>
> * * *
>
> November 3, we all know what happened. We all went to sleep with President Trump handily ahead. We woke up the next morning and Biden had won. And nothing to see here. And I'm sitting at my friend's place and I get this text message. It's like Joe, you need to read this article. And as I went through the article, it talked about in Georgia, in several precincts, that the system on election day actually went down. And there was a description inside of the article that said why it went down. That they had to do an update in the middle and that took it down for four hours. But the person who gave

> the update was Eric Coomer. And at that moment my heart sank. That's when I knew. That's when I knew that there was a, you know, Dominion Voting Systems was in 28 states. That's when I started to realize that, you know, this guy Eric Coomer, when he said on that call "Don't worry about Trump, he's not going to win." That's when I knew that there's a high probability he affected the election.

The Film transitions into another clip of Dr. Coomer demonstrating adjudication. It then returns, this time to Col. Phil Waldron, who states:

> We first really started digging into Dominion was when Joe Oltmann's report on Eric Coomer first came out. And some of the comments that he had allegedly made on a teleconference, or a video call. We were approached, our team, a small team in Texas, was approached to look at some of the Antifa and BLM problems that we saw arising early in 2020.

Oltmann then goes into his lengthy explanation about ballot signature verification, imaging of ballots though the "ImageCast system" developed by Dominion, injecting fake or phantom ballots into the scanner, the adjudication process and the "erasing" of the image of the adjudicated ballot so that "you don't actually have a history of that ballot being replaced in the adjudication process."

The remainder of the Film contains various interviewees discussing election anomalies, election challenges, cheating, and the need to get involved. It then transitions to Gen. Mike Flynn's brother, Joe Flynn, who discusses the January 6 protestors and promises there would have been prosecutions relating to the 2020 election on a massive scale "if the FBI actually cared about getting to the truth." Gen. Flynn returns to criticize the judiciary and eventually vouches for the legitimacy of the election fraud narrative. "This is not fake news. This is reality. We cannot fake the American people out and lie to the American people about what the reality is. And the reality is that they were lied to.

That this system is totally broken. The United States of America election system broke down." Under oath, Gen. Flynn has sung a different tune.

Despite the lack of evidence, lack of corroboration, lack of investigation, and inherent implausibility of Oltmann's claims about Dr. Coomer, Dr. Byrne made the claims about Dr. Coomer a central part of the Film to demonstrate who rigged the 2020 election and how it was done. As with Gen. Flynn, however, Dr. Byrne too has changed his tune.

Dr. Byrne now claims that "Eric Coomer is part of a criminal conspiracy" involving "a whole bunch of dirty people" at Dominion, in Venezuela, and Serbia. According to Dr. Byrne, this conspiracy also involves the CIA, China, Iran, and Cuba. Dr. Coomer's role in this conspiracy is unclear except as it relates to adjudication, which was highlighted in the Film. On this point, Dr. Byrne testified that there was some "real loosey-gooseyness" in the adjudication process and that Dominion voting machines were capable of "mass adjudication." This information was supposedly provided to Dr. Byrne by anonymous Venezuelan defectors known as Mr. Pink, Mr. White, and Mr. Green (apparently among other colors) who Dr. Byrne claims he has sheltered in a self-funded witness protection program in the United States.

As to the "Antifa call" story in the Film, Dr. Byrne admits he did not independently verify Oltmann's story but is very confident that the "gist of the story" is true which he describes as follows: "Your client [Dr. Coomer] directed Venezuelan developers to develop software that could rig the election." This, according to Dr. Byrne, makes Dr. Coomer a "traitor."

Dr. Coomer denies he was on any such call, if it occurred. Dr. Coomer denies he was a "member" of Antifa or any specific political organization. He further denies having any knowledge, role, or involvement in manipulating, altering, or creating fraudulent ballots or records during the 2020 election or any prior election.

The allegations about Dr. Coomer in the Film are antithetical to his professional role at Dominion and destroyed his ability to work in elections and his professional reputation. The Film was released shortly after Dr. Coomer was exonerated by Newsmax. It quelled the positive momentum Dr. Coomer had received through the April 2021 Newsmax retraction. It exacerbated and prolonged the threats and harassment Dr. Coomer was receiving to the point that Dr. Coomer now resides outside of the country for his own personal safety and peace of mind.

Dr. Coomer contends that Dr. Byrne's publication of the claims about him in the Film were false and defamatory and made with actual malice. Dr. Coomer claims that Dr. Byrne's publications and related conduct by both Dr. Byrne and his agents meet the standard for intentional infliction of emotional distress. Dr. Coomer is seeking to recover economic damages, general/presumed damages, compensatory noneconomic damages, as well as punitive damages if permitted by the Court.

**(B) Defendant's position:**

The Plaintiff, Eric Coomer, Ph.D., formerly worked for Dominion Voting Systems, claims that the Defendant, Patrick Byrne, is responsible for publishing two statements that a man named Joseph Oltmann made in a 2021 documentary film called The Deep Rig, that those statements are false and defamatory, and that Dr. Byrne's

conduct intentionally caused him emotional distress. Mr. Oltmann is not a party to this case. Dr. Byrne denies the claims. Dr. Byrne contends that he funded the film but did not publish Mr. Oltmann's statements; that he believed the statements when the film was released; that the statements are substantially true or are statements of opinion; and that the harm Dr. Coomer claims was caused by others, before and apart from the film. He further contends that Dr. Coomer, as a public figure, must prove by clear and convincing evidence that Dr. Byrne knew the statements were false or seriously doubted their truth; that the statements concern matters of public concern and importance protected by the First Amendment, fairly report on court proceedings and official records, and were made in good faith; that Dr. Coomer did not ask him to publish a retraction before suing, as Florida law requires; that by his public role Dr. Coomer invited public comment and criticism; that the harm Dr. Coomer claims is speculative and was caused in part by his own conduct; that Dr. Coomer failed to take reasonable steps to reduce his losses; that his claims were brought too late; and that his remaining claims duplicate the defamation claim, are improperly pleaded, or do not state a claim the law recognizes.

The proposed statement describes the claims against Dr. Byrne, the only Defendant at trial; Steven Lucescu and The America Project, Inc. are no longer parties. It follows the description of the case the Plaintiff proposed on October 14, 2026 for the General Preliminary Instruction, and adds each of Dr. Byrne's affirmative defenses as pleaded in his Answer (Doc. 253 at 10-20), stated as his contentions.

The Defendant Byrne denies that the film was defamatory, as he spoke the truth. He also claims that he did not have the editorial control of the movie to be responsible and he was permitted under law to provide a statement of opinion. Moreover, the law in Florida requires a Plaintiff to provide a statement of retraction. None was made in the current case. The 1st Amendment of the U.S. Constitution protects speech on matters of public concern. Also, the Defendant has a fair reporting privilege, especially where he had the right to believe another person's statement. Moreover, the Plaintiff claims that the statement did not cause any harm to Dr. Coomer, and he is so damaged in his reputation that he had no reputation to be harmed. Moreover, for the Defendant, Byrne, to be liable, if Mr. Coomer was a public figure or if the defamation involved matters of great public interest, Mr. Coomer must show that Dr. Byrne was malicious. Dr. Byrne claims he was not malicious and did have a well-based belief that Mr. Coomer did do as was said in the movie. In regard to the claim for an Intentional Infliction of Emotional Distress, the claim must fail as the Complaint is a shotgun pleading. All the defenses to the defamation claim apply. Lastly, he failed to mitigate his losses.

**(4) a list of each exhibit with a notation of each objection:**

**(A)** Parties' Joint Exhibit List attached as **Exhibit 1**.

**(B)** Plaintiff's Exhibit List attached as **Exhibit 2**.

**(C)** Defendant's Exhibit List attached as **Exhibit 3**.

**(5) a list of each witness by name only with a notation of:**

**(A) the likelihood the witness will testify and**

*(i) Plaintiff's Witnesses*

| Witness/Testimony | Likelihood of Testimony |
|---|---|
| Dr. Alex Halderman | Will Call |
| Joseph Oltmann | Will Call (live or by deposition) |
| Dr. Patrick Byrne | Will Call |
| Steven Lucescu | Will Call (live or by deposition) |
| Carlito Johnson, Corporate Representative, The America Project | Will Call (live or by deposition) |
| Dr. Eric Coomer | Will Call |
| Mike Rothschild | May Call |
| Bill Coomer | May Call |
| Doug Bania | Will Call |

*(ii) Defendant's Witnesses*

| Witness/Testimony | Likelihood of Testimony |
|---|---|
| Patrick Byrne | Will Call |
| Eric Coomer, Ph.D. (adverse) | Will Call (live, and by deposition) |
| Joseph Oltmann | Will Call (live if he appears, or by contemporaneous transmission if the Court permits; otherwise by deposition) |
| Steven Lucescu | Will Call (by deposition) |
| Benjamin R. Cotton | Will Call (listed to preserve Dr. Byrne's objection, Doc. 365, to Doc. 362; as a fact witness whatever the ruling) |
| Erich Speckin | Will Call (listed to preserve Dr. Byrne's objection, Doc. 365, to Doc. 362; as a fact witness whatever the ruling) |
| Chris York | Will Call (live if he appears) |
| Leamsy Salazar | Will Call (live if he appears) |

| Witness/Testimony | Likelihood of Testimony |
| --- | --- |
| Carlito Johnson | May Call (live; otherwise by deposition) |
| Mark Cook | May Call |
| James T. Penrose, IV | May Call |
| Jeffrey Lenberg | May Call |
| Russell Ramsland | May Call |
| Doug Gould | May Call |
| Walter C. Daugherity | May Call |
| Jeffrey O'Donnell | May Call |
| Sheree Noell | May Call (live if she appears) |
| Clayton Thomas Clark | May Call (live if he appears; otherwise by deposition) |
| Adam Walbert | May Call (live if he appears) |
| Ronald Morales | May Call (live if he appears) |
| Puneet Vedi | May Call (live if he appears) |
| Doug Logan | May Call (live if he appears) |
| Christopher Issa | May Call (live if he appears) |
| Hugo Carvajal Barrios | May Call (only if needed for authentication, and as the Court permits) |
| Paul Chavez-Casanova | May Call (live if he appears) |
| James P. Allen | May Call (live if he appears) |
| Dar Leaf | May Call (live if he appears) |
| Gary Berntsen | May Call (live if he appears) |
| Tay Anderson | May Call (live if he appears) |
| Jared N. Finkell, M.D. | May Call (by deposition, only if the Plaintiff does not call him) |
| J. Alex Halderman, Ph.D. | May Call (by deposition, only if the Plaintiff does not call him) |
| Any witness listed by the Plaintiff | May Call |

| **Witness/Testimony** | **Likelihood of Testimony** |
|---|---|
| True rebuttal and impeachment witnesses | May Call |

Dr. Byrne's Witness List states the manner and subject matter of each witness's testimony.

**(B) each objection to the witness's testifying,**

Plaintiff objects to Defendant's overly broad "May Call" witness list which contains over eighty (80) individuals. Such an expansive list, which includes Nicolas Maduro and Fani Willis, is akin to no list at all and does not provide fair notice to Plaintiff. Further, many of these witnesses were not disclosed under Rule 26 and should be excluded on that basis. If necessary, Plaintiff will request the Court order Defendant to revise their witness list accordingly.

Dr. Byrne's response. Dr. Byrne has revised his witness list. It now identifies only the witnesses stated in item (5)(A)(ii) above, any witness the Plaintiff lists, and true rebuttal and impeachment witnesses. Neither Nicolas Maduro nor Fani Willis is on it.

**Objections to the Plaintiff's witnesses.** Joseph Oltmann: no objection to live testimony; Dr. Byrne objects to the use of Mr. Oltmann's deposition in place of live testimony unless the Plaintiff establishes a ground under F.R.Civ.P. 32(a)(4). Steven Lucescu (by deposition): Mr. Lucescu is no longer a party, and Dr. Byrne objects to the use of his deposition unless the Plaintiff establishes a ground under F.R.Civ.P. 32(a)(4). Carlito Johnson (by deposition): Mr. Johnson testified only as the designee of The America Project, Inc. under F.R.Civ.P. 30(b)(6); that company is no longer a party, and Dr. Byrne

objects that F.R.Civ.P. 32(a)(3) does not authorize use of the company's deposition against him, and objects under F.R.E. 602 and 701 to testimony outside the designee's personal knowledge. Dr. Byrne's objections to particular deposition designations, and his counter-designations under F.R.Civ.P. 32(a)(6), are noted in the margin of the color-coded transcripts. Bill Coomer: Dr. Byrne objects to testimony repeating statements Dr. Coomer made to him, F.R.E. 802, and to testimony about harm not shown to have been caused by the statements at issue, F.R.E. 401-403. Patrick Byrne: none. Dr. Byrne objects to testimony from any witness not on the Plaintiff's witness list, including Jared N. Finkell, M.D. (except as to the deposition testimony Dr. Byrne may offer under item (8)) and Charles J. Cain, whom the Plaintiff has disclosed, and to testimony from counsel of record at the trial in which he appears as an advocate.

**(6) a list of each expert witness, with a notation of:**

**(A) the substance of the testimony and**

*(i) Plaintiff's Experts*

*See* Plaintiff's Witness List (**Exhibit 4**). Plaintiff intends to call three testifying experts: Dr. Alex Halderman (election and cybersecurity expert); Mike Rothschild (conspiracy theory expert); and Doug Bania (reputational harm expert).

Dr. Halderman is expected to testify to the technical feasibility and inherent implausibility of the election fraud claims made in *The Deep Rig*, and specifically about the allegations that Dr. Coomer could have affected the 2020 election results without

detection. Plaintiff has previously produced a detailed report by Dr. Halderman to Defendant.

Mike Rothschild is an author and expert on the origin and spread of conspiracy theories and is expected to testify to the origins of the preconceived election fraud narratives posited in *The Deep Rig*, the inherent implausibility of the claims of election rigging, and origin of these and similar theories among adherents of QAnon. Plaintiff has previously produced a detailed report by Mr. Rothschild to Defendant.

Doug Bania has testified extensively in defamation cases across the country regarding reputational repair damage models and is expected to testify about the cost of a reputational repair program for Dr. Coomer based on publicly available data and data produced by Defendant regarding the distribution and audience reach of *The Deep Rig*. Plaintiff has previously produced a detailed report by Mr. Bania to Defendant.

Plaintiff intends to call Dr. Coomer (elections expert) as a non-retained expert. Dr. Coomer has extensive knowledge of election technology and security and will testify about the technical implausibility of claims of election rigging made about him (in addition to the fact that he did not participate in rigging the 2020 presidential election). Among other things, Dr. Coomer will describe his own contributions towards transparency of the vote adjudication process and his role in promoting the Coordinated Vulnerability Program which serves as model for election security threat detection and disclosure. Dr. Coomer's extensive work and contributions towards election security are antithetical to the false claims made about him in *The Deep Rig*.

*(ii) Defendant's Experts*

Dr. Byrne states here the substance of the testimony of each expert he will or may call. This statement, and not the Witness List (Exhibit 5), is the operative statement of substance for purposes of Local Rule 3.06(b)(6). Dr. Byrne's designations of his other disclosed experts remain in place. Each expert witness named below is also listed as a fact witness on the facts stated for that witness in Dr. Byrne's Witness List; in that capacity no opinion within F.R.E. 702 will be elicited.

(a) Jeffrey Lenberg (may call). Mr. Lenberg will testify to his review of election management system project files, database structures, and tabulation and reporting data from the 2020 general election, including the analyses used as exhibits at the January 27, 2026 deposition of Dr. Coomer. Stated as a conclusion and not as a reference to the reports, it is his opinion, as his report of May 9, 2021 states it, that the Antrim County Dominion Democracy Suite Election Management System, Results Tallying and Reporting application "has been found to be subverted"; that numerous error conditions identified by the tabulator are ignored by that application; and that, where the tabulator reported a critical error and shut down when votes were shifted between contests, the same results file presented to that application produced no error and was reported instead as blanks, or undervotes. The facts are his reports of April 7, 2021 (vote swap at tabulator), May 3, 2021 (SQL database swaps), May 9, 2021 (subversion in Antrim County), May 15, 2021 (vote shifting in Barry County), May 16, 2021 (security deficiencies), May 18, 2021 (presidential vote count), June 9, 2021 (Banks EMS subversion, Central Lake ballots, and ballot

abnormalities), and June 23, 2021 (assessment of the Halderman report), Def. 32d through 32n, and the Antrim County, Barry County, and Banks Township Dominion Democracy Suite project files, database structures, tabulator results files, and tabulation and reporting data examined for those reports. The basis is the project files, database structures, and tabulation data examined, the method stated in each report, and his experience with election management systems. The opinion was formed before June 26, 2021. Its connection to the statements at issue is that the subject matter is the Dominion system and the adjudication function that Statement 2 places at the center of the accusation. The testimony is offered affirmatively on the falsity element and in rebuttal to the opinion that the conduct described in the statements at issue was technically impossible.

(b) James T. Penrose, IV (may call). Mr. Penrose will testify to the architecture of election management systems and supporting networks; to the categories of documented vulnerability in such systems, including remote-access pathways, administrative privilege, and configuration error; and to the circumstances in which a system described as air-gapped may nonetheless be reachable. Stated as conclusions and not as references to the reports, it is his opinion, as his reports state them, that the Michigan voting systems he assessed, both Dominion and ES&S, were found to have utilized wireless technology, and that the Dominion Voting Systems proposal for Antrim County shows a quote for wireless results-transmission capability, including an external wireless modem (report of April 9, 2021); and that "if any of the automated configuration and testing functionality implemented by Dominion were to be abused in a systematic fashion, modification of election outcomes

would be trivial for an attacker," so that review of the source code of the pre-election Logic and Accuracy scripts, the tabulators, and the election management system is required to determine whether such a script was used in Antrim County (report of May 15, 2021). The facts are the materials examined and identified in those two reports, Def. 32a and 32c: the wireless components and the vendor proposal for Antrim County identified in the first, and the Dominion patent and the pre-election Logic and Accuracy functionality addressed in the second. The basis is those materials, the published literature on election-system security, and his experience in network operations and cybersecurity. The opinion was formed before June 26, 2021. Its connection to the statements at issue is that whether the class of systems Dr. Coomer helped build carried documented pathways by which results could be reached, and in what circumstances, is a fact from which the probability Statement 2 asserts is measured. Mr. Penrose is not offered on the opinion that Dr. Coomer did any act, and no such opinion will be elicited from him. He will not testify to the opinions in his report of May 2, 2021, on which Mr. Lenberg will testify. The testimony is offered affirmatively on the falsity element and in rebuttal to the opinion that the conduct described in the statements at issue was technically impossible.

(c) Doug Gould (may call). Mr. Gould will testify to the forensic examination of the Mesa County, Colorado election management server and to its security condition, Def. 32s through 32u. Stated as a conclusion, and in the terms in which Mesa County Forensic Report No. 3 states his findings, it is his opinion that there are "numerous flaws in the security of the server, many of which could provide an outside entity with direct access to

the SQL Server Database or the Application itself." Mesa Cnty. Forensic Report No. 3, at 28. The facts are the forensic image of the server and the configuration, account, log, and event data described in Mesa County Forensic Report No. 2, the forensic examination and analysis report he authored; the basis is the image and data examined, the method stated in that report, and his experience in cybersecurity and forensic examination.

(d) Walter C. Daugherity and Jeffrey O'Donnell (may call). Dr. Daugherity will testify, as his opinion stated in Mesa County Forensic Report No. 3, dated March 19, 2022, which he signed as one of the persons who prepared it and who are responsible for its content, that during the 2020 General Election new election databases were created on October 21, 2020 and 20,346 ballot records were digitally reloaded into them, that 5,567 ballots in 58 batches did not have their digital records copied to the new database although the votes were recorded in the main election database, and that the vote totals for that election cannot be verified from the server as it stands; the facts are the forensic image of the server made before the drive was overwritten and the election databases, batch records, and vote records described in that report, and the basis is that image, the database analysis method stated in the report, and his experience in computer science and database analysis. Mr. O'Donnell will testify, as his opinion stated in the same report, which he also signed, that the absence of secure hash algorithm (.sha) files for each digital ballot image makes the authenticity of each digital ballot image, and the ballot-level record for those ballots, impossible to verify; that the true total vote count in Mesa County, Colorado cannot be accurately calculated for the 2020 General Election from records in the databases of the

county's voting system; and that the manipulation of ballot records the report describes would not be identifiable to an election official using the voting system, nor to an observer or judge overseeing the conduct of the election, and, without both cyber and database management system expertise and unfettered access to the database records and computer log files of the election management server, would be undetectable; the facts are that forensic image and the batch records, the ballot records, and the election management system user log events described in that report and set out in its Appendices A through D, and the basis is the database analysis described in the report, which he performed, and his experience as a software and database developer and analyst. The connection of the Mesa County testimony to the statements at issue is that Statement 2 asserts a high probability that the election results were affected through the Dominion system, and the reports concern the tabulated vote data, the ballot records, and the security condition of a Dominion election management server in the 2020 General Election. The testimony is offered on the falsity element. Dr. Byrne states that the examination and the reports post-date June 26, 2021 and are not offered to show what he knew or believed on that date.

(e) Russell Ramsland (may call). The order of the Michigan state court releasing the Antrim County examination to the public on December 14, 2020; what was publicly documented about voting-system security from that date through June 26, 2021; and the findings the examination states, that the tabulation log for the forensic examination of the Antrim County server from December 6, 2020 consists of 15,676 individual events, of which 10,667, or 68.05 percent, were recorded errors, that those errors resulted in overall

tabulation errors or in ballots being sent to adjudication, and that the results of the Antrim County 2020 election as reported are not certifiable. The facts are the order of the Michigan state court releasing the report to the public on December 14, 2020, Def. 26; the report of the examination, "Antrim Michigan Forensics Report" (December 13, 2020), version 2, as released, Def. 18; the fact that his firm performed the examination in December 2020 and the method stated in the report; and what was publicly documented about voting-system security from December 14, 2020 through June 26, 2021. The basis is the forensic image and logs examined, the method stated in the report, and Mr. Ramsland's experience in forensic examination of computer systems. The opinion was formed before June 26, 2021. Its connection to Dr. Coomer and to the statements at issue is as follows. The gist of Statement 2, as the Plaintiff himself frames it, is an assertion of probability: that "there was, at a minimum, a high probability that Dr. Coomer affected the election results against President Trump by using his position at Dominion and technology he helped develop." Doc. 351 ¶ 75. The truth of an assertion of probability is established by proving the probability and not the event. Mr. Ramsland's testimony bears on that probability. It concerns a forensic examination of a Dominion voting system used in the November 2020 general election in which, on the examination's own findings, the tabulation could not be reconciled and the reported results were not certifiable, and the system examined includes the adjudication function Dr. Coomer testified he managed the development of in 2013. Coomer Dep. 60:6-10. Documented failure of that kind in the very system the statement names is a fact from which the probability the statement asserts is measured, and it is what

makes the opinion helpful to the trier of fact on the question of substantial truth. F.R.E. 702(a). The report was in the public record from December 14, 2020 through June 26, 2021, and Dr. Byrne will testify that he reviewed it before that date. The testimony is offered on the falsity element and, on that foundation, for its effect on his state of mind. F.R.E. 105.

(f) Mark Cook (may call). Mr. Cook will testify to the forensic examination of the Mesa County, Colorado election management server and to the portion of that examination he performed. His opinion, facts, basis, and connection will be stated by supplement, and he will not be called on the falsity element unless that supplement is served. Whatever the ruling on Doc. 362, and whether or not that supplement is served, he may testify as a fact witness to the portion of the Mesa County examination he performed, what he personally did and observed in it, and the records he made or examined in that work, without any opinion within F.R.E. 702.

(g) Benjamin R. Cotton and Erich Speckin (will call; listed to preserve the objection to Doc. 362). Both are retained experts. Each is listed to preserve Dr. Byrne's objection (Doc. 365) to the Report and Recommendation (Doc. 362), and Dr. Byrne reserves the decision whether to call either for any opinion. If the Court sustains the objection, each will be limited to the opinions stated in the affidavits, declaration, and reports listed as Def. 32o through 32r and Def. 32v, and, as to Mr. Cotton, in his Coffee County EMS Cyber Security Report, updated October 14, 2026. Mr. Cotton will testify to his forensic examinations of election equipment and data in Maricopa County, Arizona; Antrim

County, Michigan; Fulton County, Pennsylvania; Coffee County, Georgia; and Mesa County, Colorado. Stated as conclusions and not as references to the report, it is Mr. Cotton's opinion, as his Coffee County EMS Cyber Security Report states it, that the election management server used in Coffee County, Georgia in the November 3, 2020 general election, running Dominion Democracy Suite 5.5A on Microsoft Windows 10 and Microsoft SQL Server, had no operating-system patches installed after the Dominion software was installed on September 12, 2019, and antivirus definitions dated March 15, 2019; that its security logs were limited in size so that no log entries covering the November 2020 general election remained; that eleven of the twelve accounts created with the Dominion software never had their passwords changed and that the accounts shared a common password; that 3,411 of the 3,445 remote network logons recorded in its security log were anonymous logons; that software outside the certified configuration, including Microsoft SQL Server Management Studio and multiple code compilers, was present; that the election encryption keys and certificates stored in the election database could be retrieved by anyone with local or remote access to the server; and that the Coffee County web-server logs record HTTP calls from October 2020 through January 2021 to an unauthenticated .NET Remoting endpoint, bearing a User-Agent header that also appears in published exploit code, which he states is evidence consistent with a remote code execution attack. The facts are the two forensic disk images of the Coffee County election management server described in the report and the registry, file-system, log, network, account, and database data drawn from them; the basis is that data, the method and tools

stated in the report, and his experience in computer forensics and incident response. Mr. Speckin will testify to the matters stated in his report concerning Fulton County, Pennsylvania, and to his examination of ballot printing in Maricopa County, Arizona; of ballots and envelopes in Detroit, Michigan; of the electronic poll-book database of Irving Township, Michigan; and of ballot QR-code entries in Georgia. Whatever the ruling, each will testify as a fact witness, without any opinion within F.R.E. 702, to the forensic work he personally performed and what he observed in it, and to what he communicated to Dr. Byrne before June 26, 2021, offered under F.R.E. 105 for its effect on Dr. Byrne's state of mind and not for the truth of the matters communicated.

Dr. Byrne offers this expert testimony affirmatively on the falsity element, and, as to the documents he testifies he reviewed before June 26, 2021, for their effect on his state of mind under F.R.E. 105. He does not offer it on the objective reasonableness of anyone's belief, which is not the standard. Doc. 175 at 13. The Court has recognized that "Defendants can present evidence on the feasibility of vote tampering or other technical issues through expert testimony." Doc. 328 at 5. To the extent the Report and Recommendation recommends supplementation of the F.R.Civ.P. 26(a)(2)(C)(ii) disclosures, Dr. Byrne's supplemental disclosure states, for each non-retained witness named above other than Mr. Cook, the opinion, the facts on which it rests, the basis for it, whether it was formed before or after June 26, 2021, and its connection to Dr. Coomer or to the statements at issue. If the Court adopts the Report, Dr. Byrne will serve any further

supplement the Report requires within seven days of the order, without waiver of his objection. Doc. 362 at 8, 10-11.

**(B) each objection to the witness's testifying,**

Plaintiff objects to expert opinion testimony from any of Defendant's witnesses. Retained experts have been excluded by the Magistrate Judge. (Doc. 362). Defendant was required to supplement his disclosures regarding non-retained experts by the same order but did not do so within the required seven days (and has not done so as of this filing). Defendant has objected to the Magistrate Judge's order. (Doc. 365). As of this filing, a ruling on the objection is pending from this Court.

Dr. Byrne's response. Doc. 362 is a Report and Recommendation, to which Dr. Byrne has objected. Doc. 365. As the Plaintiff states, a ruling on that objection is pending. Dr. Byrne's supplemental disclosure, and the further supplement he will serve if the Court adopts the Report, are addressed in item (6)(A)(ii) above.

Dr. Byrne states the following objections to the Plaintiff's experts.

(a) Eric Coomer, Ph.D. Objection. The Plaintiff has designated himself as a non-retained expert. Dr. Byrne objects to opinion testimony from the Plaintiff on any subject beyond his personal knowledge. F.R.Civ.P. 26(a)(2)(C), (D), 37(c)(1); F.R.E. 602, 701(c), 702, 703. He objects in particular to opinion on the eight subjects that appear for the first time in the document the Plaintiff served on June 1, 2026, F.R.Civ.P. 26(a)(2)(D), 37(c)(1); to opinion on the implausibility of the telephone-call statement Mr. Oltmann attributes to Dr. Coomer and on the subjects the June 1, 2026 document heads "General conspiracy

theories" and "Donald Trump," on grounds independent of disclosure, F.R.E. 403, 701; and to any opinion the Plaintiff contends falls within his disclosures unless its foundation is first laid outside the presence of the jury, F.R.E. 104(a), (c).

(b) J. Alex Halderman, Ph.D. Objection. Dr. Byrne objects to testimony beyond the four corners of the declaration dated April 14, 2025 that the Plaintiff served. F.R.Civ.P. 26(a)(2)(B), 37(c)(1); F.R.E. 702, 703. He objects to testimony on the "inherent implausibility of Byrne's claims in The Deep Rig," as the Plaintiff's witness list describes it, because the claim is confined to Mr. Oltmann's two statements and Dr. Byrne's own statements do not support a claim as pleaded. Doc. 175 at 23; Doc. 351 ¶ 78, at 27. He objects separately to the opinions stated at paragraphs 28 and 77 of that declaration, and to any other opinion in it, as circumstantial evidence of what he himself believed on June 26, 2021. F.R.E. 401, 402, 403, 105. He objects to any opinion drawn from a 2021 declaration referenced in the Plaintiff's disclosures but not served with them, F.R.Civ.P. 26(a)(2)(B), 37(c)(1), and, if a further or corrected disclosure is permitted, asks leave to depose Dr. Halderman before the trial term, limited to the subjects the new disclosure states. F.R.Civ.P. 37(c)(1)(C).

(c) Mike Rothschild. Objection. Dr. Byrne objects to opinion characterizing him, the film, or its audience by reference to a movement, an ideology, or a belief system, including the Plaintiff's stated subject of "QAnon believers." F.R.E. 401, 402, 403, 404(a)(1), 404(b)(1), 702. Dr. Byrne does not object to testimony concerning the

circulation of Mr. Oltmann's account by persons other than Dr. Byrne from November 2020, which bears on causation and apportionment.

(d) Doug Bania. Objection. Dr. Byrne objects to the reputation-repair figures, and to any reach, impression, view, audience, or circulation figure that aggregates the release of the film with publications by other persons or with other parts of the film, absent a showing sufficient to support a finding both that a reputation-repair cost has been incurred or is reasonably certain to be incurred and that the reach stated is separately attributable to the publication of the statements at issue by Dr. Byrne. F.R.E. 104(a), (b), (c), 401, 402, 403, 702.

As to every expert the Plaintiff has disclosed, Dr. Byrne reserves his objections under F.R.E. 401, 402, 403, 702, 703, and 705, and under F.R.Civ.P. 26(a)(2) and 37(c)(1), including objections to testimony beyond the four corners of the disclosure served for that witness.

**(7) a breakdown of the type and amount of monetary damages,**

**Economic Damages.** Plaintiff seeks economic damages up to $39,988,479 pursuant to calculations performed by his reputational harm and damages expert, Doug Bania.

**Noneconomic Damages.** Plaintiff seeks presumed/general damages for defamation per se (pending defamation per se ruling by the Court) due to the injury to his reputation. Plaintiff seeks non-economic damages to compensate for mental anguish, suffering, emotional distress, and loss of enjoyment of life, both in the past and to be experienced in

the future. Under Florida law, there is no exact standard for measuring such damages. Rather, Plaintiff intends to ask the jury to award an amount of past and future noneconomic damages that is fair and just in light of the evidence presented at trial, in accordance with Florida law.

**Punitive Damages.** Plaintiff seeks punitive damages pursuant to § 768.73, Fla. Stat. The amount of any such punitive damage will be determined by the jury based on the evidence presented at trial, in accordance with § 768.73, Fla. Stat.

The Plaintiff's claim, as he has disclosed it. Economic damages: the cost of a reputation-repair campaign, stated in the Plaintiff's Fourth Amended Disclosures § C (June 1, 2026) as "at least $1,420,805 to $39,988,479." Noneconomic damages: "in an amount to be determined at trial." Punitive damages: unstated. Attorney's fees and costs: unstated. Disgorgement of profits derived from the film: sought in the Prayer for Relief of the Second Amended Complaint, unstated in the computation.

Dr. Byrne's position. The Plaintiff has not computed a recoverable amount. The economic figure he discloses is the projected cost of a reputation-repair campaign. The report from which it comes states that such a campaign "is needed" and that its cost "ranges from a minimum of $1,420,805 to $39,988,479." The report does not state that any such campaign has been undertaken or that any part of that cost has been paid, and the disclosure that carries the figures calls them costs "incurred." The figure is computed from the reach of the statements collectively, which includes publications by persons who are not parties.

No noneconomic amount has been computed or disclosed. Dr. Byrne requests that the Plaintiff state, in this item, the amount he will ask the jury to award in each category.

Dr. Byrne further states that no claim for disgorgement of profits is properly before the Court. The Second Amended Complaint pleads no count for unjust enrichment; that count was dismissed and was not repleaded. Doc. 175 at 21-23. Dr. Byrne objects to evidence of revenue derived from the film and to any instruction or verdict question on disgorgement. Dr. Byrne is aware of no basis on which the Plaintiff may recover attorney's fees on these claims, and he reserves his objection to any award of fees to the Plaintiff and to any award of prejudgment interest. Dr. Byrne reserves all rights to seek his own fees, costs, and expenses upon prevailing, under F.R.Civ.P. 54, Local Rule 7.01, and any applicable statute or rule. He further states that attorney's fees are not an element of damages, are not submitted to the jury, and, if a fee question arises, are reserved to the Court after verdict.

Colorado law, which Dr. Byrne contends governs, limits any recovery. Damages for noneconomic loss or injury are subject to C.R.S. § 13-21-102.5(3)(a). Exemplary damages may be awarded only if the Plaintiff proves beyond a reasonable doubt that the injury was attended by circumstances of fraud, malice, or willful and wanton conduct, C.R.S. §§ 13-21-102(1)(a), 13-25-127(2); may not exceed the actual damages awarded, C.R.S. § 13-21-102(1)(a); and may not be based on evidence of a party's income or net worth, C.R.S. § 13-21-102(6). Dr. Byrne objects to any request for punitive damages measured under Fla. Stat. § 768.73.

**(8) a list of each deposition offered in lieu of live testimony, unless the deposition is only for impeachment,**

Plaintiff expects to present deposition testimony of three fact witnesses: Joseph Oltmann, Steven Lucescu, and Carlito Johnson, in his capacity as corporate representative of former Defendant, The America Project.

Dr. Byrne expects to offer designated portions of the following depositions taken in this action: Eric Coomer, Ph.D. (January 27, 2026), under F.R.Civ.P. 32(a)(3); Steven Lucescu (February 18, 2025), under F.R.Civ.P. 32(a)(4)(B) or, in the alternative, F.R.Civ.P. 32(a)(4)(E), and under F.R.Civ.P. 32(a)(6) if the Plaintiff offers any part of it; Joseph Oltmann (June 9, 2026), if he does not appear, under F.R.Civ.P. 32(a)(4)(B) or, in the alternative, F.R.Civ.P. 32(a)(4)(E); and Carlito Johnson, as the designee of The America Project, Inc. (November 20, 2025), only under F.R.Civ.P. 32(a)(2) or 32(a)(4)(D) if he does not appear. If the witness is unavailable under F.R.E. 804(a), Dr. Byrne may also offer, under F.R.Civ.P. 32(a)(8) and F.R.E. 804(b)(1), designated portions of the following depositions taken in another action: Jared N. Finkell, M.D. (July 6, 2023) and J. Alex Halderman, Ph.D. (August 16, 2023), each only if the Plaintiff does not call him; Joseph Oltmann (June 6, 2024); and Clayton Thomas Clark (April 30 and May 1, 2024), if he does not appear.

The parties' designations, counter-designations, and objections are reflected in the color-coded transcripts filed under paragraph 9 of the Case Management and Scheduling Order. Dr. Byrne objects to the Plaintiff's designations of the depositions of Mr. Lucescu, Mr. Johnson, and Mr. Oltmann served October 16, 2026, and counter-designates under

F.R.Civ.P. 32(a)(6), as noted in the margin of those transcripts. If the Court permits a further deposition of Mr. Oltmann for use at trial, Dr. Byrne will designate from it on the schedule the Court sets. Unresolved objections to video-recorded depositions will be submitted ten days before the trial term, in accordance with the Court's published practice.

**(9) a concise statement of each admitted fact,**

- Plaintiff is the former Director of Product Strategy and Security for Dominion Voting Systems.
- On November 9, 2020, Joseph Oltmann first published, on his podcast, his account of a conference call he claimed to have overheard.
- On December 22, 2020, Dr. Coomer filed a lawsuit in the District Court for the City and County of Denver, Colorado, against Mr. Oltmann arising out of that account.
- On April 30, 2021, Newsmax issued a public apology and retraction of its prior reporting about Dr. Coomer that was based on Mr. Oltmann's account of a conference call he claimed to have overheard.
- Dr. Coomer's employment with Dominion Voting Systems ended on May 14, 2021.
- *The Deep Rig* movie premiered on June 26, 2021, at an event in Phoenix, Arizona.
- *The Deep Rig* movie was re-released on July 21, 2022, at a theatre in Naples, Florida.

Dr. Byrne proposes the following additional facts for admission. Each is drawn from the Plaintiff's own pleading, declaration, brief, or stipulation, from an order in this action, or from the docket.

- Mr. Oltmann repeated that account on a variety of platforms, and his statements were published by others, including The Gateway Pundit and One America News Network, beginning in November 2020. *Coomer v. Lindell*, Final Jury Instructions No. 8, stipulated fact 17.

- Joseph Oltmann is not a party to this action.
- Roger R. Richards directed the film. Doc. 197 ¶ 68.
- Steven Lucescu is no longer a party to this action. Doc. 351 ¶¶ 14, 77.

**(10) a concise statement of each agreed principle of law,**

- The elements of defamation are substantially similar under Florida and Colorado law.
- The case is a matter of public concern.
- In matters of public concern, Plaintiff's burden of proof requires a showing of a publication with actual malice.
- The defamation claim in this case requires proof of the following elements: whether Defendant Byrne published a statement about Plaintiff Coomer; whether the statement was in some significant respect false; whether Defendant Byrne either knew the statement was false or published with reckless disregard for the truth or falsity of the statement; whether the statement was defamatory; and, if so, whether the defamatory statement was a legal cause of damage to Plaintiff Coomer.
- The elements of intentional infliction of emotional distress are substantially similar under Florida and Colorado law.
- The elements of intentional inflection of emotion distress requires proof of the following elements: whether Defendant Byrne engaged in extreme and outrageous conduct with the intent to cause severe emotional distress or with reckless disregard of the high probability of causing severe emotional distress; and, if so, whether that extreme and outrageous conduct was a legal cause of severe emotional distress to Plaintiff Coomer.

Dr. Byrne proposes the following additional agreed principles of law.

- Dr. Coomer bears the burden of proving that each statement was false. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776-77 (1986).
- Dr. Coomer must prove, by clear and convincing evidence, that Dr. Byrne published each statement knowing that it was false or with reckless disregard

as to whether it was false. The test is subjective: whether Dr. Byrne himself in fact entertained serious doubts as to the truth of the statement. Doc. 351 at 2, 26; *id.* ¶ 51, at 15; Doc. 175 at 13; *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).

- Dr. Coomer is not proceeding on a theory that any statement Dr. Byrne himself made is actionable defamation. Doc. 351 ¶ 78, at 27.

- Presumed and punitive damages may not be awarded without a showing of knowledge of falsity or reckless disregard for the truth. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349 (1974).

**(11) a concise statement of each issue of fact without incorporating another paper,**

**(A) Plaintiff's Issues of Fact**

*(i) Defamation*

- Whether Defendant Byrne "published" statement(s) about Dr. Coomer.

- Whether such were in some significant respect false.

- Whether Defendant Byrne either knew the statement(s) were false or published them with reckless disregard for the truth or falsity of the statement.

- Whether the statement(s) published were defamatory.

- Whether the defamatory statement(s) were a legal cause of damage to Dr. Coomer.

*(ii) Intentional Infliction of Emotional Distress*

- Whether Defendant Byrne engaged in extreme and outrageous conduct.

- Whether Defendant Byrne acted with the intent to cause severe emotional distress or with reckless disregard of the high probability of causing emotion distress.

- Whether that extreme and outrageous conduct was a legal cause of emotional distress to Dr. Coomer.

*(iii) Damages*

- What amount of money does the greater weight of the evidence show will fairly and adequately compensate Dr. Coomer for his economic loss.

- What amount of money does the greater weight of the evidence show will fairly and adequately compensate Dr. Coomer for any out-of-pocket economic loss, impairment of his reputation, personal humiliation, and mental anguish and suffering, both in the past and in the future.

- Whether Defendant Byrne was personally guilty of intentional misconduct which was a substantial cause of damage to Dr. Coomer and that Defendant Byrne's primary purpose in publishing the statement was to indulge ill will, hostility, or an intent to harm Dr. Coomer.

**(B) Defendant's Issues of Fact**

- Whether Dr. Byrne published each statement at issue, that is, whether he took a responsible part in its publication by making it, selecting it, directing that it be included, or otherwise controlling whether it appeared in the film.

- Whether each statement was understood to refer to Dr. Coomer.

- If the Court does not decide the question as a matter of law, whether each statement was defamatory.

- Whether the substance or gist of each statement was false when the film was released, or substantially true.

- Whether Dr. Byrne himself, when the film was released, knew that a statement was false or had serious doubts about its truth.

- Whether any part Dr. Byrne took in publishing a statement at issue was a legal cause of damage to Dr. Coomer, and the amount of that damage, as distinct from harm caused by other parts of the film, by statements of other people, and by other publications, before or after June 26, 2021.

- Whether Dr. Byrne engaged in extreme and outrageous conduct, intentionally or recklessly, and whether that conduct was a legal cause of severe emotional distress to Dr. Coomer.

- Whether Dr. Byrne and at least one other person agreed to defame Dr. Coomer, whether an overt act was done in furtherance of that agreement, and whether Dr. Coomer was damaged as a result.

- If exemplary damages are submitted, whether Dr. Coomer has proved beyond a reasonable doubt that the injury he claims was attended by circumstances of fraud, malice, or willful and wanton conduct, and, if so, the amount, which may not exceed the actual damages awarded. C.R.S. §§ 13-21-102(1)(a), 13-25-127(2).

- Whether Dr. Coomer failed to take reasonable steps to reduce the losses he claims.

- Whether the harm Dr. Coomer claims was brought about by an intervening cause that was not reasonably foreseeable.

- If the Court determines that the defense presents a question for the jury, whether Dr. Coomer consented to the publication of a statement at issue.

- If the Court determines that comparative fault is available, whether, and in what percentage, any fault of Dr. Coomer contributed to the damages he claims.

- If the Court determines that a claim on a publication after June 26, 2021 is before the jury and that its timeliness turns on a disputed fact, the facts bearing on when that claim accrued.

**(12) a concise statement of each issue of law without incorporating another paper,**

- Whether the statements at issue are defamatory per se as a matter of law. (Doc. 333).

- Whether a genuine issue of material fact exists regarding Defendant Byrne's substantial truth defense. (Doc. 333).

- Whether a genuine issue of material fact exists regarding Defendant Byrne's publication of the statements at issue. (Doc. 334).

- Whether a genuine issue of material fact exists regarding actual malice as to Defendant Byrne. (Doc. 334).

- Whether a genuine issue of material fact exists regarding Dr. Coomer's intentional infliction of emotional distress claim. (Doc. 334).
- Whether Florida or Colorado law applies where conflicts exist.
- Whether conflicts of law exist between Florida and Colorado law with respect to proof of actual damages even when the statement is defamatory per se; the standard of proof applicable to the award of punitive damages; limitations on the award of punitive damages; consideration of a party's income or net worth in the award of punitive damages; and the burden of proof applied to proof of falsity of the publication.
- Whether and to what extent the ruling in *Coomer v. Oltmann*, No. 26W258, Ruling Regarding Permanent Protection Order Hearing (Denver Cnty. Ct. July 6, 2026) has preclusive effect (Denver ruling). (Doc. 371).
- Whether Joseph Oltmann's statement about Dr. Coomer that there was a "high probability" that Dr. Coomer affected the election is protected opinion. (Doc. 371).
- Whether the Court should enter an order under FED. R. CIV. P. 56(g) treating as established that Joseph Olmtann sincerely held his belief as of May 8, 2026, and that Dr. Coomer is precluded from relitigating it. (Doc. 371).
- Whether Byrne's Supplemental Motion for Summary Judgment, Doc. 371, should be struck. (Doc. 372).
- Whether issue preclusion applies to the Denver ruling. (Doc. 372).
- Whether a Rule 56(g) order proposed by Defendant Byrne is material to any element the jury will decide. (Doc. 372).

Dr. Byrne states each issue of law and each affirmative defense here, without incorporating another paper, so that none is abandoned under paragraph 8 of the Case Management and Scheduling Order. No affirmative defense pleaded in the Answer is withdrawn. For each defense he identifies how it is presented at trial: a question for the jury on which he bears the burden of proof; the negation of an element on which Dr. Coomer bears the burden; or an issue of law for the Court. Where the Court has ruled on or commented on a defense, he states the ruling or the observation and does not re-argue it to the jury.

**Defendant's Issues of Law**

1. The governing standard of fault. Dr. Byrne asks the Court to rule before the charge that Dr. Coomer must prove actual malice by clear and convincing evidence on every claim. The grounds are Dr. Coomer's concession, Doc. 351 at 2; *id.* ¶ 51, at 15; Doc. 175 at 9-10; Colorado law, which, unlike Florida law, requires a plaintiff who is not a public figure to prove actual malice when the claim rests on a statement relating to a matter of public concern, Doc. 175 at 9 & n.5, 10 (citing *Coomer v. Donald J. Trump for President, Inc.*, 552 P.3d 562, 581 (Colo. App. 2024)); and, in the alternative, his status as a limited-purpose public figure, a question of federal law. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974); *Berisha v. Lawson*, 973 F.3d 1304, 1310-11, 1314 n.6 (11th Cir. 2020). If the Court applies a negligence standard, presumed and punitive damages remain unavailable without a finding of knowledge of falsity or reckless disregard. *Gertz*, 418 U.S. at 349-50.

2. Whether Dr. Coomer is a limited-purpose public figure, on which Dr. Byrne bears the burden of establishing the status. Doc. 253 at 11.

3. Choice of law. Colorado substantive law governs the Plaintiff's claims and the measure of compensatory and exemplary damages. Because the action was transferred under 28 U.S.C. § 1631, the Court applies Florida's choice-of-law principles. Doc. 175 at 8. Florida applies the most significant relationship test of the Restatement (Second) of Conflict of Laws to tort claims. *Bishop v. Fla. Specialty Paint Co.*, 389 So. 2d 999, 1001 (Fla. 1980). For a defamation published in more than one State, the State of most significant relationship is usually the State where the plaintiff was domiciled at the time, if the matter was published there. Restatement (Second) of Conflict of Laws § 150(2) (Am. L. Inst. 1971); *see Frey v. Minter*, No. 20-10331 (11th Cir. Oct. 1, 2020) (unpublished) (applying Florida choice-of-law rules and § 150 to a defamation claim after transfer). The parties agree that Dr. Coomer was domiciled in Colorado when this action was filed (item (1)), and he has pleaded that he is domiciled there. Doc. 197 ¶ 9. Colorado courts and the Tenth Circuit have applied Colorado law to his claims arising from the same account. *Coomer v. Donald J. Trump for President, Inc.*, 2024 COA 35, 552 P.3d 562; *Coomer v. Salem Media of Colo., Inc.*, 2025 COA 2; *Coomer v. Make Your Life Epic LLC*, 98 F.4th 1320, 1327 (10th Cir. 2024). On the motions to dismiss, Dr. Coomer declined to offer any argument or authority opposing application of Colorado's actual-malice rule. Doc. 175 at 9. Dr. Byrne's proposed instructions apply Colorado substantive law to the claims and defenses, and Dr. Byrne opposes the Plaintiff's Motion for

Determination that Florida Law Governs Defamation Claim and Punitive Damages (Doc. 373). Where this statement cites Florida authority on an element, defense, or remedy, it does so in the alternative, for use if the Court determines that Florida law governs that issue.

4. Which publication or publications of the film are at issue, and on what date or dates. Dr. Byrne's position is that the publication sued upon is the release of the film that began with its premiere on June 26, 2021, and that the Second Amended Complaint pleads no separate claim on the July 2022 showing in Naples, Florida described at Doc. 197 ¶ 119. In the alternative, any claim on that showing is barred by the statute of limitations, C.R.S. § 13-80-103(1)(a), or, if Florida law applies, Fla. Stat. §§ 95.11(5)(h), 770.05, 770.07, and does not relate back under F.R.Civ.P. 15(c)(1)(B).

5. Whether each statement at issue, including the clause of Statement 2 stating "there's a high probability he affected the election," Doc. 197 ¶ 103, is a statement of fact, opinion, or mixed opinion. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20-21 (1990).

6. Whether either statement at issue is defamatory per se.

7. What the governing law requires to hold a defendant responsible for publishing a statement made by another person, and whether funding, appearing in, or promoting a work is by itself sufficient.

8. Whether, under the governing law, a qualified privilege, or the fair report privilege as to the film's account of the December 14, 2020 court-ordered public release of the Antrim County examination and of the findings stated in *Curling v. Raffensperger*, 493 F. Supp. 3d 1264 (N.D. Ga. 2020), applies as a matter of law. *Alan v. Palm Beach Newspapers, Inc.*, 973 So. 2d 1177, 1179-80 (Fla. 4th DCA 2008).

9. Whether the conduct alleged in the claim for intentional infliction of emotional distress may reasonably be regarded as extreme and outrageous, and whether that claim is impermissibly duplicative of the defamation claim. *Vance v. S. Bell Tel. & Tel. Co.*, 983 F.2d 1573, 1575 n.7 (11th Cir. 1993); *Fridovich*, 598 So. 2d at 70.

10. Whether the civil conspiracy claim may proceed on the same publication as the defamation claim, whether it is derivative of that claim, whether a defendant is answerable for acts committed before he joined any agreement

found, and whether an agreement to promote a view about an election is an agreement to defame.

11. Whether a corporation and its own agents acting on its behalf can conspire with one another.

12. Whether the claim styled as one for a permanent injunction states a cause of action or a remedy, and whether injunctive relief restraining speech is available.

13. Whether the Plaintiff may submit a claim for exemplary damages and, if so, the application of Colorado law: the requirement that the facts be proved beyond a reasonable doubt, C.R.S. § 13-25-127(2); the limit that any award not exceed the actual damages awarded, C.R.S. § 13-21-102(1)(a); the exclusion of evidence of income or net worth, C.R.S. § 13-21-102(6); and the Court's authority to reduce or disallow an award, C.R.S. § 13-21-102(2). If Florida law applies, the standard of proof and the procedure, including whether the amount is tried in a second stage under F.R.Civ.P. 42(b) and whether evidence of Dr. Byrne's financial resources is received only in that stage.

14. Whether evidence of Dr. Coomer's other actions, settlements, and recoveries arising from the same account is admissible on causation and apportionment, and whether any setoff or reduction is determined by the Court after verdict.

15. Whether the defense of failure to mitigate damages is submitted to the jury.

16. Whether substantial truth is submitted as an affirmative defense on which Dr. Byrne bears a burden, or only as the negation of the falsity element on which Dr. Coomer bears the burden. Dr. Byrne's position is the latter. *Hepps*, 475 U.S. at 776-77.

17. Whether comparative fault or apportionment of fault is available on these intentional-tort claims under the governing law, and, if Florida law applies, whether Fla. Stat. § 768.81 applies to them.

18. Whether a statement Dr. Byrne made himself, on which the Plaintiff is not proceeding, may be treated as a republication or an adoption of a statement Mr. Oltmann made. Doc. 351 ¶ 78.

19. The admissibility of evidence of other judgments, verdicts, settlements, and proceedings, and how a prior sworn statement given in another proceeding is

identified to the jury; of the sanctions and show-cause proceedings in this action; of the Defendant's wealth, business history, and personal life; of settlement communications; of threats and harassment by third parties; of the events of January 6, 2021 and of the unrelated conduct of the Defendant's associates; of the July 2022 release of the film and its later availability; of opinion testimony beyond the four corners of a served expert disclosure or, from a non-retained expert, beyond a disclosed summary of facts and opinions; of opinion testimony from the Plaintiff beyond his personal knowledge or his timely disclosures; of an expert opinion formed after June 26, 2021 as evidence of what Dr. Byrne believed on that date; of testimony from counsel of record at the trial in which he appears as an advocate; of the reputation-repair figures stated in the Plaintiff's damages computation, and of any reach, impression, view, audience, or circulation figure that combines the June 26, 2021 release of the film with publications by other persons, or that attributes to the two statements at issue the reach of a later showing or of another part of the film; of Dr. Byrne's out-of-court statements made after June 26, 2021, including the statement pleaded at Doc. 197 ¶ 122, while the jury decides liability and compensatory damages; of characterization of Dr. Byrne by reference to a movement, a belief system, or a label; and of the disqualification of any lawyer in the District of Columbia action, of any disciplinary, admission, or sanctions proceeding in another forum concerning any lawyer appearing in this case, and of Dr. Byrne's statements made after June 26, 2021 about any judge, court order, or court. Also at issue are whether any party may argue that the jury may award damages against Dr. Byrne for harm caused by other persons; whether all parties are confined, on the issue of truth, to the truth or falsity of the two statements at issue and not the conduct of the 2020 presidential election generally, subject to exceptions for what was communicated to Dr. Byrne before June 26, 2021, for the timing and sources of the harm the Plaintiff claims, and for the evidence of the witnesses Dr. Byrne has disclosed on the falsity element; whether the film is published to the jury only in the portions the parties designate by timecode, with the complete film received for authentication and for the record only; whether the preliminary questions on any statement offered under F.R.E. 801(d)(2)(C), (D), or (E), including the May 15, 2026 written statement of Steven Lucescu, Doc. 351-23, are determined under F.R.E. 104(a) outside the presence of the jury before opening statements; and whether Dr. Byrne's own requests in Joint Exhibit 11 are not hearsay, whether his statement in it that a clip's authenticity was in question is admissible under F.R.E. 803(3), and whether the statements made to him in it are received under F.R.E. 105 for their effect on his state of mind.

20. Whether any inference may be drawn from a nonparty's assertion of a constitutional privilege, and if so against whom, and whether that question is determined outside the presence of the jury before any such assertion is published to it. F.R.E. 104(c), 403. Dr. Byrne does not contend that such an assertion can never support an inference in a civil case; he asks that the question be decided before the jury hears the assertion. He objects to any instruction inviting an inference from a party's failure to call a witness.

21. Whether a party may ask the jurors to place themselves in the position of a party or to award what they would want for themselves; argue a per-diem, mathematical, or unit-of-time formula for noneconomic damages; or argue that the jury should send a message, punish, deter, or set an example, in voir dire, in opening statement, or in closing argument. F.R.E. 403; F.R.Civ.P. 16(c)(2)(L). Dr. Byrne asks the Court to direct that no party do so.

22. Whether the Plaintiff must prove by a preponderance of the evidence, or by clear and convincing evidence, that each statement at issue was understood to refer to him.

23. Whether the Colorado anti-SLAPP statute applies. Dr. Byrne preserves the point, with express acknowledgment that this Court has stated that it "has previously ruled Colorado's statute inapplicable in federal court proceedings like this one." Doc. 175 at 9.

24. If Florida law applies, whether notice under Fla. Stat. § 770.01 was required before suit. Dr. Byrne preserves the point, with express acknowledgment that this Court has observed that "Defendants do not appear to fall within the protection of the statute." Doc. 175 at 9.

25. Whether any award of damages for noneconomic loss or injury is subject to the limitation of C.R.S. § 13-21-102.5(3)(a), which applies "[i]n any civil action other than medical malpractice actions in which damages for noneconomic loss or injury may be awarded."

**Defendant's Affirmative Defenses**

Numbering the affirmative defenses sequentially as they appear in the Answer, Doc. 253 at 10-20, paragraphs 1 through 35, Dr. Byrne asserts each of them; none is withdrawn. For each, he states how it is presented at trial. No amendment of the Answer is sought. A

pleading in the alternative is not an admission, F.R.Civ.P. 8(d)(2) and (3), and nothing in the Answer is a concession that either statement at issue is false or that Dr. Byrne published either of them.

1. Substantial truth (Count 1). The negation of the falsity element, on which Dr. Coomer bears the burden; no separate truth instruction is requested. If the Court submits it as an affirmative defense, Dr. Byrne bears the burden by a preponderance of the evidence.

2. Opinion (Count 1). An issue of law for the Court in the first instance; a question for the jury only if the Court finds a statement to be mixed opinion.

3. Failure to provide notice of retraction (Count 1). Preserved as an issue of law for the Court; no jury instruction is requested.

4. Lack of actual malice; public figure (Count 1). The absence of knowledge of falsity and of serious doubt is the negation of an element on which Dr. Coomer bears the burden by clear and convincing evidence. Public-figure status is an issue of law for the Court.

5. Anti-SLAPP (Count 1). Preserved as an issue of law; not argued to the jury.

6. First Amendment protection (Count 1). An issue of law for the Court, bearing on the elements and the burdens.

7. Fair reporting privilege (Count 1). An issue of law for the Court in the first instance; a question for the jury only if the facts are disputed.

8. Qualified privilege (Count 1). An issue of law for the Court in the first instance; a question for the jury only if the facts are disputed. No finding of publication is requested or conceded.

9. Fair comment (Count 1). Decided through the fact-or-opinion determination and the knowledge element; no separate instruction is requested.

10. Lack of causation (Count 1). The negation of an element on which Dr. Coomer bears the burden.

11. Failure to state a claim; shotgun pleading (Counts 2 through 5). Preserved as an issue of law.

12. Statute of limitations (Count 1). An issue of law for the Court on undisputed dates; a question for the jury only if a fact is disputed.

13. Failure to mitigate damages (Count 1). A question for the jury on which Dr. Byrne bears the burden by a preponderance of the evidence.

14. Failure to provide notice under Fla. Stat. § 770.01 (Count 1). Preserved as an issue of law; not argued to the jury. No finding of publication is requested or conceded.

15. Lack of publication (Count 1). The negation of an element on which Dr. Coomer bears the burden.

16. Consent and waiver (Count 1). A question for the jury only if the Court determines that the defense presents one, in which case Dr. Byrne bears the burden by a preponderance of the evidence.

17. Comparative fault (Count 1). An issue of law for the Court whether comparative fault is available under the governing law; a question for the jury only if it is.

18. Superseding and intervening causes (Count 1). A rule of causation on an element on which Dr. Coomer bears the burden.

19. Shotgun pleading (Count 2). Preserved as an issue of law.

20. Failure to state a claim for intentional infliction of emotional distress (Count 2). An issue of law for the Court in the first instance.

21. Lack of causation (Count 2). The negation of an element on which Dr. Coomer bears the burden.

22. Speculative and unproven damages (Count 2). The negation of an element on which Dr. Coomer bears the burden.

23. Failure to mitigate damages (Count 2). A question for the jury on which Dr. Byrne bears the burden by a preponderance of the evidence.

24. Statute of limitations (Count 2). An issue of law for the Court on undisputed dates; a question for the jury only if a fact is disputed.

25. Superseding and intervening causes (Count 2). A rule of causation on an element on which Dr. Coomer bears the burden.

26. Impermissibly duplicative claim (Count 2). An issue of law for the Court. *Fridovich*, 598 So. 2d at 70.

27. Shotgun pleading (Count 3). Preserved as an issue of law.

28. Failure to state a claim for civil conspiracy (Count 3). An issue of law for the Court in the first instance.

29. Impermissibly duplicative claim (Count 3). An issue of law for the Court.

30. Shotgun pleading (Count 4). Preserved as an issue of law.

31. Not a valid cause of action (Count 4). The claim states a remedy, not a cause of action; equitable relief is for the Court, and no jury instruction is requested.

32. Impermissibly duplicative claim (Count 4). An issue of law for the Court.

33. Shotgun pleading (Count 5). Preserved as an issue of law.

34. Not a valid cause of action (Count 5). An issue of law for the Court; punitive damages are submitted, if at all, only if liability is found.

35. Impermissibly duplicative claim (Count 5). An issue of law for the Court.

**Effect of this statement.** Under Local Rule 3.06(b) and paragraph 8 of the Case Management and Scheduling Order, this joint statement governs the trial. As to Dr. Byrne, it states his positions and his defenses in his own terms.

**(13) a list of each pending motion or other unresolved issue**

- Plaintiff's Motion for Summary Judgment (Doc. 333).
- Defendant Byrne's Motion for Summary Judgment (Doc. 334).
- Defendant's Byrne's Objections to Magistrate Report and Recommendations of August 27, 2026 (Doc. 365).

- Ruling on Magistrate's Order re Defendant Patrick Byrne and his counsel Peter Ticktin's Motion for Reconsideration Based on Newly Obtained Evidence (Doc. 357) and Request for an Evidentiary Hearing (Doc. 358).

- Defendant's Byrne's Supplemental Motion for Summary Judgment (Doc. 371).

- Plaintiff's Motion to Strike and, in the alternative, Response in Opposition to Defendant Patrick Byrne's Supplemental Motion for Summary Judgmeent (Doc. 372).

- Plaintiff's Motion for Determination that Florida Law Governs Defamation Claim and Punitive Damages (Doc. 373).

Dr. Byrne identifies the following additional pending motions and unresolved issues.

- The dismissal of Steven Lucescu and The America Project, Inc. Both are no longer parties. Doc. 351 ¶¶ 14, 77 (Mr. Lucescu); Docs. 347, 352. The motion for summary judgment of The America Project, Inc. (Doc. 336) is moot.

- Dr. Byrne's Motion for Pretrial Determinations under F.R.Civ.P. 16(c)(2), and his Motion for Pretrial Determinations on the Affirmative Defenses under F.R.Civ.P. 16(c)(2)(A) and (L), including the determination that no timely claim rests on the July 2022 showing in Naples, Florida.

- Dr. Byrne's motion under F.R.Civ.P. 42(b) to try the amount of any punitive damages in a second stage, and his motions under F.R.Civ.P. 43(a) concerning the trial testimony of Roger R. Richards and Joseph Oltmann.

- Dr. Byrne opposes the Plaintiff's Motion for Determination that Florida Law Governs Defamation Claim and Punitive Damages (Doc. 373), and contends that Colorado substantive law governs.

- Any motion by the Plaintiff concerning choice of law or the supplementation of non-retained expert disclosures.

- The motions in limine each party files on or before October 23, 2026, and the responses to them.

- No motion to amend the Answer is pending or sought; each affirmative defense is asserted as pleaded and, as to Count 1, as it applies to the claim as confined by Doc. 175 at 23.

Dr. Byrne estimates that the trial will occupy eight to ten trial days, within the 5-10 days that paragraph 5 of the Case Management and Scheduling Order allows, with time limits, stipulations, and designation reading to be set at the pretrial conference.

**(14) a statement of the usefulness of further settlement discussions**

The parties agree that further settlement discussions would not be productive and are unlikely to result in a resolution of this case. The parties reached an impasse at mediation.

**(15) the signatures of trial counsel and any pro se party following this certificate:**

"In preparing this final pretrial statement, I have aimed for the just, speedy, and inexpensive resolution of this action."

Respectfully submitted this 30th day of October 2026.

*/s/ Peter Ticktin*
Peter Ticktin, Esquire
Florida Bar No. 887935
David L. Perry II, Esquire
Florida Bar No. 1045902
Serv512@LegalBrains.com
Serv600@LegalBrains.com
**THE TICKTIN LAW GROUP**
270 SW Natura Avenue
Deerfield Beach, Florida 33441
(561) 232-2222
*Attorneys For Defendant*
*Patrick Byrne*